IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC, <br> TRIAD AT LAGRANGE I, LLC, <br> TRIAD AT LUMBER CITY I, LLC <br> TRIAD AT POWDER SPRINGS I, LLC <br> TRIAD AT THOMASVILLE I, LLC <br>     10 Roswell Street, Suite 210 <br>     Alpharetta, Georgia 30004 <br><br>             Plaintiffs <br><br> v. <br><br> MICHAEL O. LEAVITT, <br> Secretary of the U.S. Department of Health <br> and Human Services <br>     200 Independence Ave., S.W. <br>     Washington, D.C. 20001 <br><br> and <br><br> U.S. DEPARTMENT OF HEALTH AND <br> HUMAN SERVICES <br>     200 Independence Ave., S.W. <br>     Washington, D.C. 20001 <br><br> and <br><br> CENTERS FOR MEDICARE AND <br> MEDICAID SERVICES <br>     200 Independence Ave., S.W. <br>     Washington, D.C. 20001 <br><br> and <br><br> KERRY N. WEEMS, <br> Administrator of the Centers for Medicare <br> and Medicaid Services <br>     200 Independence Ave., S.W. <br>     Washington, D.C. 20001, <br><br>             Defendants | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * Case No. _____ <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

# 349707 JCT
011397-0019

## COMPLAINT FOR DECLARATORY AND TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (sometimes collectively "Triad") sue the United States Department of Health and Human Services ("HHS"), Michael O. Leavitt, solely in his official capacity as Secretary of HHS, the Centers for Medicare and Medicaid Services ("CMS"), and Kerry N. Weems, solely in his capacity as Administrator (collectively, the "Defendants") for declaratory and injunctive relief and state as follows:

### INTRODUCTION

1. Plaintiffs operate five nursing homes in the State of Georgia. A substantial part of the Plaintiffs' revenue is derived from providing care to Medicare beneficiaries. This case involves the improper and over-reaching attempt by CMS to recoup from Plaintiffs more than $2 million that was improperly paid by CMS to the prior operator of the Plaintiffs' nursing homes.

2. While Plaintiffs assumed the Medicare provider agreements of their predecessor, they did not assume liability for payments improperly made to their predecessor during a time when that operator provided no service whatsoever to Medicare beneficiaries, as it was no longer operating these facilities.

3. Despite prompt attempts by Plaintiffs to resolve this dispute, CMS has refused to suspend its recoupment action, which threatens the continued viability of Plaintiffs' nursing homes, as well as the health, well being and safety of the more than five hundred elderly residents of those facilities.

## PARTIES

4. Triad at Jeffersonville I, LLC, is a Georgia limited liability company that leases and operates a 131-bed nursing facility located in Jeffersonville, Georgia.

5. Triad at LaGrange I, LLC is a Georgia limited liability company that leases and operates a 138-bed nursing facility in LaGrange, Georgia.

6. Triad at Lumber City I, LLC is a Georgia limited liability company that leases and operates an 86-bed nursing facility in Lumber City, Georgia.

7. Triad at Powder Springs I, LLC is a Georgia limited liability company that leases and operates a 208-bed nursing facility in Powder Springs, Georgia.

8. Triad at Thomasville I, LLC is a Georgia limited liability company that leases and operates a 52-bed nursing facility in Thomasville, Georgia.

9. Defendant U.S. Department of Health and Human Services is the federal, executive branch agency that administers the Social Security program, including Medicare.

10. Defendant Michael O. Leavitt is the Secretary of HHS. In that capacity, he is responsible for the conduct and policies of HHS, including those of the Centers for Medicare and Medicaid Services. Secretary Leavitt is sued in his official capacity.

11. The Centers for Medicare and Medicaid Services ("CMS") is the agency within HHS responsible for administering the Medicare program.

12. Defendant Kerry N. Weems is the Administrator of CMS. As such, he is responsible or the conduct and policies of CMS, including those of the Fiscal Intermediaries who administer the payment of Medicare reimbursement to nursing homes providing skilled nursing care. Administrator Weeks is sued in his official capacity.

## JURISDICTION AND VENUE

13. Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e), as all Defendants reside in the District of Columbia.

## FACTS

15. Plaintiffs operate five nursing homes with a total of 615 licensed beds in the State of Georgia. All five nursing homes provide skilled nursing facility care to Medicare beneficiaries. Plaintiffs began leasing and operating these nursing homes on December 1, 2006, after the facilities' owner evicted the prior lessee and operator, Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc. (collectively "Mariner").

16. In December of 2003, the owner of the five nursing homes now leased and operated by Plaintiffs directed Mariner to vacate as these nursing homes had been leased to Plaintiffs. The owner directed Mariner to vacate on January 1, 2004 so Plaintiffs could take possession and begin operating the facilities.

17. Mariner refused to vacate the facilities as directed. After several years of litigation, the Georgia courts determined that Mariner had no lawful basis for retaining possession. See Mariner Health Care, Inc., et al. v. Foster, 280 Ga. App. 406, 634 S.E.2d 162 (2006), cert. denied (2006). Reluctantly, Mariner vacated the facilities and Plaintiffs began operating them on December 1, 2006.

18. The Medicare program, established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq., pays for certain medical care provided to eligible aged and disabled persons. Part A of the Medicare program involves reimbursement for

skilled nursing facility care. 42 U.S.C. § 1395i-3. Although previously reimbursed on a reasonable cost basis, Medicare now reimburses a skilled nursing facility on a prospective payment basis. 42 CFR § 413.330 et seq.

19. Typically, CMS reimburses a nursing home for care "only following submission of a bill." 42 CFR § 413.350. However, CMS may also pay for skilled nursing care pursuant to a periodic interim payment ("PIP") system. Under the PIP methodology, a nursing home is paid, on a bi-weekly basis, an amount as determined by the Fiscal Intermediary "by estimating the reimbursable amount for the year based on the previous year's experience," subject to certain adjustment. 42 CFR § 413.355(c).

20. Whether paid by submitting monthly bill relating services provided or 26 times a year pursuant to the PIP methodology, at the end of a fiscal year, the provider submits a cost report. Medicare audits the cost report and compares the amount paid to the provider and the amount actually due based on the care provided. If as a result of the audit Medicare determines that the amount paid is greater than the amount due, the overpayment is typically recovered by reducing the amount paid to the provider in the next fiscal year. The converse is true if the provider has been underpaid, i.e., the reimbursement due to the provider is paid during the next fiscal year.

21. Medicare regulations provide that Fiscal Intermediaries, private non-government organizations, administer the payment, reimbursement and audit process for various Medicare services, including payments to nursing homes that participate in the Medicare program and provide skilled nursing care.

22. On November 30, 2006, the day before Plaintiffs began operating the subject nursing homes, they filed five Medicare Provider/Supplier Enrollment

Applications alerting CMS that Mariner no longer operated these facilities and asking that the Medicare Provider Agreements and numbers be assigned to Plaintiffs, effective December 1, 2006.[1]

23. In January 2007, Plaintiffs contacted Blue Cross Blue Shield of Georgia ("BCBS"), the CMS Fiscal Intermediary responsible for skilled nursing facility services provided in Georgia, seeking information about the status of their applications. At that time, Plaintiff learned that they had used the wrong application form. Plaintiffs immediately filed new applications, using the correct form, on January 30, 2007. As before, the applications related that Plaintiffs began operating these facilities on December 1, 2006. The applications also related the prior operator's name, the doing business name of the nursing facilities, the prior operator's NPI, the name of the prior operator's Fiscal Intermediary (Mutual of Omaha), the prior operator's Medicare Information Number, the fact that Plaintiffs were "accepting assignment," and the "Effective Date of Transfer," i.e., December 1, 2006.

24. Plaintiff's Medicare Enrollment Applications for the five facilities in question alerted CMS that Mariner no longer operated these facilities and, along with Mariner's failure to submit bills seeking reimbursement, should have caused the Medicare payments to Mariner to end. However, that did not occur. Instead, the government sent periodic interim payments to Mariner on December 27, 2006, January 10 and 24, February 7 and 21, March 7 and 21, and April 4 and 18, 2007 for service

---

[1] Operators routinely accept assignment of the prior operator's Medicare provider agreement to avoid a break in service. If an operator filed an application for a new provider agreement, the operator would not receive Medicare reimbursement for care provided to beneficiaries during the period between the termination of the prior provider agreement and the issuance of a new provider agreement. Indeed, provider agreements are automatically assigned to subsequent providers of skilled nursing facility care. 42 CFR § 489.18(c).

periods that did not even begin until after Mariner surrendered the facilities to Plaintiffs on December 1, 2006.

25. Inexplicably, Mariner accepted these payments and has retained over $ 2.0 million in Medicare funds for services it did not provide. Needless to say, Mariner should have advised CMS that it should not have been paid these funds. Plaintiffs' efforts to have Mariner return these funds have not been successful. Clearly, CMS should take action to have Mariner return funds that should have not been paid.

26. In five separate letters dated February 11, 2008, CMS advised Plaintiffs that they were responsible for overpayments made for skilled nursing facility services as noted below:

| | |
|---|---:|
| Triad at Jeffersonville | $ 246,600 |
| Triad at LaGrange | 370,011 |
| Triad at Lumber City | 424,400 |
| Triad at Powder Springs | 946,700 |
| Triad at Thomasville | <u>215,771</u> |
| TOTAL | $2,203,482 |

27. The February 11, 2008 letters advised that unless Plaintiff paid these sums by February 25, 2008, the alleged overpayments would be recouped by withholding payments due for services provided to Medicare recipients during the previous thirty-day period and for services provided in the future until the purported $2.2 million overpayment was repaid.

28. The February 11, 2008 letters advised that Plaintiffs could object and claim that withholding "should not occur." The letters related that the Fiscal Intermediary, BCBS, would "review your documentation." However, the letters also advised that proceeding in this manner "will not delay recoupment."

29. In letters dated February 15 and 21, 2008, Plaintiffs' counsel advised BCBS that the moneys that CMS seeks to recoup from Plaintiffs ($2,203,482) involve periodic interim payments mistakenly and improperly paid by the Medicare program to Mariner, the prior operator of the five nursing homes now operated by Plaintiffs. These payments were made to Mariner beginning on December 28, 2006 and continuing through April 18, 2007, for periods of service when Mariner did not even operate the facilities and, of course, was not providing care to Medicare recipients because Plaintiffs began operating the facilities on December 1, 2006.

30. In a response to Plaintiffs' February 15 letter, BCBS claimed that the Plaintiffs are responsible for "overpayments" made to Mariner, the prior operator of these facilities, because the Plaintiffs accepted assignment of Mariner's Medicare provider numbers and agreements. In response to the fact that periodic interim payments were made to Mariner, <u>after</u> CMS had been told that Mariner was no longer providing services to Medicare recipients at these five facilities, BCBS cited CMS Publication 100-08, the <u>Medicare Program Integrity Manual</u>, Chapter 11.1B, which states that a Fiscal Intermediary "may not" change a provider's EFT payment method during a change of ownership (sometimes referred to as "CHOW"). The BCBS response also claimed "payment arrangements between old and new owners, in a [change of ownership] situation is [sic] strictly a civil matter."

31. In a February 21, 2008 letter to BCBS, Plaintiffs pointed out that CMS's obligation to stop making periodic interim payments to Mariner is unrelated to the change in ownership/assignment of Medicare provider agreement process. Rather, Plaintiffs related that CMS should have stopped making payments to Mariner when Mariner stopped submitting claims for services provided to Medicare recipients. As stated in the February 21 letter:

> This situation does not involve a change in a method of payment or a "payment arrangement[ ] between old and new owners." Rather, this situation involves approximately $2.0 million in Medicare funds paid to Mariner that <u>should not</u> have been paid at all. (emphasis in original)

32. 42 CFR § 413.350 provides that a SNF receiving payment under the prospective payment system may be paid under the PIP methodology for Part A services if qualifying criteria set forth in Section 413.64(h) are met. Section 413.350(b)(3)(ii) explicitly provides that an intermediary must terminate PIP "if the SNF no longer meets the requirements of Section 413.64(h)."

33. In describing a fiscal intermediary's monitoring function under the PIP program, Section 413.64(h)(7) provides:

> A significant factor in evaluating the amount of the payment in terms of the realization of the projected Medicare utilization of services is the timely submittal to the intermediary of completed admissions and billing forms. <u>All providers must complete billings in detail under this method as under regular interim payment procedures</u>. (emphasis added)

34. To obtain Medicare reimbursement under the PIP methodology, a provider must still submit detailed billing requests to the intermediary. Mariner discontinued doing so since no services to Medicare beneficiaries were provided after November 30,

2006. Because bills were not submitted and pursuant to its monitoring function, Mariner's Fiscal Intermediary, Mutual of Omaha, should not have made period interim payments for ten service periods <u>when no services were provided</u>.[2] As Mariner was no longer providing care to Medicare recipients, it no longer met the qualifying criteria for payment under the PIP methodology. *See* Section 413.64(h)(3) and (5).

35.  CMS cannot seek reimbursement from Plaintiffs for periodic interim payments that Mutual of Omaha improperly and erroneously paid to Mariner. Since those payments were inadvertently paid to Mariner for services that Mariner did not provide, CMS must seek reimbursement from Mariner. It may not recoup those funds by reducing reimbursement due to Plaintiffs for services actually provided to Medicare beneficiaries.

36.  Section 80.4 of the <u>Medicare Claim Processing Manual</u> provides "To remain on PIP, providers ... must submit 85 percent of their bills timely and accurately." That, obviously, did not happen here because Mariner submitted <u>no</u> bills for the nine service periods in question.

37.  In a February 21, 2008 response to the Plaintiffs' February 21 letter, the CMS Office of Financial Management advised that "CMS stands firm that, regardless of the conditions contributing to or resulting in an overpayment, the repayment of any debt owed to the Medicare program is the sole responsibility of the owner(s) of the provider agreement relating to the debt at the time the overpayment is determined." CMS further stated its position that because Plaintiffs accepted assignment of Mariner's provider agreements, "Triad is viewed <u>as the only responsible party</u> in repayment of the debt in

---

[2] The service periods are 12/1-13/06, 12/14-27/06, 12/28/06 – 1/10/07, 1/11-24/07, 1/25-2/7/07, 2/8-21/07, 2/22–3/7/07, 3/8-21/07 and 3/22-4/4/07, and 4/5-18/07.

question," regardless where the sums were deposited "<u>or the cause of the overpayments</u>" (emphasis added).

38. Ignoring the fact that Plaintiffs obtained possession and began operating the facilities after the Georgia Court of Appeals determined that Mariner had no right to retain possession of these nursing homes, CMS advised Plaintiffs to "pursue reimbursement from Mariner based on the terms of the sales agreement." For these reasons, CMS advised that it would begin withholding interim payments due to Plaintiffs on February 26, 2008, until more than $2.0 million in Medicare funds mistakenly paid to Mariner for care not provided to Medicare beneficiaries was "repaid."

39. 42 CFR § 489.18(c) provides that a provider agreement is automatically assigned to the new provider when there is a change of ownership. Section 489.18(e)(4) provides that the lease of all or part of a provider facility constitutes a change in ownership of the leased facility. The CMS letters issued on April 12, 2007 following review of the Plaintiffs' application advised that Mariner's Medicare agreements were "automatically assigned" to Plaintiffs effective December 1, 2006. Hence, since Plaintiffs became the provider under the Medicare agreements on December 1, 2006, CMS cannot maintain that more than $2 million paid to Mariner <u>after December 1, 2006</u> constitute overpayments to the provider, since, as of that date Mariner was no longer a provider since its agreement had been automatically assigned to Plaintiffs as of that date.

40. The five nursing homes/skilled nursing facilities operated by Plaintiffs receive reimbursement for Medicare services on a monthly basis, as a result of billing requests identifying the services provided to Medicare beneficiaries. For example, on January 31, 2008, CMS paid Plaintiffs approximately $775,000 for services provided

during the prior thirty-day period. Of course, these funds are used to pay expenses associated with that care, which costs have already been incurred and must be paid.

41. Plaintiffs submitted requests for payment to BCBS on February 8, 2008, seeking $798,477.95 in reimbursement for services provided for the month of January 2008. If CMS withholds those funds to recoup payments mistakenly paid to Mariner for services not provided, Plaintiffs will unable to continue providing skilled nursing and other care and services to the more than 500 frail elderly residents who live in these facilities and depend upon Plaintiffs for their care, safety and well being. Under these circumstances, and as addressed more fully below, Plaintiffs seek declaratory and injunctive relief preventing CMS from recouping $2.2 million mistakenly paid to Mariner by withholding Medicare reimbursement due to Plaintiffs.

42. In the February 21 response to Plaintiffs arguments that Medicare reimbursement due to them should not be withheld to "repay" funds that should not have been paid to Mariner, CMS takes the remarkable position that Plaintiffs are solely responsible for "repayment of the debt in question" regardless where the sums were deposited "or the cause of the overpayments." Equally shocking and erroneous is the statement that "CMS has no authority to attempt to collect these debts from Mariner."

43. Until Plaintiffs received the February 11, 2008 letters advising that Medicare funds mistakenly paid to Mariner would be recouped by withholding Medicare payments due to the Plaintiffs for services actually provided, they had no idea that payments to Mariner continued for service periods that did not even begin until after Mariner was no longer operating these facilities. CMS, however, maintains that the Plaintiffs are solely responsible for the payments erroneously paid to Mariner because

Plaintiffs accepted assignment for Mariner's provider agreements and therefore have "successor liability" for overpayments made to the predecessor operator, Mariner.

44. The five Notices of Desk Review sent to Plaintiffs (Provider #s 115354, 115413, 115538, 115404 and 115427) directed Plaintiffs to pay to CMS the funds improperly paid to Mariner no later than February 25, 2008, relating, "payments will be withheld [on February 26, 2008] until payment in full is received or an extended repayment request is received." However, under the circumstances described above, recoupment" should not occur beginning on February 26, 2008, because Plaintiffs are not obligated to repay funds that should not have been paid to Mariner.

45. If CMS is permitted to regain funds improperly paid to Mariner by withholding approximately $800,000 in Medicare reimbursement due to Plaintiffs on February 26, 2008, Plaintiffs will not have sufficient funds to continue operating these five nursing homes, rendering Plaintiffs incapable of continuing to provide care to the more than five hundred elderly residents of these five nursing homes. Specifically, if the Medicare payment due on February 26 is not made, Plaintiffs will not be have sufficient funds to pay the employees who provide care in Plaintiffs' five nursing homes.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully ask this Court to:

1    Enter a declaratory judgment that the Defendants may not withhold Medicare reimbursement due to Plaintiffs as a result of CMS mistakenly paying over $2.0 million to Mariner after Mariner stopped providing services to Medicare recipients;

2.    Enjoin the Defendants on a temporary, interlocutory and permanent basis from withholding Medicare reimbursement due to Plaintiffs as a result of CMS making

payments to Mariner after Mariner stopped providing services to Medicare recipients; and

    3.    Grant such other relief, as the Court deems proper and necessary.

Respectfully Submitted,

/s/ Jack C. Tranter

Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201-4033
(410) 727-7702

Attorneys for Plaintiffs

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Triad at Jefferson I, LLC, and Triad at LaGrange I, LLC, and Triad at Lumber City I, LLC, and Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC.

## DEFENDANTS

Michael O. Leavitt, Secretary of the U.S. Department of Health and Human Services, and U.S. Department of Health and Human Services, and Centers for Medicare and Medicaid Services, and Kerry N. Weems, Administrator of the Centers for Medicare and Medicaid Services

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Jack C. Tranter, Esq., Thomas C. Dame, Esq.,
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400, Baltimore, MD 21201
(410) 727-7702

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
⦿ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and <u>one</u> in a corresponding Nature of Suit)

○ **A.** *Antitrust*

☐ 410 Antitrust

○ **B.** *Personal Injury/Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C.** *Administrative Agency Review*

☒ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

⦿ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.** *General Civil (Other)*    OR    ○ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

## V. ORIGIN

⦿ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq.; 42 U.S.C. § 1395i-3; 42 CFR § 413.330 et seq.;42 CFR § 413.350; 42 CFR § 489.18(c)

## VII. REQUESTED IN COMPLAINT

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐  DEMAND $ Declaratory and Injunctive Relief  Check YES only if demanded in complaint  JURY DEMAND: YES ☐  NO ☒

## VIII. RELATED CASE(S) IF ANY

(See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE 2/26/2008   SIGNATURE OF ATTORNEY OF RECORD _[signature]_

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.