IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC, et al., | * | |
| | * | |
| Plaintiffs | | |
| | * | Case No. _____ |
| v. | * | |
| MICHAEL O. LEAVITT, et al., | * | |
| Defendants | * | |
| | * | |

## PLAINTIFFS' MOTION FOR TEMPORARY
## RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (sometimes collectively "Triad") hereby move, pursuant to Fed. R. Civ. P. 65 for a temporary restraining order or, in the alternative, for a preliminary injunction, and state:

1.    Plaintiffs submit and hereby incorporate a Memorandum in support of this Motion;

2.    Plaintiffs have submitted a Complaint and attached Affidavit in support of this Motion;

3.    If not enjoined, Defendants' actions will irreparably harm Plaintiffs who have no adequate remedy at law;

4.    The undersigned certifies that consent to this Motion could not be obtained from opposing counsel pursuant to LCvR 7(m) because opposing counsel had not yet been identified by Defendants.

WHEREFORE, Plaintiffs respectfully request that this Court issue an Order, as more fully described in the proposed Order attached and incorporated herein, enjoining Defendants preliminarily and permanently from asserting any right of recoupment or setoff against Plaintiffs for amounts paid on or after December 1, 2006 to the entities that previously operated Plaintiffs' nursing homes.

Respectfully Submitted,

Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702

Attorneys for Plaintiffs

# 349843 TCD
011397-0019

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,    *
et al.,
                              *

            Plaintiffs         *  Case No. _____ **08 0329**

v.                        *.

MICHAEL O. LEAVITT, et al.,    *

            Defendants     *

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (sometimes collectively "Triad") submit this Memorandum in Support of Motion for Temporary Restraining Order and/or Preliminary Injunction, and state:

### INTRODUCTION

Plaintiffs operate five nursing homes in the State of Georgia. A substantial part of the Plaintiffs' revenue is derived from providing care to Medicare beneficiaries. This case involves the improper and over-reaching attempt by the Centers for Medicare and Medicaid Services ("CMS") to recoup from the Plaintiffs substantial sums (approximately $2 million) that were improperly paid by CMS to the prior operator of the Plaintiffs' nursing homes . While the Plaintiffs assumed the Medicare provider agreements of their predecessor, effective December 1, 2006, they did not assume liability for payments improperly made and received during a time

**FILED**

FEB 2 6 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

when the predecessor provided no service whatsoever to Medicare recipients and the applicable provider agreements had already been assigned to Plaintiffs.

Despite prompt attempts by the Plaintiffs to resolve this dispute, CMS refuses to suspend its recoupment action, which seriously threatens the continued viability of the Plaintiffs' nursing homes. Accordingly, through this Motion, Plaintiffs seek temporary and/or preliminary injunctive relief to prevent CMS from endangering the continued viability of Plaintiffs' nursing homes, as well as the health, well being and safety of the more than five hundred elderly residents of those facilities.

## STATEMENT OF FACTS

### I.    The Parties

The Plaintiffs' nursing homes are operated by separate, but affiliated, entities. Triad at Jeffersonville I, LLC, is a Georgia limited liability company that leases and operates a 107-bed nursing facility located in Jeffersonville, Georgia. Triad at LaGrange I, LLC is a Georgia limited liability company that leases and operates a 138-bed nursing facility in LaGrange, Georgia. Triad at Lumber City I, LLC is a Georgia limited liability company that leases and operates an 86-bed nursing facility in Lumber City, Georgia. Triad at Powder Springs I, LLC is a Georgia limited liability company that leases and operates a 208-bed nursing facility in Powder Springs, Georgia. Triad at Thomasville I, LLC is a Georgia limited liability company that leases and operates a 52-bed nursing facility in Thomasville, Georgia.

Defendant U.S. Department of Health and Human Services is the federal, executive branch agency that administers the Social Security program, including Medicare. Defendant Michael O. Leavitt is the Secretary of HHS. In that capacity, he is responsible for the conduct and policies of HHS, including those of CMS. Secretary Leavitt is sued in his official capacity.

CMS is the agency within HHS responsible for administering the Medicare program. Defendant Kerry N. Weems is the Administrator of CMS. As such, he is responsible or the conduct and policies of CMS, including those of the fiscal intermediaries who administer payment of reimbursement to nursing homes providing skilled nursing care. Administrator Weems is sued in his official capacity.

## II.    Statutory and Regulatory Background

Established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq., the Medicare Program is a federal health insurance program for the aged, blind and disabled under which qualified health care providers, including nursing homes, are reimbursed by the federal government for the treatment and care provided to Medicare beneficiaries.

Part A of the Medicare program involves reimbursement paid for skilled nursing facility care.  42 U.S.C. § 1395i-3.  Although previously reimbursed on a reasonable cost basis, Medicare now reimburses a skilled nursing facility on a prospective payment basis. 42 C.F.R. Section 413.330 et seq. Typically, CMS reimburses a nursing home for care "only following submission of a bill."  42 C.F.R. § 413.350.  However, CMS may also pay for skilled nursing care pursuant to a periodic interim payment ("PIP") system.  Under the PIP methodology, a nursing home is paid, on a bi-weekly basis, an amount as determined by the Fiscal Intermediary "by estimating the reimbursable amount for the year based on the previous year's experience," subject to certain adjustment. 42 C.F.R. § 413.355(c).

Whether payment is made as a result of a provider submitting monthly bills or 26 times a year as a result of the PIP methodology, at the end of a fiscal year, the provider submits a cost report.  Medicare audits the cost report and compares the amount paid to the provider and the amount actually due based on the care provided.  If as a result of the audit Medicare determines

that the amount paid is greater than the amount due, the overpayment is typically recovered by reducing the amount paid to the provider in the next fiscal year. The converse is true if the provider has been underpaid, i.e., the reimbursement due to the provider is paid during the next fiscal year.

Medicare regulations provide that Fiscal Intermediaries, private non-government organizations, administer the payment, reimbursement and audit process for various Medicare services, including payments to nursing homes that participate in the Medicare program and provide skilled nursing care. In this case, as noted above, BCBS is the Fiscal Intermediary responsible for overseeing and auditing Medicare reimbursement for skilled nursing facility care provided by Plaintiffs.

### III.    **Factual Background**

####        A.    **History and Operation of Triad's Nursing Homes.**

Plaintiffs operate five nursing homes with a total of 615 licensed beds in the State of Georgia. All five nursing homes provide skilled nursing facility care to Medicare beneficiaries. Affidavit of Ronald M. Herbert, Jr. ("Herbert Affidavit"), paragraph 4. Plaintiffs assumed operation of the nursing homes on December 1, 2006 under a lease agreement after the owner of the facilities evicted the prior lessee and operator, Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc. (collectively "Mariner"). Id.

In December of 2003, more than four years ago the owner of the five nursing homes now leased and operated by Plaintiffs advised Mariner, which then occupied and operated the facilities, to vacate on January 1, 2004, as these nursing homes had been leased to Plaintiffs. Mariner refused to vacate the facilities as directed. After several years of litigation, the Georgia courts determined that Mariner had no lawful basis for retaining possession. See Mariner Health

Care, Inc. v. Foster, 634 S.E. 2d. 162 (Ga. App. 2006) cert. denied (2000).  Reluctantly, Mariner delivered the facilities to Plaintiffs and Plaintiffs began operating these five nursing homes on December 1, 2006.

Pursuant to Medicare regulations, effective December 1, 2006, the Plaintiffs assumed Mariner's Medicare provider agreements and Medicare provider numbers for the five nursing homes in order to provide continuous care without interruption of Medicare reimbursement for eligible services.  Herbert Affidavit, paragraph 8.  On November 30, 2006, the day before the Plaintiffs began operating the five nursing homes, Plaintiffs filed five Medicare Provider/Supplier Enrollment Applications alerting CMS that Mariner no longer operated these facilities and asking that the Medicare Provider Agreements and numbers be assigned to Plaintiffs, effective December 1, 2006.[1]  Id.

In January 2007, Plaintiffs later contacted BCBS seeking information about the status of their applications.  Id., paragraph 9.  At that time, Plaintiff learned that they had used the wrong application form.  Id.  Plaintiffs immediately filed new applications, using the correct form, on January 30, 2007.  Id.  As before, the applications related that Plaintiffs began operating these facilities on December 1, 2006.  Id.  The applications also related the prior operator's name, the doing business name of the nursing facilities, the prior operator's NPI, the name of the prior operator's Fiscal Intermediary (Mutual of Omaha), the prior operator's Medicare Information Number, the fact that Plaintiffs were "accepting assignment," and the "Effective Date of Transfer," i.e., December 1, 2006.  Id.

---

[1] Operators routinely accept assignment of the prior operator's Medicare provider agreement to avoid a break in service.  If an operator filed an application for a new provider agreement, the operator would not receive Medicare reimbursement for care provided to beneficiaries during the period between the termination of the prior provider

### B.    The Alleged "Overpayment."

As noted above, Plaintiff's Medicare Enrollment Applications for the five facilities in question alerted CMS that Mariner no longer operated these facilities and, along with Mariner's failure to submit bills seeking reimbursement, should have caused the Medicare payments to Mariner to end. Id., paragraph 11. However, that did not occur. Instead, the government sent payments to Mariner on December 27, 2006, January 10 and 24, February 7 and 21, March 7 and 21, and April 4, 2007 for service periods that did not even begin until after Mariner surrendered the facilities to Plaintiffs on December 1, 2006. Id., paragraph 6.

Inexplicably, Mariner accepted these payments and has retained over $ 2.0 million in Medicare funds for services it did not provide.  Needless to say, Mariner should have advised CMS that it should not have been paid these funds.  Plaintiffs' efforts to have Mariner return these funds have not been successful.  Clearly, CMS should take action to have Mariner return funds that should have not been paid.

Instead of pursuing Mariner, the party that improperly kept funds it was not entitled to retain, CMS took action only against Plaintiffs, who had no idea that approximately $2.0 million had been improperly and erroneously paid to Mariner. Id. In five separate letters dated February 11, 2008, BCBS claims that Plaintiffs are responsible for overpayments made for skilled nursing facility services as noted below:

| | |
|---|---|
| Triad at Jeffersonville | $ 246,600 |
| Triad at LaGrange | 370,011 |
| Triad at Lumber City | 424,400 |
| Triad at Powder Springs | 946,700 |

---

agreement and the issuance of a new provider agreement. Indeed, provider agreements are automatically assigned to subsequent providers of skilled nursing facility care. 42 C.F.R. § 489.18(c).

| | |
|---|---|
| Triad at Thomasville | 215,771 |
| TOTAL | $2,203,482 |

Id. (and attached Exhibit 1).

The February 11, 2008 letters advised that unless Plaintiffs paid these sums by February 25, 2008, the alleged overpayments would be recouped by withholding payments due for services provided to Medicare recipients during the previous thirty-day period and for services provided in the future until the purported $2.2 million overpayment was repaid. Id. The February 11, 2008 letters advised that Plaintiffs could object and claim that withholding "should not occur." The letters related that the Fiscal Intermediary, BCBS would "review your documentation." Id. However, the letters also advised that proceeding in this manner "will not delay recoupment." Id.

## VI.    Irreparable Injury

If interim injunctive relief is not granted as requested in this action, Plaintiffs will suffer devastating consequences, including the likely quick demise of their nursing home business.

On or about February 8, 2008, Plaintiffs submitted bills to the CMS Fiscal Intermediary responsible for reviewing bills and paying funds due to Plaintiffs, seeking $798,477.95 in Medicare reimbursement for services provided to Medicare beneficiaries in January 2008. Herbert Affidavit, paragraph 12.   Under the course of action announced by CMS, no reimbursement will be paid to Plaintiffs, as they expected.

If CMS and BCBS are allowed to retain almost $800,000 in Medicare reimbursement due to Plaintiffs to recoup funds that CMS erroneously and improperly paid to the prior operator, Plaintiffs will not have sufficient funds to continue operating. Id., paragraph 13. Needless to say, the health, safety, and well being of the more than 500 elderly residents of the five nursing

homes will be jeopardized if the Triad Entities do not have sufficient funds to continue providing care. Id.

Attached as Exhibit 3 to the Herbert Affidavit is a schedule relating the Plaintiffs' Accounts Payable and Available Cash (labeled "Running Total") as of February 22, 2008. Id., paragraph 14. This schedule also includes the Plaintiffs' Accounts Payable through March 25, 2008. Id. Also included are the projected amounts that Plaintiffs will be able to borrow as a result of services provided to Medicaid recipients and residents who are "private pay." Id. Although the Plaintiffs expected to receive funds from CMS for services provided to Medicare beneficiaries in January, these funds are not included because CMS has advised that they will be withheld to "recoup" payments improperly paid to the nursing facilities' prior operator for services that were not performed. Id.

Under the terms of Plaintiffs' Working Capital Loan, Medicare and Medicaid payments are sent to a lock box maintained by the lender, not to directly to Plaintiffs. Id., paragraph 15. The Triad Entities are entitled to advances under the Working Capital Loan based upon the submission of a "borrowing base certificate" to the lender. Id. Since Plaintiffs are due almost $800,000 for services and care provided in January and Triad anticipates that those funds would be electronically transferred to the lock box on February 26, roughly $160,000 in funds would have been available to Plaintiffs in addition to its normal borrowing base certificate to pay the accounts payable. Id.

As shown on Exhibit 3, payroll for the Plaintiffs in the approximate amount of $600,000 must be paid on March 6, 2008. Id., paragraph 16. As a result of payments that must be made prior to that date, Plaintiffs will have a deficit of ($171,870) on March 4. Id. Even with the

expected availability of $538,821 in funds as a result of Plaintiffs' borrowing base certificate, Plaintiffs will not have sufficient funds to pay their employees on March 6, as shown below:

| Date | Vendor/Payment | Amount | Balance |
|------|---------------|--------|---------|
| 2/29/08 | | | ($2,037.) |
| 3/4/08 | Ga. Dept. of Comm. Health | ($169,833.) | ($171,870.) |
| 3/6/08 | Funds Available Due to Borrowing Availability | $538,801. | $368,988. |
| 3/6/08 | Payroll | ($600,000.) | |

Id.

In sum, as shown above and as depicted on Exhibit 3, if the Medicare reimbursement due for care provided in January 2008 is not paid, Plaintiffs will not have sufficient funds to pay employees and "make payroll" on March 6, 2008. Id., paragraph 17. Moreover, to be able to make payroll on March 6, funds must be accessible no later than February 29, 2008. Id., paragraph 18.

## ARGUMENT

### I.    The Standard for Granting Preliminary Injunctive Relief

Under the standards set forth in applicable case law, plaintiffs are entitled to preliminary injunctive relief pending the outcome of this litigation. The legal standards applicable to Plaintiffs' request for preliminary injunctive relief are explained in Davenport v. Int'l Bhd. Of Teamsters, 166 F. 3d 356, 360 (D.C. Cir. 1999):

> A court considering a plaintiff's request for a preliminary injunction must examine whether: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction.

Davenport, 166 F.3d at 360; see also Virginia Petroleum Jobbers Ass'n v. FPC, 259 F. 2d 921, 925

(D.C. Cir. 1958). These factors interrelate on a sliding scale and must be balanced against each

other. Davenport, 166 F. 3d at 360.

**III.     Plaintiffs Present A Strong Likelihood of Success on the Merits.**

As explained below, the Defendants' threatened recoupment from Plaintiffs of the

substantial Medicare payments improperly paid to Mariner after the assignment of Mariner's

Medicare provider agreements to the Plaintiffs is illegal and baseless.

**A.     Applicable Medicare Regulations Do Not Permit Recoupment from
the Plaintiffs of Amounts Paid to Mariner After the Provider
Agreements Were Assigned to the Plaintiffs.**

Under appropriate circumstances, and pursuant to 42 C.F.R. § 405.371, CMS (or its

intermediary) is entitled to recoup Medicare overpayments from a provider by reducing present

or future Medicare payments due to the provider.  42 C.F.R. § 405.371(a)(2).  Moreover, in a

case involving a provider that accepted assignment of a prior operator's Medicare provider

agreement, CMS may pursue the new provider for liability arising out of the original provider

agreement.  42 C.F.R. § 489.18(d); United States v. Vernon Home Health, Inc., 21 F. 3d 693,

696 (5th Cir.), cert. denied, 513 U.S. 1015 (1994).

In this case, CMS seeks to do something remarkably different, i.e., it seeks to recover

from Plaintiffs payments that it improperly paid to Mariner after Mariner's Medicare provider

agreements had been assigned to Plaintiffs.  In accordance with 42 C.F.R. § 489.18(c), upon a

"change in ownership," the "existing provider agreement will automatically be assigned to the

new owner." In this case, the "change or ownership" occurred when Plaintiffs began leasing and

operating the nursing home on December 1, 2006.  See 42 C.F.R. § 489.18(a)(4) ("The lease of

all or part of a provider facility constitutes change of ownership of the leased portion").  Indeed,

in five letters sent to Plaintiffs on or about April 12, 2007, CMS acknowledged the change of

ownership of each nursing home and that each Medicare provider agreement had been automatically assigned to Plaintiffs, <u>effective December 1, 2006</u>. <u>See</u> Herbert Affidavit, paragraph 10 (and attached Exhibit 2).

Thus, beginning on December 1, 2006, Mariner had no right to be paid by CMS under any Medicare provider agreement applicable to the five subject nursing homes because those agreements had been assigned to the Plaintiffs as of that date. Accordingly, the Plaintiffs cannot be liable payments made to Mariner because all of those payments were made after the date of the assignment of the provider agreements.

If CMS had overpaid for care during the period when Mariner was actually operating the facilities and providing care to Medicare beneficiaries prior to the assignment of the Medicare provider agreements, effective December 1, 2006, Plaintiffs would be responsible for repaying the amount of any overpayment. <u>United States v. Vernon Home Health, Inc.</u>, supra. However, that is not what occurred here. Instead, CMS, through its intermediary, erroneously continued to make Medicare payments to Mariner long after Mariner stopped providing care to Medicare beneficiaries and after the provider agreements had been assigned to Plaintiffs. Under these circumstances, there is no legal justification for CMS to assert a right to repayment, much less through a recoupment of future payments on fifteen days notice.[2]

### B. Even if the Plaintiffs Were Responsible for Post-Assignment Payments to Mariner, the Plaintiffs are not Liable Because the Payments Were Not Made Properly by CMS.

Assuming <u>arguendo</u> that Plaintiffs are responsible for payments made to Mariner after the date of the automatic assignment of the provider agreements (which they are not) and after

---

[2] Under the apparent rationale of CMS, one can imagine any number of even more absurd scenarios under which Plaintiffs would be held liable for repayment. For example, presumably CMS would expect to recover from Plaintiffs mistaken payments made to Mariner even now after CMS has full knowledge of its mistake.

Mariner stopped providing care to Medicare beneficiaries, CMS cannot recoup the payments made to Mariner from Plaintiffs because the payments should have not been made under the applicable regulations.

First, as explained above, CMS erroneously and improperly made periodic interim payments to Mariner because Plaintiffs advised CMS in their Medicare enrollment applications first filed on November 30, 2006, that Plaintiffs began providing care to Medicare beneficiaries and other residents of the five nursing homes on December 1, 2006. Thus, CMS had actual notice, as of the date of the change of ownership, that Medicare payments to Mariner should cease because Mariner was no longer providing care to Medicare beneficiaries.

Second, the payments made to Mariner under periodic interim payment or PIP methodology were not permitted under the Medicare regulations. Specifically, 42 C.F.R. § 413.350 provides that a nursing home being paid under the prospective interim payment methodology may receive payments for Part A services only if qualifying criteria set forth in Section 413.64(h) are met. Section 413.350 explicitly provides that "an intermediary must terminate PIP payments" if the SNF no longer meets the requirement of Section 413.64(h). In describing a fiscal intermediary's monitoring function under the PIP program, Section 413.64(h)(7) provides:

> A significant factor in evaluating the amount of the payment in terms of the realization of the projected Medicare utilization of services is the timely submittal to the intermediary of completed admissions and billing forms. All providers must complete billings in detail under this method as under regular interim payment procedures. (emphasis added)

42 C.F.R. § 413.64(h)(7).

To obtain Medicare reimbursement under the atypical PIP system, a provider must still submit detailed billing requests to the intermediary. Mariner discontinued doing so when it stopped providing service to Medicare beneficiaries on November 30, 2006. Because bills were not submitted and pursuant to its monitoring function, Mariner's Fiscal Intermediary, Mutual of Omaha, should not have made periodic interim payments for ten service periods when no services were provided.[3] As Mariner was no longer providing care to Medicare recipients, it no longer met the

qualifying criteria for payment under the PIP methodology. *See* Section 413.64(h)(3) and (5).

CMS cannot seek reimbursement from Plaintiffs for periodic interim payments that Mutual of Omaha improperly and erroneously paid to Mariner. Since those payments were inadvertently paid to Mariner for services that Mariner did not provide, CMS must seek reimbursement from Mariner. It may not recoup those funds by reducing reimbursement to Plaintiffs for services actually provided to Medicare beneficiaries.

Section 80.4 of the Medicare Claim Processing Manual provides "To remain on PIP, providers ... must submit 85 percent of their bills timely and accurately." That, obviously, did not happen here because Mariner submitted no bills for the ten service periods in question. Mutual of Omaha improperly continued making PIP payments to Mariner after Mariner stopped providing service to Medicare beneficiaries on November 30, 2006. Payments should not have been made beginning on December 27, 2006 and continuing at biweekly intervals through May 2, 2007, as no bills were submitted seeking reimbursement during that period.

---

[3] The service periods are 12/1-13/06, 12/14-27/06, 12/28/06 – 1/10/07, 1/11-24/07, 1/25-2/7/07, 2/8-21/07, 2/22–3/7/07, 3/8-21/07, 3/22-4/4/07, and 4/5-18/07.

III.    **The Balance of the Hardships Decidedly Favors Plaintiffs.**

    A.    **Plaintiffs Will Suffer Irreparable
          Harm Absent Preliminary Injunctive Relief.**

        1.    **The Plaintiffs Will Suffer The Irreparable
             Loss of Their Nursing Home Business.**

If preliminary injunctive relief is denied in this case, the Medicare payments to Plaintiffs will cease and Plaintiffs will be unable to pay their employees and vendors and continue providing care to the more than five hundred elderly residents of their nursing homes. Without Medicare reimbursements, Triad cannot fund expenses that are necessary to the continued provision of care. Triad likely will be forced to terminate all of its employees and cease operating the nursing homes. Triad, accordingly, will suffer extreme and irreparable harm unless the Court grants injunctive relief preventing Medicare from withholding reimbursement payments pending the outcome of this litigation.

In International Long Term Care, Inc. v. Shalala, 947 F. Supp 15 (D. D.C. 1996), this Court recognized the irreparable nature of the precise harm present here. In that case, the Honorable Paul Friedman granted a preliminary injunction in favor of a nursing home to preserve Medicare funding. Judge Friedman determined that the nursing home "might well be forced to close its doors, and the residents might have to be transferred." International Long Term Care, 947 F. Supp. at 18. Judge Friedman held "[t]his is just the sort of irreparable and unnecessary harm that carefully tailored, limited injunctive relief is intended to prevent." Id.

Likewise, in Mediplex of Massachusetts, Inc. v. Shalala, 39 F. Supp. 2d 88 (D. Ma. 1999), a case involving a nursing home being terminated from the Medicare program, the Court found irreparable harm in the form of harm to the patients and harm to viability of the facility, and granted a preliminary injunction in favor of the nursing home to prevent the termination of Medicare

14

payments. Mediplex, 39 F. Supp. at 98-100. See also Libbie Rehabilitation Center, Inc. v. Shalala,

26 F. Supp. 2d 128 (D. D.C. 1998) (preliminary injunction granted based on a finding of irreparable

harm to nursing home); Beverly Enterprises v. Mathews, 432 F. Supp. 1073 (D. D.C. 1976) (finding

of irreparable harm to a nursing home as a result of a suspension of Medicare payments).

> **2.     Absent Injunctive Relief, Nursing Home Residents Will be Irreparably Injured.**

In addition to the devastating financial impact that will occur immediately to the Plaintiffs'

business, the health, safety, and well being of the more than 500 elderly residents of the five

nursing homes will be jeopardized if Plaintiffs do not have sufficient funds to continue providing

care. Herbert Affidavit, paragraph 13. As noted above, in International Long Term Care, Judge

Friedman cited the hardship on residents, who might be required to be transferred as a result of

the actions by Medicare in that case, as irreparable injury that ought to be avoided. International

Long Term Care, 947 F. Supp. at 18.

> **B.     Defendants Will Suffer No Hardship If The Court Grants Preliminary Injunctive Relief.**

Defendants will suffer no harm if Plaintiffs' request for injunctive relief is granted. The only

"hardship" that Defendants can claim is the requirement that they provide administrative services

associated with making Medicare payments to Plaintiffs pending the outcome of this litigation. In

Libbie Rehabilitation, 26 F. Supp. 2d at 132-33, the Court characterized this type of "harm" as

"minimal to non-existent." Other courts have also balanced the government's potential harm

against the harm to providers and have determined that any harm to the government is significantly

outweighed by the risk of harm to the provider and its patients if interlocutory injunctive relief is not

afforded. Mediplex, 39 F. Supp.2d at 100-101; International Long Term Care, 947 F. Supp. at 19.

In sum, the certain irreparable harm and injury to Plaintiffs and the many elderly residents of the

nursing homes they operate, absent injunctive relief, clearly outweighs the *de minimus*

administrative burden resulting from CMS continuing to review bills submitted by Plaintiffs and sending Medicare reimbursement to them as a compensation for services provided to Medicare beneficiaries.

### IV.    The Public Interest Will Be Served by Granting Preliminary Injunctive Relief.

The public interest factor weighs heavily in favor of granting preliminary injunctive relief. Without injunctive relief, the public will suffer because, as explained above, the Triad nursing homes will not continue in business if CMS is permitted to recoup from Plaintiffs approximately $2.0 million paid to Mariner for services not provided to Medicare beneficiaries, which payments were made after the effective date of the assignment of Mariner's provider agreements to Plaintiffs. As a result, the health, well being and safety of the more than five hundred elderly residents of Plaintiffs' nursing homes will be at risk, as they will be forced to relocate to other nursing homes, assuming, of course, that placements for so many of the individuals needing nursing home care can even be found. Under the circumstance here, the public has a significant, important and legitimate interest in the continued payment for Medicare services at the nursing facilities operated by Plaintiffs and the continued operation of those facilities during the pendancy of this litigation. International Long Term Care, 947 F. Supp at 20.

### CONCLUSION

For the reasons described above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction.

Respectfully Submitted,

Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201-4033
(410) 727-7702

Attorneys for Plaintiffs

# 349708 TCD
011397-0015

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,        *
et al.,
                                       *

          Plaintiffs
                                       *    Case No. _____

v.                                     *

MICHAEL O. LEAVITT, et al.,            *

          Defendants
                                       *

### AFFIDAVIT OF RONALD M. HERBERT, JR.
### SUPPORTING PLAINTIFF'S MOTION FOR TEMPORARY
### RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

    1.    My name is Ronald M. Herbert, Jr. I am at least 21 years of age and I am competent to testify to the matters set forth herein. I am the Chief Operating Officer of Triad Senior Living, LLC ("TSL").

    2.    Adam Ashpes, Chief Executive Officer of TSL, and I each own 50% of TSL, Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC.

    3.    TSL has entered into management agreements with Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (collectively, the "Triad Entities.") Pursuant to those agreements, TSL performs all accounting functions for the Triad Entities.

4.     The Triad Entities lease and operate five nursing facilities with 615 licensed beds in Georgia. All five nursing facilities participate in the Medicare program and provide skilled nursing care to Medicare beneficiaries.

5.     On February 12, 2008, the Triad facilities received letters dated February 11, 2008 from Blue Cross Blue Shield of Georgia ("BCBS"), the Fiscal Intermediary that administers the Medicare program in Georgia for the Center for Medicare and Medicaid Services ("CMS"), the agency within the U.S. Department of Health and Human Services responsible for administering the Medicare program. True and correct copies of these letters are attached as Exhibit 1.

6.     The February 11 letters advised that CMS would withhold Medicare reimbursement due to the Triad Entities unless $2,203,482 was paid to CMS on or before February 25, 2008. If that sum is unpaid, the February 11 letters advised that Medicare would withhold Medicare reimbursement due to the Triad Entities until $2,203,482 was "repaid." The February 11 letters asserted that the following "overpayments" were made for each of the nursing homes:

| | |
|---|---|
| Triad at Jeffersonville | $ 246,600 |
| Triad at LaGrange | 370,011 |
| Triad at Lumber City | 424,400 |
| Triad at Powder Springs | 946,700 |
| Triad at Thomasville | 215,771 |
| TOTAL | $2,203,482 |

7.    As related in the Complaint for Declaratory and Temporary, Preliminary and Permanent Injunctive Relief prepared by TSL and the Triad Entities' counsel, approximately $2 million of the amount that CMS seeks to recoup from the Triad Entities represents funds erroneously paid by CMS to the prior operator of the five nursing facilities for service periods that did not even begin until after the Triad Entities began operating the Facilities on December 1, 2006.

8.    On November 30, 2006, the day before Triad began operating the five nursing homes, Triad filed five Medicare Provider/Supplier Enrollment Applications alerting CMS that Mariner no longer operated these facilities and asking that the Medicare Provider Agreements and numbers be assigned to Plaintiffs, effective December 1, 2006.    Operators routinely accept assignment of the prior operator's Medicare provider agreement to avoid a break in service.    If an operator filed an application for a new provider agreement, the operator would not receive Medicare reimbursement for care provided to beneficiaries during the period between the termination of the prior provider agreement and the issuance of a new provider agreement.

9.    In January 2007, Triad contacted Blue Cross Blue Shield of Georgia ("BCBS"), the CMS Fiscal Intermediary responsible for skilled nursing facility services provided in Georgia, seeking information about the status of their applications. At that time, Triad learned that the wrong application form had been used.    Triad immediately filed new applications, using the correct form, on January 30, 2007.    As before, the applications related that Plaintiffs began operating these facilities on December 1, 2006. The applications also related the prior operator's name, the doing business name of the

nursing facilities, the prior operator's NPI, the name of the prior operator's Fiscal Intermediary (Mutual of Omaha), the prior operator's Medicare Information Number, the fact that Plaintiffs were "accepting assignment," and the "Effective Date of Transfer," i.e., December 1, 2006.

10.    Through four letters dated April 12, 2007 and one dated April 26, 2007 (addressed to the facility operated by Triad at Jeffersonville I, LLC), CMS acknowledged to Triad that the change of ownership of each of the five nursing homes was effective on December 1, 2006, and that each of the applicable provider agreements of the prior owner was automatically assigned to the new owner. True and correct copies of the letters acknowledging change of ownership are collectively attached as Exhibit 2.

11.    Because (1) the Triad Entities advised CMS on November 30, 2006 that they would begin operating the facilities on December 1, 2006; (2) the prior operator did not submit bills for any services provided to Medicare beneficiaries after November 30, 2006, as it was no longer operating the facilities and providing care; and (3) payments were made to the prior operator after the Medicare provider agreements were automatically assigned to the Triad Entities effective December 1, 2006, the Triad Entities do not believe that CMS may regain funds improperly paid to the prior operator by withholding Medicare reimbursement that is due for services provided by the Triad Entities.

12.    On or about February 8, 2008, TSL, on behalf of the Triad Entities, submitted bills to BCBS, the CMS Fiscal Intermediary responsible for reviewing bills and paying funds due to the Triad Entities, seeking $798,477.95 in Medicare reimbursement for services provided to Medicare beneficiaries in January 2008.

13. If CMS and BCBS are allowed to retain almost $800,000 in Medicare reimbursement due to the Triad Entities to recoup funds that CMS erroneously and improperly paid to the prior operator, the Triad Entities will not have sufficient funds to continue operating. Needless to say, the health, safety, and well being of the more than 500 elderly residents of the five nursing homes will be jeopardized if the Triad Entities do not have sufficient funds to continue providing care.

14. Attached as Exhibit 3 is a schedule relating the Triad Entities' Accounts Payable and Available Cash (labeled "Running Total") as of February 22, 2008. This schedule also includes the Triad Entities' Accounts Payable through March 25, 2008. Also included are the projected amounts that TSL will be able to borrow as a result of services provided to Medicaid recipients and residents who are "private pay." Although the Triad Entities expected to receive funds from CMS on or about February 26, 2008 for services provided to Medicare beneficiaries in January, these funds are not included because CMS has advised that they will be withheld to "recoup" payments improperly paid to the nursing facilities' prior operator for services that were not performed.

15. Under the terms of TSL's Working Capital Loan, Medicare and Medicaid payments are sent to a lock box maintained by the lender, not to directly to TSL. The Triad Entities are entitled to advances under the Working Capital Loan based upon the submission of a "borrowing base certificate" to the lender. Since the Triad Entities are due almost $800,000 for services and care provided in January and Triad anticipates that those funds would be electronically transferred to the lock box on or about February 26, roughly $160,000 in funds would have been available to TSL in addition to its normal borrowing base certificate to pay the Triad Entities' accounts payable.

16.     As shown on Exhibit 3, payroll for the Triad Entities in the approximate amount of $600,000 must be paid on March 6, 2008. As a result of payments that must be made prior to that date, the Triad Entities will have a deficit of ($171,870) on March 4. Even with the expected availability of $538,821 in funds as a result of TSL's borrowing base certificate, the Triad Entities will not have sufficient funds to pay their employees on March 6, as shown below:

| Date | Vendor/Payment | Amount | Balance |
|------|----------------|--------|---------|
| 2/29/08 | | | ($2,037.) |
| 3/4/08 | Ga. Dept. of Comm. Health | ($169,833.) | ($171,870.) |
| 3/6/08 | Funds Available Due to Borrowing Availability | $538,801. | $368,988. |
| 3/6/08 | Payroll | ($600,000.) | |

17.     As shown above and as depicted on Exhibit 3, if the Medicare reimbursement due for care provided in January 2008 is not paid, the Triad Entities will not have sufficient funds to pay employees and "make payroll" on March 6, 2008.

18.     To be able to make payroll on March 6, funds must be accessible to TSL no later than February 29, 2008.

I solemnly affirm under the penalties of perjury that the contents of the foregoing Affidavit are true and correct to the best of my knowledge, information, and belief.

**2.26.2008**
Date

_____ C.O.O.
Ronald M. Herbert, Jr.

# 349786 JCT
011397-0019

6

**MEDICARE PART A**
**INTERMEDIARY**
Fax (706) 257-1082

**CMS**

CENTERS for MEDICARE & MEDICAID SERVICES

February 11, 2008

Mr. Ronald Herbert
Triad at Jeffersonville 1, LLC
10 Roswell Street Suite 210
Alpharetta, GA 30004

7004 2510 0000 5663 6353
RETURN RECEIPT REQUESTED
CERTIFIED MAIL
TENTATIVE REVIEW

| | |
|---|---|
| Provider #: | 115413 |
| Period Ended: | 06/30/2007 |
| Overpayment: | (246,600.00) |
| Payment Due Date: | 02/25/2008 |
| Withhold Date: | 02/26/2008 |
| Int. Penalty Begin Date: | 03/12/2008 |
| Interest Rate: | 12.125% |

Dear Mr. Herbert:

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

As Filed Due Provider (Plan)

| | | | |
|---|---|---|---|
| 1. | As Filed Part A | 0.00 | |
| 2. | As Filed Part B | 0.00 | 0.00 |

Total Review Adjustment

| | | | |
|---|---|---|---|
| 1. | Review Adjustment Part A | (246,600.00) | |
| 2. | Review Adjustment Part B | 0.00 | (246,600.00) |

Total Tentative Settlement

| | | | |
|---|---|---|---|
| 1. | Tentative Settlement Part A | (246,600.00) | |
| 2. | Tentative Settlement Part B | 0.00 | (246,600.00) |

Ck recd with As Filed Cost Report

Offset

Offset

Balance

| | | | |
|---|---|---|---|
| 1. | Balance Part A | (246,600.00) | |
| 2. | Balance Part B | 0.00 | (246,600.00) |

Blue Cross and Blue Shield of Georgia
Provider Audit and Reimbursement - 2357 Warm Springs Road - Columbus, Georgia 31904
An Independent Licensee of The Blue Cross and Blue Shield Association
*A CMS Contracted Intermediary*

**EXHIBIT**

*1*

tabbies

Mr. Ronald Herbert
Triad at Jeffersonville 1, LLC
Alpharetta, GA 30004

| | |
|---|---:|
| Offset | _____ |
| Offset | _____ |
| Late Filed Interest Part A | _____ |
| Late Filed Interest Part B | _____ |
| Adjusted Balance Due Provider (Plan) | (246,600.00) |

We have tentatively reviewed your cost report and the results of our review have revealed that your facility has been overpaid the amount shown above.

We request that you refund this amount in full. You have 15 days from the date of this letter (Payment Due Date shown above) to submit payment to the Medicare program. If payment in full is not received by your payment due date, your payments will be withheld until payment in full is received or an extended repayment request is received. If you have reason to believe that the withhold should not occur, you must notify us immediately. We will review your documentation, but we will not delay recoupment. This is not an appeal of the overpayment determination. The appeal process is detailed in the NPR. In addition, in accordance with 42 CFR 447.30, if we do not receive payment in full or an extended repayment request (along with a check for the first proposed payment), we may initiate a request that your Federal share of Title XIX (Medicaid) be withheld, if applicable. If this withholding is initiated it will not be removed until payment in full is received or an acceptable extended repayment request is received and approved.

If payment in full is not received, simple interest at the annual rate shown above will be charged on your unpaid balance beginning on the 31st day (Interest Penalty Begin Date) in accordance with 42 CFR 405.378. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made in full. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged and will continue to be assessed for full 30-day periods on any portion that remains outstanding until the debt is paid in full. Each payment will be applied first to accrued interest and then to principal. After each payment interest will continue to accrue on the remaining principal balance at the rate shown above.

If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine if you are eligible for a repayment plan. You must explain and document your need for an extended repayment plan (ERP) showing financial hardship. Any repayment schedule (where one is approved) would run from the date of this letter. Requests for extended repayments of 12 months or more must be accompanied by at least one letter from a financial institution denying your loan request for the amount of this overpayment. For details concerning applying for an ERP and the necessary documentation to support an ERP request, please refer to our website at www.georgiamedicare.com/AuditandReimbursement.cfm#6. You have 15 days from the date of this letter (Payment Due Date) to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full amount before suspension of interim payments begins. Any amount withheld will not be refunded.

Mr. Ronald Herbert                                                    Page 3
Triad at Jeffersonville 1, LLC
Alpharetta, GA 30004

Per CMS guidelines, pursuant to 1866(b)(2)(A) and ( c ) of title XVIII, continued failure to respond may result in termination of the agreement if your overpayment is $1,000 or more.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process.   Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly.  If possible, when notifying us about the bankruptcy please include the name the bankruptcy is filed under and the district where bankruptcy is filed.

Your check, made payable to the Centers for Medicare & Medicaid Services, should include your provider number, and should be sent to the following address:

> Provider Audit & Reimbursement
> Attn:  Sandra Ludwig
> P.O. Box 9048
> Columbus, GA  31904

If we can assist you further in the resolution of this matter, please call Sandra Ludwig at 706-257-1073.

Sincerely,

Laura Martin
Provider Reimbursement

Enclosure

DATE        02/11/2008

TENTATIVE REVIEW
PROVIDER #                    11-5413
PERIOD ENDED·          06/30/2007
DUE DATE:
DELINQUENT DATE:

Dear

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

As Filed Due Provider (Plan)

| | | | |
|---|---|---|---|
| 1. | As Filed Part A | 0 | |
| 2. | As Filed Part B | 0 | 0 |

Total Review Adjustment

| | | | |
|---|---|---|---|
| 1. | Review Adjustment Part A | (246,600) | |
| 2. | Review Adjustment Part B | 0 | (246,600) |

Total Tentative Settlement

| | | | |
|---|---|---|---|
| 1. | Tentative Settlement Part A | (246,600) | |
| 2. | Tentative Settlement Part B | 0 | (246,600) |

Check Received for As Filed

Offset for As Filed

Offset for As Filed

Previous Tentative Payment/Recovery

Balance

1.    Balance Part A

2.    Balance Part B

Late Filed Cost Report Interest

Offset

Offset

Adjusted Balance Due Provider (Plan)

## WORKSHEET E PART III
## SNF
## Part A

NAME:    Triad at Jeffersonville I, LLC
PROV #.   115413
FYE      06/30/2007

LWS
DATE:   02/07/2008

| | | INPUT DATA ONLY | REVISED | VARIANCE |
|---|---|---|---|---|
| 7 | INPT ROUTINE PPS AMOUNT | 843,356 | 804,508 | (38,848) |
| 8 | PRIMARY PAYOR AMOUNT | 0 | 0 | 0 |
| 9 | COINSURANCE | 223,146 | 240,661 | 17,515 |
| | DEDUCTIBLE | 0 | 0 | 0 |
| 10 | BAD DEBTS | 0 | 0 | 0 |
| 14 | SUBTOTAL | 620,210 | 563,847 | (56,363) |
| 16 | INTERIM PAYMENTS * | 620,210 | 810,447 | 190,237 |
| 17 | BALANCE DUE | 0 | (246,600) | (246,600) |

* Interim Payments

PS&R      563,847
Lump Sum 1  246,600   per mutual of Omaha
Lump Sum 2  0

Total    810,447

---

NAME:    Triad at Jeffersonville I, LLC
PROV #.   115413
FYE:     06/30/2008

| | |
|---|---|
| AS FILED BAD DEBTS | 0 |
| REIMB PERCENT | 0.75 |
| AMOUNT PAYABLE | $0 |



**CENTERS for MEDICARE & MEDICAID SERVICES**

## MEDICARE PART A
## INTERMEDIARY
Fax (706) 257-1082

February 11, 2008

Mr. Ronald Herbert
Triad at LaGrange I, LLC
10 Roswell Street Suite 210
Alpharetta, GA 30004

7004 2510 0000 5663 6339
RETURN RECEIPT REQUESTED
CERTIFIED MAIL
TENTATIVE REVIEW

| | |
|---|---:|
| Provider #: | 115354 |
| Period Ended: | 06/30/2007 |
| Overpayment: | (370,011.00) |
| Payment Due Date: | 02/25/2008 |
| Withhold Date: | 02/26/2008 |
| Int. Penalty Begin Date: | 03/12/2008 |
| Interest Rate: | 12.125% |

Dear Mr. Herbert:

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

| | | | | |
|---|---|---|---:|---:|
| As Filed Due Provider (Plan) | | | | |
| | 1. | As Filed Part A | 69,393.00 | |
| | 2. | As Filed Part B | 0.00 | 69,393.00 |
| Total Review Adjustment | | | | |
| | 1. | Review Adjustment Part A | (439,404.00) | |
| | 2. | Review Adjustment Part B | 0.00 | (439,404.00) |
| Total Tentative Settlement | | | | |
| | 1. | Tentative Settlement Part A | (370,011.00) | |
| | 2. | Tentative Settlement Part B | 0.00 | (370,011.00) |
| Ck recd with As Filed Cost Report | | | | |
| Offset | | | | |
| Offset | | | | |
| Balance | | | | |
| | 1. | Balance Part A | (370,011.00) | |
| | 2. | Balance Part B | 0.00 | (370,011.00) |

**Blue Cross and Blue Shield of Georgia**
Provider Audit and Reimbursement - 2357 Warm Springs Road - Columbus, Georgia 31904
An Independent Licensee of The Blue Cross and Blue Shield Association
*A CMS Contracted Intermediary*

Mr. Ronald Herbert                                                        Page 2
Triad at LaGrange I, LLC
Alpharetta, GA 30004

Offset                                                          _____

Offset                                                          _____

Late Filed Interest Part A                                      _____

Late Filed Interest Part B                                      _____

Adjusted Balance Due Provider (Plan)                            (370,011.00)
                                                                _____

We have tentatively reviewed your cost report and the results of our review have revealed that your facility has been
overpaid the amount shown above.

We request that you refund this amount in full. You have 15 days from the date of this letter (Payment Due Date shown
above) to submit payment to the Medicare program. If payment in full is not received by your payment due date, your
payments will be withheld until payment in full is received or an extended repayment request is received. If you have
reason to believe that the withhold should not occur, you must notify us immediately. We will review your
documentation, but we will not delay recoupment. This is not an appeal of the overpayment determination. The
appeal process is detailed in the NPR. In addition, in accordance with 42 CFR 447.30, if we do not receive payment
in full or an extended repayment request (along with a check for the first proposed payment), we may initiate a request
that your Federal share of Title XIX (Medicaid) be withheld, if applicable. If this withholding is initiated it will not
be removed until payment in full is received or an acceptable extended repayment request is received and approved.

If payment in full is not received, simple interest at the annual rate shown above will be charged on your
unpaid balance beginning on the 31st day (Interest Penalty Begin Date) in accordance with 42 CFR 405.378. Interest
is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made in full. Thus, if
payment is received 31 days from the date of final determination, one 30-day period of interest will be charged and will
continue to be assessed for full 30-day periods on any portion that remains outstanding until the debt is paid in full.
Each payment will be applied first to accrued interest and then to principal. After each payment interest will continue
to accrue on the remaining principal balance at the rate shown above.

If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine
if you are eligible for a repayment plan. You must explain and document your need for an extended repayment
plan (ERP) showing financial hardship. Any repayment schedule (where one is approved) would run from the date of
this letter. Requests for extended repayments of 12 months or more must be accompanied by at least one letter
from a financial institution denying your loan request for the amount of this overpayment. For details concerning
applying for an ERP and the necessary documentation to support an ERP request, please refer to our website at
www.georgiamedicare.com/AuditandReimbursement.cfm#6. You have 15 days from the date of this letter (Payment
Due Date) to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full
amount before suspension of interim payments begins. Any amount withheld will not be refunded.

Mr. Ronald Herbert                                                                Page 3
Triad at LaGrange 1, LLC
Alpharetta, GA 30004

Per CMS guidelines, pursuant to 1866(b)(2)(A) and ( c ) of title XVIII, continued failure to respond may result in termination of the agreement if your overpayment is $1,000 or more.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy please include the name the bankruptcy is filed under and the district where bankruptcy is filed.

Your check, made payable to the Centers for Medicare & Medicaid Services, should include your provider number, and should be sent to the following address:

> Provider Audit & Reimbursement
> Attn:  Sandra Ludwig
> P.O. Box 9048
> Columbus, GA  31904

If we can assist you further in the resolution of this matter, please call Sandra Ludwig at 706-257-1073.

Sincerely,

Laura Martin

Laura Martin
Provider Reimbursement

Enclosure

# WORKSHEET E PART III
## SNF
### Part A

| | | LWS DATE: | 02/07/2008 |
|---|---|---|---|
NAME: Triad at LaGrange I, LLC
PROV #: 115354
FYE: 06/03/2007

| | | INPUT DATA ONLY | REVISED | VARIANCE |
|---|---|---|---|---|
| 7 | INPT ROUTINE PPS AMOUNT | 1,100,302 | 1,043,352 | (56,950) |
| 8 | PRIMARY PAYOR AMOUNT | 0 | 0 | 0 |
| 9 | COINSURANCE | 325,102 | 327,334 | 2,232 |
| | DEDUCTIBLE | 0 | 0 | 0 |
| 10 | BAD DEBTS | 69,393 | 69,393 | 0 |
| 14 | SUBTOTAL | 844,593 | 785,411 | (59,182) |
| 16 | INTERIM PAYMENTS * | 775,200 | 1,155,422 | 380,222 |
| 17 | BALANCE DUE | 69,393 | (370,011) | (439,404) |

* Interim Payments

| PS&R | 716,018 |
|---|---|
| Lump Sum 1 | 47,604 |
| Lump Sum 2 | 391,800 | per mutual of Omaha
| Total | 1,155,422 |

NAME: Triad at LaGrange I, LLC
PROV #: 115354
FYE: 06/30/2008

| AS FILED BAD DEBTS | 69,393 |
|---|---|
| REIMB PERCENT | 0.75 |
| AMOUNT PAYABLE | $52,045 |



CENTERS for MEDICARE & MEDICAID SERVICES

# MEDICARE PART A
## INTERMEDIARY
Fax (706) 257-1082

February 11, 2008

Mr. Ronald Herbert
Triad at Lumber City I, LLC
10 Roswell Street Suite 210
Alpharetta, GA 30004

7004 2510 0000 5663 6346
RETURN RECEIPT REQUESTED
CERTIFIED MAIL
TENTATIVE REVIEW

| | |
|---|---|
| Provider #: | 115404 |
| Period Ended: | 06/30/2007 |
| Overpayment: | (424,400.00) |
| Payment Due Date: | 02/25/2008 |
| Withhold Date: | 02/26/2008 |
| Int. Penalty Begin Date: | 03/12/2008 |
| Interest Rate: | 12.125% |

Dear Mr. Herbert:

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

| | | | | |
|---|---|---|---|---|
| As Filed Due Provider (Plan) | | | | |
| | 1. | As Filed Part A | 0.00 | |
| | 2. | As Filed Part B | 0.00 | 0.00 |
| Total Review Adjustment | | | | |
| | 1. | Review Adjustment Part A | (424,400.00) | |
| | 2. | Review Adjustment Part B | 0.00 | (424,400.00) |
| Total Tentative Settlement | | | | |
| | 1. | Tentative Settlement Part A | (424,400.00) | |
| | 2. | Tentative Settlement Part B | 0.00 | (424,400.00) |
| Ck recd with As Filed Cost Report | | | | |
| Offset | | | | |
| Offset | | | | |
| Balance | | | | |
| | 1. | Balance Part A | (424,400.00) | |
| | 2. | Balance Part B | 0.00 | (424,400.00) |

**Blue Cross and Blue Shield of Georgia**
Provider Audit and Reimbursement - 2357 Warm Springs Road - Columbus, Georgia 31904
An Independent Licensee of The Blue Cross and Blue Shield Association
*A CMS Contracted Intermediary*

Mr. Ronald Herbert                                                          Page 2
Triad at Lumber City I, LLC
Alpharetta, GA 30004


Offset                                                          _____

Offset                                                          _____

Late Filed Interest Part A                                      _____

Late Filed Interest Part B                                      _____

Adjusted Balance Due Provider (Plan)                            (424,400.00)
                                                                _____

We have tentatively reviewed your cost report and the results of our review have revealed that your facility has been
overpaid the amount shown above.

We request that you refund this amount in full. You have 15 days from the date of this letter (Payment Due Date shown
above) to submit payment to the Medicare program. If payment in full is not received by your payment due date, your
payments will be withheld until payment in full is received or an extended repayment request is received. If you have
reason to believe that the withhold should not occur, you must notify us immediately. We will review your
documentation, but we will not delay recoupment. This is not an appeal of the overpayment determination. The
appeal process is detailed in the NPR. In addition, in accordance with 42 CFR 447.30, if we do not receive payment
in full or an extended repayment request (along with a check for the first proposed payment), we may initiate a request
that your Federal share of Title XIX (Medicaid) be withheld, if applicable. If this withholding is initiated it will not
be removed until payment in full is received or an acceptable extended repayment request is received and approved.

If payment in full is not received, simple interest at the annual rate shown above will be charged on your
unpaid balance beginning on the 31st day (Interest Penalty Begin Date) in accordance with 42 CFR 405.378. Interest
is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made in full. Thus, if
payment is received 31 days from the date of final determination, one 30-day period of interest will be charged and will
continue to be assessed for full 30-day periods on any portion that remains outstanding until the debt is paid in full.
Each payment will be applied first to accrued interest and then to principal. After each payment interest will continue
to accrue on the remaining principal balance at the rate shown above.

If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine
if you are eligible for a repayment plan. You must explain and document your need for an extended repayment
plan (ERP) showing financial hardship. Any repayment schedule (where one is approved) would run from the date of
this letter. Requests for extended repayments of 12 months or more must be accompanied by at least one letter
from a financial institution denying your loan request for the amount of this overpayment. For details concerning
applying for an ERP and the necessary documentation to support an ERP request, please refer to our website at
www.georgiamedicare.com/AuditandReimbursement.cfm#6. You have 15 days from the date of this letter (Payment
Due Date) to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full
amount before suspension of interim payments begins. Any amount withheld will not be refunded.

Mr. Ronald Herbert                                                                Page 3
Triad at Lumber City I, LLC
Alpharetta, GA 30004

Per CMS guidelines, pursuant to 1866(b)(2)(A) and ( c ) of title XVIII, continued failure to respond may result in
termination of the agreement if your overpayment is $1,000 or more.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will
be resolved in accordance with the applicable bankruptcy process.   Accordingly, we request that you immediately
notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services
and the Department of Justice to assure that we handle your situation properly.   If possible, when notifying us about
the bankruptcy please include the name the bankruptcy is filed under and the district where bankruptcy is filed.

Your check, made payable to the Centers for Medicare & Medicaid Services, should include your provider number,
and should be sent to the following address:

                    Provider Audit & Reimbursement
                    Attn:  Sandra Ludwig
                    P.O. Box 9048
                    Columbus, GA  31904

If we can assist you further in the resolution of this matter, please call Sandra Ludwig at 706-257-1073.

Sincerely,

Laura Martin
Provider Reimbursement

Enclosure

SNF-TENT

WORKSHEET E PART III ,
SNF
Part A

NAME:     Triad at Lumber City I, LLC
PROV #:   115404
FYE:      06/30/2007

LWS
DATE:     02/07/2008

|  | | INPUT DATA ONLY | REVISED | VARIANCE |
|---|---|---|---|---|
| 7 | INPT ROUTINE PPS AMOUNT | 837,192 | 771,554 | (65,638) |
| 8 | PRIMARY PAYOR AMOUNT | 0 | 0 | 0 |
| 9 | COINSURANCE | 201,556 | 232,778 | 31,222 |
|  | DEDUCTIBLE | 0 | 0 | 0 |
| 10 | BAD DEBTS | 0 | 0 | 0 |
| 14 | SUBTOTAL | 635,636 | 538,776 | (96,860) |
| 16 | INTERIM PAYMENTS * | 635,636 | 963,176 | 327,540 |
| 17 | BALANCE DUE | 0 | (424,400) | (424,400) |

* Interim Payments

PS&R          538,776
Lump Sum 1    424,400    per mutual of Omaha
Lump Sum 2    0
   Total      963,176

---

NAME:     Triad at Lumber City I, LLC
PROV #:   115404
FYE:      06/30/2008

| AS FILED BAD DEBTS | 0 |
|---|---|
| REIMB PERCENT | 0.75 |
| AMOUNT PAYABLE | $0 |



**MEDICARE PART A**
**INTERMEDIARY**
Fax (706) 257-1082

February 11, 2008

7004 2510 0000 5663 6360

Mr. Ronald Herbert
Triad at Powder Springs I, LLC
10 Roswell Street Suite 210
Alpharetta, GA 30004

RETURN RECEIPT REQUESTED
CERTIFIED MAIL
TENTATIVE REVIEW

| | |
|---|---:|
| Provider #: | 115538 |
| Period Ended: | 06/30/2007 |
| Overpayment: | (946,700.00) |
| Payment Due Date: | 02/25/2008 |
| Withhold Date: | 02/26/2008 |
| Int. Penalty Begin Date: | 03/12/2008 |
| Interest Rate: | 12.125% |

Dear Mr. Herbert:

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

As Filed Due Provider (Plan)

| | | | | |
|---|---|---|---:|---:|
| | 1. | As Filed Part A | 0.00 | |
| | 2. | As Filed Part B | 0.00 | 0.00 |
| Total Review Adjustment | | | | |
| | 1. | Review Adjustment Part A | (946,700.00) | |
| | 2. | Review Adjustment Part B | 0.00 | (946,700.00) |
| Total Tentative Settlement | | | | |
| | 1. | Tentative Settlement Part A | (946,700.00) | |
| | 2. | Tentative Settlement Part B | 0.00 | (946,700.00) |
| Ck recd with As Filed Cost Report | | | | |
| Offset | | | | |
| Offset | | | | |
| Balance | | | | |
| | 1. | Balance Part A | (946,700.00) | |
| | 2. | Balance Part B | 0.00 | (946,700.00) |

**Blue Cross and Blue Shield of Georgia**
Provider Audit and Reimbursement - 2357 Warm Springs Road - Columbus, Georgia 31904
An Independent Licensee of The Blue Cross and Blue Shield Association
*A CMS Contracted Intermediary*

Mr. Ronald Herbert                                                                      Page 2
Triad at Powder Springs I, LLC
Alpharetta, GA 30004

Offset                                                                        _____

Offset                                                                        _____

Late Filed Interest Part A                                                    _____

Late Filed Interest Part B                                                    _____

Adjusted Balance Due Provider (Plan)                                          (946,700.00)
                                                                              _____

We have tentatively reviewed your cost report and the results of our review have revealed that your facility has been
overpaid the amount shown above.

We request that you refund this amount in full. You have 15 days from the date of this letter (Payment Due Date shown
above) to submit payment to the Medicare program. If payment in full is not received by your payment due date, your
payments will be withheld until payment in full is received or an extended repayment request is received. If you have
reason to believe that the withhold should not occur, you must notify us immediately. We will review your
documentation, but we will not delay recoupment. This is not an appeal of the overpayment determination. The
appeal process is detailed in the NPR. In addition, in accordance with 42 CFR 447.30, if we do not receive payment
in full or an extended repayment request (along with a check for the first proposed payment), we may initiate a request
that your Federal share of Title XIX (Medicaid) be withheld, if applicable. If this withholding is initiated it will not
be removed until payment in full is received or an acceptable extended repayment request is received and approved.

If payment in full is not received, simple interest at the annual rate shown above will be charged on your
unpaid balance beginning on the 31st day (Interest Penalty Begin Date) in accordance with 42 CFR 405.378. Interest
is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made in full. Thus, if
payment is received 31 days from the date of final determination, one 30-day period of interest will be charged and will
continue to be assessed for full 30-day periods on any portion that remains outstanding until the debt is paid in full.
Each payment will be applied first to accrued interest and then to principal. After each payment interest will continue
to accrue on the remaining principal balance at the rate shown above.

If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine
if you are eligible for a repayment plan. You must explain and document your need for an extended repayment
plan (ERP) showing financial hardship. Any repayment schedule (where one is approved) would run from the date of
this letter. Requests for extended repayments of 12 months or more must be accompanied by at least one letter
from a financial institution denying your loan request for the amount of this overpayment. For details concerning
applying for an ERP and the necessary documentation to support an ERP request, please refer to our website at
www.georgiamedicare.com/AuditandReimbursement.cfm#6. You have 15 days from the date of this letter (Payment
Due Date) to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full
amount before suspension of interim payments begins. Any amount withheld will not be refunded.

Mr. Ronald Herbert                                                                                    Page 3
Triad at Powder Springs I, LLC
Alpharetta, GA 30004

Per CMS guidelines, pursuant to 1866(b)(2)(A) and ( c ) of title XVIII, continued failure to respond may result in termination of the agreement if your overpayment is $1,000 or more.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy please include the name the bankruptcy is filed under and the district where bankruptcy is filed.

Your check, made payable to the Centers for Medicare & Medicaid Services, should include your provider number, and should be sent to the following address:

                    Provider Audit & Reimbursement
                    Attn:  Sandra Ludwig
                    P.O. Box 9048
                    Columbus, GA  31904

If we can assist you further in the resolution of this matter, please call Sandra Ludwig at 706-257-1073.

Sincerely,

Laura Martin
Provider Reimbursement

Enclosure

WORKSHEET E PART III

SNF

Part A

NAME:      Triad Powder Springs I, LLC          LWS
PROV #:    115                                   DATE:      02/07/2008
FYE:       06/2007

| | INPUT DATA ONLY | REVISED | VARIANCE |
|---|---|---|---|
| 7   INPT ROUTINE PPS AMOUNT | | | |
| 8   PRIMRY PAYOR AMOUNT | 2,773,450 | 2,545,647 | (227,803) |
| 9   COINRANCE | 0 | 0 | 0 |
|     DEDUTIBLE | 522,945 | 527,285 | 4,340 |
| 10  BAD DBTS | 0 | 0 | 0 |
| 14  SUBTAL | 0 | 0 | 0 |
| 16  INTER PAYMENTS * | 2,250,505 | 2,018,362 | (232,143) |
| | 2,250,505 | 2,965,062 | 714,557 |
| 17  BALANE DUE | 0 | (946,700) | (946,700) |

* Interim Payments

PS&R            2,018,36 ✓
Lump Sum 1      946,700  per mutual of Omaha
Lump Sum 2      0
   Total        2,965,06

NAME:      Triad at Powder Springs I, LLC
PROV #:    115538
FYE:       06/30/2008

AS FILED BAD DEBTS          0

REIMB PERCENT            0.75

AMOUNT PAYABLE          $0



**MEDICARE PART A**
**INTERMEDIARY**
Fax (706) 257-1082

February 11, 2008

Mr. Ronald Herbert
Triad at Thomasville I, LLC
10 Roswell Street Suite 120
Alpharetta, GA, GA 30004

7004 2510 0000 5663 6834
RETURN RECEIPT REQUESTED
CERTIFIED MAIL
TENTATIVE REVIEW

| | |
|---|---|
| Provider #: | 115427 |
| Period Ended: | 06/30/2007 |
| Overpayment: | (215,771.00) |
| Payment Due Date: | 02/25/2008 |
| Withhold Date: | 02/26/2008 |
| Int. Penalty Begin Date: | 03/12/2008 |
| Interest Rate: | 12.125% |

Dear Mr. Herbert:

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

As Filed Due Provider (Plan)

| | | | | |
|---|---|---|---|---|
| | 1. | As Filed Part A | 7,735.00 | |
| | 2. | As Filed Part B | 0.00 | 7,735.00 |
| Total Review Adjustment | | | | |
| | 1. | Review Adjustment Part A | (223,506.00) | |
| | 2. | Review Adjustment Part B | 0.00 | (223,506.00) |
| Total Tentative Settlement | | | | |
| | 1. | Tentative Settlement Part A | (215,771.00) | |
| | 2. | Tentative Settlement Part B | 0.00 | (215,771.00) |
| Ck recd with As Filed Cost Report | | | | |
| Offset | | | | |
| Offset | | | | |
| Balance | | | | |
| | 1. | Balance Part A | (215,771.00) | |
| | 2. | Balance Part B | 0.00 | (215,771.00) |

**Blue Cross and Blue Shield of Georgia**
Provider Audit and Reimbursement - 2357 Warm Springs Road - Columbus, Georgia 31904
An Independent Licensee of The Blue Cross and Blue Shield Association
*A CMS Contracted Intermediary*

Mr. Ronald Herbert                                                    Page 2
Triad at Thomasville I, LLC
Alpharetta, GA, GA 30004

Offset

Offset                                                              _____

Late Filed Interest Part A                                          _____

Late Filed Interest Part B                                          _____

Adjusted Balance Due Provider (Plan)                                _____
                                                                    (215,771.00)

We have tentatively reviewed your cost report and the results of our review have revealed that your facility has been overpaid the amount shown above.

We request that you refund this amount in full. You have 15 days from the date of this letter (Payment Due Date shown above) to submit payment to the Medicare program. If payment in full is not received by your payment due date, your payments will be withheld until payment in full is received or an extended repayment request is received. If you have reason to believe that the withhold should not occur, you must notify us immediately. We will review your documentation, but we will not delay recoupment. This is not an appeal of the overpayment determination. The appeal process is detailed in the NPR. In addition, in accordance with 42 CFR 447.30, if we do not receive payment in full or an extended repayment request (along with a check for the first proposed payment), we may initiate a request that your Federal share of Title XIX (Medicaid) be withheld, if applicable. If this withholding is initiated it will not be removed until payment in full is received or an acceptable extended repayment request is received and approved.

If payment in full is not received, simple interest at the annual rate shown above will be charged on your unpaid balance beginning on the 31st day (Interest Penalty Begin Date) in accordance with 42 CFR 405.378. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made in full. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged and will continue to be assessed for full 30-day periods on any portion that remains outstanding until the debt is paid in full. Each payment will be applied first to accrued interest and then to principal. After each payment interest will continue to accrue on the remaining principal balance at the rate shown above.

If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine if you are eligible for a repayment plan. You must explain and document your need for an extended repayment plan (ERP) showing financial hardship. Any repayment schedule (where one is approved) would run from the date of this letter. Requests for extended repayments of 12 months or more must be accompanied by at least one letter from a financial institution denying your loan request for the amount of this overpayment. For details concerning applying for an ERP and the necessary documentation to support an ERP request, please refer to our website at www.georgiamedicare.com/AuditandReimbursement.cfm#6. You have 15 days from the date of this letter (Payment Due Date) to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full amount before suspension of interim payments begins. Any amount withheld will not be refunded.

Mr. Ronald Herbert                                                            Page 3
Triad at Thomasville I, LLC
Alpharetta, GA, GA 30004

Per CMS guidelines, pursuant to 1866(b)(2)(A) and ( c ) of title XVIII, continued failure to respond may result in termination of the agreement if your overpayment is $1,000 or more.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy please include the name the bankruptcy is filed under and the district where bankruptcy is filed.

Your check, made payable to the Centers for Medicare & Medicaid Services, should include your provider number, and should be sent to the following address:

> Provider Audit & Reimbursement
> Attn: Sandra Ludwig
> P.O. Box 9048
> Columbus, GA  31904

If we can assist you further in the resolution of this matter, please call Sandra Ludwig at 706-257-1073.

Sincerely,

Laura Martin
Provider Reimbursement

Enclosure

WORKSHEET E PART III
SNF
Part A

NAME:    Triad at Thomasville I, LLC
PROV #:   115427
FYE:     06/30/2007

LWS
DATE:   02/07/2008

| | INPUT DATA ONLY | REVISED | VARIANCE |
|---|---|---|---|
| 7 INPT ROUTINE PPS AMOUNT | 554,005 | 551,955 | (2,050) |
| 8 PRIMARY PAYOR AMOUNT | 0 | 0 | 0 |
| 9 COINSURANCE | 139,307 | 139,803 | 496 |
| DEDUCTIBLE | 0 | 0 | 0 |
| 10 BAD DEBTS | 7,735 | 7,735 | 0 |
| 14 SUBTOTAL | 422,433 | 419,887 | (2,546) |
| 16 INTERIM PAYMENTS * | 414,698 | 635,658 | 220,960 |
| 17 BALANCE DUE | 7,735 | (215,771) | (223,506) |

* Interim Payments

PS&R       412,152 √
Lump Sum 1  218,200/per mutual of Omaha
Lump Sum 2  5,306 √

Total     635,658

NAME:    Triad at Thomasville I, LLC
PROV #:   115427
FYE:     06/30/2008

| | |
|---|---|
| AS FILED BAD DEBTS | 7,735 |
| REIMB PERCENT | 0.75 |
| AMOUNT PAYABLE | $5,801 |

Department of Health & Human Services
Centers for Medicare & Medicaid Services
61 Forsyth St., Suite. 4T20
Atlanta, Georgia 30303-8909



April 12, 2007

Maggie Sudduth, Administrator
Thomasville Nursing & Rehabilitation Center*
120 Skyline Drive
Thomasville, Georgia 31757

Dear Ms. Sudduth:                    Re: SNF CMS Certification Number (CCN): **11-5427**

We have been notified of the change in the ownership of your facility effective **December 1, 2006.**

When there is a change of ownership, the Medicare agreement between the Secretary of Health and Human Services and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement. These include: correcting deficiencies previously cited, complying with Title VI of the Civil Rights Act, complying with applicable health and safety requirements, and submitting the Ownership and Financial Interest Disclosure Statement to the Centers for Medicare & Medicaid Services.

Effective with the change of ownership the following apply:

**PREVIOUS**                              **NEW**
Provider #: 11-5427                       Provider #: 11-5427
Effective Date: 07/31/95                  Effective Date: **12/01/06**
Intermediary/Code: Mutual (52280)         Intermediary/Code: **BC/BS GA (00101)**
FYE: 03/31                                FYE: 06/30

Payment may be made for services rendered by your facility under the new ownership until your compliance with all Medicare requirements can be confirmed by an on-site survey. Payments will be discontinued upon the expiration of your provider agreement if certification requirements are not met.

You must take steps to maintain required records and information necessary to allocate the costs for furnishing services to beneficiaries. Payments made under Medicare are subject to a final cost report. Your fiscal intermediary will contact you shortly concerning the cost report. They will explain any records and information which will be needed to validate these costs. **Blue Cross/Blue Shield of Georgia (00101) and Mutual of Omaha (52280)** have been notified by copy of this letter.

Page 2

**EXHIBIT**
tabbies
2

Should you have any questions concerning this matter, please contact Patricia Pearson at (404) 562-7441.

Sincerely,

Patricia Pearson for

Sandra M. Pace
Associate Regional Administrator
Division of Survey & Certification

**NOTE TO THE FISCAL INTERMEDIARY:**
**THIS LETTER REPLACES THE CMS-2007, PROVIDER TIE-IN NOTICE.**

**\*Formerly: Brian Center of Thomasville**

Department of Health & Human Services
Centers for Medicare & Medicaid Services
61 Forsyth St., Suite. 4T20
Atlanta, Georgia 30303-8909



April 12, 2007

Michael Stewart, Administrator
Lumber City Nursing & Rehabilitation Center*
Georgia Highway 19
Lumber City, Georgia 31549

Dear Mr. Stewart:                    Re: SNF CMS Certification Number (CCN): **11-5404**

We have been notified of the change in the ownership of your facility effective **December 1, 2006.**

When there is a change of ownership, the Medicare agreement between the Secretary of Health and Human Services and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement. These include: correcting deficiencies previously cited, complying with Title VI of the Civil Rights Act, complying with applicable health and safety requirements, and submitting the Ownership and Financial Interest Disclosure Statement to the Centers for Medicare & Medicaid Services.

Effective with the change of ownership the following apply:

**PREVIOUS**                        **NEW**
Provider #: 11-5404                 Provider #: 11-5404
Effective Date: 07/31/95            Effective Date: **12/01/06**
Intermediary/Code: Mutual (52280)   Intermediary/Code: **BC/BS GA (00101)**
FYE: 03/31                          FYE: 06/30

Payment may be made for services rendered by your facility under the new ownership until your compliance with all Medicare requirements can be confirmed by an on-site survey. Payments will be discontinued upon the expiration of your provider agreement if certification requirements are not met.

You must take steps to maintain required records and information necessary to allocate the costs for furnishing services to beneficiaries. Payments made under Medicare are subject to a final cost report. Your fiscal intermediary will contact you shortly concerning the cost report. They will explain any records and information which will be needed to validate these costs. **Blue Cross/Blue Shield of Georgia (00101)** and **Mutual of Omaha (52280)** have been notified by copy of this letter.

Page 2

Should you have any questions concerning this matter, please contact Patricia Pearson at (404) 562-7441.

Sincerely,

Patricia Pearson for

Sandra M. Pace
Associate Regional Administrator
Division of Survey & Certification

NOTE TO THE FISCAL INTERMEDIARY:
THIS LETTER REPLACES THE CMS-2007, PROVIDER TIE-IN NOTICE.

*Formerly: Brian Center Nursing Care/Lumber City

Department of Health & Human Services
Centers for Medicare & Medicaid Services
61 Forsyth St., Suite. 4T20
Atlanta, Georgia 30303-8909



April 12, 2007

Fred Youngman, Administrator
Power Springs Nursing & Rehabilitation Center*
3460 Powder Springs Road
Powder Springs, Georgia 30127

Dear Mr. Youngman:                Re: SNF CMS Certification Number (CCN): **11-5538**

We have been notified of the change in the ownership of your facility effective **December 1, 2006.**

When there is a change of ownership, the Medicare agreement between the Secretary of Health and Human Services and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement. These include: correcting deficiencies previously cited, complying with Title VI of the Civil Rights Act, complying with applicable health and safety requirements, and submitting the Ownership and Financial Interest Disclosure Statement to the Centers for Medicare & Medicaid Services.

Effective with the change of ownership the following apply:

**PREVIOUS**                          **NEW**
Provider #: 11-5538                    Provider #: 11-5538
Effective Date: 07/31/95              Effective Date: **12/01/06**
Intermediary/Code: Mutual (52280)     Intermediary/Code: **BC/BS GA (00101)**
FYE: 03/31                             FYE: **06/30**

Payment may be made for services rendered by your facility under the new ownership until your compliance with all Medicare requirements can be confirmed by an on-site survey. Payments will be discontinued upon the expiration of your provider agreement if certification requirements are not met.

You must take steps to maintain required records and information necessary to allocate the costs for furnishing services to beneficiaries. Payments made under Medicare are subject to a final cost report. Your fiscal intermediary will contact you shortly concerning the cost report. They will explain any records and information which will be needed to validate these costs. **Blue Cross/Blue Shield of Georgia (00101)** and **Mutual of Omaha (52280)** have been notified by copy of this letter.

Page 2

Should you have any questions concerning this matter, please contact Patricia Pearson at (404) 562-7441.

Sincerely,

Patricia Pearson for

Sandra M. Pace
Associate Regional Administrator
Division of Survey & Certification

**NOTE TO THE FISCAL INTERMEDIARY:**
**THIS LETTER REPLACES THE CMS-2007, PROVIDER TIE-IN NOTICE.**

**\*Formerly: Brian Center Nursing Care**

Department of Health & Human Services
Centers for Medicare & Medicaid Services
61 Forsyth St., Suite. 4T20
Atlanta, Georgia 30303-8909



April 12, 2007

Judy Walker, Administrator
LaGrange Nursing & Rehabilitation Center*
2111 West Point Road
LaGrange, Georgia  30240

Dear Ms. Walker:                              Re: SNF CMS Certification Number (CCN): **11-5354**

We have been notified of the change in the ownership of your facility effective **December 1, 2006.**

When there is a change of ownership, the Medicare agreement between the Secretary of Health and Human Services and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement. These include: correcting deficiencies previously cited, complying with Title VI of the Civil Rights Act, complying with applicable health and safety requirements, and submitting the Ownership and Financial Interest Disclosure Statement to the Centers for Medicare & Medicaid Services.

Effective with the change of ownership the following apply:

**PREVIOUS**                                  **NEW**
Provider #: 11-5354                           Provider #: 11-5354
Effective Date: 07/31/95                      Effective Date: **12/01/06**
Intermediary/Code: Mutual (52280)             Intermediary/Code: **BC/BS GA (00101)**
FYE: 03/31                                    FYE: 06/30

Payment may be made for services rendered by your facility under the new ownership until your compliance with all Medicare requirements can be confirmed by an on-site survey. Payments will be discontinued upon the expiration of your provider agreement if certification requirements are not met.

You must take steps to maintain required records and information necessary to allocate the costs for furnishing services to beneficiaries. Payments made under Medicare are subject to a final cost report. Your fiscal intermediary will contact you shortly concerning the cost report. They will explain any records and information which will be needed to validate these costs. **Blue Cross/Blue Shield of Georgia (00101)** and **Mutual of Omaha (52280)** have been notified by copy of this letter.

Page 2

Should you have any questions concerning this matter, please contact Patricia Pearson at (404) 562-7441.

Sincerely,

Patricia Pearson for

Sandra M. Pace
Associate Regional Administrator
Division of Survey & Certification

NOTE TO THE FISCAL INTERMEDIARY:
THIS LETTER REPLACES THE CMS-2007, PROVIDER TIE-IN NOTICE.

*Formerly: Brian Center Health & Rehab/LaGrange

Department of Health & Human Services
Centers for Medicare & Medicaid Services
61 Forsyth St., Suite. 4T20
Atlanta, Georgia 30303-8909



CENTERS for MEDICARE & MEDICAID SERVICES

April 26, 2007

Frances Faulk, Administrator
Jeffersonville Nursing and Rehabilitation Center
113 Spring Valley Drive
Jeffersonville, Georgia 31044

Dear Ms. Faulk:                              SNF CMS Certification Number (CCN) 11-5413

We have been notified of the change in the ownership of your facility effective **December 1, 2006.**

When there is a change of ownership, the Medicare agreement between the Secretary of Health and Human Services and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement.  These include: correcting deficiencies previously cited, complying with Title VI of the Civil Rights Act, complying with applicable health and safety requirements, and submitting the Ownership and Financial Interest Disclosure Statement to the Centers for Medicare & Medicaid Services.

Effective with the change of ownership the following apply:

### PREVIOUS                                ### NEW

Provider #: 11-5413                          Provider #: 11-5413
Effective Date: 09/01/89                     Effective Date: **12/1/06**
Intermediary & Code:  MOO (52280)            Intermediary & Code:  **BC/BS GA (00101)**
FYE:  03/31                                  FYE:  **06/30**

Payment may be made for services rendered by your facility under the new ownership until your compliance with all Medicare requirements can be confirmed by an on-site survey.  Payments will be discontinued upon the expiration of your provider agreement if certification requirements are not met.

You must take steps to maintain required records and information necessary to allocate the costs for furnishing services to beneficiaries.  Payments made under Medicare are subject to a final cost report.  Your fiscal intermediary will contact you shortly concerning the cost report.  They will explain any records and information, which will be needed to validate these costs.

Page 2

**Blue Cross/Blue Shield of Georgia (00101)** and **Mutual of Omaha (52280)** have been notified of this action by copy of this letter.

Should you have any questions concerning this matter, please contact Patricia Pearson at (404) 562-7441.

Sincerely,

Patricia Pearson for

Sandra M. Pace
Associate Regional Administrator
Division of Survey & Certification

**NOTE TO THE FISCAL INTERMEDIARY:**
**THIS LETTER REPLACES THE CMS-2007, PROVIDER TIE-IN NOTICE.**

cc: **Blue Cross/Blue Shield of Georgia**
    **Mutual of Omaha**
    **Patricia Putt, DHR, Georgia State Agency**

Triad Senior Living/Foster 5
Actual and Anticipated Cash Flows

| Date | Description | Jeffersonville | LaGrange | Lumber City | Powder Springs | Thomasville | Triad Sr. L Operations | Total | Running Total |
|---|---|---|---|---|---|---|---|---|---|
| 2/22/2008 | ▓▓▓▓▓▓▓▓▓▓ Subtotal | (4,279,511) | (6,024,929) | (3,746,378) | (10,716,294) | (2,535,357) | 27,850,843 | (51,626,827) | |
| 2/25/2008 | AP The Hartford | (985) | | | | | | (984.93) | (152,612) |
| 2/25/2008 | AP The Hartford ( 2 of 9 ) | (1,543) | (1,822) | (1,055) | (2,687) | (678) | | (7,585.27) | (160,197) |
| 2/25/2008 | AP BlueCross Blue Shield | (23,598) | (26,593) | (15,384) | (49,005) | (12,714) | | (127,294.70) | (287,492) |
| 2/26/2008 | AP Superior Vision | (305) | (201) | (256) | (638) | (214) | | (1,614.08) | (289,106) |
| 2/26/2008 | AP Cigna | (1,849) | (2,117) | (753) | (3,629) | (1,122) | | (9,270.40) | (298,376) |
| 2/26/2008 | AP Provident Life and Accident Ins | (3,197) | (2,322) | (1,744) | (4,363) | (1,050) | | (12,676.70) | (311,053) |
| 2/27/2008 | AP PMAIC | (10,084) | (10,658) | (6,941) | (15,637) | (4,396) | | (47,713.90) | (358,767) |
| 2/27/2008 | AP Kindred (Nov) | (8,495) | (24,229) | (14,428) | (42,178) | (5,535) | | (94,865.42) | (453,632) |
| 2/27/2008 | ADVANCE | | | | | | 540,925 | 540,925.00 | 87,293 |
| 2/28/2008 | AP HamiltonInsuranceAgencydue 1st: Mar,Apr,May) | (8,737) | (9,153) | (5,824) | (14,145) | (3,744) | | (41,603.41) | 45,689 |
| 2/29/2008 | AP Sysco    EST | (5,252) | (6,179) | (5,160) | (11,088) | (3,251) | | (30,929.50) | 14,760 |
| 2/29/2008 | AP Professional Medical  EST | (16,796) | | | | | | (16,796.47) | (2,037) |
| 2/29/2008 | AP Check Run | | | | | | | - | (2,037) |
| 2/29/2008 | ▓▓▓▓▓▓▓▓▓▓ Subtotal | (4,960,156) | (6,108,002) | (3,797,924) | (10,859,665) | (2,568,062) | 27,981,769 | (2,036,050) | |
| 3/4/2008 | AP Department of Community Health | (31,555) | (38,742) | (23,588) | (61,229) | (14,721) | | (169,833.00) | (171,870) |
| 3/6/2008 | Payroll | (100,000) | (120,000) | (75,000) | (240,000) | (65,000) | | (600,000.00) | (771,870) |
| 3/6/2008 | ADVANCE | | | | | | 538,821 | 538,821.00 | (233,049) |
| 3/7/2008 | AP Professional Medical  EST | (10,602) | (4,372) | | (15,983) | (2,044) | | (33,000.53) | (266,049) |
| 3/7/2008 | AP Sysco    EST | (5,274) | (4,714) | (4,595) | (9,137) | (1,820) | | (25,529.54) | (291,579) |
| 3/7/2008 | AP Foster | (10,262) | (46,723) | (20,365) | (87,898) | (13,907) | | (179,154.05) | (470,733) |
| 3/7/2008 | | | | | | | | - | (470,733) |
| 3/7/2008 | ▓▓▓▓▓▓▓▓▓▓ Subtotal | (4,517,848) | (6,322,550) | (3,921,459) | (11,273,912) | (2,665,554) | 28,230,590 | (470,732.77) | |
| 3/12/2008 | ADVANCE | | | | | | 525,250 | 525,250.00 | 54,517 |
| 3/14/2008 | AP Sysco    EST | (5,252) | (6,179) | (5,160) | (11,088) | (3,251) | | (30,929.50) | 23,588 |
| 3/14/2008 | AP Professional Medical  EST | (16,796) | | | | | | (16,796.47) | 6,791 |
| 3/14/2008 | AP Check Run | | | | | (200,000) | | (200,000.00) | (193,209) |
| 3/14/2008 | ▓▓▓▓▓▓▓▓▓▓ Subtotal | (4,539,898) | (6,328,729) | (3,926,619) | (11,284,999) | (2,868,805) | 28,755,840 | (193,208.74) | |
| 3/20/2008 | AP Cbeyond | | | | (3,349) | | | (3,349.08) | (196,558) |
| 3/20/2008 | Payroll | (100,000) | (120,000) | (75,000) | (240,000) | (65,000) | | (600,000.00) | (796,558) |
| 3/20/2008 | ADVANCE | | | | | | 552,991 | 552,991.00 | (243,567) |
| 3/21/2008 | AP Professional Medical  EST | (10,602) | (4,372) | | (15,983) | (2,044) | | (33,000.53) | (276,567) |
| 3/21/2008 | AP Sysco    EST | (5,274) | (4,714) | (4,595) | (9,137) | (1,820) | | (25,529.54) | (302,097) |
| 3/21/2008 | | | | | | | | - | (302,097) |
| 3/21/2008 | AP Premium Assign Corp (3 of 11) | (8,601) | (8,620) | (5,377) | (13,007) | (3,261) | | (38,866.16) | (340,963) |
| 3/21/2008 | ▓▓▓▓▓▓▓▓▓▓ Subtotal | (4,664,378) | (6,466,834) | (4,011,591) | (11,566,476) | (2,940,930) | 29,308,831 | (340,963.03) | |
| 3/24/2008 | AP The Hartford | (985) | | | | | | (984.93) | (341,948) |
| 3/24/2008 | AP The Hartford ( 2 of 9 ) | (1,543) | (1,822) | (1,055) | (2,687) | (678) | | (7,585.27) | (349,533) |
| 3/24/2008 | AP BlueCross Blue Shield | (23,598) | (26,593) | (15,384) | (49,005) | (12,714) | | (127,294.70) | (476,828) |
| 3/25/2008 | AP Superior Vision | (305) | (201) | (256) | (638) | (214) | | (1,614.08) | (478,442) |

Foster 5 Cash Flow Analysis cash projection.xls  2/25/2008  12:30 PM

Triad Senior Living/Foster 5
Actual and Anticipated Cash Flows

| Date | Description | Jeffersonville | LaGrange | Lumber City | Powder Springs | Thomasville | Triad Sr. L Operations | Total | Running Total |
|------|-------------|------:|------:|------:|------:|------:|------:|------:|------:|
| 3/25/2008 | AP Cigna | (1,849) | (2,117) | (753) | (3,629) | (1,122) | | (9,270.40) | (467,712) |
| 3/25/2008 | AP Provident Life and Accident Ins | (3,197) | (2,322) | (1,744) | (4,363) | (1,050) | | (12,676.70) | (500,389) |
| 3/26/2008 | AP PMAIC | (10,084) | (10,656) | (6,941) | (15,637) | (4,396) | | (47,713.90) | (548,103) |
| 3/26/2008 | AP Kindred (Nov) | (8,495) | (24,229) | (14,428) | (42,178) | (5,535) | | (94,865.42) | (642,968) |
| 3/26/2008 | ADVANCE | | | | | | 537,027 | 537,027.00 | (105,941) |
| 3/26/2008 | AP HamiltonInsuranceAgency(due 1st Mar,Apr,May) | (8,737) | (9,153) | (5,824) | (14,145) | (3,744) | | (41,603.41) | (147,545) |
| 3/27/2008 | AP Sysco    EST | (5,252) | (6,179) | (5,160) | (11,088) | (3,251) | | (30,929.50) | (178,474) |
| 3/28/2008 | AP Professional Medical EST | (16,796) | | | | | | (16,796.47) | (195,271) |
| 3/28/2008 | AP Check Run | | | | | | | - | (195,271) |
| 3/28/2008 | Subtotal | (4,749,014) | (6,549,505) | (4,093,129) | (11,709,846) | (2,973,635) | 29,845,858 | (195,270.81) | |
| 4/3/2008 | Payroll | (100,000) | (120,000) | (75,000) | (240,000) | (65,000) | | (600,000.00) | (795,271) |
| 4/3/2008 | ADVANCE | | | | | | 516,936 | 516,936.00 | (278,335) |
| 4/3/2008 | AP Professional Medical EST | (10,602) | (4,372) | | (15,983) | (2,044) | | (33,000.53) | (311,335) |
| 4/4/2008 | AP Sysco    EST | (5,274) | (4,714) | (4,585) | (9,137) | (1,820) | | (25,529.54) | (336,865) |
| 4/4/2008 | AP Department of Community Health | (31,555) | (38,742) | (23,586) | (61,229) | (14,721) | | (169,833.00) | (506,698) |
| 4/4/2008 | | | | | | | | | (506,698) |
| 4/4/2008 | Subtotal | (4,892,245) | (6,717,333) | (4,196,299) | (12,035,195) | (3,057,220) | 30,880,882,794 | (506,697.88) | |
| 4/9/2008 | AP Foster | (10,282) | (46,723) | (20,365) | (87,898) | (13,907) | | (179,154.05) | (685,852) |
| 4/10/2008 | ADVANCE | | | | | | 532,340 | 532,340.00 | (153,512) |
| 4/11/2008 | AP Sysco    EST | (5,252) | (6,179) | (5,160) | (11,088) | (3,251) | | (30,929.50) | (184,441) |
| 4/11/2008 | AP Professional Medical EST | (45,000) | | | | | | (45,000.00) | (229,441) |
| 4/11/2008 | AP Check Run | | | | (200,000) | | | (200,000.00) | (429,441) |
| 4/11/2008 | Subtotal | (4,952,958) | (6,770,234) | (4,219,824) | (12,455,168) | (3,274,378) | 30,895,134 | (429,441.43) | |
| 4/17/2008 | Payroll | (100,000) | (120,000) | (75,000) | (240,000) | (65,000) | | (600,000.00) | (1,029,441) |
| 4/17/2008 | ADVANCE | | | | | | 557,487 | 557,487.00 | (471,954) |
| 4/17/2008 | AP Professional Medical EST | (10,602) | (4,372) | | (15,983) | (2,044) | | (33,000.53) | (504,955) |
| 4/18/2008 | AP Sysco    EST | (5,274) | (4,714) | (4,585) | (9,137) | (1,820) | | (25,529.54) | (530,485) |
| 4/18/2008 | | | | | | | | - | (530,485) |
| 4/18/2008 | | | | | | | | - | (530,485) |
| 4/18/2008 | Subtotal | (5,068,835) | (6,899,319) | (4,271,409) | (12,400,300) | (3,343,242) | 31,452,621 | (530,484.50) | |
| 4/21/2008 | AP The Hartford | (985) | | | | | | (984.93) | (531,469) |
| 4/21/2008 | AP The Hartford ( 2 of 9 ) | (1,543) | (1,622) | (1,055) | (2,687) | (678) | | (7,585.27) | (539,055) |
| 4/21/2008 | AP BlueCross Blue Shield | (23,598) | (26,593) | (15,384) | (49,005) | (12,714) | | (127,294.70) | (666,349) |
| 4/22/2008 | AP Superior Vision | (305) | (201) | (256) | (638) | (214) | | (1,614.08) | (667,963) |
| 4/22/2008 | AP Cigna | (1,849) | (2,117) | (753) | (3,629) | (1,122) | | (9,270.40) | (677,234) |
| 4/22/2008 | AP Provident Life and Accident Ins | (3,197) | (2,322) | (1,744) | (4,363) | (1,050) | | (12,676.70) | (689,911) |
| 4/22/2008 | AP PMAIC | (10,084) | (10,656) | (6,941) | (15,637) | (4,396) | | (47,713.90) | (737,624) |
| 4/23/2008 | AP Kindred (Nov) | (8,495) | (24,229) | (14,428) | (42,178) | (5,535) | | (94,865.42) | (832,490) |
| 4/23/2008 | ADVANCE | | | | | | 543,561 | 543,561.00 | (288,929) |
| 4/24/2008 | AP Sysco    EST | (5,252) | (6,179) | (5,160) | (11,088) | (3,251) | | (30,929.50) | (319,858) |
| 4/25/2008 | AP Professional Medical EST | (45,000) | | | | | | (45,000.00) | (364,858) |

Foster 5 Cash Flow Analysis cash projection.xls  2/25/2008  12:30 PM

Triad Senior Living/Foster 5
Actual and Anticipated Cash Flows

| Date | Description | Jeffersonville | LaGrange | Lumber City | Powder Springs | Thomasville | Triad Sr. L Operations | Total | Running Total |
|---|---|---|---|---|---|---|---|---|---|
| 4/25/2008 | *Subtotal* (5168.942) (6.973.237) (3.317.192) (12.529.526) (3.372.203) 13.199.618 (964.858(40)) | | | | | | | | |
| 4/30/2008 | ADVANCE | | | | | | 518,252 | 518,252.00 | 153,394 |
| 5/1/2008 | Payroll | (100,000) | (120,000) | (75,000) | (240,000) | (65,000) | | (600,000.00) | (446,606) |
| 5/1/2008 | | | | | | | | - | (446,606) |
| 5/1/2008 | AP Professional Medical EST | (10,602) | (4,372) | | (15,983) | (2,044) | | (33,000.53) | (479,607) |
| 5/2/2008 | AP Sysco    EST | (5,274) | (4,714) | (4,585) | (9,137) | (1,820) | | (25,529.54) | (505,136) |
| 5/2/2008 | *Subtotal* (5284.818) (7.102.323) (4.396.747) (12.794.645) (3.441.067) 32.514.434 (505(136(47)) | | | | | | | | |
| 5/5/2008 | AP Department of Community Health | (31,555) | (38,742) | (23,586) | (61,229) | (14,721) | | (169,833.00) | (674,969) |
| 5/7/2008 | AP Kindred (Nov) | (8,495) | (24,229) | (14,428) | (42,178) | (5,535) | | (94,865.42) | (769,835) |
| 5/8/2008 | ADVANCE | | | | | | 535,762 | 535,762.00 | (234,073) |
| 5/8/2008 | AP Foster | (10,262) | (46,723) | (20,365) | (87,898) | (13,907) | | (179,154.05) | (413,227) |
| 5/9/2008 | AP Sysco    EST | (5,252) | (6,179) | (5,160) | (11,088) | (3,251) | | (30,929.50) | (444,156) |
| 5/9/2008 | AP Professional Medical EST | (45,000) | | | | | | (45,000.00) | (489,156) |
| 5/9/2008 | AP Check Run | | | | | (200,000) | | (200,000.00) | (689,156) |
| 5/9/2008 | *Subtotal* (5386.382) (7.218.195) (4.460.286) (12.997.039) (3.678.481) 33.050.196 (689(156(44)) | | | | | | | | |
| 5/15/2008 | ADVANCE | | | | | | 559,650 | 559,650.00 | (129,506) |
| 5/15/2008 | Payroll | (100,000) | (120,000) | (75,000) | (240,000) | (65,000) | | (600,000.00) | (729,506) |
| 5/15/2008 | | | | | | | | - | (729,506) |
| 5/16/2008 | AP Professional Medical EST | (10,602) | (4,372) | | (15,983) | (2,044) | | (33,000.53) | (762,507) |
| 5/16/2008 | AP Sysco    EST | (5,274) | (4,714) | (4,585) | (9,137) | (1,820) | | (25,529.54) | (788,037) |
| 5/16/2008 | *Subtotal* (5.501.258) (7.347.281) (4.539.840) (18.262.158) (3.747.345) 33.609.845 (788(036(51)) | | | | | | | | |
| 5/21/2008 | AP The Hartford | (985) | | | | | | (984.93) | (789,021) |
| 5/21/2008 | AP The Hartford ( 2 of 9 ) | (1,543) | (1,622) | (1,055) | (2,687) | (678) | | (7,585.27) | (796,607) |
| 5/21/2008 | AP BlueCross Blue Shield | (23,598) | (26,593) | (15,384) | (49,005) | (12,714) | | (127,294.70) | (923,901) |
| 5/21/2008 | AP Superior Vision | (305) | (201) | (256) | (638) | (214) | | (1,614.08) | (925,515) |
| 5/21/2008 | AP Cigna | (1,849) | (2,117) | (753) | (3,629) | (1,122) | | (9,270.40) | (934,786) |
| 5/21/2008 | AP Provident Life and Accident Ins | (3,197) | (2,322) | (1,744) | (4,363) | (1,050) | | (12,676.70) | (947,463) |
| 5/21/2008 | AP PMAIC | (10,084) | (10,656) | (6,941) | (15,637) | (4,398) | | (47,713.90) | (995,176) |
| 5/21/2008 | AP Kindred (Nov) | (8,495) | (24,229) | (14,428) | (42,178) | (5,535) | | (94,865.42) | (1,090,042) |
| 5/22/2008 | ADVANCE | | | | | | 542,753 | 542,753.00 | (547,289) |
| 5/23/2008 | AP Sysco    EST | (5,252) | (6,179) | (5,160) | (11,088) | (3,251) | | (30,929.50) | (578,218) |
| 5/23/2008 | AP Professional Medical EST | (45,000) | | | | | | (45,000.00) | (623,218) |
| 5/23/2008 | *Subtotal* (5.601.365) (7.421.399) (4.585.663) (18.351.384) (3.776.306) 34.152.599 (623(218(41)) | | | | | | | | |
| 5/29/2008 | ADVANCE | | | | | | 519,997 | 519,997.00 | (103,221) |
| 5/29/2008 | Payroll | (100,000) | (120,000) | (75,000) | (240,000) | (65,000) | | (600,000.00) | (703,221) |
| 5/30/2008 | AP Professional Medical EST | (10,602) | (4,372) | | (15,983) | (15,000) | | (45,956.49) | (749,178) |
| 5/30/2008 | AP Sysco    EST | (5,274) | (4,714) | (4,585) | (9,137) | (7,000) | | (30,709.64) | (779,888) |
| 5/30/2008 | *Subtotal* (5.717.241) (7.550.285) (4.665.148) (18.656.503) (3.863.306) 34.672.596 (779(887(54)) | | | | | | | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC, et     *
al.,
                                        *

              Plaintiffs
                                        *     Case No. _____

v.                                      *

MICHAEL O. LEAVITT, et al.,             *

              Defendants                *

                                        *

*     *     *     *     *     *     *     *     *     *     *     *     *     *

## CERTIFICATE OF COUNSEL RULE LCvR 65.1

I, the undersigned, counsel of record for Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (collectively "Triad or Plaintiffs"), certify that on this 26th day of February, 2008 courtesy copies of Plaintiffs' 1) Complaint For Declaratory and Temporary, Preliminary and Permanent Injunctive Relief; 2) Motion for Temporary Restraining Order, with attached Memorandum In Support Of Motion For Temporary Restraining Order and/or Preliminary Injunction, and Affidavit of Ronald Herbert, Jr.; and 3) Rule 7.1 Disclosure Certificate were transmitted electronically to the following:

1.    Janice Hoffman, Esq., Associate General Counsel, U.S. Department of Health and Human Services, at 7500 Security Boulevard, C2-04-17, Baltimore, MD 21244, janice.hoffman@hhs.gov, at 12:20 p.m.;

2.    Mark Polston, Esq., Deputy Associate General Counsel, U.S. Department of Health and Human Services, 330 Independence Avenue, S.W., Room 5311, Washington, D.C. 20001, mark.polston@hhs.gov, at 12:20 p.m.;

3.    Marie Ransley, Esq., Acting Chief Counsel, Sam Nunn Atlanta Federal Center, 61 Forsyth St., S.W., Suite 5M60, Atlanta, GA 30303, marie.ransley@hhs.gov, at 12:20 p.m.;

4.    Rudolph Contreras, Esq., Civil Division, U.S. Attorney's Office, 555 4th Street, N.W., Washington, DC 20530, Rudolph.Contreras@usdoj.gov, at 12:20 p.m.;

Jack C. Tranter, Fed Bar. No. MD 00310
Thomas C. Dame, Fed. Bar No. MD 08352
Brian T. Tucker, Fed. Bar No. MD 27485
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201
(410) 727-7702
Attorneys for Plaintiffs Triad at Jeffersonville I,
LLC, et al.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,    *
et al.,
                                   *
        Plaintiffs
                                   *   Case No. _____
v.
                                   *
MICHAEL O. LEAVITT, et al.,
                                   *
        Defendants
                                   *

## **TEMPORARY RESTRAINING ORDER**

On February 26, 2008 Plaintiffs filed a Complaint for Declaratory and Temporary,

Preliminary, and Permanent Injunctive Relief (the "Complaint") and a Motion for a Preliminary

Injunction or in the alternative for a Temporary Restraining Order (the "Motion").

Based on the information contained therein, this Court finds that Plaintiffs have shown

that the proposed recoupment against Plaintiffs for amounts paid after December 1, 2006 to the

prior operator of Plaintiffs' nursing homes will lead to irreparable injury in the form of a real

threat to the continued viability of Plaintiffs' business and the disruption of necessary health care

services to the more than 500 elderly residents of Plaintiffs' nursing homes. These injuries

cannot be adequately remedied without immediate injunctive relief because if Defendants

withhold Medicare payments due to Plaintiffs this week Plaintiffs will be unable to meet their

payroll obligations and will likely be forced to cease operations. Because this harm is immediate

and irreparable, and Plaintiffs have made good faith efforts to notify Defendants of the

Complaint and the Motion, this Order is appropriate and warranted.

# 349843

This Court further finds that the harm to Defendants of granting this Temporary Restraining Order is minimal because it does not impose any undue burden or expense on the government. Therefore the balance of harm tips decidedly in favor of Plaintiffs. In addition, Plaintiffs' Memorandum in Support of their motion indicates a strong probability of success on the merits. Finally, this Court finds that the public interest is best served by issuing this Temporary Restraining Order because it allows Plaintiffs' nursing home business to continue and avoids a disruption of service to the more than 500 elderly residents of Plaintiffs' nursing homes.

Therefore, it is this _____ day of February, 2008,

ORDERED that

1.    The February 11, 2008 letters from CMS, purporting to recoup sums paid after December 1, 2006 to the entities that previously operated Plaintiffs' nursing homes, shall have no effect unless and until further ordered by this Court;

2.    Defendants are enjoined from effecting or attempting to effect, any action to withhold Medicare reimbursement due to Plaintiffs or to recoup funds paid after December 1, 2006 to the prior operators of Plaintiffs' nursing homes, until the Court has had the opportunity to review the merits of the underlying claims;

3.    Defendants shall continue to make payments for services rendered by Plaintiffs to Medicare beneficiaries, as appropriate as if no attempt to recoup had been initiated against Plaintiffs;

4.    This Temporary Restraining Order will expire in 10 days or such other time as ordered by this Court; and

5.    Plaintiffs shall give security by depositing with the clerk of court the amount of $200.00.

_____
Judge, United States District Court
  for the District of Columbia