IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC, *
et al.,
          *

   Plaintiffs
         . *   Case No. 08-cv-00329

v.
          *

MICHAEL O. LEAVITT, et al.,
          *

   Defendants
          *


## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (sometimes collectively "Triad"), pursuant to Federal Rule of Civil Procedure 56 and LCvR 56.1, by and through their undersigned attorneys, hereby move for summary judgment in their favor. As explained in the accompanying Memorandum in Support of Motion for Summary Judgment, Plaintiffs' Statement of Material Facts, and exhibits, which are incorporated herein by reference, there is no genuine dispute of material fact and Plaintiffs are entitled to judgment as a matter of law.

WHEREFORE, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion and enter judgment in their favor.

Respectfully Submitted,


_____/s/  Jack C. Tranter_____
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702

Attorneys for Plaintiffs


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 3rd day of March, 2008, I mailed and emailed a copy of the foregoing Plaintiffs' Motion for Summary Judgment to the following counsel for Defendants:

Wendy M. Ertmer
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, D.C. 20530
wendy.ertmer@usdoj.gov


_____/s/ Jack C. Tranter_____
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,　　*
et al.,

　　　　　　　　　　　　　　　　　*

　　　　　　　Plaintiffs

　　　　　　　　　　　　　　　　　*　　Case No. 08-00329

v.

　　　　　　　　　　　　　　　　　*

MICHAEL O. LEAVITT, et al.,

　　　　　　　　　　　　　　　　　*

　　　　　　　Defendants

　　　　　　　　　　　　　　　　　*

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (sometimes collectively "Triad") submit this Memorandum In Support Of Motion For Summary Judgment and state:

### INTRODUCTION

Plaintiffs operate five nursing homes in the State of Georgia.  A substantial part of the Plaintiffs' revenue is derived from providing care to Medicare beneficiaries.  This case involves the improper and over-reaching attempt by the Centers for Medicare and Medicaid Services ("CMS") to recoup from Plaintiffs approximately $2.0 million that was improperly paid by CMS to Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc., the prior operator of the five nursing homes now operated by Plaintiffs.  While the Plaintiffs accepted assignment of Mariner's Medicare provider agreements, Plaintiffs are not liable for periodic interim payments erroneously

1

paid by CMS to Mariner after the effective date of the assignment (December 1, 2006) for periods of service that did not even occur until after Mariner stopped providing care to Medicare beneficiaries .

## MATERIAL UNDISPUTED FACTS

The material undisputed facts are set forth in Plaintiff's Statement Of Material Fact In Support Of Motion For Summary Judgment ("Plaintiffs' Statement of Fact") filed in conjunction with this memorandum.

## STATUTORY AND REGULATORY CONTEXT

Established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq., the Medicare Program is a federal health insurance program for the aged, blind and disabled under which qualified health care providers, including nursing homes, are reimbursed by the federal government for the treatment and care provided to Medicare beneficiaries. Part A of the Medicare program involves reimbursement paid for skilled nursing facility care. 42 U.S.C. § 1395i-3.

Although previously reimbursed on a reasonable cost basis, Medicare now pays for skilled nursing facility care on a prospective payment basis. 42 C.F.R. Section 413.330 et seq. Typically, CMS reimburses a nursing home for care "only following submission of a bill." 42 C.F.R. § 413.350. However, CMS may also pay for skilled nursing care pursuant to the periodic interim payment ("PIP") system. Under the PIP methodology, a nursing home is paid, on a bi-weekly basis, in an amount determined by the Fiscal Intermediary " estimating the reimbursable amount for the year based on the previous year's experience," subject to certain adjustments. 42 C.F.R. § 413.355(c).

Whether payment is made as a result of a provider submitting monthly bills or 26

times a year as a result of the PIP methodology, at the end of a fiscal year, the provider submits a cost report. Medicare audits the cost report and compares the amount paid to the provider and the amount actually due based on the care provided. If, as a result of the audit, Medicare determines that the amount paid is greater than the amount due, the overpayment is typically recovered by reducing the amount paid to the provider in the next fiscal year. The converse is true if the provider has been underpaid, i.e., the reimbursement due to the provider is paid during the next fiscal year.

Medicare regulations provide that Fiscal Intermediaries, private non-government organizations, administer the payment, reimbursement and audit process for various Medicare services, including payments to nursing homes that participate in the Medicare program and provide skilled nursing care. Blue Cross and Blue Shield of Georgia ("BCBS") is the Fiscal Intermediary responsible for overseeing and auditing Medicare reimbursement for skilled nursing facility care provided by Plaintiffs. Plaintiffs' Statement of Facts at 7.

## ARGUMENT

### I.    The Applicable Standard for Summary Judgment.

Summary judgment is proper if the evidence before the Court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The mere existence of a factual dispute is insufficient to defeat a motion for summary judgment, as the dispute must concern a material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In this case, as explained below, there

is no genuine dispute of material fact and Plaintiffs are entitled to judgment as a matter of law.

## II.    Applicable Medicare Regulations Do Not Permit Recoupment from Plaintiffs of Amounts Paid to Mariner After the Provider Agreements Were Assigned.

Under appropriate circumstances and in compliance 42 C.F.R. § 405.371, CMS (or an intermediary) may recoup Medicare overpayments made to a provider by reducing present or future Medicare payments due to the provider.  42 C.F.R. § 405.371(a)(2). Indeed, in a case involving a provider that accepted assignment of a prior operator's Medicare provider agreement, CMS may pursue the new provider for liability arising out of the original provider agreement.  42 C.F.R. § 489.18(d); United States v. Vernon Home Health, Inc., 21 F. 3d 693, 696 (5th Cir.), cert. denied, 513 U.S. 1015 (1994); Deerbrook Pavilion, LLC v. Shalala, 235 F. 3d 1100 (8th Cir. 2000), cert denied, 534 U.S. 992 (2001).  This concept is sometimes referred to as "successor liability."

In this case, however, CMS seeks to do something remarkably different.  CMS does not seek to recoup an overpayment made to Mariner for services provided by Mariner before the effective date of the assignment of the provider agreements to Plaintiffs.  Rather, CMS seeks to recover from Plaintiffs periodic interim payments mistakenly made by CMS to Mariner, *after* the effective date of  the assignment of Mariner's Medicare provider agreements to Plaintiffs for services that Mariner did not provide. As such, this action is inconsistent with the scope of successor liability as described in the Vernon and Deerbrook cases.

Rather than merely holding Plaintiffs responsible for liabilities that arose under the provider agreements when Mariner still operated the nursing homes, CMS seeks to

impose liability on Plaintiffs for funds paid to Mariner that Mariner did not provide for events that had not yet occurred at the time of the assignment of the provider agreements. When Plaintiffs assumed the prior operators' provider agreements, they understood that they were accepting existing Medicare liabilities of the nursing homes. However, they are not responsible for *future* payments mistakenly made to Mariner.

### A.    The Mariner Provider Agreements Were Automatically Assigned to Plaintiffs.

42 C.F.R. § 489.18(c) provides that upon a "change in ownership," the "existing provider agreement will automatically be assigned to the new owner."  In this case, the "change or ownership" occurred when Plaintiffs began leasing and operating the nursing home on December 1, 2006.  See 42 C.F.R. § 489.18(a)(4) ("The lease of all or part of a provider facility constitutes change of ownership of the leased portion").  Indeed, in four letters sent to Plaintiffs on or about April 12, 2007 and in a fifth letter sent on April 26, 2006, CMS acknowledged the change of ownership of each nursing home and that each Medicare provider agreement had been automatically assigned to Plaintiffs, effective December 1, 2006.  Plaintiffs' Statement of Facts at 11.  Thus, beginning on December 1, 2006, Mariner had no right to be paid by CMS under any Medicare provider agreement applicable to the five nursing homes because those agreements had been assigned to the Plaintiffs as of that date.

### B.    There is no Legal Support for Imposing Successor Liability on Plaintiffs for Events that Occurred After Assignment of the Provide Agreements.

The imposition of successor liability upon the automatic assignment of a provider agreement arises from 42 C.F.R. § 489.18(d), which provides:

An assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued, including, but not limited to the following:

(1) Any existing plan of correction.

(2) Compliance with applicable health and safety standards.

(3) Compliance with the ownership and financial interest disclosure requirements of part 420, subpart C, of this chapter.

(4) Compliance with civil rights requirements set forth in 45 C.F.R. Parts 80, 84, and 90.

42 C.F.R. § 489.18(d); Vernon, 21 F. 3d at 696.

By its express terms, § 489.18(d) does not impose liability upon a successor provider for events that occur *after* the assignment of the provider agreement (e.g., a mistaken payment made to the prior operator after the assignment). Rather, the regulation saddles the new provider with the existing liabilities of the outgoing provider, e.g. liability arising from "[a]ny existing plan of correction." Liability for a mistaken and improper payment to a former provider cannot arise under the provider agreement because the former provider is no longer a party to the agreement after the assignment.

Several courts have followed the Fifth Circuit's reasoning in Vernon in holding that the language of § 489.18(d) establishes successor liability, arising under the original provider agreement, on a provider who accepts assignment of the agreement. However, each of these decisions involves successor liability for obligations that arose *before* the assignment of the provider agreement and for services that were actually provided.

For example, in Deerbrook, the Eighth Circuit held that the new provider was liable for its predecessors' previously established civil monetary penalties because the new provider "assumed the existing provider agreement under which its predecessors

incurred CMPs [civil monetary penalties]." <u>Deerbrook</u>, 235 F. 3d at 1104.    Likewise, in

<u>Delta Health Group, Inc. v. Leavitt</u>, 459 F. Supp. 2d 1207 (N.D. Fla. 2006), the Court

found the new provider liable for civil monetary penalties imposed upon the prior

operator.  <u>See also</u> <u>Cedar Hill Manor, LLC v. Dep't of Social Services</u>, 145 S.W. 3d 447

(Mo. Ct. App. 2004) (current provider was liable for civil monetary penalties of prior

operator thrice removed).

     Not surprisingly, no reported decision imposes liability on a new provider based

upon events that occurred after the effective date of the assignment of the provider

agreement, as CMS seeks to do here.  As explained above, the applicable regulation does

not permit imposition of successor liability under the facts of this case.  Moreover, a

determination that a new provider is liable based upon post-assignment events would

subvert the policy rationale courts have discussed in rendering decisions based on

successor liability.

     In <u>Delta Health Group</u>, the Court identified several justifications and policy bases

for successor liability, including  that it is fair to impose successor liability on a new

provider because, by accepting the assignment of the old provider agreement, a new

provider gains the benefit of receiving uninterrupted Medicare reimbursement payments.

<u>Delta Health Group</u>, 459 F. Supp. 2d at 1222–223. The Court further explained that the

new owner can refuse assignment of the existing agreement "or it can perform its 'due

diligence' prior to the sale to ensure that there are no outstanding [civil monetary

penalties]." <u>Delta Health Group</u>, 459 F. Supp. 2d at 1223, <u>citing</u>, <u>Deerbrook</u>, 235 F. 3d at

1104-105, and <u>Cedar Hill Manor</u>, 145 S.W. 3d at 454; <u>see</u> <u>also</u> <u>BP Care, Inc. v.

Thompson</u>, 337 F. Supp. 2d 1021, 1029 (S.D. Ohio 2003), <u>aff'd on other grounds</u>, 398 F.

7

3d 503 (6th Cir. 2005) (explaining that prior investigation by the new operator is necessary since assuming the provider agreement "exposes the new operator to any liability incurred under the agreement because a facility is purchased 'as is'"). Here, no amount of due diligence would have informed Plaintiffs that they would be responsible for payments mistakenly made by CMS to Mariner after Plaintiffs began operating the facilities for periods of service when Mariner did not provide care. Put simply, CMS's plan to impose liability on Plaintiffs for activities they could not have anticipated is fundamentally unfair.

If CMS had overpaid for care during the period when Mariner was actually operating the facilities and providing care to Medicare beneficiaries (before assignment of the Medicare provider agreements, effective December 1, 2006), Plaintiffs would be responsible for repaying the amount of any such overpayment. Vernon, 21 F. 3d at 696. However, that is not what occurred here. Instead, CMS, Mutual of Omaha, Mariner's Fiscal Intermediary, erroneously continued making periodic interim payments to Mariner long after Mariner stopped providing care to Medicare beneficiaries and after the effective date of the assignment of Mariner provider agreements to Plaintiffs. Under these circumstances and as explained above, there is no legal basis for CMS to recover Medicare funds improperly and mistakenly paid to Mariner by withholding payments due to Plaintiffs for care actually provided to Medicare beneficiaries.

### III.    Alternatively, Plaintiffs are not Liable Because the Payments Were Not Properly Made to Mariner.

Assuming *arguendo* that Plaintiffs are responsible for payments made to Mariner after the date of the automatic assignment of the provider agreements (which they are not) and after Mariner stopped providing care to Medicare beneficiaries, CMS cannot

recoup the funds paid to Mariner from Plaintiffs because the payments should have not been made under the applicable regulations.

First, as explained above, CMS erroneously and improperly continued making periodic interim payments to Mariner even though Plaintiffs advised CMS in their Medicare enrollment applications, first filed on November 30, 2006, that Plaintiffs began providing care to Medicare beneficiaries and other residents of the five nursing homes on December 1, 2006. Thus, CMS had actual notice, as of the date of the change of ownership, that Medicare payments to Mariner should cease because Mariner was no longer providing care to Medicare beneficiaries.

Second, the payments made to Mariner under the periodic interim payment or PIP methodology are not permitted under Medicare regulations. Specifically, 42 C.F.R. § 413.350 provides that a nursing home being paid under the PIP methodology may receive payments for Part A services only if qualifying criteria set forth in Section 413.64(h) are met. Section 413.350 explicitly provides that "an intermediary must terminate PIP payments" if the SNF no longer meets the requirement of Section 413.64(h). In describing a fiscal intermediary's monitoring function under the PIP program, Section 413.64(h)(7) provides:

> A significant factor in evaluating the amount of the payment in terms of the realization of the projected Medicare utilization of services is the timely submittal to the intermediary of completed admissions and billing forms. All providers must complete billings in detail under this method as under regular interim payment procedures. (emphasis added)

42 C.F.R. § 413.64(h)(7).

To obtain Medicare reimbursement under the PIP methodology, a provider must still submit detailed billing requests to the intermediary. Mariner discontinued doing so when it stopped providing care to Medicare beneficiaries on November 30, 2006. Because bills were not submitted and pursuant to its monitoring function, Mariner's Fiscal Intermediary, Mutual of Omaha, should not have made periodic interim payments for ten service periods when no services were provided. As Mariner was no longer providing care to Medicare recipients, it no longer met the qualifying criteria for payment under the PIP methodology. *See* Section 413.64(h)(3) and (5).

Section 80.4 of the <u>Medicare Claim Processing Manual</u> also provides, "To remain on PIP, providers ... must submit 85 percent of their bills timely and accurately." That, obviously, did not happen here because Mariner submitted <u>no</u> bills for the ten service periods in question. Payments should not have been made beginning on December 27, 2006 and continuing at biweekly intervals through April 18, 2007, as no bills were submitted seeking reimbursement during that period.

In sum, CMS cannot seek reimbursement from Plaintiffs for periodic interim payments that Mutual of Omaha improperly and erroneously paid to Mariner. Since those payments were inadvertently paid to Mariner for services that Mariner did not provide, CMS must seek reimbursement from Mariner. It may not recoup those funds by reducing reimbursement to Plaintiffs for services actually provided to Medicare beneficiaries.

## CONCLUSION

For the reasons described above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment.

Respectfully Submitted,

/s/ Jack C. Tranter

Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201-4033
(410) 727-7702
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 3rd day of March 2008, I mailed and emailed a copy of the foregoing Memorandum in Support of Plaintiffs' Motion for Summary Judgment to the following counsel for Defendants:

Wendy M. Ertmer
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, D.C. 20530
wendy.ertmer@usdoj.gov

/s/ Jack C. Tranter

Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201-4033
(410) 727-7702

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,          *
et al.,
                                         *
              Plaintiffs                 *
                                         *        Case No. 08-cv-00329
v.                                       *
                                         *
MICHAEL O. LEAVITT, et al.,              *
                                         *
              Defendants                 *


**PLAINTIFFS' STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (sometimes collectively "Triad"), pursuant to LCvR 56.1, submit this Statement of Material Facts in Support of Motion for Summary Judgment.

1.     Plaintiffs are five separate, but affiliated, entities that operate nursing homes in Georgia. Triad at Jeffersonville I, LLC, is a Georgia limited liability company that leases and operates a 131-bed nursing facility located in Jeffersonville, Georgia. Affidavit of Ronald M. Herbert, Jr. ("Herbert Affidavit") at 2. Triad at LaGrange I, LLC is a Georgia limited liability company that leases and operates a 138-bed nursing facility in LaGrange, Georgia. Id. Triad at Lumber City I, LLC is a Georgia limited liability company that leases and operates an 86-bed nursing facility in Lumber City, Georgia. Id. Triad at Powder Springs I, LLC is a Georgia limited liability company that leases and operates a 208-bed nursing facility in Powder Springs, Georgia. Id. Triad at Thomasville I, LLC is a Georgia limited liability company that leases and

operates a 52-bed nursing facility in Thomasville, Georgia. Id. Pursuant to agreements with Plaintiffs, Triad Senior Living, LLC provides management and accounting to Plaintiffs. Id.

2.     The five nursing homes operated by Plaintiffs have a total of 615 licensed beds and provide skilled nursing facility care to Medicare beneficiaries. Herbert Affidavit at 3.

3.     In December of 2003, more than four years ago, the owner of the five nursing homes now leased and operated by Plaintiffs advised Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc. (collectively, "Mariner"), which then occupied and operated the facilities, to vacate on January 1, 2004, as these nursing homes had been leased to Plaintiffs. A true and correct letter of the owner's counsel's letter directing Mariner to vacate is attached as Exhibit 1. Herbert Affidavit at 4. Mariner refused to vacate the facilities as directed. See Mariner Health Care, Inc. v. Foster, 634 S.E. 2d. 162 (Ga. App. 2006) cert. denied (2000), a copy of which is attached for convenience as Exhibit 2.

4.     After several years of litigation, the Georgia Court of Appeals determined that Mariner had no lawful basis for retaining possession. See Mariner Health Care, Inc. v. Foster, supra. Hence, on December 1, 2006, Mariner delivered the facilities to Plaintiffs and Plaintiffs began operating these five nursing homes. A true and correct copy of an October 10, 2003 letter from Boyd P. Gentry, Executive Vice President and Chief Executive Officer, Mariner Health Care, relating that Mariner would vacate as of December 1, 2006 is attached as Exhibit 3. Herbert Affidavit at 5.

5.     On November 30, 2006, the day before the Plaintiffs began operating the five nursing homes, Plaintiffs filed five Medicare Provider/Supplier Enrollment Applications alerting CMS that Mariner no longer operated these facilities and asking that the Medicare Provider

Agreements be assigned to Plaintiffs, effective December 1, 2006. Herbert Affidavit at 6. A true and correct copy of one of those nearly identical applications is attached as Exhibit 4. Id.

6.    As related in the applications, Plaintiffs decided to accept assignment of Mariner's Medicare provider agreements to avoid a break in service. Id. If Plaintiffs had filed applications for new provider agreements, Plaintiffs would not have received Medicare reimbursement for care provided to beneficiaries during the period between the termination of the prior provider agreements (December 1, 2006) and the issuance of new provider agreements to Plaintiffs. Herbert Affidavit at 7.

7.    On or about January 15, 2007, Marcella Godwin, Director of Business Office Services, Triad Senior Living, LLC, called Blue Cross Blue Shield of Georgia ("BCBS") to inquire about the status of the Plaintiffs' applications. Affidavit of Marcella Godwin ("Godwin Affidavit") at 3. BCBS is the Medicare Fiscal Intermediary that administers the Medicare program in Georgia. Id. Ms. Godwin spoke with Shannon Ray, Network Service Specialist, Sr. Id.

8.    As related in the applications, Ms. Godwin advised Ms. Ray that Plaintiffs had begun operating the five nursing homes in question on December 1, 2006 and had filed the applications on November 30, 2006, the day before. Godwin Affidavit at 4. Ms. Ray, however, told Ms. Godwin that no applications had been received. Id. Ms. Godwin responded that they had been sent by overnight mail on November 30, 2007. Id. A true and correct copy of a Federal Express US *Airbill* evidencing that Ronald Herbert, Triad's Chief Operating Officer, sent the applications to Ms. Ray on November 30, 2006 is attached as Exhibit 5. Id. Ms. Ray advised that she would look for the applications and "get back" to Ms. Godwin. Id.

9.      Later that day, Mr. Ray called Ms. Godwin and advised that the applications had been sent back because Plaintiffs had used an out-of-date enrollment form. Godwin Affidavit at 5. Ms. Godwin responded that the applications had not been received. Id. Regardless, as a result of learning that an out-of-date form had been used, Plaintiffs filed new applications on January 30, 2007. Id. A true and correct copy of one of those nearly identical applications is attached as Exhibit 6. A true and correct of the Federal Express *AirBill* relating that the applications had been sent to Ms. Ray on January 30 is attached as Exhibit 7. Id. As of the date of Ms. Godwin's affidavit (March 3, 2008), the applications filed on November 30, 2007 had still not been returned.

10.      As before, the applications related that Plaintiffs began operating these five nursing facilities on December 1, 2006. Godwin Affidavit at 6. The applications also related the prior operator's name, the doing business name of the nursing facilities, the prior operator's NPI, the name of the prior operator's Fiscal Intermediary (Mutual of Omaha), the prior operator's Medicare Information Number, the fact that Plaintiffs were "accepting assignment," and the "Effective Date of Transfer," i.e., December 1, 2006. Id.

11.      In four letters dated April 12, 2007 and a fifth dated April 26, 2007, the Centers for Medicare and Medicaid Services ("CMS") acknowledged the change of ownership of each nursing home and related that the Medicare provider agreements had been "automatically assigned" to Plaintiffs, effective December 1, 2006. Herbert Affidavit at 8. True and correct copies of those letters are attached as Exhibit 8. Id.

12.      Despite being told that Mariner no longer operated these facilities as of December 1, 2006, and even though Mariner was no longer submitting bills identifying services provided to Medicare beneficiaries, CMS continued making payments to Mariner under the

periodic interim payment ("PIP") methodology, by which a nursing home is paid, on a bi-weekly basis, an amount determined by the fiscal intermediary "estimating the reimbursable amount for the year based on the previous year's experience," subject to certain adjustments.  42 C.F.R. § 413.355(c). Herbert Affidavit at 9.

13.    Specifically, Mariner's Fiscal Intermediary, Mutual of Omaha, sent payments to Mariner on December 27, 2006, January 10 and 24, February 7 and 21, March 7 and 21, and April 4, 2007 for service periods that did not even begin until after Mariner vacated the facilities on November 30, 2006.  True and correct copies of letters Plaintiffs received from Mutual of Omaha detailing the payments made to Mariner are attached to the Statement of Facts as Exhibit 9.  Godwin Affidavit at 7.  Inexplicably, Mariner accepted these payments and has retained approximately $2.0 million in Medicare funds for services it did not provide.   Herbert Affidavit at 10.

14.    CMS has taken action against Plaintiffs to collect the payments made to Mariner. In five letters dated February 11, 2008, BCBS claims that Plaintiffs are responsible for the payments in the amounts noted below:

|                         |              |
| ----------------------- | ------------ |
| Triad at Jeffersonville | $  246,600   |
| Triad at LaGrange       | 370,011      |
| Triad at Lumber City    | 424,400      |
| Triad at Powder Springs | 946,700      |
| Triad at Thomasville    | 215,771      |
| TOTAL                   | $2,203,482   |

Herbert Affidavit at 11.   True and correct copies of the February 10 letters are attached as Exhibit 10.  Id

15.     For reasons unknown to Plaintiffs, on April 18 and May 2, 2008, Mutual of Omaha, Mariner's Fiscal Intermediary, paid Plaintiffs $245,100.   Hence, after vacating the facilities on November 30, 2006, Mariner received $1,982,600 ($2,203,482 - $ 245,100 = $1,982,600) from Mutual of Omaha, even though Mariner was no longer providing services to Medicare beneficiaries and was not submitting bills.  Herbert Affidavit at 11.  The February 11, 2008 letters advised that unless Plaintiffs paid to CMS the sums that had been paid to Mariner by February 25, 2008, CMS would recoup these funds by withholding payments due to Plaintiffs for services provided to Medicare recipients during the prior thirty-day period and for services provided in the future, until the approximately $2.0 million paid to Mariner was recouped. Exhibit 10; Herbert Affidavit at 12.

16.     The February 11, 2008 letters, however, advised that Plaintiffs could object and claim that withholding "should not occur."  Herbert Affidavit at 13; Exhibit 10.  The letters related that BCBS would "review your documentation."   Id.  However, the letters also advised that proceeding in this manner "will not delay recoupment."  Id.

17.     Upon discovering for the first time on February 12, 2007 that CMS had paid and Mariner had retained approximately $2.0 million in Medicare reimbursement for services that Mariner did not provide, Plaintiff's counsel asked Mariner's counsel to return these funds to CMS as soon as possible.  Affidavit of Jack C. Tranter ("Tranter Affidavit") at 5.  A true and correct copy of Plaintiffs counsel's February 13, 2008 letter to Mariner's counsel, Christopher Galanek, Esq. and Jennifer Dempsey, Esq., and series of email exchanges between Plaintiffs' counsel and Ms. Dempsey and Thomas Reilly, Esq. another attorney who represents Mariner, are attached collectively as Exhibit 11.  Id.  To date, Mariner's counsel has not responded Plaintiffs

request that Mariner repay to CMS the funds that were paid to Mariner after Mariner stopped providing care. Id.

18.     Plaintiffs' attempts to convince CMS to collect from Mariner the funds paid to Mariner, after Mariner vacated the facilities on December 1, 2006, rather that by withholding Medicare reimbursement due to Triad for services actually provided, were unsuccessful. True and correct copies of the correspondence between Plaintiffs' counsel and BCBS are attached as Exhibit 12. Tranter Affidavit at 6.

19.     In response to Plaintiffs' argument that Medicare reimbursement due to Plaintiffs should not be withheld to "recoup" funds that should not have been paid to Mariner, CMS advised that Plaintiffs are solely responsible for "repayment of the debt in question" regardless where the sums were deposited "or the cause of the overpayments." Tranter Affidavit at 7. In this response, CMS also stated that it "has no authority to attempt to collect these debts from Mariner." Id.

20.     Until Plaintiffs received the February 11, 2008 letters advising that Medicare funds paid to Mariner would be obtained by withholding Medicare payments due to Plaintiffs for services actually provided, they had no idea that CMS would pursue Plaintiffs for the payments CMS made to Mariner for service periods that did not even begin until after Mariner vacated the facilities. Herbert Affidavit at 14. CMS, however, maintains that the Plaintiffs are solely responsible for the payments erroneously paid to Mariner because Plaintiffs accepted assignment for Mariner's provider agreements and therefore have "successor liability" for overpayments made to the predecessor operator, Mariner. Id.

21.     The February 11 Notices of Desk Review sent to Plaintiffs (*see* Exhibit 10) directed Plaintiffs to pay to CMS the funds paid to Mariner no later than February 25, 2008,

relating, "payments will be withheld [on February 26, 2008] until payment in full is received or an extended repayment request is received." *See* Exhibit 10.

22.     The five nursing homes/skilled nursing facilities operated by Plaintiffs receive reimbursement for Medicare services on a monthly basis, as a result of billing requests identifying the services provided to Medicare beneficiaries.   Herbert Affidavit at 15. For example, on January 31, 2008, CMS paid Plaintiffs approximately $775,000 for services provided during the prior thirty-day period.   These funds are used to pay expenses associated with that care, which costs have already been incurred and must be paid.  Id.

23.     Plaintiffs submitted requests for payment to BCBS on February 8, 2008, seeking $798,477.95 in reimbursement for services provided for the month of January 2008.   Herbert Affidavit at 16. If CMS withholds funds due to Plaintiffs for services provided to Medicare beneficiaries to recoup payments paid to Mariner for services not provided, Plaintiffs will not be able to continue providing skilled nursing and other care and services to the more than 500 frail elderly residents who live in these facilities and depend upon Plaintiffs for their care, safety and well being.  Id.

Respectfully Submitted,

_____/s/  Jack C. Tranter_____
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 3rd day of March, 2008, I mailed and emailed a copy of the foregoing Statement of Material Facts Pursuant to LCvR 56.1 in Support of Plaintiffs' Motion for Summary Judgment to the following counsel for Defendants:

Wendy M. Ertmer
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, D.C. 20530
wendy.ertmer@usdoj.gov


_____/s/ Jack C. Tranter_____
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201-4033
(410) 727-7702

LAW OFFICES
OF
## THOMAS A. NASH, JR.
A PROFESSIONAL CORPORATION

TELEPHONE:  (912) 527-7060          7 EAST CONGRESS STREET, SUITE 901          E-MAIL: TANASHJR@AOL.COM
POST OFFICE BOX 3075
TELECOPIER:  (912) 527-7900         SAVANNAH, GEORGIA  31402-3075

December 16, 2003

**Transmitted via Fax #(404) 962-6617**

Diane L. Lidz, Esq.
Troutman Sanders, LLP
Bank of America Plaza
600 Peachtree Street, N.E., Suite 5200
Atlanta, GA 30308-2216

In Re:        William M. Foster/Mariner Healthcare

Dear Diane:

After receiving the latest communication from Mariner in the form of the proposed tenant mortgage, I reviewed this and the other pending matters with Mr. Foster, at least one of which I recall Ms. Perez identifying in our last telephone conference as a "deal killer".

At this time, it is important to Mr. Foster that the future of these homes be resolved. Mariner's requirements are not acceptable to Mr. Foster, just as the concept of the leasehold mortgage was unacceptable a couple of years ago when first proposed.

We regret that we were unable to reach an agreement with you regarding Mariner's future operation of the homes. We appreciate your effort in this regard. Since our last telephone conference, Mr. Foster has entered into a long term lease agreement with Triad Health Management of Georgia, LLC for the operation of these five homes, effective January 1, 2004. We would appreciate an orderly transition of the homes to their control.

Thank you, in advance, for your cooperation in this transition. Please call me if you have any questions.

Sincerely,

Thomas A. Nash, Jr.

TANJr:dw

cc:     William M. Foster

PLAINTIFF'S
EXHIBIT

1

Westlaw.

--- S.E.2d ----

Page 1

--- S.E.2d ----, 2006 WL 1891790 (Ga.App.)
(Cite as: --- S.E.2d ----)

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
Court of Appeals of Georgia.
MARINER HEALTH CARE, INC. et al.
v.
FOSTER.
Foster
v.
Mariner Healthcare, Inc. et al.
Nos. A06A0775, A06A0776.

July 11, 2006.

Jennifer Dempsey, Christopher Galanek, Powell, Goldstein LLP, N.W. Atlanta, for Appellant/Appellee.
Joshua Kight, Kight, Baggett & Kight, P.C., Dublin, Paul Caiola, Brian Tucker, Galagher Evelius & Jones LLP, Baltimore, for Appellee/Appellant.
RUFFIN, Chief Judge.
*1 Brian Center Nursing Care/Austell, Inc., a subsidiary of Mariner Health Care, Inc., (collectively, "Mariner") leased five nursing homes (the "Facilities") from William Foster. After the written leases had expired, Mariner remained in possession of the Facilities, and Mariner and Foster attempted to negotiate a new written lease. No new lease was agreed upon, and Foster eventually leased the Facilities to another company. Mariner did not vacate the Facilities, and Foster filed a declaratory judgment action seeking a determination of the rights of the parties. Mariner counterclaimed, seeking a declaratory judgment that it had a contractual right of first refusal to re-lease the Facilities and arguing that Foster breached an oral contract and is bound by promissory estoppel.

The parties filed cross-motions for summary judgment. On the issue of the existence of a right of first refusal, the trial court granted Foster's motion for summary judgment and denied Mariner's motion for partial summary judgment. The trial

court denied Foster's motion for summary judgment on Mariner's claim for promissory estoppel. The trial court also denied Mariner's motions to transfer venue and for judgment on the pleadings. We granted Mariner's motion for interlocutory appeal in Case No. A06A0775, and Foster cross-appeals in Case No. A06A0776. For reasons that follow, we affirm in Case No. A06A0775 and reverse in Case No. A06A0776.

We conduct a de novo review of both the law and the evidence on appeal from the grant or denial of a motion for summary judgment.[FN1] We view the evidence in a light most favorable to the nonmovant in order "to determine whether a genuine issue of material fact exists and whether the moving party was entitled to judgment as a matter of law."[FN2]

FN1. See *Guideone Life Ins. Co. v. Ward,* 275 Ga.App. 1, 2 (619 S.E.2d 723) (2005).

FN2. Id.

Mariner and Foster entered into two leases, one for the Facilities located in Thomasville, Jeffersonville, Lumber City, and La Grange, Georgia, and one for the Facility in Powder Springs, Georgia. The leases gave Mariner a right of first refusal as to any re-lease of the Facilities under the following conditions:
Lessor covenants during the Lease Term not to sell ... . or agree to re-lease effective upon the termination of this Lease, any one or more of the Facilities without first giving Lessee at least thirty (30) days written notice (the "Offer Notice") specifying the terms of said sale ... or lease, ... which Offer Notice shall be deemed to constitute an offer by Lessor to sell ... or lease such Facility or Facilities to Lessee on the same terms and conditions ... as set forth in the offer notice.

The two leases ended on March 31, 2003. While

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



PLAINTIFF'S EXHIBIT
2

--- S.E.2d ----

--- S.E.2d ----, 2006 WL 1891790 (Ga.App.)
(Cite as: --- S.E.2d ----)

Page 2

Mariner and Foster negotiated for either an extension of the leases or new leases. Mariner remained in possession of the Facilities and continued to pay rent. The parties discussed "a partial renewal of the Leases for a period of six (6) months commencing on April 1, 2003 and ending on September 30, 2003." Although Foster disputes that he agreed to these terms, viewing the negotiations in the light most favorable to Mariner, they resulted in a six-month extension of the leases. Mariner did not vacate the Facilities after the six-month extension had expired, and negotiations for a new lease continued unsuccessfully into the fall of 2003.

*2 On December 15, 2003, Foster entered into a written lease for the Facilities with Triad Health Management of Georgia, LLC. He did not provide Mariner with a right of first refusal. The next day, December 16, 2003, Foster notified Mariner that the Facilities had been leased to Triad effective January 1, 2004, and asked for "an orderly transition of the [Facilities] to [Triad's] control." Mariner did not vacate the Facilities, and this litigation ensued.

The trial court found that Mariner was a tenant at will in December 2003 and, as such, would only be entitled to a right of first refusal if that right were a general term or condition of the original leases that continued to govern the at will relationship. It concluded that the right of first refusal was not a general term or condition of the Leases and could not be enforced by Mariner once it was a tenant at will. Accordingly, the trial court denied Mariner's motion for partial summary judgment and granted Foster's motion for summary judgment as to the right of first refusal issue. It also denied Mariner's motion for judgment on the pleadings and motion to transfer venue. The trial court denied Foster's motion for summary judgment on Mariner's promissory estoppel claim because it found that, while no enforceable contract right existed, there was "some evidence of a promise made and reliance upon that promise to [Mariner's] detriment."

1. Preliminarily, we note that in both cases Mariner's counsel has repeatedly failed to provide adequate citation to the record, frequently referring

to spans of 100 to 200 pages as the source for specific quotes upon which it relies. References to the record in briefs should contain specific page numbers.[FN3] We caution Mariner's counsel that our rules "are designed to facilitate the consideration of enumerated errors, and ... compliance with such rules is not optional." [FN4] Future violations of the Court's rules may result in sanctions.[FN5]

FN3. See Court of Appeals Rule 25(c)(3)(i).

FN4. *In the Interest of D. D.,* 273 Ga.App. 839(1) (616 S.E.2d 179) (2005).

FN5. See *Smith v. State,* 278 Ga.App. 315(1) (628 S.E.2d 722) (2006).

*Case No. A06A0775*

2. Mariner challenges the trial court's holding that it could not enforce a right of first refusal. Mariner contends that when the leases were extended beginning in April 2003, Foster agreed that the terms and conditions of the leases would continue in force so long as the parties continued to negotiate. Mariner bases its argument on (1) comments made by Foster's representative relating to the March 2003 negotiations to the effect that negotiations would continue as long as Mariner continued to pay rent, and (2) on a letter relating to the lease extension stating that "[a]ll other terms and conditions of the above-referenced Leases shall continue in full force and affect [sic]." But none of this evidence, even when viewed in a light most favorable to Mariner, contains a specific time frame. And, assuming there was an extension of the leases, it terminated on September 30, 2003. Any lease beyond that time was, at best, an oral agreement for an indefinite period of time, hence unenforceable. [FN6] Under Georgia law, "[w]here no time is specified for the termination of a tenancy, the law construes it to be a tenancy at will." [FN7] The trial court properly concluded that in December 2003, no written lease agreement for a specific time period governed the relationship between Mariner and Foster, and that Mariner was a tenant at will.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.E.2d ----                                                                    Page 3

--- S.E.2d ----, 2006 WL 1891790 (Ga.App.)
(Cite as: --- S.E.2d ---)

FN8

FN6. See *Lenning v. Morgan*, 228 Ga.App. 763, 764-765(1) (492 S.E.2d 742) (1997); *Farmer v. Argenta*, 174 Ga.App. 682, 683 (331 S.E.2d 60) (1985) (physical precedent only).

FN7. OCGA § 44-7-6.

FN8. See *Valiant Steel & Equipment v. Roadway Express*, 205 Ga.App. 237, 240(2) (421 S.E.2d 773) (1992); *Plank v. Bourdon*, 173 Ga.App. 391, 394(2) (326 S.E.2d 571 (1985).

*3 " 'One who is a tenant at will by virtue of his holding over after the expiration of the term of his lease holds the premises subject to the general terms and conditions specified in the lease, except so far as modified by mutual agreement.' " FN9 Thus, as a tenant at will in December 2003, Mariner could enforce the right of first refusal in the original leases only if it was a general term or condition of the leases. Whether a right of first refusal is a general term or condition of a lease appears to be an issue of first impression in Georgia.

FN9. *Colonial Self Storage & c. v. Concord Properties*, 147 Ga.App. 493, 494(1) (249 S.E.2d 310) (1978).

We conclude that the general terms and conditions of a lease are those indispensable to a continuing landlord/tenant relationship; "at a minimum, provisions for rent and repairs." FN10 We agree with the trial court that the right of first refusal was not a general term or condition of the leases because it is not a term or condition that is necessary in order for the landlord/tenant relationship to continue. Moreover, the leases here specifically included a time limit on the availability of the right of first refusal, which was "during the lease term." The construction of a lease, which is a contract, is generally a question of law for the court. FN11 If the language of a contract is clear and unambiguous, we enforce those terms and need not

look elsewhere to assist in the contract's interpretation. FN12 Here, the clear and unambiguous language of the contract provides that the right of first refusal only existed during the lease term. FN13 The trial court did not err in holding as a matter of law that Mariner, a tenant at will, could not enforce the right of first refusal contained in the expired leases.

FN10. See *Gully v. Glover*, 190 Ga.App. 238, 240(2) (378 S.E.2d 411) (1989).

FN11. See *Shore v. Loomis*, 187 Ga.App. 674, 675(1) (371 S.E.2d 96) (1988).

FN12. See *Holcim (US), Inc. v. AMDG, Inc.*, 265 Ga.App. 818, 820 (596 S.E.2d 197) (2004).

FN13. See *Booker v. Hall*, 248 Ga.App. 639, 642(1)(b) (548 S.E.2d 391) (2001) (right of first refusal limited to two years by terms of contract); see, e.g., *Burns v. Reves*, 217 Ga.App. 316, 317-318(1) (457 S.E.2d 178) (1995) (purchase option in lease expired at end of lease and could not later be exercised by hold-over tenants).

3. Mariner argues that the trial court erred in denying its motion for judgment on the pleadings because Foster failed to state a claim for declaratory judgment or show that he is entitled to the remedy of dispossession. We conduct a de novo review of a trial court's ruling on a motion for judgment on the pleadings. FN14 Because a motion for judgment on the pleadings should be granted only when there is a complete failure to state a claim, we treat all well-pled material allegations by the nonmovant as true and all denials by the movant as false. FN15

FN14. See *Bogard v. Inter-State Assurance Co.*, 263 Ga.App. 767, 589 S.E.2d 317 (2003).

FN15. See *Ware v. Fidelity Acceptance Corp.*, 225 Ga.App. 41, 44(3) (482 S.E.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.E.2d ----

--- S.E.2d ----, 2006 WL 1891790 (Ga.App.)
(Cite as: --- S.E.2d ----)

536) (1997).

(a) Georgia's declaratory judgment act is to be construed liberally, and all that is required to state a claim for declaratory judgment is "the presence in the declaratory action of a party with an interest in the controversy adverse to that of the petitioner." FN16 We have previously held that "a determination of the rights of the parties to a lease agreement is a proper subject for relief under the [declaratory judgment] act." FN17 Accordingly, we are unpersuaded by Mariner's argument that Foster cannot seek a declaratory judgment because he has already executed a lease with Triad and filed dispossessory actions against Mariner and thus does not seek the trial court's guidance as to future acts. The dispossessory actions against Mariner have been stayed pending the outcome of this action, and Mariner remains in possession of the Facilities. The outcome here clearly will govern Foster's future actions toward Mariner. Because Foster's complaint is sufficient to state a claim for declaratory judgment, the trial court properly denied Mariner's motion for judgment on the pleadings on this basis.FN18

> FN16. *RTS Landfill v. Appalachian Waste Systems, LLC*, 267 Ga.App. 56, 63(3) (598 S.E.2d 798) (2004).

> FN17. *Cook Farms, Inc. v. Bostwick*, 165 Ga.App. 692, 693(1) (302 S.E.2d 574) (1983).

> FN18. See *RTS Landfill*, supra.

*4 (b) Mariner also contends that the trial court should have dismissed Foster's case because he has not complied with Georgia's statutory procedures for dispossessing a tenant at will, and thus is not entitled to the remedy of dispossession that he seeks. Specifically, Mariner argues that Foster did not give 60 days' notice to vacate the premises and, when the 60 days had expired, did not make a demand for possession.FN19 But, taking the allegations in Foster's complaint as true, he notified Mariner on December 16, 2003 that he was terminating its tenancy at will, and "the statutorily

required sixty (60) day notice for termination of a tenancy at will ended on February 14, 2004." This gave Mariner "fair notice of the claim and a general indication of the type of litigation involved." FN20 We therefore agree with the trial court that Foster's allegations are sufficient to state a claim upon which relief might be granted, and we affirm its denial of Mariner's motion for judgment on the pleadings.FN21

> FN19. See OCGA § 44-7-7 (landlord must provide tenant with 60 days' notice to terminate tenancy at will); OCGA § 44-7-50 (at the end of the 60 days, landlord may make additional demand for possession).

> FN20. *Lathem v. Hestley*, 270 Ga. 849, 850 (514 S.E.2d 440) (1999); see also *Alexander v. Steining*, 197 Ga.App. 328, 332 (398 S.E.2d 390) (1990).

> FN21. See *Smith v. Local Union No. 1863*, 260 Ga.App. 683, 685-686(2) (580 S.E.2d 566 (2003).

4. Mariner Health Care, Inc. also challenges the trial court's denial of its motion to transfer venue. This action was brought in Twiggs County; Mariner Health Care argues that as a corporation with its only registered office in DeKalb County, it must be sued in DeKalb County. We will affirm a trial court's ruling on a motion to transfer venue if it is supported by any evidence. FN22

> FN22. See *Conrad v. Conrad*, 278 Ga. 107, 109 (597 S.E.2d 369) (2004).

Where there are multiple defendants, venue is proper in any county where one of the defendants may be sued.FN23 The trial court held that venue was proper in Twiggs County as to Brian Center Nursing Care/Austell, Inc. under OCGA § 14-2-510(b)(2). Pursuant to that code section, venue is proper "[i]n actions based on contracts, in that county in this state where the contract to be enforced was made or is to be performed, if the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.E.2d ----

--- S.E.2d ----, 2006 WL 1891790 (Ga.App.)
(Cite as: --- S.E.2d ----)

corporation has an office and transacts business in that county." [FN24] Although awkwardly phrased, the trial court's order concludes that because one of the Facilities at issue is located in Twiggs County and Brian Center has an office and transacts business there, venue was proper as to Brian Center and, consequently, as to its co-defendant, Mariner Health Care. Because there is some evidence to support the trial court's finding that venue was proper in Twiggs County, we affirm.[FN25]

> FN23. See Ga. Const.1983, Art. VI, Sec. II, Par. IV; OCGA § 9-10-31.

> FN24. OCGA § 14-2-510(b)(2).

> FN25. See *McLendon v. Albany Warehouse Co.*, 203 Ga.App. 865, 867-869(2) (418 S.E.2d 130) (1992); *Chrysler Credit Corp. v. Brown*, 198 Ga.App. 653, 655(2) (402 S.E.2d 753) (1991).

*Case No. A06A0776*

5. In his cross-appeal, Foster asserts that the trial court erred in denying his motion for summary judgment on Mariner's promissory estoppel claim. [FN26] A defendant is entitled to summary judgment "if it is able to pierce the plaintiff's pleadings as to any material element and the plaintiff is unable to respond with any evidence to create a jury issue as to that element." [FN27] The elements of promissory estoppel are:

> FN26. Mariner contends that certain of Foster's arguments on cross-appeal were not raised in the trial court and thus cannot be considered on appeal. However, our review of the voluminous record, including Foster's memoranda in support of his motion for summary judgment and the hearing transcript, indicates that these issues were before the trial court and we may address them. See *Georgia Farm Bureau Mut. Ins. Co. v. Shook*, 215 Ga.App. 66, 67-68 (449 S.E.2d 658)

(1994).

> FN27. *Garrett v. NationsBank, N.A.*, 228 Ga.App. 114, 116 (491 S.E.2d 158) (1997).

(1) the defendant made a promise or promises; (2) the defendant should have reasonably expected the plaintiffs to rely on such promise; (3) the plaintiffs relied on such promise to their detriment; and (4) an injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, plaintiffs changed their position to their detriment by surrendering, forgoing, or rendering a valuable right.[FN28]

> FN28. *McReynolds v. Prudential Ins. Co.*, 276 Ga.App. 747, 749(1) (624 S.E.2d 218) (2005).

*5 Promissory estoppel does not apply to a promise that is vague, indefinite, or of uncertain duration.[FN29]

> FN29. See *Voyles v. Sasser*, 221 Ga.App. 305, 306(2) (472 S.E.2d 80) (1996) (promissory estoppel does not apply to a promise to continue to do business with company indefinitely); *Loy's Office Supplies v. Steelcase, Inc.*, 174 Ga.App. 701, 702 (331 S.E.2d 75) (1985) (no promissory estoppel where promise was made to continue business relationship for an indefinite period of time).

Here, the promise upon which Mariner alleges it relied was "that the terms and conditions of the Lease would continue as long as [Mariner] paid rent and continued to negotiate." Mariner contends that it was harmed as a result of relying on this promise because it "continued to occupy the facilities; ... increased its rent payments[;] ... made each rent payment to Foster; and ... undertook negotiations with Foster for a new lease." But the alleged promise, even when viewed in the light most favorable to Mariner, was for an indefinite period of time. It was also vague, as the parties did not attempt to define what would constitute

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.E.2d ----                                                                          Page 6

--- S.E.2d ----, 2006 WL 1891790 (Ga.App.)
(Cite as: --- S.E.2d ----)

continuing to negotiate.[FN30] As such, it cannot be the basis for a promissory estoppel claim, and the trial court erred in denying Foster's motion for summary judgment on this ground.[FN31]

> FN30. See *Reuben v. First Nat. Bank of Atlanta,* 146 Ga.App. 864, 867 (247 S.E.2d 504) (1978) (promise to make loan unenforceable under theory of promissory estoppel where promise did not establish specific terms of the loan).

> FN31. See *Voyles,* supra.

*Judgment affirmed in Case No. A06A0775 and reversed in Case No. A06A0776.*

SMITH, P.J., and PHIPPS, J., concur.
Ga.App.,2006.
Mariner Health Care, Inc. v. Foster
--- S.E.2d ----, 2006 WL 1891790 (Ga.App.)

Briefs and Other Related Documents (Back to top)

• A06A0775 (Docket) (Dec. 8, 2005)
• A06A0776 (Docket) (Dec. 8, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10/18/2006  16:05    4782721773              FOSTER DEVELOPMENTQT                    PAGE  01



**MARINER**
Health·Care

October 10, 2006

Mr. William M. Foster
145 Spring Street
Macon, GA 31201

Re:   Surrender of Brian Center/Powder Springs, Brian Center/Jeffersonville, Brian
      Center/LaGrange, Brian Center/Lumber City, Brian Center/Thomasville, Brian
      Center/Powder Springs, Brian Center/Jeffersonville, Brian Center/LaGrange,
      Brian Center/Lumber City (collectively, the "Facilities")

Dear Mr. Foster:

In connection with the conclusion of our recent litigation, I am writing to notify you that
Mariner Health Care, Inc. and its subsidiaries ("Mariner") will surrender possession and
operation of the Facilities to you or your designee on December 1, 2006. We would
appreciate your cooperation in accomplishing a smooth transition.

As you know, to ensure the uninterrupted care of the patients currently residing at the
Facilities it is critical that we agree to an orderly process to transfer the operations of the
Facilities. As a result, enclosed with this letter please find a form of Operations Transfer
Agreement that will set forth the terms and conditions of the transfer of operations of the
Facilities to you or your designee.

We appreciate your consideration in this matter and if you wish to discuss the Operations
Transfer Agreement or any matters relating to the Facilities, please do not hesitate to
contact me at 678-443-6872.

Yours truly,

Boyd P. Gentry
Executive Vice President and
Chief Financial Officer



PLAINTIFF'S
EXHIBIT
3

La Grange

# MEDICARE

## FEDERAL HEALTH CARE
### PROVIDER/SUPPLIER ENROLLMENT APPLICATION



Application for Health Care
Providers that will Bill
Medicare Fiscal Intermediaries

**CENTERS FOR MEDICARE & MEDICAID SERVICES**



PLAINTIFF'S
EXHIBIT

4

CMS 855A (11/2001)
(Formerly HCFA 855)

OMB Approval No. 0938-0685

# CENTERS FOR MEDICARE & MEDICAID SERVICES

**Medicare Provider/Supplier Enrollment Application**

## Privacy Act Statement

The Centers for Medicare and Medicaid Services (CMS) is authorized to collect the information requested on this form by sections 1124(a)(1), 1124A(a)(3), 1128, 1814, 1815, 1833(e), and 1842(r) of the Social Security Act [42 U.S.C. §§ 1320a-3(a)(1), 1320a-7, 1395f, 1395g, 1395(I)(e), and 1395u(r)] and section 31001(1) of the Debt Collection Improvement Act [31 U.S.C. § 7701(c)].

The purpose of collecting this information is to determine or verify the eligibility of individuals and organizations to enroll in the Medicare program as providers/suppliers of goods and services to Medicare beneficiaries and to assist in the administration of the Medicare program. This information will also be used to ensure that no payments will be made to providers or suppliers who are excluded from participation in the Medicare program. All information on this form is required, with the exception of those sections marked as "optional" on the form. Without this information, the ability to make payments will be delayed or denied.

The information collected will be entered into the Provider Enrollment, Chain and Ownership System (PECOS), and either system number 09-70-0525 titled Unique Physician/Practitioner Identification (UPIN) System (published in Vol. 61 of the Federal Register at page 20,528 (May 7, 1996)), or the National Provider Identifier (NPI) System, Office of Management and Budget (OMB) approval 0938-0684 (R-187). The information in this application will be disclosed according to the routine uses described below.

**Information from these systems may be disclosed under specific circumstances to:**
1) CMS contractors to carry out Medicare functions, collating or analyzing data, or to detect fraud or abuse;
2) A congressional office from the record of an individual health care provider/supplier in response to an inquiry from the congressional office at the written request of that individual health care practitioner;
3) The Railroad Retirement Board to administer provisions of the Railroad Retirement or Social Security Acts;
4) Peer Review Organizations in connection with the review of claims, or in connection with studies or other review activities, conducted pursuant to Part B of Title XVIII of the Social Security Act;
5) To the Department of Justice or an adjudicative body when the agency, an agency employee, or the United States Government is a party to litigation and the use of the information is compatible with the purpose for which the agency collected the information;
6) To the Department of Justice for investigating and prosecuting violations of the Social Security Act, to which criminal penalties are attached;
7) To the American Medical Association (AMA), for the purpose of attempting to identify medical doctors when the Unique Physician Identification Number Registry is unable to establish identity after matching contractor submitted data to the data extract provided by the AMA;
8) An individual or organization for a research, evaluation, or epidemiological project related to the prevention of disease or disability, or to the restoration or maintenance of health;
9) Other Federal agencies that administer a Federal health care benefit program to enumerate/enroll providers/suppliers of medical services/supplies or to detect fraud or abuse;
10) State Licensing Boards for review of unethical practices or non-professional conduct;
11) States for the purpose of administration of health care programs; and/or
12) Insurance companies, self insurers, health maintenance organizations, multiple employer trusts, and other health care groups providing health care claims processing, when a link to Medicare or Medicaid claims is established, and data are used solely to process provider's/supplier's health care claims.

The enrolling provider or supplier should be aware that the Computer Matching and Privacy Protection Act of 1988 (P.L. 100-503) amended the Privacy Act, 5 U.S.C. § 552a, to permit the government to verify information through computer matching.

## Protection of Proprietary Information

Privileged or confidential commercial or financial information collected in this form is protected from public disclosure by Federal law 5 U.S.C. § 552(b)(4) and Executive Order 12600.

## Protection of Confidential Commercial and/or Sensitive Personal Information

If any information within this application (or attachments thereto) constitutes a trade secret or privileged or confidential information (as such terms are interpreted under the Freedom of Information Act and applicable case law), or is of a highly sensitive personal nature such that disclosure would constitute a clearly unwarranted invasion of the personal privacy of one or more persons, then such information will be protected from release by CMS under 5 U.S.C. §§ 552(b)(4) and/or (b)(6), respectively.

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## INSTRUCTIONS FOR HEALTH CARE PROVIDERS THAT WILL BILL MEDICARE FISCAL INTERMEDIARIES

Please **PRINT** or **TYPE** all information so it is legible. Failure to provide all requested information might cause the application to be returned and may delay the enrollment process. See inside front cover for mailing instructions. Electronic copies of all CMS Medicare enrollment forms can be found at the Medicare web-site at (http://www.hcfa.gov/medicare/enrollment/forms/). These electronic forms may be downloaded to your computer, completed on screen, printed, signed, and mailed to the appropriate Medicare contractor.

Whenever additional information needs to be reported within a section, copy and complete that section for each additional entry. We strongly suggest maintaining a photocopy of the provider's completed application and supporting documents for future reference.

This application is to be completed by all health care provider organizations that provide medical services to Medicare beneficiaries and who bill fiscal intermediaries. For purposes of this application and Medicare enrollment, all such organizations will be referred to as "providers." A list of the provider types that should complete this application can be found in Section 2A. Failure to promptly submit a completed CMS 855A to the fiscal intermediary will result in delays in obtaining enrollment and billing privileges.

After completing the enrollment application, the provider may wish to complete and submit additional forms in the following situations:

- To have Medicare payments sent electronically to a provider's bank account, the provider should complete the form "Medicare Authorization Agreement for Electronic Funds Transfers" (Form HCFA-588).

- To submit claims electronically, the provider will need to complete the Electronic Data Interchange (EDI) agreement.

If the provider plans to do any of the above, submit the appropriate form(s)/agreement with this application. The forms should have been received in the initial enrollment package. If not, they can be obtained from the Medicare fiscal intermediary.

## APPLICATION SUBMISSION AND PROCESSING

This application should be submitted directly to your intermediary of preference. See the CMS web-site (http://www.hcfa.gov/medicare/enrollment) for a listing of fiscal intermediaries. Providers that are part of a chain, or that share fiscal data with other enrolled providers, may choose the same fiscal intermediary, even if they are not located in the area normally serviced by that fiscal intermediary. Home Health Agencies (HHA) and Hospices should submit this application to their regional home health intermediary (RHHI). However, if the HHA is provider based, it should submit this application to its parent provider's fiscal intermediary. The provider's fiscal intermediary of preference does not automatically guarantee that it will be assigned to that fiscal intermediary. Providers, who are currently enrolled in the Medicare program and are requesting to change their fiscal intermediary, must submit their request to the Medicare Regional Office prior to submission of this application. However, this is not applicable when the fiscal intermediary changes as the result of a CHOW, acquisition/merger, or a consolidation and the fiscal intermediary of preference is the fiscal intermediary currently being used by the provider who is acquiring the changing provider. The fiscal intermediary will answer any questions you have concerning completion of the CMS 855A.

The provider must immediately contact the local State Agency that handles the provider type being enrolled. The State Agency will provide you with any State-specific forms required for your provider type. They will also do preliminary planning for any required State Surveys or notice of accreditation in lieu of a survey (when this is permitted).

If the provider does not currently have a Medicare identification number, the CMS regional office will assign one upon the successful completion of enrollment. Issuance of a Medicare identification number usually requires a written agreement (usually a provider agreement) with CMS. If the fiscal intermediary should contact the provider for additional information, the provider must furnish the information immediately to ensure the timely processing of this

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## DEFINITIONS OF MEDICARE ENROLLMENT TERMINOLOGY

To help you understand certain terms used throughout the application, we have included the following definitions.

<u>Authorized Official</u>-An appointed official to whom the provider has granted the legal authority to enroll it in the Medicare program, to make changes and/or updates to the provider's status in the Medicare program (e.g., new practice locations, change of address, etc.) and to commit the provider to fully abide by the laws, regulations, and program instructions of Medicare. The authorized official must be the provider's general partner, chairman of the board, chief financial officer, chief executive officer, president, direct owner of 5% or more of the provider (see Section 5 for the definition of a "direct owner"), or must hold a position of similar status and authority within the provider's organization.
<u>Billing Agency</u>-A Company that the enrolling provider contracts with to furnish claims processing functions for the provider.
<u>Carrier</u>-The Part B Medicare claims processing contractor.
<u>Delegated Official</u>-Any individual who has been delegated, by the provider's "Authorized Official," the authority to report changes and updates to the provider's enrollment record. A delegated official must be a managing employee (W-2) of the provider or have a 5% ownership interest, or any partnership interest, in the provider.
<u>Fiscal Intermediary</u>-The Part A Medicare claims processing contractor.
<u>Legal Business Name</u>-The name that is reported to the Internal Revenue Service (IRS) for tax reporting purposes.
<u>Medicare Identification Number</u>-This is a generic term for any number that uniquely identifies the enrolling provider. Examples of Medicare identification numbers are Unique Physician/Practitioner Identification Number (UPIN), Online Survey Certification and Reporting number (OSCAR), and National Supplier Clearinghouse (number) (NSC).
<u>Mobile Facility/Portable Unit</u>-These terms apply when a service that requires medical equipment is provided in a vehicle, or the equipment for the service is transported to multiple locations within a geographic area. The most common types of mobile facilities/portable units are mobile IDTFs, portable X-ray, portable mammography, and mobile clinics. Physical therapists and other medical practitioners (e.g., physicians, nurse practitioners, physician assistants) who perform services at multiple locations (i.e., house calls, assisted living facilities) are not considered to be mobile facilities/portable units.
<u>Provider</u>-A provider is a hospital, critical access hospital, skilled nursing facility, nursing facility, comprehensive outpatient rehabilitation facility, home health agency, or hospice, that has in effect an agreement to participate in Medicare; or a rural health clinic (RHC), Federally qualified health center (FQHC), rehabilitation agency, or public health agency that has in effect a similar agreement but only to furnish outpatient physical therapy or speech pathology services; or a community mental health center that has in effect a similar agreement but only to furnish partial hospitalization services. A provider is not synonymous with the corporation or other legal entity that owns or operates the provider. The "provider" is the CMS recognized provider type listed above. Therefore, an owning or operating entity may own or operate many providers.
<u>Provider Identification Number (PIN)</u>-This number is assigned to providers, suppliers, groups and organizations in Medicare Part B. This number will identify who provided the service to the beneficiary on the Medicare claim form.
<u>Supplier</u>-A physician or other practitioner, or an organization other than a provider that furnishes health care services under Medicare Part B. The term supplier also includes independent laboratories, portable x-ray services, physical therapists in private practice, end stage renal disease (ESRD) facilities, and chiropractors.
<u>Tax Identification Number (TIN)</u>-This is a number issued by the Internal Revenue Service (IRS) that the provider uses to report tax information to the IRS.
<u>Unique Physician/Practitioner Identification Number (UPIN)</u>-This number is assigned to physicians, non-physician practitioners, and suppliers to identify the referring or ordering physician on Medicare claims.
To reduce the burden of furnishing some types of supporting documentation, we have designated specific types of documentation to be furnished on an "as needed" basis. However, the fiscal intermediary may request, at any time during the enrollment process, documentation to support or validate information that is reported in this application. Some examples of documents that may be requested for validation are billing agreements, W-2s, pay stubs, articles of incorporation, and partnership agreements.

## HOW TO MAKE CHANGES OR UPDATES TO A PREVIOUS APPLICATION

If a provider organization has a change in its tax identification number (TIN), a new enrollment application must be completed, even if most of the data on the form remains the same unless the TIN is the only information that is changing (see "Change of Information" instructions on page 5). If an existing provider and/or the provider's organization changes its name, address, etc., and there is no change in its tax identification number, the provider must annotate the change by checking the section where the change is going to be made and sign and date the certification statement. For example, if an existing provider is only changing a practice location and has previously completed an application, the provider completes Sections 1, 4, and 15. The provider does not complete a full application.

OMB Approval No. 0938-0685

## General Instructions

The Medicare Federal Health Care Provider/Supplier Enrollment Application has been designed by the Centers for Medicare and Medicaid Services (CMS) to assist in the administration of the Medicare program and to ensure that the Medicare program is in compliance with all regulatory requirements. The information collected in this application will be used to ensure that payments made from the Medicare trust fund are only paid to qualified health care providers, and that the amounts of the payments are correct. This information will also identify whether the provider is qualified to render health care services and/or furnish supplies to Medicare beneficiaries. To accomplish this, Medicare must know basic identifying and qualifying information about the health care provider that is seeking billing privileges in the Medicare program.

Medicare needs to know: (1) the type of health care provider enrolling, (2) what qualifies this provider as a health care related provider of services and/or supplies, (3) where this provider intends to render these services and/or furnish supplies, and (4) those persons or entities with an ownership interest, or managerial control, as defined in this application, over the provider.

This application **MUST** be completed in its entirety, unless the appropriate box is checked to indicate the section does not apply or when reporting a change to previously submitted information. If a section does not apply to this provider, check (X) the appropriate box in that section and skip to the next section.

### 1. General Application Information

#### A. Reason for Submittal of this Application

This section is to be completed with general information as to why this application is being submitted and whether this provider currently has a business relationship with another Federal health care program. To ensure timely processing of this application, **Numbers 1 and 2 below MUST ALWAYS be completed.**

**1.** Check one:   ☐ Initial Enrollment     ☐ Reactivation

☐ Change of Information (Check appropriate Section(s))

☐ 1   ☐ 2   ☐ 3   ☐ 4   ☐ 5   ☐ 6   ☐ 7   ☐ 8   ☐ 9

☐ 10   ☐ 11   ☐ 12   ☐ 13   ☐ 15   ☐ 16

☐ Voluntary Termination of Billing Number - Effective Date (MM/DD/YYYY): _____ / /

☒ Change of Ownership (CHOW) - See Instructions and Complete Section 1B

☐ Acquisition/Merger (including the CHOW) - See Instructions and Complete Section 1C

☐ Consolidation (including the CHOW) - See Instructions and Complete Section 1D

**2.** Tax Identification Number : *20-5933784*

**3.** Medicare Identification Number : *11-5354*

**4.** Fiscal Intermediary Preference:

a) Check here ☐ if this provider is enrolling in the Medicare program for the first time. If known, furnish the name of the provider's fiscal intermediary preference in Section 1A4c below.

b) Check here ☒ if this provider is currently enrolled in the Medicare program and is requesting a change of its fiscal intermediary as a result of a CHOW, acquisition/merger, or a consolidation, and furnish the name of the new preferred fiscal intermediary in Section 1A4c below.

c) Name of Preferred Fiscal Intermediary : *BLUE CROSS BLUE SHIELD OF GEORGIA*

CMS 855A (11/2001)

**A. General Application Information (Continued)**

### B. Change of Ownership Information (CHOW Only)

This section is to be completed with information that identifies the name and Medicare identification number of the currently enrolled provider (Transferor) prior to the change of ownership. This section must be completed by both the current owner(s) (to protect them from any future liabilities) and the new owner (to establish payment under its tax identification number).  **Submit two copies of the sales or other asset transfer agreement with this application.**

1. Legal Business Name of Transferor as Reported to the IRS
   *BRIAN CENTER HEALTH AND REHAB / LAGRANGE*

2. "Doing Business As" Name of Transferor (if applicable)

| 3. Medicare Identification Number of Transferor  *115354* | Projected Effective Date of Transfer (MM/DD/YYYY)  *12/01/2006* | Name of Fiscal Intermediary of Transferor  *BCBS GA* |
|---|---|---|

4. Will the new owner be accepting assignment of the current "Provider Agreement?"   ☒ YES ☐ NO

### C. Acquisitions/Merger (including the CHOW)     Effective Date of Acquisition:     *12/01/2006*

This section is to be completed when:
1) A currently enrolled provider is acquiring another currently enrolled provider(s), or
2) A currently enrolled provider is being acquired by another currently enrolled provider. **All** providers involved in the acquisition <u>must</u> complete this section. For each provider, furnish the following information: legal business name, tax identification number, current fiscal intermediary, and Medicare identification number. For the provider being acquired, furnish the name of the sub-units of that provider and provide each sub-unit's Medicare identification number. Also indicate whether that sub-unit will remain active. If more than one provider is being acquired, copy and complete this section as needed.

**NOTE: Submit two copies of the sales or other asset transfer agreement(s) with this application.**

### 1. Provider Being Acquired

This section is to be completed with information about the currently enrolled provider that is being acquired and will no longer retain its current Medicare provider number as a result of this acquisition.

| a) Legal Business Name of the "Provider Being Acquired" as Reported to the IRS | Tax Identification Number |
|---|---|
| Brian Center Health and Rehab / LaGrange | |
| b) Current Fiscal Intermediary | Medicare Identification Number |
| | 115354 |

c) Furnish the name and Medicare identification number of all sub-units of the above provider that have separate Medicare identification numbers but have not entered into separate provider agreements, such as PPS excluded swing bed units of a hospital.

Name/Department:                                    Medicare Identification Number:

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

### 2. Acquiring Provider

This section is to be completed with information about the organization acquiring the provider identified in Section 1C1.

| a) Legal Business Name of the "Acquiring Provider" as Reported to the IRS | Tax Identification Number |
|---|---|
| *TRIAD AT LAGRANGE I, LLC* | *20-5933784* |
| b) Current Fiscal Intermediary  *BCBS GA* | Medicare Identification Number  *11-5354* |

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## 1. General Application Information (Continued)

### D. Consolidations (Including the CHOW)        Effective Date of Consolidation:        12/01/2006

All currently enrolled providers that are consolidating with other currently enrolled providers must complete this section with information about all the providers involved. This section is only to be completed when the consolidation of two or more providers results in an entirely new provider and the issuance of a new Medicare provider number. For each provider, furnish the following information: legal business name, tax identification number, current fiscal intermediary, Medicare identification number, and all sub-units of each provider. For each sub-unit, furnish the Medicare identification number and indicate which sub-units will remain active. In addition, complete Section 1D3 with identifying information about the newly created provider. If there are more than two consolidating providers, copy and complete this section as needed.

### 1.   1st Consolidating Provider

This section is to be completed with information about the 1st currently enrolled provider that, as a result of this consolidation, will no longer retain its current Medicare provider number.

| a)  Legal Business Name of the Provider Organization as Reported to the IRS | Tax Identification Number |
|---|---|
| b)  Current Fiscal Intermediary | Medicare Identification Number |

c)  Furnish the name and Medicare identification number of all sub-units of the above provider that have separate Medicare identification numbers but have not entered into separate provider agreements, such as PPS excluded swing bed units of a hospital.

Name/Department:                                          Medicare Identification Number:

_____                          _____

_____                          _____

_____                          _____

_____                          _____

### 2.   2nd Consolidating Provider

This section is to be completed with information about the 2nd currently enrolled provider that, as a result of this consolidation, will also no longer retain its current Medicare provider number.

| a)  Legal Business Name of the Provider Organization as Reported to the IRS  *N/A* | Tax Identification Number  *N/A* |
|---|---|
| b)  Current Fiscal Intermediary  *N/A* | Medicare Identification Number  *N/A* |

c)  Furnish the name and Medicare identification number of all sub-units of the above provider that have separate Medicare identification numbers but have not entered into separate provider agreements, such as PPS excluded swing bed units of a hospital.

Name/Department:                                          Medicare Identification Number:

_____                          _____

_____                          _____

_____                          _____

_____                          _____

### 3.   Newly Created Provider Identification Information

Complete this section with identifying information about the newly created provider resulting from this consolidation.

| a)  Legal Business Name of the new Provider as Reported to the IRS  *TRIAD AT LAGRANGE I, LLC* | Tax Identification Number  *20-5933784* |
|---|---|
| b)  Fiscal Intermediary Preference  *BLUE CROSS BLUE SHIELD OF GEORGIA* | |

7

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## 2. Provider Identification

This section is to be completed with information specifically related to the provider submitting this application. Furnish the following information about the provider: (1) provider type, (2) provider name, (3) the mailing address and telephone number where Medicare can contact the provider directly, (4) whether the provider has been accredited or Federally approved, and (5) whether the provider has any "prospective payment system" (PPS) exclusions.

### A. Type of Provider

Check the appropriate boxes below. The provider must meet all Medicare requirements for the type of provider checked. Submit copies of all required licenses, certifications, and registrations with this application.

**1. Type of Provider (Check one):**
- [ ] Religious Non-Medical Health Care Institution (RNHCI)
- [ ] Community Mental Health Center
- [ ] Comprehensive Outpatient Rehabilitation Facility
- [ ] End-Stage Renal Disease Facility (ESRD)
- [ ] Federally Qualified Health Center (FQHC)
- [ ] Histocompatibility Laboratory
- [ ] Home Health Agency
- [ ] Home Health Agency (Sub-unit)
- [ ] Hospice
- [ ] Hospital (If checked, complete Sections 2A2 and 2A3
- [ ] Indian Health Services Facility
- [ ] Multiple Hospital Component in a Medical Complex
- [ ] Organ Procurement Organization (OPO)
- [ ] Outpatient Physical Therapy/Occupational Therapy/ Speech Pathology Services
- [ ] Psychiatric Unit (of Hospital)
- [ ] Rehabilitation Agency (unit of Hospital)
- [ ] Rural Health Clinic
- [x] Skilled Nursing Facility
- [ ] Other (Specify): _____

**2. If this provider is a hospital, check all applicable sub-groups listed below:**

- [ ] Hospital    [ ] Change    Effective Date: __/__/__

  - [ ] Hospital-General
  - [ ] Hospital-Alcohol/Drug
  - [ ] Hospital-Acute Care
  - [ ] Hospital-Children's (excluded from PPS)
  - [ ] Hospital-Critical Access
  - [ ] Hospital-Critical Access (Swing-Bed unit)
  - [ ] Hospital-Long-Term (excluded from PPS)
  - [ ] Hospital-Long-Long (Swing-Bed unit)
  - [ ] Hospital-Psychiatric (excluded from PPS)
  - [ ] Hospital-Short-Term (General and Specialty)
  - [ ] Hospital-Short-Term (Swing-Bed unit)
  - [ ] Hospital-Rehabilitation (excluded from PPS)
  - [ ] Hospital-Rehabilitation (Swing-Bed unit)

- [ ] Other (Specify): _____

**3. Hospital Departments billing for Practitioner Services:**

**a)** If this provider is a hospital, check the appropriate box below. See instructions before completing this section.
- [ ] Not Applicable
- [ ] Single billing number for all departments        [ ] Single billing number for each department listed below

_____        _____        _____

_____        _____        _____

_____        _____        _____

**b)** Does this hospital have a compliance plan stating that all managing employees are checked against the OIG exclusion and GSA debarment lists?    [ ] YES    [ ] NO

### B. Provider Identification Information    [ ] Change    Effective Date: __/__/__

Furnish the provider's legal business name (as reported to the IRS), "doing business as" name (name provider generally known by to the public), and the various operating dates and places of formal business registration and/or incorporation. If incorporated, the provider may be required to submit a copy of its "Articles of Incorporation" for validation purposes.

**1. Legal Business Name as Reported to the IRS**
*TRIAD AT LAGRANGE I, LLC*

| **2. "Doing Business As" (DBA) Name (if applicable)** *LAGRANGE NURSING AND REHABILITATION CENTER* | County/Parish where DBA Name Registered (if applicable)  *TROUP* |
|---|---|

**3. Identify the type of organizational structure for this provider (Check one):**
[ ] Corporation    [x] Partnership    [ ] Other (Specify): _____

| **4. Medicare Year-End Cost Report Date (MM/DD)** 06/30 | Date Business Started (MM/DD/YYYY) 11/27/2006 |
|---|---|
| **5. Incorporation Date (if applicable) (MM/DD/YYYY)** 11/27/2006 | State where Incorporated (if applicable)  *GA* |

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## Provider Identification (Continued)

| C. Correspondence Address | ☐ Change | Effective Date: | / / |
|---|---|---|---|

This must be an address and telephone number where Medicare can <u>contact the provider directly</u>.

Mailing Address Line 1
**10 ROSWELL STREET**

Mailing Address Line 2
**SUITE 210**

| City **ALPHARETTA** | State **GA** | ZIP Code + 4 **30004-6015** |
|---|---|---|

| Telephone Number **(678)366-0305** | (Ext.) ( ) | Fax Number (if applicable) **(678)366-0306** | E-mail Address (if applicable) |
|---|---|---|---|

Note: Sections 2D through 2F below require a "Yes," "No," or "Pending" response. If a specific question does not apply to this provider, check "No" and continue with the next question. If the response is "Yes" or "Pending," furnish the additional information requested in that section and continue with the next question.

| D. Accreditation | ☐ Change | Effective Date: | / / |
|---|---|---|---|

1. Is this provider accredited?
   **IF YES, complete the following:**
2. Date of Accreditation (MM/DD/YYYY): _____ / / _____
3. Name of Accrediting Body:

☐ YES  ☒ NO
☐ PENDING

| E. Federal Approval (FQHCs and OPOs only) | ☐ Change | Effective Date: 01/01/2004 |
|---|---|---|

1. Is this provider Federally approved?
   **IF YES, complete the following:**
2. Date of Approval (MM/DD/YYYY): _____ / / _____

☐ YES  ☐ NO
☐ PENDING

| F. Prospective Payment System Exclusions | ☐ Change | Effective Date: | / / |
|---|---|---|---|

1. Does this provider have any "Prospective Payment System" (PPS) excluded units?
   **IF YES, check the type(s) of excluded unit(s) below.**
2. Type of unit(s) to be excluded:   ☐ Psychiatric Unit   ☐ Rehabilitation Agency (unit)

☐ YES  ☒ NO

## G. Comments

Use this section to explain any unique billing number requests or to clarify any other information furnished in this Section.

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## 3. Adverse Legal Actions and Overpayments

This section is to be completed with information concerning any adverse legal actions and/or overpayments that have been imposed or levied against this provider (see Table A below for list of adverse actions that must be reported).

**A. Adverse Legal History**          ☒ Change          Effective Date: 07/01/2005

1. Has this provider, under any current or former name or business identity, ever had any of the adverse legal actions listed in Table A below imposed against it?          ☐ YES   ☒ NO

2. IF YES, report each adverse legal action, when it occurred, the law enforcement authority/court/administrative body that imposed the action, and the resolution. Attach a copy of the adverse legal action documentation(s)

Adverse Legal Action:          Date:          Law Enforcement Authority:          Resolution:

_____          _____          _____          _____

_____          _____          _____          _____

_____          _____          _____          _____

---

**Table A**

1) Any felony or misdemeanor conviction, under Federal or State law, related to: (a) the delivery of an item or service under Medicare or a State health care program, or (b) the abuse or neglect of a patient in connection with the delivery of a health care item or service.

2) Any felony or misdemeanor conviction, under Federal or State law, related to theft, fraud, embezzlement, breach of fiduciary duty, or other financial misconduct in connection with the delivery of a health care item or service.

3) Any felony misdemeanor conviction, under Federal or State law, relating to the interference with or obstruction of any investigation into any criminal offense described in 42 C.F.R. Section 1001.101 or 1001.201.

4) Any felony or misdemeanor conviction, under Federal or State law, relating to the unlawful manufacture, distribution, prescription, or dispensing of a controlled substance.

5) Any revocation or suspension of a license to provide health care by any State licensing authority. This includes the surrender of such a license while a formal disciplinary proceeding was pending before a State licensing authority.

6) Any revocation or suspension of accreditation.

7) Any suspension or exclusion from participation in, or any sanction imposed by, a Federal or State health care program, or any debarment from participation in any Federal Executive Branch procurement or non-procurement program.

8) Any current Medicare payment suspension under any Medicare billing number.

**Note: All applicable adverse legal actions must be reported, _regardless_ of whether any records were expunged or any appeals are pending.**

---

**B. Overpayment Information**          ☒ Change          Effective Date: 07/01/2005

1. Does this provider, under any current or former name or business identity, have any outstanding Medicare overpayments?          ☐ YES   ☒ NO

2. IF YES, furnish the name and account number under which the overpayment(s) exists.

Name under which the overpayment occurred:          Account number under which the overpayment exists:

_____          _____

_____          _____

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## 4. Current Practice Location(s)

This section is to be completed with information about the physical location(s) where this provider currently renders health care services. If this provider operates a mobile facility or portable units, furnish the address of the "Base of Operations," as well as vehicle information and the geographic area serviced by these facilities or units. In addition, cite where this provider wants its payments sent, and where the provider maintains patients' records. If there is more than one practice location, copy and complete this section for each.

### A. Practice Location Information          ☐ Add    ☐ Delete    ☒ Change    Effective Date: 12/01/2006

| 1. Practice Location Name<br>*LAGRANGE NURSING & REHABILITATION CENTER* | Date Started at this Location<br>(MM/DD/YYYY)   12/01/2006 |
|---|---|

2. Practice Location Address Line 1
*2111 WEST POINT ROAD*

Practice Location Address Line 2

| City<br>*LAGRANGE* | County/Parish<br>*TROUP* | State<br>*GA* | ZIP Code + 4<br>*30240* |
|---|---|---|---|

| Telephone Number<br>*(706)882-1405* | (Ext.)<br>( ) | Fax Number (if applicable)<br>( ) - | E-mail Address (if applicable) |
|---|---|---|---|

**3.** <u>Hospitals Only</u>: Is the practice location above an inpatient services practice location?    ☐ YES ☐ NO

**4.** Does this provider own/lease this practice location?    ☒ YES ☐ NO

| 5. CLIA Number for this location (if applicable) | FDA/Radiology (Mammography) Certification Number(s) for this location (if applicable) |
|---|---|

### B. Mobile Facility and/or Portable Units          ☐ Change    Effective Date: / /

Does this organization furnish health care services from a mobile facility or portable unit?
**IF YES**, use Sections 4C through 4E to furnish information about the mobile/portable services.    ☐ YES ☒ NO
**IF NO**, proceed to Section 4F (Medicare Payment "Pay To" Address)

### C. Base of Operations Address          ☐ Add    ☐ Delete    ☐ Change    Effective Date: / /

The base of operations is the location from where personnel are dispatched, where mobile/portable equipment is stored and, when applicable, where vehicles are parked when not in use. See instructions for further examples.
**Check here** ☐ and skip to Section 4D if the "Base of Operations" address is the same as the "Practice Location."

| 1. Base of Operations Name | Date Started at this Location<br>(MM/DD/YYYY)   12/01/2006 |
|---|---|

2. Street Address Line 1

Street Address Line 2

| City | County/Parish | State | ZIP Code + 4 |
|---|---|---|---|

| Telephone Number<br>( ) - | (Ext.)<br>( ) | Fax Number (if applicable)<br>( ) - | E-mail Address (if applicable) |
|---|---|---|---|

### D. Vehicle Information          ☐ Add    ☐ Delete    ☐ Change    Effective Date: / /

If the mobile health care services are rendered in a vehicle, such as a mobile home or trailer, furnish the following vehicle information. See the instructions for a full explanation of the types of vehicles that need to be reported. If more than three vehicles are used, copy and complete this section as needed.

| 1. Type of Vehicle (van, mobile home, trailer, etc.) | Vehicle Identification Number |
|---|---|
| 2. Type of Vehicle (van, mobile home, trailer, etc.) | Vehicle Identification Number |
| 3. Type of Vehicle (van, mobile home, trailer, etc.) | Vehicle Identification Number |

**Note:** For each vehicle, a copy of all health care related permits/licenses/registrations <u>MUST</u> be submitted.

CMS 855A (11/2001)

OMB Approval No. 0938-0685

**4. Practice Location (Continued)**

| E. Geographic Location | ☐ Add | ☐ Delete | Effective Date: | / / |

This section is to be completed with information identifying the geographic area(s) where health care services are rendered by all **Home Health Agencies,** and **Mobile** and/or **Portable** facilities.

Furnish the county/parish, city, State and ZIP Code for all locations where mobile and/or portable services are rendered.

**Note: If this provider renders mobile health care services in more than one State, and those States are served by different Medicare contractors, then a separate CMS 855A enrollment application must be completed for each Medicare contractor jurisdiction.**

1. Initial Reporting and/or Additions

| County/Parish: | City: | State: | Zip Code(s): |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

2. Deletions

| County/Parish: | City: | State: | Zip Code(s): |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

| F. Medicare Payment "Pay To" Address | ☒ Change | Effective Date: | 01/01/2004 |

Furnish the address where payments should be sent for services rendered at the practice location in Section 4A or 4C.

"Pay To" Address Line 1
10 ROSWELL STREET

"Pay To" Address Line 2 :
SUITE 210

| City | State | ZIP Code + 4 |
|---|---|---|
| ALPHARETTA | GA | 30004-6015 |

**Check here ☒ and complete and submit Form HCFA-588** with this application if the provider would like its payments electronically transferred to its bank account.

| G. Location of Patients' Medical Records | ☐ Add | ☐ Delete | ☐ Change | Effective Date: | / / |

1. Check here ☒ if all patients' medical records are stored at the location shown in Section 4A or 4C, and skip this section.

2. If any of the patients' medical records are stored in a location other than the location shown in Section 4A or 4C, complete this section with the name and address of the storage location.

Name of Storage Facility/Location

Storage Facility Address Line 1

Storage Facility Address Line 2

| City | State | ZIP Code + 4 |
|---|---|---|
| | | |

H. Comments

Explain any unique or unusual circumstances concerning the provider's practice location(s) or the method by which the provider renders health care services.

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## 5. Ownership Interest and/or Managing Control Information (Organizations)

This section is to be completed with information about all organizations that have 5% or more (direct or indirect) ownership interest of, any partnership interest in, and/or managing control of, the provider identified in Section 2B, as well as any information on adverse legal actions that have been imposed against that organization. <u>See instructions for examples of organizations that should be reported here.</u>  If there is more than one organization, copy and complete this section for each.

**A.  Check here ☐  If this section does not apply and skip to Section 6.**

**B.  Organization with Ownership Interest and/or Managing Control - Identification**

| ☐ Add | ☐ Delete | ☒ Change | Effective Date: | 12/01/2006 |
|---|---|---|---|---|

| 1. Check all that apply: | ☒ 5% or more Ownership Interest<br>☒ Managing Control     ☒ Partner | Effective Date of <u>Ownership</u> (MM/DD/YYYY)   12/01/2006 |
|---|---|---|
| 2. Legal Business Name as Reported to the IRS | *TRIAD AT LAGRANGE I, LLC* | Effective Date of <u>Control</u> (MM/DD/YYYY)   12/01/2006 |
| 3. "Doing Business As" Name (if applicable) *LAGRANGE NURSING AND REHABILITATION CENTER* | | Tax Identification Number *20-5933784* |
| 4. Business Address Line 1 *2111 WEST POINT ROAD* | | Medicare Identification Number(s) (if applicable) *11-5354* |

Business Address Line 2

| City *LAGRANGE* | State *GA* | ZIP Code + 4 *30240* |
|---|---|---|

| **C. Adverse Legal History** | ☒ Change | Effective Date: | 07/01/2005 |
|---|---|---|---|

This section is to be completed <u>only</u> if the organization in Section 5B above is a 5% or greater <u>owner</u> (direct or indirect) of the provider identified in Section 2B, or has a <u>partnership</u> interest in the provider identified in Section 2B.

1. Has the organization in Section 5B above, under any current or former name or business identity, <u>ever</u> had any of the adverse legal actions listed in Table A in Section 3A imposed against it?     ☐ YES  ☒ NO

2. IF YES, report each adverse legal action, when it occurred, the law enforcement authority/court/administrative body that imposed the action, and the resolution.  Attach a copy of the adverse legal action documentation(s) and resolution(s).

| Adverse Legal Action: | Date: | Law Enforcement Authority: | Resolution: |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## 6. Ownership Interest and/or Managing Control Information (Individuals)

This section is to be completed with information about any individual that has a 5% or greater (direct or indirect) ownership interest in, or any partnership interest in, the provider identified in Section 2B. All officers, directors, and managing employees of the provider must also be reported in this section. In addition, any information on adverse legal actions that have been imposed against the individuals reported in this section must be furnished. If there is more than one individual, copy and complete this section for each.

### A. Individual with Ownership Interest and/or Managing Control -Identification Information

☐ Add          ☐ Delete          ☒ Change          Effective Date: 12/01/2006

| 1. Name    First<br>*RONALD* | Middle<br>*MURDOCH* | Last<br>*HERBERT* | Jr., Sr., etc.<br>*JR* |
|---|---|---|---|

| Social Security Number<br>*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* | Date of Birth (MM/DD/YYYY)<br>*10/12/1962* | Credentials (M.D., O.D., etc.) |
|---|---|---|

| Medicare Identification Number (if applicable) | Effective Date of <u>Ownership</u><br>(MM/DD/YYYY)   *12/01/2006* | Effective Date of <u>Control</u><br>(MM/DD/YYYY)   *12/01/2006* |
|---|---|---|

2. If the above individual is **directly** associated with the provider in Section 2B, what is this individual's relationship with the provider? (Check all that apply.)

☒ 5% of Greater Owner          ☒ Partner          ☐ Managing Employee
☒ Director/Officer          ☐ Other (Specify):

3. If the above individual is **directly** associated with an organization identified in Section 5B, furnish the name of that organization in the space below:

Legal Business Name of Organization:   *TRIAD AT LAGRANGE I, LLC*

4. What is this individual's role with the organization reported in Section 6A3 above? (Check all that apply.)

☒ 5% of Greater Owner          ☒ Partner          ☐ Managing Employee
☒ Director/Officer          ☐ Other (Specify):

### B. Adverse Legal History

☒ Change          Effective Date: 12/01/2006

**Please read the applicable instructions before completing this section.** This section is to be completed <u>only</u> if the individual in Section 6A above is a 5% or greater <u>owner</u> (direct or indirect) of, has a <u>partnership</u> interest in, is an actual employee of, or director/officer of, the provider identified in Section 2B.

1. Has the individual in Section 6A above, under any current or former name or business identity, <u>ever</u> had any of the adverse legal actions listed in Table A in Section 3A imposed against him or her?          ☐ YES ☒ NO

2. **IF YES**, report each adverse legal action, when it occurred, the law enforcement authority/court/administrative body that imposed the action, and the resolution. Attach a copy of the adverse legal action documentation(s) and resolution(s).

| Adverse Legal Action: | Date: | Law Enforcement Authority: | Resolution: |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

CMS 855A (11/2001)

OMB Approval No. 0938-0685

| 7. Chain Home Office Information |
|---|

This section is to be completed with information about the "Home Office" for those providers that are members of, or are joining, a chain organization.

**A.  Check here ☐ if this section does not apply and skip to Section 8.**

**B.  Type of Action this Provider Is Reporting**   ☒ Change          Effective Date:                    / /

| Check one: | ☒ Provider in chain for first time (Initial Enrollment or Change of Ownership) | |
|---|---|---|
| | ☐ Provider dropped out of current chain | Effective Date:           / / |
| | ☐ Provider in a different chain since last report | Effective Date:           / / |
| | ☐ Provider in same chain under new chain name | Effective Date:           / / |

**C. Chain Home Office Administrator Information**       ☐ Change      Effective Date:                 / /

| Name of Home Office Administrator or CEO : | First   RONALD | Middle   MURDOCH | Last   HERBERT | Jr., Sr., etc.   JR |
|---|---|---|---|---|
| Title of Home Office Administrator   MANAGING MEMBER | Social Security Number   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 | | Date of Birth (MM/DD/YYYY)   10/12/1962 | |

**D. Chain Home Office Information**        ☒ Change        Effective Date:       12/01/2006

| 1.   Name of Home Office as Reported to the IRS   TRIAD SENIOR LIVING LLC | Tax Identification Number   04-3794889 |
|---|---|

2.   Home Office Business Street Address Line 1
**10 ROSWELL STREET**

Home Office Business Street Address Line 2
**SUITE 210**

| City   ALPHARETTA | State         GA | ZIP Code + 4   30004-6015 |
|---|---|---|
| Telephone Number        (Ext.)   (678)366-0305        (207 ) | Fax Number (if applicable)   (678)366-0306 | E-mail Address (if applicable) |

| 3.   Chain Number | Home Office Intermediary   BLUE CROSS BLUE SHIELD OF GA | Home Office Cost Report Year-End Date (MM/DD)        06/30 |
|---|---|---|

**E. Type of Business Structure of the Chain Home Office**    ☒ Change      Effective Date:     12/01/2006

Check one:

Voluntary:
☐ Non-Profit - Religious Organization
☐ Non-Profit - Other (Specify): _____

Proprietary
☐ Individual
☐ Corporation
☒ Partnership
☐ Other (Specify): _____

Government:
☐ Federal
☐ State
☐ City
☐ County
☐ City-County
☐ Hospital District
☐ Other (Specify below):

**F.  Provider's Affirmation to the Chain Home Office**     ☒ Change      Effective Date:     01/01/2004

Check one:
☐ Joint Venture/Partnership     ☒ Managed/Related     ☐ Leased
☐ Operated/Related     ☐ Wholly Owned     ☐ Other (Specify)

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## 8. Billing Agency

This section is to be completed with information about all billing agencies this provider uses or contracts with that submit claims to Medicare on the provider's behalf. If more than one billing agency is used, copy and complete this section for each. The provider may be required to submit a copy of its current signed billing agreement/contract if Medicare cannot verify the information in this section.

**A.** Check here ☒ If this section does not apply and skip to Section 9.

| **B.** Billing Agency Name and Address | ☐ Add | ☐ Delete | ☐ Change | Effective Date: | / / |
|---|---|---|---|---|---|

| 1. Legal Business Name as Reported to the IRS | Tax Identification Number |
|---|---|

2. "Doing Business As" Name (If Applicable)

3. Business Street Address Line 1

Business Street Address Line 2

| City | State | ZIP Code + 4 |
|---|---|---|

| Telephone Number          (Ext.)<br>( )  - | Fax Number (if applicable)<br>( )  - | E-mail Address (if applicable) |
|---|---|---|

**C.** Billing Agreement/Contract Information         ☐ Change    Effective Date:    / /

Answer the following questions about the provider's agreement/contract with the above billing agency.

1. Does the provider have unrestricted access to its Medicare remittance notices?   ☐ YES  ☐ NO
2. Does the provider's Medicare payment go directly to the provider?   ☐ YES  ☐ NO
   IF NO, proceed to Question 3.
   IF YES, skip Questions 3, 4 and 5.
3. Does the provider's Medicare payment go directly to a bank?   ☐ YES  ☐ NO
   IF NO, proceed to Question 5.
   IF YES, answer the following questions and skip Questions 4 and 5.
   a) Is the bank account only in the name of the provider?   ☐ YES  ☐ NO
   b) Does the provider have unrestricted access to the bank account and statements?   ☐ YES  ☐ NO
   c) Does the bank only answer to the provider regarding what the provider wants from the bank (e.g., sweep account instructions, bank statements, closing account, etc.)?   ☐ YES  ☐ NO
4. Does the provider's Medicare payment go directly to the billing agent?   ☐ YES  ☐ NO
   IF NO, proceed to Question 5.
   IF YES, answer the following question and skip Question 4.
   a) Does the billing agent cash the provider's check?   ☐ YES  ☐ NO
      IF NO, proceed to Question b.
      IF YES, are all of the following conditions included in the billing agreement?
      1) The agent receives payment under an agency agreement with the provider.
      2) The agent's compensation is not related in any way to the dollar amounts billed or collected.
      3) The agent's compensation is not dependent upon the actual collection of payment.
      4) The agent acts under payment disposition instructions that the provider may modify or revoke at any time.
      5) In receiving payment, the agent acts only on behalf of the provider (except insofar as the agent uses part of that payment as compensation for the agent's billing and collection services).   ☐ YES  ☐ NO
   b) Does the billing agent either give the Medicare payment directly to this provider or deposit the payment into this provider's bank account?   ☐ YES  ☐ NO
5. Who receives the provider's Medicare payment?  _____

CMS 855A (11/2001)

OMB Approval No. 0938-0685

**9. Electronic Claims Submission Information**

This section is to be completed with information about any company (clearinghouse) this provider uses or contracts with for electronic claims submission services. See the instructions to determine when and how this section is to be completed. If this provider submits (or will be submitting) claims electronically <u>without</u> the use of a 3rd party company (clearinghouse), check the box in Section 9A and submit a copy of the provider's electronic data interchange (EDI) agreement if one has been established or check the box in Section 9B to start the EDI agreement process. If more than one clearinghouse is used, copy and complete this section for each.

**A copy of all currently established EDI agreements for this provider <u>MUST</u> be submitted with this application.**

**A.** Check here ☒ If this section does not apply and skip to Section 10.

**B.** Check here ☐ If enrolling in Medicare for the first time and would like to submit claims electronically.

| C. Clearinghouse Name and Address | ☐ Add | ☐ Delete | ☐ Change Effective Date: | 12/01/2006 |
|---|---|---|---|---|

| 1. Legal Business Name as Reported to the IRS | Tax Identification Number 20-5933784 |
|---|---|

2. "Doing Business As" Name (if applicable)

3. Business Street Address Line 1

Business Street Address Line 2

| City | State GA | ZIP Code + 4 |
|---|---|---|
| Telephone Number (Ext.) ( ) - | Fax Number (if applicable) ( ) - | E-mail Address (if applicable) |

---

**10. Staffing Company**

This section is to be completed with information about all staffing companies that this provider uses, either under written contract or by an unwritten agreement. If this provider uses more than one staffing company, copy and complete this section for each. The provider may be required to submit a copy of its current signed staffing company agreement/contract.

**A.** Check here ☒ if this section does not apply and skip to Section 11.

| B. Staffing Company Name and Address | ☐ Add | ☐ Delete | ☐ Change Effective Date: | / / |
|---|---|---|---|---|

| 1. Legal Business Name as Reported to the IRS | Tax Identification Number |
|---|---|

2. "Doing Business As" Name (if applicable)

3. Business Street Address Line 1

Business Street Address Line 2

| City | State | ZIP Code + 4 |
|---|---|---|
| Telephone Number (Ext.) ( ) - | Fax Number (if applicable) ( ) - | E-mail Address (if applicable) |

**C. Staffing Company Contract/Agreement Information**

Answer the following questions about the staffing company and the provider's contract/agreement with them.

1. Does the staffing company shown in Section 10B above <u>and</u> the billing agency identified in Section 8B have a common owner(s)? ☐ YES ☐ NO

2. If applicable, are there any provisions in the staffing company contract/agreement that supersede or contradict the enrolling provider's billing agreement? ☐ Not applicable ☐ YES ☐ NO

3. What department(s) of this provider does this company staff? _____ _____

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## 11. Surety Bond Information

This section is to be completed by providers mandated by law to obtain a surety bond in order to enroll in and bill the Medicare program. See instructions to determine whether this provider is required to obtain a surety bond. Furnish all requested information about the provider's insurance agent, surety company, and the surety bond.

**A. Check here** ☐ **If this section does not apply and skip to Section 12.**

**B. Check here** ☐ **If this provider qualifies for a waiver of the bond requirement based on its operation as a government entity.** See instructions for specific documentation requirements and skip to Section 12.

**C. Name and Address of Surety Bond** ☐ Change    Effective Date: _____

| 1. Legal Business Name of Surety Bond Company as Reported to the IRS | Tax Identification Number |
|---|---|

2. Mailing Address Line 1

Mailing Address Line 2

| City | State | ZIP Code + 4 |
|---|---|---|
| Telephone Number        (Ext.) | Fax Number (if applicable) | E-mail Address (if applicable) |

**D. Name and Address of Insurance Agency/Broker**

☐ Add        ☐ Delete        ☐ Change        Effective Date: _____

1. Legal Business Name of Agency/Broker as Reported to the IRS

2. Name of Individual Agent

3. Mailing Address Line 1

Mailing Address Line 2

| City | State | ZIP Code + 4 |
|---|---|---|
| Telephone Number        (Ext.) | Fax Number (if applicable) | E-mail Address (if applicable) |

**E. Surety Bond Information** ☐ Change    Effective Date: _____

| 1. Amount of Surety Bond $ | Surety Bond Number |
|---|---|
| 2. Effective Date of Surety Bond (MM/DD/YYYY) | If reporting a new bond, give cancellation date of the current bond (MM/DD/YYYY) |

3. Is the surety bond:        ☐ Annual        (or)        ☐ Continuous

4. Check here ☐ if this is a Medicare/Medicaid "Dual Obligee Surety Bond."

**F. Government Security** ☐ Change    Effective Date: _____

If a government security has been purchased, furnish the following information.

| 1. Amount $ | Effective Date (MM/DD/YYYY) | Federal Reserve Bank Account Number |
|---|---|---|

2. Check the appropriate box below:
   a) Is the Treasury Bill:        ☐ 3 months?        ☐ 6 months?        ☐ 1 year?
   b) Is the Treasury Note:        ☐ 2 years?        ☐ 5 years?        ☐ 10 year?
   c) Is the government security a 30-year Treasury Bond?                    ☐ YES ☐ NO

   **Note:** If the government security is less than one year in duration, the provider **must** submit proof of the renewable government security at least 14 days prior to the expiration date.

*This section is not applicable for any providers at this time.*

18                                                          CMS 855A (11/2001)

OMB Approval No. 0938-0685

---

## 12. Capitalization Requirements for Home Health Agencies (HHAs)

This section is to be completed by Home Health Agencies with information about capitalization. As of January 1, 1998 all HHAs are required to provide documentation verifying that they have sufficient initial reserve operating funds (capitalization) to operate for the first three months of operation in the Medicare program. See Instructions for further details on capitalization requirements.

### A.   Check here ☒ if this section does not apply and skip to Section 13.

### B.   Type of Home Health Agency

Check One:              ☐ Non-profit Agency                    ☐ Proprietary Agency

### C.   Projected Number of Visits by this Home Health Agency

How many visits does this HHA project it will make in the first:      three months of operation?  _____
                                                                      twelve months of operation?  _____

### D.   Financial Documentation

1.  Although not required to be submitted concurrently with this application, in order to expedite the enrollment process the HHA may attach a copy of its most current savings, checking or other financial statement(s) that verifies the initial reserve operating funds, accompanied by:

    a)  An attestation from an officer of the bank or other financial institution stating that the funds are in the account(s) and are immediately available for the HHA's use, and

    b)  Certification from the HHA attesting that at least 50% of the reserve operating funds are non-borrowed funds.

2.  Will the HHA be submitting the above documentation with this application?              ☐ YES  ☐ NO

NOTE: The Fiscal Intermediary may require a subsequent attestation that the funds are still available.  If the Fiscal Intermediary determines that the HHA requires funds in addition to those indicated on the originally submitted account statement(s), it will require verification of the additional amount as well as a new attestation statement.

### E.   Additional Information

Provide any additional information, either in the space below or through documentation, necessary to assist the fiscal intermediary or State agency in properly comparing this HHA with other comparable HHAs.

---

CMS 855A (11/2001)

OMB Approval No. 0938-0685

**13. Contact Person(s)**

Furnish the name(s) and telephone number(s) of a person(s) who can answer questions about the information furnished in this application. If a contact person is not reported in this section, all questions will be directed to the authorized official named in Section 15B.

**A. Check here ☐ if this section does not apply and skip to Section 14.**

| B. 1st Contact Name and Telephone | ☐ Add | ☐ Delete | ☒ Change | Effective Date: | 01/01/2004 |

| Name        First | Last | E-mail Address (if applicable) | Telephone Number | (Ext.) |
|---|---|---|---|---|
| RONALD | HERBERT | | (678)366-0305 | (207) |

| C. 2nd Contact Name and Telephone Number | ☐ Add | ☐ Delete | ☒ Change | Effective Date: | 01/01/2004 |

| Name        First | Last | E-mail Address (if applicable) | Telephone Number | (Ext.) |
|---|---|---|---|---|
| ADAM | ASHPES | | (678)366-0305 | (208) |

**14. Penalties for Falsifying Information on this Enrollment Application**

This section explains the penalties for deliberately furnishing false information to gain enrollment in the Medicare program.

1. 18 U.S.C. § 1001 authorizes criminal penalties against an individual who, in any matter within the jurisdiction of any department or agency of the United States, knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry.

Individual offenders are subject to fines of up to $250,000 and imprisonment for up to five years. Offenders that are organizations are subject to fines of up to $500,000 (18 U.S.C. § 3571). Section 3571(d) also authorizes fines of up to twice the gross gain derived by the offender if it is greater than the amount specifically authorized by the sentencing statute.

2. Section 1128B(a)(1) of the Social Security Act authorizes criminal penalties against any individual who, "knowingly and willfully," makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program.

The offender is subject to fines of up to $25,000 and/or imprisonment for up to five years.

3. The Civil False Claims Act, 31 U.S.C. § 3729, imposes civil liability, in part, on any person who:
   a.) knowingly presents, or causes to be presented, to an officer or any employee of the United States Government a false or fraudulent claim for payment or approval;
   b.) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or
   c.) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

The Act imposes a civil penalty of $5,000 to $10,000 per violation, plus three times the amount of damages sustained by the Government.

4. Section 1128A(a)(1) of the Social Security Act imposes civil liability, in part, on any person (including an organization, agency or other entity) that knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency…a claim…that the Secretary determines is for a medical or other item or service that the person knows or should know:
   a.) was not provided as claimed; and/or
   b.) the claim is false or fraudulent.

This provision authorizes a civil monetary penalty of up to $10,000 for each item or service, an assessment of up to three times the amount claimed, and exclusion from participation in the Medicare program and State health care programs.

5. The government may assert common law claims such as "common law fraud," "money paid by mistake," and "unjust enrichment."

Remedies include compensatory and punitive damages, restitution, and recovery of the amount of the unjust profit.

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## 15. Certification Statement

This section is used to officially notify the provider of additional requirements that must be met and maintained in order for the provider to be enrolled in the Medicare program. This section also requires the signature and date thereof of an "Authorized Official" who can legally and financially bind the provider to the laws, regulations, and program instructions of the Medicare program. Section 16 permits the "Authorized Official" to delegate signature authority to other individual(s) (Delegated Officials) employed by the provider for the purpose of reporting future changes to the provider's enrollment record. See instructions to determine who within the provider qualifies as an Authorized Official and a Delegated Official.

### A.   Additional Requirements for Medicare Enrollment

By his/her signature(s), the authorized official named below and the delegated official(s) named in Section 16 agree to adhere to the following requirements stated in this Certification Statement:

1.) I agree to notify the Medicare contractor of any future changes to the information contained in this form within 90 days of the effective date of the change. I understand that any change in the business structure of this provider may require the submission of a new application.

2.) I have read and understand the Penalties for Falsifying Information, as printed in this application. I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare, or any deliberate alteration of any text on this application form, may be punished by criminal, civil, or administrative penalties including, but not limited to, the revocation of Medicare billing number(s), and/or the imposition of fines, civil damages, and/or imprisonment.

3.) I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

4.) Neither this provider, nor any 5% or greater owner, partner, officer, director, W-2 managing employee, authorized official, or delegated official thereof is currently sanctioned, suspended, debarred, or excluded by the Medicare or Medicaid program, or any other Federal program, or is otherwise prohibited from providing services to Medicare or other Federal program beneficiaries.

5.) I agree that any existing or future overpayment made to the provider by the Medicare program may be recouped by Medicare through the withholding of future payments.

6.) I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

| B.   Authorized Official Signature | ☐ Add | ☐ Delete | ☒ Change | Effective Date: | 12/01/2006 |

I have read the contents of this application. My signature legally and financially binds this provider to the laws, regulations, and program instructions of the Medicare program. By my signature, I certify that the information contained herein is true, correct, and complete, to the best of my knowledge, and I authorize the Medicare program contractor to verify this information. If I become aware that any information in this application is not true, correct, or complete, I agree to notify the Medicare program contractor of this fact immediately.

| Authorized Official Name<br>Print    RONALD | First | Middle<br>MURDOCH | Last<br>HERBERT | Jr., Sr., etc.<br>JR. |
|---|---|---|---|---|
| Authorized Official<br>Signature    (First, Middle, Last, Jr., Sr., M.D., D.O., etc.)<br>_Ronald_  c.o.o. | | Title/Position<br>C.O.O. | Date (MM/DD/YYYY)<br>Signed  11.29.2006 | |

CMS 855A (11/2001)

OMB Approval No. 0938-0685

## 16. Delegated Official (Optional)

The signature of the authorized official below constitutes a legal delegation of authority to the official(s) named in this section to make changes and/or updates to this provider's enrollment information. The signature(s) of the delegated official(s) shall have the same force and effect as that of the authorized official, and shall legally and financially bind the provider to all the laws, regulations, and program instructions of the Medicare program. By his or her signature, the delegated official certifies that he or she has read the Certification Statement in Section 15 and agrees to adhere to all of the stated requirements. The delegated official also certifies that he/she meets the definition of a delegated official. When making changes and/or updates to the provider's enrollment information maintained by the Medicare program, the delegated official certifies that the information provided is true, correct, and complete. If assigning more than one delegated official (maximum of three), copy and complete this section as needed.

**A.  Check here ☐  if this provider will not be assigning any delegated official(s) and skip to Section 17.**

| B.  Delegated Official Signature | ☐ Add | ☐ Delete | ☒ Change | Effective Date: | 12/01/2006 |
|---|---|---|---|---|---|

| 1.  Delegated Official Name   First<br>Print  *ADAM* | Middle | Last<br>*ASHPES* | Jr., Sr., etc. |
|---|---|---|---|

| Delegated Official        (First, Middle, Last, Jr., Sr., M.D., D.O., etc)<br>Signature   *PRES/CEO* | Date (MM/DD/YYYY)<br>Signed |
|---|---|

| Title/Position<br>*PRESIDENT / CEO* | ☐ Check here only if Delegated Official<br>is a W-2 employee* | |
|---|---|---|

| 2.  Signature of Authorized Official   (First, Middle, Last, Jr., Sr., M.D., D.O., etc)<br>Assigning this Delegation             *c.o.o.* | Date (MM/DD/YYYY)<br>Signed  *11-29-2006* |
|---|---|

## 17. Attachments

This section is a list of documents that, if applicable, should be submitted with this completed enrollment application.

Place a check next to each document (as applicable or required) from the list below that is being included with this completed application.

- ☐ Copy(s) of all Federal, State, and/or local (city/county) professional licenses, certifications and/or registrations specifically required to operate as a health care facility
- ☐ Copy(s) of all Federal, State, and/or local (city/county) business licenses, certifications and/or registrations specifically required to operate as a health care facility
- ☐ Copy(s) of all CLIA Certificates, FDA Mammography Certificates, and Diabetes Education Certificates
- ☐ Copy(s) of all State Pharmacy licenses
- ☐ Copy(s) of all adverse legal action documentation (e.g., notifications, resolutions, and reinstatement letters)
- ☐ Copy(s) of all current signed electronic data interchange (EDI) agreements
- ☐ Copy(s) of all surety bonds and/or Agent's Power of Attorney
- ☐ Copy(s) of all partnership agreements
- ☐ Copy(s) of all articles of incorporation and/or corporate charters
- ☐ Copy(s) of all sales agreements (CHOWS, Acquisitions/Mergers, and Consolidations only) (2 copies)
- ☐ Copy(s) of all documents that demonstrate meeting capitalization requirements (HHAs only)
- ☐ Completed Form HCFA-588-Authorization Agreement for Electronic Funds Transfer
- ☐ IRS documents confirming the tax identification number and legal business name (e.g., CP 575)
- ☐ Any additional documentation or letters of explanation as needed

CMS 855A (11/2001)

Control No. 06100756

# STATE OF GEORGIA
## Secretary of State
Corporations Division
315 West Tower
#2 Martin Luther King, Jr. Dr.
Atlanta, Georgia 30334-1530

# CERTIFICATE
# OF
# EXISTENCE

I, Cathy Cox, Secretary of State and the Corporations Commissioner of the state of Georgia, hereby certify under the seal of my office that

## TRIAD AT LA GRANGE I, LLC

**Domestic Limited Liability Company**

was formed or was authorized to transact business on 11/22/2006 in Georgia. Said entity is in compliance with the applicable filing and annual registration provisions of Title 14 of the Official Code of Georgia Annotated and has not filed articles of dissolution, certificate of cancellation or any other similar document with the office of the Secretary of State.

This certificate relates only to the legal existence of the above-named entity as of the date issued. It does not certify whether or not a notice of intent to dissolve, an application for withdrawal, a statement of commencement of winding up or any other similar document has been filed or is pending with the Secretary of State.

This certificate is issued pursuant to Title 14 of the Official Code of Georgia Annotated and is prima-facie evidence that said entity is in existence or is authorized to transact business in this state.



WITNESS my hand and official seal of the City of Atlanta and the State of Georgia on 27th day of November, 2006

*Cathy Cox*

Cathy Cox
Secretary of State

Certification Number: 410321-1    Reference:
Verify this certificate online at http://corp.sos.state.ga.us/corp/soskb/verify.asp

Control No. 06100756

# STATE OF GEORGIA

## Secretary of State
### Corporations Division
### 315 West Tower
### #2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

# CERTIFICATE
# OF
# ORGANIZATION

I, **Cathy Cox**, the Secretary of State and the Corporations Commissioner of the State of Georgia, hereby certify under the seal of my office that

## TRIAD AT LA GRANGE I, LLC
### a Domestic Limited Liability Company

has been duly organized under the laws of the State of Georgia on **11/22/2006** by the filing of articles of organization in the Office of the Secretary of State and by the paying of fees as provided by Title 14 of the Official Code of Georgia Annotated.

WITNESS my hand and official seal of the City of Atlanta and the State of Georgia on November 22, 2006



Cathy Cox
Secretary of State

Control No: 06100756
Date Filed: 11/22/2006 12:00 AM
Cathy Cox
Secretary of State

# ARTICLES OF ORGANIZATION

## OF

## TRIAD AT LA GRANGE I, LLC

**FIRST:** The name of the Limited Liability Company (the "Company") is:

TRIAD AT LA GRANGE I, LLC

**SECOND:** Management of the Company is vested in one or more members. The name and the address of each initial member of the Company is as follows:

Ronald M. Herbert, Jr.
10 Roswell Street
Suite 210
Alpharetta, Georgia 30004

Adam T. Ashpes
10 Roswell Street
Suite 210
Alpharetta, Georgia 30004

IN WITNESS WHEREOF, the undersigned has executed these Articles of Organization on November 22, 2006.

Linda H. Jones,
Organizer

CORPORATIONS DIVISION    2006 NOV 22  P 4: 20    SECRETARY OF STATE

#316060v1 LCK
011397-0014

State of Georgia
Expedite Creation - Domestic Entity 2 Page(s)

T0633124010



**OFFICE OF SECRETARY OF STATE**
**CORPORATIONS DIVISION**
315 West Tower, #2 Martin Luther King, Jr. Drive
Atlanta, Georgia 30334-1530
(404) 656-2817
Registered agent, officer, entity status information via the Internet
http://www.georgiacorporations.org

**CATHY COX**
Secretary of State

ENRICO M. ROBINSON
Director

SUSAN GOLDEN
Assistant Director

**TRANSMITTAL INFORMATION**
**GEORGIA LIMITED LIABILITY COMPANY**

---

**IMPORTANT**

**Remember to include your e-mail address when completing this transmittal form.**

Providing your e-mail address allows us to notify you via e-mail when we receive your filing and when we take action on your filing.  Please enter your e-mail address on the line below. Thank you.

E-Mail: lklaus@gejlaw.com

---

NOTICE TO APPLICANT: PRINT PLAINLY OR TYPE REMAINDER OF THIS FORM

| | |
|---|---|
| 1. | LLC Name Reservation Number (if one has been obtained; if articles are being filed without prior reservation, leave this line blank)
| | Triad at La Grange I, LLC
| | LLC Name (List *exactly* as it appears in articles) |

2. Lissette C. Klaus, Paralegal, c/o Gallagher Evelius & Jones, LLP     410-951-1412
Name of person filing articles (certificate will be mailed to this person, at address below)    Telephone Number
218 North Charles Street, Suite 400
Address
Baltimore     Maryland     21201
City     State     Zip Code

3.    10 Roswell Street, Suite 210
Principal Office Mailing Address of LLC (Unlike registered office address, this may be a post office box)
Alpharetta     GA     30004
City     State     Zip Code

4. C T Corporation System
Name of LLC's Registered Agent in Georgia
1201 Peachtree Street, N.E.
Registered Office Street Address of LLC in Georgia (Post office box or mail drop not acceptable for registered office address)
Atlanta     Fulton     GA     30361
City     County     State     Zip Code

5. Name and Address of each organizer   (Attach additional sheets if necessary)
Linda H. Jones, Esq., c/o Gallagher Evelius & Jones, LLP, 218 N. Charles St., Ste 400, Baltimore ,    MD    21201
Organizer     Address     City     State    Zip Code

Organizer     Address     City     State    Zip Code

6. Mail or deliver the following items to the Secretary of State, at the above address:
    1)   This transmittal form
    2)   Original and one copy of the Articles of Organization
    3)   Filing fee of $100.00 payable to Secretary of State.  Filing fees are NON-refundable.

November 22, 2006
Authorized Signature     Date
Member, Manager, Organizer or Attorney-in-fact (Circle one)
Linda H. Jones, Organizer
Request certificates and obtain entity information via the Internet: http://www.georgiacorporations.org    FORM 231

GA835 - 7/17/96 C T Systems Online

| Form **SS-4** (Rev. December 2001) Department of the Treasury Internal Revenue Service | **Application for Employer Identification Number** (For use by employers, corporations, partnerships, trusts, estates, churches, government agencies, Indian tribal entities, certain individuals, and others.) ► See separate instructions for each line. ► Keep a copy for your records. | EIN 20-5933784 OMB No. 1545-0003 |
|---|---|---|

1  Legal name of entity (or individual) for whom the EIN is being requested
Triad at LaGrange I LLC

| 2  Trade name of business (if different from name on line 1) LaGrange Nursing and Rehab | 3  Executor, trustee, 'care of' name |
|---|---|
| 4a  Mailing address (room, apt., suite no. and street, or P.O. box) 10 Roswell St Suite 210 | 5a  Street address (if different) (Do not enter a P.O. box) 2111 West Point Road |
| 4b  City, state, and ZIP code Alpharetta GA 30004 - | 5b  City, state, and ZIP code LaGrange GA 30240 - |

6  County and state where principal business is located
County  Troop  State  GA

| 7a  Name of principal officer, general partner, grantor, owner, or trustor Ronald Herbert | 7b  SSN, ITIN, EIN 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 |
|---|---|

8a  Type of entity (check only one)
- ☐ Sole Proprietor (SSN)
- ☒ Partnership
- ☐ Corporation (enter form number to be filed) ►
- ☐ Personal Service
- ☐ Church or church-controlled organization
- ☐ Other nonprofit organization (specify) ►
- ☐ Other (specify) ►
- ☐ Estate (SSN of decedent)
- ☐ Plan administrator (SSN)
- ☐ Trust (SSN of grantor)
- ☐ National Guard        ☐ State/local government
- ☐ Farmers' cooperative   ☐ Federal government/military
- ☐ REMIC                  ☐ Indian tribal government/enterprises
- Group Exemption No. (GEN) ►

8b  If a corporation, name the state or foreign country (if applicable) where incorporated
State | Foreign country

9  Reason for applying (check only one)
- ☒ Started new business (specify type) ► Healthcare
- ☐ Hired employees (Check the box and see line 12)
- ☐ Compliance with IRS withholding regulations
- ☐ Other (specify) ►
- ☐ Banking purpose (specify purpose) ►
- ☐ Changed type of organization (specify new type) ►
- ☐ Purchased going business
- ☐ Created a trust (specify type) ►
- ☐ Created a pension plan (specify type) ►

| 10  Date business started or acquired (month, day, year) DEC  1  2006 | 11  Closing month of accounting year DEC |
|---|---|

12  First date wages or annuities were paid or will be paid (month, day, year)  Note: If applicant is a withholding agent, enter date income will first be paid to nonresident alien. (month, day, year) . . . . . . . . . . . . . . .  ►  DEC  15  2006

| 13  Highest number of employees expected in the next twelve months Note: If the applicant does not expect to have any employees during the period, enter "-0-" . . . . . . . . . . . . . | Agriculture | Household | Other 170 |
|---|---|---|---|

14  Check box that best describes the principal activity of your business
- ☐ Construction   ☐ Rental & leasing   ☐ Transportation & warehousing
- ☐ Real estate    ☐ Manufacturing      ☐ Finance & insurance
- ☐ Other (specify)
- ☒ Health care & social assistance   ☐ Wholesale-agent/broker
- ☐ Accommodation & food service      ☐ Wholesale-other
- ☐ Retail

15  Indicate principal line of merchandise sold; specific construction work done; products produced; or services provided.
Healthcare services

16a  Has the applicant ever applied for an employer identification number for this or any other business? . . . . . . . . . . ☐ Yes  ☒ No
Note: If "Yes" please complete lines 16b and 16c.

16b  If you checked "Yes" on line 16a, give applicant's legal name and trade name shown on prior application if different from line 1 or 2 above.
Legal name  ►
Trade name  ►

16c  Approximate date when, and city and state where, the application was filed. Enter previous employer identification number if known.

| Approximate date when filed (month, day, year) | City and state where filed | Previous EIN |
|---|---|---|

| Third Party Designee | Complete section only if you want to authorize the named individual to receive the entity's EIN and answer questions about the completion of this form | |
|---|---|---|
| | Designee's name | Designee's telephone number (include area code) ( )  - |
| | Address and ZIP code | Designee's fax number (include area code) ( )  - |

Under penalties of perjury, I declare that I have examined this application, and to the best of my knowledge and belief, it is true, correct, and complete.

| Name and title (type or print clearly) ► Ronald M Herbert COO | Applicant's telephone number (include area code) ( 678 )  366  - 0305 |
|---|---|
| Signature ► Not Required      Date ►  November 27, 2006 GMT | Applicant's fax number (include area code) ( 678 )  366  - 0306 |



**MARINER**
**Health Care**

October 10, 2006

Mr. William M. Foster
145 Spring Street
Macon, GA 31201

Re:    Surrender of Brian Center/Powder Springs, Brian Center/Jeffersonville, Brian
       Center/LaGrange, Brian Center/Lumber City, Brian Center/Thomasville, Brian
       Center/Powder Springs, Brian Center/Jeffersonville, Brian Center/LaGrange,
       Brian Center/Lumber City (collectively, the "Facilities")

Dear Mr. Foster:

In connection with the conclusion of our recent litigation, I am writing to notify you that
Mariner Health Care, Inc. and its subsidiaries ("Mariner") will surrender possession and
operation of the Facilities to you or your designee on December 1, 2006. We would
appreciate your cooperation in accomplishing a smooth transition.

As you know, to ensure the uninterrupted care of the patients currently residing at the
Facilities it is critical that we agree to an orderly process to transfer the operations of the
Facilities. As a result, enclosed with this letter please find a form of Operations Transfer
Agreement that will set forth the terms and conditions of the transfer of operations of the
Facilities to you or your designee.

We appreciate your consideration in this matter and if you wish to discuss the Operations
Transfer Agreement or any matters relating to the Facilities, please do not hesitate to
contact me at 678-443-6872.

Yours truly,

Boyd P. Gentry
Executive Vice President and
Chief Financial Officer

STATE OF GEORGIA

COUNTY OF TWIGGS

### TRIAD LEASE AGREEMENT

THIS LEASE AGREEMENT (herein "Lease") is made this *15th* day of *December* 2003,

by and between WILLIAM M. FOSTER, an individual residing in Twiggs County, Georgia ("Lessor"),

and Triad Health Management of Georgia, LLC., a limited liability company organized in the State of

Georgia ("Lessee").

### WITNESSETH

WHEREAS, Lessor is the owner of nursing home facilities known as Oceanside Nursing Home

and Savannah Beach Nursing Home (herein "Tybee Facilities") located on Tybee Island, Georgia,

consisting of 135 Licensed Nursing Home Beds, together with all personal property located therein, and

all fixtures, systems, easements and other rights appurtenant to the Tybee Facilities (all of the foregoing

being hereinafter referred to as the "Tybee Property") with the Facilities being located on real property

being more particularly described on Exhibit A hereof; and with the personal property and equipment with

respect to the Facilities being more particularly described on Exhibit B hereof, all of such exhibits by

reference being incorporated herein; and

WHEREAS, Lessor is the owner of nursing home facilities (each such facility being referred

to herein individually as a "Facility" and collectively as the "Facilities") located in Powder Springs, Georgia,

consisting of 208 licensed beds; Thomasville, Georgia, consisting of 52 licensed beds; Jeffersonville,

Georgia, consisting of 131 licensed beds; Lumber City, Georgia, consisting of 87 licensed beds; and La

-1-

Grange, Georgia, consisting of 138 licensed beds, together with all personal property located therein, and all fixtures, systems, easements and other rights appurtenant to said Facilities (all the foregoing being hereinafter referred to as the "Property"); with the Facilities being located on real property being more particularly described on Exhibit A attached hereto and with the personal property and equipment with respect to the Facilities being more particularly described on Exhibit B attached hereto, said exhibits being incorporated herein by reference and expressly made a part hereof; and

WHEREAS, Lessee is desirous of leasing from Lessor the Property.

NOW, THEREFORE, for and in consideration of Ten Dollars and no/100 ($10.00), the premises and other good and valuable consideration paid by each party to the other, the receipt and adequacy of which are hereby acknowledged by each party, and in consideration of the mutual covenants and agreements contained herein, the parties hereunto do mutually agree and covenant as follows:

Section 1.    Agreement to Lease, Rent; Effective Date; and Conditions.

(a)    Agreement to Lease. Lessor hereby leases, demises and rents the Property to Lessee for a term as set forth in Section 3 hereof; and Lessee hereby takes, accepts and rents the Property from Lessor effective as of the commencement date of this Lease hereinafter stated, subject to satisfaction of the conditions precedent to the commencement date as set forth in Section 1(c) hereof and subject to the other terms, conditions and provisions hereof. It is understood between the parties that as to the Tybee Property, this agreement is a restatement and modification of the previous lease for that Property and that the commencement date for said Property was August 1st, 2002, and that as to the remaining Facilities, the commencement date will be January 1st 2004.

# 223425 v2 AES
011387-0009

2
-2-

(b)  Rent.

During the Original Term, the following monthly rental schedule shall apply with respect to the Tybee Property:

| 1st year | $33,876.57 |
| 2nd year | $35,929.69 |
| 3rd year | $37,982.82 |
| 4th year | $41,106.25 |
| 5th year | $41,928.38 |

a.  Initial Monthly Rental Amount

| Jeffersonville | $ 21, 656.22 |
| LaGrange | $ 35,636.78 |
| Lumber City | $ 15,590.37 |
| Powder Springs | $ 81,424.20 |
| Thomasville | $  9,600.72 |

The monthly rental for all homes will increase annually by one half of the increase on the Consumer Price Index but not less than 2% annually, provided however that for the initial five year term of this lease, the rent for Jeffersonville shall increase as provided above, plus an additional increase of Five hundred Dollars ($500.00) per month, each year.

Rent payments shall be due on the first day of each calendar month.  If said rent is not received by Lessor prior to the tenth day of the month, then in addition to the rent, Lessee shall pay a late fee in the

-3-

amount of five percent (5%) of the past due rent. On the first anniversary date of the Original Term and

on each anniversary date thereafter, the rent in effect for the previous year shall increase as set forth in the

schedule set out above. The following payment schedule shall apply to the payments due hereunder.

(1)    With respect to the Tybee property, upon the execution of this agreement, earnest

money in the amount of Twenty Five Thousand Dollars ($25,000) has been deposited with Lessor and

shall be applied to Lessee's first financial obligations hereunder.

(2)    On the commencement date hereof, with respect to the Tybee Property, the Lessee

has paid the Lessor the first calendar month's rent in the amount of Twenty Eight Thousand Seven

Hundred Forty Three Dollars and Twenty Five Cents ($28,743.25) and an advance rental payment for the

last month of the Original Term estimated to be Forty One Thousand One Hundred Six Dollars and Twenty

Five Cents ($41,106.25), for a total advance rental payment of Sixty Nine Thousand Eight Hundred Forty

Nine and Fifty Cents ($69,849.50). If Lease is extended for an Additional Term, advance rent deposit of

the Original Term shall be retained and shall be increased so that monies deposited are equal to the

estimated rent for the last month of the Additional Term.

(3)    For the additional five homes being added to this Lease, contemporaneously with

the execution of this Agreement, Lessee shall pay Lessor the sum of $479,470.23 which shall represent

payment to Lessor of the following: (i) the rental applicable to the last month of the rental term of this Lease

to include December 1, 2008 through December 31, 2008 (the same being $179,470.23) hereinafter

sometimes referred to as "Advance Rent;" and (ii) a "Security Deposit" in the amount of $300,000.00.

Rent applicable under this Lease Agreement to the period of January 1st, 2004 through January 31st, 2004

(the same being $163,908.29) shall be due and payable on the Commencement Date for the Jeffersonville,

-4-

LaGrange, Lumber City, Powder Springs, and Thomasville facilities and shall be a condition precedent to Lessee's right to occupy and operate said homes.

(c)    Conditions. The following shall be conditions precedent to Lessee's obligations hereunder. At the commencement date of this Lease, all of (1) Lessor's representations and warranties hereunder shall be true, and (2) there shall not have occurred since the date hereof any damage or destruction or adverse change (excluding non-material changes made in the ordinary and necessary course of business) to the assets, business or prospects of the property.

(d)    Standards and Licensure Approval.

Within ten (10) days from the execution date of this lease, Lessee shall take all necessary actions to obtain licenses from the Georgia Department of Human Resources – Office of Regulatory Services to permit Lessee to operate the Facilities. If Lessee fails to secure approvals by June 1, 2004, but is diligently pursuing the approvals required hereunder, the time period for securing such approvals shall be extended for a period of thirty (30) days providing that such extension shall not affect the commencement date of the Lease.

(e)    Ownership of Lessee.

The Lessee warrants and represents that it is and shall continue to be during the term of this lease a corporation organized under the laws of the state of Georgia and that all shareholders thereof shall be individuals who are nonresidents of the state of Delaware.

**Section 2.    Condition and Maintenance of Leased Premises.**

(a)    Lessee accepts the Facilities in their "AS-IS" "WHERE-IS" condition.

(b)    Lessee, at its expense, will keep and maintain the Leased Premises in good repair during the Lease Term. Lessee shall promptly make, or cause to be made, all repairs, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, necessary to keep the Leased Premises in good and lawful order and condition, wear and tear from reasonable use excepted, whether or not such repairs are required by any laws, rules, regulations or ordinances hereafter enacted which involve a change of policy on any part of the governmental body enacting the same, save and except for any repairs and replacements to the Facilities which may be needed during any term hereof which the Lessor agrees to provide and pay for as hereinafter provided. Further, Lessor agrees either to assign to Lessee (if permitted) or to demand and institute any legal proceedings through counsel selected by Lessee necessary to enforce any warranties pertaining to the furnishings, appliances, fixtures, machinery, equipment and any system, including but not limited to the heating, air conditioning, electrical and plumbing systems, contained in the nursing home hereby leased. Provided however, Lessee shall be financially responsible for any legal proceeding required enforcing such warranties. Any decoration or repainting of the Leased Premises will be the responsibility of the Lessee.

Section 3.    Term.

Lessor demises the Property to Lessee to have and to hold the Property, together with all improvements, appurtenances and easements thereunto belonging, and all furniture, fixtures, appliances and equipment located thereon, for a period commencing at the commencement date hereof and ending 12:01 a.m. on December 31, 2008 (herein referred to as "Original Term") subject to Lessee's option to further extend the Lease as set forth herein; provided, however, that this Lease shall in all respects be subject to

-6-

Lessee's obtaining all licenses, permits and consents required for the operation of skilled or intermediate care nursing homes on the Property, as provided for in Section 1(c) hereof.

Section 4.   **Rental Payments**.

(a)   Payment Date. Lessee shall pay to Lessor the rent set forth in Section 1(b) on a monthly basis beginning on the commencement date hereof and on the first day of each calendar month thereafter during the Lease Term. Provided no breach or default by Lessee has occurred, rental payment for the final month hereof should be made by first applying to said rental the advance rental paid pursuant to Section One hereof, with Lessee paying any further sum due for said periods.

(b)   Additional Rent for Taxes. Lessee agrees to pay, as additional rental hereunder, all ad valorem taxes during the Lease Term that may be assessed, charged or levied against the Property. The additional rental for taxes shall be payable by Lessee on the later of (i) thirty (30) days after receipt of a copy of the tax notice indicating the amount of such taxes and (ii) the due date for such taxes.  Taxes shall be prorated for fractions of a year covered by this Lease. Lessor hereby grants Lessee the right, but not the obligation, to contest in Lessor's name any tax assessment, charge or levy, and each party shall provide the other with copies of all notices of assessments, charges and levies in a timely manner so as to permit Lessee to exercise its right to contest the same.

Section 5.   **Utilities and Maintenance**.

Lessee shall pay, in addition to the rents reserved herein, all water, gas, heat, electricity, and all other public utilities furnished it or consumed by it, in or upon the Property during the Lease Term, and shall keep the interior of the Property and all furniture, fixtures, appliances and equipment now or hereafter located on the Property in good order and repair and in a clean and safe condition (excepting, however,

-7-

ordinary wear and tear and all repairs made necessary by reason of the happening of fire and other casualties normally covered by fire and extended coverage insurance, which repairs shall be completed in accordance with Section 9 hereof) at its own costs and expense. Lessee shall have the option at any time of replacing, at its expense, any equipment or other personal property constituting part of the Property (in accordance with Section 2 above).

Section 6.    **Rights to Extend upon Expiration of Lease.**

Upon the expiration of the Original Term, this Lease may be renewed or extended upon written notice at least ninety (90) days prior to the expiration of the lease term for one (1) additional term of five (5) years ("Additional Term") to be negotiated satisfactorily to terms and conditions satisfactory to Lessor. The Original Term and the Additional Term, if any, are herein sometimes referred to as the "Lease Term". Upon the termination of this Lease, Lessee shall deliver and surrender to Lessor possession of the Property in as good condition and repair as the same shall be at the commencement of the Lease term hereof except that loss by fire, casualty, act of God, and ordinary wear and use are excepted. The other provisions hereof notwithstanding, should Lessor or Lessor's natural children or grandchildren desire to operate the Facilities at the expiration of the Original Term, provided that Lessor shall give Lessee sixty (60) days prior written notice of such desire and shall certify to Lessee that such transaction is bona fide, then at that time all of Lessee's rights hereunder shall terminate, including any rights to renew said Lease or acquire said property, except such other rights and obligations as apply to the end of the said Lease Term.

Section 7.    **Right of First Refusal to Acquire.**

Lessor covenants during the Lease Term, not to sell, convey, or otherwise dispose of (or enter into any written agreement to do the same), or effective upon the termination of this Lease, the Facilities without first giving Lessee at least forty five (45) days written notice (the "Offer Notice") specifying the terms of said sale, conveyance or disposition and specifying the name of the proposed transferee ("Transferee"), which Offer Notice shall be deemed to constitute an offer by Lessor to sell, convey, transfer or lease such Facilities to Lessee on the same terms and conditions as are being offered by the Transferee and as set forth in the Offer Notice. If Lessee accepts Lessor's offer within forty-five (45) days after receipt of the Offer Notice and meets all conditions of the proposed transfer, Lessee and Lessor shall close the transaction within sixty (60) days after Lessor's receipt of Lessee's written acceptance. If Lessee fails to meet said offer conditions or declines to accept such offer within such forty-five (45) day period, the "Acceptance Period", the offer in the Offer Notice shall expire. Notwithstanding the foregoing, Lessee shall not have any right of first refusal with respect to any sale, conveyance, disposition or lease of the Facilities to any of Lessor's natural children or grandchildren; provided, that Lessor shall give Lessee prior written notice of such transaction and shall certify to Lessee that such transaction is bona fide, at which time all of Lessee's rights hereunder shall terminate, except such rights and obligations as apply to the end of the said Lease Term.

**Section 8.    Lessee's Fixtures.**

Except as hereinafter provided, all trade fixtures, furniture, equipment and personal property owned by Lessee and installed or placed by it upon the Property, may be removed by Lessee at any time during the Lease Term, or upon the expiration thereof; provided, however, that any such fixtures or equipment placed upon the Property by Lessee, in accordance with the provisions of Section 5 hereof, in replacement

-9-

of any fixtures or equipment presently located on the Property, shall thereupon become the sole property of Lessor unless the property so replaced has been earlier delivered to Lessor if requested or stored for replacement in the Facilities. Lessee agrees to repair any damage to any buildings on the Property caused by the removing of trade fixtures and other property belonging to Lessee.

-10-

Section 9.  **Damage or Destruction**.

(a)    Damage or Destruction. In the event any improvements on the Property are damaged or destroyed by fire, casualty or disaster, the Lease Term shall not be affected thereby, except as hereinafter provided.  Lessee shall give prompt written notice of any such damage or destruction to Lessor.

(b)    Total Destruction. If the Facilities should be totally destroyed by fire or any other casualty during the Lease Term, or if all or a material portion (meaning in excess of thirty percent (30%) of the beds in the Facilities) should be so badly damaged by fire or other casualty as to become untenantable and such damage cannot reasonably be expected to be repaired within ninety (90) working days from the date of written notification by Lessee to Lessor of the occurrence of the damage, this Lease shall terminate and rent shall be fully abated from the date of destruction and all insurance proceeds with respect to such damage or destruction with respect to the Facilities (but not including insurance proceeds paid or payable with respect to Lessee's property and leasehold improvements) shall be paid over to Lessor. The advance rent payments and the liquidated damages deposits shall be promptly returned to Lessee by Lessor in the event of total destruction and the election to terminate lease. If Lessee and Lessor, through mutual agreement choose not to terminate, this Lease shall continue in full force and effect and Lessor, subject to the other provisions of this Section, shall be assigned the insurance proceeds payable from such casualty damage and Lessor shall promptly and diligently repair, replace and restore the Facilities (including personal property) to substantially the same condition existing prior to such damage or destruction. For the period Tenant is deprived of the use of any portion of the Facilities by reason of such damage or destruction and the repair or restoration of same, the annual rental hereunder shall be equitably abated or reduced, taking into account

the portion and amount of the Facilities so damaged and the effect of such damage upon the operation of Lessee's business at the Facilities.

(c)     Partial Destruction. If the Facilities should be damaged by fire or other casualty during the term of the Lease but the same are not made untenantable, or if made untenantable, they can reasonably be expected to be repaired within ninety (90) working days from the date of written notification by Lessee to Lessor of the occurrence of the damage, then this Lease shall continue in full force and effect and Lessor shall be assigned the insurance proceeds payable from such casualty damage with respect to such Facilities (but not including insurance proceeds paid or payable with respect to Lessee's property and leasehold improvements) and Lessor shall promptly and diligently repair, replace and restore the Facilities (including personal property) to substantially the same condition existing prior to such damage. For the period Lessee is deprived of the use of any portion of the Premises by reason of such damage and the repair or restoration of same, the rental hereunder shall be equitably abated or reduced, taking into account the portion and amount of the Facilities so damaged and the effect of such damage upon the operation of Lessee's business at the Facilities, except to the extent any rents are covered and payable under a Business Interruption Insurance policy carried by Lessee.

(d)     Proceeds. Notwithstanding any of the foregoing to the contrary, Lessor shall be obligated to undertake the repair, replacement or restoration work under this Section 9 at the lowest bid that is reasonably acceptable to the insurance carrier. All insurance proceeds with respect to the Lessee's property shall be paid to Lessee, without any claim thereto by Lessor, except that Lessee may direct any Business Interruption Insurance proceeds payable under Section 20(b) to be paid directly to Lessor.

However, if Lessee elects to have such proceeds paid to itself, it hereby agrees to promptly remit the amount due under Section 20(b) hereof to Lessor.

Section 10.    Quiet Enjoyment.

So long as Lessee performs all its obligations hereunder, Lessor agrees that it will not permit the disturbance of, nor interference with, Lessee's peaceful and quiet possession and enjoyment of the Property during the Lease Term subject to Lessor's right under Section 17 of this Lease. To this end, Lessor hereby warrants to Lessee that Lessor owns good and marketable fee simple title to the Property except as otherwise noted herein, that Lessor has full right and authority to execute and perform this Lease and that there are no agreements, options, laws, zoning ordinances, regulations, restrictions, covenants, claims, proceedings, lawsuits or orders which in any way would prevent or hinder or adversely affect the use of the Property by Lessee, pursuant to the terms of this Lease.

Section 11.    Assignment and Subletting.

Except as hereinafter provided, Lessee may not assign this Lease or sublease all or any portion of the Property or voluntarily or involuntarily convey or transfer any portion of the beneficial ownership of the Lessee, which shall also be considered as an assignment or sublease, without the prior written consent of Lessor.

Section 12.    Alterations and Improvements.

(a)    During the Lease Term, Lessee may not, without Lessor's prior written consent, make any changes, improvements, alterations and additions to the structural elements of any Facilities involving an expenditure by Lessee in excess of Twenty Five Thousand Dollars ($25,000). All such changes, improvements, alterations and additions shall, upon the termination of this Lease, become the sole and

-13-

exclusive property of Lessor, except as provided in Section 2 . Further, Lessor shall have a right of first

refusal, to be exercised within thirty (30) days after receiving from Lessee the terms of an offer to construct

any improvements costing in excess of Twenty Five Thousand Dollars ($25,000), in which to match any

such offer and to perform such construction.

Section 13.    Liens.

If any mechanics' or other lien shall be filed against the Property, or any buildings or improvements

therein, by reason of any alteration or addition made or alleged to have been made by or for Lessee,

Lessee shall cause the same to be canceled and discharged of record, by bond or otherwise, at the expense

of Lessee, and shall also defend on behalf of Lessor, at Lessee's sole cost and expense, any action, suit

or proceedings which may be brought for the enforcement of such lien, and save harmless Lessor from any

claim, attorney's fees or damage therefrom. In the event that any such mechanics' or other lien is not

removed by Lessee within thirty (30) days after notice is given by Lessor to remove same, Lessor shall

have the right to discharge said lien by payment or otherwise, and any reasonable sums expended by

Lessor for such discharge, including attorney's fees, shall be paid by Lessee to Lessor upon demand, and

shall be deemed to be additional rent due under this Lease.

Section 14.    Requirements of Public Authorities.

(a)    Lessee's Obligations.   Subject to the obligation of Lessor contained in subparagraph (b)

of this Section 14, Lessee agrees at its own cost and expense, during the Leases Term, to comply with all

orders, rules, regulations and requirements relating to the Property, which shall come into effect after the

commencement date of this Lease, of federal, state, municipal or other governmental authorities, applicable

to the buildings, its structural components, improvements and land, comprising any part of the Property.

-14-

**FedEx Express**

US Airbill

FedEx Tracking Number: 8586 5563 7129

0215

Sender's Copy

Date: 11/30/06

Sender's FedEx Account Number: 2270-1960-3

Sender's Name: RON HERBERT

Phone: (678) 366-0305

Company: TRIAD HEALTH MGMT

Address: 10 ROSWELL ST STE 210

ALPHARETTA   State GA   ZIP 30004-7947

Your Internal Billing Reference

Recipient's Name: Shannon Ray   Phone: 706 257-1092

Company: Blue Cross Blue Shield of GA

Recipient's Address: 2357 Warm Springs Rd

Columbus   State GA   ZIP 31904

0343352956

**Find drop-off locations at fedex.com**
Simplify your shipping. Manage your account. Access all the tools you need.

**4a Express Package Service**  Packages up to 150 lbs.
- [X] FedEx Priority Overnight
- [ ] FedEx Standard Overnight
- [ ] FedEx First Overnight
- [ ] FedEx 2Day
- [ ] FedEx Express Saver

**4b Express Freight Service**  Packages over 150 lbs.
- [ ] FedEx 1Day Freight
- [ ] FedEx 2Day Freight
- [ ] FedEx 3Day Freight

**5 Packaging**
- [ ] FedEx Envelope
- [X] FedEx Pak
- [ ] FedEx Box
- [ ] FedEx Tube
- [ ] Other

**6 Special Handling**
- [ ] SATURDAY Delivery
- [ ] HOLD Weekday
- [ ] HOLD Saturday
- [X] No
- [ ] Yes (As per attached Shipper's Declaration)
- [ ] Yes (Shipper's Declaration not required)
- [ ] Dry Ice
- [ ] Cargo Aircraft Only

**7 Payment** Bill to:
- [X] Sender
- [ ] Recipient
- [ ] Third Party
- [ ] Credit Card
- [ ] Cash/Check

Total Packages    Total Weight 5    Total Declared Value $ 100 .00

**8 NEW Residential Delivery Signature Options**
- [ ] No Signature Required
- [ ] Direct Signature
- [ ] Indirect Signature

519



PLAINTIFF'S
EXHIBIT
5



# MEDICARE ENROLLMENT APPLICATION

*LA GRANGE*

## INSTITUTIONAL PROVIDERS

## CMS-855A

SEE PAGE 1 TO DETERMINE IF YOU ARE COMPLETING THE CORRECT APPLICATION.

SEE PAGE 2 FOR INFORMATION ON WHERE TO MAIL THIS APPLICATION.

SEE PAGE 41 TO FIND A LIST OF THE SUPPORTING DOCUMENTATION THAT MUST BE SUBMITTED WITH THIS APPLICATION.

PLAINTIFF'S EXHIBIT

6



DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB NO. 0938-0685

# WHO SHOULD SUBMIT THIS APPLICATION

The following health care organizations must complete this application to initiate the enrollment process:

Community Mental Health Center
Comprehensive Outpatient
   Rehabilitation Facility
Critical Access Hospital
End-Stage Renal Disease Facility
Federally Qualified Health Center
Histocompatibility Laboratory
Home Health Agency
Hospice

Hospital (all)
Indian Health Services Facility
Organ Procurement Organization
Outpatient Physical Therapy / Occupational
   Therapy / Speech Pathology Services
Religious Non-Medical Health Care Institution
Rural Health Clinic
Skilled Nursing Facility

If your provider type is not listed above, contact the fee-for-service contractor before you submit this application.

Complete this application if you are a health care organization and you:

* Plan to bill Medicare for Part A medical services, or
* Would like to report a change to your existing Part A enrollment data. A change must be reported within 90 days of the effective date of the change.

# BILLING NUMBER INFORMATION

The Medicare Identification Number, often referred to as the Online Survey, Certification and Reporting (OSCAR) number, is a generic term for any number other than the National Provider Identifier (NPI) that is used by a provider to bill the Medicare program.

The NPI is the standard unique health identifier for health care providers and is assigned by the National Plan and Provider Enumeration System (NPPES). **Medicare health providers, except organ procurement organizations, must obtain an NPI prior to enrolling in Medicare or before submitting a change to your existing Medicare enrollment information.** Applying for an NPI is a process separate from Medicare enrollment. To obtain an NPI, you may apply online at *https://NPPES.cms.hhs.gov*. As an organization health care provider, it is your responsibility to determine if you have "subparts." A subpart is a component of an organization that furnishes healthcare and is not itself a legal entity. If you do have subparts, you must determine if they should obtain their own unique NPIs. Before you complete this enrollment application, you need to make those determinations and obtain NPI(s) accordingly.

For more information about subparts, visit *www.cms.hhs.gov/NationalProvIdentStand* to view the "Medicare Expectations Subparts Paper."

# INSTRUCTIONS FOR COMPLETING AND SUBMITTING THIS APPLICATION

* Type or print all information so that it is legible. Do not use pencil.
* Report additional information within a section by copying and completing that section for each additional entry.
* Attach all required supporting documentation.
* Keep a copy of your completed Medicare enrollment package for your records.
* Send the completed application with original signatures and all required documentation to your designated Medicare fee-for-service contractor.

CMS-855A (06/06) EF 07/2006

## AVOID DELAYS IN YOUR ENROLLMENT

To avoid delays in the enrollment process, you should:

- Complete all required sections.
- Ensure that the legal business name shown in Section 2 matches the name on the tax documents.
- Ensure that the correspondence address shown in Section 2 is the provider's address.
- Enter your NPI in the applicable section.
- Enter all applicable dates.
- Ensure that the correct person signs the application.

    **Note:** A billing agent representative may not sign the application.

- Send your application and all supporting documentation to the designated fee-for-service contractor.

## OBTAINING MEDICARE APPROVAL

The usual process for becoming a certified Medicare provider is as follows:

1. The applicant completes and submits a CMS-855A enrollment application and all supporting documentation to its fee-for-service contractor.

2. The fee-for-service contractor reviews the application and makes a recommendation for approval or denial to the CMS Regional Office, with a copy to the State agency.

3. The State agency conducts a survey. Based on the survey results, the State agency makes a recommendation for approval or denial (a certification of compliance or noncompliance) to the CMS Regional Office. Certain provider types may elect voluntary accreditation by a CMS-recognized accrediting organization in lieu of a State survey.

4. The CMS Regional Office makes the final decision regarding program eligibility. The CMS Regional Office also works with the Office of Civil Rights to obtain necessary Civil Rights clearances. If approved, the provider must typically sign a provider agreement.

## ADDITIONAL INFORMATION

For additional information regarding the Medicare enrollment process, visit *www.cms.hhs.gov/MedicareProviderSupEnroll.*

The fee-for-service contractor may request, at any time during the enrollment process, documentation to support or validate information reported on the application. You are responsible for providing this documentation in a timely manner.

The information you provide on this application will not be shared. It is protected under 5 U.S.C. Section 552(b)(4) and/or (b)(6), respectively. For more information, see the last page of this application for the Privacy Act Statement.

## MAIL YOUR APPLICATION

The Medicare fee-for-service contractor (also referred to as a fiscal intermediary or a Medicare administrative contractor) that services your State is responsible for processing your enrollment application. To locate the mailing address for your fee-for-service contractor, go to *www.cms.hhs.gov/MedicareProviderSupEnroll.*

## SECTION 1: BASIC INFORMATION

### NEW ENROLLEES

If you are:

- Enrolling with a particular fee-for-service contractor for the first time.
- Undergoing a change of ownership where the new owner will not be accepting assignment of the Medicare assets and liabilities of the seller/former owner.

### ENROLLED MEDICARE PROVIDERS

The following actions apply to Medicare providers already enrolled in the program:

### Reactivation

To reactivate your Medicare billing privileges, submit this enrollment application. In addition, you must be able to submit a valid claim and meet all current requirements for your provider type before reactivation can occur.

### Voluntary Termination

A provider should voluntarily terminate its Medicare enrollment when:

- It will no longer be rendering services to Medicare patients,
- It is planning to cease (or has ceased) operations,
- There has been an acquisition/merger and the new owner will not be using the identification number of the entity it has acquired,
- There has been a consolidation and the identification numbers of the consolidating providers will no longer be used, or
- There has been a change of ownership and the new owner will not be accepting assignment of the Medicare assets and liabilities of the seller/former owner, meaning that the number of the seller/former owner will no longer be used.

**NOTE:** A voluntary identification number termination cannot be used to circumvent any corrective action plan or any pending/ongoing investigation, nor can it be used to avoid a period of reasonable assurance, where a provider must operate for a certain period without recurrence of the deficiencies that were the basis for the termination. The provider will not be reinstated until the completion of the reasonable assurance period.

### Change of Ownership (CHOW)

A CHOW typically occurs when a Medicare provider has been purchased (or leased) by another organization. The CHOW results in the transfer of the old owner's identification number and provider agreement (including any Medicare outstanding debt of the old owner) to the new owner. The regulatory citation for CHOWs can be found at 42 CFR 489.18. If the purchaser (or lessee) elects not to accept a transfer of the provider agreement, then the old agreement should be terminated and the purchaser or lessee is considered a new applicant.

## SECTION 1: BASIC INFORMATION (Continued)

### Acquisition/Merger

An acquisition/merger occurs when a currently enrolled Medicare provider is purchasing or has been purchased by another enrolled provider. Only the purchaser's provider number and tax identification number remain.

Acquisitions/mergers are different from CHOWs. In the case of an acquisition/merger, the seller/former owner's provider number dissolves. In a CHOW, the seller/former owner's provider number typically remains intact and is transferred to the new owner.

### Consolidation

A consolidation occurs when two or more enrolled Medicare providers consolidate to form a new business entity.

Consolidations are different from acquisitions/mergers. In an acquisition/merger, two entities combine but the provider number and tax identification number (TIN) of the purchasing entity remains intact. In a consolidation, the TINs and provider numbers of the consolidating entities dissolve and a new TIN and provider number are assigned to the new, consolidated entity.

> Because of the various situations in which a CHOW, acquisition/merger, or consolidation can occur, it is recommended that the provider contact its fee-for-service contractor or its CMS Regional Office if it is unsure as to whether such a transaction has occurred. The provider should also review the applicable federal regulation at 42 CFR 489.18 for additional guidance.

### Change of Information

A change of information should be submitted if you are changing, adding, or deleting information under your current tax identification number.

**NOTE:** Ownership changes that do not qualify as CHOWs, acquisitions/mergers, or consolidations should be reported here. The most common example involves stock transfers. For instance, assume that a business entity's stock is owned by A, B, and C. A sells his stock to D. While this is an ownership change, it is generally not a formal CHOW under 42 CFR 489.18. Thus, the ownership change from A to D should be reported as a change of information, not a CHOW. If you have any questions on whether an ownership change should be reported as a CHOW or a change of information, contact your fee-for-service contractor or CMS Regional Office.

If you are already enrolled in Medicare and are not receiving Medicare payments via EFT, any change to your enrollment information will require you to submit a CMS-588 application. All future payments will then be received via EFT.

### Revalidation

CMS may require you to submit or update your enrollment information. The fee-for-service contractor will notify you when it is time for you to revalidate your enrollment information. Do not submit a revalidation application until you have been contacted by the fee-for-service contractor.

# SECTION 1: BASIC INFORMATION

## A. Check one box and complete the required sections

| REASON FOR APPLICATION | BILLING NUMBER INFORMATION | REQUIRED SECTIONS |
|---|---|---|
| ☐ You are a new enrollee in Medicare | Enter your Medicare Identification Number (if issued) and the NPI you would like to link to this number in Section 4. | Complete all sections except 2F, 2G, and 2H |
| ☐ You are enrolling with another fee-for-service contractor's jurisdiction<br><br>☐ You are reactivating your Medicare enrollment | Enter your Medicare Identification Number (if issued) and the NPI you would like to link to this number in Section 4. | Complete all sections except 2F, 2G, and 2H |
| ☐ You are voluntarily terminating your Medicare enrollment | Effective Date of Termination:<br><br>Medicare Identification Number that is terminating (if issued):<br><br>NPI (if issued): | 1A, 2B1, 13, and either 15 or 16 |
| ☑ There has been a **Change of Ownership (CHOW)** of the Medicare-enrolled provider<br><br>You are the:<br>☐ Seller/Former Owner<br>☑ Buyer/New Owner | Medicare Identification Number (if issued):<br>115354<br>NPI:<br>1407908163<br><br>Tax Identification Number:<br>20-5933784 | Seller/Former Owner:<br>1A, 2F, 13, and either 15 or 16<br><br>Buyer/New Owner:<br>Complete all sections except 2G and 2H |
| ☐ Your organization has taken part in an **Acquisition or Merger**<br><br>You are the:<br>☐ Seller/Former Owner<br>☐ Buyer/New Owner | Medicare Identification Number of the Seller/Former Owner (if issued):<br><br>NPI:<br><br>Tax Identification Number: | Seller/Former Owner:<br>1A, 2G, 13, and either 15 or 16<br><br>Buyer/New Owner:<br>1A, 2G, 4, 13, and either 15 (if you are the authorized official) or 16 (if you are the delegated official), and 6 for the signer if that authorized or delegated official has not been established for this provider. |
| ☐ Your organization has **Consolidated** with another organization<br><br>You are the:<br>☐ Former organization<br>☐ New organization | Medicare Identification Number of the Seller/Former Owner (if issued):<br><br>NPI:<br><br>Tax Identification Number: | Former Organizations:<br>1A, 2H, 13, and either 15 or 16<br><br>New Organization:<br>Complete all sections except 2F and 2G |
| ☐ You are changing your Medicare information | Medicare Identification Number (if issued):<br>NPI: | Go to Section 1B |
| ☐ You are revalidating your Medicare enrollment | Enter your Medicare Identification Number (if issued) and the NPI you would like to link to this number in Section 4. | Complete all sections except 2F, 2G, and 2H |

CMS-855A (06/06)   EF 07/2006

5

# SECTION 1:  BASIC INFORMATION (Continued)

## B. Check all that apply and complete the required sections:

| | REQUIRED SECTIONS |
|---|---|
| ☐ Identifying Information | 1, 2 (complete only those sections that are changing), 3, 13, and either 15 (if you are the authorized official) or 16 (if you are the delegated official), and Section 6 for the signer if that authorized or delegated official has not been established for this provider. |
| ☐ Adverse Legal Actions/Convictions | 1, 2B1, 3, 13, and either 15 (if you are the authorized official) or 16 (if you are the delegated official), and Section 6 for the signer if that authorized or delegated official has not been established for this provider. |
| ☐ Practice Location Information, Payment Address & Medical Record Storage Information | 1, 2B1, 3, 4 (complete only those sections that are changing), 13, and either 15 (if you are the authorized official) or 16 (if you are the delegated official), and Section 6 for the signer if that authorized or delegated official has not been established for this provider. |
| ☐ Ownership Interest and/or Managing Control Information (Organizations) | 1, 2B1, 3, 5, 13, and either 15 (if you are the authorized official) or 16 (if you are the delegated official), and Section 6 for the signer if that authorized or delegated official has not been established for this provider. |
| ☐ Ownership Interest and/or Managing Control Information (Individuals) | 1, 2B1, 3, 6, 13, and either 15 (if you are the authorized official) or 16 (if you are the delegated official), and Section 6 for the signer if that authorized or delegated official has not been established for this provider. |
| ☐ Chain Home Office Information | 1, 2B1, 3, 7, 13, and either 15 (if you are the authorized official) or 16 (if you are the delegated official), and Section 6 for the signer if that authorized or delegated official has not been established for this provider. |
| ☐ Billing Agency Information | 1, 2B1, 3, 8 (complete only those sections that are changing), 13, and either 15 (if you are the authorized official) or 16 (if you are the delegated official), and Section 6 for the signer if that authorized or delegated official has not been established for this provider. |
| ☐ Special Requirements for Home Health Agencies | 1, 2B1, 3, 12, 13, and either 15 (if you are the authorized official) or 16 (if you are the delegated official), and Section 6 for the signer if that authorized or delegated official has not been established for this provider. |
| ☐ Authorized Official(s) | 1, 2B1, 3, 6, 13, and 15. |
| ☐ Delegated Official(s) (Optional) | 1, 2B1, 3, 6, 13, 15, and 16. |

# SECTION 2: IDENTIFYING INFORMATION

## NEW ENROLLEES

**Submit separate CMS-855A enrollment applications** if the types of providers for which this application is being submitted are separately recognized provider types with different rules regarding Medicare participation. For example, if a provider functions as both a hospital and an end-stage renal disease (ESRD) facility, the provider must complete two separate enrollment applications (CMS-855A)—one for the hospital and one for the ESRD facility.

If a hospital performs multiple types of services, only one enrollment application (CMS-855A) is required. For example, a hospital that has a swing-bed unit need only submit one enrollment application (CMS-855A). This is because the provider is operating as a single provider type—a hospital—that happens to have a distinct part furnishing different/additional services.

## Special Enrollment Notes

If you are adding a psychiatric or rehabilitation unit to a hospital, check the appropriate subcategory under the "Hospital" heading. (A separate enrollment for the psychiatric/rehabilitation unit is not required). The unit should be listed as a practice location in Section 4.

If you are adding a home health agency (HHA) branch, list it as a practice location in Section 4. A separate enrollment application is not necessary.

If you are changing hospital types (e.g., general hospital to a psychiatric hospital), indicate this in Section 2. A new/separate enrollment is not necessary.

If you are adding an HHA sub-unit (as opposed to a branch), this requires an initial enrollment application for the sub-unit.

# SECTION 2: IDENTIFYING INFORMATION (Continued)

## A. TYPE OF PROVIDER

The provider must meet all Federal and State requirements for the type of provider checked. Check only one provider type. If the provider functions as two or more provider types, a separate enrollment application (CMS-855A) must be submitted for each type.

1. Type of Provider (other than Hospitals – See 2A2). Check only one:
   - ☐ Community Mental Health Center
   - ☐ Comprehensive Outpatient Rehabilitation Facility
   - ☐ Critical Access Hospital
   - ☐ End-Stage Renal Disease Facility
   - ☐ Federally Qualified Health Center
   - ☐ Histocompatibility Laboratory
   - ☐ Home Health Agency
   - ☐ Home Health Agency (Sub-unit)
   - ☐ Hospice
   - ☐ Indian Health Services Facility
   - ☐ Organ Procurement Organization
   - ☐ Outpatient Physical Therapy/Occupational Therapy/ Speech Pathology Services
   - ☐ Religious Non-Medical Health Care Institution
   - ☐ Rural Health Clinic
   - ☑ Skilled Nursing Facility
   - ☐ Other (Specify):_____

2. If this provider is a hospital, check all applicable subgroups and units listed below and complete Section 2A3.
   - ☐ Hospital—General
   - ☐ Hospital—Acute Care
   - ☐ Hospital—Children's (excluded from PPS)
   - ☐ Hospital—Long-Term (excluded from PPS)
   - ☐ Hospital—Psychiatric (excluded from PPS)
   - ☐ Hospital—Rehabilitation (excluded from PPS)
   - ☐ Hospital— Short-Term (General and Specialty)
   - ☐ Hospital—Swing-Bed approved
   - ☐ Hospital—Psychiatric Unit
   - ☐ Hospital—Rehabilitation Unit
   - ☐ Other (Specify):_____

3. Does this hospital have a compliance plan that states that the hospital checks all managing employees against the exclusion/debarment lists of both the HHS Office of the Inspector General (OIG) and the General Services Administration (GSA)?
   - ☐ YES    ☐ NO

## B. IDENTIFICATION INFORMATION

### 1. BUSINESS INFORMATION

Legal Business Name  (not the "Doing Business As" name) as reported to the Internal Revenue Service

Triad at LaGrange I, LLC

Identify the type of organizational structure of this provider (Check one)
☐ Corporation  ☑ Limited Liability Company  ☐ Partnership  ☐ Sole Proprietor  ☐ Other (Specify): 20-5933784

| Tax Identification Number | |
|---|---|
| 20-5933784 | Medicare Year-End Cost Report Date (mm/dd) 06/30 |
| Incorporation Date (mm/dd/yyyy) (if applicable) 12/01/2006 | State Where Incorporated (if applicable) GA |

Other Name

LaGrange Nursing and Rehabilitation Center

Type of Other Name
☐ Former Legal Business Name  ☑ Doing Business As Name  ☐ Other (Specify):_____

## SECTION 2: IDENTIFYING INFORMATION (Continued)

### 2. STATE LICENSE INFORMATION/CERTIFICATION INFORMATION

Provide the following information if the provider has a State license/certification to operate as the provider type for which you are enrolling.

❑ State License Not Applicable

| License Number | State Where Issued |
|---|---|
| 1-141-1885 | GA |
| Effective Date *(mm/dd/yyyy)* | Expiration/Renewal Date *(mm/dd/yyyy)* |
| 12/01/2006 | does not expire |

### Certification Information

❑ Certification Not Applicable

| Certification Number | State Where Issued |
|---|---|
| | |
| Effective Date *(mm/dd/yyyy)* | Expiration/Renewal Date *(mm/dd/yyyy)* |
| | |

### C. CORRESPONDENCE ADDRESS

Provide contact information for the entity listed in Section 2B1 of this section. Once enrolled, the information provided below will be used by the fee-for-service contractor if it needs to contact you directly. This address cannot be a billing agency's address.

Mailing Address Line 1 *(Street Name and Number)*
2111 West Point Road

Mailing Address Line 2 *(Suite, Room, etc.)*

| City/Town | State | ZIP Code + 4 |
|---|---|---|
| LaGrange | GA | 30240-4047 |

| Telephone Number | Fax Number *(if applicable)* | |
|---|---|---|
| (706) 812-9293 | (706) 812-9353 | E-mail Address *(if applicable)* |

### D. ACCREDITATION

Is this provider accredited?

If YES, complete the following:                                    ❑ YES ☑ NO

Date of Accreditation *(mm/dd/yyyy)*

Name of Accrediting Body

Type of Accreditation or Accreditation Program (e.g., hospital accreditation program, home health accreditation)

### E. COMMENTS

Use this section to clarify any information furnished in this section.

# SECTION 2: IDENTIFYING INFORMATION (Continued)

## F. CHANGE OF OWNERSHIP (CHOW) INFORMATION

Both the seller/former owner and the new owner should complete this section. (As the new owner may not know all of the seller/former owner's data, it should furnish this information on an "if known" basis.) The seller/former owner must complete Sections 1A, 2F, 13, and either 15 or 16. (Section 6 must also be completed if the signer has never completed Section 6 before.) The new owner must complete the entire application.

Legal Business Name of "Seller/Former Owner" as reported to the Internal Revenue Service
**Mariner Health LaGrange**

"Doing Business As" Name of Seller/Former Owner *(if applicable)*
**Brian Center LaGrange**

| Old Owner's NPI **1114999687** | Effective Date of Transfer *(this can be a future date)(MM/DD/YYYY)* **12/01/2006** | Old Owner's Medicare Identification Number *(if issued)* **115354** Name of Fee-For-Service Contractor of Seller/Former Owner **Mutual** |
|---|---|---|

Will the new owner be accepting assignment of the current "Provider Agreement?" ☑ YES ☐ NO

If the answer is "No," then this is an initial enrollment and the new owner should follow the instructions for "New Enrollees" in Section 1 of this form.

**Submit one copy of the bill of sale with the application. A copy of the final sales agreement must be submitted once the sale is executed.**

## G. ACQUISITIONS/MERGERS

Effective Date of Acquisition

The seller/former owner need only complete Sections 1A, 2G, 13, and either 15 or 16; the new owner must complete Sections 1A, 2G, 4, 13, and either 15 or 16. (Section 6 must also be completed if the signer has never completed Section 6 before.)

## 1. PROVIDER BEING ACQUIRED

This section is to be completed with information about the currently enrolled provider that is being acquired and will no longer retain its current Medicare provider number as a result of this acquisition.

Legal Business Name of the "Provider Being Acquired" as reported to the Internal Revenue Service

Current Fee-for-Service Contractor

Provide the name and Medicare identification number of all units of the above provider that have separate Medicare identification numbers but have not entered into separate provider agreements, such as swing bed units of a hospital and HHA branches. Also furnish the NPI. Units that already have a separate provider agreement should not be reported here.

| Name/Department | Medicare Identification Number *(if issued)* | National Provider Identifier |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

## SECTION 2: IDENTIFYING INFORMATION (Continued)

### 2. ACQUIRING PROVIDER

This section is to be completed with information about the organization acquiring the provider identified in Section 2G1.

| Legal Business Name of the "Acquiring Provider" as Reported to the Internal Revenue Service | Medicare Identification Number (if issued) |
|---|---|
| Current Fee-for-Service Contractor | National Provider Identifier |

Submit one copy of the bill of sale with the application. A copy of the final sales agreement must be submitted once the sale is executed.

### H. CONSOLIDATIONS

The newly formed provider completes the entire application. The providers that are being consolidated are reported below.

### 1. 1ST CONSOLIDATING PROVIDER

This section is to be completed with information about the 1st currently enrolled provider that, as a result of this consolidation, will no longer retain its current Medicare provider number.

Legal Business Name of the Provider Organization as Reported to the Internal Revenue Service

Current Fee-for-Service Contractor

Effective Date of Consolidation

Provide the name and Medicare identification number of all units of the above provider that have separate Medicare identification numbers but have not entered into separate provider agreements, such as swing-bed units of a hospital and HHA branches. Also furnish the NPI. Units that already have a separate provider agreement should not be reported here.

| Name/Department | Medicare Identification Number (if issued) | National Provider Identifier |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

### 2. 2ND CONSOLIDATING PROVIDER

This section is to be completed with information about the 2nd currently enrolled provider that, as a result of this consolidation, will also no longer retain its current Medicare provider number.

Legal Business Name of the Provider Organization as Reported to the Internal Revenue Service

Current Fee-for-Service Contractor

## SECTION 2: IDENTIFYING INFORMATION (Continued)

Provide the name and Medicare identification number of all units of the above provider that have separate Medicare identification numbers but have not entered into separate provider agreements, such as swing-bed units of a hospital and HHA branches. Also furnish the NPI. Units that already have a separate provider agreement should not be reported here.

| Name/Department | Medicare Identification Number *(if issued)* | National Provider Identifier |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## 3. NEWLY CREATED PROVIDER IDENTIFICATION INFORMATION

Complete this section with identifying information about the newly created provider resulting from this consolidation.

| Legal Business Name of the New Provider as Reported to the Internal Revenue Service | Tax Identification Number |
|---|---|
| | |

**Submit one copy of the bill of sale with the application. A copy of the final sales agreement must be submitted once the sale is executed.**

# SECTION 3: ADVERSE LEGAL ACTIONS/CONVICTIONS

This section captures information on adverse legal actions, such as convictions, exclusions, revocations, and suspensions. All applicable adverse legal actions must be reported, regardless of whether any records were expunged or any appeals are pending. If you are uncertain as to whether an action falls within one of the adverse legal action categories or whether a name reported on this application has an adverse legal action, query the Healthcare Integrity and Protection Data Bank. For information on how to access the Data Bank, call 1-800-767-6732 or visit *www.npdb-hipdb.com.* There is a charge for using this service.

## ADVERSE LEGAL ACTIONS THAT MUST BE REPORTED

### Convictions

1. The provider, supplier, or any owner of the provider or supplier was, within the last 10 years preceding enrollment or revalidation of enrollment, convicted of a Federal or State felony offense that CMS has determined to be detrimental to the best interests of the program and its beneficiaries. Offenses include:

   Felony crimes against persons and other similar crimes for which the individual was convicted, including guilty pleas and adjudicated pre-trial diversions; financial crimes, such as extortion, embezzlement, income tax evasion, insurance fraud and other similar crimes for which the individual was convicted, including guilty pleas and adjudicated pre-trial diversions; any felony that placed the Medicare program or its beneficiaries at immediate risk (such as a malpractice suit that results in a conviction of criminal neglect or misconduct); and any felonies that would result in a mandatory exclusion under Section 1128(a) of the Act.

2. Any misdemeanor conviction, under Federal or State law, related to: (a) the delivery of an item or service under Medicare or a State health care program, or (b) the abuse or neglect of a patient in connection with the delivery of a health care item or service.

3. Any misdemeanor conviction, under Federal or State law, related to theft, fraud, embezzlement, breach of fiduciary duty, or other financial misconduct in connection with the delivery of a health care item or service.

4. Any felony or misdemeanor conviction, under Federal or State law, relating to the interference with or obstruction of any investigation into any criminal offense described in 42 C.F.R. Section 1001.101 or 1001.201.

5. Any felony or misdemeanor conviction, under Federal or State law, relating to the unlawful manufacture, distribution, prescription, or dispensing of a controlled substance.

## Exclusions, Revocations or Suspensions

1. Any revocation or suspension of a license to provide health care by any State licensing authority. This includes the surrender of such a license while a formal disciplinary proceeding was pending before a State licensing authority.

2. Any revocation or suspension of accreditation.

3. Any suspension or exclusion from participation in, or any sanction imposed by, a Federal or State health care program, or any debarment from participation in any Federal Executive Branch procurement or non-procurement program.

4. Any current Medicare payment suspension under any Medicare billing number.

5. Any Medicare revocation of any Medicare billing number.

# SECTION 3: ADVERSE LEGAL ACTIONS/CONVICTIONS (Continued)

## ADVERSE LEGAL HISTORY

1. Has your organization, under any current or former name or business entity, ever had an adverse action listed on page 13 of this application imposed against it?

   ☐ YES–Continue Below    ☑ NO–Skip to Section 4

2. If yes, report each adverse legal action, when it occurred, the Federal or State agency or the court/administrative body that imposed the action, and the resolution, if any.
   Attach a copy of the adverse legal action documentation(s) and resolution(s).

| Adverse Legal Action | Date | Taken By | Resolution |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# SECTION 4: PRACTICE LOCATION INFORMATION

## INSTRUCTIONS

- Report all practice locations within the jurisdiction of the Medicare fee-for-service contractor to which you will submit this application.
- If the provider is adding a practice location in the same State and the location requires a separate provider agreement, a separate, complete CMS-855A must be submitted for that location. The location is considered a separate provider for purposes of enrollment, and is not considered a practice location of the main provider. If a provider agreement is not required, the location can be added as a practice location.
- If the provider is adding a practice location in another State and the location requires a separate provider agreement, a separate, complete CMS-855A must be submitted for that location. (This often happens when a home health agency wants to perform services in an adjacent State.)
- If the provider is adding a practice location within another fee-for-service contractor's jurisdiction and the provider is not already enrolled with that fee-for-service contractor, the provider must submit a full, complete CMS-855A to that fee-for-service contractor—regardless of whether a separate provider agreement is required. It cannot add the location as a mere practice location.
- Provide the specific street address as recorded by the United States Postal Service. Do not furnish a P.O. Box.

If you have any questions as to whether the practice location requires a separate State survey or provider agreement, contact your fee-for-service contractor.

**Community Mental Health Centers** (CMHCs) must report all alternative sites where core services are provided (proposed alternative sites for initial enrollment and actual alternative sites for those CMHCs already participating in Medicare). In accordance with provisions of the Public Health Service Act, a CMHC is required to provide mental health services principally to individuals who reside in a defined geographic area (service area). Therefore, CMHCs must service a distinct and definable community. Those CMHCs operating or proposing to operate outside this specific community must have a separate provider agreement/number, submit a separate enrollment application, and individually meet the requirements to participate. CMS will determine if the alternative site is permissible or whether the site must have a separate agreement/number. CMS will consider the actual demonstrated transportation pattern of CMHC clients within the community to ensure that all core services and partial hospitalization services are available from each location within the community. A CMHC patient must be able to access and receive services he/she needs at the parent CMHC site or the alternative site within the distinct and definable community served by the parent.

## SECTION 4: PRACTICE LOCATION INFORMATION (Continued)

**Hospitals** must report all practice locations where the hospital provides services. Do not report separately enrolled provider types such as skilled nursing facilities (SNFs), HHAs, RHCs, etc., even if these entities are provider-based to the hospital. For instance, a hospital owns a SNF and an HHA. The hospital should not list the SNF and HHA on its application, as they are not locations where the hospital furnishes services. They are providers that are separate and distinct from the hospital, and will be reported on their respective CMS-855A applications.

### Base of Operations Address

- If this provider does not have a physical location where equipment and/or vehicles are stored or from where personnel report on a regular basis, complete this section with information about the location of the dispatcher/scheduler. This situation may occur if the provider operates mobile units that travel continuously from one location directly to another.
- HHAs must complete this section.

### Mobile Facility and/or Portable Units

To properly pay claims, Medicare must know when services are provided in a mobile facility or with portable units. (This section is mostly applicable to providers that perform outpatient physical therapy, occupational therapy, and speech pathology services.)

- A "mobile facility" is generally a mobile home, trailer, or other large vehicle that has been converted, equipped, and licensed to render health care services. These vehicles usually travel to local shopping centers or community centers to see and treat patients inside the vehicle.
- A "portable unit" is when the provider transports medical equipment to a fixed location (e.g., a physician's office or nursing home) to render services to the patient.

# SECTION 4: PRACTICE LOCATION INFORMATION(Continued)

## A. PRACTICE LOCATION INFORMATION

Report all practice locations where services will be furnished. If there is more than one location, copy and complete this section for each. Please list your primary practice location first.

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

| CHECK ONE | ❏ CHANGE | ❏ ADD | ❏ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

Practice Location Name *("Doing Business As" name if different from Legal Business Name)*
LaGrange Nursing and Rehabilitation Center

Practice Location Address Line 1 *(Street Name and Number)—(Not a P.O. Box)*
2111 West Point Road

Practice Location Address Line 2 *(Suite, Room, etc.)*

| City/Town | State | ZIP Code + 4 |
|---|---|---|
| LaGrange | GA | 30240-4047 |

| Telephone Number | Fax Number *(if applicable)* | E-mail Address *(if applicable)* |
|---|---|---|
| (706) 812-9293 | 706-812-9353 | |

| Medicare Identification Number *(if issued)* | National Provider Identifier |
|---|---|
| 115354 | 1407908163 |

| CLIA Number for this Location *(if applicable)* | FDA/Radiology (Mammography) Certification Number(s) for this location *(if applicable)* |
|---|---|
| 11D0725365 | |

Hospitals and HHAs only (Identify type of practice location):

❏ HHA Branch
❏ Hospital Psychiatric Unit
❏ Hospital Rehabilitation Unit
❏ Hospital Swing-Bed Unit
❏ OPT Extension Site
❏ Other Hospital Practice Location: _____

## B. WHERE DO YOU WANT REMITTANCE NOTICES OR SPECIAL PAYMENTS SENT?

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

| CHECK ONE | ❏ CHANGE | ❏ ADD | ❏ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

**Medicare will issue payments via electronic funds transfer (EFT).** Since payment will be made by EFT, the "Special Payments" address will indicate where all other payment information (e.g., remittance notices, special payments) are sent.

# SECTION 4: PRACTICE LOCATION INFORMATION (Continued)

☐ "Special Payments" address is the same as the practice location (only one address is listed in Section 4A). **Skip to Section 4C.**

☑ "Special Payments" address is different than that listed in Section 4A, or multiple locations are listed. **Provide address below.**

"Special Payments" Address Line 1 (PO Box or Street Name and Number)
10 Roswell Street

"Special Payments" Address Line 2 (Suite, Room, etc.)
Suite 210

| City/Town | State | ZIP Code + 4 |
|-----------|-------|--------------|
| Alpharetta | GA | 30004-7947 |

## C. WHERE DO YOU KEEP PATIENTS' MEDICAL RECORDS?

If you store patients' medical records (current and/or former patients) at a location other than the location in Section 4A or 4D, complete this section with the address of the storage location.

If this section is not complete, you are indicating that all records are stored at the practice locations reported in Section 4A or 4D. The records must be the provider's records, not the records of another provider. Post Office Boxes and drop boxes are not acceptable as physical addresses where patients' records are maintained. For mobile facilities/portable units, the patients' medical records must be under the provider's control.

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

First Medical Record Storage Facility for Current and Former Patients

| CHECK ONE | ☐ CHANGE | ☐ ADD | ☐ DELETE |
|-----------|----------|-------|----------|
| DATE (mm/dd/yyyy) | | | |

Storage Facility Address Line 1 (Street Name and Number)

Storage Facility Address Line 2 (Suite, Room, etc.)

| City/Town | State | ZIP Code + 4 |
|-----------|-------|--------------|
| | | |

## SECTION 4: PRACTICE LOCATION INFORMATION (Continued)

### Second Medical Record Storage Facility

| CHECK ONE | ❑ CHANGE | ❑ ADD | ❑ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

Storage Facility Address Line 1 *(Street Name and Number)*

Storage Facility Address Line 2 *(Suite, Room, etc.)*

| City/Town | State | ZIP Code + 4 |
|---|---|---|

### D. BASE OF OPERATIONS ADDRESS FOR MOBILE OR PORTABLE PROVIDERS (LOCATION OF BUSINESS OFFICE OR DISPATCHER/SCHEDULER)

The base of operations is the location from where personnel are dispatched, where mobile/portable equipment is stored, and when applicable, where vehicles are parked when not in use.

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

| CHECK ONE | ❑ CHANGE | ❑ ADD | ❑ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

Check here ❑ and skip to Section 4E if the "Base of Operations" address is the same as the "Practice Location" listed in Section 4A.

Street Address Line 1 *(Street Name and Number)*

Street Address Line 2 *(Suite, Room, etc.)*

| City/Town | State | ZIP Code + 4 |
|---|---|---|
| Telephone Number | Fax Number *(if applicable)* | E-mail Address *(if applicable)* |

## SECTION 4: PRACTICE LOCATION INFORMATION (Continued)

### E. VEHICLE INFORMATION

If the mobile health care services are rendered inside a vehicle, such as a mobile home or trailer, furnish the following vehicle information. Do not furnish information about vehicles that are used only to transport medical equipment (e.g., when the equipment is transported in a van but is used in a fixed setting, such as a doctor's office) or ambulance vehicles. If more than three vehicles are used, copy and complete this section as needed.

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section. If you are a new enrollee, check "add."

| CHECK ONE FOR EACH VEHICLE | Type of Vehicle (van, mobile home, trailer, etc.) | Vehicle Identification Number |
|---|---|---|
| ❑ CHANGE   ❑ ADD   ❑ DELETE | | |
| Effective Date: | | |
| ❑ CHANGE   ❑ ADD   ❑ DELETE | | |
| Effective Date: | | |
| ❑ CHANGE   ❑ ADD   ❑ DELETE | | |
| Effective Date: | | |

For each vehicle, submit a copy of all health care related permits/licenses/registrations.

### F. GEOGRAPHIC LOCATION FOR MOBILE OR PORTABLE PROVIDERS WHERE THE BASE OF OPERATIONS AND/OR VEHICLE RENDERS SERVICES

For home health agencies (HHAs) and mobile/portable providers, furnish information identifying the geographic area(s) where health care services are rendered.

**NOTE:** If you provide mobile health care services in more than one state and those states are serviced by different Medicare fee-for-service contractors, complete a separate enrollment application (CMS-855A) for each Medicare fee-for-service contractor's jurisdiction.

### 1. INITIAL REPORTING AND/OR ADDITIONS

If you are reporting or adding an entire State, it is not necessary to report each city/town. Simply check the box below and specify the State.

❑ Entire State of _____

If services are provided in selected cities/towns, provide the locations below. Only list ZIP codes if you are not servicing the entire city/town.

| City/Town | State | ZIP Code |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

# SECTION 4: PRACTICE LOCATION INFORMATION (Continued)

## 2. DELETIONS

If you are deleting an entire State, it is not necessary to report each city/town. Simply check the box below and specify the State.

❑ Entire State of _____

If services you are deleting are furnished in selected cities/towns, provide the locations below. Only list ZIP codes if you are not servicing the entire city/town.

| City/Town | State | ZIP Code |
|-----------|-------|----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

# SECTION 5:   OWNERSHIP INTEREST AND/OR MANAGING CONTROL INFORMATION (ORGANIZATIONS)

NOTE: ONLY REPORT ORGANIZATIONS IN THIS SECTION. INDIVIDUALS MUST BE REPORTED IN SECTION 6.

Complete this section with information about all organizations that have 5 percent or more (direct or indirect) ownership interest of, any partnership interest in, and/or managing control of, the provider identified in Section 2, as well as information on any adverse legal actions that have been imposed against that organization. For examples of organizations that should be reported here, visit our Web site: *www.cms.hhs.gov/MedicareProviderSupEnroll*. If there is more than one organization that should be reported, copy and complete this section for each.

## MANAGING CONTROL (ORGANIZATIONS)

Any organization that exercises operational or managerial control over the provider, or conducts the day-to-day operations of the provider, is a managing organization and must be reported. The organization need not have an ownership interest in the provider in order to qualify as a managing organization. For instance, it could be a management services organization under contract with the provider to furnish management services for the business.

## SPECIAL TYPES OF ORGANIZATIONS

**Governmental/Tribal Organizations:** If a Federal, State, county, city, or other level of government, or an Indian tribe, will be legally and financially responsible for Medicare payments received (including any potential overpayments), the name of that government or Indian tribe should be reported as an owner. The provider must submit a letter on the letterhead of the responsible government (e.g., government agency) or tribal organization that attests that the government or tribal organization will be legally and financially responsible in the event that there is any outstanding debt owed to CMS. This letter must be signed by an appointed or elected official of the government or tribal organization who has the authority to legally and financially bind the government or tribal organization to the laws, regulations, and program instructions of Medicare.

**Non-Profit, Charitable and Religious Organizations:** Many non-profit organizations are charitable or religious in nature, and are operated and/or managed by a board of trustees or other governing body. The actual name of the board of trustees or other governing body should be reported in this section. While the organization should be listed in Section 5, individual board members should be listed in Section 6. Each non-profit organization should submit a copy of a 501(c)(3) document verifying its non-profit status.

All organizations that have any of the following must be reported in Section 5:
  • 5 percent or more ownership (direct or indirect) of the provider,
  • Managing control of the provider, or
  • A partnership interest in the provider, regardless of the percentage of ownership the partner has.

Owning/Managing organizations are generally one of the following types:
  • Corporations (including non-profit corporations)
  • Partnerships and Limited Partnerships (as indicated above)
  • Limited Liability Companies
  • Charitable and/or Religious organizations
  • Governmental and/or Tribal organizations

# SECTION 5: OWNERSHIP INTEREST AND/OR MANAGING CONTROL INFORMATION (ORGANIZATIONS) (Continued)

## A. ORGANIZATION WITH OWNERSHIP INTEREST AND/OR MANAGING CONTROL—IDENTIFICATION INFORMATION

❑ Not Applicable

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

| CHECK ONE | ❑ CHANGE | ❑ ADD | ❑ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

Check all that apply:

☑ 5 Percent or More Ownership Interest        ❑ Partner        ❑ Managing Control

Legal Business Name as reported to the Internal Revenue Service
Triad at LaGrange I, LLC

"Doing Business As" Name *(if applicable)*
LaGrange Nursing and Rehabilitation Center

Address Line 1 *(Street Name and Number)*
2111 West Point Road

Address Line 2 *(Suite, Room, etc.)*

| City/Town | State | ZIP Code + 4 |
|---|---|---|
| LaGrange | GA | 30240 - 4047 |

Tax Identification Number *(Required)*
20-5933784

| Medicare Identification Number(s) *(if issued)* | NPI *(if issued)* |
|---|---|
| 115354 | 1407908163 |

## SECTION 5:   OWNERSHIP INTEREST AND/OR MANAGING CONTROL INFORMATION (ORGANIZATIONS) (Continued)

### B. ADVERSE LEGAL HISTORY

If reporting a change to existing information, check "Change," provide the effective date of the change, and complete the appropriate fields in this section.

❑ Change     ❑ Effective Date:_____

1.  Has this organization in Section 5A, under any current or former name or business identity, ever had an adverse legal action listed on page 13 of this application imposed against it?

    ❑ YES – Continue Below     ☑ NO – Skip to Section 6

2.  If YES, report each adverse legal action, when it occurred, the Federal or State agency or the court/administrative body that imposed the action, and the resolution.

    Attach a copy of the adverse legal action documentation(s) and resolution(s).

| Adverse Legal Action | Date | Taken By | Resolution |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

## SECTION 6:   OWNERSHIP INTEREST AND/OR MANAGING CONTROL INFORMATION (INDIVIDUALS)

**NOTE:** Only Individuals should be reported in Section 6. Organizations must be reported in Section 5. For more information on "direct" and "indirect" owners, go to *www.cms.hhs.gov/MedicareProviderSupEnroll.*

**The provider MUST have at least ONE owner and/or managing employee.** If there is more than one person listed in this section, copy and complete this section for each.

The following individuals must be reported in Section 6A:

- All persons who have a 5 percent or greater direct or indirect ownership interest in the provider;
- If (and only if) the provider is a corporation (whether for-profit or non-profit), all officers and directors of the provider;
- All managing employees of the provider;
- All individuals with a partnership interest in the provider, regardless of the percentage of ownership the partner has; and
- Authorized and delegated officials.

**Example:** A provider is 100 percent owned by Company C, which itself is 100 percent owned by Individual D. Assume that Company C is reported in Section 5A as an owner of the provider. Assume further that Individual D, as an indirect owner of the provider, is reported in Section 6A1. Based on this example, the provider would check the "5 Percent or Greater Direct/Indirect Owner" box in Section 6A2.

**NOTE:** All partners within a partnership must be reported on this application. This applies to both "General" and "Limited" partnerships. For instance, if a limited partnership has several limited partners and each of them only has a 1 percent interest in the provider, each limited partner must be reported on this application, even though each owns less than 5 percent. The 5 percent threshold primarily applies to corporations and other organizations that are not partnerships.

**Non-Profit, Charitable or Religious Organizations:** If you are a non-profit charitable or religious organization that has no organizational or individual owners (only board members, directors or managers), you should submit a 501(c)(3) document verifying non-profit status with your application.

# SECTION 6: OWNERSHIP INTEREST AND/OR MANAGING CONTROL INFORMATION (INDIVIDUALS) (Continued)

For purposes of this application, the terms "officer," "director," and "managing employee" are defined as follows:

**Officer** is any person whose position is listed as being that of an officer in the provider's "articles of incorporation" or "corporate bylaws," or anyone who is appointed by the board of directors as an officer in accordance with the provider's corporate bylaws.

**Director** is a member of the provider's "board of directors." It does not necessarily include a person who may have the word "director" in his/her job title (e.g., departmental director, director of operations). Moreover, where a provider has a governing body that does not use the term "board of directors," the members of that governing body will still be considered "directors." Thus, if the provider has a governing body titled "board of trustees" (as opposed to "board of directors"), the individual trustees are considered "directors" for Medicare enrollment purposes.

**Managing Employee** means a general manager, business manager, administrator, director, or other individual who exercises operational or managerial control over, or who directly or indirectly conducts, the day-to-day operations of the provider, either under contract or through some other arrangement, regardless of whether the individual is a W-2 employee of the provider.

**NOTE:** If a governmental or tribal organization will be legally and financially responsible for Medicare payments received (per the instructions for Governmental/Tribal Organizations in Section 5), the provider is only required to report its managing employees in Section 6. Owners, partners, officers, and directors do not need to be reported, except those who are listed as authorized or delegated officials on this application.

## SECTION 6: OWNERSHIP INTEREST AND/OR MANAGING CONTROL INFORMATION (INDIVIDUALS) (Continued)

Any information on adverse legal actions that have been imposed against the individuals reported in this section must be furnished. If there is more than one individual, copy and complete this section for each individual in Section 6B.

### A. INDIVIDUALS WITH OWNERSHIP INTEREST AND/OR MANAGING CONTROL – IDENTIFICATION INFORMATION

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section. The name, date of birth, and social security number of each person listed in this section must coincide with the individual's information as listed with the Social Security Administration.

| CHECK ONE | ☐ CHANGE | ☐ ADD | ☐ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

| 1. First Name | Middle Initial | Last Name | Jr., Sr., etc. |
|---|---|---|---|
| Ronald | M | Herbert | Jr |
| Social Security Number (Required) | Date of Birth (mm/dd/yyyy) 10/12/1962 | Medicare Identification Number (if issued) | NPI (if issued) |

2. What is the above individual's relationship with the provider in Section 2B1? *(Check all that apply.)*

- ☑ 5 Percent or Greater Direct/Indirect Owner *(see Section 5 for definition)*
- ☑ Partner
- ☐ Managing Employee (W-2)
- ☑ Director/Officer
- ☐ Contracted Managing Employee
- ☐ Other _____

### B. ADVERSE LEGAL HISTORY

Complete this section for the individual reported in Section 6A above.

If you are changing information, check "change" box, furnish the effective date, and complete the appropriate fields in this section.

☐ Change    ☐ Effective Date:_____

1. Has the individual in Section 6A, under any current or former name or business identity, ever had an adverse legal action listed on page 13 of this application imposed against him/her?

| ☐ YES–Continue Below | ☑ NO–Skip to Section 7 |
|---|---|

2. If YES, report each adverse legal action, when it occurred, the Federal or State agency or the court/administrative body that imposed the action, and the resolution, if any.

Attach a copy of the adverse legal action documentation(s) and resolution(s).

| Adverse Legal Action | Date | Taken By | Resolution |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

## SECTION 6:  OWNERSHIP INTEREST AND/OR MANAGING CONTROL INFORMATION (INDIVIDUALS) (Continued)

Any information on adverse legal actions that have been imposed against the individuals reported in this section must be furnished. If there is more than one individual, copy and complete this section for each individual in Section 6B.

### A. INDIVIDUALS WITH OWNERSHIP INTEREST AND/OR MANAGING CONTROL – IDENTIFICATION INFORMATION

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section. The name, date of birth, and social security number of each person listed in this section must coincide with the individual's information as listed with the Social Security Administration.

| CHECK ONE | ❑ CHANGE | ❑ ADD | ❑ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

| 1. First Name | Middle Initial | Last Name | Jr., Sr., etc. |
|---|---|---|---|
| Adam | T | Ashpes | |

| Social Security Number (Required) | Date of Birth (mm/dd/yyyy) | Medicare Identification Number (if issued) | NPI (if issued) |
|---|---|---|---|
| _ _ _ | 08/27/1961 | | |

2. What is the above individual's relationship with the provider in Section 2B1? (Check all that apply.)

☑ 5 Percent or Greater Direct/Indirect Owner
   (see Section 5 for definition)
☑ Partner
❑ Managing Employee (W-2)

☑ Director/Officer
❑ Contracted Managing Employee
❑ Other _____

### B. ADVERSE LEGAL HISTORY

Complete this section for the individual reported in Section 6A above.

If you are changing information, check "change" box, furnish the effective date, and complete the appropriate fields in this section.

   ❑ Change   ❑ Effective Date:_____

1. Has the individual in Section 6A, under any current or former name or business identity, ever had an adverse legal action listed on page 13 of this application imposed against him/her?

   | ❑ YES–Continue Below  ☑ NO–Skip to Section 7 |

2. If YES, report each adverse legal action, when it occurred, the Federal or State agency or the court/administrative body that imposed the action, and the resolution, if any.

Attach a copy of the adverse legal action documentation(s) and resolution(s).

| Adverse Legal Action | Date | Taken By | Resolution |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

# SECTION 7: CHAIN HOME OFFICE INFORMATION

This section captures information regarding chain organizations. This information will be used to ensure proper reimbursement when the provider's year-end cost report is filed with the Medicare fee-for-service contractor.

Chain organizations are generally defined as multiple providers that are owned, leased, or through any other device, controlled by a single organization. The controlling organization is known as the chain "home office." Typically, the chain "home office":

- Maintains uniform procedures in each facility for handling admissions, utilization review, preparing and processing admission notices and bills, etc., and
- Maintains and centrally controls individual provider cost reports and fiscal records. In addition, a major portion of the Medicare audit for each provider in the chain can be performed centrally at the chain "home office."

A few of the most common provider types that would typically be in a chain organization are hospitals, comprehensive outpatient rehabilitation facilities, skilled nursing facilities, and home health agencies.

CHECK HERE ❑ IF THIS SECTION DOES NOT APPLY AND SKIP TO SECTION 8.

## A. TYPE OF ACTION THIS PROVIDER IS REPORTING

Check one:

| | Effective Date | Sections to Complete |
|---|---|---|
| ☑ Provider in chain is enrolling in Medicare for the first time *(Initial Enrollment or Change of Ownership).* | 12/01/2006 | Complete all of Section 7. |
| ❑ Provider is no longer associated with the chain organization previously reported. | _____ | Complete Section 7C, identifying the former chain home office. |
| ❑ Provider has changed from one chain to another. | _____ | Complete Section 7 in full to identify the new chain home office. |
| ❑ The name of provider's chain home office is changing *(all other information remains the same).* | _____ | Complete Section 7C. |

## B. CHAIN HOME OFFICE ADMINISTRATOR INFORMATION

| Name of Home Office Administrator or CEO | First Name Ronald | Middle Initial M | Last Name Herbert | Jr., Sr., etc. Jr. |
|---|---|---|---|---|
| Title of Home Office Administrator CHIEF OPERATING OFFICER | | Social Security Number | Date of Birth *(mm/dd/yyyy)* 10/12/1962 | |

# SECTION 7: CHAIN HOME OFFICE INFORMATION (Continued)

## C. CHAIN HOME OFFICE INFORMATION

1. Name of Home Office as Reported to the Internal Revenue Service

Triad Senior Living, LLC

2. Home Office Business Street Address Line 1 (Street Name and Number)

10 Roswell Street

Home Office Business Street Address Line 2 (Suite, Room, etc.)

Suite 210

City/Town

Alpharetta

| State | ZIP Code + 4 |
|---|---|
| GA | 30004 |

Telephone Number
(678) 366-0305

Fax Number (if applicable)
(678) 366-0306

E-mail Address (if applicable)

3. Home Office Tax Identification Number

04 · 3794889

Home Office Cost Report Year-End Date (mm/dd)

06/30

4. Home Office Fee-For-Service Contractor

BCBS of GA

Home Office Chain Number

1113

## D. TYPE OF BUSINESS STRUCTURE OF THE CHAIN HOME OFFICE

Check one:

Voluntary:
☐ Non-Profit – Religious Organization
☐ Non-Profit – Other (Specify): _____

Proprietary:
☐ Individual
☐ Corporation
☐ Partnership
☑ Other (Specify): LLC

Government:
☐ Federal
☐ State
☐ City
☐ County
☐ City-County
☐ Hospital District
☐ Other (Specify): _____

## E. PROVIDER'S AFFILIATION TO THE CHAIN HOME OFFICE

Check one:

☐ Joint Venture/Partnership
☐ Operated/Related

☑ Managed/Related
☐ Wholly Owned

☐ Leased
☐ Other (Specify): _____

# SECTION 8: BILLING AGENCY INFORMATION

Applicants that use a billing agency must complete this section. A billing agency is a company or individual that you contract with to process and submit your claims. If you use a billing agency, you are responsible for the claims submitted on your behalf.

☑ **Check here if this section does not apply and skip to Section 12.**

## BILLING AGENCY NAME AND ADDRESS

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

| CHECK ONE | ❏ CHANGE | ❏ ADD | ❏ DELETE |
|---|---|---|---|
| **DATE** (mm/dd/yyyy) | | | |

Legal Business/Individual Name as Reported to the Social Security Administration or Internal Revenue Service

Tax Identification Number or Social Security Number *(required)*

"Doing Business As" Name *(if applicable)*

Billing Agency Address Line 1 *(Street Name and Number)*

Billing Agency Address Line 2 *(Suite, Room, etc.)*

| City/Town | State | ZIP Code + 4 |
|---|---|---|
| Telephone Number | Fax Number *(if applicable)* | E-mail Address *(if applicable)* |

# SECTION 9: FOR FUTURE USE (This Section Not Applicable)

# SECTION 10: FOR FUTURE USE (This Section Not Applicable)

# SECTION 11: FOR FUTURE USE (This Section Not Applicable)

# SECTION 12: SPECIAL REQUIREMENTS FOR HOME HEALTH AGENCIES (HHAs)

## INSTRUCTIONS

**All HHAs and HHA sub-units enrolling in the Medicare program must complete this section.** HHAs and HHA sub-units initially enrolling in Medicare, Medicaid, or both programs on or after January 1, 1998 are required to provide documentation supporting that they have sufficient initial reserve operating funds (capitalization) to operate for the first three months in the Medicare and/or Medicaid program(s). The capitalization requirement applies to all HHAs and HHA sub-units enrolling in the Medicare program, including HHAs or HHA sub-units currently participating in the Medicare program that, as a result of a change of ownership, will be issued a new provider number. The capitalization requirement does not apply to a branch of an HHA. Regulations found at 42 CFR 489.28 require that the fee-for-service contractor determine the required amount of reserve operating funds needed for the enrolling HHA or HHA sub-unit by comparing the enrolling HHA or HHA sub-unit to at least three other new HHAs that it serves which are comparable to the enrolling HHA or HHA sub-unit. Factors to be considered are geographic location, number of visits, type of HHA or HHA sub-unit and business structure of the HHA or HHA sub-unit. The fee-for-service contractor then verifies that the enrolling HHA or HHA sub-unit has the required funds. To assist the fee-for-service contractor in determining the amount of funds necessary, the enrolling HHA or HHA sub-unit should complete this section.

CHECK HERE ☑ IF THIS SECTION DOES NOT APPLY AND SKIP TO SECTION 13.

## A. TYPE OF HOME HEALTH AGENCY

### 1. CHECK ONE:
❑ Non-Profit Agency          ❑ Proprietary Agency

### 2. PROJECTED NUMBER OF VISITS BY THIS HOME HEALTH AGENCY

How many visits does this HHA project it will make in the first: three months of operation? _____

twelve months of operation? _____

### 3. FINANCIAL DOCUMENTATION

A) In order to expedite the enrollment process, the HHA may attach a copy of its most current savings, checking, or other financial statement(s) that verifies the initial reserve operating funds, accompanied by:

1) An attestation from an officer of the bank or other financial institution stating that the funds are in the account(s) and are immediately available for the HHA's use, and

2) Certification from the HHA attesting that at least 50% of the reserve operating funds are non-borrowed funds.

B) Will the HHA be submitting the above documentation with this application?          ❑ YES   ❑ NO

**NOTE:** The fee-for-service contractor may require a subsequent attestation that the funds are still available. If the fee-for-service contractor determines that the HHA requires funds in addition to those indicated on the originally submitted account statement(s), it will require verification of the additional amount as well as a new attestation statement.

## SECTION 12: SPECIAL REQUIREMENTS FOR HOME HEALTH AGENCIES (HHAs) (Continued)

### 4. ADDITIONAL INFORMATION

Provide any additional documentation necessary to assist the fee-for-service contractor or State agency in properly comparing this HHA with other comparable HHAs. Use this space to explain or justify any unique financial situations of this HHA that may be helpful in determining the HHA's compliance with the capitalization requirements.

### B. NURSING REGISTRIES

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

| CHECK ONE | ❑ CHANGE | ❑ ADD | ❑ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

Does this HHA contract with a nursing registry whereby the latter furnishes personnel to perform HHA services on behalf of the provider?

    ❑ YES–Furnish the information below
    ❑ NO–Skip to Section 13

Legal Business Name as Reported to the Internal Revenue Service

Tax Identification Number *(required)*:

"Doing Business As" Name *(if applicable)*

Business Street Address Line 1 *(Street Name and Number)*

Business Street Address Line 2 *(Suite, Room, etc.)*

| City/Town | State | ZIP Code + 4 |
|---|---|---|
| Telephone Number | Fax Number *(if applicable)* | E-mail Address *(if applicable)* |

# SECTION 13: CONTACT PERSON

If questions arise during the processing of this application, the fee-for-service contractor will contact the individual shown below. If the contact person is an authorized or delegated official, check the appropriate box below and skip to the section as indicated.

☑ Contact an Authorized Official listed in Section 15
☐ Contact an Delegated Official listed in Section 16

| First Name | Middle Initial | Last Name |
|---|---|---|
| Ronald | M | Herbert |

| Telephone Number | Fax Number *(if applicable)* |
|---|---|
| (678) 366-0305 | (678) 366-0306 |

Address Line 1 *(Street Name and Number)*
10 Roswell Street

Address Line 2 *(Suite, Room, etc.)*
Suite 210

| City/Town | State | ZIP Code + 4 |
|---|---|---|
| Alpharetta | GA | 30004 - 7947 |

E-mail Address
rherbert@triadhealth.com

# SECTION 14: PENALTIES FOR FALSIFYING INFORMATION

**This section explains the penalties for deliberately furnishing false information in this application to gain or maintain enrollment in the Medicare program.**

1. 1. 18 U.S.C. § 1001 authorizes criminal penalties against an individual who, in any matter within the jurisdiction of any department or agency of the United States, knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious, or fraudulent statements or representations, or makes any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry. Individual offenders are subject to fines of up to $250,000 and imprisonment for up to five years. Offenders that are organizations are subject to fines of up to $500,000 (18 U.S.C. § 3571). Section 3571(d) also authorizes fines of up to twice the gross gain derived by the offender if it is greater than the amount specifically authorized by the sentencing statute.

2. Section 1128B(a)(1) of the Social Security Act authorizes criminal penalties against any individual who, "knowingly and willfully," makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program. The offender is subject to fines of up to $25,000 and/or imprisonment for up to five years.

3. The Civil False Claims Act, 31 U.S.C. § 3729, imposes civil liability, in part, on any person who:
    a) knowingly presents, or causes to be presented, to an officer or any employee of the United States Government a false or fraudulent claim for payment or approval;
    b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or
    c) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

    The Act imposes a civil penalty of $5,000 to $10,000 per violation, plus three times the amount of damages sustained by the Government

4. Section 1128A(a)(1) of the Social Security Act imposes civil liability, in part, on any person (including an organization, agency or other entity) that knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency...a claim...that the Secretary determines is for a medical or other item or service that the person knows or should know:
    a) was not provided as claimed; and/or
    b) the claim is false or fraudulent.

    This provision authorizes a civil monetary penalty of up to $10,000 for each item or service, an assessment of up to three times the amount claimed, and exclusion from participation in the Medicare program and State health care programs.

5. 18 U.S.C. 1035 authorizes criminal penalties against individuals in any matter involving a health care benefit program who knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact; or makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items or services. The individual shall be fined or imprisoned up to 5 years or both.

## SECTION 14: PENALTIES FOR FALSIFYING INFORMATION (Continued)

6. 18 U.S.C. 1347 authorizes criminal penalties against individuals who knowing and willfully execute, or attempt, to executive a scheme or artifice to defraud any health care benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by or under the control of any, health care benefit program in connection with the delivery of or payment for health care benefits, items, or services. Individuals shall be fined or imprisoned up to 10 years or both. If the violation results in serious bodily injury, an individual will be fined or imprisoned up to 20 years, or both. If the violation results in death, the individual shall be fined or imprisoned for any term of years or for life, or both.

7. The government may assert common law claims such as "common law fraud," "money paid by mistake," and "unjust enrichment."

   Remedies include compensatory and punitive damages, restitution, and recovery of the amount of the unjust profit.

# SECTION 15: CERTIFICATION STATEMENT

An **AUTHORIZED OFFICIAL** means an appointed official (for example, chief executive officer, chief financial officer, general partner, chairman of the board, or direct owner) to whom the organization has granted the legal authority to enroll it in the Medicare program, to make changes or updates to the organization's status in the Medicare program, and to commit the organization to fully abide by the statutes, regulations, and program instructions of the Medicare program.

A **DELEGATED OFFICIAL** means an individual who is delegated by an authorized official the authority to report changes and updates to the provider's enrollment record. A delegated official must be an individual with an "ownership or control interest in" (as that term is defined in Section 1124(a)(3) of the Social Security Act) or be a W-2 managing employee of the provider.

Delegated officials may not delegate their authority to any other individual. Only an authorized official may delegate the authority to make changes and/or updates to the provider's Medicare status. Even when delegated officials are reported in this application, an authorized official retains the authority to make any such changes and/or updates by providing his or her printed name, signature, and date of signature as required in Section 15B.

**NOTE:** Authorized officials and delegated officials must be reported in Section 6 either on this application or on a previous application to this same Medicare fee-for-service contractor. **If this is the first time an authorized and/or delegated official has been reported on the CMS-855A, you must complete Section 6 for that individual.**

By his/her signature(s), an authorized official binds the provider to all of the requirements listed in the Certification Statement and acknowledges that the provider may be denied entry to or revoked from the Medicare program if any requirements are not met. All signatures must be original and in ink. Faxed, photocopied, or stamped signatures will not be accepted.

Only an authorized official has the authority to sign (1) the initial enrollment application on behalf of the provider or (2) the enrollment application that must be submitted as part of the periodic revalidation process. A delegated official does not have this authority.

By signing this application, an authorized official agrees to immediately notify the Medicare fee-for-service contractor if any information in the application is not true, correct, or complete. In addition, an authorized official, by his/her signature, agrees to notify the Medicare fee-for-service contractor of any future changes to the information contained in this form, after the provider is enrolled in Medicare, within 90 days of the effective date of the change.

The provider can have as many authorized officials as it wants. If the provider has more than two authorized officials, it should copy and complete this section as needed.

Each authorized and delegated official must have and disclose his/her social security number.

# SECTION 15: CERTIFICATION STATEMENT (Continued)

## A. ADDITIONAL REQUIREMENTS FOR MEDICARE ENROLLMENT

These are additional requirements that the provider must meet and maintain in order to bill the Medicare program. Read these requirements carefully. By signing, the provider is attesting to having read the requirements and understanding them.

By his/her signature(s), the authorized official(s) named below and the delegated official(s) named in Section 16 agree to adhere to the following requirements stated in this Certification Statement:

1. I agree to notify the Medicare contractor of any future changes to the information contained in this application within 90 days of the effective date of the change. I understand that any change in the business structure of this provider may require the submission of a new application.

2. I have read and understand the Penalties for Falsifying Information, as printed in this application. I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare, or any deliberate alteration of any text on this application form, may be punished by criminal, civil, or administrative penalties including, but not limited to, the denial or revocation of Medicare identification number(s), and/or the imposition of fines, civil damages, and/or imprisonment.

3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

4. Neither this provider, nor any five percent or greater owner, partner, officer, director, managing employee, authorized official, or delegated official thereof is currently sanctioned, suspended, debarred, or excluded by the Medicare or State Health Care Program, e.g., Medicaid program, or any other Federal program, or is otherwise prohibited from supplying services to Medicare or other Federal program beneficiaries.

5. I agree that any existing or future overpayment made to the provider by the Medicare program may be recouped by Medicare through the withholding of future payments.

6. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

7. I authorize any national accrediting body whose standards are recognized by the Secretary as meeting the Medicare program participation requirements, to release to any authorized representative, employee, or agent of the Centers for Medicare & Medicaid Services (CMS), a copy of my most recent accreditation survey, together with any information related to the survey that CMS may require (including corrective action plans).

## SECTION 15: CERTIFICATION STATEMENT (Continued)

### B. 1ST AUTHORIZED OFFICIAL SIGNATURE

I have read the contents of this application. My signature legally and financially binds this provider to the laws, regulations, and program instructions of the Medicare program. By my signature, I certify that the information contained herein is true, correct, and complete, and I authorize the Medicare fee-for-service contractor to verify this information. If I become aware that any information in this application is not true, correct, or complete, I agree to notify the Medicare fee-for-service contractor of this fact immediately.

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

| CHECK ONE | ❑ CHANGE | ❑ ADD | ❑ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

#### Authorized Official's Information and Signature

| First Name Ronald | Middle Initial M | Last Name Herbert | Suffix (e.g., Jr., Sr.) Jr |
|---|---|---|---|
| Telephone Number (678) 366-0305 | | | Title/Position Chief Operating Officer |
| Authorized Official Signature (First, Middle, Last Name, Jr., Sr., M.D., D.O., etc.) | | | Date Signed (mm/dd/yyyy) 01/29/2007 |

### C. 2ND AUTHORIZED OFFICIAL SIGNATURE

I have read the contents of this application. My signature legally and financially binds this provider to the laws, regulations, and program instructions of the Medicare program. By my signature, I certify that the information contained herein is true, correct, and complete, and I authorize the Medicare fee-for-service contractor to verify this information. If I become aware that any information in this application is not true, correct, or complete, I agree to notify the Medicare fee-for-service contractor of this fact immediately.

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

| CHECK ONE | ❑ CHANGE | ❑ ADD | ❑ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

#### Authorized Official's Information and Signature

| First Name Adam | Middle Initial T | Last Name Ashpes | Suffix (e.g., Jr., Sr.) |
|---|---|---|---|
| Telephone Number (678) 366-0305 | | | Title/Position Chief Executive Officer |
| Authorized Official Signature (First, Middle, Last Name, Jr., Sr., M.D., D.O., etc.) | | | Date Signed (mm/dd/yyyy) 01/30/2007 |

All signatures must be original and signed in ink. Applications with signatures deemed not original will not be processed. Stamped, faxed or copied signatures will not be accepted.

# SECTION 16: DELEGATED OFFICIAL(S) (OPTIONAL)

- You are not required to have a delegated official. However, if no delegated official is assigned, the authorized official(s) will be the only person(s) who can make changes and/or updates to the provider's status in the Medicare program.

- The signature of a delegated official shall have the same force and effect as that of an authorized official, and shall legally and financially bind the provider to the laws, regulations, and program instructions of the Medicare program. By his or her signature, the delegated official certifies that he or she has read the Certification Statement in Section 15 and agrees to adhere to all of the stated requirements. The delegated official also certifies that he/she meets the definition of a delegated official. When making changes and/or updates to the provider's enrollment information maintained by the Medicare program, the delegated official certifies that the information provided is true, correct, and complete.

- Delegated officials being deleted do not have to sign or date this application.

- Independent contractors are not considered "employed" by the provider and, therefore, cannot be delegated officials.

- The signature(s) of an authorized official in Section 16 constitutes a legal delegation of authority to any and all delegated official(s) assigned in Section 16.

- If there are more than two individuals, copy and complete this section for each individual.

## A. 1ST DELEGATED OFFICIAL SIGNATURE

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

| CHECK ONE | ❑ CHANGE | ❑ ADD | ❑ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

| Delegated Official First Name | Middle Initial | Last Name | Suffix (e.g., Jr., Sr.) |
|---|---|---|---|
| | | | |

| Delegated Official Signature (First, Middle, Last Name, Jr., Sr., M.D., D.O., etc.) | Date Signed (mm/dd/yyyy) |
|---|---|

| ❑ Check here if Delegated Official is a W-2 Employee | Telephone Number |
|---|---|

| Authorized Official Signature Assigning this Delegation (First, Middle, Last Name, Jr., Sr. M.D., D.O., etc.) | Date Signed (mm/dd/yyyy) |
|---|---|

## SECTION 16: DELEGATED OFFICIAL(S) (OPTIONAL) (Continued)

### B. 2ND DELEGATED OFFICIAL SIGNATURE

If you are changing, adding, or deleting information, check the applicable box, furnish the effective date, and complete the appropriate fields in this section.

| CHECK ONE | ❑ CHANGE | ❑ ADD | ❑ DELETE |
|---|---|---|---|
| DATE (mm/dd/yyyy) | | | |

| Delegated Official First Name | Middle Initial | Last Name | | Suffix (e.g., Jr., Sr.) |
|---|---|---|---|---|

Delegated Official Signature *(First, Middle, Last Name, Jr., Sr., M.D., D.O., etc.)*

Date Signed *(mm/dd/yyyy)*

❑ Check here if Delegated Official is a W-2 Employee        Telephone Number

Authorized Official Assigning this Delegation *(First, Middle, Last Name, Jr., Sr., M.D., D.O., etc.)*
Signature

Date Signed *(mm/dd/yyyy)*

# SECTION 17: SUPPORTING DOCUMENTS

This section lists the documents that, if applicable, must be submitted with this completed enrollment application. If you are newly enrolling, reactivating or revalidating your enrollment, you must provide all applicable documents. For changes, only submit documents that are applicable to the change requested. The enrolling provider may submit a notarized copy of a Certificate of Good Standing from the provider's State licensing/certification board or other medical associations in lieu of copies of the above-requested documents. This certification cannot be more than 30 days old.

The fee-for-service contractor may request, at any time during the enrollment process, documentation to support or validate information that you have reported in this application.

## MANDATORY FOR ALL PROVIDER/SUPPLIER TYPES

Required documents that can only be obtained after a State survey are not required as part of the application submission but must be furnished within 30 days of the provider receiving them. The Medicare fee-for-service contractor will furnish specific licensing requirements for your provider type upon request.

❑ Licenses, certifications and registrations required by Medicare or State law.

❑ Federal, State, and/or local (city/county) business licenses, certifications and/or registrations required to operate a health care facility.

❑ Written confirmation from the IRS confirming your Tax Identification Number with the Legal Business Name (e.g., IRS CP 575) provided in Section 2.

❑ Completed Form CMS-588, Authorization Agreement for Electronic Funds Transfer. Note: If a provider already receives payments electronically and is not making a change to its banking information, the CMS-588 is not required.

❑ Copy of the National Provider Identifier notification that you received from the National Plan and Provider Enumeration System (NPPES).

## MANDATORY FOR SELECTED PROVIDER/SUPPLIER TYPES

❑ Copy(s) of all bills of sale or sales agreements (CHOWS, Acquisition/Mergers, and Consolidations only).

❑ Copy(s) of all documents that demonstrate meeting capitalization requirements (HHAs only).

## MANDATORY, IF APPLICABLE

❑ Statement in writing from the bank. If Medicare payment due a provider of services is being sent to a bank (or similar financial institution) where the provider has a lending relationship (that is, any type of loan), then the provider must provide a statement in writing from the bank (which must be in the loan agreement) that the bank has agreed to waive its right of offset for Medicare receivables.

❑ Copy(s) of all adverse legal action documentation (e.g., notifications, resolutions, and reinstatement letters).

❑ Copy of delegated official's W-2 if you have designated one

❑ Copy of an attestation for government entities and tribal organizations

❑ Copy of HRSA Notice of Grant Award if that is a qualifying document for FQHC status

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0685. The time required to complete this information collection is estimated at 6 hours per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Baltimore, Maryland 21244-1850
DO NOT MAIL YOUR APPLICATION TO THIS ADDRESS.

CMS-855A (06/06) EF 07/2006

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

# MEDICARE SUPPLIER ENROLLMENT APPLICATION
## PRIVACY ACT STATEMENT

The Centers for Medicare and Medicaid Services (CMS) is authorized to collect the information requested on this form by Sections 1124(a)(1), 1124A(a)(3), 1128, 1814, 1815, 1833(e), and 1842(r) of the Social Security Act [42 U.S.C. §§ 1320a-3(a)(1), 1320a-7, 1395f, 1395g, 1395(l)(e), and 1395u(r)] and Section 31001(I) of the Debt Collection Improvement Act [31 U.S.C. § 7701(c)].

The purpose of collecting this information is to determine or verify the eligibility of individuals and organizations to enroll in the Medicare program as suppliers of goods and services to Medicare beneficiaries and to assist in the administration of the Medicare program. This information will also be used to ensure that no payments will be made to providers who are excluded from participation in the Medicare program. All information on this form is required, with the exception of those sections marked as "optional" on the form. Without this information, the ability to make payments will be delayed or denied.

The information collected will be entered into the Provider Enrollment, Chain and Ownership System (PECOS). The information in this application will be disclosed according to the routine uses described below.

Information from these systems may be disclosed under specific circumstances to:
1. CMS contractors to carry out Medicare functions, collating or analyzing data, or to detect fraud or abuse;
2. A congressional office from the record of an individual health care provider in response to an inquiry from the congressional office at the written request of that individual health care practitioner;
3. The Railroad Retirement Board to administer provisions of the Railroad Retirement or Social Security Acts;
4. Peer Review Organizations in connection with the review of claims, or in connection with studies or other review activities, conducted pursuant to Part B of Title XVIII of the Social Security Act;
5. To the Department of Justice or an adjudicative body when the agency, an agency employee, or the United States Government is a party to litigation and the use of the information is compatible with the purpose for which the agency collected the information;
6. To the Department of Justice for investigating and prosecuting violations of the Social Security Act, to which criminal penalties are attached;
7. To the American Medical Association (AMA), for the purpose of attempting to identify medical doctors when the Unique Physician Identification Number Registry is unable to establish identity after matching contractor submitted data to the data extract provided by the AMA;
8. An individual or organization for a research, evaluation, or epidemiological project related to the prevention of disease or disability, or to the restoration or maintenance of health;
9. Other Federal agencies that administer a Federal health care benefit program to enumerate/enroll providers of medical services or to detect fraud or abuse;
10. State Licensing Boards for review of unethical practices or non-professional conduct;
11. States for the purpose of administration of health care programs; and/or
12. Insurance companies, self insurers, health maintenance organizations, multiple employer trusts, and other health care groups providing health care claims processing, when a link to Medicare or Medicaid claims is established, and data are used solely to process supplier's health care claims.

The enrolling supplier should be aware that the Computer Matching and Privacy Protection Act of 1988 (P.L. 100-503) amended the Privacy Act, 5 U.S.C. § 552a, to permit the government to verify information through computer matching.

## Protection of Proprietary Information
Privileged or confidential commercial or financial information collected in this form is protected from public disclosure by Federal law 5 U.S.C. § 552(b)(4) and Executive Order 12600.

## Protection of Confidential Commercial and/or Sensitive Personal Information
If any information within this application (or attachments thereto) constitutes a trade secret or privileged or confidential information (as such terms are interpreted under the Freedom of Information Act and applicable case law), or is of a highly sensitive personal nature such that disclosure would constitute a clearly unwarranted invasion of the personal privacy of one or more persons, then such information will be protected from release by CMS under 5 U.S.C. §§ 552(b)(4) and/or (b)(6), respectively.

**FedEx US Airbill** Express

FedEx Tracking Number **8611 9016 5277**

MUR 11

**0215** **Sender's Copy**

From

Date **1 30107**

Sender's FedEx Account Number **2270-1960-3**

Sender's Name **RON HERBERT** Phone **(678) 366-0305**

Company **TRIAD HEALTH MGMT**

Address **10 ROSWELL ST STE 210**

City **ALPHARETTA** State **GA** ZIP **30004-7947**

Your Internal Billing Reference **Provider enrollment**

Recipient's Name **Shannon Ray** Phone **706 257-1092**

Company **Blue Cross Blue Shield of GA**

Recipient's Address **2357 Warm Springs Rd**

Address

City **Columbus** State **GA** ZIP **31904**

**0351573167**

## Ship and track packages at fedex.com
Simplify your shipping. Manage your account. Access all the tools you need.

**4a Express Package Service** *Packages up to 150 lbs.*
- [X] FedEx Priority Overnight
- [ ] FedEx Standard Overnight
- [ ] FedEx First Overnight
- [ ] FedEx 2Day
- [ ] FedEx Express Saver

**4b Express Freight Service** *Packages over 150 lbs.*
- [ ] FedEx 1Day Freight
- [ ] FedEx 2Day Freight
- [ ] FedEx 3Day Freight

**5 Packaging**
- [ ] FedEx Envelope
- [X] FedEx Pak
- [ ] FedEx Box
- [ ] FedEx Tube
- [ ] Other

**6 Special Handling**
- [X] SATURDAY Delivery NOT Available
- [ ] HOLD Weekday at FedEx Location
- [ ] HOLD Saturday at FedEx Location

Does this shipment contain dangerous goods?
- [X] No
- [ ] Yes As per attached Shipper's Declaration
- [ ] Yes Shipper's Declaration not required.
- [ ] Dry Ice

**7 Payment** Bill to:
- [X] Sender
- [ ] Recipient
- [ ] Third Party
- [ ] Credit Card
- [ ] Cash/Check

Total Packages    Total Weight    Total Declared Value
$ .00

**8** NEW Residential Delivery Signature Options
- [ ] No Signature Required
- [ ] Direct Signature
- [ ] Indirect Signature

**519**

PLAINTIFF'S EXHIBIT 7

Department of Health & Human Services
Centers for Medicare & Medicaid Services
61 Forsyth St., Suite. 4T20
Atlanta, Georgia 30303-8909



April 12, 2007

Judy Walker, Administrator
LaGrange Nursing & Rehabilitation Center*
2111 West Point Road
LaGrange, Georgia 30240

Dear Ms. Walker:                    Re: SNF CMS Certification Number (CCN): **11-5354**

We have been notified of the change in the ownership of your facility effective **December 1, 2006.**

When there is a change of ownership, the Medicare agreement between the Secretary of Health and Human Services and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement. These include: correcting deficiencies previously cited, complying with Title VI of the Civil Rights Act, complying with applicable health and safety requirements, and submitting the Ownership and Financial Interest Disclosure Statement to the Centers for Medicare & Medicaid Services.

Effective with the change of ownership the following apply:

| **PREVIOUS** | **NEW** |
|---|---|
| Provider #: 11-5354 | Provider #: 11-5354 |
| Effective Date: 07/31/95 | Effective Date: **12/01/06** |
| Intermediary/Code: Mutual (52280) | Intermediary/Code: **BC/BS GA (00101)** |
| FYE: 03/31 | FYE: 06/30 |

Payment may be made for services rendered by your facility under the new ownership until your compliance with all Medicare requirements can be confirmed by an on-site survey. Payments will be discontinued upon the expiration of your provider agreement if certification requirements are not met.

You must take steps to maintain required records and information necessary to allocate the costs for furnishing services to beneficiaries. Payments made under Medicare are subject to a final cost report. Your fiscal intermediary will contact you shortly concerning the cost report. They will explain any records and information which will be needed to validate these costs. **Blue Cross/Blue Shield of Georgia (00101)** and **Mutual of Omaha (52280)** have been notified by copy of this letter.

Page 2

PLAINTIFF'S
EXHIBIT
8

Should you have any questions concerning this matter, please contact Patricia Pearson at (404) 562-7441.

Sincerely,

Patricia Pearson for

Sandra M. Pace
Associate Regional Administrator
Division of Survey & Certification

**NOTE TO THE FISCAL INTERMEDIARY:**
**THIS LETTER REPLACES THE CMS-2007, PROVIDER TIE-IN NOTICE.**

**\*Formerly: Brian Center Health & Rehab/LaGrange**

Department of Health & Human Services
Centers for Medicare & Medicaid Services
61 Forsyth St., Suite. 4T20
Atlanta, Georgia 30303-8909



April 12, 2007

Michael Stewart, Administrator
Lumber City Nursing & Rehabilitation Center*
Georgia Highway 19
Lumber City, Georgia 31549

Dear Mr. Stewart:                          Re: SNF CMS Certification Number (CCN): **11-5404**

We have been notified of the change in the ownership of your facility effective **December 1, 2006.**

When there is a change of ownership, the Medicare agreement between the Secretary of Health and Human Services and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement. These include: correcting deficiencies previously cited, complying with Title VI of the Civil Rights Act, complying with applicable health and safety requirements, and submitting the Ownership and Financial Interest Disclosure Statement to the Centers for Medicare & Medicaid Services.

Effective with the change of ownership the following apply:

**PREVIOUS**                              **NEW**
Provider #: 11-5404                       Provider #: 11-5404
Effective Date: 07/31/95                  Effective Date: **12/01/06**
Intermediary/Code: Mutual (52280)        Intermediary/Code: **BC/BS GA (00101)**
FYE: 03/31                                FYE: 06/30

Payment may be made for services rendered by your facility under the new ownership until your compliance with all Medicare requirements can be confirmed by an on-site survey. Payments will be discontinued upon the expiration of your provider agreement if certification requirements are not met.

You must take steps to maintain required records and information necessary to allocate the costs for furnishing services to beneficiaries. Payments made under Medicare are subject to a final cost report. Your fiscal intermediary will contact you shortly concerning the cost report. They will explain any records and information which will be needed to validate these costs. **Blue Cross/Blue Shield of Georgia (00101)** and **Mutual of Omaha (52280)** have been notified by copy of this letter.

Page 2

Should you have any questions concerning this matter, please contact Patricia Pearson at (404) 562-7441.

Sincerely,

Patricia Pearson for

Sandra M. Pace
Associate Regional Administrator
Division of Survey & Certification

**NOTE TO THE FISCAL INTERMEDIARY:**
**THIS LETTER REPLACES THE CMS-2007, PROVIDER TIE-IN NOTICE.**

**\*Formerly: Brian Center Nursing Care/Lumber City**

Department of Health & Human Services
Centers for Medicare & Medicaid Services
61 Forsyth St., Suite. 4T20
Atlanta, Georgia 30303-8909



April 12, 2007

Fred Youngman, Administrator
Power Springs Nursing & Rehabilitation Center*
3460 Powder Springs Road
Powder Springs, Georgia  30127

Dear Mr. Youngman:                Re: SNF CMS Certification Number (CCN): **11-5538**

We have been notified of the change in the ownership of your facility effective **December 1, 2006.**

When there is a change of ownership, the Medicare agreement between the Secretary of Health and Human Services and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement.  These include: correcting deficiencies previously cited, complying with Title VI of the Civil Rights Act, complying with applicable health and safety requirements, and submitting the Ownership and Financial Interest Disclosure Statement to the Centers for Medicare & Medicaid Services.

Effective with the change of ownership the following apply:

**PREVIOUS**                      **NEW**
Provider #: 11-5538               Provider #: 11-5538
Effective Date: 07/31/95          Effective Date: **12/01/06**
Intermediary/Code: Mutual (52280) Intermediary/Code:  **BC/BS GA (00101)**
FYE: 03/31                        FYE: 06/30

Payment may be made for services rendered by your facility under the new ownership until your compliance with all Medicare requirements can be confirmed by an on-site survey.  Payments will be discontinued upon the expiration of your provider agreement if certification requirements are not met.

You must take steps to maintain required records and information necessary to allocate the costs for furnishing services to beneficiaries.  Payments made under Medicare are subject to a final cost report.  Your fiscal intermediary will contact you shortly concerning the cost report.  They will explain any records and information which will be needed to validate these costs.  **Blue Cross/Blue Shield of Georgia (00101)** and **Mutual of Omaha (52280)** have been notified by copy of this letter.

Page 2

Should you have any questions concerning this matter, please contact Patricia Pearson at (404) 562-7441.

Sincerely,

Patricia Pearson for

Sandra M. Pace
Associate Regional Administrator
Division of Survey & Certification

**NOTE TO THE FISCAL INTERMEDIARY:**
**THIS LETTER REPLACES THE CMS-2007, PROVIDER TIE-IN NOTICE.**

**\*Formerly: Brian Center Nursing Care**

Department of Health & Human Services
Centers for Medicare & Medicaid Services
61 Forsyth St., Suite. 4T20
Atlanta, Georgia 30303-8909



April 12, 2007

Maggie Sudduth, Administrator
Thomasville Nursing & Rehabilitation Center*
120 Skyline Drive
Thomasville, Georgia 31757

Dear Ms. Sudduth:                         Re: SNF CMS Certification Number (CCN): **11-5427**

We have been notified of the change in the ownership of your facility effective **December 1, 2006.**

When there is a change of ownership, the Medicare agreement between the Secretary of Health and Human Services and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement. These include: correcting deficiencies previously cited, complying with Title VI of the Civil Rights Act, complying with applicable health and safety requirements, and submitting the Ownership and Financial Interest Disclosure Statement to the Centers for Medicare & Medicaid Services.

Effective with the change of ownership the following apply:

| PREVIOUS | NEW |
|---|---|
| Provider #: 11-5427 | Provider #: 11-5427 |
| Effective Date: 07/31/95 | Effective Date: **12/01/06** |
| Intermediary/Code: Mutual (52280) | Intermediary/Code: **BC/BS GA (00101)** |
| FYE: 03/31 | FYE: 06/30 |

Payment may be made for services rendered by your facility under the new ownership until your compliance with all Medicare requirements can be confirmed by an on-site survey. Payments will be discontinued upon the expiration of your provider agreement if certification requirements are not met.

You must take steps to maintain required records and information necessary to allocate the costs for furnishing services to beneficiaries. Payments made under Medicare are subject to a final cost report. Your fiscal intermediary will contact you shortly concerning the cost report. They will explain any records and information which will be needed to validate these costs. **Blue Cross/Blue Shield of Georgia (00101)** and **Mutual of Omaha (52280)** have been notified by copy of this letter.

Page 2

Should you have any questions concerning this matter, please contact Patricia Pearson at (404) 562-7441.

Sincerely,

Patricia Pearson for

Sandra M. Pace
Associate Regional Administrator
Division of Survey & Certification

**NOTE TO THE FISCAL INTERMEDIARY:**
**THIS LETTER REPLACES THE CMS-2007, PROVIDER TIE-IN NOTICE.**

**\*Formerly: Brian Center of Thomasville**

Department of Health & Human Services
Centers for Medicare & Medicaid Services
61 Forsyth St., Suite. 4T20
Atlanta, Georgia 30303-8909



April 26, 2007

Frances Faulk, Administrator
Jeffersonville Nursing and Rehabilitation Center
113 Spring Valley Drive
Jeffersonville, Georgia 31044

Dear Ms. Faulk:                    SNF CMS Certification Number (CCN) 11-5413

We have been notified of the change in the ownership of your facility effective **December 1, 2006.**

When there is a change of ownership, the Medicare agreement between the Secretary of Health and Human Services and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement.  These include: correcting deficiencies previously cited, complying with Title VI of the Civil Rights Act, complying with applicable health and safety requirements, and submitting the Ownership and Financial Interest Disclosure Statement to the Centers for Medicare & Medicaid Services.

Effective with the change of ownership the following apply:

| **PREVIOUS** | **NEW** |
|---|---|
| Provider #: 11-5413 | Provider #: 11-5413 |
| Effective Date:  09/01/89 | Effective Date: **12/1/06** |
| Intermediary & Code:  MOO (52280) | Intermediary & Code:  **BC/BS GA (00101)** |
| FYE:  03/31 | FYE:  **06/30** |

Payment may be made for services rendered by your facility under the new ownership until your compliance with all Medicare requirements can be confirmed by an on-site survey.  Payments will be discontinued upon the expiration of your provider agreement if certification requirements are not met.

You must take steps to maintain required records and information necessary to allocate the costs for furnishing services to beneficiaries.  Payments made under Medicare are subject to a final cost report.  Your fiscal intermediary will contact you shortly concerning the cost report.  They will explain any records and information, which will be needed to validate these costs.

Page 2

**Blue Cross/Blue Shield of Georgia (00101)** and **Mutual of Omaha (52280)** have been notified of this action by copy of this letter.

Should you have any questions concerning this matter, please contact Patricia Pearson at (404) 562-7441.

<div style="margin-left:40%">

Sincerely,

Patricia Pearson for

Sandra M. Pace
Associate Regional Administrator
Division of Survey & Certification

</div>

**NOTE TO THE FISCAL INTERMEDIARY:**
**THIS LETTER REPLACES THE CMS-2007, PROVIDER TIE-IN NOTICE.**


cc: **Blue Cross/Blue Shield of Georgia**
    **Mutual of Omaha**
    **Patricia Putt, DHR, Georgia State Agency**





MUTUAL of OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1604 · Omaha, NE 68101
1 866 734 9444
mutualmedicare.com
A CMS Contracted Intermediary

OCT 3 0 2007

## SETTLEMENT DATA FOR CHANGE OF INTERMEDIARY

Sandara Ludwig
Blue Cross and Blue Shield of Georgia-Medicare
2357 Warm Springs Road
Columbus, GA 31904

RE:    Provider No.: 11-5413
        Brian Center-Jeffersonville

Dear Ms. Ludwig:

This letter is to notify you that payments were made to Brian Center-Jeffersonville after they changed fiscal intermediaries effective December 01, 2006. Enclosed is a copy of the PS&R showing services paid after this date. We have also included a summary of other interim payments made after the date of change with supporting documentation. Please send us confirmation that you have received this information.

If you have any questions regarding this letter, please contact me at 1-866-734-9444 Ext. 3734.

Sincerely,

*Connie Wu*

Connie Wu
Medicare Auditor
Mutual of Omaha
Medicare Audit & Reimbursement

cc:   Ms. Mina Ramsey
      Or Current Administrator
      10 Roswell St Suite 210
      Alpharetta, GA 30004-7947

**PLAINTIFF'S EXHIBIT**
9

Version 2.0         Modified: 06/30/06         Page 1 of 1

SNF Part A - Detail Schedule

Provider:   Brian Ctr-Jeffersonville
Provider #:  11-5413
FYE:        11/30/2007

### Section 1

| Service Period (from) | to | Service Period (to) | Date Paid | # | | TOT PIP APPLY | PIP RETRO | | TOTAL PIP | APPLY | RETRO | | TOTAL PMT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/06 | to | 12/13/06 | 12/27/06 | 13 | | $ 33,800 | (96,200) | | $ | 600 | | $ | (61,800) |
| 12/14/06 | to | 12/27/06 | 01/10/07 | 14 | | $ 36,400 | | | $ | 600 | | $ | 37,000 |
| 12/28/06 | to | 01/10/07 | 01/24/07 | 14 | | $ 36,400 | | | $ | 600 | | $ | 37,000 |
| 01/11/07 | to | 01/24/07 | 02/07/07 | 14 | | $ 36,400 | | | $ | 600 | | $ | 37,000 |
| 01/25/07 | to | 02/07/07 | 02/21/07 | 14 | | $ 36,400 | | | $ | 600 | | $ | 37,000 |
| 02/08/07 | to | 02/21/07 | 03/07/07 | 14 | | $ 36,400 | | | $ | 600 | | $ | 37,000 |
| 02/22/07 | to | 03/07/07 | 03/21/07 | 14 | | $ 36,400 | | | $ | 600 | | $ | 37,000 |
| 03/08/07 | to | 03/21/07 | 04/04/07 | 14 | | $ 36,400 | | | $ | 600 | | $ | 37,000 |
| 03/22/07 | to | 04/04/07 | 04/18/07 | 14 | | $ 24,100 | | | $ | 600 | | $ | 24,700 |
| 04/05/07 | to | 04/18/07 | 05/02/07 | 14 | | $ 24,100 | | | $ | 600 | | $ | 24,700 |
| 04/19/07 | to | 05/02/07 | 05/16/07 | 14 | | $ - | | | $ | - | | $ | - |
| 05/03/07 | to | 05/16/07 | 05/30/07 | 14 | | $ | | | $ | - | | $ | - |
| 05/17/07 | to | 05/30/07 | 06/13/07 | 14 | | $ | | | $ | - | | $ | - |
| 05/31/07 | to | 06/13/07 | 06/27/07 | 14 | | $ | | | $ | - | | $ | - |
| 06/14/07 | to | 06/27/07 | 07/11/07 | 14 | | $ | | | $ | - | | $ | - |
| 06/28/07 | to | 07/11/07 | 07/25/07 | 14 | | $ | | | $ | - | | $ | - |
| 07/12/07 | to | 07/25/07 | 08/08/07 | 14 | | $ | | | $ | - | | $ | - |
| 07/26/07 | to | 08/08/07 | 08/22/07 | 14 | | $ | | | $ | - | | $ | - |
| 08/09/07 | to | 08/22/07 | 09/05/07 | 14 | | $ | | | $ | - | | $ | - |
| 08/23/07 | to | 09/05/07 | 09/19/07 | 14 | | $ | | | $ | - | | $ | - |
| 09/06/07 | to | 09/19/07 | 10/03/07 | 14 | | $ | | | $ | - | | $ | - |
| 09/20/07 | to | 10/03/07 | 10/17/07 | 14 | | $ | | | $ | - | | $ | - |
| 10/04/07 | to | 10/17/07 | 10/31/07 | 14 | | $ | | | $ | - | | $ | - |
| 10/18/07 | to | 10/31/07 | 11/14/07 | 14 | | $ | | | $ | - | | $ | - |
| 11/01/07 | to | 11/14/07 | 11/28/07 | 14 | | $ | | | $ | - | | $ | - |
| 11/15/07 | to | 11/28/07 | 12/12/07 | 14 | | $ | | | $ | - | | $ | - |
| 11/29/07 | to | 11/30/07 | 12/26/07 | 2 | | $ | | | $ | - | | $ | - |
| | to | | | | | $ - | | | $ | - | | $ | - |
| | | Totals = | | | | $ 336,800 | $ (96,200) | | $ | 6,000 | $ - | | 246,600 |

### Section 2    List all Non-LP Retros

| Date issued | Retros |
|---|---|
| | |

Auditor:   Connie Wu                    Date:   10/19/07

Reviewer:                               Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

10/19/2007

Version 23.0                    Modified 6/19/2007                    1 of 1





Mutual of Omaha Insurance Company
Medicare Division
P.O. Box 1604 • Omaha, NE 68101
1 866 734 9444
mutualmedicare.com
A CMS Contracted Intermediary

OCT 3 0 2007

## SETTLEMENT DATA FOR CHANGE OF INTERMEDIARY

Sandara Ludwig
Blue Cross and Blue Shield of Georgia-Medicare
2357 Warm Springs Road
Columbus, GA 31904

RE:    Provider No.: 11-5427
       Brian Center-Thomasville

Dear Ms. Ludwig:

This letter is to notify you that payments were made to Brian Center-Thomasville after they changed fiscal intermediaries effective December 01, 2006. Enclosed is a copy of the PS&R showing services paid after this date. We have also included a summary of other interim payments made after the date of change with supporting documentation. Please send us confirmation that you have received this information.

If you have any questions regarding this letter, please contact me at 1-866-734-9444 Ext. 3734.

Sincerely,

Connie Wu

Connie Wu
Medicare Auditor
Mutual of Omaha
Medicare Audit & Reimbursement

cc:    Ms. Mina Ramsey
       Or Current Administrator
       10 Roswell St Suite 210
       Alpharetta, GA 30004-7947

Version 2.0                     Modified: 06/30/06                     Page 1 of 1

SNF Part A - Detail Schedule

Provider:   Brian Ctr-Thomasville
Provider #:  11-5427
FYE:        11/30/2007

Section 1

| SERVICE PERIOD | | DATE PAID | TIME | PAY AMOUNT | PRELIM REVIEW | RETRO AMOUNT | TOTAL PMT |
|---|---|---|---|---|---|---|---|
| 12/01/06 to | 12/13/06 | 12/27/06 | 13 | $ 22,700 | $ (26,600) | $ 3,300 | $ (1,400) |
| 12/14/06 to | 12/27/06 | 01/10/07 | 14 | $ 24,400 | | $ 3,500 | $ 27,900 |
| 12/28/06 to | 01/10/07 | 01/24/07 | 14 | $ 24,400 | | $ 3,500 | $ 27,900 |
| 01/11/07 to | 01/24/07 | 02/07/07 | 14 | $ 24,400 | | $ 3,500 | $ 27,900 |
| 01/25/07 to | 02/07/07 | 02/21/07 | 14 | $ 24,400 | | $ 3,500 | $ 27,900 |
| 02/08/07 to | 02/21/07 | 03/07/07 | 14 | $ 24,400 | | $ 3,500 | $ 27,900 |
| 02/22/07 to | 03/07/07 | 03/21/07 | 14 | $ 24,400 | | $ 3,500 | $ 27,900 |
| 03/08/07 to | 03/21/07 | 04/04/07 | 14 | $ 24,400 | | $ 3,500 | $ 27,900 |
| 03/22/07 to | 04/04/07 | 04/18/07 | 14 | $ 20,900 | | $ 3,400 | $ 24,300 |
| 04/05/07 to | 04/18/07 | 05/02/07 | 14 | $    - | | $    - | $    - |
| 04/19/07 to | 05/02/07 | 05/16/07 | 14 | $    - | | $    - | $    - |
| 05/03/07 to | 05/16/07 | 05/30/07 | 14 | $    - | | $    - | $    - |
| 05/17/07 to | 05/30/07 | 06/13/07 | 14 | $    - | | $    - | $    - |
| 05/31/07 to | 06/13/07 | 06/27/07 | 14 | $    - | | $    - | $    - |
| 06/14/07 to | 06/27/07 | 07/11/07 | 14 | $    - | | $    - | $    - |
| 06/28/07 to | 07/11/07 | 07/25/07 | 14 | $    - | | $    - | $    - |
| 07/12/07 to | 07/25/07 | 08/08/07 | 14 | $    - | | $    - | $    - |
| 07/26/07 to | 08/08/07 | 08/22/07 | 14 | $    - | | $    - | $    - |
| 08/09/07 to | 08/22/07 | 09/05/07 | 14 | $    - | | $    - | $    - |
| 08/23/07 to | 09/05/07 | 09/19/07 | 14 | $    - | | $    - | $    - |
| 09/06/07 to | 09/19/07 | 10/03/07 | 14 | $    - | | $    - | $    - |
| 09/20/07 to | 10/03/07 | 10/17/07 | 14 | $    - | | $    - | $    - |
| 10/04/07 to | 10/17/07 | 10/31/07 | 14 | $    - | | $    - | $    - |
| 10/18/07 to | 10/31/07 | 11/14/07 | 14 | $    - | | $    - | $    - |
| 11/01/07 to | 11/14/07 | 11/28/07 | 14 | $    - | | $    - | $    - |
| 11/15/07 to | 11/28/07 | 12/12/07 | 14 | $    - | | $    - | $    - |
| 11/29/07 to | 11/30/07 | 12/26/07 | 2 | $    - | | $    - | $    - |
| Totals = | | | | $ 214,400 | $ (26,600) | $ 31,200 $ (800) | 218,200 |

Section 2    List all Non-LP Retros

| Date Issued | Retros |
|---|---|

Auditor:   Connie Wu                     Date:   10/19/07

Reviewer:  ▓▓▓▓▓▓▓▓▓▓▓▓▓               Date:  ▓▓▓▓▓▓▓▓▓

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

10/19/2007





MUTUAL of OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1604 · Omaha, NE 68101
1 866 734 9444
mutualmedicare.com
A CMS Contracted Intermediary

JUN 3 0 2007

## SETTLEMENT DATA FOR CHANGE OF INTERMEDIARY

Sandara Ludwig
Blue Cross and Blue Shield of Georgia-Medicare
2357 Warm Springs Road
Columbus, GA 31904

RE:     Provider No.: 11-5538
        Brian Center-Powder Springs

Dear Ms. Ludwig:

This letter is to notify you that payments were made to Brian Center-Powder Springs after they changed fiscal intermediaries effective December 01, 2006. Enclosed is a copy of the PS&R showing services paid after this date. We have also included a summary of other interim payments made after the date of change with supporting documentation. Please send us confirmation that you have received this information.

If you have any questions regarding this letter, please contact me at 1-866-734-9444 Ext. 3734.

Sincerely,

Connie Wu

Connie Wu
Medicare Auditor
Mutual of Omaha
Medicare Audit & Reimbursement

cc:     Ms. Mina Ramsey
        Or Current Administrator
        10 Roswell St Suite 210
        Alpharetta, GA 30004-7947

Version 2.0                    Modified: 06/30/06                    Page 1 of 1

SNF Part A - Detail Schedule

Provider: Brian Ctr-Powder Springs
Provider #: 11-5538
FYE: 11/30/2007

**Section 1**

| DATE OF SERVICE PERIOD | | DATE PREPARED | # | TOTAL PIP PAYMENT | PIP RETRO SAVINGS | TOTAL RETRO PAYMENT | RETRO SAVINGS | TOTAL PAYMENT |
|---|---|---|---|---|---|---|---|---|
| 12/01/06 to | 12/13/06 | 12/27/06 | 13 | $ 103,000 | | $ 2,100 | | $ 49,000 |
| 12/14/06 to | 12/27/06 | 01/10/07 | 14 | $ 110,900 | | $ 2,300 | | $ 113,200 |
| 12/28/06 to | 01/10/07 | 01/24/07 | 14 | $ 110,900 | | $ 2,300 | | $ 113,200 |
| 01/11/07 to | 01/24/07 | 02/07/07 | 14 | $ 110,900 | | $ 2,300 | | $ 113,200 |
| 01/25/07 to | 02/07/07 | 02/21/07 | 14 | $ 110,900 | | $ 2,300 | | $ 113,200 |
| 02/08/07 to | 02/21/07 | 03/07/07 | 14 | $ 110,900 | | $ 2,300 | | $ 113,200 |
| 02/22/07 to | 03/07/07 | 03/21/07 | 14 | $ 110,900 | | $ 2,300 | | $ 113,200 |
| 03/08/07 to | 03/21/07 | 04/04/07 | 14 | $ 110,900 | | $ 2,300 | | $ 113,200 |
| 03/22/07 to | 04/04/07 | 04/18/07 | 14 | $ 103,000 | | $ 2,300 | | $ 105,300 |
| 04/05/07 to | 04/18/07 | 05/02/07 | 14 | $ - | | $ - | | $ - |
| 04/19/07 to | 05/02/07 | 05/16/07 | 14 | $ - | | $ - | | $ - |
| 05/03/07 to | 05/16/07 | 05/30/07 | 14 | $ - | | $ - | | $ - |
| 05/17/07 to | 05/30/07 | 06/13/07 | 14 | $ - | | $ - | | $ - |
| 06/14/07 to | 06/27/07 | 07/11/07 | 14 | $ - | | $ - | | $ - |
| 06/28/07 to | 07/11/07 | 07/25/07 | 14 | $ - | | $ - | | $ - |
| 07/12/07 to | 07/25/07 | 08/08/07 | 14 | $ - | | $ - | | $ - |
| 07/26/07 to | 08/08/07 | 08/22/07 | 14 | $ - | | $ - | | $ - |
| 08/09/07 to | 08/22/07 | 09/05/07 | 14 | $ - | | $ - | | $ - |
| 08/23/07 to | 09/05/07 | 09/19/07 | 14 | $ - | | $ - | | $ - |
| 09/06/07 to | 09/19/07 | 10/03/07 | 14 | $ - | | $ - | | $ - |
| 09/20/07 to | 10/03/07 | 10/17/07 | 14 | $ - | | $ - | | $ - |
| 10/04/07 to | 10/17/07 | 10/31/07 | 14 | $ - | | $ - | | $ - |
| 10/18/07 to | 10/31/07 | 11/14/07 | 14 | $ - | | $ - | | $ - |
| 11/01/07 to | 11/14/07 | 11/28/07 | 14 | $ - | | $ - | | $ - |
| 11/15/07 to | 11/28/07 | 12/12/07 | 14 | $ - | | $ - | | $ - |
| 11/29/07 to | 11/30/07 | 12/26/07 | 2 | $ - | | $ - | | $ - |
| | | to | | $ - | | $ - | | $ - |
| **Totals =** | | | | $ 982,300 | $ (56,100) | $ 20,500 | $ - | $ 946,700 |

**Section 2**    List all Non-LP Retros

| Date issued | Retros |
|---|---|
| | |

Auditor: Connie Wu                     Date: 10/19/07

Reviewer:                              Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

10/19/2007

 

**MUTUAL of OMAHA INSURANCE COMPANY**
Medicare Division
P.O. Box 1604 • Omaha, NE 68101
1 866 734 9444
mutualmedicare.com
A CMS Contracted Intermediary

OCT 3 0 2007

## SETTLEMENT DATA FOR CHANGE OF INTERMEDIARY

Sandara Ludwig
Blue Cross and Blue Shield of Georgia-Medicare
2357 Warm Springs Road
Columbus, GA 31904

RE:     Provider No.: 11-5354
        Brian Center Nrsg-LaGrange

Dear Ms. Ludwig:

This letter is to notify you that payments were made to Brian Center Nrsg-LaGrange after they changed fiscal intermediaries effective December 01, 2006. Enclosed is a copy of the PS&R showing services paid after this date. We have also included a summary of other interim payments made after the date of change with supporting documentation. Please send us confirmation that you have received this information.

If you have any questions regarding this letter, please contact me at 1-866-734-9444 Ext. 3734.

Sincerely,

Connie Wu
Medicare Auditor
Mutual of Omaha
Medicare Audit & Reimbursement

cc:     Ms. Mina Ramsey
        Or Current Administrator
        10 Roswell St Suite 210
        Alpharetta, GA 30004-7947

SNF Part A - Detail Schedule

Provider:   Brian Center Nrsg-Lagrange
Provider #:  11-5354
FYE:        11/30/2007

Section 1

| SERVICE PERIOD | | DATE | | FI | PIPPAYOR VOUCH | FIRETRO LPITM | FI BILL PROPORT | LP BILL PROPER | RETRO PROPER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/06 | to 12/13/06 | 12/27/06 | 13 | | $ 43,700 | | | $ 3,800 | | $ (10,200) |
| 12/14/06 | to 12/27/06 | 01/10/07 | 14 | | $ 47,100 | | | $ 4,100 | | $ 51,200 |
| 12/28/06 | to 01/10/07 | 01/24/07 | 14 | | $ 47,100 | | | $ 4,100 | | $ 51,200 |
| 01/11/07 | to 01/24/07 | 02/07/07 | 14 | | $ 47,100 | | | $ 4,100 | | $ 51,200 |
| 01/25/07 | to 02/07/07 | 02/21/07 | 14 | | $ 47,100 | | | $ 4,100 | | $ 51,200 |
| 02/08/07 | to 02/21/07 | 03/07/07 | 14 | | $ 47,100 | | | $ 4,100 | | $ 51,200 |
| 02/22/07 | to 03/07/07 | 03/21/07 | 14 | | $ 47,100 | | | $ 4,100 | | $ 51,200 |
| 03/08/07 | to 03/21/07 | 04/04/07 | 14 | | $ 47,100 | | | $ 4,100 | | $ 51,200 |
| 03/22/07 | to 04/04/07 | 04/18/07 | 14 | | $ 39,500 | | | $ 4,100 | | $ 43,600 |
| 04/05/07 | to 04/18/07 | 05/02/07 | 14 | | $ - | | | $ - | | $ - |
| 04/19/07 | to 05/02/07 | 05/16/07 | 14 | | $ - | | | $ - | | $ - |
| 05/03/07 | to 05/16/07 | 05/30/07 | 14 | | $ - | | | $ - | | $ - |
| 05/17/07 | to 05/30/07 | 06/13/07 | 14 | | $ - | | | $ - | | $ - |
| 05/31/07 | to 06/13/07 | 06/27/07 | 14 | | $ - | | | $ - | | $ - |
| 06/14/07 | to 06/27/07 | 07/11/07 | 14 | | $ - | | | $ - | | $ - |
| 06/28/07 | to 07/11/07 | 07/25/07 | 14 | | $ - | | | $ - | | $ - |
| 07/12/07 | to 07/25/07 | 08/08/07 | 14 | | $ - | | | $ - | | $ - |
| 07/26/07 | to 08/08/07 | 08/22/07 | 14 | | $ - | | | $ - | | $ - |
| 08/09/07 | to 08/22/07 | 09/05/07 | 14 | | $ - | | | $ - | | $ - |
| 08/23/07 | to 09/05/07 | 09/19/07 | 14 | | $ - | | | $ - | | $ - |
| 09/06/07 | to 09/19/07 | 10/03/07 | 14 | | $ - | | | $ - | | $ - |
| 09/20/07 | to 10/03/07 | 10/17/07 | 14 | | $ - | | | $ - | | $ - |
| 10/04/07 | to 10/17/07 | 10/31/07 | 14 | | $ - | | | $ - | | $ - |
| 10/18/07 | to 10/31/07 | 11/14/07 | 14 | | $ - | | | $ - | | $ - |
| 11/01/07 | to 11/14/07 | 11/28/07 | 14 | | $ - | | | $ - | | $ - |
| 11/15/07 | to 11/28/07 | 12/12/07 | 14 | | $ - | | | $ - | | $ - |
| 11/29/07 | to 11/30/07 | 12/26/07 | 2 | | $ - | | | $ - | | $ - |
| | Totals = | | | | $ 412,900 | $ (57,700) | | $ 36,600 | $ - | 391,800 |

Section 2    List all Non-LP Retros

| Date Issued | Retros |
|---|---|
| | |

Auditor:   Connie Wu                          Date:   10/19/07

Reviewer:                                     Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

10/19/2007





MUTUAL of OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1604 · Omaha, NE 68101
1 866 734 9444
mutualmedicare.com
A CMS Contracted Intermediary

OCT 30 2007

October 19, 2007

## SETTLEMENT DATA FOR CHANGE OF INTERMEDIARY

Sandara Ludwig
Blue Cross and Blue Shield of Georgia-Medicare
2357 Warm Springs Road
Columbus, GA 31904

RE:     Provider No.: 11-5404
        Brian Center-Lumber City

Dear Ms. Ludwig:

This letter is to notify you that payments were made to Brian Center-Lumber City after they changed fiscal intermediaries effective December 01, 2006. Enclosed is a copy of the PS&R showing services paid after this date. We have also included a summary of other interim payments made after the date of change with supporting documentation. Please send us confirmation that you have received this information.

If you have any questions regarding this letter, please contact me at 1-866-734-9444 Ext. 3734.

Sincerely,

Connie Wu
Medicare Auditor
Mutual of Omaha
Medicare Audit & Reimbursement

cc:    Ms. Mina Ramsey
       Or Current Administrator
       10 Roswell St Suite 210
       Alpharetta, GA 30004-7947

SNF Part A - Detail Schedule

Provider:    Brian Ctr-Lumber City
Provider #:  11-5404
FYE:         11/30/2007

Section 1

| SERVICE PERIOD | | DATE | | | | PER DIEM PAYMENT | INTERIM RETRO PAYMENT | | TOTAL PER DIEM RETRO | LP PAYMENT | | RETRO | | TOTAL PAYMENT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/06 | to | 12/13/06 | 12/27/06 | 13 | | $ 59,200 | | | | $ 4,300 | | | | $ (101,600) |
| 12/14/06 | to | 12/27/06 | 01/10/07 | 14 | | $ 63,800 | | | | 4,600 | | | | 68,400 |
| 12/28/06 | to | 01/10/07 | 01/24/07 | 14 | | $ 63,800 | | | | 4,600 | | | | 68,400 |
| 01/11/07 | to | 01/24/07 | 02/07/07 | 14 | | $ 63,800 | | | | 4,600 | | | | 68,400 |
| 01/25/07 | to | 02/07/07 | 02/21/07 | 14 | | $ 63,800 | | | | 4,600 | | | | 68,400 |
| 02/08/07 | to | 02/21/07 | 03/07/07 | 14 | | $ 63,800 | | | | 4,600 | | | | 68,400 |
| 02/22/07 | to | 03/07/07 | 03/21/07 | 14 | | $ 63,800 | | | | 4,600 | | | | 68,400 |
| 03/08/07 | to | 03/21/07 | 04/04/07 | 14 | | $ 63,800 | | | | 4,600 | | | | 68,400 |
| 03/22/07 | to | 04/04/07 | 04/18/07 | 14 | | $ 42,700 | | | | 4,500 | | | | 47,200 |
| 04/05/07 | to | 04/18/07 | 05/02/07 | 14 | | $ - | | | | $ - | | | | - |
| 04/19/07 | to | 05/02/07 | 05/16/07 | 14 | | $ - | | | | $ - | | | | - |
| 05/03/07 | to | 05/16/07 | 05/30/07 | 14 | | $ - | | | | $ - | | | | - |
| 05/17/07 | to | 05/30/07 | 06/13/07 | 14 | | $ - | | | | $ - | | | | - |
| 05/31/07 | to | 06/13/07 | 06/27/07 | 14 | | $ - | | | | $ - | | | | - |
| 06/14/07 | to | 06/27/07 | 07/11/07 | 14 | | $ - | | | | $ - | | | | - |
| 06/28/07 | to | 07/11/07 | 07/25/07 | 14 | | $ - | | | | $ - | | | | - |
| 07/12/07 | to | 07/25/07 | 08/08/07 | 14 | | $ - | | | | $ - | | | | - |
| 07/26/07 | to | 08/08/07 | 08/22/07 | 14 | | $ - | | | | $ - | | | | - |
| 08/09/07 | to | 08/22/07 | 09/05/07 | 14 | | $ - | | | | $ - | | | | - |
| 08/23/07 | to | 09/05/07 | 09/19/07 | 14 | | $ - | | | | $ - | | | | - |
| 09/06/07 | to | 09/19/07 | 10/03/07 | 14 | | $ - | | | | $ - | | | | - |
| 09/20/07 | to | 10/03/07 | 10/17/07 | 14 | | $ - | | | | $ - | | | | - |
| 10/04/07 | to | 10/17/07 | 10/31/07 | 14 | | $ - | | | | $ - | | | | - |
| 10/18/07 | to | 10/31/07 | 11/14/07 | 14 | | $ - | | | | $ - | | | | - |
| 11/01/07 | to | 11/14/07 | 11/28/07 | 14 | | $ - | | | | $ - | | | | - |
| 11/15/07 | to | 11/28/07 | 12/12/07 | 14 | | $ - | | | | $ - | | | | - |
| 11/29/07 | to | 11/30/07 | 12/26/07 | 2 | | $ - | | | | $ - | | | | - |
| | to | | | | | $ - | | | | $ - | | | | - |
| | | Totals = | | | | $ 548,500 | $ (164,300) | | | 41,000 | $ (800) | | | 424,400 |

Section 2    List all Non-LP Retros

|  | Date issued | | Retros |
|---|---|---|---|

Auditor:    Connie Wu                          Date:    10/18/07

Reviewer:                                       Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive                                                              10/19/2007



**MEDICARE PART A
INTERMEDIARY**
Fax (706) 257-1082

February 11, 2008

Mr. Ronald Herbert
Triad at Jeffersonville I, LLC
10 Roswell Street Suite 210
Alpharetta, GA 30004

7004 2510 0000 5663 6353
**RETURN RECEIPT REQUESTED**
**CERTIFIED MAIL**
**TENTATIVE REVIEW**

| | |
|---|---|
| Provider #: | 115413 |
| Period Ended: | 06/30/2007 |
| Overpayment: | (246,600.00) |
| Payment Due Date: | 02/25/2008 |
| Withhold Date: | 02/26/2008 |
| Int. Penalty Begin Date: | 03/12/2008 |
| Interest Rate: | 12.125% |

Dear Mr. Herbert:

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

As Filed Due Provider (Plan)

|  |  |  |  |
|---|---|---|---|
| 1. | As Filed Part A | 0.00 | |
| 2. | As Filed Part B | 0.00 | 0.00 |

Total Review Adjustment

|  |  |  |  |
|---|---|---|---|
| 1. | Review Adjustment Part A | (246,600.00) | |
| 2. | Review Adjustment Part B | 0.00 | (246,600.00) |

Total Tentative Settlement

|  |  |  |  |
|---|---|---|---|
| 1. | Tentative Settlement Part A | (246,600.00) | |
| 2. | Tentative Settlement Part B | 0.00 | (246,600.00) |

Ck recd with As Filed Cost Report

Offset

Offset

Balance

|  |  |  |  |
|---|---|---|---|
| 1. | Balance Part A | (246,600.00) | |
| 2. | Balance Part B | 0.00 | (246,600.00) |

**Blue Cross and Blue Shield of Georgia**
Provider Audit and Reimbursement - 2357 Warm Springs Road - Columbus, Georgia 31904
An Independent Licensee of The Blue Cross and Blue Shield Association
*A CMS Contracted Intermediary*



PLAINTIFF'S
EXHIBIT
_10_

Mr. Ronald Herbert                                                          Page 2
Triad at Jeffersonville I, LLC
Alpharetta, GA 30004

Offset                                                          _____

Offset                                                          _____

Late Filed Interest Part A                                      _____

Late Filed Interest Part B                                      _____

Adjusted Balance Due Provider (Plan)                            (246,600.00)

We have tentatively reviewed your cost report and the results of our review have revealed that your facility has been overpaid the amount shown above.

We request that you refund this amount in full. You have 15 days from the date of this letter (Payment Due Date shown above) to submit payment to the Medicare program. If payment in full is not received by your payment due date, your payments will be withheld until payment in full is received or an extended repayment request is received. If you have reason to believe that the withhold should not occur, you must notify us immediately. We will review your documentation, but we will not delay recoupment. This is not an appeal of the overpayment determination. The appeal process is detailed in the NPR. In addition, in accordance with 42 CFR 447.30, if we do not receive payment in full or an extended repayment request (along with a check for the first proposed payment), we may initiate a request that your Federal share of Title XIX (Medicaid) be withheld, if applicable. If this withholding is initiated it will not be removed until payment in full is received or an acceptable extended repayment request is received and approved.

If payment in full is not received, simple interest at the annual rate shown above will be charged on your unpaid balance beginning on the 31st day (Interest Penalty Begin Date) in accordance with 42 CFR 405.378. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made in full. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged and will continue to be assessed for full 30-day periods on any portion that remains outstanding until the debt is paid in full. Each payment will be applied first to accrued interest and then to principal. After each payment interest will continue to accrue on the remaining principal balance at the rate shown above.

If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine if you are eligible for a repayment plan. You must explain and document your need for an extended repayment plan (ERP) showing financial hardship. Any repayment schedule (where one is approved) would run from the date of this letter. Requests for extended repayments of 12 months or more must be accompanied by at least one letter from a financial institution denying your loan request for the amount of this overpayment. For details concerning applying for an ERP and the necessary documentation to support an ERP request, please refer to our website at www.georgiamedicare.com/AuditandReimbursement.cfm#6. You have 15 days from the date of this letter (Payment Due Date) to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full amount before suspension of interim payments begins. Any amount withheld will not be refunded.

Mr. Ronald Herbert                                                                                    Page 3
Triad at Jeffersonville I, LLC
Alpharetta, GA 30004

Per CMS guidelines, pursuant to 1866(b)(2)(A) and ( c ) of title XVIII, continued failure to respond may result in
termination of the agreement if your overpayment is $1,000 or more.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will
be resolved in accordance with the applicable bankruptcy process.   Accordingly, we request that you immediately
notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services
and the Department of Justice to assure that we handle your situation properly.  If possible, when notifying us about
the bankruptcy please include the name the bankruptcy is filed under and the district where bankruptcy is filed.

Your check, made payable to the Centers for Medicare & Medicaid Services, should include your provider number,
and should be sent to the following address:

> Provider Audit & Reimbursement
> Attn:  Sandra Ludwig
> P.O. Box 9048
> Columbus, GA  31904

If we can assist you further in the resolution of this matter, please call Sandra Ludwig at 706-257-1073.

Sincerely,

Laura Martin
Provider Reimbursement

Enclosure

DATE          02/11/2008

TENTATIVE REVIEW
PROVIDER #          11-5413
PERIOD ENDED:          06/30/2007
DUE DATE:
DELINQUENT DATE:

Dear

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

As Filed Due Provider (Plan)

   1.    As Filed Part A                                    0

   2.    As Filed Part B                                    0                              0

Total Review Adjustment

   1.    Review Adjustment Part A                (246,600)

   2.    Review Adjustment Part B                          0                    (246,600)

Total Tentative Settlement

   1.    Tentative Settlement Part A              (246,600)

   2.    Tentative Settlement Part B                      0                    (246,600)

Check Received for As Filed

Offset for As Filed

Offset for As Filed

Previous Tentative Payment/Recovery

Balance

   1    Balance Part A

   2.    Balance Part B

Late Filed Cost Report Interest

Offset

Offset

Adjusted Balance Due Provider (Plan)

WORKSHEET E PART III
SNF
Part A

NAME:      Triad at Jeffersonville I, LLC
PROV #:    115413
FYE:       06/30/2007

LWS
DATE:      02/07/2008

| | INPUT DATA ONLY | REVISED | VARIANCE |
|---|---|---|---|
| 7  INPT ROUTINE PPS AMOUNT | 843,356 | 804,508 | (38,848) |
| 8  PRIMARY PAYOR AMOUNT | 0 | 0 | 0 |
| 9  COINSURANCE | 223,146 | 240,661 | 17,515 |
|    DEDUCTIBLE | 0 | 0 | 0 |
| 10 BAD DEBTS | 0 | 0 | 0 |
| 14 SUBTOTAL | 620,210 | 563,847 | (56,363) |
| 16 INTERIM PAYMENTS * | 620,210 | 810,447 | 190,237 |
| 17 BALANCE DUE | 0 | (246,600) | (246,600) |

* Interim Payments

PS&R        563,847
Lump Sum 1  246,600   *per mutual of Omaha*
Lump Sum 2  0

Total       810,447

---

NAME:      Triad at Jeffersonville I, LLC
PROV #:    115413
FYE:       06/30/2008

| | |
|---|---|
| AS FILED BAD DEBTS | 0 |
| REIMB PERCENT | 0.75 |
| AMOUNT PAYABLE | $0 |



**MEDICARE PART A**
**INTERMEDIARY**
Fax (706) 257-1082

February 11, 2008

Mr. Ronald Herbert
Triad at LaGrange I, LLC
10 Roswell Street Suite 210
Alpharetta, GA 30004

7004 2510 0000 5663 6339
**RETURN RECEIPT REQUESTED**
**CERTIFIED MAIL**
**TENTATIVE REVIEW**

| | |
|---|---|
| Provider #: | 115354 |
| Period Ended: | 06/30/2007 |
| Overpayment: | (370,011.00) |
| Payment Due Date: | 02/25/2008 |
| Withhold Date: | 02/26/2008 |
| Int. Penalty Begin Date: | 03/12/2008 |
| Interest Rate: | 12.125% |

Dear Mr. Herbert:

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

As Filed Due Provider (Plan)

| | | | |
|---|---|---|---|
| 1. | As Filed Part A | 69,393.00 | |
| 2. | As Filed Part B | 0.00 | 69,393.00 |

Total Review Adjustment

| | | | |
|---|---|---|---|
| 1. | Review Adjustment Part A | (439,404.00) | |
| 2. | Review Adjustment Part B | 0.00 | (439,404.00) |

Total Tentative Settlement

| | | | |
|---|---|---|---|
| 1. | Tentative Settlement Part A | (370,011.00) | |
| 2. | Tentative Settlement Part B | 0.00 | (370,011.00) |

Ck recd with As Filed Cost Report

Offset

Offset

Balance

| | | | |
|---|---|---|---|
| 1. | Balance Part A | (370,011.00) | |
| 2. | Balance Part B | 0.00 | (370,011.00) |

**Blue Cross and Blue Shield of Georgia**
Provider Audit and Reimbursement - 2357 Warm Springs Road - Columbus, Georgia 31904
An Independent Licensee of The Blue Cross and Blue Shield Association
*A CMS Contracted Intermediary*

Mr. Ronald Herbert                                                          Page 2
Triad at LaGrange I, LLC
Alpharetta, GA 30004

| | |
|---|---|
| Offset | _____ |
| Offset | _____ |
| Late Filed Interest Part A | _____ |
| Late Filed Interest Part B | _____ |
| Adjusted Balance Due Provider (Plan) | (370,011.00) |

We have tentatively reviewed your cost report and the results of our review have revealed that your facility has been overpaid the amount shown above.

We request that you refund this amount in full. You have 15 days from the date of this letter (Payment Due Date shown above) to submit payment to the Medicare program. If payment in full is not received by your payment due date, your payments will be withheld until payment in full is received or an extended repayment request is received. If you have reason to believe that the withhold should not occur, you must notify us immediately. We will review your documentation, but we will not delay recoupment. This is not an appeal of the overpayment determination. The appeal process is detailed in the NPR. In addition, in accordance with 42 CFR 447.30, if we do not receive payment in full or an extended repayment request (along with a check for the first proposed payment), we may initiate a request that your Federal share of Title XIX (Medicaid) be withheld, if applicable. If this withholding is initiated it will not be removed until payment in full is received or an acceptable extended repayment request is received and approved.

If payment in full is not received, simple interest at the annual rate shown above will be charged on your unpaid balance beginning on the 31st day (Interest Penalty Begin Date) in accordance with 42 CFR 405.378. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made in full. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged and will continue to be assessed for full 30-day periods on any portion that remains outstanding until the debt is paid in full. Each payment will be applied first to accrued interest and then to principal. After each payment interest will continue to accrue on the remaining principal balance at the rate shown above.

If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine if you are eligible for a repayment plan. You must explain and document your need for an extended repayment plan (ERP) showing financial hardship. Any repayment schedule (where one is approved) would run from the date of this letter. Requests for extended repayments of 12 months or more must be accompanied by at least one letter from a financial institution denying your loan request for the amount of this overpayment. For details concerning applying for an ERP and the necessary documentation to support an ERP request, please refer to our website at www.georgiamedicare.com/AuditandReimbursement.cfm#6. You have 15 days from the date of this letter (Payment Due Date) to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full amount before suspension of interim payments begins. Any amount withheld will not be refunded.

Mr. Ronald Herbert                                                      Page 3
Triad at LaGrange I, LLC
Alpharetta, GA 30004

Per CMS guidelines, pursuant to 1866(b)(2)(A) and ( c ) of title XVIII, continued failure to respond may result in termination of the agreement if your overpayment is $1,000 or more.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process.   Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly.  If possible, when notifying us about the bankruptcy please include the name the bankruptcy is filed under and the district where bankruptcy is filed.

Your check, made payable to the Centers for Medicare & Medicaid Services, should include your provider number, and should be sent to the following address:

> Provider Audit & Reimbursement
> Attn:  Sandra Ludwig
> P.O. Box 9048
> Columbus, GA  31904

If we can assist you further in the resolution of this matter, please call Sandra Ludwig at 706-257-1073.

Sincerely,

*Laura Martin*

Laura Martin
Provider Reimbursement

Enclosure

WORKSHEET E PART III
SNF
Part A

|  | | LWS | |
|---|---|---|---|
| NAME: | Triad at LaGrange I, LLC | DATE: | 02/07/2008 |
| PROV #: | 115354 | | |
| FYE: | 06/03/2007 | | |

| | | INPUT DATA ONLY | REVISED | VARIANCE |
|---|---|---|---|---|
| 7 | INPT ROUTINE PPS AMOUNT | 1,100,302 | 1,043,352 | (56,950) |
| 8 | PRIMARY PAYOR AMOUNT | 0 | 0 | 0 |
| 9 | COINSURANCE | 325,102 | 327,334 | 2,232 |
| | DEDUCTIBLE | 0 | 0 | 0 |
| 10 | BAD DEBTS | 69,393 | 69,393 | 0 |
| 14 | SUBTOTAL | 844,593 | 785,411 | (59,182) |
| 16 | INTERIM PAYMENTS * | 775,200 | 1,155,422 | 380,222 |
| 17 | BALANCE DUE | 69,393 | (370,011) | (439,404) |

\* Interim Payments

| | |
|---|---|
| PS&R | 716,018 |
| Lump Sum 1 | 47,604 |
| Lump Sum 2 | 391,800 — *per mutual of omaha* |
| Total | 1,155,422 |

| | |
|---|---|
| NAME: | Triad at LaGrange I, LLC |
| PROV #: | 115354 |
| FYE: | 06/30/2008 |

| | |
|---|---|
| AS FILED BAD DEBTS | 69,393 |
| REIMB PERCENT | 0.75 |
| AMOUNT PAYABLE | $52,045 |



**MEDICARE PART A**
**INTERMEDIARY**
Fax (706) 257-1082

February 11, 2008

Mr. Ronald Herbert
Triad at Lumber City I, LLC
10 Roswell Street Suite 210
Alpharetta, GA 30004

7004 2510 0000 5663 6346
**RETURN RECEIPT REQUESTED**
**CERTIFIED MAIL**
**TENTATIVE REVIEW**

| | |
|---|---:|
| Provider #: | 115404 |
| Period Ended: | 06/30/2007 |
| Overpayment: | (424,400.00) |
| Payment Due Date: | 02/25/2008 |
| Withhold Date: | 02/26/2008 |
| Int. Penalty Begin Date: | 03/12/2008 |
| Interest Rate: | 12.125% |

Dear Mr. Herbert:

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

| | | | | |
|---|---|---|---:|---:|
| As Filed Due Provider (Plan) | | | | |
| | 1. | As Filed Part A | 0.00 | |
| | 2. | As Filed Part B | 0.00 | 0.00 |
| Total Review Adjustment | | | | |
| | 1. | Review Adjustment Part A | (424,400.00) | |
| | 2. | Review Adjustment Part B | 0.00 | (424,400.00) |
| Total Tentative Settlement | | | | |
| | 1. | Tentative Settlement Part A | (424,400.00) | |
| | 2. | Tentative Settlement Part B | 0.00 | (424,400.00) |
| Ck recd with As Filed Cost Report | | | | |
| Offset | | | | |
| Offset | | | | |
| Balance | | | | |
| | 1. | Balance Part A | (424,400.00) | |
| | 2. | Balance Part B | 0.00 | (424,400.00) |

**Blue Cross and Blue Shield of Georgia**
Provider Audit and Reimbursement - 2357 Warm Springs Road - Columbus, Georgia 31904
An Independent Licensee of The Blue Cross and Blue Shield Association
*A CMS Contracted Intermediary*

Mr. Ronald Herbert                                                                    Page 2
Triad at Lumber City I, LLC
Alpharetta, GA 30004

Offset                                                            _____

Offset                                                            _____

Late Filed Interest Part A                                        _____

Late Filed Interest Part B                                        _____

Adjusted Balance Due Provider (Plan)                               (424,400.00)

We have tentatively reviewed your cost report and the results of our review have revealed that your facility has been
overpaid the amount shown above.

We request that you refund this amount in full. You have 15 days from the date of this letter (Payment Due Date shown
above) to submit payment to the Medicare program. If payment in full is not received by your payment due date, your
payments will be withheld until payment in full is received or an extended repayment request is received. If you have
reason to believe that the withhold should not occur, you must notify us immediately. We will review your
documentation, but we will not delay recoupment. This is not an appeal of the overpayment determination. The
appeal process is detailed in the NPR. In addition, in accordance with 42 CFR 447.30, if we do not receive payment
in full or an extended repayment request (along with a check for the first proposed payment), we may initiate a request
that your Federal share of Title XIX (Medicaid) be withheld, if applicable. If this withholding is initiated it will not
be removed until payment in full is received or an acceptable extended repayment request is received and approved.

If payment in full is not received, simple interest at the annual rate shown above will be charged on your
unpaid balance beginning on the 31st day (Interest Penalty Begin Date) in accordance with 42 CFR 405.378. Interest
is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made in full. Thus, if
payment is received 31 days from the date of final determination, one 30-day period of interest will be charged and will
continue to be assessed for full 30-day periods on any portion that remains outstanding until the debt is paid in full.
Each payment will be applied first to accrued interest and then to principal. After each payment interest will continue
to accrue on the remaining principal balance at the rate shown above.

If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine
if you are eligible for a repayment plan. You must explain and document your need for an extended repayment
plan (ERP) showing financial hardship. Any repayment schedule (where one is approved) would run from the date of
this letter. Requests for extended repayments of 12 months or more must be accompanied by at least one letter
from a financial institution denying your loan request for the amount of this overpayment. For details concerning
applying for an ERP and the necessary documentation to support an ERP request, please refer to our website at
www.georgiamedicare.com/AuditandReimbursement.cfm#6. You have 15 days from the date of this letter (Payment
Due Date) to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full
amount before suspension of interim payments begins. Any amount withheld will not be refunded.

Mr. Ronald Herbert                                                    Page 3
Triad at Lumber City I, LLC
Alpharetta, GA 30004

Per CMS guidelines, pursuant to 1866(b)(2)(A) and ( c ) of title XVIII, continued failure to respond may result in termination of the agreement if your overpayment is $1,000 or more.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process.   Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly.  If possible, when notifying us about the bankruptcy please include the name the bankruptcy is filed under and the district where bankruptcy is filed.

Your check, made payable to the Centers for Medicare & Medicaid Services, should include your provider number, and should be sent to the following address:

> Provider Audit & Reimbursement
> Attn:  Sandra Ludwig
> P.O. Box 9048
> Columbus, GA  31904

If we can assist you further in the resolution of this matter, please call Sandra Ludwig at 706-257-1073.

Sincerely,

Laura Martin
Provider Reimbursement

Enclosure

SNF-TENT

*Lm 2/7/08*

WORKSHEET E PART III

SNF

Part A

NAME:      Triad at Lumber City I, LLC
PROV #:    115404
FYE:       06/30/2007

LWS
DATE:      02/07/2008

|    |                            | INPUT DATA ONLY | REVISED | VARIANCE |
|----|----------------------------|----------------:|--------:|---------:|
| 7  | INPT ROUTINE PPS AMOUNT    | 837,192         | 771,554 | (65,638) |
| 8  | PRIMARY PAYOR AMOUNT       | 0               | 0       | 0        |
| 9  | COINSURANCE                | 201,556         | 232,778 | 31,222   |
|    | DEDUCTIBLE                 | 0               | 0       | 0        |
| 10 | BAD DEBTS                  | 0               | 0       | 0        |
| 14 | SUBTOTAL                   | 635,636         | 538,776 | (96,860) |
| 16 | INTERIM PAYMENTS *         | 635,636         | 963,176 | 327,540  |
| 17 | BALANCE DUE                | 0               | (424,400) | (424,400) |

* Interim Payments

PS&R          538,776
Lump Sum 1    424,400      *per Mutual of Omaha*
Lump Sum 2    0

   Total      963,176

---

NAME:      Triad at Lumber City I, LLC
PROV #:    115404
FYE:       06/30/2008

AS FILED BAD DEBTS          0

REIMB PERCENT               0.75

AMOUNT PAYABLE              $0



**MEDICARE PART A**
**INTERMEDIARY**
Fax (706) 257-1082

February 11, 2008

Mr. Ronald Herbert
Triad at Powder Springs I, LLC
10 Roswell Street Suite 210
Alpharetta, GA 30004

7004 2510 0000 5663 6360
**RETURN RECEIPT REQUESTED**
**CERTIFIED MAIL**
**TENTATIVE REVIEW**

| | |
|---|---|
| Provider #: | 115538 |
| Period Ended: | 06/30/2007 |
| Overpayment: | (946,700.00) |
| Payment Due Date: | 02/25/2008 |
| Withhold Date: | 02/26/2008 |
| Int. Penalty Begin Date: | 03/12/2008 |
| Interest Rate: | 12.125% |

Dear Mr. Herbert:

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

As Filed Due Provider (Plan)

|  |  |  |  |  |
|---|---|---|---:|---:|
| | 1. | As Filed Part A | 0.00 | |
| | 2. | As Filed Part B | 0.00 | 0.00 |

Total Review Adjustment

|  |  |  |  |  |
|---|---|---|---:|---:|
| | 1. | Review Adjustment Part A | (946,700.00) | |
| | 2. | Review Adjustment Part B | 0.00 | (946,700.00) |

Total Tentative Settlement

|  |  |  |  |  |
|---|---|---|---:|---:|
| | 1. | Tentative Settlement Part A | (946,700.00) | |
| | 2. | Tentative Settlement Part B | 0.00 | (946,700.00) |

Ck recd with As Filed Cost Report

Offset

Offset

Balance

|  |  |  |  |  |
|---|---|---|---:|---:|
| | 1. | Balance Part A | (946,700.00) | |
| | 2. | Balance Part B | 0.00 | (946,700.00) |

**Blue Cross and Blue Shield of Georgia**
Provider Audit and Reimbursement - 2357 Warm Springs Road - Columbus, Georgia 31904
An Independent Licensee of The Blue Cross and Blue Shield Association
*A CMS Contracted Intermediary*

Mr. Ronald Herbert                                                                                          Page 2
Triad at Powder Springs I, LLC
Alpharetta, GA 30004


Offset                                                                                     _____

Offset                                                                                     _____

Late Filed Interest Part A                                                      _____

Late Filed Interest Part B                                                      _____

Adjusted Balance Due Provider (Plan)                                   (946,700.00)
                                                                                          _____

We have tentatively reviewed your cost report and the results of our review have revealed that your facility has been overpaid the amount shown above.

We request that you refund this amount in full. You have 15 days from the date of this letter (Payment Due Date shown above) to submit payment to the Medicare program. If payment in full is not received by your payment due date, your payments will be withheld until payment in full is received or an extended repayment request is received. If you have reason to believe that the withhold should not occur, you must notify us immediately. We will review your documentation, but we will not delay recoupment. This is not an appeal of the overpayment determination. The appeal process is detailed in the NPR. In addition, in accordance with 42 CFR 447.30, if we do not receive payment in full or an extended repayment request (along with a check for the first proposed payment), we may initiate a request that your Federal share of Title XIX (Medicaid) be withheld, if applicable. If this withholding is initiated it will not be removed until payment in full is received or an acceptable extended repayment request is received and approved.

If payment in full is not received, simple interest at the annual rate shown above will be charged on your unpaid balance beginning on the 31st day (Interest Penalty Begin Date) in accordance with 42 CFR 405.378. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made in full. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged and will continue to be assessed for full 30-day periods on any portion that remains outstanding until the debt is paid in full. Each payment will be applied first to accrued interest and then to principal. After each payment interest will continue to accrue on the remaining principal balance at the rate shown above.

If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine if you are eligible for a repayment plan. You must explain and document your need for an extended repayment plan (ERP) showing financial hardship. Any repayment schedule (where one is approved) would run from the date of this letter. Requests for extended repayments of 12 months or more must be accompanied by at least one letter from a financial institution denying your loan request for the amount of this overpayment. For details concerning applying for an ERP and the necessary documentation to support an ERP request, please refer to our website at www.georgiamedicare.com/AuditandReimbursement.cfm#6. You have 15 days from the date of this letter (Payment Due Date) to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full amount before suspension of interim payments begins. Any amount withheld will not be refunded.

Mr. Ronald Herbert                                                                    Page 3
Triad at Powder Springs I, LLC
Alpharetta, GA 30004

Per CMS guidelines, pursuant to 1866(b)(2)(A) and ( c ) of title XVIII, continued failure to respond may result in termination of the agreement if your overpayment is $1,000 or more.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process.   Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly.  If possible, when notifying us about the bankruptcy please include the name the bankruptcy is filed under and the district where bankruptcy is filed.

Your check, made payable to the Centers for Medicare & Medicaid Services, should include your provider number, and should be sent to the following address:

> Provider Audit & Reimbursement
> Attn:  Sandra Ludwig
> P.O. Box 9048
> Columbus, GA  31904

If we can assist you further in the resolution of this matter, please call Sandra Ludwig at 706-257-1073.

Sincerely,

Laura Martin
Provider Reimbursement

Enclosure

SNF-TENF

*Jm 2/7/08*

WORKSHEET E PART III
SNF
Part A

NAME:       Triad Powder Springs I, LLC
PROV #:     115
FYE:        06/2007

LWS
DATE:       02/07/2008

| | | INPUT DATA ONLY | REVISED | VARIANCE |
|---|---|---|---|---|
| 7 | INPT ROUTINE PPS AMOUNT | 2,773,450 | 2,545,647 | (227,803) |
| 8 | PRIMRY PAYOR AMOUNT | 0 | 0 | 0 |
| 9 | COINSRANCE | 522,945 | 527,285 | 4,340 |
| | DEDUCTIBLE | 0 | 0 | 0 |
| 10 | BAD DBTS | 0 | 0 | 0 |
| 14 | SUBTTAL | 2,250,505 | 2,018,362 | (232,143) |
| 16 | INTERM PAYMENTS * | 2,250,505 | 2,965,062 | 714,557 |
| 17 | BALANCE DUE | 0 | (946,700) | (946,700) |

\* Interim Payments
          2,018,36
PS&R
Lump Sum 1    946,700 *per mutual of Omaha*
Lump Sum 2    0
    Total     2,965,06

NAME:       Triad at Powder Springs I, LLC
PROV #:     115538
FYE:        06/30/2008

AS FILED BAD DEBTS              0
REIMB PERCENT               0.75

AMOUNT PAYABLE               $0



**MEDICARE PART A INTERMEDIARY**
Fax (706) 257-1082

February 11, 2008

Mr. Ronald Herbert
Triad at Thomasville I, LLC
10 Roswell Street Suite 120
Alpharetta, GA, GA 30004

7004 2510 0000 5663 6834
RETURN RECEIPT REQUESTED
CERTIFIED MAIL
TENTATIVE REVIEW

| | |
|---|---|
| Provider #: | 115427 |
| Period Ended: | 06/30/2007 |
| Overpayment: | (215,771.00) |
| Payment Due Date: | 02/25/2008 |
| Withhold Date: | 02/26/2008 |
| Int. Penalty Begin Date: | 03/12/2008 |
| Interest Rate: | 12.125% |

Dear Mr. Herbert:

This is a Notice of our Tentative Desk Review of your Medicare Cost Report:

As Filed Due Provider (Plan)

| | | | |
|---|---|---|---|
| 1. | As Filed Part A | 7,735.00 | |
| 2. | As Filed Part B | 0.00 | 7,735.00 |

Total Review Adjustment

| | | | |
|---|---|---|---|
| 1. | Review Adjustment Part A | (223,506.00) | |
| 2. | Review Adjustment Part B | 0.00 | (223,506.00) |

Total Tentative Settlement

| | | | |
|---|---|---|---|
| 1. | Tentative Settlement Part A | (215,771.00) | |
| 2. | Tentative Settlement Part B | 0.00 | (215,771.00) |

Ck recd with As Filed Cost Report

Offset

Offset

Balance

| | | | |
|---|---|---|---|
| 1. | Balance Part A | (215,771.00) | |
| 2. | Balance Part B | 0.00 | (215,771.00) |

**Blue Cross and Blue Shield of Georgia**
Provider Audit and Reimbursement - 2357 Warm Springs Road - Columbus, Georgia 31904
An Independent Licensee of The Blue Cross and Blue Shield Association
*A CMS Contracted Intermediary*

Mr. Ronald Herbert                                                                    Page 2
Triad at Thomasville I, LLC
Alpharetta, GA, GA 30004

Offset                                                                    _____

Offset                                                                    _____

Late Filed Interest Part A                                                _____

Late Filed Interest Part B                                                _____

Adjusted Balance Due Provider (Plan)                                        (215,771.00)

We have tentatively reviewed your cost report and the results of our review have revealed that your **facility has been overpaid** the amount shown above.

We request that you refund this amount in full.  You have 15 days from the date of this letter (Payment Due Date shown above) to submit payment to the Medicare program.  If payment in full is not received by your payment due date, your payments will be withheld until payment in full is received or an extended repayment request is received.  If you have reason to believe that the withhold should not occur, you must notify us immediately.  We will review your documentation, but we will not delay recoupment.  This is not an appeal of the overpayment determination.  The appeal process is detailed in the NPR.  In addition, in accordance with 42 CFR 447.30, if we do not receive payment in full or an extended repayment request (along with a check for the first proposed payment), we may initiate a request that your Federal share of Title XIX (Medicaid) be withheld, if applicable.  If this withholding is initiated it will not be removed until payment in full is received or an acceptable extended repayment request is received and approved.

If payment in full is not received, simple interest at the annual rate shown above will be charged on your unpaid balance beginning on the 31st day (Interest Penalty Begin Date) in accordance with 42 CFR 405.378.  Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made in full.  Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged and will continue to be assessed for full 30-day periods on any portion that remains outstanding until the debt is paid in full.  Each payment will be applied first to accrued interest and then to principal.  After each payment interest will continue to accrue on the remaining principal balance at the rate shown above.

If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine if you are eligible for a repayment plan.   You must explain and document your need for an extended repayment plan (ERP) showing financial hardship.  Any repayment schedule (where one is approved) would run from the date of this letter.  Requests for extended repayments of 12 months or more must be accompanied by at least one letter from a financial institution denying your loan request for the amount of this overpayment.  For details concerning applying for an ERP and the necessary documentation to support an ERP request, please refer to our website at www.georgiamedicare.com/AuditandReimbursement.cfm#6.  You have 15 days from the date of this letter (Payment Due Date) to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full amount before suspension of interim payments begins.  Any amount withheld will not be refunded.

Mr. Ronald Herbert                                                                    Page 3
Triad at Thomasville I, LLC
Alpharetta, GA, GA 30004

Per CMS guidelines, pursuant to 1866(b)(2)(A) and ( c ) of title XVIII, continued failure to respond may result in termination of the agreement if your overpayment is $1,000 or more.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process.   Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice to assure that we handle your situation properly.  If possible, when notifying us about the bankruptcy please include the name the bankruptcy is filed under and the district where bankruptcy is filed.

Your check, made payable to the Centers for Medicare & Medicaid Services, should include your provider number, and should be sent to the following address:

> Provider Audit & Reimbursement
> Attn:  Sandra Ludwig
> P.O. Box 9048
> Columbus, GA  31904

If we can assist you further in the resolution of this matter, please call Sandra Ludwig at 706-257-1073.

Sincerely,

Laura Martin
Provider Reimbursement

Enclosure

SNF-TENT

WORKSHEET E PART III
SNF
Part A

NAME:     Triad at Thomasville I, LLC
PROV #:   115427
FYE:      06/30/2007

LWS
DATE:     02/07/2008

| | | INPUT DATA ONLY | REVISED | VARIANCE |
|---|---|---|---|---|
| 7 | INPT ROUTINE PPS AMOUNT | 554,005 | 551,955 | (2,050) |
| 8 | PRIMARY PAYOR AMOUNT | 0 | 0 | 0 |
| 9 | COINSURANCE | 139,307 | 139,803 | 496 |
| | DEDUCTIBLE | 0 | 0 | 0 |
| 10 | BAD DEBTS | 7,735 | 7,735 | 0 |
| 14 | SUBTOTAL | 422,433 | 419,887 | (2,546) |
| 16 | INTERIM PAYMENTS * | 414,698 | 635,658 | 220,960 |
| 17 | BALANCE DUE | 7,735 | (215,771) | (223,506) |

* Interim Payments

| | |
|---|---|
| PS&R | 412,152 |
| Lump Sum 1 | 218,200 /per mutual of Omaha |
| Lump Sum 2 | 5,306 |
| Total | 635,658 |

---

NAME:     Triad at Thomasville I, LLC
PROV #:   115427
FYE:      06/30/2008

| | |
|---|---|
| AS FILED BAD DEBTS | 7,735 |
| REIMB PERCENT | 0.75 |
| AMOUNT PAYABLE | $5,801 |

# GALLAGHER
# EVELIUS & JONES LLP

JACK C. TRANTER
jtranter@gejlaw.com
direct dial: 410 347 1370
fax: 410 468 2786

February 13, 2008

**VIA EMAIL**

Christopher P. Galanek, Esq.
Jennifer B. Dempsey, Esq.
Powell, Goldstein, Frazer & Murphy, LLP
One Atlantic Center – Fourteenth Floor
1201 W. Peachtree Street NW
Atlanta, GA 30309-3488

> Re:  *Brian Center Nursing Care/Austell, Inc. v. Triad*
> *Health Management of Georgia, LLC, et al.,*
> **Civil Action No.: 2005-cv-99496**

Dear Chris and Jen:

As Tom and I mentioned during today's call with Jennifer, Triad learned late yesterday that the Center for Medicare and Medicaid Services ("CMS") continued to make Medicare payments to your client after Triad began operating the five facilities leased from Mr. Foster on December 1, 2006. As the enclosed materials relate, these payments continued until mid-April of 2007 and total $1,982,600.

Needless to say, Brian Center is not entitled to Medicare reimbursement for services not performed. As CMS seeks to offset Medicare payments due to Triad based on funds inadvertently paid to your client, we ask that these funds be repaid to CMS as soon as possible. While we will contest CMS's notion that it may recoup from Triad funds inadvertently paid to Mariner, there is no question that Mariner is not entitled to retain these funds. Indeed, we are shocked that Mariner obtained almost two million dollars in reimbursement from CMS for Medicare services that Mariner knew had not been performed but made no effort to return or repay these funds. As you can see, these payments began in December 2006 and continued through mid-April 2007. At this juncture, I suggest that it is in both our clients' best interest that these funds be repaid as soon as possible.


PLAINTIFF'S
EXHIBIT

TEL                          FAX                          WEB

# GALLAGHER
# EVELIUS & JONES LLP

Christopher P. Galanek, Esq.
Jennifer B. Dempsey, Esq.
February 13, 2008
Page 2


If you would like to discuss this matter, please call at your convenience.


Very truly yours,

Jack C. Tranter


JCT/emc
Enclosures
cc:     Thomas C. Dame, Esq.

## Jack Tranter

**From:**   Jack Tranter
**Sent:**   Friday, February 22, 2008 4:54 PM
**To:**    'Dempsey, Jennifer'
**Cc:**    Thomas E. Reilly (E-mail)
**Subject:** Mariner/Brian Center's Retention of $2.0 million in Medicare Funds Improperly Paid From 12/28-4/18/07

   As I explained during our call today, it is imperative that we learn when Mariner will repay the Medicare funds that were improperly paid after Mariner/Brian Center stopped operating the facilities now leased and operated by Triad. Apart from criminal exposure under 18 USC Section 1035 and 1001, Mariner's decision to accept and retain these funds without advising CMS when the first payment was made on December 28, 2006 that it no longer operated these facilities is both inexplicable and shocking.

   I first brought this matter to your attention during our call on 2/13/08 and in my letter sent later than day. As I noted then, Triad only learned that Mariner had been paid almost $2.0 million for services not provided the day before. More than a week has passed and I have received no substantive reply. I mentioned this during our call this morning and in an email sent earlier today but neither you nor Chris has replied.

   Since Tom Riley represents Harry Grunstein, who owns Mariner, as well as Sava SeniorCare LLP, who we understand was providing administrative services for Mariner/Brian Center when these funds were received, I'm sending a copy of this email as well as my other correspondence to Tom.

   Needless to say, if this matter is not resolved by Mariner returning these funds or working out a repayment arrangement with CMS, we will have no choice but to take whatever action we deem necessary to make that occur.

*Jack C. Tranter, Esq.*
*Gallagher Evelius & Jones LLP*
*218 N. Charles Street, Suite 400*
*Baltimore, MD 21201*
*Direct Dial: 410-347-1370*
*Fax: 410-837-0454*

3/2/2008

## Jack Tranter

**From:** Reilly, Thomas E. [thomas.reilly@troutmansanders.com]

**Sent:** Friday, February 22, 2008 5:09 PM

**To:** Jack Tranter

**Cc:** Dempsey, Jennifer

**Subject:** RE: Mariner/Brian Center's Retention of $2.0 million in Medicare Funds Improperly Paid From 12/28-4/18/07

Jack --

Having not seen your correspondence or participated in your referenced discussion, I do not know what you are talking about. I will be happy to take a look at your correspondence if you will send it to me at your convenience.

Tom

Thomas E. Reilly
Troutman Sanders LLP
Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia. 30308-2216
(404) 885-3256 (direct dial)
(404) 962-6664 (fax)

*218 N. Charles Street, Suite 400*
*Baltimore, MD 21201*
*Direct Dial: 410-347-1370*
*Fax: 410-837-0454*

IRS CIRCULAR 230 NOTICE: Any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding federal tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email transmission may contain CONFIDENTIAL and PRIVILEGED information. If you are not the intended recipient, please notify the sender by email, do not disseminate and delete immediately.

-----Original Message-----
**From:** Dempsey, Jennifer [mailto:JDempsey@pogolaw.com]
**Sent:** Friday, February 22, 2008 1:30 PM
**To:** Jack Tranter; Tom Dame
**Cc:** Galanek, Chris
**Subject:** Triad matter

AIG has informed us that they will call us on Monday . I'll get back to you after they call on Monday.

NOTICE: This communication may contain privileged or other confidential informat

IRS CIRCULAR 230 Disclosure: Under U.S. Treasury regulations, we are required to

Thank you.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

3/2/2008

## Jack Tranter

**From:** Dempsey, Jennifer [JDempsey@pogolaw.com]
**Sent:** Friday, February 22, 2008 5:10 PM
**To:** Jack Tranter
**Cc:** Thomas E. Reilly (E-mail); Galanek, Chris
**Subject:** RE: Mariner/Brian Center's Retention of $2.0 million in Medicare Funds Improperly Paid From 12/28-4/18/07

Jack,

As we have informed you, the information you have provided re Triad's concerns has been passed along. We understand Mariner is assessing the situation. If I am alerted as to a position Mariner intends to take on this matter and am asked to convey it to you, I will convey it to you right away.

Please understand that this matter you have raised does not relate to the claims in the case for which we have been retained. We do not know if the client would have other counsel in any matter or issue seperate and apart from the matter currently before Judge Westmoreland.

Please feel free to contact me over the next week, as Chris is in trial, over any other concerns you have. Since he will be out of town, and in a trial, Chris will likely not be able to respond to any emails you send to him over the next week.

Thanks-
Jen Dempsey
Powell Goldstein, LLP
(404)572-6985

    -----Original Message-----
**From:** Jack Tranter [mailto:jtranter@GEJLAW.com]
**Sent:** Friday, February 22, 2008 4:54 PM
**To:** Dempsey, Jennifer
**Cc:** Thomas E. Reilly (E-mail)
**Subject:** Mariner/Brian Center's Retention of $2.0 million in Medicare Funds Improperly Paid From 12/28-4/18/07

    As I explained during our call today, it is imperative that we learn when Mariner will repay the Medicare funds that were improperly paid after Mariner/Brian Center stopped operating the facilities now leased and operated by Triad. Apart from criminal exposure under 18 USC Section 1035 and 1001, Mariner's decision to accept and retain these funds without advising CMS when the first payment was made on December 28, 2006 that it no longer operated these facilities is both inexplicable and shocking.

    I first brought this matter to your attention during our call on 2/13/08 and in my letter sent later than day. As I noted then, Triad only learned that Mariner had been paid almost $2.0 million for services not provided the day before. More than a week has passed and I have received no substantive reply. I mentioned this during our call this morning and in an email sent earlier today but neither you nor Chris has replied.

    Since Tom Riley represents Harry Grunstein, who owns Mariner, as well as Sava SeniorCare LLP, who we understand was providing administrative services for Mariner/Brian Center when these funds were received, I'm sending a copy of this email as well as my other correspondence to Tom.

    Needless to say, if this matter is not resolved by Mariner returning these funds or working out a repayment arrangement with CMS, we will have no choice but to take whatever action we deem necessary to make that occur.

*Jack C. Tranter, Esq.*
*Gallagher Evelius & Jones LLP*
*218 N. Charles Street, Suite 400*
*Baltimore, MD 21201*
*Direct Dial: 410-347-1370*
*Fax: 410-837-0454*

IRS CIRCULAR 230 NOTICE: Any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding federal tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email transmission may contain CONFIDENTIAL and PRIVILEGED information. If you are not the intended recipient, please notify the sender by email, do not disseminate and delete immediately.

-----Original Message-----
**From:** Dempsey, Jennifer [mailto:JDempsey@pogolaw.com]
**Sent:** Friday, February 22, 2008 1:30 PM
**To:** Jack Tranter; Tom Dame
**Cc:** Galanek, Chris
**Subject:** Triad matter

AIG has informed us that they will call us on Monday . I'll get back to you after they call on Monday.

NOTICE: This communication may contain privileged or other confidential informat

IRS CIRCULAR 230 Disclosure: Under U.S. Treasury regulations, we are required to

Thank you.

NOTICE: This communication may contain privileged or other confidential information. If yo

IRS CIRCULAR 230 Disclosure: Under U.S. Treasury regulations, we are required to inform yo

Thank you.

3/2/2008

# Jack Tranter

**From:**    Jack Tranter

**Sent:**    Friday, February 22, 2008 5:56 PM

**To:**    'Dempsey, Jennifer'

**Cc:**    Tom Dame; Thomas E. Reilly (E-mail); Christopher Galanek (E-mail)

**Subject:**    RE: Mariner/Brian Center's Retention of $2.0 million in Medicare Funds Improperly Paid From 12/28-4/18/07

Thank you for the prompt response. I guess it would be useful for Mariner to tell you and for you to tell me who I should speak to as counsel for Mariner on this matter. I recognize that this is unrelated to the litigation, but your firm is our connection to Mariner and we thought the best way to communicate our concerns was through you.

Candidly, there's little to assess. For more than a year, Mariner has been aware of the fact that the government sent $2.0 million (in ten separate payments over the period December 28, 2006 through mid-April 2007) that should not have been paid because no services were provided. I have no doubt that Boyd Gentry was aware of this when I deposed him in August and that this information was known by Mariner's accountants and the Sava staff who prepared the Medicare cost reports that were not filed. I also now know the reason that Mariner did not file those cost reports. Doing so would have disclosed Mariner's awareness that funds had been improperly paid and the government would have sought their return. Of course, Mariner personnel were aware that this would ultimately surface and that the government would attempt to recoup these funds from Triad. Once again, Mariner has taken yet another action designed to destroy Triad as a going concern.

The government's position on this is wrong, as this is not an overpayment that Triad is responsible for because these funds should not have been paid at all. If we have to litigate that issue with CMS we will. Regardless, Mariner/Brian Center has no basis for retaining funds that it should have returned to the gov't when the first check arrived in December 2006.

As noted in my earlier email, I will send my 2/13 letter and my correspondence with the fiscal intermediary to Tom Riley. Nonetheless, if you learn that this material should be addressed to another attorney please so advise me as soon as possible. In that regard, since this matter is unrelated to the litigation as you noted, I see no reason why Devin Ehrlich, Mariner's counsel cannot discuss this matter with me directly. However, when I mentioned speaking to Devin when I spoke with Chris and you on 12/13 Chris directed me not to do so. I will respect Chris's directive but since your email relates that your firm is not Mariner's counsel on this matter, I have difficulty understanding why I can't relate my concerns to Devin directly. I look forward to you advising me who will serve as Mariner's counsel in this matter.

*Jack C. Tranter, Esq.*
*Gallagher Evelius & Jones LLP*
*218 N. Charles Street, Suite 400*
*Baltimore, MD 21201*
*Direct Dial: 410-347-1370*
*Fax: 410-837-0454*

-----Original Message-----
**From:** Dempsey, Jennifer [mailto:JDempsey@pogolaw.com]
**Sent:** Friday, February 22, 2008 5:10 PM
**To:** Jack Tranter
**Cc:** Thomas E. Reilly (E-mail); Galanek, Chris
**Subject:** RE: Mariner/Brian Center's Retention of $2.0 million in Medicare Funds Improperly Paid From 12/28-4/18/07

Jack,

As we have informed you, the information you have provided re Triad's concerns has been passed along. We understand Mariner is assessing the situation. If I am alerted as to a position Mariner intends to take on this matter

and am asked to convey it to you, I will convey it to you right away.

Please understand that this matter you have raised does not relate to the claims in the case for which we have been retained. We do not know if the client would have other counsel in any matter or issue seperate and apart from the matter currently before Judge Westmoreland.

Please feel free to contact me over the next week, as Chris is in trial, over any other concerns you have. Since he will be out of town, and in a trial, Chris will likely not be able to respond to any emails you send to him over the next week.

Thanks-
Jen Dempsey
Powell Goldstein, LLP
(404)572-6985

-----Original Message-----
**From:** Jack Tranter [mailto:jtranter@GEJLAW.com]
**Sent:** Friday, February 22, 2008 4:54 PM
**To:** Dempsey, Jennifer
**Cc:** Thomas E. Reilly (E-mail)
**Subject:** Mariner/Brian Center's Retention of $2.0 million in Medicare Funds Improperly Paid From 12/28-4/18/07

As I explained during our call today, it is imperative that we learn when Mariner will repay the Medicare funds that were improperly paid after Mariner/Brian Center stopped operating the facilities now leased and operated by Triad. Apart from criminal exposure under 18 USC Section 1035 and 1001, Mariner's decision to accept and retain these funds without advising CMS when the first payment was made on December 28, 2006 that it no longer operated these facilities is both inexplicable and shocking.

I first brought this matter to your attention during our call on 2/13/08 and in my letter sent later than day. As I noted then, Triad only learned that Mariner had been paid almost $2.0 million for services not provided the day before. More than a week has passed and I have received no substantive reply. I mentioned this during our call this morning and in an email sent earlier today but neither you nor Chris has replied.

Since Tom Riley represents Harry Grunstein, who owns Mariner, as well as Sava SeniorCare LLP, who we understand was providing administrative services for Mariner/Brian Center when these funds were received, I'm sending a copy of this email as well as my other correspondence to Tom.

Needless to say, if this matter is not resolved by Mariner returning these funds or working out a repayment arrangement with CMS, we will have no choice but to take whatever action we deem necessary to make that occur.

*Jack C. Tranter, Esq.*
*Gallagher Evelius & Jones LLP*
*218 N. Charles Street, Suite 400*
*Baltimore, MD 21201*
*Direct Dial: 410-347-1370*
*Fax: 410-837-0454*

3/2/2008

IRS CIRCULAR 230 NOTICE: Any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding federal tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email transmission may contain CONFIDENTIAL and PRIVILEGED information.  If you are not the intended recipient, please notify the sender by email, do not disseminate and delete immediately.

-----Original Message-----
**From:** Dempsey, Jennifer [mailto:JDempsey@pogolaw.com]
**Sent:** Friday, February 22, 2008 1:30 PM
**To:** Jack Tranter; Tom Dame
**Cc:** Galanek, Chris
**Subject:** Triad matter

AIG has informed us that they will call us on Monday .  I'll get back to you after they call on Monday.

NOTICE: This communication may contain privileged or other confidential inf

IRS CIRCULAR 230 Disclosure: Under U.S. Treasury regulations, we are requir

Thank you.

NOTICE: This communication may contain privileged or other confidential information.

IRS CIRCULAR 230 Disclosure: Under U.S. Treasury regulations, we are required to info

Thank you.

## Jack Tranter

**From:** Reilly, Thomas E. [thomas.reilly@troutmansanders.com]
**Sent:** Friday, February 22, 2008 7:02 PM
**To:** Jack Tranter
**Subject:** Re: 2/15/08 Letter to BCBS of Ga.

Okay, thanks. Have a good weekend.

Thomas E. Reilly
Troutman Sanders LLP
Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
(404) 885-3256 (direct dial)
(404) 962-6664 (fax)

This e-mail and any files transmitted with it are confidential attorney-client communications or may otherwise be privileged or confidential and are intended solely for the individual or entity to whom they are addressed. If you are not the intended recipient, please do not read, copy or retransmit this communication but destroy it immediately. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited.

----- Original Message -----
From: Jack Tranter <jtranter@GEJLAW.com>
To: Reilly, Thomas E.
Sent: Fri Feb 22 18:47:37 2008
Subject: RE: 2/15/08 Letter to BCBS of Ga.

I can't find scanned copies of the exhibits to this letter and must leave. I'm sending a copy of this to my assistant, Cindy, to ask that she scan and send them to you on Monday.

Jack C. Tranter, Esq.
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201
Direct Dial: 410-347-1370
Fax: 410-837-0454

>
IRS CIRCULAR 230 NOTICE: Any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding federal tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email transmission may contain CONFIDENTIAL and PRIVILEGED information. If you are not the intended recipient, please notify the sender by email, do not disseminate and delete immediately.

> From:      Jack Tranter
> Sent: Friday, February 22, 2008 6:43 PM
> To:  Thomas E. Reilly (E-mail)
> Subject:    2/15/08 Letter to BCBS of Ga.
>
> << File: SCAN5774_000.pdf >> The exhibits are being sent in a separate. You probably should read my 2/13 letter to Chris Galanek first.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

# GALLAGHER
# EVELIUS & JONES LLP
ATTORNEYS AT LAW

JACK C. TRANTER
jtranter@gejlaw.com
direct dial: 410 347 1370
fax: 410 468 2786

February 15, 2008

*VIA FACSIMILE AND FEDERAL EXPRESS*

Ms. Laura Martin
Provider Reimbursement
Blue Cross and Blue Shield of Georgia
2357 Warm Springs Road
Columbus, Georgia 31904



PLAINTIFF'S
EXHIBIT
IZ

Re:   Provider #115427, Triad at Thomasville I, LLC; Provider #115413,
      Triad at Jeffersonville I, LLC; Provider #115354, Triad at LaGrange I, LLC;
      Provider #115404, Triad at Lumber City I, LLC; and Provider #115538,
      Triad at Powder Springs I, LLC

Dear Ms. Martin:

I write on behalf of Triad at Thomasville I, LLC, Triad at Jeffersonville I, LLC, Triad at La Grange I, LLC, Triad at Lumber City I, LLC and Triad at Powder Springs I, LLC (collectively "Triad") in response to your February 11, 2008 letters sent to all five Triad providers. As explained below, the refund requests you make involve Medicare PIP payments made by a Fiscal Intermediary, Mutual of Omaha, to Brian Nursing Care Center/Austell, Inc., the prior operator of these facilities, for services that Brian Center did not provide.

Specifically, PIP payments continued for several months after Triad notified CMS that Triad began operating these facilities on December 1, 2006. As these funds were mistakenly paid to the prior operator after Triad advised CMS that it began operating these facilities on December 1, 2006, Triad is not responsible for these funds and CMS may not seek reimbursement from Triad.

## BACKGROUND

On December 16, 2003, the owner of these five nursing homes in question advised Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc. (collectively "Mariner"), that the facilities had been leased to Triad. The owner directed Mariner to vacate so Triad could begin operating these nursing homes on January 1, 2004. Mariner refused to vacate the facilities as directed.

After several years of litigation, the Georgia courts determined that Mariner had no lawful basis for retaining possession. Reluctantly, Mariner delivered the facilities to Triad and Triad began operating these five nursing homes on December 1, 2006. A copy of an October 16, 2006 letter from Boyd P. Gentry, Executive Vice President and Chief Financial Officer, addressed to the owner of the facilities (William Foster) advised "Mariner Health Care, Inc. and

GALLAGHER

EVELIUS & JONES LLP

ATTORNEYS AT LAW

Ms. Laura Martin
February 15, 2008
Page 2

its subsidiaries ('Mariner') will surrender possession and operation of the Facilities ... on December 1, 2006." A copy of this letter was included with each of the five Medicare Enrollment Applications sent to Ms. Shannon Ray, Provider Enrollment, Blue Cross Blue Shield of Georgia. For convenience, a copy of Mr. Gentry's letter is enclosed as Exhibit 1.

## DISCUSSION

On December 1, 2006, Triad began operating the five nursing facilities previously leased and operated by Mariner. On November 30, 2006, the day before, Triad filed a Medicare Provider/Supplier Enrollment Application for each facility alerting CMS that Mariner no longer operated these facilities and asking that the Medicare Provider Agreement and number be assigned to the Triad entities listed above, effective December 1, 2006.

Triad later contacted BCBS of Georgia seeking information about issuance of the tie in notices. As a result of this telephone call, Triad learned that it had used the wrong application form. Triad filed new applications, using the correct form, on January 30, 2007. As before, Triad related that it began operating these facilities on December 1, 2006. In addition, the applications included the prior operator's name, the doing business name of the nursing facilities, the prior operator's NPI, the name of the prior operator's Fiscal Intermediary (Mutual), the prior operator's Medicare Information Number, the fact that Triad was "accepting assignment," and the "Effective Date of Transfer," i.e., 12/01/06. Relevant excerpts from the five applications are attached collectively as Exhibit 2.

Triad's filing of Medicare Enrollment Applications for the five facilities in question alerted the government that Mariner no longer operated these facilities and should have caused the PIP payments to Mariner to end. However, that did not occur. Instead, the government sent PIP payments to Mariner on December 27, 2006, January 10 and 24, February 7 and 21, March 7 and 21, and April 4, 2007 for service periods that did not occur until after Mariner surrendered the facilities to Triad on December 1, 2006. Inexplicably, Mariner accepted these payments and has retained almost $ 2.0 million in Medicare funds for services it did not provide. Needless to say, Mariner should have advised CMS that it should not have been paid these funds. Copies of worksheets identifying PIP payments improperly paid to and retained by Mariner are attached as Exhibit 3.

Triad discovered that PIP payments to Mariner had continued after December 1, 2006, when it received your February 11 Notices of Tentative Desk Review of Triad's Medicare Cost Reports. Triad's principals contacted me immediately and I contacted Mariner's counsel relating that PIP payments had been paid to Mariner for services that had not been performed. I asked

# 349295 JCT
011397-0015

# GALLAGHER
# EVELIUS &JONES LLP
ATTORNEYS AT LAW

Ms. Laura Martin
February 15, 2008
Page 3

that these funds be repaid as soon as possible. A copy of my letter to Mariner's counsel is attached as Exhibit 4.

## CONCLUSION

As explained above, Medicare PIP payments to Mariner continued after Triad filed its Medicare Enrollment Applications advising that Mariner stopped providing care to Medicare recipients on November 30, 2006. We have no idea why PIP payments to Mariner continued for service periods that did not even begin until after Mariner was no longer operating these facilities. In our view, CMS must obtain these improperly paid funds from Mariner. It may not seek reimbursement from Triad for PIP payments that were erroneously made to the prior operator.

We are anxious to resolve the matter in an expeditious and amicable manner and are available to discuss this unfortunate situation either by phone or in person at your convenience. Of course, if you need any additional information, please contact me at your convenience.

Finally, please be aware that I am sending a copy of this letter to Mariner's counsel, whose names appear on the letter attached as Exhibit 4.

Very truly yours,

Jack C. Tranter

JCT/cmc
Enclosures

cc:     Adam Ashpes
        Ronald M. Herbert, Jr.
        Thomas C. Dame, Esq.
        Christopher P. Galanek, Esq.
        Jennifer B. Dempsey, Esq.

Jack Tranter

From:        rherbert@triadhealth.com
Sent:        Tuesday, February 19, 2008 4:02 PM
To:          Jack Tranter
Cc:          Adam Ashpes
Subject:     Fw: Triad Facilities - overpayments


Sent from my BlackBerry® wireless handheld

-----Original Message-----
From: "Ludwig, Sandra" <Sandra.Ludwig@bcbsga.com>

Date: Tue, 19 Feb 2008 13:52:16
To:<rherbert@triadhealth.com>
Cc:"Smoot, Donna" <dsmoot@bcbsga.com>,"Ronald L. Smith (CMS/SC) (E-mail)"
<Ronald.Smith@cms.hhs.gov>,"Ludwig, Sandra" <Sandra.Ludwig@bcbsga.com>
Subject: Triad Facilities - overpayments


Mr. Herbert,

Per our discussion earlier, I've cut and pasted below an excerpt from the CMS Publication
100-08, Chapter 10, Section 11.1B, regarding a Fiscal Intermediary's inability to change a
provider's EFT payment method during a CHOW.  Based on this excerpt Mutual would have had
no other choice than to continue paying the PIP payments to your five facilities by way of
the established EFT method, which we now know was related to the bank account of the old
owner's of the these facilities. The tie-out notices from CMS were dated April 12, 2007,
and the PIP payments were discontinued by Mutual as of May 2, 2007, immediately upon
Mutual's receipt of the tie-out notice.

CMS has reiterated that payment arrangements between old and new owners, in a CHOW
situation, is strictly a civil matter.  The acceptance of the existing provider agreement
by the new owner indicates to CMS that the owners will work amongst themselves to resolve
any issues relating to payments being issued to the incorrect party while the CHOW is in
process.

    B. Payments During CHOWs
    In a CHOW, the intermediary shall continue to pay the old owner until it receives
the tie-in notice from the RO. Hence, any request from the old or new owner to change the
EFT   account to that of the new owner shall be denied. It is ultimately the
responsibility of the old and new owners to work out any payment arrangements between them
while the CHOW is        being processed by the intermediary and the RO.

You may access CMS Publication 100-08, the Medicare Program Integrity Manual, from which
the above statement was extracted, at
http://www.cms.hhs.gov/manuals/downloads/pim83c10.pdf.

Please let me know if you have additional questions, or if I can assist you further.

Thank you,

Sandra Ludwig
BCBS GA
Accountant Senior

Provider Audit & Reimbursement
(706) 257-1073 phone
(706) 257-1082 fax
sandra.ludwig@bcbsga.com

This e-mail message is for the sole use of the above named and/or intended recipient(s)
only and may contain confidential information.  If you are not an intended recipient,

**Jack Tranter**

| | |
|---|---|
| **From:** | Ludwig, Sandra [Sandra.Ludwig@bcbsga.com] |
| **Sent:** | Thursday, February 21, 2008 4:19 PM |
| **To:** | rherbert@triadhealth.com; Jack Tranter |
| **Cc:** | Smoot, Donna; Ronald L. Smith (CMS/SC) (E-mail); Ludwig, Sandra; Renee L. Brown (CMS) (E-mail); Cindy Clark |
| **Subject:** | RE: Triad Senior Living Services |

Mr. Tranter,

I have spoken with the CMS Office of Financial Management once again regarding the letter and exhibits I received from you today by way of fax and email. I explained to CMS your intention to seek judicial intervention and assistance should we begin withholding interim payments on the Triad overpayments effective February 26, as we indicated in our First Demand Letters. CMS stands firm that, regardless of the conditions contributing to or resulting in an overpayment, the repayment of any debt owed to the Medicare program is the sole responsibility of the owner(s) of the provider agreement relating to the debt at the time the overpayment is determined.

There is no question that the PIP payments issued by Mutual to the five facilities were issued after a change of ownership occurred. However, the fact remains that Triad retained the provider agreements after the CHOW from Mariner; thus, Triad is viewed as the only responsible party in repayment of the debts in question, regardless of which bank account the amounts were deposited into or the cause of the overpayments. CMS has no authority to attempt to collect these debts from Mariner. Once a provider agreement is transferred, the liability for any debt incurred on the related provider number, regardless of the age or origin of the debt, is assumed by the new owner(s). If indeed funds paid by Mutual in 2007 were received by Mariner, you should pursue reimbursement from Mariner based on the terms of your sales agreement. Should Mariner wish to repay CMS directly, please provide them the payment address indicated in each of the five Triad demand letters. In the interim, however, collection efforts will continue as indicated in our demand letters, including withholding from Triad's interim payments effective February 26, 2008.

Please contact me should you need further assistance.

Thank you,


Sandra Ludwig
BCBS GA
Accountant Senior
Provider Audit & Reimbursement
(706) 257-1073 phone
(706) 257-1082 fax
sandra.ludwig@bcbsga.com

This e-mail message is for the sole use of the above named and/or intended recipient(s) only and may contain confidential information. If you are not an intended recipient, please notify the sender of the miscommunication and delete the message. Failure to maintain the confidentiality of this e-mail and any attachment may subject you to penalties under applicable law.


-----Original Message-----
From: Cindy Clark [mailto:CClark@GEJLAW.com]
Sent: Thursday, February 21, 2008 11:37 AM
To: Ludwig, Sandra
Subject: FW: Triad Senior Living Services

# GALLAGHER
# EVELIUS & JONES LLP
ATTORNEYS AT LAW

JACK C. TRANTER
jtranter@gejlaw.com
direct dial: 410 347 1370
fax: 410 468 2786

February 21, 2008

*VIA FACSIMILE AND EMAIL*

Ms. Sandra Ludwig
Provider Audit and Reimbursement
Blue Cross and Blue Shield of Georgia
2357 Warm Springs Road
Columbus, Georgia 31904

> Re:   Provider #115427, Triad at Thomasville I, LLC; Provider #115413,
> Triad at Jeffersonville I, LLC; Provider #115354, Triad at LaGrange I, LLC;
> Provider #115404, Triad at Lumber City I, LLC; and Provider #115538,
> Triad at Powder Springs I, LLC

Dear Ms. Ludwig:

I write in response to the email message you sent to Ronald Herbert, Chief Operating Officer, Triad Senior Living Services, LLC ("Triad") on February 19, 2008 at 4:02 p.m. For convenience, a copy is attached as Exhibit 1.

Your email, presumably sent in response to my February 15th letter to Ms. Laura Martin (*see* Exhibit 2), asserts that a Fiscal Intermediary may not "change a provider's EFT payment method during a CHOW." As support for this claim, you cite CMS Publication 100-08, the Medicare Program Integrity Manual, asserting that "payment arrangements between old and new owners, in a CHOW situation, is strictly a civil matter." However, as explained below, the obligation to stop making PIP payments to Mariner is unrelated to the CHOW, as PIP payments to Mariner should have ended when Mariner stopped submitting claims because it was no longer providing care. This situation does not involve a change in a method of payment or a "payment arrangement[ ] between old and new owners." Rather, this situation involves approximately $2.0 million in Medicare funds paid to Mariner that <u>should</u> <u>not</u> have been paid at all.

42 CFR § 413.350 provides that a SNF receiving payment under the prospective payment system may receive periodic interim payments ("PIP") for Part A services if qualifying criteria set forth in Section 413.64(h) are met. Section 413.350 explicitly provides that "an intermediary must terminate PIP payments" if the SNF no longer meets the requirement of Section 413.64(h).

In describing a fiscal intermediary's monitoring function under the PIP program, Section 413.64(h)(7) provides:

> A significant factor in evaluating the amount of the payment in
> terms of the realization of the projected Medicare utilization of
> services is the timely submittal to the intermediary of completed

# GALLAGHER
# EVELIUS &JONES LLP
## ATTORNEYS AT LAW

Ms. Sandra Ludwig
February 21, 2008
Page 2

admissions and billing forms.  All providers must complete billings
in detail under this method as under regular interim payment
procedures.

To obtain Medicare reimbursement under the PIP payment system, a provider must
submit detailed billing requests to the intermediary.  Mariner presumably discontinued doing so
when it stopped providing service to Medicare beneficiaries on November 30, 2006.  Because
bills were not submitted and pursuant to its monitoring function, the fiscal intermediary in this
case, Mutual of Omaha, should not have issued PIP payments for ten service periods when no
services were provided, as occurred here, because Mariner did not submit bills seeking
reimbursement for services provided during any of those time periods.[1]  Indeed, as Mariner was
no longer providing care to Medicare recipients, it no longer met the qualifying criteria for
payment under the PIP methodology.  *See* Section 413.64(h)(3) and (5).  Simply stated, CMS
cannot seek reimbursement from Triad for PIP payments that Mutual of Omaha improperly and
erroneously paid to Mariner.  Since those payments were inadvertently paid to Mariner for
services that Mariner did not provide, CMS must seek reimbursement from Mariner.  It may not,
under the circumstance here, recoup those funds by reducing reimbursement to Triad for services
actually provided to Medicare beneficiaries.

The interpretation set forth above is supported by Section 80.4 of the Medicare Claim
Processing Manual.  For convenience, a copy is attached as Exhibit 4.  As noted there, "To
remain on PIP, providers ... must submit 85 percent of their bills timely and accurately."  That,
obviously, did not happen here because Mariner submitted no bills for the ten service periods in
question.

In sum, Mutual of Omaha improperly continued making PIP payments to Mariner after
Mariner stopped providing service to Medicare beneficiaries on November 30, 2006.  Payments
should not have been made beginning on December 27, 2006 and continuing at biweekly
intervals through May 2, 2007, as no bills were submitted seeking reimbursement during that
period.

Under these circumstances, we respectfully submit that CMS should seek reimbursement
from Mariner, as Mariner is not entitled to retain funds paid for services not performed.  In my

---

[1] As related in Exhibit 3, the service periods are 12/1-13/06, 12/14-27/06, 12/28/06 – 1/10/07, 1/11-24/07,
1/25-2/7/07, 2/8-21/07, 2/22–3/7/07, 3/8-21/07 and 3/22-4/4/07, and 4/5-18/07.

# 349506 JCT
011397-0015

GALLAGHER

EVELIUS & JONES LLP

ATTORNEYS AT LAW

Ms. Sandra Ludwig
February 21, 2008
Page 3

earlier letter, I identified Mariner counsel and suggested that CMS contact Mariner directly and make arrangements to be repaid. A copy of the letter I sent to Mariner's counsel is enclosed as Exhibit 5. I again suggest that someone contact those individuals and make arrangements to have the funds that were improperly paid returned.

The five Notices of Desk Review sent to Triad (Provider #s 115354, 115413, 115538, 115404 and 115427) directed Triad to pay to CMS the funds improperly paid to Mariner ($ 1,982,600) no later than February 25, 2008, relating, "payments will be withheld until payment in full is received or an extended repayment request is received." Those letters advised that Triad could notify CMS if it believed that payments should not be withheld. However, the letters also advised that doing so "will not delay recoupment."

Under the circumstances described above, we respectfully request that "recoupment" not occur beginning on February 26, 2008, because Triad is not obligated to repay funds that should not have been paid to Mariner. If CMS is not agreeable to defer recoupment, Triad will have no recourse but to seek judicial intervention and assistance in light of the devastating effect recouping $2.0 million will have on Triad's ability to continue operating these five nursing facilities.

If you or your counsel would like to discuss this matter please call at your earliest convenience.

Very truly yours,

Jack C. Tranter

JCT/cmc
Enclosures

cc:    Adam Ashpes
       Ronald M. Herbert, Jr.
       Patrick Trotta, CPA
       Thomas C. Dame, Esq.
       Anne B. Fox, Esq.

# 349506 JCT
011397-0015

*EXHIBIT 1*

**Jack Tranter**

| | |
|---|---|
| From: | rherbert@triadhealth.com |
| Sent: | Tuesday, February 19, 2008 4:02 PM |
| To: | Jack Tranter |
| Cc: | Adam Ashpes |
| Subject: | Fw: Triad Facilities - overpayments |

Sent from my BlackBerry® wireless handheld

-----Original Message-----
From: "Ludwig, Sandra" <Sandra.Ludwig@bcbsga.com>

Date: Tue, 19 Feb 2008 13:52:16
To:<rherbert@triadhealth.com>
Cc:"Smoot, Donna" <dsmoot@bcbsga.com>,"Ronald L. Smith (CMS/SC) (E-mail)"
<Ronald.Smith@cms.hhs.gov>,"Ludwig, Sandra" <Sandra.Ludwig@bcbsga.com>
Subject: Triad Facilities - overpayments

Mr. Herbert,

Per our discussion earlier, I've cut and pasted below an excerpt from the CMS Publication
100-08, Chapter 10, Section 11.1B, regarding a Fiscal Intermediary's inability to change a
provider's EFT payment method during a CHOW.  Based on this excerpt Mutual would have had
no other choice than to continue paying the PIP payments to your five facilities by way of
the established EFT method, which we now know was related to the bank account of the old
owner's of the these facilities. The tie-out notices from CMS were dated April 12, 2007,
and the PIP payments were discontinued by Mutual as of May 2, 2007, immediately upon
Mutual's receipt of the tie-out notice.

CMS has reiterated that payment arrangements between old and new owners, in a CHOW
situation, is strictly a civil matter.  The acceptance of the existing provider agreement
by the new owner indicates to CMS that the owners will work amongst themselves to resolve
any issues relating to payments being issued to the incorrect party while the CHOW is in
process.

     B. Payments During CHOWs
     In a CHOW, the intermediary shall continue to pay the old owner until it receives
the tie-in notice from the RO. Hence, any request from the old or new owner to change the
EFT   account to that of the new owner shall be denied. It is ultimately the
responsibility of the old and new owners to work out any payment arrangements between them
while the CHOW is     being processed by the intermediary and the RO.

You may access CMS Publication 100-08, the Medicare Program Integrity Manual, from which
the above statement was extracted, at
http://www.cms.hhs.gov/manuals/downloads/pim83c10.pdf.

Please let me know if you have additional questions, or if I can assist you further.

Thank you,

Sandra Ludwig
BCBS GA
Accountant Senior

Provider Audit & Reimbursement
(706) 257-1073 phone
(706) 257-1082 fax
sandra.ludwig@bcbsga.com

This e-mail message is for the sole use of the above named and/or intended recipient(s)
only and may contain confidential information. If you are not an intended recipient,

1

*EXHIBIT 2*

# GALLAGHER

# EVELIUS & JONES LLP

ATTORNEYS AT LAW

JACK C. TRANTER
jtranter@gejlaw.com
direct dial: 410 347 1370
fax: 410 468 2786

February 15, 2008

*VIA FACSIMILE AND FEDERAL EXPRESS*

Ms. Laura Martin
Provider Reimbursement
Blue Cross and Blue Shield of Georgia
2357 Warm Springs Road
Columbus, Georgia 31904

Re:   Provider #115427, Triad at Thomasville I, LLC; Provider #115413,
      Triad at Jeffersonville I, LLC; Provider #115354, Triad at LaGrange I, LLC;
      Provider #115404, Triad at Lumber City I, LLC; and Provider #115538,
      Triad at Powder Springs I, LLC

Dear Ms. Martin:

I write on behalf of Triad at Thomasville I, LLC, Triad at Jeffersonville I, LLC, Triad at La Grange I, LLC, Triad at Lumber City I, LLC and Triad at Powder Springs I, LLC (collectively "Triad") in response to your February 11, 2008 letters sent to all five Triad providers. As explained below, the refund requests you make involve Medicare PIP payments made by a Fiscal Intermediary, Mutual of Omaha, to Brian Nursing Care Center/Austell, Inc., the prior operator of these facilities, for services that Brian Center did not provide.

Specifically, PIP payments continued for several months after Triad notified CMS that Triad began operating these facilities on December 1, 2006. As these funds were mistakenly paid to the prior operator after Triad advised CMS that it began operating these facilities on December 1, 2006, Triad is not responsible for these funds and CMS may not seek reimbursement from Triad.

## BACKGROUND

On December 16, 2003, the owner of these five nursing homes in question advised Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc. (collectively "Mariner"), that the facilities had been leased to Triad. The owner directed Mariner to vacate so Triad could begin operating these nursing homes on January 1, 2004. Mariner refused to vacate the facilities as directed.

After several years of litigation, the Georgia courts determined that Mariner had no lawful basis for retaining possession. Reluctantly, Mariner delivered the facilities to Triad and Triad began operating these five nursing homes on December 1, 2006. A copy of an October 16, 2006 letter from Boyd P. Gentry, Executive Vice President and Chief Financial Officer, addressed to the owner of the facilities (William Foster) advised "Mariner Health Care, Inc. and

GALLAGHER
EVELIUS & JONES LLP
ATTORNEYS AT LAW

Ms. Laura Martin
February 15, 2008
Page 2

its subsidiaries ('Mariner') will surrender possession and operation of the Facilities ... on December 1, 2006." A copy of this letter was included with each of the five Medicare Enrollment Applications sent to Ms. Shannon Ray, Provider Enrollment, Blue Cross Blue Shield of Georgia. For convenience, a copy of Mr. Gentry's letter is enclosed as Exhibit 1.

### DISCUSSION

On December 1, 2006, Triad began operating the five nursing facilities previously leased and operated by Mariner. On November 30, 2006, the day before, Triad filed a Medicare Provider/Supplier Enrollment Application for each facility alerting CMS that Mariner no longer operated these facilities and asking that the Medicare Provider Agreement and number be assigned to the Triad entities listed above, effective December 1, 2006.

Triad later contacted BCBS of Georgia seeking information about issuance of the tie in notices. As a result of this telephone call, Triad learned that it had used the wrong application form. Triad filed new applications, using the correct form, on January 30, 2007. As before, Triad related that it began operating these facilities on December 1, 2006. In addition, the applications included the prior operator's name, the doing business name of the nursing facilities, the prior operator's NPI, the name of the prior operator's Fiscal Intermediary (Mutual), the prior operator's Medicare Information Number, the fact that Triad was "accepting assignment," and the "Effective Date of Transfer," i.e., 12/01/06. Relevant excerpts from the five applications are attached collectively as Exhibit 2.

Triad's filing of Medicare Enrollment Applications for the five facilities in question alerted the government that Mariner no longer operated these facilities and should have caused the PIP payments to Mariner to end. However, that did not occur. Instead, the government sent PIP payments to Mariner on December 27, 2006, January 10 and 24, February 7 and 21, March 7 and 21, and April 4, 2007 for service periods that did not occur until after Mariner surrendered the facilities to Triad on December 1, 2006. Inexplicably, Mariner accepted these payments and has retained almost $ 2.0 million in Medicare funds for services it did not provide. Needless to say, Mariner should have advised CMS that it should not have been paid these funds. Copies of worksheets identifying PIP payments improperly paid to and retained by Mariner are attached as Exhibit 3.

Triad discovered that PIP payments to Mariner had continued after December 1, 2006, when it received your February 11 Notices of Tentative Desk Review of Triad's Medicare Cost Reports. Triad's principals contacted me immediately and I contacted Mariner's counsel relating that PIP payments had been paid to Mariner for services that had not been performed. I asked

GALLAGHER

EVELIUS & JONES LLP

ATTORNEYS AT LAW

Ms. Laura Martin
February 15, 2008
Page 3

that these funds be repaid as soon as possible. A copy of my letter to Mariner's counsel is attached as Exhibit 4.

### CONCLUSION

As explained above, Medicare PIP payments to Mariner continued after Triad filed its Medicare Enrollment Applications advising that Mariner stopped providing care to Medicare recipients on November 30, 2006. We have no idea why PIP payments to Mariner continued for service periods that did not even begin until after Mariner was no longer operating these facilities. In our view, CMS must obtain these improperly paid funds from Mariner. It may not seek reimbursement from Triad for PIP payments that were erroneously made to the prior operator.

We are anxious to resolve the matter in an expeditious and amicable manner and are available to discuss this unfortunate situation either by phone or in person at your convenience. Of course, if you need any additional information, please contact me at your convenience.

Finally, please be aware that I am sending a copy of this letter to Mariner's counsel, whose names appear on the letter attached as Exhibit 4.

Very truly yours,

Jack C. Tranter

JCT/cmc
Enclosures

cc:    Adam Ashpes
        Ronald M. Herbert, Jr.
        Thomas C. Dame, Esq.
        Christopher P. Galanek, Esq.
        Jennifer B. Dempsey, Esq.

# 349295 JCT
011397-0015

*EXHIBIT 3*

| | | | |
|---|---|---|---|
| JEFF | → | 246,600 | ⟨24,700⟩ | 221,900 |
| TROM | → | 218,200 | ⟨24,300⟩ | 193,900 |
| POND | → | 946,700 | (105,300) | 841,400 |
| LAGR | → | 391,800 | ⟨43,600⟩ | 348,200 |
| LUMB | — | 424,400 | ⟨47,200⟩ | 377,200 |
| | | 2,227,700 | ⟨245,100⟩ | 1,982,600 |

SNF Part A - Detail Schedule

Provider:  Brian Ctr~Jeffersonville
Provider #: 11-5413
FYE:       11/30/2007

Section 1

| SERVICE PERIOD | | | | | PRIMARY APPL PYMT | RETRO | PER DIEM LESS RETRO | | TOTAL LP |
|---|---|---|---|---|---|---|---|---|---|
| 12/01/06 | to | 12/13/06 | 12/27/06 | 13 | $ 33,800 | | $ 600 | | $ (61,800) |
| 12/14/06 | to | 12/27/06 | 01/10/07 | 14 | $ 36,400 | | $ 600 | | 37,000 |
| 12/28/06 | to | 01/10/07 | 01/24/07 | 14 | $ 36,400 | | $ 600 | | 37,000 |
| 01/11/07 | to | 01/24/07 | 02/07/07 | 14 | $ 36,400 | | $ 600 | | 37,000 |
| 01/25/07 | to | 02/07/07 | 02/21/07 | 14 | $ 36,400 | | $ 600 | | 37,000 |
| 02/08/07 | to | 02/21/07 | 03/07/07 | 14 | $ 36,400 | | $ 600 | | 37,000 |
| 02/22/07 | to | 03/07/07 | 03/21/07 | 14 | $ 36,400 | | $ 600 | | 37,000 |
| 03/08/07 | to | 03/21/07 | 04/04/07 | 14 | $ 36,400 | | $ 600 | | 37,000 |
| 03/22/07 | to | 04/04/07 | 04/18/07 | 14 | $ 24,100 | | $ 600 | | 24,700 |
| 04/05/07 | to | 04/18/07 | 05/02/07 | 14 | $ 24,100 | | $ 600 | | 24,700 |
| 04/19/07 | to | 05/02/07 | 05/16/07 | 14 | $ - | | $ - | | - |
| 05/03/07 | to | 05/16/07 | 05/30/07 | 14 | $ - | | $ - | | - |
| 05/17/07 | to | 05/30/07 | 06/13/07 | 14 | $ - | | $ - | | - |
| 05/31/07 | to | 06/13/07 | 06/27/07 | 14 | $ - | | $ - | | - |
| 06/14/07 | to | 06/27/07 | 07/11/07 | 14 | $ - | | $ - | | - |
| 06/28/07 | to | 07/11/07 | 07/25/07 | 14 | $ - | | $ - | | - |
| 07/12/07 | to | 07/25/07 | 08/08/07 | 14 | $ - | | $ - | | - |
| 07/26/07 | to | 08/08/07 | 08/22/07 | 14 | $ - | | $ - | | - |
| 08/09/07 | to | 08/22/07 | 09/05/07 | 14 | $ - | | $ - | | - |
| 08/23/07 | to | 09/05/07 | 09/19/07 | 14 | $ - | | $ - | | - |
| 09/06/07 | to | 09/19/07 | 10/03/07 | 14 | $ - | | $ - | | - |
| 09/20/07 | to | 10/03/07 | 10/17/07 | 14 | $ - | | $ - | | - |
| 10/04/07 | to | 10/17/07 | 10/31/07 | 14 | $ - | | $ - | | - |
| 10/18/07 | to | 10/31/07 | 11/14/07 | 14 | $ - | | $ - | | - |
| 11/01/07 | to | 11/14/07 | 11/28/07 | 14 | $ - | | $ - | | - |
| 11/15/07 | to | 11/28/07 | 12/12/07 | 14 | $ - | | $ - | | - |
| 11/29/07 | to | 11/30/07 | 12/26/07 | 2 | $ - | | $ - | | - |
| | to | | | | $ - | | $ - | | - |
| | Totals = | | | | $ 336,800 | $ (96,200) | $ 6,000 | - | $ 246,600 |

*Recrd B
Triad~

Section 2    List all Non-LP Retros

|  Date Issued  |  Retros  |
|---|---|

Auditor:  Connie Wu                    Date:  10/19/07

Reviewer: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓         Date: ▓▓▓▓▓▓▓▓▓▓▓▓▓

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

10/19/2007

SNF Part A - Detail Schedule

Provider:  Brian Cn-Thomasville
Provider #:  11-5427
FYE:  11/30/2007

### Section 1

| SERVICE PERIOD | DATE PAID | DATE | DAYS | TOTAL PC PAYMENT | PIP PAYMENT RECVD | PIP RETRO OWED | TOTAL PIP PAYMENT | PIP WITHHOLD CURR CYCLE | RETRO PAYMENT | TOTAL PAYMENT |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/06 to 12/13/06 | 12/27/06 | 13 | | $ | $ 22,700 | $ (26,600) | | $ 3,300 | $ (100) | $ (1,400) |
| 12/14/06 to 12/27/06 | 01/10/07 | 14 | | $ | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 12/28/06 to 01/10/07 | 01/24/07 | 14 | | $ | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 01/11/07 to 01/24/07 | 02/07/07 | 14 | | $ | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 01/25/07 to 02/07/07 | 02/21/07 | 14 | | $ | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 02/08/07 to 02/21/07 | 03/07/07 | 14 | | $ | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 02/22/07 to 03/07/07 | 03/21/07 | 14 | | $ | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 03/08/07 to 03/21/07 | 04/04/07 | 14 | | $ | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 03/22/07 to 04/04/07 | 04/18/07 | 14 | | $ | $ 20,900 | | | $ 3,400 | | $ 24,300 |
| 04/05/07 to 04/18/07 | 05/02/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 04/19/07 to 05/02/07 | 05/16/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 05/03/07 to 05/16/07 | 05/30/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 05/17/07 to 05/30/07 | 06/13/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 05/31/07 to 06/13/07 | 06/27/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 06/14/07 to 06/27/07 | 07/11/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 06/28/07 to 07/11/07 | 07/25/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 07/12/07 to 07/25/07 | 08/08/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 07/26/07 to 08/08/07 | 08/22/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 08/09/07 to 08/22/07 | 09/05/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 08/23/07 to 09/05/07 | 09/19/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 09/06/07 to 09/19/07 | 10/03/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 09/20/07 to 10/03/07 | 10/17/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 10/04/07 to 10/17/07 | 10/31/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 10/18/07 to 10/31/07 | 11/14/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 11/01/07 to 11/14/07 | 11/28/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 11/15/07 to 11/28/07 | 12/12/07 | 14 | | $ | $ - | | | $ - | | $ - |
| 11/29/07 to 11/30/07 | 12/26/07 | 2 | | $ | $ - | | | $ - | | $ - |
| to | | | | $ | | | | $ | | $ |
| **Totals =** | | | | $ 214,400 | $ (26,600) | | | $ 31,200 | $ (800) | 218,200 |

*Recvd B*
*Triad*

### Section 2    List all Non-LP Retros

Date issued            Retros

Auditor:  Connie Wu                    Date:  10/19/07

Reviewer:                              Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

10/19/2007

SNF Part A - Detail Schedule

Provider:     Brian Ctr-Powder Springs
Provider #:   11-5538
FYE:          11/30/2007

Section 1

| SERVICE PERIOD | | DATE | | | | PD RETRO | | | RETRO | TOTAL PMT |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/06 to | 12/13/06 | 12/27/06 | 13 | | $ 103,000 | | $ 2,100 | | $ | 49,000 |
| 12/14/06 to | 12/27/06 | 01/10/07 | 14 | | $ 110,900 | | $ 2,300 | | $ | 113,200 |
| 12/28/06 to | 01/10/07 | 01/24/07 | 14 | | $ 110,900 | | $ 2,300 | | $ | 113,200 |
| 01/11/07 to | 01/24/07 | 02/07/07 | 14 | | $ 110,900 | | $ 2,300 | | $ | 113,200 |
| 01/25/07 to | 02/07/07 | 02/21/07 | 14 | | $ 110,900 | | $ 2,300 | | $ | 113,200 |
| 02/08/07 to | 02/21/07 | 03/07/07 | 14 | | $ 110,900 | | $ 2,300 | | $ | 113,200 |
| 02/22/07 to | 03/07/07 | 03/21/07 | 14 | | $ 110,900 | | $ 2,300 | | $ | 113,200 |
| 03/08/07 to | 03/21/07 | 04/04/07 | 14 | | $ 110,900 | | $ 2,300 | | $ | 113,200 |
| 03/22/07 to | 04/04/07 | 04/18/07 | 14 | | $ 103,000 | | $ 2,300 | | $ | 105,300 |
| 04/05/07 to | 04/18/07 | 05/02/07 | 14 | | $ - | | $ - | | $ | - |
| 04/19/07 to | 05/02/07 | 05/16/07 | 14 | | $ - | | $ - | | $ | - |
| 05/03/07 to | 05/16/07 | 05/30/07 | 14 | | $ - | | $ - | | $ | - |
| 05/17/07 to | 05/30/07 | 06/13/07 | 14 | | $ - | | $ - | | $ | - |
| 05/31/07 to | 06/13/07 | 06/27/07 | 14 | | $ - | | $ - | | $ | - |
| 06/14/07 to | 06/27/07 | 07/11/07 | 14 | | $ - | | $ - | | $ | - |
| 06/28/07 to | 07/11/07 | 07/25/07 | 14 | | $ - | | $ - | | $ | - |
| 07/12/07 to | 07/25/07 | 08/08/07 | 14 | | $ - | | $ - | | $ | - |
| 07/26/07 to | 08/08/07 | 08/22/07 | 14 | | $ - | | $ - | | $ | - |
| 08/09/07 to | 08/22/07 | 09/05/07 | 14 | | $ - | | $ - | | $ | - |
| 08/23/07 to | 09/05/07 | 09/19/07 | 14 | | $ - | | $ - | | $ | - |
| 09/06/07 to | 09/19/07 | 10/03/07 | 14 | | $ - | | $ - | | $ | - |
| 09/20/07 to | 10/03/07 | 10/17/07 | 14 | | $ - | | $ - | | $ | - |
| 10/04/07 to | 10/17/07 | 10/31/07 | 14 | | $ - | | $ - | | $ | - |
| 10/18/07 to | 10/31/07 | 11/14/07 | 14 | | $ - | | $ - | | $ | - |
| 11/01/07 to | 11/14/07 | 11/28/07 | 14 | | $ - | | $ - | | $ | - |
| 11/15/07 to | 11/28/07 | 12/12/07 | 14 | | $ - | | $ - | | $ | - |
| 11/29/07 to | 11/30/07 | 12/26/07 | 2 | | $ - | | $ - | | $ | - |
| to | | | | | $ - | | $ - | | $ | - |
| Totals = | | | | $ 982,300 | $ (56,100) | | $ 20,500 | $ - | $ | 946,700 |

*Recv'd By Triad*

Section 2     List all Non-LP Retros

| Date issued | | | Retros | |
|---|---|---|---|---|

Auditor:   Connie Wu                Date:   10/19/07

Reviewer:  [illegible]              Date:   [illegible]

Please complete the Date the review was completed and who completed it before saving file to the w drive

10/19/2007

SNF Part A - Detail Schedule

Provider:  Brian Center Nrsg-Lagrange
Provider #:  11-5354
FYE:  11/30/2007

### Section 1

| SERVICE PERIOD | | DATE PAID | | | INTERIM PYMT/ACOMPT | | FINAL PYMT/ADJMT | RETRO LBL/WITHHD/AMT | TOTAL PYMT |
|---|---|---|---|---|---|---|---|---|---|
| 12/01/06 | to | 12/13/06 | 12/27/06 | 13 | $ | 43,700 | | $ 3,800 | $ (10,200) |
| 12/14/06 | to | 12/27/06 | 01/10/07 | 14 | $ | 47,100 | | $ 4,100 | $ 51,200 |
| 12/28/06 | to | 01/10/07 | 01/24/07 | 14 | $ | 47,100 | | $ 4,100 | $ 51,200 |
| 01/11/07 | to | 01/24/07 | 02/07/07 | 14 | $ | 47,100 | | $ 4,100 | $ 51,200 |
| 01/25/07 | to | 02/07/07 | 02/21/07 | 14 | $ | 47,100 | | $ 4,100 | $ 51,200 |
| 02/08/07 | to | 02/21/07 | 03/07/07 | 14 | $ | 47,100 | | $ 4,100 | $ 51,200 |
| 02/22/07 | to | 03/07/07 | 03/21/07 | 14 | $ | 47,100 | | $ 4,100 | $ 51,200 |
| 03/08/07 | to | 03/21/07 | 04/04/07 | 14 | $ | 47,100 | | $ 4,100 | $ 51,200 |
| 03/22/07 | to | 04/04/07 | 04/18/07 | 14 | $ | 39,500 | | $ 4,100 | $ 43,600 * |
| 04/05/07 | to | 04/18/07 | 05/02/07 | 14 | $ | - | | $ - | $ - |
| 04/19/07 | to | 05/02/07 | 05/16/07 | 14 | $ | - | | $ - | $ - |
| 05/03/07 | to | 05/16/07 | 05/30/07 | 14 | $ | - | | $ - | $ - |
| 05/17/07 | to | 05/30/07 | 06/13/07 | 14 | $ | - | | $ - | $ - |
| 05/31/07 | to | 06/13/07 | 06/27/07 | 14 | $ | - | | $ - | $ - |
| 06/14/07 | to | 06/27/07 | 07/11/07 | 14 | $ | - | | $ - | $ - |
| 06/28/07 | to | 07/11/07 | 07/25/07 | 14 | $ | - | | $ - | $ - |
| 07/12/07 | to | 07/25/07 | 08/08/07 | 14 | $ | - | | $ - | $ - |
| 07/26/07 | to | 08/08/07 | 08/22/07 | 14 | $ | - | | $ - | $ - |
| 08/09/07 | to | 08/22/07 | 09/05/07 | 14 | $ | - | | $ - | $ - |
| 08/23/07 | to | 09/05/07 | 09/19/07 | 14 | $ | - | | $ - | $ - |
| 09/06/07 | to | 09/19/07 | 10/03/07 | 14 | $ | - | | $ - | $ - |
| 09/20/07 | to | 10/03/07 | 10/17/07 | 14 | $ | - | | $ - | $ - |
| 10/04/07 | to | 10/17/07 | 10/31/07 | 14 | $ | - | | $ - | $ - |
| 10/18/07 | to | 10/31/07 | 11/14/07 | 14 | $ | - | | $ - | $ - |
| 11/01/07 | to | 11/14/07 | 11/28/07 | 14 | $ | - | | $ - | $ - |
| 11/15/07 | to | 11/28/07 | 12/12/07 | 14 | $ | - | | $ - | $ - |
| 11/29/07 | to | 11/30/07 | 12/26/07 | 2 | $ | - | | $ - | $ - |
| | to | | | | | | | | |
| | | Totals = | | | $ 412,900 | $ (57,700) | $ 36,600 | $ - | 391,800 |

*Rec'vd By Triad

### Section 2   List all Non-LP Retros

| Date Issued | Retros |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

Auditor:  Connie Wu                    Date:  10/19/07

Reviewer:  [redacted]                  Date:  [redacted]

Please complete the Date the review was completed and who completed it before saving file to the w-drive.

10/19/2007

SNF Part A - Detail Schedule

Provider:    Brian Ctr-Lumber City
Provider #:  11-5404
FYE:         11/30/2007

Section 1

| SERVICE PERIOD | | DATE PAID | | PMT ($) | RETRO PYMT | | PMT | | RETRO | | TOTAL PMT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/06 | to | 12/13/06 | 12/27/06 | 13 | $ 59,200 | | | $ 4,300 | | $ (101,600) |
| 12/14/06 | to | 12/27/06 | 01/10/07 | 14 | $ 63,800 | | | $ 4,600 | | $ 68,400 |
| 12/28/06 | to | 01/10/07 | 01/24/07 | 14 | $ 63,800 | | | $ 4,600 | | $ 68,400 |
| 01/11/07 | to | 01/24/07 | 02/07/07 | 14 | $ 63,800 | | | $ 4,600 | | $ 68,400 |
| 01/25/07 | to | 02/07/07 | 02/21/07 | 14 | $ 63,800 | | | $ 4,600 | | $ 68,400 |
| 02/08/07 | to | 02/21/07 | 03/07/07 | 14 | $ 63,800 | | | $ 4,600 | | $ 68,400 |
| 02/22/07 | to | 03/07/07 | 03/21/07 | 14 | $ 63,800 | | | $ 4,600 | | $ 68,400 |
| 03/08/07 | to | 03/21/07 | 04/04/07 | 14 | $ 63,800 | | | $ 4,600 | | $ 68,400 |
| 03/22/07 | to | 04/04/07 | 04/18/07 | 14 | $ 42,700 | | | $ 4,500 | | $ 47,200 * Recvd B |
| 04/05/07 | to | 04/18/07 | 05/02/07 | 14 | $ - | | | $ - | | $ -   Triad~ |
| 04/19/07 | to | 05/02/07 | 05/16/07 | 14 | $ - | | | $ - | | $ - |
| 05/03/07 | to | 05/16/07 | 05/30/07 | 14 | $ - | | | $ - | | $ - |
| 05/17/07 | to | 05/30/07 | 06/13/07 | 14 | $ - | | | $ - | | $ - |
| 05/31/07 | to | 06/13/07 | 06/27/07 | 14 | $ - | | | $ - | | $ - |
| 06/14/07 | to | 06/27/07 | 07/11/07 | 14 | $ - | | | $ - | | $ - |
| 06/28/07 | to | 07/11/07 | 07/25/07 | 14 | $ - | | | $ - | | $ - |
| 07/12/07 | to | 07/25/07 | 09/08/07 | 14 | $ - | | | $ - | | $ - |
| 07/26/07 | to | 08/08/07 | 08/22/07 | 14 | $ - | | | $ - | | $ - |
| 08/09/07 | to | 08/22/07 | 09/05/07 | 14 | $ - | | | $ - | | $ - |
| 08/23/07 | to | 09/05/07 | 09/19/07 | 14 | $ - | | | $ - | | $ - |
| 09/06/07 | to | 09/19/07 | 10/03/07 | 14 | $ - | | | $ - | | $ - |
| 09/20/07 | to | 10/03/07 | 10/17/07 | 14 | $ - | | | $ - | | $ - |
| 10/04/07 | to | 10/17/07 | 10/31/07 | 14 | $ - | | | $ - | | $ - |
| 10/18/07 | to | 10/31/07 | 11/14/07 | 14 | $ - | | | $ - | | $ - |
| 11/01/07 | to | 11/14/07 | 11/28/07 | 14 | $ - | | | $ - | | $ - |
| 11/15/07 | to | 11/28/07 | 12/12/07 | 14 | $ - | | | $ - | | $ - |
| 11/29/07 | to | 11/30/07 | 12/26/07 | 2 | $ - | | | $ - | | $ - |
| | to | | | | $ - | | | $ - | | $ - |
| | | Totals = | | | $ 548,500 | $ (164,300) | | $ 41,000 | $ (800) | $ 424,400 |

Section 2    List all Non-LP Retros

Date issued        Retros

Auditor:    Connie Wu                    Date:    10/18/07

Reviewer:                               Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

10/19/2007

Version 23.0                    Modified 6/19/2007                    1 of 1

*EXHIBIT 4*

GALLAGHER
EVELIUS & JONES LLP
ATTORNEYS AT LAW

JACK C. TRANTER
jtranter@gejlaw.com
direct dial: 410 347 1370
fax: 410 468 2786

February 13, 2008

<u>VIA EMAIL</u>

Christopher P. Galanek, Esq.
Jennifer B. Dempsey, Esq.
Powell, Goldstein, Frazer & Murphy, LLP
One Atlantic Center – Fourteenth Floor
1201 W. Peachtree Street NW
Atlanta, GA 30309-3488

Re:    *Brian Center Nursing Care/Austell, Inc. v. Triad*
       *Health Management of Georgia, LLC, et al.,*
       Civil Action No.: 2005-cv-99496

Dear Chris and Jen:

As Tom and I mentioned during today's call with Jennifer, Triad learned late yesterday that the Center for Medicare and Medicaid Services ("CMS") continued to make Medicare payments to your client after Triad began operating the five facilities leased from Mr. Foster on December 1, 2006. As the enclosed materials relate, these payments continued until mid-April of 2007 and total $1,982,600.

Needless to say, Brian Center is not entitled to Medicare reimbursement for services not performed. As CMS seeks to offset Medicare payments due to Triad based on funds inadvertently paid to your client, we ask that these funds be repaid to CMS as soon as possible. While we will contest CMS's notion that it may recoup from Triad funds inadvertently paid to Mariner, there is no question that Mariner is not entitled to retain these funds. Indeed, we are shocked that Mariner obtained almost two million dollars in reimbursement from CMS for Medicare services that Mariner knew had not been performed but made no effort to return or repay these funds. As you can see, these payments began in December 2006 and continued through mid-April 2007. At this juncture, I suggest that it is in both our clients' best interest that these funds be repaid as soon as possible.

# 349047 JCT
011397-0015

GALLAGHER
EVELIUS & JONES LLP
ATTORNEYS AT LAW

Christopher P. Galanek, Esq.
Jennifer B. Dempsey, Esq.
February 13, 2008
Page 2


If you would like to discuss this matter, please call at your convenience.


Very truly yours,

Jack C. Tranter


JCT/cmc
Enclosures
cc:    Thomas C. Dame, Esq.


# 349047 JCT
011397-0015

*EXHIBIT 5*

The contractor shall process all "other-than-clean" claims and notify the provider and provider of the determination within 45 calendar days of receipt. (See Pub 100-4, Chapter 1, §80.2.1 for the definition of "receipt date" and for timeliness standards for clean claims.) However, when the contractor develops to the provider/supplier or beneficiary for additional information, the contractor shall cease counting the 45 calendar days on the day that the contractor sends the development letter. Upon receiving the materials requested in the development letter from the provider/supplier and/or beneficiary, the contractor shall resume counting the 45 calendar days.

EXAMPLE:

> The contractor receives a claim on June 1st, but does not send a development letter to the provider/supplier and/or beneficiary until June 5th. In this situation, 5 of the 45 allotted calendar days will have already passed before the contractor requested the additional information. Upon receiving the information back from the provider/supplier and/or beneficiary, the contractor has 40 calendar days left to process the claim and notify the individual that filed the claim of the payment determination for that claim.

Contractors shall follow existing procedures relative to both the length of time the provider/supplier and/or beneficiary is afforded to return information requested in the development letters and situations where the provider/supplier and/or beneficiary does not respond.

Contractors shall report the number of other-than-clean claims processed in 45 days or less on Form 1 of the Contractor Reporting of Operational and Workload Data (CROWD) report. Use six-digit code "00051" in column 1 to report this information. Report the number of other-than-clean claims processed in 46 days or longer on Form 1 of the CROWD system, and use column 1 or a line using code "00061" as the identifier.

The following types of claims do not apply to this instruction:

- Claims where the Social Security Administration blocks a beneficiary's Health Insurance Claim Number (HIC),

- Claims the contractors are required to hold due to CMS instructions,

- Translator rejects,

- Claims where CWF is unable to process due to technical issues with the CWF beneficiary record or beneficiary identification issues,

- Claims submitted by a hospice, and

- Claims in development due to processing requirements (e.g. medical review) in Publication 100-8, the Medicare Program Integrity Manual.

## 80.4 - Enforcement of Provider Billing Timelines and Accuracy Standard to Continue PIP (Periodic Interim Payment)

(Rev. 1, 10-01-03)

A3-3676

## A. General

To remain on PIP, providers, (with the exception of HHAs that do not receive PIP with the advent of PPS mandated by law on October 1, 2000), must submit 85 percent of their bills timely and accurately. Timely and accurately means that 85 percent of its bills (excluding those listed below) are submitted within 30 days of discharge and pass front-end edits for consistency and completeness. A bill is not considered received unless it can pass FI edits. FIs must accumulate statistics on inpatient and SNF billing performance for each PIP provider to monitor whether it meets this requirement. These instructions do not effect bi-weekly payments for pass-throughs (Medicare Provider Reimbursement Manual, (PRM) §2405.2) and for adjustments to indirect cost for medical education (PRM §2405.3).

The evaluation for timeliness of billing should be consistent with the frequency for monitoring the payment amounts under the PIP program. Thus, for non-PPS hospitals and SNFs the evaluation process is scheduled at 3-month intervals and PPS providers are evaluated every 4 months. The evaluation includes data from the entire 3- or 4-month period. In determining whether a provider submitted its bills within 30 days of discharge or through date on interim bills, count the date from Form CMS-1450 FL6 (through date) to the date received by the FI. If the provider does not meet the criteria, discontinue PIP immediately. The periodic performance report that is provided in accordance with subsection B will constitute advance notice before discontinuing PIP.

Exclude the following:

- MSP cases (value codes 12-16);
- Any special situation identified by the provider or FI that is documented as beyond provider control. Exclusions must be approved by the RO; and
- Bills that have not passed FI front-end edits for acceptance. (Such bills are counted only when acceptable to the shared system edit processes.)

The FIs must accumulate statistics monthly and summarize them for the entire evaluation period.

## B. Procedure for Measuring and Reporting to Hospitals and SNFs

The FIs accumulate a record for each bill that passes front-end edits. Bills must be counted in the month received regardless of the discharge month. No later than 10 work-days after the end of the month, FIs furnish a report to each hospital/SNF. For the month indicating the following:

- The total number of bills received;
- The number not excluded as described in section A;
- The number not excluded received in 30 days or less;
- The percentage not excluded received in 30 days or less.

Also, for providers that fail to meet the standard, furnish individual case identification of claims that were not billed within 30 days of discharge. List only claims that are not excluded and are identified in subsection A. The report must be furnished in electronic media, unless the FI determines a paper listing would be cheaper to process. If electronic media is used, use the following record format. Determine the physical characteristics of the file.

| Fld | Description | Psn. | Picture | Just | From | Thru |
|---|---|---|---|---|---|---|
| 1 | Provider Number | 6 | X(6) | L | 001 | 006 |
| 2 | Blank | 3 | X(3) | | 007 | 009 |
| 3 | Blank | 1 | X | | 010 | |
| 4 | HIC Number | 12 | X(12) | L | 011 | 022 |
| 5 | Blank | 1 | X | | 023 | |
| 6 | Beneficiary Surname | 6 | X(6) | L | 024 | 029 |
| 7 | Blank | 1 | X | | 030 | |
| 8 | Patient Control Number | 17 | X(17) | L | 031 | 047 |
| 9 | Blank | 1 | X | | 048 | |
| 10 | From Date | 6 | 9(6) | | 049 | 054 |
| 11 | Blank | 1 | X | | 055 | |
| 12 | Discharge or Thru Date | 6 | 9(6) | | 056 | 061 |
| 13 | Blank | 1 | X | | 062 | |
| 14 | Date Bill Received | 6 | 9(6) | | 063 | 068 |
| 15 | Blank | 1 | X | | 069 | |
| 16 | Days Elapsed | 4 | 9(4) | R | 070 | 073 |

If sub-provider identification is used, positions 7, 8, and 9 may be utilized.

## C. Reinstatement of PIP

Do not reinstate PIP for a provider until it meets all criteria in PRM §§2405.1.B and 2407 and has met the requirements in subsection A for timeliness and accuracy for six consecutive months.

## D. New Request for PIP

Evaluate new requests for PIP as in subsections A and B. At least three months experience is required for new requests, (except for new providers with less experience).

## E. Hospitals on 100 Percent PRO Prepayment Review

The 30-day requirements for submitting bills to FIs are not applicable. The RO makes determinations of timely and accurate bill submission by hospitals for which the PRO reviews 100 percent of the discharges before payment. However, other standards remain applicable for retaining PIP in such cases. See PRM §§2405.1.B and 2407 for the requirements.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,    *
et al.,

                                       *

        Plaintiffs

                                       *   Case No. 08-cv-00329

v.

                                       *

MICHAEL O. LEAVITT, et al.,

                                     *

        Defendants

                                     *

## AFFIDAVIT OF RONALD M. HERBERT, JR.
## SUPPORTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    1.    My name is Ronald M. Herbert, Jr.  I am at least 21 years of age and I am competent to testify to the matters set forth herein.  I am the Chief Operating Officer of Triad Senior Living, LLC ("TSL").

    2.    Plaintiffs are five separate, but affiliated, entities that operate nursing homes in Georgia.  Triad at Jeffersonville I, LLC, is a Georgia limited liability company that leases and operates a 131-bed nursing facility located in Jeffersonville, Georgia. Triad at LaGrange I, LLC is a Georgia limited liability company that leases and operates a 138-bed nursing facility in LaGrange, Georgia.  Triad at Lumber City I, LLC is a Georgia limited liability company that leases and operates an 86-bed nursing facility in Lumber City, Georgia.  Triad at Powder Springs I, LLC is a Georgia limited liability company that leases and operates a 208-bed nursing facility in Powder Springs, Georgia. Triad at Thomasville I, LLC is a Georgia limited liability company that leases and operates a 52-bed nursing facility in Thomasville, Georgia.  Pursuant to agreements with Plaintiffs, Triad Senior Living, LLC provides management and accounting to Plaintiffs.

3.     The five nursing homes operated by Plaintiffs have a total of 615 licensed beds and provide skilled nursing facility care to Medicare beneficiaries.

4.     In December of 2003, more than four years ago, the owner of the five nursing homes now leased and operated by Plaintiffs advised Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc. (collectively "Mariner"), which then occupied and operated the facilities, to vacate on January 1, 2004, as these nursing homes had been leased to Plaintiffs. A true and correct letter of the owner's counsel's letter directing Mariner to vacate is attached to Plaintiffs' Statement Of Material Facts In Support Of Motion For Summary Judgment ("Plaintiffs' Statement of Facts") as Exhibit 1.

5.     Mariner delivered the facilities to Plaintiffs and Plaintiffs began operating these five nursing homes on December 1, 2006.  A true and correct copy of an October 10, 2003 letter from Boyd P. Gentry, Executive Vice President and Chief Executive Officer, Mariner Health Care, relating that Mariner would vacate as of December 1, 2006 is attached to Plaintiffs' Statement of Facts as Exhibit 3.

6.     On November 30, 2006, the day before Plaintiffs began operating the five nursing homes, Plaintiffs filed five Medicare Provider/Supplier Enrollment Applications alerting CMS that Mariner no longer operated these facilities and asking that the Medicare Provider Agreements be assigned to Plaintiffs, effective December 1, 2006.  A true and correct copy of one of those substantially similar applications is attached to Plaintiffs' Statement of Facts as Exhibit 4.

7.     Plaintiffs decided to accept assignment of Mariner's Medicare provider agreements to avoid a break in service.  If Plaintiffs had filed applications for new

provider agreements, Plaintiffs would not have received Medicare reimbursement for care provided to beneficiaries during the period between the termination of the prior provider agreements (November 30, 2006) and the issuance of new provider agreements to Plaintiffs.

8.      In four letters dated April 12, 2007 and a fifth dated April 26, 2007, CMS acknowledged the change of ownership of each nursing home and related that the Medicare provider agreements had been "automatically assigned" to Plaintiffs, effective December 1, 2006.  True and correct copies of those letters are attached to Plaintiffs' Statement of Facts as Exhibit 8.

9.      Despite being told that Mariner no longer operated these facilities as of December 1, 2006, and even though Mariner was no longer submitting bills identifying services provided to Medicare beneficiaries, CMS continued making payments to Mariner under the periodic interim payment ("PIP") methodology, by which a nursing home is paid, on a bi-weekly basis, in an amount determined by the Fiscal Intermediary "by estimating the reimbursable amount for the year based on the previous year's experience," subject to certain adjustments.

10.     Specifically, Mariner's Fiscal Intermediary, Mutual of Omaha, sent payments to Mariner on December 27, 2006, January 10 and 24, February 7 and 21, March 7 and 21, and April 4 and 18, 2007 for service periods that did not even begin until after Mariner vacated the facilities on November 30, 2006.  Inexplicably, Mariner accepted these payments and has retained approximately $2.0 million in Medicare funds for services it did not provide.

11.    CMS has taken action against Plaintiffs to collect the payments made to Mariner.    In five letters dated February 11, 2008, BCBS claims that Plaintiffs are responsible for the payments in the amounts noted below:

| | |
|---|---:|
| Triad at Jeffersonville | $ 246,600 |
| Triad at LaGrange | 370,011 |
| Triad at Lumber City | 424,400 |
| Triad at Powder Springs | 946,700 |
| Triad at Thomasville | 215,771 |
| TOTAL | $2,203,482 |

True and correct copies of the February 10 letters are attached to Plaintiffs' Statement of Facts as Exhibit 10.  For reasons unknown to Plaintiffs, on April 18 and May 2, 2008, Mutual of Omaha, Mariner's Fiscal Intermediary, paid Plaintiffs $245,100.  Hence, after vacating the facilities on December 1, 2006, Mariner received $1,982,600 ($2,203,482 - $ 245,100 = $1,982,600) from Mutual of Omaha, even though Mariner was no longer providing services to Medicare beneficiaries and was not submitting bills.

12.    The February 11, 2008 letters advised that unless Plaintiffs paid to CMS the sums that had been paid to Mariner by February 25, 2008, CMS would recoup these funds by withholding payments due to Plaintiffs for services provided to Medicare recipients during the prior thirty-day period and for services provided in the future, until the approximately $2.0 million paid to Mariner was recouped.

13.    The February 11, 2008 letters, however, advised that Plaintiffs could object and claim that withholding "should not occur."  The letters related that BCBS

4

would "review your documentation." However, the letters also advised that proceeding in this manner "will not delay recoupment."

14. Until Plaintiffs received the February 11, 2008 letters advising that Medicare funds paid to Mariner would be obtained by withholding Medicare payments due to Plaintiffs for services actually provided, they had no idea that CMS would pursue Plaintiffs for the payments CMS made to Mariner for service periods that did not even begin until after Mariner vacated the facilities. CMS, however, maintains that the Plaintiffs are solely responsible for the payments erroneously paid to Mariner because Plaintiffs accepted assignment for Mariner's provider agreements and therefore have "successor liability" for overpayments made to the predecessor operator, Mariner. The February 11, 2008 letters directed Plaintiffs to pay to CMS the funds paid to Mariner no later than February 25, 2008, relating, "payments will be withheld [on February 26, 2008] until payment in full is received or an extended repayment request is received."

15. The five nursing homes/skilled nursing facilities operated by Plaintiffs receive reimbursement for Medicare services on a monthly basis, as a result of billing requests identifying the services provided to Medicare beneficiaries. For example, on January 31, 2008, CMS paid Plaintiffs approximately $775,000 for services provided during the prior thirty-day period. These funds are used to pay expenses associated with that care, which costs have already been incurred and must be paid.

16. Plaintiffs submitted requests for payment to BCBS on February 8, 2008, seeking $798,477.95 in reimbursement for services provided for the month of January 2008. If CMS withholds funds due to Plaintiffs for services provided to Medicare beneficiaries to recoup payments mistakenly paid to Mariner for services not provided,

Plaintiffs will not be able to continue providing skilled nursing and other care and services to the more than 500 frail elderly residents who live in these facilities and depend upon Plaintiffs for their care, safety and well being.

I solemnly affirm under the penalties of perjury that the contents of the foregoing Affidavit are true and correct based upon my personal knowledge.

3.3.08
_____
Date

_____  COO.
Ronald M. Herbert, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,          *
et al.,
                                         *

            Plaintiffs
                                         *   Case No. 08-cv-00329

v.                                       *

MICHAEL O. LEAVITT, et al.,              *

            Defendants                   *

                                         *


**AFFIDAVIT OF MARCELLA GODWIN**
**SUPPORTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

1.      My name is Marcella Godwin.  I am at least 21 years of age and I am competent to testify to the matters set forth herein.  I am the Director of Business Office Services for Triad Senior Living, LLC ("TSL").  TSL provides management services to Plaintiffs.

2.      Plaintiffs are the affiliated but separate owners of five nursing homes located in the State of Georgia.  On November 30, 2006, the day before the Plaintiffs began operating these nursing homes, Plaintiffs filed five Medicare Provider/Supplier Enrollment Applications alerting CMS that Mariner no longer operated these facilities and asking that the Medicare Provider Agreements be assigned to Plaintiffs, effective December 1, 2006.  A true and correct copy of one of those substantially similar applications is attached to Plaintiff's Statement Of Material Fact In Support Of Motion For Summary Judgment ("Plaintiffs Statement of Facts") as Exhibit 4.

3.      On or about January 15, 2007, I called Blue Cross Blue Shield of Georgia ("BCBS") to inquire about the status of Plaintiffs' applications.  BCBS is the Medicare

# 350198 TCD
011397-0019

Fiscal Intermediary that administers the Medicare program in Georgia. I spoke with Shannon Ray, Network Service Specialist Sr.

4.      As related in the applications, I advised Ms. Ray that Plaintiffs had begun operating the five nursing homes in question on December 1, 2006 and had filed the applications on November 30, 2006, the day before. Ms. Ray, however, told me that no applications had been received. I responded that they had been sent by overnight mail on November 30, 2007. A true and correct copy of a Federal Express US *Airbill* evidencing that Ronald Herbert, Triad's Chief Operating Officer sent the applications to Ms. Ray on November 30, 2006 is attached to Plaintiffs' Statement of Facts as Exhibit 5. Ms. Ray advised that she would look for the applications and "get back" to me.

5.      Later that day, Mr. Ray called me and advised that the applications had been sent back because Plaintiffs had used an out-of-date enrollment form. I responded that the applications had not been received. Regardless, as a result of learning that an out-of-date form had been used, Plaintiffs filed new applications on January 30, 2007. A true and correct copy of one of those substantially similar applications is attached to the Plaintiffs" Statement of Facts as Exhibit 6. A true and correct of the Federal Express *AirBill* relating that the applications had been sent to Ms. Ray on January 30 is attached to Plaintiffs' Statement of Facts as Exhibit 7. As of March 3, 2008 the applications filed on November 30, 2007 had still not been returned to TSL.

6.      As before, the January 30 applications related that Plaintiffs began operating these five nursing facilities on December 1, 2006. The applications also related the prior operator's name, the doing business name of the nursing facilities, the prior operator's NPI, the name of the prior operator's Fiscal Intermediary (Mutual of Omaha),

the prior operator's Medicare Information Number, the fact that Plaintiffs were "accepting assignment," and the "Effective Date of Transfer," i.e., December 1, 2006.

7.     In October 2007, as a result of letters sent by Mutual of Omaha, Mariner's Fiscal Intermediary, to the five nursing homes operated by Plaintiffs, I learned that Mutual of Omaha sent payments to Mariner on December 27, 2006, January 10 and 24, February 7 and 21, March 7 and 21, and April 4 and 18, 2007 for service periods that did not even begin until after Mariner vacated these facilities on November 30, 2006.  True and correct copies of letters Plaintiffs received from Mutual of Omaha detailing the payments made to Mariner are attached to Plaintiffs' Statement of Facts as Exhibit 9.

I solemnly affirm under the penalties of perjury that the contents of the foregoing Affidavit are true and correct based upon my personal knowledge.


_3/3/08_
Date

_Marcella Godwin_
Marcella Godwin

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,    *
et al.,

                               *

        Plaintiffs

                            *   Case No. 08-cv-00329

v.

                               *

MICHAEL O. LEAVITT, et al.,

                               *

        Defendants

                               *

## AFFIDAVIT OF JACK C. TRANTER
## SUPPORTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    1.     My name is Jack C. Tranter.  I am at least 21 years of age and am competent to testify to the matters set forth in this affidavit.  I am an attorney licensed to practice in the State of Maryland.  I am a partner in the law firm, Gallagher Evelius & Jones LLP, which serves as counsel for Plaintiffs in the above-captioned case.  Among other court memberships, I am a member in good standing of the bar of the United States District Court for the District of Columbia.

    2.     In December of 2003, more than four years ago, the owner of the five nursing homes now leased and operated by Plaintiffs advised Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc. (collectively "Mariner"), which then occupied and operated the facilities, to vacate on January 1, 2004, as these nursing homes had been leased to Plaintiffs.  Mariner refused to vacate the facilities as directed.  *See* Mariner Health Care, Inc. v. Foster, 634 S.E. 2d. 162 (Ga. App. 2006) cert. denied (2006), a copy of which is attached to Plaintiffs' Statement Of

Material Facts In Support Of Motion For Summary Judgment ("Plaintiffs' Statement of Facts") as Exhibit 2.

3.     After several years of litigation, the Georgia Court of Appeals determined that Mariner had no lawful basis for retaining possession. *See* Mariner Health Care, Inc. v. Foster, supra.   Hence, on December 1, 2006, Mariner delivered the facilities to Plaintiffs and Plaintiffs began operating these five nursing homes.

4.     As described more fully in Plaintiffs' Statement of Facts, the Centers for Medicare and Medicaid Services ("CMS"), through its Fiscal Intermediary, Blue Cross and Blue Shield of Georgia ("BCBS"), has taken action against Plaintiffs to collect approximately $2.0 million paid to Mariner, the prior operator of the nursing homes now operated by Plaintiffs.

5.     Upon discovering for the first time on February 12, 2007 that CMS had paid and Mariner had retained approximately $2.0 million in Medicare funds for services that Mariner did not provide, on behalf of Plaintiffs, I asked Mariner's counsel to return these funds to CMS as soon as possible.   True and correct copies of my February 13, 2008 letter to Mariner's counsel, Christopher Galanek, Esq. and Jennifer Dempsey, Esq., and a series of email exchanges between me and Ms. Dempsey and Thomas Reilly, Esq., another attorney who represents Mariner, are attached to Plaintiffs' Statement of Facts collectively as Exhibit 11.   To date, Mariner's counsel has not responded to Plaintiffs' request that Mariner repay the funds that CMS mistakenly paid to Mariner after Mariner stopped providing care.

6.     My attempts, on behalf of Plaintiffs, to convince CMS to collect from Mariner the funds paid to Mariner, after Mariner vacated the facilities on December 1,

# 350245 TCD
011397-0019

2006, for services that Mariner did not perform, rather that by withholding Medicare reimbursement due to Triad for services actually provided, have been unsuccessful. True and correct copies of the correspondence between BCBS and me are attached to Plaintiffs' Statement of Facts collectively as Exhibit 12.

7.    In response to Plaintiffs' argument that Medicare reimbursement due to Plaintiffs should not be withheld to "recoup" funds that should not have been paid to Mariner, CMS advised me that Plaintiffs are solely responsible for "repayment of the debt in question" regardless where the sums were deposited "or the cause of the overpayments." In this response CMS also stated that it "has no authority to attempt to collect these debts from Mariner." *See* Exhibit 12.

I solemnly affirm under the penalties of perjury that the contents of the foregoing Affidavit are true and correct based upon my personal knowledge.

3/3/08
_____
Date

_____
Jack C. Tranter, Esq.