## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:08cv00329 (CKK) |
| MICHAEL O. LEAVITT *et al.*, | ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 56 and Local Civil Rule 56.1, the U.S. Department of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), Michael O. Leavitt, Secretary of HHS, and Kerry N. Weems, Acting Administrator of CMS (collectively, "Defendants"), hereby move this Court to dismiss this action lack of subject matter jurisdiction or, in the alternative, for summary judgment in their favor. A statement of undisputed material facts, a memorandum of law supporting Defendants' motion and opposing Plaintiffs' motion (with exhibits and declarations), a response to Plaintiffs' statement of material facts, and a proposed order are submitted herewith.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

s/ Wendy M. Ertmer
WENDY M. ERTMER
DC Bar No. 490228
Trial Attorney

Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, DC  20530
Telephone:  (202) 616-7420
Fax:  (202) 616-8470
Email:  wendy.ertmer@usdoj.gov

*Counsel for Defendants*

Dated:  March 17, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 17, 2008, a copy of the foregoing pleading, together with all attachments, was filed electronically via the Court's ECF system, through which an electronic notice of filing will be sent to the following counsel of record:

| | |
|---|---|
| Jack C. Tranter | jtranter@gejlaw.com |
| Thomas C. Dame | tdame@gejlaw.com |

s/ Wendy M. Ertmer
WENDY M. ERTMER

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:08cv00329 (CKK) |
| MICHAEL O. LEAVITT *et al.*, | ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT
OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rules 7(h) and 56.1, Defendants submit this Statement of

Undisputed Material Facts in Support of Their Cross-Motion for Summary Judgment.

1.    Plaintiffs are operators of five skilled nursing facilities ("SNFs") that provide care

to Medicare beneficiaries.  Decl. of Donna Smoot ("Smoot Decl.") ¶ 2.  Plaintiffs began

operating these facilities on December 1, 2006.  *Id.*  Prior to December 1, 2006, Mariner Health

Care, Inc. ("Mariner") operated Plaintiffs' facilities.  Decl. of Thomas M. Bruce ("Bruce Decl.")

¶ 3.

2.    Mutual of Omaha Insurance Company ("Mutual of Omaha")[1] served as Mariner's

Medicare fiscal intermediary ("FI") beginning April 1, 2003.  *Id.*  Mutual of Omaha paid Mariner

on a biweekly basis according to a Periodic Interim Payment ("PIP") system.  *See id.*  Mutual of

Omaha began making PIP payments to Mariner on August 1, 2003.  *Id.*

3.    On November 30, 2006, one day before the transfer of the facilities from Mariner

to Plaintiffs, Plaintiffs submitted outdated and incomplete Form CMS-855A ("855A")

---

[1]    Mutual of Omaha is now Wisconsin Physicians Service Insurance Corporation.  *See*
Bruce Decl. ¶ 2.  We refer to Mariner's fiscal intermediary throughout this statement as "Mutual
of Omaha."

applications to their FI, Blue Cross Blue Shield of Georgia ("Georgia BCBS"). *See* Smoot Decl. ¶ 3; Pls.' Mot. for Summ. J. ("Pls.' Mot."), Ex. 4 at 6 (reflecting incomplete information with respect to Mariner's fiscal intermediary). The next day, Georgia BCBS returned Plaintiffs' outdated and incomplete 855A applications and took no action with respect to those applications. Smoot Decl. ¶ 3. Georgia BCBS received four of the five corrected 855As (LaGrange, Lumber City, Powder Springs, and Thomasville) on January 31, 2007, and received the fifth (Jeffersonville) on February 5, 2007. *Id.* ¶ 5. These applications reflected that Plaintiffs would accept assignment of Mariner's provider agreements. *Id.* ¶ 11; Pls.' Mot., Ex. 6 at 10.

4.      Georgia BCBS and the Regional Office ("RO") of the Centers for Medicare & Medicaid Services ("CMS") processed Plaintiffs' 855A applications. Smoot Decl. ¶¶ 5-6; *see also* Decl. of Ronald L. Smith ("Smith Decl.") ¶ 26. On April 12, 2007, the RO issued tie-in and tie-out notices for four of Plaintiffs' facilities (LaGrange, Lumber City, Powder Springs, and Thomasville). Smith Decl. ¶ 26. On April 26, 2007, the RO issued a tie-in notice and tie-out notice for the fifth of Plaintiffs' facilities (Jeffersonville). *Id.* These notices were issued, *inter alia*, to both Mutual of Omaha and Georgia BCBS. Smoot Decl. ¶ 6; Bruce Decl. ¶¶ 10-11.

5.      The Change of Ownership ("CHOW") period for Plaintiffs' provider facilities therefore began on December 1, 2006, and ended either on April 12, 2007 (LaGrange, Lumber City, Powder Springs, and Thomasville), or on April 26, 2007 (Jeffersonville).

6.      Mutual of Omaha continued to receive claims for Plaintiffs' provider facilities through June 2007 for services rendered by Mariner before December 1, 2006. Bruce Decl. ¶ 8.

7.      Mutual of Omaha continued to make biweekly PIP payments to Mariner during the CHOW period. *Id.* ¶ 4. The first two of these payments (December 13, 2006, and December 27, 2006) consisted of payment in whole or in part for services rendered prior to December 1,

2006. The remaining payments were periodic payments for services rendered during the CHOW application period. *See id.*

8.    Mutual of Omaha reviewed Mariner's PIP payments semi-annually to determine whether the amount of the payments should be adjusted to more closely approximate the reimbursement to be determined at settlement for the cost reporting period. *Id.* ¶ 5. Mutual of Omaha completed a semi-annual PIP review for the five facilities on March 30, 2007, for the service period April 1, 2006, to December 31, 2006. *Id.* ¶ 6.

9.    Mutual of Omaha first became aware of the CHOW when it received tie-out notices from the RO on April 13, 2007, for four of Plaintiffs' facilities (LaGrange, Lumber City, Powder Springs, and Thomasville), and on April 27, 2007, for one of Plaintiffs' facilities (Jeffersonville). *Id.* ¶¶ 9-11.

10.    Mutual of Omaha made the last PIP payment on April 18, 2007, for four of Plaintiffs' facilities (LaGrange, Lumber City, Powder Springs, and Thomasville). *Id.* ¶ 10. Although Mutual of Omaha received the tie-out notices for these four facilities on April 13, 2007, the April 18, 2007, payments had already been entered into the system on April 6, 2007. *Id.* Mutual of Omaha made the last PIP payment for the fifth facility (Jeffersonville) on May 2, 2007. *Id.* ¶ 11. Again, although Mutual of Omaha received the tie-out notice for this facility on April 27, 2007, the May 2, 2007, payment had already been entered into the system on April 20, 2007. *Id.* Once the tie-out notices issued, however, Mutual of Omaha redirected the April 18, 2007, and May 2, 2007, payments to the facilities' physical addresses rather than to Mariner's account. *Id.* ¶¶ 10-11.

11.    Plaintiffs had established with Georgia BCBS that they would be paid on a claim-by-claim basis, as opposed to a PIP basis. Smoot Decl. ¶ 7. Until May 1, 2007, Georgia BCBS

received no claims for any of Plaintiffs' facilities. *Id.* On May 1, 2007, after the tie-in notices issued, Plaintiffs began submitting claims to Georgia BCBS for services rendered from December 1, 2006, the effective date of the CHOW. *Id.* Georgia BCBS paid those claims. *Id.*

12.    In May, June, and July 2007, Mutual of Omaha sent five letters to Georgia BCBS stating that it had made PIP payments to Mariner for services rendered during the CHOW period (December 1, 2006, through April 12 or 26, 2007). Bruce Decl. ¶ 12. In October 2007, Mutual of Omaha sent additional letters to the same effect. *Id.* ¶ 13. As Mutual of Omaha and Georgia BCBS maintain separate financial and claims systems, Georgia BCBS had not known that Mutual of Omaha had already made PIP payments for that same service period (December 1, 2006, through April 12 or 26, 2007) until Mutual of Omaha notified Georgia BCBS of those payments. Smoot Decl. ¶ 7.

13.    Mutual of Omaha did not receive terminating cost reports for the reporting period that ended November 30, 2006, until September 12, 2007. Bruce Decl. ¶ 13. Mutual of Omaha is finalizing these cost reports and expects to issue Notices of Program Reimbursement ("NPRs") by July 2008. *Id.* ¶ 14. The NPRs will notify the holder of the Medicare provider agreements, now Triad, of any overpayments or underpayments for the cost report period ending November 30, 2006. *Id.*

14.    On November 29, 2007, Georgia BCBS received annual cost reports from Plaintiffs for the fiscal year ending June 30, 2007 ("FYE 6/30/07"). Smoot Decl. ¶ 10. Georgia BCBS conducted reviews of these cost reports, each of which considered the amounts paid to the provider numbers during the FYE 06/30/07 period by both Georgia BCBS and Mutual of Omaha. *Id.* A comparison of the actual amounts paid to the reimbursable amount due each provider indicated that Triad's facilities had been overpaid. *Id.*

15. Georgia BCBS sent Overpayment First Demand letters to the five Plaintiff facilities on February 11, 2008, by certified mail. *Id.* ¶ 12. These letters advised Plaintiffs that unless receivable amounts due the Medicare program were paid in full by February 26, 2008, withholding of interim payments would begin on that day, and also advised Plaintiffs of their right to seek an extended repayment plan. *Id.*; *see also* Pls.' Mot., Ex. 10. Georgia BCBS's efforts to recoup the overpayments are targeted at Plaintiffs, as opposed to Mariner, because Plaintiffs hold the Medicare provider agreements for those facilities. Smoot Decl. ¶ 11.

16. Plaintiffs' representatives responded with several letters setting forth Plaintiffs' position that they are not liable for overpayments made to Mariner. *See* Pls.' Mot, Ex. 12. Georgia BCBS responded to those letters explaining the reasons that Georgia BCBS seeks recoupment from Plaintiffs. *See id.* (February 19, 2008, email from Sandra Ludwig to Jack Tranter); *see also* Smoot Decl. ¶ 14; Ex. F to Defs.' Mot. to Dismiss or, in the Alternative, Cross-Mot. for Summ. J. ("Defs.' Mot.").

17. Between February 21, 2008, and February 25, 2008, Georgia BCBS exchanged several emails with Plaintiffs' representatives regarding the overpayment determinations. Smoot Decl. ¶ 16. This correspondence reflected a willingness on behalf of Georgia BCBS to discuss a repayment plan for the overpayment amount. *Id.*; *see also* Defs.' Mot., Ex. F ("We would be agreeable to working out payment arrangements if your clients are willing to consider the entire balance of the overpayments as part of those arrangements."). Plaintiffs, however, would not consider a repayment plan for the entire overpayment of $2,203,483, but instead maintained that they were responsible only for $187,254. Smoot Decl. ¶ 16; *see also* Defs.' Mot., Ex. F.

18. The Notice of Program Reimbursement ("NPR") with respect to Plaintiffs' November 29, 2007, cost report has not yet issued. *See id.* ¶ 18. Accordingly, Plaintiffs have

not yet sought review by the Provider Reimbursement Review Board ("PRRB") of the FI's final

reimbursement determination.  This NPR is expected to issue by September 30, 2008.  *Id.*

       Respectfully submitted,

`

       JEFFREY S. BUCHOLTZ
       Acting Assistant Attorney General

       SHEILA M. LIEBER
       Deputy Director
       Federal Programs Branch

       s/ Wendy M. Ertmer
       WENDY M. ERTMER
       DC Bar No. 490228
       Trial Attorney
       Federal Programs Branch
       U.S. Department of Justice, Civil Division
       20 Massachusetts Avenue NW, Room 7218
       Washington, DC  20530
       Telephone:  (202) 616-7420
       Fax:  (202) 616-8470
       Email:  wendy.ertmer@usdoj.gov

       *Counsel for Defendants*

Dated:  March 17, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:08cv00329 (CKK) |
| MICHAEL O. LEAVITT *et al.*, | ) ) | |
| Defendants. | ) ) | |

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE,
CROSS-MOTION FOR SUMMARY JUDGMENT**

---

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

STANDARD OF REVIEW ................................................................................................. 3

STATUTORY AND REGULATORY FRAMEWORK ....................................................... 3

I.      PAYMENT PROCEDURES ....................................................................................... 4

      A.      Payment Methods for Skilled Nursing Facilities ...................................... 4

      B.      Annual Cost Reconciliation ...................................................................... 5

      C.      Administrative Appeal Procedures Regarding Overpayment Determinations ....... 6

II.     CHANGES OF OWNERSHIP ("CHOWs") ................................................................ 6

      A.      Processing a Change of Ownership ........................................................... 7

      B.      Refusing/Accepting Assignment of a Former Owner's Provider Agreement ........ 8

      C.      Billings and Payments During a Change of Ownership ........................... 9

ARGUMENT ....................................................................................................................... 10

I.      THIS COURT LACKS SUBJECT MATTER JURISDICTION. .................................... 10

      A.      The Federal Question Statute, 28 U.S.C. § 1331, Does Not Confer Jurisdiction Over Plaintiffs' Claims. ...................................... 10

      B.      Plaintiffs Have Failed to Comply With the Statutory Prerequisites for Obtaining Judicial Review. ...................................... 12

      C.      Plaintiffs' Claims of Financial Distress Will Not Justify Their Disregard of the Statutory Requirements ...................................... 14

II.     PLAINTIFFS' CLAIMS FAIL ON THE MERITS. ...................................................... 16

      A.      Plaintiffs Are Liable as Mariner's Successor for Overpayments to Mariner ........ 17

      C.      Mutual of Omaha's Payments to Mariner During the CHOW Were Made Consistent With CMS Procedures. ...................................... 21

CONCLUSION ................................................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Action Alliance of Senior Citizens v. Leavitt*, 483 F.3d 852 (D.C. Cir. 2007) ............................. 21

*Am. Chiropractic Ass'n v. Leavitt*, 431 F.3d 812 (D.C. Cir. 2005) ............................................. 11

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ........................................................................ 3

*Avacados Plus Inc. v. Veneman*, 370 F.3d 1243 (D.C. Cir. 2004)................................................ 14

*BP Care, Inc. v. Thompson*, 337 F. Supp. 2d 1021 (S.D. Ohio 2003)......................................... 17

*BP Care, Inc. v. Thompson*, 398 F.3d 503 (6th Cir. 2005)......................................................... 11

*Caregivers Plus, Inc. v. Thompson*, 311 F. Supp. 2d 728 (N.D. Ind. 2004)................................ 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 3

*Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487 (D.C. Cir. 1984) ....................... 10

*Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100 (8th Cir. 2000) ......................................... 17

*Delta Health Group, Inc. v. U.S. Dep't of Health & Human Servs.*, 459 F. Supp. 2d 1207
   (N.D. Fla. 2006)........................................................................................................................ 17

*Great Rivers Home Care, Inc. v. Thompson*, 170 F. Supp. 2d 900 (E.D. Mo. 2001). 11, 13, 14, 15

*Heckler v. Cmty. Health Servs. of Crawford County*, 467 U.S. 51 (1984) .................................. 21

*Heckler v. Ringer*, 466 U.S. 602 (1984) ..................................................................................... 11

*Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192 (D.C. Cir. 1992) ............................................. 3

*Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107 (9th Cir. 2003) ..................................................... 11

*Raintree Healthcare Corp. v. Omega Healthcare Investors, Inc.*, 431 F.3d 685 (9th Cir.
   2005) ......................................................................................................................................... 8

*Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1 (2000).................................. 1, 11, 12, 15

*Three Lower Counties Cmty. Health Servs. Inc. v. U.S. Dep't of Health & Human Servs.*,
   517 F. Supp. 2d 431 (D.D.C. 2007)......................................................................................... 12

**United States v. Vernon Home Health, Inc.*, 21 F.3d 693 (5th Cir. 1994).......................... passim

*V.N.A. of Greater Tift County, Inc. v. Heckler*, 711 F.2d 1020 (11th Cir. 1983) ........................ 15

*Weinberger v. Salfi*, 422 U.S. 749 (1975).................................................................................. 11

*Your Home Visiting Nurse Servs. v. Shalala*, 525 U.S. 449 (1999)............................................. 11

## Statutes

5 U.S.C. § 706........................................................................................................................... 16

28 U.S.C. § 1331.......................................................................................................... 1, 10, 11, 12

28 U.S.C. § 1346......................................................................................................................... 11

*42 U.S.C. § 405................................................................................................................ 10, 11, 12

42 U.S.C. § 1395g ................................................................................................ 4, 8, 17, 18

42 U.S.C. § 1395h ......................................................................................................... 4

42 U.S.C. § 1395i-3 ....................................................................................................... 4

42 U.S.C. § 1395cc ........................................................................................................ 4

42 U.S.C. § 1395ff ........................................................................................................ 12

42 U.S.C. § 1395ii ................................................................................................... 10, 11

*42 U.S.C. § 1395oo ............................................................................................. passim

42 U.S.C. §§ 1395 to 1395hhh ..................................................................................... 3

42 U.S.C. §§ 1395c to 1395i-5 ..................................................................................... 3

## Rules

Fed. R. Civ. P. 12 ............................................................................................. 3, 10, 16

Fed. R. Civ. P. 56 .......................................................................................................... 3

## Regulations

42 C.F.R. § 405.373. ..................................................................................................... 6

42 C.F.R. § 405.374 ...................................................................................................... 6

42 C.F.R. § 405.375 ................................................................................................. 6, 13

42 C.F.R. § 405.1801 ..................................................................................................... 6

42 C.F.R. § 405.1803 ..................................................................................................... 5

42 C.F.R. § 405.1809 ................................................................................................... 13

42 C.F.R. § 405.1811 ..................................................................................................... 6

42 C.F.R. § 405.1835 ............................................................................................... 6, 13

42 C.F.R. § 405.1875 ..................................................................................................... 6

42 C.F.R. § 405.1877 ............................................................................................... 6, 13

42 C.F.R. § 413.20 ........................................................................................................ 5

42 C.F.R. § 413.24 ........................................................................................................ 5

42 C.F.R. § 413.60. ....................................................................................................... 5

42 C.F.R. § 413.64 ................................................................................................. passim

42 C.F.R. § 413.335 ...................................................................................................... 4

42 C.F.R. § 413.337 ...................................................................................................... 4

42 C.F.R. § 413.350 ............................................................................................ 4, 5, 9, 22

42 C.F.R. § 489.18 ................................................................................................. passim

42 C.F.R. §§ 413.330 to 413.355 ................................................................................. 4

## Other Authorities

*Medicare Financial Management Manual* ................................................................... 8, 9

*Medicare Program Integrity Manual* ........................................................... 7, 9, 19, 20

*Medicare Provider Reimbursement Manual* ................................................................ 5

## **INTRODUCTION**

Plaintiffs, five operators of skilled nursing facilities providing care to Medicare beneficiaries, bring this lawsuit to challenge a preliminary Medicare overpayment determination made by the Centers for Medicare & Medicaid Services ("CMS"). Specifically, Plaintiffs (or "Triad") claim that they are not required to repay the Medicare program approximately $2 million that the agency has tentatively determined it overpaid Plaintiffs' nursing facilities. The basis of Plaintiffs' argument is their allegation that the overpayments were made not to Plaintiffs but to the prior lessee of Plaintiffs' nursing facilities, Mariner Health Care, Inc. ("Mariner") during the period in which the facilities where undergoing a Change of Ownership ("CHOW") from Mariner to Plaintiffs.

The facts that give rise to this lawsuit reflect Plaintiffs' fundamental misunderstanding of the Medicare statute, regulations, and procedures. The first defect in this lawsuit is Plaintiffs' claim that the general federal question statute, 28 U.S.C. § 1331, provides a basis for jurisdiction, even though the Supreme Court has held that this provision cannot serve as the jurisdictional basis of claims arising under the Medicare Act. *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 5 (2000). Instead, 42 U.S.C. § 1395oo(f) sets forth the exclusive means of obtaining jurisdiction of provider reimbursement claims arising under the Medicare Act, and jurisdiction under § 1395oo(f) requires a final decision of the Secretary as a prerequisite to judicial review. To obtain a final decision, a provider must have presented its challenge to the agency's overpayment determination to the Medicare Provider Reimbursement Review Board ("PRRB"), received a final decision from the PRRB, and given the CMS Administrator sixty days to reverse, affirm, or modify the PRRB's decision. Because Plaintiffs in this case have satisfied

1

none of these statutory prerequisites, this Court lacks subject matter jurisdiction over Plaintiffs'
claims.

The second defect in Plaintiffs' lawsuit is its contention that the agency improperly paid
Mariner and therefore must recover from Mariner.  When a new lessee of a Medicare facility
chooses to accept assignment of the former lessee's Medicare provider agreement, however, the
new lessee assumes liability for overpayments made to the prior lessee.  *E.g.*, *United States v.
Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994).  Having chosen to accept
assignment of Mariner's provider agreement, Plaintiffs are responsible for any overpayments.

Plaintiffs' arguments to the contrary reflect their misunderstanding of the agency's
CHOW procedures, which call for continued payment to the *former* owner until CMS approves
the new owner's application, even though the facilities are generally operated by the *new* owner
during this period.  As a result of their apparent misunderstanding, Plaintiffs failed to make the
necessary arrangements with Mariner to ensure that Triad would be paid by Mariner for services
Triad rendered during the application period.  Instead, Plaintiffs double-billed the Medicare
program for the same set of services.  Having failed to follow agency procedure, Plaintiffs
cannot – as a matter of law or equity – saddle the Medicare program with a $2 million loss for
which Plaintiffs themselves are responsible by causing the Medicare program to pay twice for a
single set of services.

For these reasons, Defendants respectfully request that this Court deny Plaintiffs' motion
for summary judgment and grant Defendants' motion to dismiss for lack of subject matter
jurisdiction or, in the alternative, their cross-motion for summary judgment.

## STANDARD OF REVIEW

Actions are subject to dismissal when the court lacks subject matter jurisdiction over the claims. Fed. R. Civ. P. 12(b)(1). In reviewing a motion to dismiss for lack of subject matter jurisdiction, the court may where necessary consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).

In ruling on a motion for summary judgment, the court must determine first whether the moving party has met its burden of production: the movant must "inform[] the district court of the basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted). If the motion for summary judgment is properly supported, the burden shifts to the non-movant to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). In meeting this burden, the non-movant "may not rest upon mere allegation or denials of his pleading" but must present "affirmative evidence" showing a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986).

## STATUTORY AND REGULATORY FRAMEWORK

Medicare, the federal medical insurance program for the aged and disabled, is governed by Title XVIII of the Social Security Act ("the Medicare Act"), 42 U.S.C. §§ 1395 to 1395hhh. CMS is responsible for administering the Medicare program. Part A of the Medicare program provides coverage, *inter alia*, for post-hospital nursing home stays. *Id.* §§ 1395c to 1395i-5.

I.    **PAYMENT PROCEDURES**

To receive payment for services provided to Medicare beneficiaries under Medicare Part A, a skilled nursing facility ("SNF") must enter into a provider agreement with the Secretary of the Department of Health and Human Services ("HHS"). *Id.* § 1395cc(a). To enter a provider agreement, the SNF must undergo a comprehensive survey to ensure that it meets the health and safety requirements specified in the Medicare Act and CMS regulations. *See id.* §§ 1395i-3(a)(3), (b)-(d). Payment of a provider by the Secretary is accomplished through a "fiscal intermediary" ("FI"), either a public or a private entity (usually an insurance company under contract with the HHS Secretary), which makes the initial determination of amount of payment and handles the payments. *Id.* §§ 1395g, 1395h.

A.    Medicare Payment Methods for Skilled Nursing Facilities

Fiscal intermediaries pay SNFs for services rendered under Medicare Part A on the basis of a prospective payment system ("PPS"). 42 C.F.R. §§ 413.330 to 413.355. FIs pay most SNFs on the basis of regular billings submitted by the SNF reflecting the allowable prospectively-determined rates associated with treating the number of patients with the particular conditions reported by the SNF for that billing period. *Id.* § 413.335(a); *see also id.* § 413.337 (setting forth methodology for calculating prospective payment rates). These per diem costs and payments are then reconciled at the end of the cost reporting year in a process explained further below.

Alternatively, qualifying SNFs may elect to be paid on a "periodic interim payment" ("PIP") basis. 42 U.S.C. § 1395g(e); 42 C.F.R. §§ 413.64(h), 413.350. The FI bases biweekly PIP payments not on actual billings but on the SNF's average costs for a two-week period, an amount the FI derives from the SNF's historic payment levels. *See id.* §§ 413.64(h)(6), 413.350(b)(2). PIP providers, like non-PIP providers, still submit regular billings. *Id.*

§ 413.64(h)(7).  For PIP providers, however, the FI uses these billings not to calculate biweekly

payments (since the PIP provider has already been paid for that service period), but to conduct

semi-annual reviews to ensure that PIP payment amounts approximate actual costs as closely as

possible.  *Id.* § 413.350(b)(2).

  For both PIP and non-PIP SNFs, it may take several months for a facility to identify and

report all of its claims.  *See* Decl. of Thomas M. Bruce ("Bruce Decl.") ¶ 5 (noting that semi-

annual PIP reviews are typically conducted ninety days after the end of a service period to allow

providers adequate time to submit all of their claims).  The provider's regular billings therefore

frequently reflect claims for services provided weeks or months prior to claim submission.

  B. <u>Annual Cost Reconciliation</u>

  Regardless of the payment method, the FI reconciles interim payments with the SNF's

total allowable costs by means of an annual cost report that the provider submits at the end of its

fiscal year.  42 C.F.R. §§ 413.20(b), 413.24(f), 413.60(b).  The FI conducts an audit after the cost

report is received and makes an initial retroactive adjustment to the provider's account, known as

a "tentative" settlement.  *Id.* § 413.64(f)(2).  The FI then completes its full audit of the provider's

cost report and issues a Notice of Program Reimbursement ("NPR").  *Id.* § 405.1803.  The NPR

identifies any adjustments to the tentative settlement and states the amounts of any Medicare

overpayment or underpayment, the amount of reimbursement owed to the Medicare program,

and the reasons for the determination.  *Id.* §§ 405.1803(a), (b).  The FI must issue the NPR

"within a reasonable period of time" of receiving the provider's cost report and "should make

every effort to issue a NPR within 12 months of receipt of a cost report."  *Id.* § 405.1803(a);

*Medicare Provider Reimbursement Manual* ("PRM"), Pt. I, Ch. 29, § 2905.1, attached as Ex. C.

C.    <u>Administrative Appeal Procedures Regarding Overpayment Determinations</u>

When the FI's tentative settlement identifies an overpayment, the FI must notify the provider of its intent to offset or recoup payment and give the provider an opportunity for rebuttal.  42 C.F.R. § 405.373(a).  The provider must submit a rebuttal within fifteen days of the offset notification.  *Id.* § 405.374(a).  If the provider submits a rebuttal, CMS or the FI must, within fifteen days, consider the statement and determine whether the facts justify the offset.  *Id.* § 405.375(a).  This FI determination is an "initial determination" that is not appealable.  *Id.* § 405.375(c).

In contrast, when the NPR ultimately issues (after the tentative settlement), the provider may appeal to the Provider Reimbursement Review Board ("PRRB") if the amount in controversy is $10,000 or more and a hearing request is timely filed.  42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1801(a)(1), 405.1811, 405.1835(a).  The PRRB's decision is then final unless the Secretary – who has delegated his authority to the CMS Administrator – reverses, affirms, or modifies the PRRB's decision within sixty days.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. §§ 405.1875, 405.1877(a).  The provider may obtain judicial review of the final decision by commencing an action in a United States District Court within sixty days of receipt of notice of the agency's final decision.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877(a).

## II.    CHANGES OF OWNERSHIP ("CHOWs")

A Change of Ownership ("CHOW") of a provider facility occurs, *inter alia*, with "the lease of all or part of a provider facility."  42 C.F.R. § 489.18(a)(4).

A.    Processing a Change of Ownership

When a CHOW is expected to occur, the old and new owners[1] must each submit a Form

CMS-855A ("855A") application to their FI (or, if the FI changes, to their respective FIs).  *See*

*Medicare Program Integrity Manual* ("PIM"), Ch. 10, § 5.5.C.3. (setting forth procedures for

processing 855As from old and new owners), attached as Ex. B; *see also* 42 C.F.R. § 489.18(b)

("A provider who is contemplating or negotiating a change of ownership must notify CMS.").

The 855A is the agency's enrollment application for health care organizations seeking to provide

Medicare Part A services.

During the CHOW period, the FI for the new owner and the CMS Regional Office

("RO") process the new owner's 855A application.  *See* Ex. B (PIM), Ch. 10, § 5.5.C.3.

Processing activity includes, *inter alia*, verifying the new owners and managers against the

Medicare Exclusion Database and the General Services Administrative Debarment List,

verifying the new owner's tax identification number, and reviewing the sales agreement

submitted by the new owner (if applicable).  *See* Declaration of Ronald L. Smith ("Smith Decl.")

¶ 13.  The purposes of these activities are to determine whether a CHOW has indeed occurred

and to ensure that the new owner does not include individuals or entities with which the

Medicare program is not permitted to conduct business.  *Id.*

When the new owner's 855A is approved, the RO issues a "tie-in notice" to the new

owner and sends copies to the FI (or to both FIs, if the FI changes).  *Id.* § 15.  The tie-in notice

assigns the provider agreement to the new owner, retroactive to the transfer date.  *See* 42 C.F.R.

---

[1]    The CHOW at issue in this case involved a change in the lessee of the provider facilities, not a change in the owner of the facilities.  For ease of discussion, however, we refer throughout this Memorandum to Mariner and Plaintiffs as the old and new "owners" of the provider facilities.

§ 489.18(c) ("[T]he existing provider agreement will be automatically assigned to the new

owner.").  The tie-in notice terminates the CHOW period.

      B.     <u>Refusing/Accepting Assignment of a Former Owner's Provider Agreement</u>

In its 855A application, the new owner indicates whether it will accept or refuse

assignment of the former owner's provider agreement.

If the new owner refuses assignment, it must enter into a new provider agreement and

obtain a new provider number.  *See Medicare Financial Management Manual* ("FMM"), Ch. 3,

§ 130, attached as Ex. A; *see also Vernon Home Health, Inc.*, 21 F.3d at 696.  Unless and until

this process is complete, the new owner would be unable to participate in the Medicare program,

thus disrupting Medicare coverage and payment for services.  *See, e.g.*, *Raintree Healthcare*

*Corp. v. Omega Healthcare Investors, Inc.*, 431 F.3d 685, 687 (9th Cir. 2005) ("If Suncrest

instead had chosen to apply for a new number, the nursing home could not have participated in

the Medicare program while its application was pending.").

If the new owner accepts assignment of the old owner's provider agreement, the FI

continues to pay for services rendered during the 855A application period, thereby allowing the

new owner to provide continuous service to the patients at that facility and to receive continuous

payments.  In contrast to a new agreement, an assigned agreement is subject to the "terms and

conditions under which it was originally issued."  42 C.F.R. § 489.18(d).  Because one of those

conditions is that adjustments are made for overpayments (and underpayments), 42 U.S.C.

§ 1395g(a), the new owner is responsible for all overpayments (and is the beneficiary of all

underpayments) made to the former owner under the provider agreement:

> With assignment, the new owner assumes all penalties and sanctions under the Medicare
> program, including the repayment of any accrued overpayments, regardless of who had
> ownership of the Medicare agreement at the time the overpayment was discovered unless
> fraud was involved.  In addition, the new owner receives benefits of assuming the

> Medicare provider agreement, such as receiving underpayments discovered after the CHOW.
>
> . . .
>
> Where a provider undergoes a CHOW where the new provider accepts assignment of the previous owner's Medicare agreement, the responsibility for repaying any outstanding and future overpayments resides with the new owner.

Ex. A (FMM), Ch. 3, § 130; *see also Vernon Home Health, Inc.*, 21 F.3d at 696.

C.      Billings and Payments During a Change of Ownership

To the extent a new owner accepts assignment of the provider agreement, payments will continue through the CHOW period. These payments, however, are made to the former owner, because the former owner remains the holder of the provider agreement through the CHOW period (*i.e.*, until CMS has approved the 855A application). CMS relies on the new and old owners to work out an arrangement between themselves so that the new owner gets paid by the old owner for services the new owner renders during the CHOW period:

> B.   Payments During CHOWs
>
> In a CHOW, the intermediary shall continue to pay the old owner until it receives the tie-in notice from the RO. Hence, any request from the old or new owner to change the EFT account to that of the new owner shall be denied. It is ultimately the responsibility of the old and new owners to work out any payment arrangements between them while the CHOW is being processed by the intermediary and the RO.

Ex. B (PIM), Ch. 10, § 11.1.B.; *see also id.* Ch. 10, § 5.5.C.3. ("Medicare payments shall continue to be made to the old owners until the CHOW is approved by the RO, even if the old owner submits a CMS 588 to change the bank account to that of the new owner.").

As discussed above, SNFs must submit regular billings reflecting their allowable PPS costs, regardless of the payment methodology. 42 C.F.R. §§ 413.64(h)(7), 413.350(b)(3)(ii). During a CHOW, the former owner continues to submit these billings, as it may take the former owner several months to identify and submit all billings incurred for the pre-CHOW service

period.  *See, e.g.*, Bruce Decl. ¶ 5 (noting that semi-annual PIP reviews are typically conducted ninety days after the end of a service period to allow providers adequate time to submit all of their claims).

## ARGUMENT

## I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION.

It is axiomatic that "[a] federal court's subject matter jurisdiction, constitutionally limited by article III, extends only so far as Congress provides by statute."  *Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487, 492 (D.C. Cir. 1984).  Therefore, "the court must scrupulously observe the precise jurisdictional limits prescribed by Congress."  *Id.* at 492 n.9.

Plaintiffs' complaint cites 28 U.S.C. § 1331 as the sole basis for this Court's jurisdiction. Compl. ¶ 13.  For claims arising under the Medicare Act, however, § 1331 is not a basis for judicial review.  Instead, review of Medicare provider reimbursement determinations is available only to the extent that Plaintiffs have complied with the procedures set forth in the Medicare Act. Because Plaintiffs have failed to comply with these procedures, this Court lacks subject matter jurisdiction over Plaintiffs' claims, and the Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

      A.    <u>The Federal Question Statute, 28 U.S.C. § 1331, Does Not Confer Jurisdiction Over Plaintiffs' Medicare Act Claims.</u>

Section 405(h) of the Social Security Act, made applicable to the Medicare Act by 42 U.S.C. § 1395ii, strips courts of general federal question jurisdiction under 28 U.S.C. § 1331 for claims arising under the Medicare Act:

> The findings and decision of the [Secretary] after a hearing shall be binding upon all individuals who were parties to such hearing.  No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided.  No action against the United States, the [Secretary], or any officer or

employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter [*i.e.*, the Medicare Act].

*Id.* § 405(h).

Accordingly, in *Shalala v. Illinois Council on Long Term Care, Inc.*, the Supreme Court held that a nursing home provider's challenge to Medicare Part A regulations may not be brought under 28 U.S.C. § 1331 but, under § 405(h) (as incorporated by 42 U.S.C. § 1395ii), must be channeled through the review provisions of the Medicare Act. 529 U.S. 1, 10, 13 (2000); *see also Your Home Visiting Nurse Servs. v. Shalala*, 525 U.S. 449, 456 (1999) ("[J]udicial review under the federal-question statute, 28 U.S.C. § 1331, is precluded by 42 U.S.C. § 405(h)); *Am. Chiropractic Ass'n v. Leavitt*, 431 F.3d 812, 816-18 (D.C. Cir. 2005) (district lacked jurisdiction under 28 U.S.C. § 1331 to review challenge to Secretary's interpretation of Medicare statute); *BP Care, Inc. v. Thompson*, 398 F.3d 503, 509 (6th Cir. 2005) (district court lacked jurisdiction under 28 U.S.C. § 1331 to review Medicare provider's challenge to agency's successor liability policies); *Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1114-15 (9th Cir. 2003) (§ 405(h) required channeling through administrative process Medicare provider's claim "deal[ing] with the appropriateness of the [agency's] and [FI's] decisions with respect to the compensation the [provider] should have received for the services it provided to Medicare beneficiaries"); *Caregivers Plus, Inc. v. Thompson*, 311 F. Supp. 2d 728, 733 (N.D. Ind. 2004) (no jurisdiction under § 1331 to review provider's reimbursement claim); *Great Rivers Home Care, Inc. v. Thompson*, 170 F. Supp. 2d 900, 904 (E.D. Mo. 2001) (same).

The "claim arising under" language of § 405(h) is broadly construed to "include any claims in which 'both the standing and the substantive basis for the presentation' of the claims" is the Medicare Act. *Heckler v. Ringer*, 466 U.S. 602, 615 (1984) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 760-61 (1975)). The Supreme Court has made clear that the bar on federal

question jurisdiction contained in the Medicare statute "plainly" applies "irrespective of whether

the individual challenges the agency's [decision] on evidentiary, rule-related, statutory,

constitutional, or other legal grounds." *Ill. Council*, 529 U.S. at 10.  The Court has also made

clear that if administrative processes are required as a prerequisite to judicial review, they must

be followed "even if they are time-consuming . . . and even if the agency cannot grant the relief

sought." *Three Lower Counties Cmty. Health Servs. Inc. v. U.S. Dep't of Health & Human

Servs.*, 517 F. Supp. 2d 431, 435 (D.D.C. 2007) (citing *Ill. Council*, 529 U.S. at 20, 22-23).

In this case, there can be no dispute that Plaintiffs' Medicare provider reimbursement

claims "aris[e] under" the Medicare Act, 42 U.S.C. § 405(h), thereby precluding jurisdiction of

those claims under 28 U.S.C. § 1331, and instead requiring that those claims be channeled

through the administrative process.

      B.    <u>Plaintiffs Have Failed to Comply With the Statutory Prerequisites for Obtaining
Judicial Review.</u>

Under the Medicare Act, the jurisdiction of a federal court to review a provider's

reimbursement claim is conferred by 42 U.S.C. § 1395oo(f)(1), which provides:

> Providers shall have the right to obtain judicial review of any final decision of the
> [PRRB], or of any reversal, affirmance, or modification by the Secretary, by a civil action
> commenced within 60 days of the date on which notice of any final decision by the
> [PRRB] or of any reversal, affirmance, or modification by the Secretary it received.

42 U.S.C. § 1395oo(f)(1).  Under this provision, judicial review of a provider reimbursement

claim requires a "final decision" of the Secretary.  *Id.  Cf.* 42 U.S.C. § 405(g), made applicable to

the Medicare Act by 42 U.S.C. § 1395ff(b)(1)(A) (requiring "final decision" of agency as

prerequisite to judicial review).

Section 1395oo sets forth the procedures for obtaining a "final decision" of the Secretary.

Specifically, a provider dissatisfied with its FI's final determination of the amount of total

program reimbursement due (*i.e.*, the NPR) is entitled to a hearing before the PRRB if the amount in controversy exceeds $10,000 and if a hearing request is timely filed.  *Id.* § 1395oo(a); *see also* 42 C.F.R. §§ 405.1809, 405.1835(a), 405.1877(a).  The PRRB's decision is final unless, within sixty days, the Secretary reverses, affirms, or modifies the PRRB's decision.  *Id.* § 1395oo(f)(1).

An FI's "tentative" settlement, in contrast to an NPR, is an initial determination that is not appealable.  42 C.F.R. § 405.375(c).  Courts therefore lack subject matter jurisdiction to review an FI's tentative settlement determinations.  *See, e.g.*, *Great Rivers Home Care, Inc.*, 170 F. Supp. 2d at 904-06.  Instead, district courts have jurisdiction to review a Medicare FI's overpayment determination only after the FI issues the NPR, the provider challenges the NPR with the PRRB, the PRRB issues a decision, and the sixty-day period in which the Secretary may affirm, modify, or reverse the PRRB's decision expires.  *See id.*

In this case, Plaintiffs submitted their first annual cost report on November 29, 2007, for the fiscal year ending June 30, 2007.  Decl. of Donna Smoot ("Smoot Decl.") ¶ 10.  On February 11, 2008, in accordance with CMS regulations, 42 C.F.R. § 413.64(f)(2), Plaintiffs' fiscal intermediary, Blue Cross Blue Shield of Georgia ("Georgia BCBS") issued tentative settlements for Plaintiffs' provider facilities reflecting the amount of the overpayments in question and seeking recoupment of those overpayments.  *See* Pls.' Mot. for Summ. J. ("Pls.' Mot.), Ex. 10. These tentative settlements are *initial* determinations that are not appealable.  42 U.S.C. §§ 405.375(c).  This Court therefore lacks jurisdiction over Plaintiffs' challenge to these initial determinations.

Plaintiffs' challenge to Georgia BCBS's overpayment determinations will ultimately be subject to judicial review, to the extent those determinations become final and to the extent

Plaintiffs properly exhaust their administrative remedies. Specifically, Plaintiffs will have

exhausted their administrative remedies after Georgia BCBS issues their NPRs (which it expects

to do by September 30, 2008, Smoot Decl. ¶ 18), and after Plaintiffs have challenged the NPRs

with the FI, challenged the NPRs with the PRRB, received a final decision from the PRRB, and

given the CMS Administrator sixty days to reverse, affirm, or modify the PRRB's decision.

Until then, however, Plaintiffs' claims are not subject to this Court's jurisdiction. *See, e.g.*,

*Great Rivers Home Care*, 170 F. Supp. 2d at 905-06 (holding that district court had no

jurisdiction to review overpayment determinations because NPRs had not yet issued and provider

had not yet challenged NPRs with PRRB or asked Secretary to waive this administrative

requirement).

      C.    <u>Plaintiffs' Claims of Financial Distress Do Not Justify Their Disregard of the
Statutory Requirements.</u>

Plaintiffs have suggested that they are in such severe financial distress that they cannot

survive if forced now to pay the amounts they owe. *See* Pls.' St. of Material Facts ("Pls.' St.")

¶ 23. Plaintiffs' claims do not justify abdication of the statutory exhaustion requirement. As an

initial matter, "[i]f the statute does mandate exhaustion, a court cannot excuse it." *Avacados*

*Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004). As explained above, the Medicare

Act does require exhaustion and, as the Supreme Court explained in *Illinois Council*, this

requirement reflects Congress's determination that the advantages of exhaustion outweigh the

hardship to which the exhaustion requirement may subject some regulated entities:

> Insofar as § 405(h) prevents application of the . . . "exhaustion" exceptions, *i.e.*, insofar
> as it demands the "channeling" of virtually all legal attacks through the agency, it assures
> the agency greater opportunity to apply, interpret, or revise policies, regulations, or
> statutes without possibly premature interference by different individual courts applying
> . . . "exhaustion" exceptions case by case. But this assurance comes at a price, namely,
> occasional individual, delay-related hardship. In the context of a massive, complex
> health and safety program such as Medicare, embodied in hundreds of pages of statutes

and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts, paying this price may seem justified. In any event, such was the judgment of Congress . . . .

*Ill. Council*, 529 U.S. at 13.

Furthermore, claims of financial distress do not justify judicial waiver of the requirement to seek PRRB review of the NPR before filing a lawsuit. *See V.N.A. of Greater Tift County, Inc. v. Heckler*, 711 F.2d 1020, 1034 (11th Cir. 1983) ("Having chosen to operate within the [Medicare] system on a cash-poor basis, they take a knowing risk that an intermediary's determination might delay payment."); *Great Rivers Home Care, Inc.*, 170 F. Supp. 2d at 905 (in challenge to overpayment determination, declining to waive administrative requirement to challenge NPR with PRRB despite provider's allegations of "severe economic distress" pending issuance of NPR and PRRB review). The same is true here.

Finally, any allegations by Plaintiffs of financial hardship are further mitigated by the fact that Georgia BCBS, Plaintiffs' FI, advised Plaintiffs that they could propose to Georgia BCBS an extended repayment schedule if they could not afford full repayment now:

> If you are unable to refund the entire amount at this time, advise this office immediately so that we may determine if you are eligible for a repayment plan. You must explain and document your need for an extended repayment plan (ERP) showing financial hardship. . . . Requests for extended repayments for 12 months or more must be accompanied by at least one letter from a financial institution denying your loan request for the amount of this overpayment. . . . You have 15 days from the date of this letter . . . to submit a repayment schedule (along with a check for the first proposed payment) or a check for the full amount before suspension of interim payments begins.

Pls.' Mot., Ex. 10 at 2; *see also* Email from Sandra Ludwig (Georgia BCBS) to Jack Tranter (Triad) (Feb. 25, 2008) (reflecting discussion of repayment plan by Georgia BCBS), attached as Ex. F. To Defendants' knowledge, Plaintiffs have failed to pursue any of the options Georgia

BCBS set forth for providers suffering financial hardship, including seeking a temporary loan and/or arranging a repayment plan for the amount of the overpayments.[2]

Accordingly, any allegations by Plaintiffs of financial distress pending issuance of the NPR and PRRB review will not suffice as a basis for disregarding the exhaustion requirements of the Medicare Act.

*        *        *

Having failed to wait for the NPR to issue and to challenge the overpayment determination with the PRRB as required by § 1395oo(f), having failed (to Defendants' knowledge) to seek a loan that could have provided Plaintiffs the financial flexibility to comply with the statute and regulations, having failed to offer to its FI an extended repayment plan for the amount of the overpayments, and having chosen to operate on such a cash-poor basis that they allegedly cannot afford to await PRRB review, Plaintiffs cannot now complain that their economic circumstances are so dire that this court should disregard the explicit exhaustion requirement contained in the Medicare statute.  This court lacks subject matter jurisdiction over this matter, and this lawsuit should be dismissed under Federal Rule of Civil Procedure 12(b)(1).

## II.    **PLAINTIFFS' CLAIMS FAIL ON THE MERITS.**

To the extent Plaintiffs have established subject matter jurisdiction, they presumably bring this lawsuit under the Administrative Procedure Act, pursuant to a theory that the agency's offset determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Defendants' recoupment activity in this case – far

---

[2]     In addition, Plaintiffs' allegation that "[i]f CMS withholds funds due to Plaintiffs . . ., Plaintiffs will not be able to continue providing skilled nursing and other care," *see* Pls.' St. ¶ 23, is dubious.  Just last year, Plaintiffs managed to survive for *five months* without a single payment from the Medicare program.  *See* Smoot Decl. ¶ 7 (stating that Plaintiffs, despite providing services since December 1, 2006, submitted no Medicare claims until May 2007).

from arbitrary and capricious – reflects a straight-forward application of agency regulations and procedures holding the current holder of the provider agreement responsible for all overpayments made to the provider number.

A.    Triad Is Liable as Mariner's Successor for Overpayments to Mariner.

As discussed above, a new owner (or lessor) of a Medicare provider facility must choose either to accept assignment of the facility's existing provider agreement or to apply for its own provider agreement. The risk of accepting assignment is that the old owner's liabilities transfer with the provider agreement. More specifically, Medicare regulations provide that an assigned agreement is subject to the "terms and conditions under which it was originally issued." 42 C.F.R. § 489.18(d). One of those conditions is that adjustments are made for overpayments: "The Secretary shall periodically determine . . . necessary adjustments on account of previously made overpayments . . . ." 42 U.S.C. § 1395g(a). Accordingly, "[w]ith assignment, the new owner assumes all penalties and sanctions under the Medicare program, including the repayment of any accrued overpayments, *regardless of who had ownership of the Medicare agreement at the time the overpayment was discovered* unless fraud was involved." Ex. A (FMM), Ch. 3, § 130 (emphasis added).

Courts have therefore held that, if a new owner accepts assignment of an old owner's provider agreement, the new owner assumes liability for overpayments made to, and civil monetary penalties incurred by, the old owner. *Vernon Home Health, Inc.*, 21 F.3d at 696; *see also Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1103-04 (8th Cir. 2000); *Delta Health Group, Inc. v. U.S. Dep't of Health & Human Servs.*, 459 F. Supp. 2d 1207, 1221 (N.D. Fla. 2006); *BP Care, Inc. v. Thompson*, 337 F. Supp. 2d 1021, 1028-29 (S.D. Ohio 2003), *aff'd on other grounds*, 398 F.3d 503 (6th Cir. 2005). A policy pursuant to which liability attaches to the

provider number (which remains constant when the new owner accepts assignment) rather than to the owner (which changes) facilitates the provision of continuous Medicare services and payments during a CHOW. *See Vernon Home Health, Inc.*, 21 F.3d at 696 ("By encompassing a system of interim payments on an estimated cost basis, subject to year-end accounting, the program ensures Medicare providers a steady flow of income sufficient to provide service. The assignee of a provider number is subject to this accounting procedure in order to provide continuous service.").

Accordingly, because overpayments were made to the Mariner/Triad provider numbers pursuant to the Mariner/Triad provider agreements, Plaintiffs, the current holders of those provider agreements, are responsible for the overpayments.

B.     Plaintiffs' Arguments to the Contrary Lack Merit.

Plaintiffs attempt to distinguish *Vernon Home Health, Inc.* and similar cases on the basis that the facts of those cases involved overpayments that occurred *before* the CHOW application period, rather than *during* the CHOW application period. *See* Pls.' Memo. at 4-8. Plaintiffs' argument fails.

First, there is no basis in the regulations or the statute for drawing a distinction between overpayments made pursuant to the provider agreement *during* the CHOW period as opposed to *before* the CHOW period. The applicable regulatory and statutory provisions state that "[a]n assigned agreement is subject to all applicable statutes and regulation and to the terms and conditions under which it was originally issued," 42 C.F.R. § 489.18(d), one of which is liability for overpayments made pursuant to that provider agreement, 42 U.S.C. § 1395g. The FI's continued payments to Mariner until CMS recognized Plaintiffs as the holders of the provider agreements were proper. That the provider assignments were ultimately made retroactive to

18

December 1, 2006 (so that Plaintiffs, for annual cost reporting purposes, would be recognized as the holders of the provider agreements as of the date they began operating the facilities, Smith Decl. ¶ 15), does not change the fact that, on the date the payments in question were made, CMS still recognized Mariner as the holder of the provider agreements.

Second, CMS procedures clearly state that payments will continue to be made to the *former* owner during the CHOW and, as such, the new and old owners should work out payment arrangements *between themselves* during a CHOW:

> B. Payments During CHOWs
>
> In a CHOW [*i.e.*, a change of ownership], the intermediary shall continue to pay the old owner until it receives the tie-in notice from the RO. Hence, any request from the old or new owner to change the EFT account to that of the new owner shall be denied. ***It is ultimately the responsibility of the old and new owners to work out any payment arrangements between them while the CHOW is being processed by the intermediary and the RO.***

Ex. B (PIM), Ch. 10, § 11.1.B. (emphasis added); *see also id.* Ch. 10, § 5.5.C.3. ("Medicare payments shall continue to be made to the old owners until the CHOW is approved by the RO, even if the old owner submits a CMS 588 to change the bank account to that of the new owner."). Indeed, the purpose of assuming a provider agreement is to avoid cessation of Medicare services and payments during the CHOW period. Because payments cannot be made to the new owner until CMS recognizes the new owner as the holder of the provider agreement, *see* Smith Decl. ¶ 17, CMS policy calls for payments to the old owner to continue during the CHOW period. Plaintiffs therefore knew, or with due diligence certainly should have known, that Mariner would continue to be paid during the CHOW period and that Plaintiffs would need to work out an agreement with Mariner to transfer those payments to Plaintiffs. To the extent that Plaintiffs were unable to do so because of the unusual nature of the transfer that occurred in

this case, Plaintiffs should have obtained their own provider agreement and number.  Instead, Plaintiffs chose to assume the risk.

Finally, the debt owed by Plaintiffs is just as easily (or perhaps better) characterized as an overpayment to *Plaintiffs*, for which even Plaintiffs could not dispute they are responsible, not an overpayment to Mariner.  As just discussed, when a new owner accepts assignment of the provider agreement, the FI continues to pay the former owner through the end of the CHOW.  Ex. B (PIM), Ch. 10, § 11.1.B.  The approximately $2 million overpayment that occurred in this case was therefore not an improper overpayment by Mutual of Omaha (Mariner's FI) to *Mariner* during the CHOW, but an overpayment by Georgia BCBS (Plaintiffs' FI) to *Plaintiffs* after the CHOW.  Because the overpayments that occurred in this case are arguably better characterized as overpayments to Plaintiffs – for which Plaintiffs are clearly responsible – it makes no sense to distinguish *Vernon Home Health, Inc.* on the facts of this particular case.  To do so would be to determine liability on the basis of an entirely semantic distinction.

In sum, a sizeable overpayment occurred here because Plaintiffs disregarded CMS's CHOW procedures, most notably the procedures regarding payments during a CHOW.  As the Supreme Court has explained in the context of a Medicare provider's action challenging an HHS overpayment determination:

> Justice Holmes wrote:  "Men must turn square corners when they deal with the Government."  This observation has its greatest force when a private party seeks to spend the Government's money.  Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds.  This is consistent with the general rule that those who deal with the Government are expected to know the law . . . .

*Heckler v. Cmty. Health Servs. of Crawford County*, 467 U.S. 51, 63 (1984) (citations omitted). The Medicare program should not bear the $2 million loss associated with Plaintiffs' disregard of Medicare program procedures.

     C.    <u>Mutual of Omaha's Payments to Mariner During the CHOW Were Made Consistent With CMS Procedures.</u>

Plaintiffs alternatively argue that even if they could be liable for overpayments made to Mariner during the CHOW period, CMS's payments to Mariner were improper and therefore unrecoverable. Pls.' Memo. at 8-10. In particular, Plaintiffs argue that Mariner stopped submitting required billings on November 30, 2006, and therefore had no right to payment after that date. *Id.* at 10. This argument fails on several levels.

As an initial matter, the propriety of the payments to Mariner made pursuant to the Mariner/Triad provider agreement is irrelevant. The purpose of recoupment is to collect money improperly paid to providers for Medicare services. That the FI should never have paid the provider the contested sum is therefore not a defense to an overpayment determination but the reason for the overpayment determination. If CMS determines, for whatever reason, that the Mariner/Triad provider number should not have been paid a certain sum, then CMS overpaid that provider number and is entitled to recover that overpayment.[3]

Furthermore, Mutual of Omaha's payments to Mariner during the CHOW period were made consistent with agency procedure. Plaintiffs' argument to the contrary is not only factually incorrect but also reflects their misunderstanding of the regulatory process. Plaintiffs are correct that entities paid on a PIP basis, like Mariner had been paid, must submit regular billings so the

---

[3]    The agency frequently recovers money *improperly* paid through the Medicare program. *See, e.g.*, *Action Alliance of Senior Citizens v. Leavitt*, 483 F.3d 852, 854 (D.C. Cir. 2007) (recognizing HHS's efforts to collect $47 million of erroneous payments resulting from agency's "monumental gaffe").

FI may conduct periodic review to determine whether its PIP payment estimates are accurate. 42 C.F.R. § 413.350(b)(2). Plaintiffs are also correct that a cessation in billings should lead to a cessation in PIP payments. *Id.* § 413.350(b)(3)(ii); *see also id.* § 413.64(h).

Plaintiffs are incorrect, however, to assert that Mutual of Omaha should have known on December 1, 2006, the beginning of the CHOW period, whether Mariner was still submitting billings. When an entity is paid on a PIP basis, billings are submitted for the purpose of periodic reviews of PIP payment levels, not for the purpose of making monthly payments to providers. *See id.* § 413.350(b)(2). For SNFs, the FI conducts these PIP reviews at least twice per year. *Id.* The first PIP review of Mariner's facilities after December 1, 2006, was completed on March 30, 2007. Bruce Decl. ¶ 6. As such, the earliest Mutual of Omaha could or should have realized a cessation of billings from these five facilities was March 30, 2007, by which time all but one of the PIP payments at issue had already been made. *See* Pls.' St. ¶ 13.

In addition, Plaintiffs incorrectly assert that Mutual of Omaha received no billings from Mariner's provider number during the CHOW period. The March review, for example, reflected receipt of 109 claims from Mariner's provider number in the month of February. Bruce Decl. ¶ 8. Such continued billings are the norm during a CHOW because the former owner must continue to submit billings reflecting its costs for the pre-CHOW period, and it typically takes months for an entity to complete its submission of claims for a particular time period. *See id.* ¶ 5; Smith Decl. ¶ 18. As such, an FI would have no reason to stop PIP payments to a former owner as a result of a cessation in billings until potentially months after the transfer date when either (1) the new owner's 855A application has been approved and the tie-in notice issues; or (2) a PIP review eventually reveals a cessation in claims activity.

Plaintiffs are therefore wrong to assert that Mutual of Omaha should have discontinued PIP payments to Mariner on December 1, 2006.  Because Mariner's billings continued through the CHOW period, Mutual of Omaha's PIP payments to Mariner through the CHOW period were made consistent with agency procedures.

*      *      *

Under Plaintiffs' theory of the case, Plaintiffs' improper[4] 855A applications submitted to Georgia BCBS on November 30, 2006, should have alerted Mutual of Omaha to stop payments to Mariner the next day.  But the 855A, even a proper 855A, is not a "stop payment" vehicle.  Instead, the tie-in notice is the "stop payment" vehicle.  Mutual of Omaha therefore properly paid Mariner until April 12 and 26, 2007, the dates of the tie-in notices.  Because Triad then billed, and Georgia BCBS paid, for the same service period, a substantial overpayment occurred, for which Plaintiffs, as the current holders of the provider agreements, are responsible.  Plaintiffs' misunderstanding of the regulatory system in which they have chosen to operate does not – as a matter of law or equity – warrant a $2 million loss to the Medicare program.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant Defendants' Motion to Dismiss or, in the alternative, their Cross-Motion for Summary Judgment, and deny Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

`

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

---

[4]    In addition to filing their applications using erroneous forms, Smoot Decl. ¶ 3, Plaintiffs also failed to identify Mutual of Omaha as the outgoing FI in their initial 855A applications, as specifically requested in that form.  *See* Pls.' Memo., Ex. 4 (Triad at LaGrange's Nov. 30, 2006, 855A) at 6.

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

s/ Wendy M. Ertmer
WENDY M. ERTMER
DC Bar No. 490228
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, DC  20530
Telephone:  (202) 616-7420
Fax:  (202) 616-8470
Email:  wendy.ertmer@usdoj.gov

*Counsel for Defendants*

Dated:  March 17, 2008

# EXHIBIT A

# Medicare Financial Management Manual
## Chapter 3 - Overpayments

**Table of Contents**
*(Rev. 106, 07-03-06)*

10 – Overpayments Determined by the FI or Carrier
    10.1 – Aggregate Overpayments
    10.2 – Individual Overpayments
20 – Recovery of Cost Report Overpayments- Cost Report Filed
    20.1 – Part A Provider is Participating in Medicare and Medicaid
    20.2 – Provider is No Longer Participating in Medicare and Not Participating in Medicaid
    20.3 – Provider is No Longer Participating in Medicare But is Participating in Medicaid
30 – Recovery of Cost Report Overpayments- Overdue Cost Report
    30.1 - Part A Provider is Participating in Medicare and Medicaid
    30.2 - Provider is No Longer Participating in Medicare and Not Participating in Medicaid
    30.3 - Provider is No Longer Participating in Medicare But is Participating in Medicaid: One or More Cost Reports Not Filed
40 – Recovery of Claims Accounts Receivables from the Provider- FI Only
    40.1 – Demand Letter Contents
    40.2- Sample Demand Letter for Claims Accounts Receivables
50 – Recovery of Overpayments When a Provider Changes its FI- FI Only
    50.1 – Action by Outgoing FI
    50.2 – Action by Incoming FI
    50.3 – Extended Repayment Plan – Change of FI
60 – Interim Rate Adjustments and Periodic Interim Payment Adjustments – FI Only
70 – Determining Liability and Waiver of Recovery for Overpayments
    70.1 – 1879 Determination – Limitation of Liability
    70.2 – 1842(l) Determination
    70.3 – 1870 Determination – Waiver of Recovery of an Overpayment
80 – Individual Overpayments Discovered Subsequent to the Third Year
    80.1 – How to Determine the Third Calendar Year After the Year the Payment was Approved

    80.4 - Recovery of Overpayment Due to Overdue Cost Report
90 – Provider Liability
    90.1 – Examples of Situations in Which Provider is Liable
    90.2 – Provider Protests its Liability
100 – Beneficiary Liability
110 – Recovery Where the Beneficiary is Liable for the Overpayment

110.1 – Recovery Where the Beneficiary is Covered Under Medicaid or Another Health Insurance Plan, Private or Governmental
110.2 – Recovery From the Beneficiary
110.3 - When to Suspend Efforts to Recover from the Beneficiary Following the Initial Demand Letter
110.4 – Content of Demand Letter to Beneficiary
110.5 – Sample Demand Letter to Beneficiary
110.6 – Optional Paragraphs for Inclusion in Demand Letters
110.7 – Recovery Where Beneficiary is Deceased
110.8 – Beneficiary Wishes to Refund in Installments
110.9 – Beneficiary Protests
110.10 – When the FI or Carrier Does Not Take Recovery Action in Beneficiary Cases but Considers Whether Waiver of Recovery is Applicable
110.11 – Recording Overpayment Cases in Which the Provider is Not Liable- FI Only
120 – Referral to the Department of Justice (DOJ)
120.1 – Communication on Cases Sent to RO for DOJ Referral
120.2 – Cases Referred to DOJ for Possible Litigation
130 – Change of Ownership (CHOW)
140 - Bankruptcy
140.1 - Glossary of Acronyms
140.2 - Basic Bankruptcy Terms and Definitions
140.2.1 - Bankruptcy is Litigation
140.2.2 - Types of Bankruptcies
140.2.3 - Filing Bankruptcy Draws a Line in the Sand
140.2.4 - Bankruptcy Affects Nearly All Medicare Operations
140.2.5 - Recoupment and Set-off
140.2.6 - Time is of the Essence
140.2.7 - Definitions
140.3 - Contractor's Establishment of Relationships to Ensure Effective Actions Regarding Providers In Bankruptcy
140.3.1 - Contractor Staff Must Establish Relationships to Ensure That the RO and Regional Counsel Receive Prompt Notice of Provider Bankruptcies, so That Medicare Can Take Quick Action
140.3.2 - Contractors Must Recognize and Advise RO Staff About Potential Provider Bankruptcies
140.3.3 - Contractor Staff Will Establish a Relationship With the RO That has Jurisdiction Over the Bankruptcy
140.3.4 - RO Jurisdiction Generally Parallels the Bankruptcy Court Where Case Is Filed
140.3.5 - Contractor and Regional Office Bankruptcy Point of Contact Staff Member
140.4 - Actions to Take When a Provider Files for Bankruptcy
140.4.1 - Establish Effective Lines of Communications with Partners
140.4.2 - Respond to RO Requests for Information
140.4.3 - Immediate Contractor Directives From the RO

140.4.4 - Tracking Debts/CO Communications
140.5 - Chain Bankruptcies
140.5.1 - Chain Providers
140.5.2 - Single Providers Serviced By a National Contractor
140.6 - Affirmative Recovery Actions
140.6.1 - Working with the RO and Regional Counsel's Office
140.6.2 - Assumption of the Medicare Provider Agreement
140.6.3 - Settlement Agreements or Stipulations
140.6.4 - Recoupment
140.6.5 - Administrative Freeze/Setoff
140.7 - Preparing and Filing Proof of Claim
140.8 - Closure Bankruptcy Cases And Treatment Of Overpayment Reporting
Systems At End Of Bankruptcy
140.8.1 - Closing the Bankruptcy Case
140.8.2 - Debt Located at the Debt Collection Center or Department of the Treasury
140.8.3 - Managing Bankruptcy Debt at the Contractor Location

Bankruptcy Attachments

Attachment A - Referral Checklist in Word format (41.9 KB)
Attachment B - Contractor Bankruptcy Checklist in Word format (30.5 KB)
150 – Accelerated Payments – FI Only
150.1 – Eligibility for Accelerated Payment
150.2 – Computation of the Accelerated Payment
150.3 – The Accelerated Payment and the Provider Overpayment Reporting
(POR) System
150.4 – Recoupment of the Accelerated Payment
Exhibit 1 – Sample Format for Provider Request for Accelerated Payment
160 – Termination of Collection Action
160.1 – Termination of Collection Action – Provider Overpayments
160.2 – Termination of Collection Action – Beneficiary Overpayments
170 – General Overpayment Provisions
170.1 – Offset of Overpayments Against Other Benefits Due- FI Only
170.2 – When the FI or Carrier Does Not Attempt Recovery Action
170.3 - Information and Help Obtainable from the Social Security Office   (SSO)
170.4 – Recovery Where Physician or Other Individual Practitioner is
Deceased- Carrier Only
170.5 – Provider Offers to Settle on Compromise Basis
170.6 – Unsolicited Overpayment Refunds
170.7 – Timely Deposit of Overpayment Refund Checks
170.8 – Informal Referral to RO
180 – Exhibits
180.1-Exhibit 1 – Provider Overpayment Reporting System
180.1.1- Provider Overpayment Reporting System- Data Entry
180.1.2- Provider Overpayment Report Printout
180.1.3- POR System User Manual
180.1.4- List of Status Codes

180.1.5- Posting Interest Entries
180.1.6- Request Provider Debts from the POR History File
180.1.7-Requesting Report from the AD Hoc Reports Management System (ARMS)
180.2- Exhibit 2- Physician/Supplier Overpayment Reporting (PSOR) System
180.2.1- Data Entry
180.2.2- PSOR User Manual
180.2.3 – Advance Payments User Manual
*190 – Collection of Fee-for-Service Payments Made During Periods of Medicare Advantage (MA) Enrollment*

forwards the information to the FI/Carrier for provider notification. If the provider offers a compromise, the FI/Carrier shall notify the RO and submit the following information:

- Relevant documentation relating to the offer to compromise including, but not limited to, the name, title, and position of the party making the offer, the amount of the compromise offer to settle or otherwise dispose of the overpayment, and the financial standing of the debtors; and

- Recommendations of the U. S. Attorney, if any.

The FI/Carrier shall forward the offer of compromise to the CMS Claims Collection Officer (CCO) through the RO.

In most cases, the U.S. Attorney assigned the Medicare overpayment case will not be fully familiar with Medicare procedures, laws, regulations, or reimbursement. The FI/Carrier may be requested to provide technical information to supplement the U. S. Attorney's knowledge. As cases are readied for litigation, the RO may contact the FI/Carrier for assistance in documenting the administrative record, e.g., a list of FI potential witnesses and technical advisors.

## 130 – Change of Ownership (CHOW)

### (Rev. 29, 01-02-04)

When a provider undergoes a CHOW, the provider agreement is automatically assigned to the new owner unless the new owner rejects assignment of the provider agreement. The paragraphs below describe the impact of assignment on overpayment recovery.

Assignment of Medicare Provider Agreement:

Automatic assignment of the existing provider agreement to the new owner means the new owner is subject to all the terms and conditions under which the existing agreement was issued. (See State Operations Manual, §3210) With assignment, the new owner assumes all penalties and sanctions under the Medicare program, including the repayment of any accrued overpayments, regardless of who had ownership of the Medicare agreement at the time the overpayment was discovered unless fraud was involved. In addition, the new owner receives benefits of assuming the Medicare provider agreement, such as receiving underpayments discovered after the CHOW.

When a provider undergoes a CHOW where the new provider accepts assignment of the previous owner's Medicare agreement, the responsibility for repaying any outstanding and future overpayments resides with the new owner. Exception: If any of the overpayments determined for a fiscal year when the previous owner had assignment were discovered due to fraud the responsibility for the repayment of the overpayments does not shift to the new provider. It stays with the old provider.

A sales agreement stipulating that the new owner is not liable for the overpayments made to the previous owner is not evidence enough for recovery from the new owner to not occur. Medicare was not a part of the sales agreement. That is a civil matter and it would be up to the new owner to enforce the sales agreement. If the new owner assumes assignment of the Medicare agreement, Medicare will attempt to recover from the new/current owner regardless of the sales agreement.

The intermediary should attempt collection from the new owner.  If this is not successful and the FI/Carrier has reasonable evidence that the previous owner can repay the overpayment it should refer the case to the regional office.  The regional office will then confer with the regional OGC and decide if this case warrants collection from the previous owner.  This should be completed before the debt is transferred to the Department of Treasury.

Nonassignment of a Medicare provider agreement:

If the new owner refuses to accept assignment of the Medicare agreement, the new owner must enter into its own Medicare agreement.  In this case there would be no CHOW of the Medicare agreement and the previous owner would still be responsible for any outstanding overpayments.

## 140 - Bankruptcy -
**(Rev. 12, 10-18-02)**

This section contains actions that the contractors must take to safeguard the Medicare Trust Funds when a provider files for bankruptcy. This section does not address bankruptcy issues involving debts arising under the MSP provisions. (Although this Manual will usually use the term "provider," its provisions also apply to suppliers, including physicians). However, use of the term "provider" does not mean that the Medicare program considers suppliers and physicians to be providers. It also explains how to report accurately the Centers for Medicare & Medicaid Services' (CMS) accounts receivable balances and support CMS's efforts to effectively evaluate and manage bankruptcy cases.

This manual will guide contractor staff through the initial stages of a provider bankruptcy. It is not intended to be, and cannot be, a step by step process from beginning to end. Bankruptcy is litigation. Bankruptcy law and the bankruptcy court affect all the actions CMS and its contractors take concerning a bankrupt Medicare provider. Therefore, contractor staff must consult closely with the Regional Office (RO) before taking, omitting, continuing or discontinuing actions regarding a bankrupt provider. In some cases, attorneys from the Department of Justice (DOJ) in Washington, D.C. or United States Attorney's offices will work directly with RO staff. However, in most cases, the RO will be in contact with regional counsel.

This section consists of eight subsections which are listed in the Table of Contents.

## 140.1 - Glossary of Acronyms
**(Rev. 12, 10-18-02)**

ARMG - Accounting and Risk Management Group
CMS - Centers for Medicare & Medicaid Services
DME - Durable Medical Equipment
DMERC - Durable Medical Equipment Regional Carrier
DMSO - Division of Medicaid and State Operations

# Medicare Financial Management Manual
## Chapter 8 – Contractor Procedures for Provider Audits

**Table of Contents**
*(Rev. 127, 07-13-07)*

## Transmittals for Chapter 8

Introduction
10 – Receipt and Acceptance of Cost Reports
    10.1 – Contractor's Responsibility Prior to Submission of Cost Reports
10.2 – Contractor's Responsibility If the Provider Fails to File a Cost Report Timely or the Cost Report is Rejected
    10.3 – Acceptance of Medicare Cost Report
    10.4 – Submission of Cost Report Data to CMS
    10.5 – Initial/Tentative Retroactive Adjustments (a.k.a. Tentative Settlements)
    10.6 – Autoload Program in STAR, System Tracking for Audit and Reimbursement
20 – Desk Reviews
    20.1 – Definition
    20.2 – Components of the Uniform Desk Review (UDR)
    20.3 – Desk Review Exceptions Resolution Process
    20.4 – Wage Index Review
30 – Field and In-House Audits
    30.1 – Definition of Field and In-House Audits
    30.2 – Purpose of Field and In-House Audits
40 – Field Audit Planning and Management (Global Scoping) Field and In-House Audits
    40.1 – Cost Reports and Auditing Multiple Provider Institution
    40.2 – Audit Priority Considerations
50 – Scoping/Planning of Individual Field and In-House Audits
    50.1 – Establishing the Objective/Scope of the Field and In-House Audit
    50.2 – Tailoring of the Audit Program
60 – Field and In-House Audit Process
    60.1 – Audit Confirmation Letter (a.k.a. Engagement Letter)
        60.1.1-Audit Confirmation Letter for Field Audit
        60.1.2-Audit Confirmation Letter for In-House Audit
    60.2 – Entrance Conference
        60.2.1-Entrance Conference for Field Audit
        60.2.2-Entrance Conference for In-House Audit
    60.3 – Tests of Internal Control
    60.4 – Reliance on Work Done by Other Auditors
    60.5 – Coordination of Activities During Field and In-House Audits
    60.6 – Designing Tests/Sampling
    60.7 – Evidence

60.8 – Working Papers
60.9 – Documentation Standards
60.10 – Pre-Exit Conference
60.11 – Finalization of Audit Adjustments
60.12 – Exit Conference
60.13 – Supervision During the Audit Process
70 –Reporting Standards
70.1 – Content and Structure of the Medicare Cost Report Audit Report
70.2 – Form of Report if Medicare Cost Report Was Not Audited
70.3 – Reporting of Indication of Illegal Acts
70.4 – Audit Adjustment Report
70.5 – Medicare Cost Report and All Related Documents
80 – Standards for Performing Medicare Audits
80.1 – Qualifications
80.2 – Independence
80.3 – Due Professional Care
80.4 – Internal Quality Control
90 – Final Settlement of the Cost Report
90.1 – Submission of Settled Cost Report Data to CMS
100 – Cost Report Reopenings
110 – Audit Responsibility When Provider Changes Contractors
120 – Audits of Home Offices
120.1 – Audit Responsibility for Home Office Costs of Chain Organizations
120.2 – Responsible/Designated Contractor's Responsibility if the Home Office
Fails to File a Cost Statement
120.3 – Planning/Scoping the Home Office Audit
120.4 – Timing and Completion of Home Office Audits
120.5 – Distribution of the Audited Home Office Cost Statement and Results of
the Audit
120.6 – Standards for Issuance of an Audit Report for a Home Office
120.7 – Audit Responsibility When Responsible/Designated Contractor Changes
120.8 – Acceptance of Home Office Cost Statements
130 – Provider Permanent File
140 – Fraud & Abuse
140.1 – Definitions
140.2 – Contractor Responsibility in Suspected Fraud or Abuse Cases
150 – Access to Books, Documents, and Records of Provider's Subcontractors
150.1 – General
150.2 – Definitions
150.3 – Types of Contracts Covered by Access Provisions
150.4 – Monetary Criteria
150.5 – Access Clause not in Contract
150.6 – Reasons for Seeking Access
150.7 – Access Request Procedures
150.8 – Subcontractor Response Requirements
150.9 – Refusal of Subcontractor to Furnish Access

        150.10 – Freedom of Information Act (FOIA) Requests
160 – Audit Subcontracts
        160.1 – Routing of Audit Subcontracts
        160.2 – Required Documentation
        160.3 – Competition
170 – Exhibits
        Exhibit I – Summary of Uniform Desk Review Issues
        <u>Exhibit II a – Audit Confirmation Letter – Field Audit</u>
        <u>Exhibit II b – Audit Confirmation Letter – In-House Audit</u>
        Exhibit III – Entrance Conference Agenda
        Exhibit IV – Internal Control Questionnaire
        Exhibit V – Pre-Exit Conference Format
        Exhibit VI – Audit Adjustment Report
        Exhibit VII – Form of Report on Audit of Medicare Cost Report
        Exhibit VIII – Form of Report for Medicare Cost Report That Has not Been
        Audited
        Exhibit IX  – Personal Impairments Statement
        Exhibit X - Model Audit Subcontract Form
        Exhibit XI - addendum to Subcontract

You are required to submit an extract of the following Medicare cost reports to CMS in accordance with the Healthcare Cost Report Information System (HCRIS) specifications within 210 days of the cost reporting period ending date or 60 days after receipt of the cost report, whichever is later.

- CMS Form 2552-96, Hospital Cost Report, for cost reporting periods ending on or after September 30, 1996

- CMS Form 2540-96, Skilled Nursing Facility Cost Report, for cost reporting periods ending on or after June 30, 1996

- CMS Form 1728-94, Home Health Agency Cost Report, for cost reporting periods ending on or after December 31, 1994

- CMS Form 265-94, Renal Dialysis Cost Report, for cost reporting periods ending on or after December 31, 1994

- CMS Form 1983-99, Hospice Cost Report, for cost reporting periods beginning on or after April 1, 1999

This submission must pass all level one electronic cost report edits (see §10.3 of this chapter) and all HCRIS reject edits.

If the cost report is deemed to be "Low Medicare utilization" or "No Medicare utilization", do not submit a HCRIS extract of the "as submitted" cost report.

## 10.5 – Initial/Tentative Retroactive Adjustments (a.k.a. Tentative Settlements)
(Rev. 27, 12-19-03)

Section 42 CFR 413.64 and the Provider Reimbursement Manual, Part 1 (PRM-I), §2408.2, stipulate that an initial/tentative retroactive adjustment must be made as quickly as possible after the receipt of a cost report from the provider. Therefore, make such adjustments within 60 days of the acceptance of the provider's cost report. Prompt initial/tentative retroactive adjustments are essential to ensure proper cash flow to providers. Reducing or delaying tentative settlements until a final determination could jeopardize the financial viability of some providers.

You are not required to make initial/tentative retroactive adjustments where one of the conditions listed in §2408.2 of PRM-I applies. You are also not required to make initial/tentative retroactive adjustments for Skilled Nursing Facilities (SNFs) and Home Health Agencies (HHAs) when the provider did not receive Periodic Interim Payments (PIP) or other interim payments and the cost report does not include a claim for any reimbursement (e.g., bad debts, drug expenses) paid outside of the PPS system. However, you must complete initial/tentative retroactive adjustments of SNF and HHA cost reports when a portion of the provider's payment is based on amounts determined

through the cost report methodology (e.g., bad debts, drug expenses) or when the provider received PIP or non-PIP interim payments.

For the purpose of initial/tentative retroactive adjustment, accept costs as reported. However, to avoid creating an overpayment, reduce the payment by any amounts attributable to obvious errors or inconsistencies in the cost report. Also give consideration to amounts owed the program by the provider (e.g., possible adjustments for prior periods and current period for unresolved issues, unrecovered overpayment). If the current year's tentative settlement results in an underpayment and the provider has existing Medicare overpayments, follow the instructions in Chapter 3 of this manual. In instances where a provider is in bankruptcy or is part of bankruptcy proceedings, bankruptcy procedures will supersede these instructions.

Cost-to-charge ratios (CCRs) are used in determining outlier payments, payments for pass-through devices, and monthly interim transitional corridor payments under the outpatient prospective payment system (OPPS). CCRs are also used to determine payments for extraordinarily high cost cases (cost outliers) under the acute care hospitals inpatient and long term care hospitals prospective payment systems (IPPS and LTCH PPS, respectively). You are required to update the CCRs for providers reimbursed under the OPPS, IPPS, and LTCH PPS to reflect cost and charge information from a provider's most recent cost reporting period, whether tentatively settled or final settled. Therefore, immediately after completion of the tentative settlement, calculate the updated CCRs in a manner described below and input them into the Outpatient Provider Specific File (OPSF) and Provider Specific File (PSF).

- If you made adjustments during the tentative settlement for prior year audit adjustments or other changes and these adjustments have an impact of more than 20% (plus/minus) on the CCRs from the "as filed" cost report, calculate the updated CCRs using the tentative settlement data.

- If the tentative settlement adjustments have an impact of 20% or less on the CCRs from the "as filed" cost report, or if no adjustments to the tentative settlement were made, calculate the updated CCRs using the hospital's "as filed" cost report.

## 10.6 - Autoload Program in STAR, System Tracking for Audit and Reimbursement
**(Rev. 89; Issued: 01-13-06; Effective Date: 10-01-05; Implementation Date: 02-13-06)**

Effective October 1, 2005, contractors shall use the STAR Autoload Program (See Chapter 10 of the STAR Manual on how to use this program.) to update screens 6 and 9 in STAR for any as filed, finalized, or reopened cost reports entered into STAR on or after October 1, 2005. Contractors must ensure that accurate cost report data appears on those screens for filed cost reports, the initial Notice of Program Reimbursement (NPR) and all revised NPRs, as this information is utilized to estimate audit savings.

- Prepare instructions and review programs for use in conducting inspection activities;

- Establish frequency and timing of inspection activities and criteria for selection of engagements; and

- Provide for reporting inspection findings to the appropriate management levels and for monitoring actions taken or planned.

## 90 – Final Settlement of the Cost Report
*(Rev. 127, Issued: 07-13-07, Effective: 10-01-07, Implementation: 10-01-07)*

CMS expects that you settle (i.e., issue a Notice of Amount of Program Reimbursement (NPR)) all cost reports that are not scheduled for audit within 12 months of acceptance of a cost report unless you have a documented reason why the cost report cannot be settled (for example bankruptcy, OIG investigation, DOJ investigation). *If a settlement has been delayed because a prior year cost report is being audited, that settlement will be considered timely if completed within 6 months of the NPR date of the cost report that was audited.* If a provider files an amended cost report and that cost report is not going to be audited, CMS expects that you settle the cost report within the greater of 5 months from the acceptance of the amended cost report, or the time left of the 12 months from the acceptance of the "initial" filed cost report.

If you audit a cost report, issue the NPR to the provider within 60 days of the exit conference or within 60 days after the audit adjustments are finalized (using the timeframes described in §60.11 of this chapter) if an exit conference is waived.

As a general rule, if proper notification was given to the provider (see §§60.1 and 60.2 of this chapter) and adjustments were proposed due to the "lack of documentation" as described in 42 CFR 413.20 and 42 CFR 413.24, issue the NPR without considering documentation received from the provider after the established timeframes unless there are circumstances that you have previously approved.

If the provider used the PS&R settlement data to file the cost report or if you decide to use the PS&R data because the provider's reported settlement data is not documented properly, settle the cost report using a PS&R with a paid through date no earlier than 120 days prior to the issuance of the final audit adjustment report. If you do not issue an audit adjustment report (e.g., there were no desk review exceptions resolution process adjustments or field audit adjustments), use a PS&R with a paid through date that is no earlier than 120 days prior to the NPR date. If you settle the cost report later than 18 months after the end of the provider's fiscal year, use a PS&R with a paid through date that is no earlier than 15 months after the end of the provider's fiscal year.

## 90.1 – Submission of Settled Cost Report Data to CMS
(Rev. 27, 12-19-03)

Within 30 days after issuance of the NPR to the provider, submit to CMS an extract of the following Medicare cost reports in accordance with the Healthcare Cost Report Information System (HCRIS) specifications:

- CMS Form 2552-96, Hospital Cost Report, for cost reporting periods ending on or after September 30, 1996

- CMS Form 2540-96, Skilled Nursing Facility Cost Report, for cost reporting periods ending on or after September 30, 1996

- CMS Form 1728-94, Home Health Agency Cost Report, for cost reporting periods ending on or after September 30, 1994

- CMS Form 265-94, Renal Dialysis Cost Report, for cost reporting periods ending on or after December 31, 1994

- CMS Form 1984-99, Hospice Cost Report, for cost reporting periods beginning on or after April 1, 1999

This submission must pass all level one electronic cost report edits (see §10.3 of this chapter) and all HCRIS reject edits.

HCRIS requires only one submission of the cost report data for "Low" or "No Medicare Utilization" providers. This submission is due within 30 days of the settlement (either with or without audit) of the cost report.

The cost report data is contained in the HCRIS database at CMS and is updated on a quarterly basis. This database is available to all users authorized at CMS. The cost report data files in the HCRIS database are also available to the public on the CMS Web site.

## 100 – Cost Report Reopenings
(Rev. 27, 12-19-03)

Instructions that describe the circumstances under which the final determination on a cost report can be reopened are contained in 42 CFR 405.1885 and PRM-1, Sections 2931 through 2932. In accordance with these instructions, you may reopen a cost report if you receive a written request to reopen from the provider within 3 years of the date that the Notice of Amount of Program Reimbursement (NPR) was issued. You may also reopen a cost report within the 3-year reopening period based on your own motion or at the request of CMS. However, if fraud or similar fault is involved, you can reopen the cost report at any time.

If a provider submits a written reopening request to you before the 3-year reopening period expires, you must apply the provisions of PRM-1, §2931.2 when making a

# EXHIBIT B

| **CMS Manual System** | Department of Health & Human Services (DHHS) |
|---|---|
| **Pub 100-08 Medicare Program Integrity** | Centers for Medicare & Medicaid Services (CMS) |
| Transmittal 150 | Date: JUNE 30, 2006 |
| | Change Request 5139 |

**Subject: Re-issuance of Chapter 10, Introduction of Provider Enrollment**

**I. SUMMARY OF CHANGES:** There are several reasons for this re-issuance. CMS has revised its provider enrollment applications (CMS-855) and issued a new provider enrollment regulation (6002-P). The re-issued chapter 10 furnishes instructions relating to these documents. It also incorporates provider enrollment policies that have been developed since 2003. Much of the current language in chapter 10 has been re-written so as to make it clearer and more concise. Finally, duplicative data in various sections of the chapter has been eliminated.

**NEW / REVISED MATERIAL**
**EFFECTIVE DATE: JULY 3, 2006**
**IMPLEMENTATION DATE: JULY 3, 2006**

*Disclaimer for manual changes only: The revision date and transmittal number apply only to red italicized material. Any other material was previously published and remains unchanged. However, if this revision contains a table of contents, you will receive the new/revised information only, and not the entire table of contents.*

**II. CHANGES IN MANUAL INSTRUCTIONS:**
**R=REVISED, N=NEW, D=DELETED**

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| R | 10/Table of Contents |
| R | 10/1/Introduction to Provider Enrollment |
| R | 10/1.1/Definitions |
| R | 10/1.2/CMS-855 Medicare Enrollment Applications |
| R | 10/1.3/Medicare Contractor Duties |
| R | 10/2/Timeliness Standards |
| R | 10/2.1/Timeframes for Initial Applications |
| R | 10/2.2/Timeframes for Changes of Information |
| R | 10/2.3/General Timeliness Principles |
| D | 10/2.4/Acknowledgment of Receipt |
| R | 10/3/Pre-Screening and Application Returns |
| R | 10/3.1/Pre-Screening Process |

| R | 10/3.2/Returning the Application |
|---|---|
| D | 10/3.3/Adverse Legal Actions and Overpayments |
| D | 10/3.4/Practice Location |
| D | 10/3.5/Ownership and Managing Control Information (Organizations) |
| D | 10/3.6/Ownership and Managing Control Information (Individuals) |
| D | 10/3.7/Chain Home Office Information |
| D | 10/3.8/Billing Agency |
| D | 10/3.9/Electronic Claims Submission Information |
| D | 10/3.10/Staffing Company |
| D | 10/3.11/Surety Bond Information |
| D | 10/3.12/Capitalization Requirement for Home Health Agencies |
| D | 10/3.13/Contact Person |
| D | 10/3.14/Penalties for Falsifying Information on This Application |
| D | 10/3.15/Certification Statement |
| D | 10/3.16/Delegated Official |
| D | 10/3.17/Attachments |
| R | 10/4/Application Review |
| R | 10/4.1/Basic Information (Section 1 of the CMS-855) |
| R | 10/4.2/Identifying Information (Section 2 of the CMS-855) |
| N | 10/4.2.1/Tax Identification Numbers and Legal Business Names |
| N | 10/4.2.2/Licenses and Certifications |
| N | 10/4.2.3/Correspondence Address |
| N | 10/4.2.4/Accreditation |
| N | 10/4.2.5/Section 2 of the CMS-855A |
| N | 10/4.2.6/Section 2 of the CMS-855B |
| N | 10/4.2.7/Section 2 of the CMS-855I |
| R | 10/4.3/Adverse Legal Actions/Convictions |
| R | 10/4.4/Practice Location Information |
| N | 10/4.4.1/Section 4 of the CMS-855A |
| N | 10/4.4.2/Section 4 of the CMS-855B |
| N | 10/4.4.3/Section 4 of the CMS-855I |

| | |
|---|---|
| R | 10/4.5/Owning and Managing Organizations |
| R | 10/4.6/Owning and Managing Individuals |
| N | 10/4.7/Chain Organizations |
| N | 10/4.8/Billing Agencies |
| N | 10/4.9/Reserved for Future Use |
| N | 10/4.10/Reserved for Future Use |
| N | 10/4.11/Reserved for Future Use |
| N | 10/4.12/Special Requirements for Home Health Agencies (HHAs) |
| N | 10/4.13/Contact Person |
| N | 10/4.14/Reserved for Future Use |
| N | 10/4.15/Certification Statement |
| N | 10/4.16/Delegated Official |
| N | 10/4.17/Reserved for Future Use |
| N | 10/4.18/Ambulance Attachment |
| N | 10/4.19/IDTF Attachment |
| N | 10/4.19.1/IDTF Standards |
| N | 10/4.19.2/CPT-4 and HCPCS Codes |
| N | 10/4.19.3/Interpreting Physicians |
| N | 10/4.19.4/Technicians |
| N | 10/4.19.5/Supervising Physicians |
| N | 10/4.19.6/Desk and Site Reviews |
| N | 10/4.19.7/Special Procedures and Supplier Types |
| N | 10/4.19.8/Billing Issues |
| N | 10/4.20/Processing CMS-855R Applications |
| N | 10/4.21/National Provider Identifier (NPI) |
| R | 10/5/Verification and Validation |
| R | 10/5.1/General Verification Principles |
| R | 10/5.2/Verification of Data |
| R | 10/5.3/Requesting and Receiving Clarifying Information |
| R | 10/5.4/Special Verification Procedures for CMS-855B, CMS-855I and CMS-855R Applications |
| N | 10/5.5/Special Verification Procedures for CMS-855A Applications |

| N | 10/5.6/Special Verification Procedures for Enrolling Independent CLIA Labs, Ambulatory Surgical Centers (ASCs), and Portable X-ray Suppliers |
|---|---|
| N | 10/5.7/Special Procedures for Processing Full CMS-855 Applications Submitted by Enrolled Providers |
| R | 10/6/Final Application Actions |
| N | 10/6.1/Approvals |
| N | 10/6.1.1/Non-Certified Suppliers and Individuals Practitioners |
| N | 10/6.1.2/Certified Providers and Certified Suppliers |
| N | 10/6.2/Denials |
| R | 10/7/Changes of Information |
| R | 10/7.1/General Procedures |
| R | 10/7.2/Special Instructions for Certified Providers, ASCs, and Portable X-ray Suppliers |
| R | 10/7.3/Voluntary Terminations |
| D | 10/7.4/Practice Location |
| D | 10/7.5/Statement of Termination |
| D | 10/7.6/Reassignment of Benefits Statement |
| D | 10/7.7/Attestation Statement |
| R | 10/8/Electronic Fund Transfers (EFT) |
| R | 10/9/Revalidation |
| R | 10/10/Documentation |
| D | 10/10.1/Processing the Application |
| D | 10/10.2/Provider Identification |
| D | 10/10.3/Adverse Legal Actions and Overpayments |
| D | 10/10.4/Practice Location |
| D | 10/10.5/Ownership and Managing Control Information (Organizations) |
| D | 10/10.6/Ownership and Managing Control Information (Individuals) |
| D | 10/10.7/Chain Home Office Information |
| D | 10/10.8/Billing Agency |
| D | 10/10.9/Electronic Claims Submission Information |
| D | 10/10.10/Staffing Company |
| D | 10/10.11/Surety Bond Information |

| | |
|---|---|
| D | 10/10.12/Capitalization Requirements for Home Health Agencies (HHAs) |
| D | 10/10.13/Contact Person |
| D | 10/10.14/Penalties for Falsifying Information |
| D | 10/10.15/Certification Statement |
| D | 10/10.16/Delegated Official |
| D | 10/10.17/Special Processing Situations |
| R | 10/11/Special Processing Situations |
| R | 10/11.1/Tie-In Notices |
| R | 10/11.2/Out-of-State Practice Locations for Certified Providers |
| R | 10/11.3/Provider-Based |
| N | 10/11.4/State Survey Actions |
| N | 10/11.5/Carrier Processing of Hospital Applications |
| N | 10/11.6/Par Agreements |
| N | 10/11.7/Opt-Out |
| R | 10/12/Provider and Supplier Types/Services |
| N | 10/12.1/Community Mental Health Centers (CMHCs) |
| N | 10/12.2/Diabetes Self-Management Training (DSMT) |
| N | 10/12.3/Mass Immunizers Who Roster Bill |
| N | 10/12.4/Enrolling Indian Health Service (IHS) Facilities as Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) Suppliers |
| R | 10/13/Reserved for Future Use |
| R | 10/14/Model Correspondence Language |
| D | 10/14.1/Request for Additional Information |
| D | 10/14.2/Approval and Recommendations for Approval |
| D | 10/14.3/Denials |
| D | 10/14.4/Revocations |
| R | 10/15/PECOS |
| R | 10/16/External Reporting Requirements |
| D | 10/16.1/Fraud Investigation Database |
| D | 10/16.2/Healthcare Integrity and Protection Data Bank |
| D | 10/16.3/Uncovering Fraud and Abuse |
| D | 10/16.4/Excluded Parties List System (General Service |

| | |
|---|---|
| | Administration (GSA) Debarment) |
| R | 10/17/Maintenance and Release of CMS-855 Data |
| R | 10/17.1/Security |
| R | 10/17.2/Release of Information |
| R | 10/17.3/File Maintenance |
| D | 10/17.4/Railroad Retirement Board (RRB) |
| D | 10/17.5/Provider-Based Processing and Change of Status |
| R | 10/18/Customer Service |
| N | 10/18.1/Web Sites |
| N | 10/18.2/Provider Enrollment Inquiries |
| D | 10/20/Tracking Requirements |
| D | 10/21/Retention of Records |
| D | 10/22/Provider/Supplier Education |
| D | 10/23/Web Site |
| D | 10/24/Security Safeguards |
| D | 10/25/Documentation |
| D | 10/26/File Maintenance and Review |
| D | 10/27/Provider Enrollment, Chain and Ownership System (PECOS) |
| D | 10/28/Enrolling Indian Health Services (IHS) Facilities as Durable Medical Equipment, Prosthetics, Orthotics and Supplies (DMEPOS) Suppliers |

## III. FUNDING:

No additional funding will be provided by CMS; contractor activities are to be carried out within their FY 2006 operating budgets.

## IV. ATTACHMENTS:

Business Requirements

Manual Instruction

*Unless otherwise specified, the effective date is the date of service.*

*is the case, the instructions in subsection (C) of section 5.6 of this manual shall be followed.)*

- *All members of a group practice must be entered into PECOS.*

- *If the supplier is adding or changing a practice location and the new location is in another State within the contractor's jurisdiction, the carrier shall ensure that the supplier furnishes all applicable licenses, certifications, etc., for that State.   A complete CMS-855 application for the new State is not required, though the carrier shall create a new enrollment record in PECOS for the new State.*

## 5.5 – Special Verification Procedures for CMS-855A Applications
### (Rev.150, Issued: 06-30-06, Effective: 07-03-06, Implementation: 07-03-06)

*Unless otherwise stated, all references to the "RO" in this section 5.5 refer to the RO's survey & certification staff, not its provider enrollment personnel.*

### A.  Audit and Claims Intermediaries

*For purposes of enrollment, there are generally two categories of intermediaries: audit intermediaries and claims intermediaries.  The audit intermediary enrolls the provider, conducts audits, etc. The claims intermediary pays the provider's claims.  In most cases, the provider's audit intermediary and claims intermediary will be the same; on occasion, they will be different.  (This often happens with provider-based entities, where the provider's enrollment application will be processed by the parent provider's intermediary (audit intermediary) and its claims will be paid by a different intermediary (claims intermediary)).*

*When enrolling a home health agency (HHA), hospice, rural health clinic (RHC), or federally qualified health center (FQHC), the following rules apply:*

- *<u>HHAs & Hospices</u> – If the entity is provider-based, it shall submit its enrollment application to the parent provider's intermediary.  If the entity is freestanding, the application should go to the applicable regional home health intermediary (RHHI). Regardless of whether the entity is provider-based or not, however, the claims intermediary will be the RHHI unless CMS directs otherwise.*

- *<u>RHCs</u> – If the entity is provider-based, it should submit its enrollment application to the parent provider's intermediary.  If the entity is freestanding, the application should go to the applicable regional RHC intermediary.*

- *<u>FQHC</u> – All FQHC applications, whether provider-based or freestanding, shall be processed by United Government Services.*

*Thus, the audit and claims intermediaries will typically be different if the enrollee is a provider-based HHA, hospice, or RHC. In these situations, the audit intermediary (i.e., the parent provider's intermediary) shall process all changes of information, including all EFT changes. The audit intermediary shall notify the applicant during the initial enrollment process that all future changes of information must be sent to the audit intermediary, not the claims intermediary. (Quite often, a provider will submit an EFT change request to the claims intermediary because the latter processes the provider's claims.) If the provider inadvertently sends a change of information request (or, for that matter, an initial enrollment) to the claims intermediary, the latter shall return the application per section 3.2 of this manual.*

*Once the audit intermediary finishes processing the initial enrollment application, it shall fax a copy of the application to the claims intermediary. It shall also fax copies of any future changes of information involving payment issues (e.g., EFT) to the claims intermediary once processing is complete.*

*It is imperative that the audit and claims intermediaries effectively communicate and coordinate with each other in all payment-related matters involving the provider. This includes, among other things, notifying the other intermediary whenever a tie-in or tie-out notice is received, informing the other intermediary about program integrity issues, etc.*

### B. Provider Nomination

*As of October 1, 2005, freestanding providers entering the Medicare program may no longer express a preference for a particular fiscal intermediary. The ROs will assign these new providers to the local Blue Cross plan that serves the State or U.S. territory in which the provider is located. The term "new provider" includes situations where a change of ownership occurs but the new owner does not accept assignment of the existing provider agreement; in this situation, the provider will be assigned to the local Blue Cross plan.*

*There are several exceptions to this policy:*

- *Freestanding specialty providers, such as (but not limited to) HHAs and hospices, will continue to be assigned to their designated specialty intermediaries;*

- *Provider-based facilities will continue to be assigned to the audit intermediary that serves the parent provider, even if it is not the local Blue Cross plan.*

- *New providers that belong to or are joining CMS-recognized chains have the option to be assigned to the local Blue Cross plan or to the intermediary that services the chain home office;*

- *Providers involved in CHOWs where the new owner <u>accepts</u> assignment of the existing provider agreement will remain with their current intermediary, even if it is not the local Blue Cross plan.*

*In all cases, the ROs retain jurisdiction over the assignment and reassignment of providers to their respective intermediaries. If an intermediary receives a request from a provider to change its existing intermediary, it shall refer the provider to the RO contact person who handles intermediary assignments.*

## C. Changes of Ownership (CHOWs)

### 1. <u>CHOW Definitions</u>

*Changes of ownership (CHOWs) are officially defined and governed by 42 CFR § 489.18 and § 3210 of the CMS State Operations Manual (SOM). The ROs make the final determination as to whether a CHOW has occurred, unless this function has been delegated.*

*For purposes of provider enrollment <u>only</u>, there are three main categories of CHOWs captured on the CMS-855A application:*

- **"Standard" CHOW** *– This occurs when the OSCAR number and provider agreement of a provider are transferred to another entity as a result of that entity's purchase of the provider. To illustrate, suppose Entity A is enrolled in Medicare, but Entity B is not. B acquires A. In this case, A's provider agreement and OSCAR number transfer to B.*

*This is perhaps the most frequently encountered change of ownership scenario. Even though it is technically an acquisition (i.e., B bought/acquired A) under § 489.18, this situation falls under the "CHOW" category – as opposed to the "Acquisition/Merger" category – <u>on the CMS-855A.</u>*

- *Acquisition/Merger - In general, this occurs when two or more Medicare-enrolled entities combine, leaving only one remaining OSCAR number and provider agreement. For instance, Entity A and Entity B are both enrolled in Medicare. Each entity has its own OSCAR number and provider agreement. The two entities decide to merge. Since Entity B's OSCAR number and provider agreement will be eliminated (leaving only Entity A's OSCAR number and provider agreement), a § 489.18 merger has occurred.*

*If the acquisition results in an existing provider having new owners but keeping its same provider number, the applicant should check the CHOW block.*

- **Consolidations** - *This occurs when two or more entities combine, creating a brand new entity. To illustrate, suppose Entities A and B (both of which are enrolled in Medicare) decide to combine and, in the process, create a new entity – Entity C. The OSCAR numbers and provider agreements of both A and B are eliminated. Entity C will have its own OSCAR number and provider agreement.*

*Note the difference between acquisitions/mergers and consolidations. In an acquisition/merger, when A and B combine there is one surviving entity. In a consolidation, however, when A and B combine there are no surviving entities. Rather, a new entity is created – Entity C.*

*Unless specified otherwise, the term "CHOW" as used below includes CHOWs, acquisitions/mergers and consolidations.*

2.  *Determining Whether a CHOW Has Occurred*

*In examining whether: (1) a CHOW has occurred, and/or (2) the new owner will be accepting assignment of the Medicare assets and liabilities of the old owner, the intermediary shall perform all necessary research – including reviewing the sales agreement, contacting the provider(s) to request clarification of the sales agreement, etc. – before referring the matter to the RO for guidance. Such referrals to the RO should only be made if the intermediary is truly unsure as to whether a CHOW has taken place and should not be referred as a matter of course. (A RO CHOW determination is typically not required prior to the intermediary making its recommendation.) Note that a provider may undergo financial and administrative changes that it may consider to be a CHOW, but does not meet the definition shown in 42 CFR § 489.18.*

*While a CHOW is usually accompanied by a change in the tax identification number (TIN), this is not always the case. There may be a few instances where the TIN will remain the same. Conversely, there may be some cases where a provider is changing its TIN but not its ownership. In short, while a change of TIN (or lack thereof) is evidence that a CHOW has or has not occurred, it is not the most important factor; rather, the change in the provider's ownership arrangement is. Hence, it is imperative that the intermediary review the sales agreement closely, as this will give the best indication as to whether a CHOW has occurred.*

*If the provider claims that the transaction in question is a stock transfer and not a CHOW, the intermediary reserves the right to request any information from the provider to verify this.*

3.  *Processing CHOW Applications*

*The intermediary shall process CHOW applications in accordance with the following:*

- *Unless otherwise specified in this section, both the old and new owners must submit separate CMS-855A applications as well as copies of the interim and final sales agreements.*

- *Old owner* – *The old owner's CMS-855A CHOW application does not require a recommendation for approval or denial; any recommendations will be based upon the CHOW application received from the new owner. Also, the creation of an enrollment record in PECOS for the old owner is not required, though an L & T record is.*

*If a certification statement is not on file for the old owner, the intermediary shall request that section 6 be completed for the individual who is signing the certification statement. The intermediary shall review this individual against all applicable databases, including Qualifier.net.*

*If a CMS-855A is not received from the new owner within 14 calendar days of receipt of the old owner's CMS-855A, the intermediary shall contact the new owner. If the new owner fails to: (1) submit a CMS-855A and (2) indicate that it accepts assignment of the provider agreement, within 30 calendar days after the intermediary contacted it, the latter shall stop payments unless the sale has not yet taken place per the terms of the sales agreement. Payments to the provider can resume once this information is received and the intermediary ascertains that the provider accepts assignment.*

- *New owner* – *The intermediary shall ensure that the information contained in the sales agreement is consistent with that reported on the new owner's CMS-855A. The intermediary shall not forward a copy of the application to the State agency until it has received and reviewed the final sales agreement. It need not revalidate the information on the CMS-855A even if the data may be somewhat outdated by the time the final sales agreement is received.*

*If the old owner's CMS-855A is available at the time of review, the intermediary shall examine the information thereon against the new owner's CMS-855A to ensure consistency (e.g., same names). If the old owner's CMS-855A has not been received, the intermediary shall contact the old owner and request it. However, the intermediary may begin processing the new owner's application without waiting for the arrival of the old owner's application; it may also make its recommendation to the State agency without having received the old owner's CMS-855A. The intermediary shall not make a recommendation for approval unless the new owner has checked on the form that it will assume the provider agreement and that the terms of the sales agreement indicate as such.*

- *To the maximum extent practicable, CMS-855A applications from the old and new owners in a CHOW should be processed as they come in. The intermediary should not wait for applications from both the old and new owner to arrive before processing them. However, unless the instructions in this manual indicate otherwise, the intermediary should attempt to send the old and new applications to the State simultaneously, rather than as soon as they are processed. For instance, suppose the old owner submits an*

*application on March 1. The intermediary should begin processing the application immediately, without waiting for the arrival of the new owner's application. Yet it should avoid sending the old owner's application to the State until the new owner's application comes in. (For acquisition/mergers and consolidations, the intermediary may send in the applications separately, since one number is going away.)*

- *All subunits that have a separate provider agreement (e.g., HHA subunits) must submit their CHOW on a separate CMS-855A. They cannot report the CHOW via the main provider's CMS-855A.*

*If the subunit has a separate OSCAR identifier but not a separate provider agreement (e.g., hospital psychiatric unit, HHA branch), the CHOW can be reported on the main provider's CMS-855A. This is because the subunit is a practice location of the main provider and not a separately enrolled entity.*

- *CMS-855A CHOW applications may be accepted by the intermediary up to 90 calendar days prior to the anticipated date of the proposed ownership change. Any application received more than three months in advance of the projected sale date can be returned under section 3.2 of this manual.*

- *If a final sales agreement is not submitted within 90 days after the intermediary's receipt of the new owner's application, the intermediary shall reject the application Though the intermediary must wait until the 90th day to return the application, the intermediary may do so regardless of how many times it contacted the new owner or what type of responses (short of the actual receipt of the sales agreement) were obtained.*

*With respect to HHA capitalization, the intermediary need not wait 90 days to return the application, but should give the HHA a reasonable period of time (as defined by the intermediary) to furnish the necessary documentation.*

- *If the intermediary ascertains by any means that an enrolled provider has: (1) been purchased by another entity or (2) purchased another Medicare enrolled provider, the intermediary shall immediately request CMS-855A applications from both the old and new owners. If the new owner fails to submit the CMS-855A provider within the latter of: (1) the date of acquisition or (2) thirty (30) days after the request, the intermediary shall stop payments to the provider. Payments may be resumed upon receipt of the completed CMS-855A.*

- *Medicare payments shall continue to be made to the old owners until the CHOW is approved by the RO, even if the old owner submits a CMS 588 to change the bank account to that of the new owner.*

- *Unlike the new owner in a CHOW or consolidation, the new owner in an acquisition/merger need not complete the entire CMS-855A. This is because the new owner is already enrolled in Medicare; as such, the provider being acquired would simply be reported as a practice location in section 4 of the new owner's CMS-855A.*

- *There may be instances where the parties in a CHOW, acquisition/merger or consolidation transaction may not have signed a "sales agreement" or "bill of sale" in the conventional sense of the term. (This may often occur with consolidations.) The intermediary may, but is not required to, accept alternative documentation, so long as such documentation furnishes clear verification of the terms of the transaction as well as all information necessary to carry out all applicable instructions pertaining to changes of ownership.*

- *When reviewing the sales agreement, the intermediary shall primarily look for: (1) consistency with the data furnished on the CMS-855A (e.g., same names), and (2) confirmation that the transaction qualifies as a CHOW.*

- *On occasion, a CHOW may be occurring in conjunction with a change to the facility's provider sub-type. This most frequently happens when a hospital undergoes a CHOW and is changing from a general hospital to another type of hospital, such as a psychiatric hospital. Although a change in hospital type is considered a change of information, it is not necessary for the provider to submit separate applications – one for the COI and one for the CHOW. Instead, all information (including the change of hospital type) should be reported on the CHOW application; the entire application should then be processed as a CHOW. However, if the facility is changing from one main provider type to another (e.g., hospital converting to a SNF) and also undergoing a CHOW, the provider must submit its application as an initial enrollment.*

- *Unless stated otherwise in this manual, the intermediary shall ensure that all applicable sections of the CMS-855A for both the old and new owners are completed in accordance with the instructions on the CMS-855A.*

4.  *Special PECOS Policies Regarding CHOWs*

- *If a provider lists a practice location that has a different OSCAR number from the main facility (e.g., HHA branch, hospital unit, OPT extension site), the intermediary shall create a separate enrollment record in PECOS for that location (i.e., the main facility and the practice location will each have its own enrollment record).*

- *The intermediary is not required to create an enrollment record in PECOS for the old owner.*

- *The intermediary is not required to create a new L & T record in PECOS when the tie-in notice comes in, as the existing record should not be in final status and can be changed. Simply changing the L & T status is sufficient.*

- *Suppose a request for a CHOW comes in and the intermediary enters the data into PECOS as a CHOW. It turns out, after additional research, that the transaction was not a CHOW (e.g., was a stock transfer; was an initial enrollment because the new owner refused to accept the Medicare liabilities). If the intermediary cannot change the*

*transaction type in PECOS., it can leave the record in CHOW status but should note the provider's file that the transaction was not a CHOW.*

5. *Multiple Providers Under a Single TIN*

*It is acceptable for multiple providers to have the same TIN. However, each provider must submit a separate CMS-855 application, and the intermediary must create a separate enrollment record for each.*

## 5.6 – Special Verification Procedures for Enrolling Independent CLIA Labs, Ambulatory Surgical Centers (ASCs), and Portable X-ray Suppliers (Rev.150, Issued: 06-30-06, Effective: 07-03-06, Implementation: 07-03-06)

### A. CLIA Labs

*Labs that are "integrated" into an existing provider or supplier do not require a separate CMS-855 enrollment. "Integrated" labs are typically those that have exactly the same ownership and physical location as another enrolled supplier or provider. (Common examples include: (1) hospital labs and (2) a lab at a physician's office.)*

*The contractor has the discretion to determine whether a particular lab qualifies as "integrated." If it deems the lab as "integrated," the parent provider should list the lab as a practice location on the CMS-855 and furnish the applicable CLIA number.*

*If the lab is not "integrated," the lab must enroll as an independent CLIA lab via the CMS-855B application. The carrier shall advise the supplier that it must contact the applicable CLIA office; the lab cannot be enrolled until it receives a CLIA number. The carrier shall ensure that the lab has furnished a notarized or certified true copy of the CLIA certificate or State license. Once the independent CLIA lab has been reviewed and has a valid CLIA number, it can be enrolled.*

*Labs that do not plan to participate in the Medicare program must be directed to the applicable CLIA office.*

### B. ASCs and Portable X-ray Suppliers (PXRs)

*Unlike other supplier types whose applications are processed by carriers, ASCs and PXRs must receive a State survey and formal RO approval before they can be enrolled in Medicare. As such, the carrier can only make a <u>recommendation</u> for approval or denial to the State and the RO once it finishes reviewing the supplier's application. The carrier <u>shall not</u> enroll the supplier unless and until it receives a document or other notification from the RO stating that the supplier has met all the qualifications needed to obtain Medicare billing privileges. (This document is usually an approval letter or tie-in notice.) Upon receipt of the tie-in notice or approval letter from the RO, the carrier shall*

*submits an initial application. To illustrate, if a hospital contacts the contractor requesting information concerning how it should enroll in the Medicare program, this need not be documented because the hospital has not yet submitted an enrollment application.*

*If an application is returned per section 3.2 of this manual, the contractor shall document this. The manner of documentation lies within the contractor's discretion.*

### B. Verification of Data Elements

*Once the contractor has completed its review of the CMS-855 (e.g., approved/denied application, approved change request), it shall provide a written statement asserting that it has: (1) verified all data elements on the application, and (2) reviewed all applicable names on the CMS-855 against Qualifier.net, the MED, and the GSA debarment list. The statement must be signed and dated. It can be drafted in any manner the contractor chooses so long as it certifies that the above-mentioned activities were completed. The record can be stored electronically.*

*For each person or entity that appeared on the MED or GSA lists, the contractor shall document the finding via a screen printout. In all other situations, the contractor is not encouraged to document their reviews via screen printouts. Simply using the verification statement described above is sufficient. Although the contractor has the discretion to use screen prints if it so chooses, the verification statement is still required.*

## 11 – Special Processing Situations
**(Rev.150, Issued: 06-30-06, Effective: 07-03-06, Implementation: 07-03-06)**

### 11.1 – Tie-In Notices
**(Rev.150, Issued: 06-30-06, Effective: 07-03-06, Implementation: 07-03-06)**

*This section only applies to fiscal intermediaries.*

### A. General Information

*Although it may vary by RO, tie-in and tie-out notices are generally issued in the following circumstances:*

- *Initial enrollment;*
- *CHOW;*
- *Acquisition/Merger;*
- *Consolidation;*
- *Addition or deletion of HHA branch, hospital unit, or OPT extension site;*

- *Voluntary and involuntary termination of billing numbers*

*As each RO may have different practices for issuing tie-in and tie-out notices, the intermediary should contact its RO to find out the specific circumstances for which such notices are issued. This also applies to instances when the RO delegates the task of issuing tie-in or tie-out notices to the State agency. The intermediary may accept such notices from the State in lieu of those from the RO. However, the intermediary should first contact the applicable RO to confirm: (1) that the latter has indeed delegated this function to the State, and (2) the specific transactions (e.g., CHOWs, HHA branch additions) for which this function has been delegated.*

*If the contractor receives a tie-in notice from the RO but the provider never completed the necessary CMS-855A paperwork, the contractor shall have the provider complete and submit that paperwork. (This applies to initial applications, CHOWs, practice location additions, etc.)*

*In situations where the audit intermediary is different from the claims intermediary, the audit intermediary shall fax a copy of any tie-in notice it receives to the claims intermediary. For instance, if the audit intermediary receives a tie-in notice signifying that a provider's request for Medicare participation has been approved, the audit intermediary should send a copy to the claims intermediary. This is to ensure that the claims intermediary is fully aware of the RO's action, as some ROs may only send a copy of the tie-in notice to the audit intermediary. If the audit intermediary chooses, it can simply contact the claims intermediary by phone or e-mail and ask if the latter received the tie-in notice.*

## B. Payments During CHOWs

*In a CHOW, the intermediary shall continue to pay the old owner until it receives the tie-in notice from the RO. Hence, any request from the old or new owner to change the EFT account to that of the new owner shall be denied. It is ultimately the responsibility of the old and new owners to work out any payment arrangements between them while the CHOW is being processed by the intermediary and the RO.*

## 11.2 – Out-of-State Practice Locations for Certified Providers
**(Rev.150, Issued: 06-30-06, Effective: 07-03-06, Implementation: 07-03-06)**

*As a general rule, the question of whether a CMS-855A needs to be completed for each State in which the provider performs services depends on three things: (1) State law, (2) the fiscal intermediary jurisdictions involved, and (3) how the RO(s) wants to handle the situation. Consider the following scenario:*

*A provider is enrolled in State X and now wants to perform services in State Y.*

# EXHIBIT C

FOREWORD

This manual provides guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services furnished under the Health Insurance for the Aged Act of 1965, as amended. These "Principles of Reimbursement for Provider Costs" have been published in HIRM-l. The provisions of the law and the regulations are accurately reflected in this manual, but it does not have the effect of regulations.

The Social Security Administration (SSA) also publishes quarterly the "Social Security Rulings" under the authority of the Commissioner of Social Security for the purpose of making available official rulings relating to the health insurance program and the other programs under his jurisdiction. The rulings contain appeals case decisions, as well as statements of policy and interpretations of the law (title XVIII of the Social Security Act-Medicare) and regulations which have precedential effect.

Rulings are intended to exemplify general manual instructions and do not alter existing policy guidelines. However, they may place more emphasis on a particular program are that has been identified as a problem. The rulings do not have the force and effect of a statute or regulations, but provide illustrative case material useful in interpreting and applying policies and procedures contained in instructional issuances.

The procedures and methods set forth in this manual have been devised to accommodate program needs and the administrative needs of providers and their intermediaries and will assure that the reasonable cost regulations are uniformly applied nationally without regard to where covered services are furnished. The manual contains informational and procedural material on various aspects of the determination of cost and to assist provider in preparing annual cost reports. The provider's intermediary will issue any necessary supplementary instructions as appropriate for local guidance on items relating to cost determination. For any cost situation that is not covered by the manual's guidelines and policies, generally accepted accounting principles should be applied.

Under generally accepted accounting principles, or under the "Principles of Reimbursement for Provider Costs" there may be more than one method for handling a particular cost item; in such case the method elected by the provider must be consistently followed in subsequent reporting periods. A change of method must be approved by the intermediary (or SSA for providers dealing directly with the Government) on a prospective and not retrospective basis. Where the manual sets a time limit for requesting such change, or limits the number of changes, the provider and intermediary will be guided by the manual instructions.

I

The manual accommodates new pages or revisions as further interpretations of the regulations and changes in procedures and methods are made. Accordingly, revised sections, pages, or chapters are issued as necessary. Brackets in the margin of the page indicate new or changed material.

Questions by a provider on cost policies and procedures in the program should be referred to the provider's intermediary.

II

CHAPTER 29

PROVIDER PAYMENT
DETERMINATIONS AND APPEALS PROCEDURES

Section

### General

Requirement for a Hearing on a Disputed Intermediary
    Determination ...................................................................................................2900

### Intermediary Determination

Issuance of Intermediary Determination ............................................................2905
    Time Frame for Issuance of Intermediary
        Determination ..........................................................................................2905.1
    Nonallowable Cost Report Entries.........................................................2905.2
Notice of Amount of Program Reimbursement ..................................................2906
Continuation of Existing Settlement Practice  Prior
    To and After Issuance of Notice of Amount of
    Program Reimbursement ..........................................................................2907
Effect of Determination and Notice of Amount of Program
    Reimbursement ..........................................................................................2908

### Notice of Base Period Costs/Target Amount

Issuance of Notice of Base Period Costs/Target Amount....................................2909
    Content of Notice of Base Period Costs/Target Amount................................2909.1

### Intermediary Hearing

Provider's and Other Entity's Right to Intermediary
    Hearing.........................................................................................................2910
Request for Intermediary Hearing.......................................................................2911
    Late Filing of Request for Hearing .................................................2911.1
    Intermediary Action on Request for Hearing.................................2911.2
Parties to the Intermediary Hearing ...................................................................2912
    Appointment and Authority of a Party's
        Representative.......................................................................................2912.1
Selection of Hearing Officer ...............................................................................2913
    Qualifications of Hearing Officer ...................................................2913.1
    Disqualification of Hearing Officer ................................................2913.2
Responsibility of Hearing Officer.......................................................................2914
    Determination of Amount in Controversy
        (42 CFR 405.1839) ...............................................................................2914.1
    Prehearing Preparation and Procedures .........................................2914.2
    Notice of Time and Place for Hearing............................................2914.3
    Notice of Dismissal of Request for Hearing ..................................2914.4
    Hearing on Record - Personal Appearance Waived.......................2914.5
    Nature of Hearing............................................................................2914.6
    Issues for Determination at Hearing ..............................................2914.7
    Authority of Hearing Officer and Limitations ...............................2914.8
    Hearing Officer Jurisdiction:  Chain Providers.............................2914.9

CHAPTER 29

PROVIDER PAYMENT
DETERMINATIONS AND APPEALS PROCEDURES

                                                                    Section

Intermediary Hearing Procedures.......................................................2915
    Conduct of Hearing..........................................................2915.1
    Evidence............................................................................2915.2
    Witnesses ..........................................................................2915.3
    Hearing Record .................................................................2915.4
    Hearing New Issues...........................................................2915.5
Intermediary Hearing Decision ..............................................2916
HCFA Review of Intermediary Hearings.................................2917
Model Formats for Intermediary Hearings...........................2918
    Request for Intermediary Hearing, Exhibit 1 ..................................
    Notice of Hearing, Exhibit 2 ............................................................
    Intermediary Hearing Decision, Exhibit 3 .......................................

                    Provider Reimbursement Review Board

Right to Board Hearing .........................................................2920
    Individual Appeals ............................................................2920.1
    Group Appeals ...................................................................2920.2
    Expedited Judicial Review.................................................2920.3
Request for Board Hearing or for Expedited
    Judicial Review ................................................................2921

                    Administrator and Judicial
                    Review of Board Decisions

Administrator Review of Board Decisions ...........................2927
Judicial Review.......................................................................2928

                Finality, Reopening, and Correction of
            Intermediary and Board Determinations and Decisions

Finality ....................................................................................2930
    When Determinations and Decisions Become Final.......................2930.1
Reopening and Correction .....................................................2931
    Time Limits for Reopening................................................2931.1
    Reopening Final Determination ........................................2931.2
Notices (Including Notices of Refusal) Related to
    Reopening and Correction ...............................................2932
    Notice of Refusal to Reopen or Correct...........................2932.1

                        Disclosure of Information

Disclosure of Information in the Hearing Process ...............2950
Disclosure of the Intermediary Hearing Decision................2951
Disclosure of the PRRB Decision and the Decision
    of the Secretary ...............................................................2952

PROVIDER PAYMENT
DETERMINATIONS AND APPEALS PROCEDURES

|  | Section | Page |
|---|---|---|
| Expedited Judicial Review Process | 2926 | 29-68.3 |
| Limitation on Expedited Proceedings | 2926.1 | 29-68.3 |
| Provider Request and Accompanying Documents | 2926.2 | 29-68.3 |
| Timing of Provider Request | 2926.3 | 29-68.4 |
| Intermediary Participation | 2926.4 | 29-68.4 |
| Board Action | 2926.5 | 29-68.5 |
| Effect of Board Determination | 2926.6 | 29-68.5 |
| Appendix A - Provider Reimbursement Review | | |
| Board Jurisdiction | 29-68.6 | |

### Administrator and Judicial
### Review of Board Decisions

| Administrator Review of Board Decisions | 2927 | 29-68.10 |
|---|---|---|
| Judicial Review | 2928 | 29-72 |

### Finality, Reopening, and Correction of
### Intermediary and Board Determinations and Decisions

| Finality | 2930 | 29-73 |
|---|---|---|
| When Determinations and Decisions Become Final | 2930.1 | 29-73 |
| Reopening and Correction | 2931 | 29-74 |
| Time Limits for Reopening | 2931.1 | 29-79 |
| Reopening Final Determination | 2931.2 | 29-80 |
| Notices (Including Notices of Refusal) Related to | | |
| Reopening and Correction | 2932 | 29-82 |
| Notice of Refusal to Reopen or Correct | 2932.1 | 29-83 |

### Disclosure of Information

| Disclosure of Information in the Hearing Process | 2950 | 29-85 |
|---|---|---|
| Disclosure of the Intermediary Hearing Decision | 2951 | 29-87 |
| Disclosure of the PRRB Decision and the Decision | | |
| of the Secretary | 2952 | 29-87 |

2.    Afford the provider or other entity a right to a hearing if it is dissatisfied with the determination and the amount in controversy (§2910) is at least $1,000.  Where the amount at issue is $10,000 or more, the intermediary must advise the provider of its right to a hearing before the Provider Reimbursement Review Board (PRRB);

3.    Establish procedures for intermediary hearings and the right to a PRRB hearing, which meet the standards set out in the regulations and the general instructions in this chapter, and supply copies of the procedures to the providers and other entities it serves;

4.    Provide an intermediary hearing which is conducted in such a manner, and at a place which is reasonably convenient to the provider or other entity as to insure that a fair hearing is afforded;

5.    Provide for the issuance of a dated written notice of the hearing officer's decision after the intermediary hearing;

6.    When a request for PRRB hearing has been filed with the Board:

a.    Review the materials submitted by the provider;

b.    Notify the Provider and the Board if it appears that the request for hearing was not timely or where the amount in controversy is not $10,000.

c.    Review its record which formed the basis for its determination of the total amount of payment due the provider;

d.    Attempt to join with the provider in written stipulations setting forth any issues that the review has resolved and the issues (and any facts which are not in dispute and relate directly to the issue) that remain for Board resolution; and

e.    Assure that all available documentary evidence in support of the provider or the intermediary is part of the record.

Unless the agreement between the Secretary and the intermediary provides otherwise, the responsibility for providing the intermediary hearing, for furnishing written notice to providers and other entities of the availability of the hearing, and for designating a hearing officer to conduct the hearing, as required by this and following sections, may not be subcontracted by the intermediary.

<u>Intermediary Determination</u>

2905.    ISSUANCE OF INTERMEDIARY DETERMINATION

Upon receipt of a perfected (final) cost report the intermediary, within  a reasonable period of time (§2905.1), sends the provider or other entity a written Notice of Amount of Program Reimbursement (NPR) (§2906) setting forth the amounts arrived at in its determination, including any underpayment or overpayment made to the provider or other entity.  This NPR is considered the intermediary's final determination for purposes of any future appeal rights.

The NPR shall be sent even though the intermediary has reason to believe that the provider intends to request a hearing on the determination. Furthermore, where the determination shows that the provider, or other entity, is indebted to the program, the intermediary must take the necessary action to recover the overpayment, including a suspension of interim payments. Such action of recovery or suspension should continue in accordance with existing instructions even after a request for a hearing has been filed. If necessary, appropriate adjustments will be made upon completion of the review process.

2905.1     Time Frame for Issuance of Intermediary Determination.--The intermediary is to make every attempt to issue a NPR within 12 months of receipt of a cost report. Regulations provide that where the intermediary fails to render a determination within 12 months after receipt of the perfected (final) cost report, the provider (as defined in § 2900) may request a hearing before the PRRB, provided that (a) the cause of such delay does not lie with the provider and (b) the amount stated on the cost report as the amount of intended program payment due is at least $10,000 per cost report period.

2905.2     Nonallowable Cost Report Entries.--The intermediary has the responsibility of providing necessary guidance to providers in preparing their cost reports. If certain cost report items are discovered during an audit or desk review which are not related to patient care and, therefore, are nonallowable, the intermediary will make the necessary adjustments and inform the provider of them. Additionally, the intermediary will document any adjustments made to the cost report involving nonallowable items.

If these same nonallowable items appear on a subsequent cost report, the intermediary will inform the provider why these costs were disallowed. This notification will be made by a letter from the intermediary advising the provider that any further insistence by the provider on including the same nonallowable items in the next cost report could result in referral to the U.S. Attorney for consideration of criminal and/or civil prosecution.

There will be no referral to the U.S. Attorney where:

A.    The provider clearly indicates this item(s) is being included in the cost report only to establish the basis for an appeal and each disputed item and amount is specifically identified.

B.    The issue pertains to the cost reporting period for which the cost report is filed.

It is important to note, however, that if there is a suspicion of any intent to defraud the United States Government supported by even the initial insertion of a nonallowable item in the cost report, no warning is required prior to a prompt referral of the case for investigation and prosecution.

# EXHIBIT D





PHONE MEMO

AFORDER NO. 50750

FAX:

TO: (919) 325-2578

FROM: Marcella Godwin

OF:

DATE: 12/11/07    TIME:    AM  PM

PHONE (

CELL (    Do not have

FAX (    this

MESSAGE:

12/11/07    115427

115538

Triad at Jefferson    115404

115354

R. Tharpe 12/11/07    115413

E-MAIL ADDRESS    SIGNED

☐ PHONED  ☐ CALL BACK  ☐ RETURNED CALL  ☐ WANTS TO SEE YOU  ☑ WILL CALL AGAIN  ☐ WAS IN  ☐ URGENT



# EXHIBIT E



MUTUAL of OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1604 · Omaha, NE 68101
1 866 734 9444
mutualmedicare.com
A CMS Contracted Intermediary

May 15, 2007

SETTLEMENT DATA FOR CHANGE OF INTERMEDIARY

RECEIVED
MAY 2 2 2007
MEDICARE MAIL CLERK

MAY 2 2 2007
AVP PROVIDER
REIMBURSEMENT

Mr. Jimmy Atkinson
Blue Cross Blue Shield of Georgia
2357 Warm Springs Road
Columbus, GA  31904

RE:   Provider No.: 11-5354
      Brian Center Nursing-LaGrange

Dear Mr. Atkinson:

This letter is to notify you that payments were made to Brian Center Nursing – LaGrange after
they changed fiscal intermediaries effective December 01, 2006. We have also included a
summary of other interim payments made after the date of change with supporting
documentation. Please send us confirmation that you have received this information.

If you have any questions regarding this letter, please contact me at 1-866-734-9444 Ext. 3734.

Sincerely,

Connie Wu

Connie Wu
Medicare Auditor
Mutual of Omaha
Medicare Audit & Reimbursement

cc:   Mr. Gary Reicherzer, Director of Reimbursement
      Mariner Health Care
      5300 W Sam Houston Pkwy N #200
      Houston, TX  77041

      Current Administrator
      Brian Center Nursing – LaGrange
      2111 W Point Road
      LaGrange, GA  30240

SNF Part A - Detail Schedule

Provider:  Brian Ctr Nrsg - LaGrange
Provider #:  11-5354
FYE:  03/31/2007

Section 1

| SERVICE PERIOD | | DATE PAID | | | | TOTAL RETRO PAYING | TOTAL RETRO SAVINGS | | PAYBACK INTEREST | RETRO PYMT | TOTAL PYMT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04/01/06 | to | 04/05/06 | 04/19/06 | 5 | $ | $ | - | | $ | - | $ | - |
| 04/06/06 | to | 04/19/06 | 05/03/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 04/20/06 | to | 05/03/06 | 05/17/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 05/04/06 | to | 05/17/06 | 05/31/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 05/18/06 | to | 05/31/06 | 06/14/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 06/01/06 | to | 06/14/06 | 06/26/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 06/15/06 | to | 06/28/06 | 07/12/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 06/29/06 | to | 07/12/06 | 07/26/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 07/13/06 | to | 07/26/06 | 08/09/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 07/27/06 | to | 08/09/06 | 08/23/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 08/10/06 | to | 08/23/06 | 09/06/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 08/24/06 | to | 09/06/06 | 09/20/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 09/07/06 | to | 09/20/06 | 10/04/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 09/21/06 | to | 10/04/06 | 10/18/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 10/05/06 | to | 10/18/06 | 11/01/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 10/19/06 | to | 11/01/06 | 11/15/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 11/02/06 | to | 11/15/06 | 11/29/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 11/16/06 | to | 11/29/06 | 12/13/06 | 14 | $ | $ | - | | $ | - | $ | - |
| 11/30/06 | to | 12/13/06 | 12/27/06 | 13 | $ | 43,700 | $ | | 3,800 | | $ | 47,500 |
| 12/14/06 | to | 12/27/06 | 01/10/07 | 14 | $ | 47,100 | $ | | 4,100 | | $ | 51,200 |
| 12/28/06 | to | 01/10/07 | 01/24/07 | 14 | $ | 47,100 | $ | | 4,100 | | $ | 51,200 |
| 01/11/07 | to | 01/24/07 | 02/07/07 | 14 | $ | 47,100 | $ | | 4,100 | | $ | 51,200 |
| 01/25/07 | to | 02/07/07 | 02/21/07 | 14 | $ | 47,100 | $ | | 4,100 | | $ | 51,200 |
| 02/08/07 | to | 02/21/07 | 03/07/07 | 14 | $ | 47,100 | $ | | 4,100 | | $ | 51,200 |
| 02/22/07 | to | 03/07/07 | 03/21/07 | 14 | $ | 47,100 | $ | | 4,100 | | $ | 51,200 |
| 03/08/07 | to | 03/21/07 | 04/04/07 | 14 | $ | 47,100 | $ (7,720) | | 4,100 | | $ | (6,550) |
| 03/22/07 | to | 03/31/07 | 04/18/07 | 14 | $ | 39,500 | $ | | - | | $ | 43,600 |
| | to | | | | $ | | $ | | - | | $ | |
| | | **Totals =** | | | $ | 412,900 | $ (57,720) | | $ 36,600 | $ (30) | $ | 381,750 |

Section 2    List all Non-LP Retros

| Date Issued | Retros |
|---|---|
| | |
| | |

Auditor:  Connie Wu                          Date:  05/04/07

Reviewer:                                     Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

05/18/2007

Modified 3/28/2007

1 of 1



**CMS/**

CENTERS for MEDICARE & MEDICAID SERVICES

MUTUAL of OMAHA, MUTUAL OF OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1604 • Omaha, NE 68101
1 866 734 9444
mutualmedicare.com
A CMS Contracted Intermediary

May 15, 2007

## SETTLEMENT DATA FOR CHANGE OF INTERMEDIARY

Mr. Jimmy Atkinson
Blue Cross Blue Shield of Georgia
2357 Warm Springs Road
Columbus, GA 31904

MAY 2 2 2007
AVP, PROVIDER
REIMBURSEMENT

RE:    Provider No.: 11-5538
       Brian Center - Powder Springs

Dear Mr. Atkinson:

This letter is to notify you that payments were made to Brian Center – Powder Springs after they changed fiscal intermediaries effective December 01, 2006. We have also included a summary of other interim payments made after the date of change with supporting documentation. Please send us confirmation that you have received this information.

If you have any questions regarding this letter, please contact me at 1-866-734-9444 Ext. 3734.

Sincerely,

*Connie Wu*

Connie Wu
Medicare Auditor
Mutual of Omaha
Medicare Audit & Reimbursement

cc:    Mr. Gary Reicherzer, Director of Reimbursement
       Mariner Health Care
       5300 W Sam Houston Pkwy N #200
       Houston, TX 77041

       Current Administrator
       Brian Center – Powder Springs
       3460 Powder Springs Road
       Powder Springs, GA 30127

**RECEIVED**

MAY 2 2 2007

**MEDICARE MAIL CLERK**

Version 2.0                    Modified: 06/30/06                    Page 1 of 1

SNF Part A - Detail Schedule

...er:   Brian Center – Power Springs
...der #:  11-5538
...E:     03/31/2007

Section 1

| SERVICE PERIOD | | DATE PAID | ACT RT DAYS | (redacted) | (redacted) | LP RETRO PYMNT | (redacted) | RETRO AMT | (redacted) | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|---|
| 04/01/06 to | 04/05/06 | 04/19/06 | 5 | | $ | - | | $ | - | $ | - |
| 04/06/06 to | 04/19/06 | 05/03/06 | 14 | | $ | - | | $ | - | $ | - |
| 04/20/06 to | 05/03/06 | 05/17/06 | 14 | | $ | - | | $ | - | $ | - |
| 05/04/06 to | 05/17/06 | 05/31/06 | 14 | | $ | - | | $ | - | $ | - |
| 05/18/06 to | 05/31/06 | 06/14/06 | 14 | | $ | - | | $ | - | $ | - |
| 06/01/06 to | 06/14/06 | 06/28/06 | 14 | | $ | - | | $ | - | $ | - |
| 06/15/06 to | 06/28/06 | 07/12/06 | 14 | | $ | - | | $ | - | $ | - |
| 06/29/06 to | 07/12/06 | 07/26/06 | 14 | | $ | - | | $ | - | $ | - |
| 07/13/06 to | 07/26/06 | 08/09/06 | 14 | | $ | - | | $ | - | $ | - |
| 07/27/06 to | 08/09/06 | 08/23/06 | 14 | | $ | - | | $ | - | $ | - |
| 08/10/06 to | 08/23/06 | 09/06/06 | 14 | | $ | - | | $ | - | $ | - |
| 08/24/06 to | 09/06/06 | 09/20/06 | 14 | | $ | - | | $ | - | $ | - |
| 09/07/06 to | 09/20/06 | 10/04/06 | 14 | | $ | - | | $ | - | $ | - |
| 09/21/06 to | 10/04/06 | 10/18/06 | 14 | | $ | - | | $ | - | $ | - |
| 10/05/06 to | 10/18/06 | 11/01/06 | 14 | | $ | - | | $ | - | $ | - |
| 10/19/06 to | 11/01/06 | 11/15/06 | 14 | | $ | - | | $ | - | $ | - |
| 11/02/06 to | 11/15/06 | 11/29/06 | 14 | | $ | - | | $ | - | $ | - |
| 11/16/06 to | 11/29/06 | 12/13/06 | 14 | | $ | - | | $ | - | $ | - |
| 11/30/06 to | 12/13/06 | 12/27/06 | 13 | | $ | 103,000 | 2,300 | $ | 2,100 | $ | 105,100 |
| 12/14/06 to | 12/27/06 | 01/10/07 | 14 | | $ | 110,900 | | $ | 2,300 | $ | 113,200 |
| 12/28/06 to | 01/10/07 | 01/24/07 | 14 | | $ | 110,900 | | $ | 2,300 | $ | 113,200 |
| 01/11/07 to | 01/24/07 | 02/07/07 | 14 | | $ | 110,900 | | $ | 2,300 | $ | 113,200 |
| 01/25/07 to | 02/07/07 | 02/21/07 | 14 | | $ | 110,900 | | $ | 2,300 | $ | 113,200 |
| 02/08/07 to | 02/21/07 | 03/07/07 | 14 | | $ | 110,900 | | $ | 2,300 | $ | 113,200 |
| 02/22/07 to | 03/07/07 | 03/21/07 | 14 | | $ | 110,900 | | $ | 2,300 | $ | 113,200 |
| 03/08/07 to | 03/21/07 | 04/04/07 | 14 | | $ | 110,900 | | $ | 2,300 | $ | 113,200 |
| 03/22/07 to | 03/31/07 | 04/16/07 | 14 | | $ | 105,000 | (56,130) | $ | 2,300 | $ | 49,140 |
| to | | | | | $ | - | | $ | - | $ | - |
| | | Totals = | | | $ | 982,300 | $ (56,130) | $ | 20,500 | $ (30) | $ | 946,640 |

Section 2    List all Non-LP Retros

| Date issued | Retros |
|---|---|
| (redacted) | (redacted) |

Auditor:   Connie Wu                          Date:   04/27/07

Reviewer:  (redacted)                         Date:  (redacted)

Please complete the Date the review was completed and who completed it before saving
file to the w-drive                                                     05/16/2007

**CMS/**
CENTERS for MEDICARE & MEDICAID SERVICES


MUTUAL of OMAHA

MUTUAL *of* OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1604 · Omaha, NE 68101
1 866 734 9444
mutualmedicare.com
A CMS Contracted Intermediary

JUL 1 7 2007

## SETTLEMENT DATA FOR CHANGE OF INTERMEDIARY

Mr. Jimmy Atkinson
Blue Cross Blue Shield of Georgia
2557 Warm Springs Road
Columbus, Georgia 31904

RECEIVED
JUL 2 3 2007

JUL 2 3 2007

MEDICARE MAIL CLERK

RE:    Provider No.: 11-5413
       Jeffersonville

Dear Mr. Atkinson:

This letter is to notify you that payments were made to Jeffersonville after they changed fiscal intermediaries effective 12/01/06. Enclosed is a summary of interim payments made after the date of change with supporting documentation. Please send us confirmation that you have received this information.

If you have any questions regarding this letter, please contact me at 1-866-734-9444 Ext. 6243.

Sincerely,

Buren Hardy
Medicare Auditor
Mutual of Omaha
Medicare Audit & Reimbursement

Version 2.0                    Modified: 06/30/06                    Page 1 of 1

SNF Part A - Detail Schedule

Provider:    Jeffersonville
Provider #:  115413
FYE:         03/31/2007

Section 1

| SERVICE PERIOD | | DATE PAID | | Total PIP Payment | PIP Pay to FYE | PIP RETRO PYMNT | Total LP Payment | LP PAY to FYE | RETRO PYMNT | TOTAL PYMT |
|---|---|---|---|---|---|---|---|---|---|---|
| 04/01/06 | to 04/05/06 | 04/19/06 | 5 | | $ - | | | $ - | $ - | $ - |
| 04/06/06 | to 04/19/06 | 05/03/06 | 14 | | $ - | | | $ - | $ - | - |
| 04/20/06 | to 05/03/06 | 05/17/06 | 14 | | $ - | | | $ - | $ - | - |
| 05/04/06 | to 05/17/06 | 05/31/06 | 14 | | $ - | | | $ - | $ - | - |
| 05/18/06 | to 05/31/06 | 06/14/06 | 14 | | $ - | | | $ - | $ - | - |
| 06/01/06 | to 06/14/06 | 06/28/06 | 14 | | $ - | | | $ - | $ - | - |
| 06/15/06 | to 06/29/06 | 07/12/06 | 14 | | $ - | | | $ - | $ - | - |
| 06/29/06 | to 07/26/06 | 07/26/06 | 14 | | $ - | | | $ - | $ - | - |
| 07/13/06 | to 07/26/06 | 08/09/06 | 14 | | $ - | | | $ - | $ - | - |
| 07/27/06 | to 08/09/06 | 08/23/06 | 14 | | $ - | | | $ - | $ - | - |
| 08/10/06 | to 08/23/06 | 09/06/06 | 14 | | $ - | | | $ - | $ - | - |
| 08/24/06 | to 09/06/06 | 09/20/06 | 14 | | $ - | | | $ - | $ - | - |
| 09/07/06 | to 09/20/06 | 10/04/06 | 14 | | $ - | | | $ - | $ - | - |
| 09/21/06 | to 10/04/06 | 10/18/06 | 14 | | $ - | | | $ - | $ - | - |
| 10/05/06 | to 10/18/06 | 11/01/06 | 14 | | $ - | | | $ - | $ - | - |
| 10/19/06 | to 11/01/06 | 11/15/06 | 14 | | $ - | | | $ - | $ - | - |
| 11/02/06 | to 11/15/06 | 11/29/06 | 14 | | $ - | | | $ - | $ - | - |
| 11/16/06 | to 11/29/06 | 12/13/06 | 14 | | $ - | | | $ - | $ - | - |
| 11/30/06 | to 12/13/06 | 12/27/06 | 13 | 36,400 | $ 33,800 | | 600 | $ 600 | $ - | 34,400 |
| 12/14/06 | to 12/27/06 | 01/10/07 | 14 | 36,400 | $ 36,400 | | 600 | $ 600 | $ - | 37,000 |
| 12/28/06 | to 01/10/07 | 01/24/07 | 14 | 36,400 | $ 36,400 | | 600 | $ 600 | $ - | 37,000 |
| 01/11/07 | to 01/24/07 | 02/07/07 | 14 | 36,400 | $ 36,400 | | 600 | $ 600 | $ - | 37,000 |
| 01/25/07 | to 02/07/07 | 02/21/07 | 14 | 36,400 | $ 36,400 | | 600 | $ 600 | $ - | 37,000 |
| 02/08/07 | to 02/21/07 | 03/07/07 | 14 | 36,400 | $ 36,400 | | 600 | $ 600 | $ - | 37,000 |
| 02/22/07 | to 03/07/07 | 03/21/07 | 14 | 36,400 | $ 36,400 | | 600 | $ 600 | $ - | 37,000 |
| 03/08/07 | to 03/21/07 | 04/04/07 | 14 | 36,400 | $ 36,400 | | 600 | $ 600 | $ - | 37,000 |
| 03/22/07 | to 03/31/07 | 04/18/07 | 10 | 26,000 | $ 17,200 | (95,900) | 600 | $ 400 | $ - | (78,300) |
| | to | | | | $ - | | | $ - | $ - | - |
| | Totals = | | | | $ 305,800 | $ (95,900) | | $ 5,200 | $ - | $ 215,100 |

Section 2    List all Non-LP Retros

|  | Date issued | Retros |
|---|---|---|
| | | |
| | | |
| | | |

Auditor:   Buren Hardy                      Date:   07/13/07

Reviewer:                                    Date:

Please complete the Date the review was completed and who completed it before saving.
file to the wdrive

07/13/2007

SNF Part A - Detail Schedule

Provider:   Jeffersonville
Provider #:  115413
FYE:        03/31/2008

### Section 1

| SERVICE PERIOD | | DATE PAID | | Total PIP Payments | PIP Pay app to FYE | PIP RETRO PYMNT | Total LP Payment | LP Pay app To FYE | RETRO PYMNT | TOTAL PYMT |
|---|---|---|---|---|---|---|---|---|---|---|
| 04/01/07 | to | 04/04/07 | 04/19/07 | 4 | 24,100 | $ 6,900 | | 600 | $ 200 | $ 7,100 |
| 04/05/07 | to | 04/18/07 | 05/02/07 | 14 | 24,100 | $ 24,100 | | 600 | $ 600 | $ 24,700 |
| 04/19/07 | to | 05/02/07 | 05/16/07 | 14 | | $ - | | | $ - | $ - |
| 05/03/07 | to | 05/16/07 | 05/30/07 | 14 | | $ - | | | $ - | $ - |
| 05/17/07 | to | 05/30/07 | 06/13/07 | 14 | | $ - | | | $ - | $ - |
| 05/31/07 | to | 06/13/07 | 06/27/07 | 14 | | $ - | | | $ - | $ - |
| 06/14/07 | to | 06/27/07 | 07/11/07 | 14 | | $ - | | | $ - | $ - |
| 06/28/07 | to | 07/11/07 | 07/25/07 | 14 | | $ - | | | $ - | $ - |
| 07/12/07 | to | 07/25/07 | 08/08/07 | 14 | | $ - | | | $ - | $ - |
| 07/26/07 | to | 08/08/07 | 08/22/07 | 14 | | $ - | | | $ - | $ - |
| 08/09/07 | to | 08/22/07 | 09/05/07 | 14 | | $ - | | | $ - | $ - |
| 08/23/07 | to | 09/05/07 | 09/19/07 | 14 | | $ - | | | $ - | $ - |
| 09/06/07 | to | 09/19/07 | 10/03/07 | 14 | | $ - | | | $ - | $ - |
| 09/20/07 | to | 10/03/07 | 10/17/07 | 14 | | $ - | | | $ - | $ - |
| 10/04/07 | to | 10/17/07 | 10/31/07 | 14 | | $ - | | | $ - | $ - |
| 10/18/07 | to | 10/31/07 | 11/14/07 | 14 | | $ - | | | $ - | $ - |
| 11/01/07 | to | 11/14/07 | 11/28/07 | 14 | | $ - | | | $ - | $ - |
| 11/15/07 | to | 11/28/07 | 12/12/07 | 14 | | $ - | | | $ - | $ - |
| 11/29/07 | to | 12/12/07 | 12/26/07 | 14 | | $ - | | | $ - | $ - |
| 12/13/07 | to | 12/26/07 | 01/09/08 | 14 | | $ - | | | $ - | $ - |
| 12/27/07 | to | 01/09/08 | 01/23/08 | 14 | | $ - | | | $ - | $ - |
| 01/10/08 | to | 01/23/08 | 02/06/08 | 14 | | $ - | | | $ - | $ - |
| 01/24/08 | to | 02/06/08 | 02/20/08 | 14 | | $ - | | | $ - | $ - |
| 02/07/08 | to | 02/20/08 | 03/05/08 | 14 | | $ - | | | $ - | $ - |
| 02/21/08 | to | 03/05/08 | 03/19/08 | 14 | | $ - | | | $ - | $ - |
| 03/06/08 | to | 03/19/08 | 04/02/08 | 14 | | $ - | | | $ - | $ - |
| 03/20/08 | to | 03/31/08 | 04/16/08 | 12 | | $ - | | | $ - | $ - |
| | to | | | | | $ - | | | $ - | $ - |
| | | Totals = | | | | $ 31,000 | $ - | | $ 800 $ - | $ 31,800 |

### Section 2    List all Non-LP Retros

| Date issued | Retros |
|---|---|
| | |
| | |
| | |

Auditor:   Buren Happy                    Date:   07/13/07

Reviewer:                                 Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

07/13/2007

SNF Part A - Detail Schedule

Provider:   Brian Ctr-Jeffersonville
Provider #:  11-5413
FYE:        11/30/2007

### Section 1

| SERVICE PERIOD | | | | | | $ TOTAL PYMT |
|---|---|---|---|---|---|---|
| 12/01/06 to 12/13/06 | 12/27/06 | 13 | $ 33,800 | (96,200) | $ 600 | $ (61,800) |
| 12/14/06 to 12/27/06 | 01/10/07 | 14 | $ 36,400 | | $ 600 | $ 37,000 |
| 12/28/06 to 01/10/07 | 01/24/07 | 14 | $ 36,400 | | $ 600 | $ 37,000 |
| 01/11/07 to 01/24/07 | 02/07/07 | 14 | $ 36,400 | | $ 600 | $ 37,000 |
| 01/25/07 to 02/07/07 | 02/21/07 | 14 | $ 36,400 | | $ 600 | $ 37,000 |
| 02/08/07 to 02/21/07 | 03/07/07 | 14 | $ 36,400 | | $ 600 | $ 37,000 |
| 02/22/07 to 03/07/07 | 03/21/07 | 14 | $ 36,400 | | $ 800 | $ 37,000 |
| 03/08/07 to 03/21/07 | 04/04/07 | 14 | $ 36,400 | | $ 600 | $ 37,000 |
| 03/22/07 to 04/04/07 | 04/18/07 | 14 | $ 24,100 | | $ 600 | $ 24,700 |
| 04/05/07 to 04/18/07 | 05/02/07 | 14 | $ 24,100 | | $ 600 | $ 24,700 |
| 04/19/07 to 05/02/07 | 05/16/07 | 14 | $ - | | $ - | $ - |
| 05/03/07 to 05/16/07 | 06/30/07 | 14 | $ - | | $ - | $ - |
| 05/17/07 to 05/30/07 | 06/13/07 | 14 | $ - | | $ - | $ - |
| 05/31/07 to 06/13/07 | 06/27/07 | 14 | $ - | | $ - | $ - |
| 05/14/07 to 06/27/07 | 07/11/07 | 14 | $ - | | $ - | $ - |
| 06/28/07 to 07/11/07 | 07/25/07 | 14 | $ - | | $ - | $ - |
| 07/12/07 to 07/25/07 | 08/08/07 | 14 | $ - | | $ - | $ - |
| 07/26/07 to 08/08/07 | 08/22/07 | 14 | $ - | | $ - | $ - |
| 08/09/07 to 09/22/07 | 09/05/07 | 14 | $ - | | $ - | $ - |
| 08/23/07 to 09/05/07 | 09/19/07 | 14 | $ - | | $ - | $ - |
| 09/06/07 to 09/19/07 | 10/03/07 | 14 | $ - | | $ - | $ - |
| 09/20/07 to 10/03/07 | 10/17/07 | 14 | $ - | | $ - | $ - |
| 10/04/07 to 10/17/07 | 10/31/07 | 14 | $ - | | $ - | $ - |
| 10/18/07 to 10/31/07 | 11/14/07 | 14 | $ - | | $ - | $ - |
| 11/01/07 to 11/14/07 | 11/28/07 | 14 | $ - | | $ - | $ - |
| 11/15/07 to 11/28/07 | 12/12/07 | 14 | $ - | | $ - | $ - |
| 11/29/07 to 11/30/07 | 12/26/07 | 2 | $ - | | $ - | $ - |
| to | | | $ - | | $ - | $ - |
| **Totals =** | | | **$ 336,800** | **$ (96,200)** | **$ 6,000** | **$ 246,600** |

### Section 2    List all Non-LP Retros

| Date Issued | Retros |
|---|---|
| | |

Auditor:   Connie Wu                    Date:   10/19/07

Reviewer:                               Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

10/19/2007

PIP RETRO QUERY
115413
PIP SERVICE PERIOD: 12/01/2006 to 03/31/2007
RETRO TRANS. DATES: 01/01/2006 to 12/31/2007

| Provider Number | FYE | Trans. Date | System | Description | Service Period From | Service Period To | RETROS | PIP Payments | Level Payments Part A | Level Payments Part B |
|---|---|---|---|---|---|---|---|---|---|---|
| 115413 | | 12/27/2006 | FISS | Pymt Pip Amt PIP PMT - 36400 SPLIT | 11/30/2006 | 12/13/2006 | 0 | 33,800 | 0 | 0 |
| 115413 | | 12/27/2006 | FISS | Pymt Cpl Aml LP PMT - 600 SPLIT | 11/30/2006 | 12/13/2006 | 0 | 0 | 600 | 0 |
| 115413 | | 01/10/2007 | FISS | Pymt Pip Amt | 12/14/2006 | 12/27/2006 | 0 | 36,400 | 0 | 0 |
| 115413 | | 01/10/2007 | FISS | Pymt Cpll Amt | 12/14/2006 | 12/27/2006 | 0 | 0 | 600 | 0 |
| 115413 | | 01/24/2007 | FISS | Pymt Pip Amt | 12/28/2006 | 01/10/2007 | 0 | 36,400 | 0 | 0 |
| 115413 | | 01/24/2007 | FISS | Pymt Cpll Amt | 12/28/2006 | 01/10/2007 | 0 | 0 | 600 | 0 |
| 115413 | | 02/07/2007 | FISS | Pymt Pip Amt | 01/11/2007 | 01/24/2007 | 0 | 36,400 | 0 | 0 |
| 115413 | | 02/07/2007 | FISS | Pymt Cpll Amt | 01/11/2007 | 01/24/2007 | 0 | 0 | 600 | 0 |
| 115413 | | 02/21/2007 | FISS | Pymt Pip Amt | 01/25/2007 | 02/07/2007 | 0 | 36,400 | 0 | 0 |
| 115413 | | 02/21/2007 | FISS | Pymt Cpll Amt | 01/25/2007 | 02/07/2007 | 0 | 0 | 600 | 0 |
| 115413 | | 03/07/2007 | FISS | Pymt Pip Amt | 02/08/2007 | 02/21/2007 | 0 | 36,400 | 0 | 0 |
| 115413 | | 03/07/2007 | FISS | Pymt Cpll Amt | 02/08/2007 | 02/21/2007 | 0 | 0 | 600 | 0 |
| 115413 | | 03/21/2007 | FISS | Pymt Pip Amt | 02/22/2007 | 03/07/2007 | 0 | 36,400 | 0 | 0 |
| 115413 | | 03/21/2007 | FISS | Pymt Cpll Amt | 02/22/2007 | 03/07/2007 | 0 | 0 | 600 | 0 |
| 115413 | | 04/04/2007 | FISS | Pymt Pip Amt | 03/08/2007 | 03/21/2007 | 0 | 36,400 | 0 | 0 |
| 115413 | | 04/04/2007 | FISS | Pymt Cpll Amt | 03/08/2007 | 03/21/2007 | 0 | 0 | 600 | 0 |
| 115413 | | 04/18/2007 | FISS | Pymt Pip Amt PIP PMT - 24100 SPLIT | 03/22/2007 | 04/04/2007 | 0 | 17,200 | 0 | 0 |
| 115413 | | 04/18/2007 | FISS | Pymt Cpll Anl LP PMT - 600 SPLIT | 03/22/2007 | 04/04/2007 | 0 | 0 | 400 | 0 |
| | | | | Total | | | | 305,800 | 5,200 | |
| 115413 | | 04/20/2006 | HIGLAS52280-M040105-040506 PIP UNDER CR | | 04/06/2007 | 04/18/2007 | 204,500.00 | 0 | 0 | 0 |
| 115413 | | 10/23/2006 | HIGLAS52280-M040106-101806 PIP UP KV | | 04/05/2007 | 04/18/2007 | 223,100.00 | 0 | 0 | 0 |
| 115413 | 03/31/2007 | 10/23/2006 | HIGLAS52280DDI APROV-IRR-PASS | | 04/05/2007 | 04/18/2007 | -7,200.00 | 0 | 0 | 0 |
| 115413 | 03/31/2007 | 04/09/2007 | HIGLAS52280000 APROV-IRR-PIP | | 04/05/2007 | 04/18/2007 | -307,600.00 | 0 | 0 | 0 |

*(handwritten annotations: "N/A"; "(307,400) ≥ (25,400)"; "111/355 -1  (307,400)"; "√1/1/06 - 3/3/07  255C"; "3/1/1 - 3/16/07  111")*

MUTUAL OF OMAHA INSURANCE COMPANY
Contractor for MEDICARE

## INTERIM PAYMENT REVIEW SUMMARY

Type           SNF PPS                                    Audit Team #:    S1
Number         11-5413
Name           Brian Center Nursing Care - Jeffersonville
FYE            03/31/2007
Review Period  04/01/2006    to    12/31/2006             PIP Review #:

REVIEW COMMENTS:

PIP Amount        ($307,600)
LP Amount            $0

Service Period  04/01/2006   through         03/21/2007            FYE:     03/31/2007

PIP Amount           $0
LP Amount            $0

Service Period            through                              FYE:

| No Change In Payment | CHANGE: | | | | FISS effective date: | 04/12/2007 |
|---|---|---|---|---|---|---|
|  | PIP payment from | $36,400 | to | $24,100 | effective | 04/18/2007 |
| X | LP payment from | $600 | to | $600 | effective | 04/18/2007 |

Auditor                              Date   07/13/2007

Lead Auditor                         Date


_____   Underpayment(s) issue Retro(s).
_____   Overpayment(s) check due _____    or apply payment of  _____

Reimbursement Analyst  _____         Date _____
Sr. Reimbursement Analyst _____        Date _____
Reimbursement Supervisor _____        Date _____
Reimbursement Manager _____        Date _____
*Signature required when over- or under-payment is $1 million or greater, or when a PIP or LP is added or deleted.
**Signature required when over- or under-payment is $2.5 million or greater.

PIP/LP TOLERANCE SETTINGS IN FISS:    (Financial Master Administrative Screen 2)
        Total PIP/LP Tolerance for FISS    $24,700  (MAP 7904)

Verification of FISS Tolerance updates
Reimbursement Analyst  _____         Date _____
Sr. Reimbursement Analyst _____        Date _____

MUTUAL OF OMAHA INSURANCE COMPANY
Contractor for MEDICARE

## INTERIM PAYMENT REVIEW SUMMARY

Type          SNF PPS                                    Audit Team #:  [ S1 ]
Number        ~~XXXXXXX~~
Name          Brian Center Nursing Care - Jeffersonville
FYE           03/31/2007
Review Period 04/01/2006    to    06/30/2006             PIP Review #: ~~XXXXX~~

REVIEW COMMENTS:

PIP Amount        $223,100
LP Amount         ($7,200)

Service Period  04/01/2006   through      10/18/2006          FYE:    03/31/2007

PIP Amount        $0
LP Amount         $0

Service Period  _____  through _____          FYE:    _____

| No Change In Payment | CHANGE: | | | | FISS effective date: | 11/09/2006 |
|---|---|---|---|---|---|---|
| _____ | PIP payment from | $20,800 | to | $36,400 | effective | 11/15/2006 |
| _____ | LP payment from | $1,100 | to | $600 | effective | 11/15/2006 |

Auditor ~~XXXXXXXXXXXXX~~              Date  07/13/2007

Lead Auditor _____                  Date _____

_____  Underpayment(s) issue Retro(s).
_____  Overpayment(s) check due _____  or apply payment of _____

Reimbursement Analyst _____              Date _____
Sr. Reimbursement Analyst _____          Date _____
Reimbursement Supervisor _____  *        Date _____
Reimbursement Manager _____  **          Date _____

*Signature required when over- or under-payment is $1 million or greater, or when a PIP or LP is added or deleted.
**Signature required when over- or under-payment is $2.5 million or greater.

PIP/LP TOLERANCE SETTINGS IN FISS:        (Financial Master Administrative Screen 2)
        Total PIP/LP Tolerance for FISS     $37,000  (MAP 7904)

Verification of FISS Tolerance updates
Reimbursement Analyst _____              Date _____
Sr. Reimbursement Analyst _____          Date _____

PIP RETRO QUERY
115413
PIP SERVICE PERIOD: 04/01/2007 to 03/31/2008
RETRO TRANS. DATES: 04/01/2007 to 03/31/2008

| Provider Number | FYE | Trans. Date | System | Description | Service Period From | Service Period To | RETROS | PIP Payments | Level Payments Part A | Level Payments Part B | Part |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 115413 | | 04/18/2007 | FISS | Pymt Pip Amt PIP PMT - 24100 SPLIT | 03/22/2007 | 04/04/2007 | 0 | 6,900 | 0 | 0 | 0 |
| 115413 | | 04/18/2007 | FISS | Pymt Cpll Amt LP PMT - 600 SPLIT | 03/22/2007 | 04/04/2007 | 0 | 0 | 200 | 0 | 0 |
| 115413 | | 05/02/2007 | FISS | Pymt Pip Amt | 04/05/2007 | 04/18/2007 | 0 | 24,100 | 0 | 0 | 0 |
| 115413 | | 05/02/2007 | FISS | Pymt Cpll Amt | 04/05/2007 | 04/18/2007 | 0 | 0 | 600 | 0 | 0 |
| | | | | **Total** | | | 0 | 31,000 | 800 | 0 | 0 |
| 115413 | 03/31/2007 | 04/09/2007 | HIGLAS5228000 | APROV-IRR-PIP | 04/05/2007 | 04/18/2007 | -307,600.00 | N/A | 0 | 0 | 0 |

1 of 1



**CMS/**
CENTERS for MEDICARE & MEDICAID SERVICES

MUTUAL *of* OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1604 · Omaha, NE 68101
1 866 734 9444
mutualmedicare.com
A CMS Contracted Intermediary

JUN 1 8 2007

06/12/07

AVP PROVIDER
REIMBURSEMENT

RECEIVED

SETTLEMENT DATA FOR CHANGE OF INTERMEDIARY   JUN 1 8 2007

MEDICARE MAIL CLERK

Mr. Jimmy Atkinson
Blue Cross Blue Shield of Georgia
2557 Warm Springs Road
Columbus, Georgia 31904

RE:   Provider No.: 11-5427
      Thomasville

Dear Mr. Atkinson:

This letter is to notify you that payments were made to Thomasville after they changed fiscal
intermediaries effective 12/01/06. Enclosed is a summary of interim payments made after the
date of change with supporting documentation. Please send us confirmation that you have
received this information.

If you have any questions regarding this letter, please contact me at 1-866-734-9444 Ext. 6243.

Sincerely,

Buren Hardy
Medicare Auditor
Mutual of Omaha
Medicare Audit & Reimbursement

SNF Part A - Detail Schedule

Provider:  **Thomasville**
Provider #:  115427
FYE:  03/31/2007

**Section 1**

| SERVICE PERIOD | | DATE PAID | DAYS | TOTAL LP PAYMENTS | LP RETRO PAYMENTS | LP PTD TO PYMNT | NON LP PAYMENTS | NON LP PYMT RETRO PYMNT | RETRO | TOTAL PYMT |
|---|---|---|---|---|---|---|---|---|---|---|
| 04/01/06 to | 04/05/06 | 04/19/06 | 5 | | $ - | | | $ - | | $ - |
| 04/06/06 to | 04/19/06 | 05/03/06 | 14 | | $ - | | | $ - | | $ - |
| 04/20/06 to | 05/03/06 | 05/17/06 | 14 | | $ - | | | $ - | | $ - |
| 05/04/06 to | 05/17/06 | 05/31/06 | 14 | | $ - | | | $ - | | $ - |
| 05/18/06 to | 05/31/06 | 06/14/06 | 14 | | $ - | | | $ - | | $ - |
| 06/01/06 to | 06/14/06 | 06/28/06 | 14 | | $ - | | | $ - | | $ - |
| 06/15/06 to | 06/28/06 | 07/12/06 | 14 | | $ - | | | $ - | | $ - |
| 06/29/06 to | 07/12/06 | 07/26/06 | 14 | | $ - | | | $ - | | $ - |
| 07/13/06 to | 07/26/06 | 08/09/06 | 14 | | $ - | | | $ - | | $ - |
| 07/27/06 to | 08/09/06 | 08/23/06 | 14 | | $ - | | | $ - | | $ - |
| 08/10/06 to | 08/23/06 | 09/06/06 | 14 | | $ - | | | $ - | | $ - |
| 08/24/06 to | 09/06/06 | 09/20/06 | 14 | | $ - | | | $ - | | $ - |
| 09/07/06 to | 09/20/06 | 10/04/06 | 14 | | $ - | | | $ - | | $ - |
| 09/21/06 to | 10/04/06 | 10/18/06 | 14 | | $ - | | | $ - | | $ - |
| 10/05/06 to | 10/18/06 | 11/01/06 | 14 | | $ - | | | $ - | | $ - |
| 10/19/06 to | 11/01/06 | 11/15/06 | 14 | | $ - | | | $ - | | $ - |
| 11/02/06 to | 11/15/06 | 11/29/06 | 14 | | $ - | | | $ - | | $ - |
| 11/16/06 to | 11/29/06 | 12/13/06 | 14 | | $ - | | | $ - | | $ - |
| 11/30/06 to | 12/13/06 | 12/27/06 | 13 | | $ 22,700 | | | $ 3,300 | | $ 25,000 |
| 12/14/06 to | 12/27/06 | 01/10/07 | 14 | | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 12/28/06 to | 01/10/07 | 01/24/07 | 14 | | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 01/11/07 to | 01/24/07 | 02/07/07 | 14 | | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 01/25/07 to | 02/07/07 | 02/21/07 | 14 | | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 02/08/07 to | 02/21/07 | 03/07/07 | 14 | | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 02/22/07 to | 03/07/07 | 03/21/07 | 14 | | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 03/08/07 to | 03/21/07 | 04/04/07 | 14 | | $ 24,400 | | | $ 3,500 | | $ 27,900 |
| 03/22/07 to | 03/31/07 | 04/18/07 | 10 | | $ 14,900 | (26,580) | | $ 2,400 | (810) | $ (10,090) |
| to | | | | | | | | | | |
| **Totals =** | | | | | $ 208,400 | $ (26,580) | | $ 30,200 | $ (810) | 211,210 |

**Section 2**   List all Non-LP Retros

| Date issued | Retros |
|---|---|
| | |

Auditor:  Buren Hardy                                    Date:  05/02/07

Reviewer:                                                Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

05/02/2007

SNF Part A - Detail Schedule

Provider:  Brian Ctr-Thomasville
Provider #:  11-5427
FYE:  11/30/2007

<u>Section 1</u>

| SERVICE PERIOD | | DATE PAID | DAYS | PIE Payment | PIE PAYMENT TO FYE | PIE RETRO PYMNT | TOT LP Payment | LP RETRO TO FYE | RETRO PYMNS | TOTAL SERVICE |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/06 to | 12/13/06 | 12/27/06 | 13 | | $ 22,700 | (26,600) | 3,500 | $ 3,300 | (800) | $ (1,400) |
| 12/14/06 to | 12/27/06 | 01/10/07 | 14 | | $ 24,400 | | 3,500 | $ 3,500 | | 27,900 |
| 12/28/06 to | 01/10/07 | 01/24/07 | 14 | | $ 24,400 | | 3,500 | $ 3,500 | | 27,900 |
| 01/11/07 to | 01/24/07 | 02/07/07 | 14 | | $ 24,400 | | 3,500 | $ 3,500 | | 27,900 |
| 01/25/07 to | 02/07/07 | 02/21/07 | 14 | | $ 24,400 | | 3,500 | $ 3,500 | | 27,900 |
| 02/08/07 to | 02/21/07 | 03/07/07 | 14 | | $ 24,400 | | 3,500 | $ 3,500 | | 27,900 |
| 02/22/07 to | 03/07/07 | 03/21/07 | 14 | | $ 24,400 | | 3,500 | $ 3,500 | | 27,900 |
| 03/08/07 to | 03/21/07 | 04/04/07 | 14 | | $ 24,400 | | 3,500 | $ 3,500 | | 27,900 |
| 03/22/07 to | 04/04/07 | 04/18/07 | 14 | | $ 20,900 | | 3,400 | $ 3,400 | | 24,300 |
| 04/05/07 to | 04/18/07 | 05/02/07 | 14 | | $ - | | | $ - | | - |
| 04/19/07 to | 05/02/07 | 05/16/07 | 14 | | $ - | | | $ - | | - |
| 05/03/07 to | 05/16/07 | 05/30/07 | 14 | | $ - | | | $ - | | - |
| 05/17/07 to | 05/30/07 | 06/13/07 | 14 | | $ - | | | $ - | | - |
| 05/31/07 to | 06/13/07 | 06/27/07 | 14 | | $ - | | | $ - | | - |
| 06/14/07 to | 06/27/07 | 07/11/07 | 14 | | $ - | | | $ - | | - |
| 06/28/07 to | 07/11/07 | 07/25/07 | 14 | | $ - | | | $ - | | - |
| 07/12/07 to | 07/25/07 | 08/08/07 | 14 | | $ - | | | $ - | | - |
| 07/26/07 to | 08/06/07 | 08/22/07 | 14 | | $ - | | | $ - | | - |
| 08/09/07 to | 08/22/07 | 09/05/07 | 14 | | $ - | | | $ - | | - |
| 08/23/07 to | 09/05/07 | 09/19/07 | 14 | | $ - | | | $ - | | - |
| 09/06/07 to | 09/19/07 | 10/03/07 | 14 | | $ - | | | $ - | | - |
| 09/20/07 to | 10/03/07 | 10/17/07 | 14 | | $ - | | | $ - | | - |
| 10/04/07 to | 10/17/07 | 10/31/07 | 14 | | $ - | | | $ - | | - |
| 10/18/07 to | 10/31/07 | 11/14/07 | 14 | | $ - | | | $ - | | - |
| 11/01/07 to | 11/14/07 | 11/28/07 | 14 | | $ - | | | $ - | | - |
| 11/15/07 to | 11/28/07 | 12/12/07 | 14 | | $ - | | | $ - | | - |
| 11/29/07 to | 11/30/07 | 12/26/07 | 2 | | $ - | | | $ - | | - |
| to | | | | | $ - | | | $ - | | - |
| | | Totals = | | | $ 214,400 | $ (26,600) | | $ 31,200 | $ (800) | $ 218,200 |

<u>Section 2</u>   List all Non-LP Retros

| | Date Issued | | Retros |
|---|---|---|---|

Auditor:  Connie Wu                          Date:  10/19/07

Reviewer:  _____          Date: _____

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

10/19/2007

FISS File Query
Provider Numbers: 115427
Remit Dates From/To: 12/01/06, 04/30/07

| Payo Num | Rmit Dte | Pymt Pip Amt | Pymt Cpt Amt | Pymt Dme Amt | Pymt Kdny Amt | Pymt Bad Debt Amt | Pymt Npa Amt | Pymt Roe Amt | Pymt Sett Amt | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 115427 | 12/13/06 | 24,400 | -3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 27,900 |
| 115427 | 12/27/06 | 24,400 | -3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 27,900 |
| 115427 | 01/10/07 | 24,400 | -3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 27,900 |
| 115427 | 01/24/07 | 24,400 | -3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 27,900 |
| 115427 | 02/07/07 | 24,400 | -3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 27,900 |
| 115427 | 02/21/07 | 24,400 | -3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 27,900 |
| 115427 | 03/07/07 | 24,400 | -3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 27,900 |
| 115427 | 03/21/07 | 24,400 | -3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 27,900 |
| 115427 | 04/04/07 | 24,400 | -3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 27,900 |
| 115427 | 04/19/07 | 20,900 | -3,400 | 0 | 0 | 0 | 0 | 0 | 0 | 24,300 |

Ran: Tuesday, May 01, 2007 01:54 PM

## PIP RETRO QUERY
### 115427
**PIP SERVICE PERIOD: 12/01/2006 to 03/31/2007**
**RETRO TRANS. DATES: 01/01/2006 to 12/31/2007**

| Provider Number | FYE | Trans. Date | System | Description | Service Period From | Service Period To | RETROS | PIP Payments | Level A Payments Part | Level B Payments Part |
|---|---|---|---|---|---|---|---|---|---|---|
| 115427 | | 12/27/2006 | FISS | Pymt Pip Amt PIP PMT - 24400 SPLIT | 11/30/2006 | 12/13/2006 | 0 | 22,700 | 0 | 0 |
| 115427 | | 12/27/2006 | FISS | Pymt Cpit Amt LP PMT - 3500 SPLIT | 11/30/2006 | 12/13/2006 | 0 | 0 | 3,300 | 0 |
| 115427 | | 01/10/2007 | FISS | Pymt Pip Amt | 12/14/2006 | 12/27/2006 | 0 | 24,400 | 0 | 0 |
| 115427 | | 01/10/2007 | FISS | Pymt Cpit Amt | 12/14/2006 | 12/27/2006 | 0 | 0 | 3,500 | 0 |
| 115427 | | 01/24/2007 | FISS | Pymt Pip Amt | 12/28/2006 | 01/10/2007 | 0 | 24,400 | 0 | 0 |
| 115427 | | 01/24/2007 | FISS | Pymt Cpit Amt | 12/28/2006 | 01/10/2007 | 0 | 0 | 3,500 | 0 |
| 115427 | | 02/07/2007 | FISS | Pymt Pip Amt | 01/11/2007 | 01/24/2007 | 0 | 24,400 | 0 | 0 |
| 115427 | | 02/07/2007 | FISS | Pymt Cpit Amt | 01/11/2007 | 01/24/2007 | 0 | 0 | 3,500 | 0 |
| 115427 | | 02/21/2007 | FISS | Pymt Cpit Amt | 01/25/2007 | 02/07/2007 | 0 | 24,400 | 0 | 0 |
| 115427 | | 02/21/2007 | FISS | Pymt Pip Amt | 01/25/2007 | 02/07/2007 | 0 | 0 | 3,500 | 0 |
| 115427 | | 03/07/2007 | FISS | Pymt Cpit Amt | 02/08/2007 | 02/21/2007 | 0 | 24,400 | 0 | 0 |
| 115427 | | 03/07/2007 | FISS | Pymt Pip Amt | 02/08/2007 | 02/21/2007 | 0 | 0 | 3,500 | 0 |
| 115427 | | 03/21/2007 | FISS | Pymt Cpit Amt | 02/22/2007 | 03/07/2007 | 0 | 24,400 | 0 | 0 |
| 115427 | | 03/21/2007 | FISS | Pymt Pip Amt | 02/22/2007 | 03/07/2007 | 0 | 0 | 3,500 | 0 |
| 115427 | | 04/04/2007 | FISS | Pymt Cpit Amt | 03/08/2007 | 03/21/2007 | 0 | 24,400 | 0 | 0 |
| 115427 | | 04/04/2007 | FISS | Pymt Pip Amt | 03/08/2007 | 03/21/2007 | 0 | 0 | 3,500 | 0 |
| 115427 | | 04/04/2007 | FISS | Pymt Cpit Amt | 03/22/2007 | 04/04/2007 | 0 | 24,400 | 0 | 0 |
| 115427 | | 04/18/2007 | FISS | Pymt Pip Amt PIP PMT - 20900 SPLIT | 03/22/2007 | 04/04/2007 | 0 | 14,900 | 3,500 | 0 |
| 115427 | | 04/18/2007 | FISS | Pymt Cpit Amt LP PMT - 3400 SPLIT | 03/22/2007 | 04/04/2007 | 0 | 0 | 2,400 | 0 |
| | | | | **Total** | | | | 208,400 | 30,200 | 0 |
| 115427 | 03/31/2006 | 04/04/2006 | HIGLAS5228D000 | 04/01/05-03/22/06 PIP O/P AT | 03/22/2007 | 04/04/2007 | -102,200.00 | 0 | 0 | 0 |
| 115427 | 03/31/2007 | 10/23/2006 | HIGLAS52380-N0 | 04/1106-101806 PIP UP MI | 03/22/2007 | 04/04/2007 | 172,000.00 | 0 | 0 | 0 |
| 115427 | 03/31/2007 | 10/23/2006 | HIGLAS5228D000 | APROV-IRR-PASS | 03/22/2007 | 04/04/2007 | -44,600.00 | 0 | 0 | 0 |
| 115427 | 03/31/2007 | 04/09/2007 | HIGLAS5228D000 | APROV-IRR-PASS | 03/22/2007 | 04/04/2007 | -2,600.00 | 0 | 0 | 0 |
| 115427 | 03/31/2007 | 04/09/2007 | HIGLAS5228D000 | APROV-IRR-PIP | 03/22/2007 | 04/04/2007 | -85,000.00 | 0 | 0 | 0 |

*Handwritten annotations:* 1/1/06 – 3/31/07 ; 355 ; 12/1/06 – 3/31/07 ; 1h ; 355 ; (85,000) – (26,580) ; (2,600) – (810)

MUTUAL OF OMAHA INSURANCE COMPANY
Contractor for MEDICARE

## INTERIM PAYMENT REVIEW SUMMARY

Type                SNF PPS                                    Audit Team #:        S1
Number              ▓▓▓▓▓▓▓
Name                Brian Center of Thomasville
FYE                 03/31/2007
Review Period       04/01/2006    to    12/31/2006            PIP Review #:  ▓▓▓▓▓▓▓

REVIEW COMMENTS:

PIP Amount          ($85,000)
LP Amount           ($2,600)

Service Period    04/01/2006    through      03/21/2007        FYE:      03/31/2007

PIP Amount          $0
LP Amount           $0

Service Period    _____  through _____            FYE:    _____

| No Change In Payment | CHANGE: | | | FISS effective date: | 04/12/2007 |
|---|---|---|---|---|---|
| | PIP payment from | $24,400 | to $20,900 | effective | 04/18/2007 |
| | LP payment from | $3,500 | to $3,400 | effective | 04/18/2007 |

Auditor  ▓▓▓▓▓▓▓                          Date  05/01/2007

Lead Auditor  _____            Date  _____

_____  Underpayment(s) issue Retro(s).
_____  Overpayment(s) check due _____  or apply payment of _____

Reimbursement Analyst  _____                        Date  _____
Sr. Reimbursement Analyst  _____                    Date  _____
Reimbursement Supervisor  _____           *         Date  _____
Reimbursement Manager  _____               **       Date  _____

*Signature required when over- or under-payment is $1 million or greater, or when a PIP or LP is added or deleted.
**Signature required when over- or under-payment is $2.5 million or greater.

PIP/LP TOLERANCE SETTINGS IN FISS:    (Financial Master Administrative Screen 2)
         Total PIP/LP Tolerance for FISS    $24,300   (MAP 7904)

### Verification of FISS Tolerance updates
Reimbursement Analyst  _____                        Date  _____
Sr. Reimbursement Analyst  _____                    Date  _____

MUTUAL OF OMAHA INSURANCE COMPANY
Contractor for MEDICARE

## INTERIM PAYMENT REVIEW SUMMARY

| | | | | |
|---|---|---|---|---|
| Type | SNF PPS | | Audit Team #: | S1 |
| Number | ░░░░░░░ | | | |
| Name | Brian Center of Thomasville | | | |
| FYE | 03/31/2007 | | | |
| Review Period | 04/01/2006 to 06/30/2006 | | PIP Review #: | ░░░░░░░ |

REVIEW COMMENTS:

| | | | | | |
|---|---|---|---|---|---|
| PIP Amount | $172,000 | | | | |
| LP Amount | ($41,600) | | | | |
| | | | | | |
| Service Period | 04/01/2006 through | 10/18/2006 | FYE: | 03/31/2007 | |
| | | | | | |
| PIP Amount | $0 | | | | |
| LP Amount | $0 | | | | |
| | | | | | |
| Service Period | through | | FYE: | | |

| No Change In Payment | CHANGE: | | | | |
|---|---|---|---|---|---|
| | PIP payment from | $12,300 | to | $24,400 | FISS effective date: 11/09/2006 |
| | LP payment from | $6,400 | to | $3,500 | effective 11/15/2006 |
| | | | | | effective 11/15/2006 |

| | | |
|---|---|---|
| Auditor ░░░░░░░ | Date | 05/01/2007 |
| Lead Auditor | Date | |

_____ Underpayment(s) issue Retro(s)
_____ Overpayment(s) check due _____ or apply payment of _____

| | | |
|---|---|---|
| Reimbursement Analyst | Date | |
| Sr. Reimbursement Analyst | Date | |
| Reimbursement Supervisor | Date | * |
| Reimbursement Manager | Date | ** |

*Signature required when over- or under-payment is $1 million or greater, or when a PIP or LP is added or deleted.
**Signature required when over- or under-payment is $2.5 million or greater.

## PIP/LP TOLERANCE SETTINGS IN FISS:    *(Financial Master Administrative Screen 2)*
Total PIP/LP Tolerance for FISS    $27,900  (MAP 7904)

### Verification of FISS Tolerance updates

| | | |
|---|---|---|
| Reimbursement Analyst | Date | |
| Sr. Reimbursement Analyst | Date | |

SNF Part A - Detail Schedule

Provider:    Thomasville
Provider #:  115427
FYE:         03/31/2008

Section 1

| SERVICE PERIOD | | LAST PD PAID | Total LP PYMNT | LP PYMNT TO FYE | LP RETRO PYMNT | Total PS PYMNT | PS PYMNT TO FYE | PS RETRO PYMNT | QTY PYMNT |
|---|---|---|---|---|---|---|---|---|---|
| 04/01/07 to 04/04/07 | | 04/18/07 | 4 | $ 6,000 | | | $ 1,000 | | |
| 04/05/07 to 04/18/07 | | 05/02/07 | 14 | $ - | | | $ - | | $ 7,000 |
| 04/19/07 to 05/02/07 | | 05/16/07 | 14 | $ - | | | $ - | | $ - |
| 05/03/07 to 05/16/07 | | 05/30/07 | 14 | $ - | | | $ - | | $ - |
| 05/17/07 to 05/30/07 | | 06/13/07 | 14 | $ - | | | $ - | | $ - |
| 05/31/07 to 06/13/07 | | 06/27/07 | 14 | $ - | | | $ - | | $ - |
| 06/14/07 to 06/27/07 | | 07/11/07 | 14 | $ - | | | $ - | | $ - |
| 06/28/07 to 07/11/07 | | 07/25/07 | 14 | $ - | | | $ - | | $ - |
| 07/12/07 to 07/25/07 | | 08/08/07 | 14 | $ - | | | $ - | | $ - |
| 07/26/07 to 08/08/07 | | 08/22/07 | 14 | $ - | | | $ - | | $ - |
| 08/09/07 to 08/22/07 | | 09/05/07 | 14 | $ - | | | $ - | | $ - |
| 08/23/07 to 09/05/07 | | 09/19/07 | 14 | $ - | | | $ - | | $ - |
| 09/06/07 to 09/19/07 | | 10/03/07 | 14 | $ - | | | $ - | | $ - |
| 09/20/07 to 10/03/07 | | 10/17/07 | 14 | $ - | | | $ - | | $ - |
| 10/04/07 to 10/17/07 | | 10/31/07 | 14 | $ - | | | $ - | | $ - |
| 10/18/07 to 10/31/07 | | 11/14/07 | 14 | $ - | | | $ - | | $ - |
| 11/01/07 to 11/14/07 | | 11/28/07 | 14 | $ - | | | $ - | | $ - |
| 11/15/07 to 11/28/07 | | 12/12/07 | 14 | $ - | | | $ - | | $ - |
| 11/29/07 to 12/12/07 | | 12/26/07 | 14 | $ - | | | $ - | | $ - |
| 12/13/07 to 12/26/07 | | 01/09/08 | 14 | $ - | | | $ - | | $ - |
| 12/27/07 to 01/09/08 | | 01/23/08 | 14 | $ - | | | $ - | | $ - |
| 01/10/08 to 01/23/08 | | 02/06/08 | 14 | $ - | | | $ - | | $ - |
| 01/24/08 to 02/06/08 | | 02/20/08 | 14 | $ - | | | $ - | | $ - |
| 02/07/08 to 02/20/08 | | 03/05/08 | 14 | $ - | | | $ - | | $ - |
| 02/21/08 to 03/05/08 | | 03/19/08 | 14 | $ - | | | $ - | | $ - |
| 03/06/08 to 03/19/08 | | 04/02/08 | 14 | $ - | | | $ - | | $ - |
| 03/20/08 to 03/31/08 | | 04/16/08 | 12 | $ - | | | $ - | | $ - |
| to | | | | $ - | | | $ - | | $ - |
| Totals = | | | | $ 6,000 | $ - | | $ 1,000 | $ - | $ 7,000 |

Section 2    List all Non-LP Retros

Date issued          Retros

Auditor:  Buren Hardy                     Date:  05/01/07
Reviewer:                                 Date:
Please complete the Date the review was completed and who completed it before saving
file to the w-drive

06/08/2007

# PIP RETRO QUERY
## 115427

PIP SERVICE PERIOD: 04/01/2007 to 03/31/2008
RETRO TRANS. DATES: 04/01/2007 to 03/31/2008

| Provider Number | FYE | Trans. Date | System | Description | Service Period From | Service Period To | RETROS | PIP Payments | Level Payments Part A | Level Payments Part B |
|---|---|---|---|---|---|---|---|---|---|---|
| 115427 | 03/31/2007 | 04/09/2007 | FISS | Pymt Pip Amt PIP PMT - 20900 SPLIT HIGLAS6228000 APROV-IRR-PASS | 03/22/2007 | 04/04/2007 | -2,600.00 | 6,000 | 0 | 0 |
| 115427 | 03/31/2007 | 04/18/2007 | FISS | Pymt Cplt Amt LP PMT - 3400 SPLIT HIGLAS5228000 APROV-IRR-PIP | 03/22/2007 | 04/04/2007 | -85,000.00 | 0 | 1,000 | 0 |
| | | | | Total | | | | 6,000 | 1,000 | 0 |

ran: 06/06/2007 11:43 AM

FISS File Query
Provider Numbers: 115427
Remit Dates From/To: 04/01/07,06/05/07

| Pay'e Num | Rmit Dte | Pymt Plp Amt | Pymt Cpt Amt | Pymt Dime Amt | Pymt Kdny Amt | Pymt Bad Debt Amt | Pymt Npas Amt | Pymt Roe Amt | Pymt Sel Amt | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 115427 | 04/04/07 | 24,400 | 3,500 | 0 | 0 | 0 | 0 | 0 | 0 | 27,900 |
| 115427 | 04/19/07 | 20,900 | 3,400 | 0 | 0 | 0 | 0 | 0 | 0 | 24,300 |

Ran: Wednesday, June 06, 2007  11:49 AM

**CMS/**
CENTERS for MEDICARE & MEDICAID SERVICES



**MUTUAL of OMAHA**

MUTUAL *of* OMAHA INSURANCE COMPANY
Medicare Division
P.O. Box 1604 - Omaha, NE 68101
1 866 734 9444
mutualmedicare.com
A CMS Contracted Intermediary

06/12/07

JUN 1 8 2007

SETTLEMENT DATA FOR CHANGE OF INTERMEDIARY & PROVIDER
REIMBURSEMENT

Mr. Jimmy Atkinson
Blue Cross Blue Shield of Georgia
2557 Warm Springs Road
Columbus, Georgia 31904

RE:    Provider No.: 11-5404
       Lumber City

Dear Mr. Atkinson:

This letter is to notify you that payments were made to Lumber City after they changed fiscal
intermediaries effective 12/01/06. Enclosed is a summary of interim payments made after the
date of change with supporting documentation. Please send us confirmation that you have
received this information.

If you have any questions regarding this letter, please contact me at 1-866-734-9444 Ext. 6243.

Sincerely,

Buren Hardy
Medicare Auditor
Mutual of Omaha
Medicare Audit & Reimbursement

RECEIVED
JUN 1 8 2007
MEDICARE MAIL CLERK

Version 2.0                    Modified: 06/30/06                    Page 1 of 1

SNF Part A - Detail Schedule

Provider:      Lumber City
Provider #:    115404
FYE:           03/31/2007

Section 1

| SERVICE PERIOD | | DATE PAID | NO. DAYS PAYMENT | LP $ RECOVERY | NET RETRO PMT | RECONCILE PERIOD | LP $ RECOVERY FEES | RETRO PMT | TOTAL RETRO PMT |
|---|---|---|---|---|---|---|---|---|---|
| 04/01/06 to | 04/05/06 | 04/19/06 | 5 | $ - | | | $ - | | $ - |
| 04/06/06 to | 04/19/06 | 05/03/06 | 14 | $ - | | | $ - | | $ - |
| 04/20/06 to | 05/03/06 | 05/17/06 | 14 | $ - | | | $ - | | $ - |
| 05/04/06 to | 05/17/06 | 05/31/06 | 14 | $ - | | | $ - | | $ - |
| 05/18/06 to | 05/31/06 | 06/14/06 | 14 | $ - | | | $ - | | $ - |
| 06/01/06 to | 06/14/06 | 06/28/06 | 14 | $ - | | | $ - | | $ - |
| 06/15/06 to | 06/28/06 | 07/12/06 | 14 | $ - | | | $ - | | $ - |
| 06/29/06 to | 07/12/06 | 07/26/06 | 14 | $ - | | | $ - | | $ - |
| 07/13/06 to | 07/26/06 | 08/09/06 | 14 | $ - | | | $ - | | $ - |
| 07/27/06 to | 08/09/06 | 08/23/06 | 14 | $ - | | | $ - | | $ - |
| 08/10/06 to | 08/23/06 | 09/06/06 | 14 | $ - | | | $ - | | $ - |
| 08/24/06 to | 09/06/06 | 09/20/06 | 14 | $ - | | | $ - | | $ - |
| 09/07/06 to | 09/20/06 | 10/04/06 | 14 | $ - | | | $ - | | $ - |
| 09/21/06 to | 10/04/06 | 10/18/06 | 14 | $ - | | | $ - | | $ - |
| 10/05/06 to | 10/18/06 | 11/01/06 | 14 | $ - | | | $ - | | $ - |
| 10/19/06 to | 11/01/06 | 11/15/06 | 14 | $ - | | | $ - | | $ - |
| 11/02/06 to | 11/15/06 | 11/29/06 | 14 | $ - | | | $ - | | $ - |
| 11/16/06 to | 11/29/06 | 12/13/06 | 14 | $ - | | | $ - | | $ - |
| 11/30/06 to | 12/13/06 | 12/27/06 | 13 | | $ 59,200 | | | $ 4,300 | $ 63,500 |
| 12/14/06 to | 12/27/06 | 01/10/07 | 14 | | $ 63,800 | | | $ 4,600 | $ 68,400 |
| 12/28/06 to | 01/10/07 | 01/24/07 | 14 | | $ 63,800 | | | $ 4,600 | $ 68,400 |
| 01/11/07 to | 01/24/07 | 02/07/07 | 14 | | $ 63,800 | | | $ 4,600 | $ 68,400 |
| 01/25/07 to | 02/07/07 | 02/21/07 | 14 | | $ 63,800 | | | $ 4,600 | $ 68,400 |
| 02/08/07 to | 02/21/07 | 03/07/07 | 14 | | $ 63,800 | | | $ 4,600 | $ 68,400 |
| 02/22/07 to | 03/07/07 | 03/21/07 | 14 | | $ 63,800 | | | $ 4,600 | $ 68,400 |
| 03/08/07 to | 03/21/07 | 04/04/07 | 14 | | $ 63,800 | | | $ 4,600 | $ 68,400 |
| 03/22/07 to | 03/31/07 | 04/18/07 | 10 | | $ 30,500 | (164,340) | | $ 3,200 | $ (131,420) |
| to | | | | | | | | | |
| | | Totals = | | $ 535,300 | $ (164,340) | | $ 39,700 | $ (760) | $ 410,880 |

Section 2    List all Non-LP Retros

| Date Issued | Retros |
|---|---|
| | |

Auditor:    Buren Hardy                    Date:  05/01/07
Reviewer:   [signature]                    Date:  [illegible]

Please complete the Date the review was completed and who completed it before saving file to the w-drive

05/01/2007

## PIP RETRO QUERY.
## 115404
### PIP SERVICE PERIOD: 12/01/2006 to 04/30/2007
### RETRO TRANS. DATES: 01/01/2006 to 12/31/2007

| Provider Number | FYE | Trans. Date | System | Description | Service Period From | Service Period To | RETROS | PIP Payments | Level Payments Part A | Level Payments Part B |
|---|---|---|---|---|---|---|---|---|---|---|
| 115404 | | 12/27/2006 | FISS | Pymt Pip Amt PIP PMT - 63800 SPLIT | 11/30/2006 | 12/13/2006 | 0 | 59,200 | 0 | |
| 115404 | | 12/27/2006 | FISS | Pymt Cpt Amt LP PMT - 4600 SPLIT | 11/30/2005 | 12/13/2006 | 0 | 0 | 4,300 | |
| 115404 | | 01/10/2007 | FISS | Pymt Pip Amt | 12/14/2006 | 12/27/2006 | 0 | 63,800 | 0 | |
| 115404 | | 01/10/2007 | FISS | Pymt Cpt Amt | 12/14/2006 | 12/27/2006 | 0 | 0 | 4,600 | |
| 115404 | | 01/24/2007 | FISS | Pymt Pip Amt | 12/28/2006 | 01/10/2007 | 0 | 63,800 | 0 | |
| 115404 | | 01/24/2007 | FISS | Pymt Cpt Amt | 12/28/2006 | 01/10/2007 | 0 | 0 | 4,600 | |
| 115404 | | 02/07/2007 | FISS | Pymt Pip Amt | 01/11/2007 | 01/24/2007 | 0 | 63,800 | 0 | |
| 115404 | | 02/07/2007 | FISS | Pymt Cpt Amt | 01/11/2007 | 01/24/2007 | 0 | 0 | 4,600 | |
| 115404 | | 02/21/2007 | FISS | Pymt Pip Amt | 01/25/2007 | 02/07/2007 | 0 | 63,800 | 0 | |
| 115404 | | 02/21/2007 | FISS | Pymt Cpt Amt | 01/25/2007 | 02/07/2007 | 0 | 0 | 4,600 | |
| 115404 | | 03/07/2007 | FISS | Pymt Pip Amt | 02/08/2007 | 02/21/2007 | 0 | 63,800 | 0 | |
| 115404 | | 03/07/2007 | FISS | Pymt Cpt Amt | 02/08/2007 | 02/21/2007 | 0 | 0 | 4,600 | |
| 115404 | | 03/21/2007 | FISS | Pymt Pip Amt | 02/22/2007 | 03/07/2007 | 0 | 63,800 | 0 | |
| 115404 | | 03/21/2007 | FISS | Pymt Cpt Amt | 02/22/2007 | 03/07/2007 | 0 | 0 | 4,600 | |
| 115404 | | 04/04/2007 | FISS | Pymt Pip Amt | 03/08/2007 | 03/21/2007 | 0 | 63,800 | 0 | |
| 115404 | | 04/04/2007 | FISS | Pymt Cpt Amt | 03/08/2007 | 03/21/2007 | 0 | 0 | 4,600 | |
| 115404 | | 04/18/2007 | FISS | Pymt Pip Amt | 03/22/2007 | 04/04/2007 | 0 | 42,700 | 0 | |
| 115404 | | 04/18/2007 | FISS | Pymt Cpt Amt | 03/22/2007 | 04/04/2007 | 0 | 0 | 4,500 | |
| | | | | Total | | | 0 | 648,500 | 41,000 | 0 |
| | 03/31/2006 | 04/24/2006 | HIGLAS52280-M/04/01/05-04/05/06 PIP UP | | 03/22/2007 | 04/04/2007 | 31,700.00 | 0 | 0 | 0 |
| | 03/31/2006 | 04/24/2006 | HIGLAS52280D01/04/01/05-04/05/06 LP OP KG | | 03/22/2007 | 04/04/2007 | -100.00 | 0 | 0 | 0 |
| 115404 | 03/31/2006 | 10/23/2006 | HIGLAS52280-M/4/1/06-10/18/06 PIP UP MI | | 03/22/2007 | 04/04/2007 | 441,800.00 | 0 | 0 | 0 |
| 115404 | 03/31/2007 | 10/23/2006 | HIGLAS52280000/APPROV-IRR-PASS | | 03/22/2007 | 04/04/2007 | -21,600.00 | 0 | 0 | 0 |
| 115404 | 03/31/2007 | 04/06/2007 | HIGLAS52280D0/APPROV-IRR-PIP | | 03/22/2007 | 04/04/2007 | -525,600.00 | 0 | 0 | 0 |
| 115404 | 03/31/2007 | 04/06/2007 | HIGLAS52280009/APPROV-IRR-PASS | | 03/22/2007 | 04/04/2007 | -2,500.00 | 0 | 0 | 0 |

*(Handwritten annotations in margin:)*
4/1/06 - 3/31/07   355
11/1/06 - 3/31/07   1/1
355/1/1 = 355
355 - (500,565) = (167,700)
(confidential) = (169,440)
(7,3000) = (7,P.3)

FISS File Query
Provider Numbers: 115404
Remit Dates From/To: 12/01/06,04/30/07

| Paye Num | Rmit Dte | Pymt Pip Amt | Pymt Cpl Amt | Pymt Dme Amt | Pymt Kdny Amt | Pymt Bad Debt Amt | Pymt Npa Amt | Pymt Roe Amt | Pymt Sell Amt | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 115404 | 12/13/06 | 63,800 | 4,600 | 0 | 0 | 0 | 0 | 0 | 0 | 68,400 |
| 115404 | 12/27/06 | 63,800 | 4,600 | 0 | 0 | 0 | 0 | 0 | 0 | 68,400 |
| 115404 | 01/10/07 | 63,800 | 4,600 | 0 | 0 | 0 | 0 | 0 | 0 | 68,400 |
| 115404 | 01/24/07 | 63,800 | 4,600 | 0 | 0 | 0 | 0 | 0 | 0 | 68,400 |
| 115404 | 02/07/07 | 63,800 | 4,600 | 0 | 0 | 0 | 0 | 0 | 0 | 68,400 |
| 115404 | 02/21/07 | 63,800 | 4,600 | 0 | 0 | 0 | 0 | 0 | 0 | 68,400 |
| 115404 | 03/07/07 | 63,800 | 4,600 | 0 | 0 | 0 | 0 | 0 | 0 | 68,400 |
| 115404 | 03/21/07 | 63,800 | 4,600 | 0 | 0 | 0 | 0 | 0 | 0 | 68,400 |
| 115404 | 04/04/07 | 63,800 | 4,600 | 0 | 0 | 0 | 0 | 0 | 0 | 68,400 |
| 115404 | 04/19/07 | 42,700 | 4,500 | 0 | 0 | 0 | 0 | 0 | 0 | 47,200 |

Ran: Tuesday, May 01, 2007  01:54 PM

MUTUAL OF OMAHA INSURANCE COMPANY
Contractor for MEDICARE

## INTERIM PAYMENT REVIEW SUMMARY

Type          **SNF PPS**                                    Audit Team #:  [ **S1** ]
Number        [redacted]
Name          **Brian Center Nursing Care - Lumber City**
FYE           **03/31/2007**
Review Period 04/01/2006    to    12/31/2006                 PIP Review #: [redacted]

REVIEW COMMENTS:

PIP Amount    ($525,600)
LP Amount     ($2,500)

Service Period  04/01/2006   through    03/21/2007          FYE:    03/31/2007

PIP Amount    $0
LP Amount     $0

Service Period  _____  through   _____           FYE:   _____

No Change
In Payment             CHANGE:                              FISS effective date:   04/12/2007
_____     PIP payment from  $63,800   to   $42,700   effective   04/18/2007
_____     LP payment from   $4,600    to   $4,500    effective   04/18/2007

Auditor  [redacted]                      Date  05/01/2007

Supervisor  _____                   Date  _____

_____  Underpayment(s) issue Retro(s).
_____  Overpayment(s) check due  _____   or apply payment of  _____

Reimbursement Analyst  _____                          Date  _____
Sr. Reimbursement Analyst  _____                      Date  _____
Reimbursement Supervisor  _____            *          Date  _____
Reimbursement Manager  _____               **         Date  _____
*Signature required when over- or under-payment is $1 million or greater, or when a PIP or LP is added or deleted.
**Signature required when over- or under-payment is $2.5 million or greater.

PIP/LP TOLERANCE SETTINGS IN FISS:      *(Financial Master Administrative Screen 2)*
        Total PIP/LP Tolerance for FISS   $47,200   (MAP 7904)

                    Verification of FISS Tolerance updates
Reimbursement Analyst  _____                          Date  _____
Sr. Reimbursement Analyst  _____                      Date  _____

MUTUAL OF OMAHA INSURANCE COMPANY
Contractor for MEDICARE

## INTERIM PAYMENT REVIEW SUMMARY

Type          SNF PPS                                         Audit Team #:    [ S1 ]
Number        ▓▓▓▓▓▓▓
Name          Brian Center Nursing Care - Lumber City
FYE           03/31/2007
Review Period 04/01/2006    to    06/30/2006                  PIP Review #: ▓▓▓▓▓▓▓

REVIEW COMMENTS:

PIP Amount        $441,800
LP Amount        ($21,600)

Service Period  04/01/2006    through    10/18/2006           FYE:    03/31/2007

PIP Amount        $0
LP Amount         $0

Service Period  _____    through    _____           FYE:    _____

| No Change In Payment | CHANGE: | | | | | FISS effective date: 11/09/2006 |
|---|---|---|---|---|---|---|
| _____ | PIP payment from | $32,700 | to | $63,800 | effective | 11/15/2006 |
| | LP payment from | $6,100 | to | $4,600 | effective | 11/15/2006 |

Auditor ▓▓▓▓▓▓▓                          Date  05/01/2007

Lead Auditor _____          Date _____

_____    Underpayment(s) issue Retro(s).
_____    Overpayment(s) check due _____    or apply payment of _____

Reimbursement Analyst _____          Date _____
Sr. Reimbursement Analyst _____       Date _____
Reimbursement Supervisor _____  *     Date _____
Reimbursement Manager _____  **       Date _____

*Signature required when over- or under-payment is $1 million or greater, or when a PIP or LP is added or deleted.
**Signature required when over- or under-payment is $2.5 million or greater.

PIP/LP TOLERANCE SETTINGS IN FISS:    (Financial Master Administrative Screen 2)
        Total PIP/LP Tolerance for FISS  $68,400  (MAP 7904)

Verification of FISS Tolerance updates

Reimbursement Analyst _____          Date _____
Sr. Reimbursement Analyst _____       Date _____

# PIP RETRO QUERY
## 115404
PIP SERVICE PERIOD: 04/01/2007 to 03/31/2008
RETRO TRANS. DATES: 04/01/2007 to 03/31/2008

| Provider Number | FYE | Trans. Date | System | Description | Service Period From | Service Period To | RETROS | PIP Payments | Level A Payments Part | Level B Payments Part |
|---|---|---|---|---|---|---|---|---|---|---|
| 115404 | 03/31/2007 | 04/06/2007 04/18/2007 | HIGLAS5228000-APROV-IRR-PIP FISS | Pymt Pip Amt PIP PMT - 42700 SPLIT | 03/22/2007 | 04/04/2007 | -$25,600.00 | 12,200 | 0 | 0 |
| 115404 | 03/31/2007 | 04/06/2007 04/18/2007 | HIGLAS5228000-APROV-IRR-PASS FISS | Pymt Cptl Amt LP PMT - 4500 SPLIT | 03/22/2007 | 04/04/2007 | -2,500.00 | 0 | 1,300 | 0 |
| | | | | Total | | | 0 | 12,200 | 1,300 | 0 |

FISS File Query
Provider Numbers: 115404
Remit Dates From/To: 04/01/07, 06/05/07

| Paye Num | Rmit Dte | Pymt Pip Amt | Pymt Optl Amt | Pymt Dme Amt | Pymt Kdny Amt | Pymt Bad Debt Amt | Pymt Npa Amt | Pymt Rae Amt | Pymt Sett Amt | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 115404 | 04/04/07 | 63,800 | 4,600 | 0 | 0 | 0 | 0 | 0 | 0 | 68,400 |
| 115404 | 04/19/07 | 42,700 | 4,500 | 0 | 0 | 0 | 0 | 0 | 0 | 47,200 |
| 115404 | 05/03/07 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,369 | 3,369 |

Ran: Wednesday, June 06, 2007 11:48 AM

SNF Part A - Detail Schedule

Provider:    Lumber City
Provider #:  115404
FYE:         03/31/2008

Section 1

| SERVICE PERIOD | | DATE | | | | | | | TOTAL AMT |
|---|---|---|---|---|---|---|---|---|---|
| 04/01/07 to | 04/04/07 | 04/18/07 | 4 | $ 12,200 | | | $ 1,300 | | $ 13,500 |
| 04/05/07 to | 04/18/07 | 05/02/07 | 14 | $ - | | | $ - | | $ - |
| 04/19/07 to | 05/02/07 | 05/16/07 | 14 | $ - | | | $ - | | $ - |
| 05/03/07 to | 05/16/07 | 05/30/07 | 14 | $ - | | | $ - | | $ - |
| 05/17/07 to | 05/30/07 | 06/13/07 | 14 | $ - | | | $ - | | $ - |
| 05/31/07 to | 06/13/07 | 06/27/07 | 14 | $ - | | | $ - | | $ - |
| 06/14/07 to | 06/27/07 | 07/11/07 | 14 | $ - | | | $ - | | $ - |
| 06/28/07 to | 07/11/07 | 07/25/07 | 14 | $ - | | | $ - | | $ - |
| 07/12/07 to | 07/25/07 | 08/08/07 | 14 | $ - | | | $ - | | $ - |
| 07/26/07 to | 08/08/07 | 08/22/07 | 14 | $ - | | | $ - | | $ - |
| 08/09/07 to | 08/22/07 | 09/05/07 | 14 | $ - | | | $ - | | $ - |
| 08/23/07 to | 09/05/07 | 09/19/07 | 14 | $ - | | | $ - | | $ - |
| 09/06/07 to | 09/19/07 | 10/03/07 | 14 | $ - | | | $ - | | $ - |
| 09/20/07 to | 10/03/07 | 10/17/07 | 14 | $ - | | | $ - | | $ - |
| 10/04/07 to | 10/17/07 | 10/31/07 | 14 | $ - | | | $ - | | $ - |
| 10/18/07 to | 10/31/07 | 11/14/07 | 14 | $ - | | | $ - | | $ - |
| 11/01/07 to | 11/14/07 | 11/28/07 | 14 | $ - | | | $ - | | $ - |
| 11/15/07 to | 11/28/07 | 12/12/07 | 14 | $ - | | | $ - | | $ - |
| 11/29/07 to | 12/12/07 | 12/26/07 | 14 | $ - | | | $ - | | $ - |
| 12/13/07 to | 12/26/07 | 01/09/08 | 14 | $ - | | | $ - | | $ - |
| 12/27/07 to | 01/09/08 | 01/23/08 | 14 | $ - | | | $ - | | $ - |
| 01/10/08 to | 01/23/08 | 02/06/08 | 14 | $ - | | | $ - | | $ - |
| 01/24/08 to | 02/06/08 | 02/20/08 | 14 | $ - | | | $ - | | $ - |
| 02/07/08 to | 02/20/08 | 03/05/08 | 14 | $ - | | | $ - | | $ - |
| 02/21/08 to | 03/05/08 | 03/19/08 | 14 | $ - | | | $ - | | $ - |
| 03/06/08 to | 03/19/08 | 04/02/08 | 14 | $ - | | | $ - | | $ - |
| 03/20/08 to | 03/31/08 | 04/16/08 | 12 | $ - | | | $ - | | $ - |
| to | | | | $ - | | | $ - | | $ - |
| Totals = | | | | $ 12,200 | $ | | $ 1,300 | $ - | $ 13,500 |

Section 2    List all Non-LP Retros

Date issued          Retros

Auditor:    Buren Hardy                          Date:    05/01/07

Reviewer:                                        Date:

Please complete the Date the review was completed and who completed it before saving
file to the w-drive

06/06/2007

# EXHIBIT F

RE Triad Senior Living Services (2)

From: Ludwig, Sandra [Sandra.Ludwig@bcbsga.com]
Sent: Monday, February 25, 2008 5:01 PM
To: Jack Tranter
Cc: Adam Ashpes (E-mail); Ronald M. Herbert Jr. (E-mail); Tom Dame;
Smith, Ronald L. (CMS/SC); Brown, Renee L. (CMS/SC); Smoot, Donna;
Ludwig, Sandra
Subject: RE: Triad Senior Living Services

Mr. Tranter,

Please allow me to clarify. When you requested payment arrangements on the amount
of $187,254 I relayed that the entire oustanding debt (including the portion you
indicate as being Mariner's liability) must be considered as a whole. As the debt
is related to the same cost reporting period, and there was one owner only during
that cost reporting period, it is not possible to divide the debt, as you were
requesting we do so. We would be agreeable to working out payment arrangements if
your clients are willing to consider the entire balance of the overpayments as part
of those arrangements. From the CMS perspective the current owners are liable for
the entire debt; therefore, any payment arangements mutually agreed upon must
encompass the entire amount of the debt.

As far as the name of the lawyer in the CMS Regional Office, I have placed several
calls yet have not been able to obtain that information this late in the afternoon.
I will have that information for you first thing tomorrow morning, though, and I
will call you or email you as soon as I do.

Thank you,

Sandra Ludwig
BCBS GA
Accountant Senior
Provider Audit & Reimbursement
(706) 257-1073 phone
(706) 257-1082 fax
sandra.ludwig@bcbsga.com

This e-mail message is for the sole use of the above named and/or intended
recipient(s) only and may contain confidential information. If you are not an
intended recipient, please notify the sender of the miscommunication and delete the
message. Failure to maintain the confidentiality of this e-mail and any attachment
may subject you to penalties under applicable law.


-----Original Message-----
From: Jack Tranter [mailto:jtranter@GEJLAW.com]
Sent: Monday, February 25, 2008 4:20 PM
To: Ludwig, Sandra
Cc: Adam Ashpes (E-mail); Ronald M. Herbert Jr. (E-mail); Tom Dame
Subject: RE: Triad Senior Living Services


Just to confirm the discussion we just had. I proposed that Triad pay back the
amount that was paid to Triad as a result of the preliminary interim payment
arrangement with Mariner. Ron Herbert computed that amount to be $245,100, as noted
on Exhibit 1 on my February 15 letter. I related that Triad wanted that sum reduced
by the bad debt amounts identified in the February 14 letters from Doreen Hanlon
(total $57,846). Accordingly, I related that Triad proposes to pay this amount
($187,254) in equal installments over the next twelve months so that efforts can be
made to reclaim the funds that were improperly paid to Mariner. You rejected this
proposal relating that "CMS cannot separate the amounts" or something to that
effect.

RE Triad Senior Living Services (2)
    I then asked you to get me the number of a lawyer in the CMS Regional
Office who would be handling this matter as we planned to file suit tomorrow in the
US District Court for the District of Columbia.  I related that we intended to seek
a TRO and preliminary injunctive relief.  I advised that I needed a lawyers' name to
send copies of our pleadings.  Having been a government lawyer and Chief of Civil
Cases in the US Attorneys Office here in Maryland, it is not my practice to
"sandbag" gov't lawyers.  You related that you would get the name of the lawyer who
will be responsible for this matter and call me back with his or her name.

    Thanks.

Jack C. Tranter, Esq.
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201
Direct Dial:  410-347-1370
Fax:  410-837-0454

IRS CIRCULAR 230 NOTICE: Any U.S. tax advice contained in this communication (or in
any attachment) is not intended or written to be used, and cannot be used, for the
purpose of (i) avoiding federal tax penalties or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

This email transmission may contain CONFIDENTIAL and PRIVILEGED information.  If you
are not the intended recipient, please notify the sender by email, do not
disseminate and delete immediately.

From: Ludwig, Sandra [mailto:Sandra.Ludwig@bcbsga.com]
Sent: Thursday, February 21, 2008 4:19 PM
To: rherbert@triadhealth.com; Jack Tranter
CC: Smoot, Donna; Ronald L. Smith (CMS/SC) (E-mail); Ludwig, Sandra; Renee L. Brown
(CMS) (E-mail); Cindy Clark
Subject: RE: Triad Senior Living Services

Mr. Tranter,

I have spoken with the CMS Office of Financial Management once again regarding the
letter and exhibits I received from you today by way of fax and email.  I explained
to CMS your intention to seek judicial intervention and assistance should we begin
withholding interim payments on the Triad overpayments effective February 26, as we
indicated in our First Demand Letters.  CMS stands firm that, regardless of the
conditions contributing to or resulting in an overpayment, the repayment of any debt
owed to the Medicare program is the sole responsibility of the owner(s) of the
provider agreement relating to the debt at the time the overpayment is determined.

There is no question that the PIP payments issued by Mutual to the five facilities
were issued after a change of ownership occurred.  However, the fact remains that
Triad retained the provider agreements after the CHOW from Mariner; thus, Triad is
viewed as the only responsible party in repayment of the debts in question,
regardless of which bank account the amounts were deposited into or the cause of the
overpayments.  CMS has no authority to attempt to collect these debts from Mariner.
Once a provider agreement is transferred, the liability for any debt incurred on the
related provider number, regardless of the age or origin of the debt, is assumed by
the new owner(s).  If indeed funds paid by Mutual in 2007 were received by Mariner,
you should pursue reimbursement from Mariner based on the terms of your sales
agreement.  Should Mariner wish to repay CMS directly, please provide them the
payment address indicated in each of the five Triad demand letters.  In the interim,
Page 2

RE Triad Senior Living Services (2)
however, collection efforts will continue as indicated in our demand letters, including withholding from Triad's interim payments effective February 26, 2008.

Please contact me should you need further assistance.

Thank you,


Sandra Ludwig
BCBS GA
Accountant Senior
Provider Audit & Reimbursement
(706) 257-1073 phone
(706) 257-1082 fax
sandra.ludwig@bcbsga.com

This e-mail message is for the sole use of the above named and/or intended recipient(s) only and may contain confidential information. If you are not an intended recipient, please notify the sender of the miscommunication and delete the message. Failure to maintain the confidentiality of this e-mail and any attachment may subject you to penalties under applicable law.


-----Original Message-----
From: Cindy Clark [mailto:CClark@GEJLAW.com]
Sent: Thursday, February 21, 2008 11:37 AM
To: Ludwig, Sandra
Subject: FW: Triad Senior Living Services


Exhibits only attached.

 <<Exhibits to Ltr.pdf>>

>
IRS CIRCULAR 230 NOTICE: Any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding federal tax penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email transmission may contain CONFIDENTIAL and PRIVILEGED information. If you are not the intended recipient, please notify the sender by email, do not disseminate and delete immediately.

> From:          Cindy Clark   On Behalf Of Jack Tranter
> Sent: Thursday, February 21, 2008 11:34 AM
> To:    'sandra.ludwig@bcbsga.com'
> Cc:    'ptrotta@stkcpa.com'
> Subject:       Triad Senior Living Services
>
> This is a second transmission of a letter with exhibits from Jack Tranter.
>
>
>
> -----Original Message-----
> From:          Cindy Clark   On Behalf Of Jack Tranter
> Sent: Thursday, February 21, 2008 11:08 AM
> To:    'sandra.ludwig@bcbsga.com'
> Cc:    'aashpes@triadhealth.com'; 'rherbert@triadhealth.com'; Tom Dame; Anne B.
Fox;

RE Triad Senior Living Services (2)

```
> Subject:
>
>
>
>
> Cynthia Clark
> Secretary to Jack C. Tranter
> Gallagher Evelius & Jones LLP
> 218 N. Charles Street, Suite 400
> Baltimore, MD 21201
> 410-347-1275 x273
>
> _____
>
>
>
```

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information or otherwise protected by law. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# EXHIBIT G

**Martin, Laura**

| | |
|---|---|
| **From:** | Marcella Godwin [mgodwin@triadhealth.com] |
| **Sent:** | Friday, February 22, 2008 3:24 PM |
| **To:** | Martin, Laura |
| **Subject:** | 6/30/08 Lump sum payments |
| **Importance:** | High |

Have the interim lump sum payments for 115538, 115404, and 115413 been processed yet?
We are anxious to get the amount of the lump sum, as we are filing a suit against the prior owner for these
monies, as well as working on a repayment agreement.
Please let me know ASAP.
Thanks,

**Marcella Godwin**

Director of Business Office Services

Triad Senior Living

10 Roswell Street

Suite 210

Alpharetta, GA  30004

678-366-0305 Ext. 205

678-366-0306 fax

678-325-2178 fax

678-234-9087 mobile

mgodwin@triadhealth.com

CONFIDENTIALITY NOTICE: The information contained in this email message is
CONFIDENTIAL INFORMATION intended ONLY for the use of the individual or entity
named herein. If you are not the intended recipient or the employee or agent
responsible for delivering it to the intended recipient, you are hereby notified
that any dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please immediately
notify us by telephone at (678)366-0305 and return the original message by reply
email. Thank you for your cooperation.

2/22/2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TRIAD AT JEFFERSONVILLE I, LLC *et al.*,

          Plaintiffs,

        v.

MICHAEL O. LEAVITT *et al.*,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:08cv00329 (CKK)

<u>**DECLARATION OF RONALD L. SMITH**</u>

I, Ronald L. Smith, do hereby declare:

1.      I work in the Atlanta Regional Office of the Centers for Medicare & Medicaid Services ("CMS") and serve as Chief of the Medicare Financial Management Branch. I have served in this capacity since January 1997. In this capacity, I am responsible for planning, organizing, and directing all regional Medicare financial management activities related to contractor budgets, financial reporting, cost report audit, reimbursement, and debt collection. I make this declaration based on personal knowledge and on information made available to me in the course of my official duties.

<u>Payments to Skilled Nursing Facilities</u>

2.      CMS contracts with entities known as fiscal intermediaries ("FIs") to administer the payment, reimbursement, and audit processes for various Medicare providers, including skilled nursing facilities ("SNFs").

3.      The Medicare program reimburses SNFs for skilled nursing care provided to Medicare beneficiaries based on a prospective payment system ("PPS"). 42 C.F.R. §§ 413.330 to 413.355. Under the PPS, SNFs are paid a per diem payment of a predetermined rate for

inpatient services furnished to Medicare beneficiaries. *Id.* § 413.335(a).  Under the PPS, SNFs

receive interim payments following submission of a bill, which they typically submit to the FI

monthly. *Id.* § 413.350(a).  Alternatively, SNFs may request payment on a periodic interim

payment ("PIP") basis. *Id.* § 413.350(b); *see also id.* § 413.64(h).  Under the PIP system, the FI

estimates a SNF's prospective payments based on the SNF's payment experience under the PPS

and makes biweekly payments to the SNF equal to 1/26 of the total estimated amount of payment

for the year. *Id.* § 413.350(b)(2).  Each PIP payment is made two weeks after the end of a

biweekly period of service.  *Id.*  Payments made on a PIP basis are subject to final settlement.

*Id.*

      4.      To be approved for payment on a PIP basis, a SNF must meet the requirements set

forth in 42 C.F.R. § 413.64(h). *Id.* § 413.350(b)(1).  Approval is also conditioned upon the FI's

best judgment as to whether payment can be made under the PIP method without undue risk of

its resulting in an overpayment to the SNF. *Id.*  The FI must review a SNF's interim PIP

payments at least twice during the reporting period and adjust them if necessary. *Id.*

§ 413.350(b)(2).  In order for the FI to be able to determine whether the PIP amounts should be

adjusted because they are not closely approximating the reimbursement to be determined at

settlement for the cost reporting period, a SNF paid on a PIP basis must submit billings as if paid

on a claim-by-claim basis. *Id.* § 413.64(h)(7).  An FI will terminate paying a SNF on a PIP basis

if the SNF no longer meets the requirements of 42 C.F.R. § 413.64(h). *Id.* § 413.350(b)(3)(ii).

      5.      If a SNF does not request, or does not qualify for, PIP payments, the SNF is

reimbursed for services on a per diem basis when claims are filed.

<u>Tentative Cost Report Settlement and Recoupment of Overpayments</u>

6.      Upon entering the Medicare program, providers select a 12-month cost reporting

period. A provider must file its annual cost report on or before the last day of the fifth month

following the close of the reporting period. *Id.* § 413.24(f)(2)(i). The FI must issue an initial

adjustment, or "tentative" settlement, as quickly as possible but no later than 60 days following

acceptance of the provider's cost report. *Id.* § 413.64(f)(2); *Medicare Financial Management*

*Manual* ("FMM"), Ch. 8, § 10.5, attached as Ex. A to Defs.' Mot. to Dismiss or, in the

Alternative, for Summ. J. ("Defs.' Mot."). A tentative settlement usually reflects that monies are

owed either to the provider or to the Medicare program.

7.      If the results of the tentative settlement reveal that a provider has been overpaid

for the cost reporting period, the FI sends a letter requesting that the provider refund the

overpayment amount within 15 days of the date of the letter. *See* 42 C.F.R. § 405.373(a). The

letter notifies the provider that if payment in full is not received in 15 days, the provider's

Medicare payments will be withheld until payment in full is received or the FI receives from the

provider a request for an extended repayment plan.

8.      The letter notifying the provider of the overpayment and recoupment also gives

the provider an opportunity for rebuttal. *Id.* The provider must submit a rebuttal, if any, within

15 days of the overpayment letter. *Id.* § 405.374(a). If the provider submits a rebuttal, the FI

must consider the statement within 15 days, determine whether the facts justify the recoupment,

and notify the provider of its determination. *Id.* §§ 405.375(a), (b). The FI's determination is

not appealable. *Id.* § 405.375(c).

3

<u>Final Cost Report Settlement and Notice of Program Reimbursement</u>

9.    The FI must perform a final reconciliation of a provider's cost report and issue the

provider a written notice reflecting its final determination of the total amount of reimbursement

due the provider within 12 months of acceptance of the cost report, unless the provider is

scheduled to be audited. *Id.* § 405.1803(a); Ex. A (FMM), Ch. 8, § 90. This final determination

is referred to as the Notice of Program Reimbursement ("NPR") and is binding on the provider

unless it requests an intermediary or Provider Reimbursement Review Board ("PRRB") hearing

within 180 days. 42 U.S.C. § 1395oo(a); 42 C.F.R §§ 405.1807, 405.1835(a).

<u>Changes of Ownership Generally</u>

10.    A Change of Ownership ("CHOW") occurs when ownership or a lease of a

Medicare provider, such as a SNF, is transferred from one entity to another. CMS, through its

Regional Offices ("ROs"), determines whether a CHOW has occurred. *Medicare Program*

*Integrity Manual* ("PIM"),[1] Ch. 10, § 5.5.C.1., attached as Ex. B to Defs.' Mot.

11.    The CHOW process begins when the old and new owners or lessees each submit a

Form CMS 855A ("855A") and supporting documentation to the FI informing the FI of the

transfer of ownership or lease. *See id.* § 5.5.C.3. The 855A is CMS's enrollment application for

health care organizations seeking to provide Medicare Part A services.

12.    In the 855A, the new owner indicates whether it will accept assignment of the old

owner's provider agreement. If it does so, the new owner agrees to assume the liabilities of the

former owner or lessee. 42 C.F.R. § 489.18(d); Ex. A (FMM), Ch. 3, § 130. Specifically, the

new owner or lessee accepts liability for repayment of any overpayments, regardless of who had

ownership of the Medicare agreement at the time the overpayment was discovered. Ex. A

---

[1]    References to the *Medicare Program Integrity Manual* are references to Revision 150 of
the manual, which was published on June 30, 2006. *See* Ex. B.

(FMM), Ch. 3, § 130.  The responsibility for repaying any outstanding and future overpayments

rests with the new owner or lessee.  *Id.*  Conversely, the new owner or lessee also receives the

benefits of assuming the Medicare provider agreement, such as receiving underpayments

discovered after the CHOW.  *Id.*  If the new owner or lessee rejects assignment of the provider

agreement, the new owner or lessee must enter into its own Medicare agreement.  *Id.*  The old

owner or lessee, not the new owner or lessee, would then be responsible for any outstanding

overpayments.  *Id.*  Under the Federal Claims Collection Act of 1966, as amended, the FI must

attempt recovery of an overpayment in accordance with CMS regulations.

13.    Upon submission of the 855A to the FI, the FI processes the application by

performing the verification and validation activities described in Chapter 10 of the *Medicare*

*Program Integrity Manual.*  Ex. B (PIM), Ch. 10, § 5.5.C.3.  These activities include, but are not

limited to:  reviewing all owners and managers against the Medicare Exclusion Database and the

General Services Administration Debarment List, verifying the new owner's tax identification

number, and reviewing the sales agreement (if applicable).

14.    Upon completion of all of the applicable activities described in Chapter 10, the FI

makes a recommendation for approval or denial of the provider's CHOW application to the State

Agency ("SA"), with a copy of the letter to the RO.  The SA then makes a recommendation to

the RO.  The RO reviews the SA's recommendation for accuracy and completeness and validates

that a CHOW occurred.  It is important that the FI, the SA, and the RO take the time to review

CHOW applications carefully and thoroughly to ascertain that a CHOW has indeed occurred and

to ensure that the new owners do not include individuals or entities with whom the Medicare

program is not permitted to do business.

15.    If approved by the RO, the RO issues an official letter (Form CMS 2007) to the old and new owners and fiscal intermediaries notifying them of the approval. Although the letter is the same, the copy sent to the old owner and FI is typically referred to as the "tie-out notice," and the copy sent to the new owner and FI is typically referred to as the "tie-in notice." Even though the old and new owners have entered into an agreement for the sale of a SNF or a new lessee has taken over the lease of a SNF from the old lessee, the CHOW is not recognized by Medicare until the tie-in and tie-out notices issue.

16.    With the tie-in and tie-out notices, CMS typically makes assignment of the provider agreement retroactive to the date of the transfer in order to align CMS records with those of the owners. *See* 42 C.F.R. § 489.18(c) (providing for automatic assignment of the provider agreement). This retroactive assignment allows each owner properly to report its costs on its annual cost report for the period it actually operated the business. If CMS made assignment of the provider agreement effective on the date it issued the tie-in and tie-out notices, the new owner could not file a cost report reflecting services provided during the CHOW period, and the old owner would be unable to file a cost report reflecting those services because it did not operate the facility during the CHOW period.

17.    Because the provider continues to furnish services to Medicare beneficiaries during the CHOW period, the Medicare program continues to make payments during the CHOW period. Because the CHOW is not final until CMS issues the tie-in and tie-out notices, however, it would be inappropriate for the FI to begin making payments to the new owner, which CMS has not yet recognized as the owner of the provider facility. The FI therefore continues to pay the old owner or lessee until it receives the tie-in notice from the RO. Ex. B (PIM), Ch. 10, §§ 5.5.C.3, 11.1.B. It is well-established CMS policy that it is the responsibility of the old owner

6

or lessee and the new owner or lessee to work out any billing and payment arrangements

between them while the CHOW is being processed by the FI and the RO because the FI's

payment will not necessarily be directed to the entity operating the facility at the time of

payment. *Id.* § 11.1.B. These details are usually included in a sales agreement or other

agreement between the parties. Payment for these claims is made to the old owner's bank

account under the old owner's tax identification number ("TIN"). The FI cannot change a bank

account or TIN from the old owner to the new owner until the tie-in notices are received. *Id.*

     18.     Providers, whether paid on a PIP or claim-by-claim basis, also typically continue

to submit claims during the CHOW period. These claims will typically reflect services provided

both before the CHOW period and during the CHOW period. Because these claims are

electronically-submitted by provider number, the FI would not know which owner – the old or

the new – is submitting claims during the CHOW period.

Provider Termination

     19.     SNFs may voluntarily terminate their Medicare provider agreement. *See* 42

C.F.R. § 489.52. In order to terminate an agreement, the SNF must give CMS written notice of

its intent, and the termination date must fall on the first day of a month. *Id.* § 489.52(a). The

SNF also must give public notice at least 15 days before the effective date and this notice must

be published in one or more local newspapers. *Id.* § 489.52(c). Upon request, SAs often assist a

voluntarily-terminated SNF with the relocation of Medicare patients by identifying other local

Medicare certified nursing homes in the area.

     20.     CMS may terminate a SNF if it does not comply with the provider agreement. *Id.*

§ 489.53. This process is known as an involuntary termination. In these situations, CMS notifies

the SNF of the termination at least 15 days before the effective date of the termination unless

7

there is immediate jeopardy to the health and safety of the patients. *Id.* § 489.53(d). In situations of immediate jeopardy, CMS gives the SNF at least 2 days notice. *Id.* § 489.53(d)(2)(ii). CMS also concurrently gives public notice. *Id.* § 489.53(d)(4). For involuntary terminations, the State bears the ultimate responsibility for transferring Medicare residents to another Medicare facility.

21.    Presently, the state of Georgia has 12 active Medicare-only certified SNFs and 345 active Medicare/Medicaid dually-certified SNFs. Given the large number of certified facilities in Georgia, Medicare beneficiaries would not be denied care or otherwise harmed as a result of a SNF's voluntary or involuntary termination from the Medicare program.

CMS Manuals

22.    Manuals published by CMS are the agency's issuances, day-to-day operating instructions, policies, and procedures that are based on statutes, regulations, guidelines, models, and directives. CMS program components, providers, contractors, and state survey agencies, among others, use the manuals to administer CMS programs. Manuals are also a good source of Medicare and Medicaid information for the general public.

23.    The *Medicare Financial Management Manual* ("FMM") (Pub. 100-06) sets forth procedures related to the fiscal integrity of the Medicare program. The FMM is publicly available at http://www.cms.hhs.gov/Manuals/IOM/list.asp. A true and correct copy of relevant excerpts of the FMM is attached as Ex. A to Defendant's Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment.

24.    The *Medicare Program Integrity Manual* ("PIM") (Pub. 100-08) sets forth procedures to ensure proper payment of providers by Medicare contractors. The PIM is publicly available at http://www.cms.hhs.gov/Manuals/IOM/list.asp. A true and correct copy of relevant

8

excerpts of the June 30, 2006, revision of the PIM is attached as Ex. B to Defendant's Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment.

25.    The *Medicare Provider Reimbursement Manual* ("PRM") (Pub. 15-1 and 15-2) sets forth procedures for reimbursing providers for services pursuant to the Medicare regulations. The PRM is publicly available at http://www.cms.hhs.gov/Manuals/PBM/list.asp.  A true and correct copy of relevant excerpts of the PRM is attached as Ex. C to Defendants' Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment.

<u>The Mariner/Triad Changes of Ownership</u>

26.    The CMS RO issued tie-in and tie-out notices for four of the facilities operated by Triad Senior Living, LLC (LaGrange, Lumber City, Powder Springs, and Thomasville) on April 12, 2007, and for one of the facilities (Jeffersonville) on April 26, 2007.  True and correct copies of the tie-in/tie-out notices for each of the facilities are attached as Ex. 8 to Plaintiffs' Motion for Summary Judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2008

*Ronald L. Smith*

Ronald L. Smith

9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC *et*        )
*al.*,                                      )
                                            )
                    Plaintiffs,             )
                                            )    Civil Action No. 1:08cv00329 (CKK)
            v.                              )
                                            )
MICHAEL O. LEAVITT *et al.*,                )
                                            )
                    Defendants.             )

## DECLARATION OF THOMAS M. BRUCE

I, Thomas Matthew Bruce, do hereby declare:

1.      I am a Senior Manager, Regional Audit, for the Medicare Division of the

Wisconsin Physicians Service Insurance Corporation ("WPS"). I have held this position for two

years and eight months, except that prior to November 5, 2007, I was employed in the identical

position for the Medicare Division of the Mutual of Omaha Insurance Company ("Mutual of

Omaha"). In this position, I manage a staff that audits and settles Medicare cost reports and

determines payments for Medicare providers. I make this declaration based on personal

knowledge and on information made available to me in the course of my official duties.

2.      Mutual of Omaha (now WPS) is a Medicare Fiscal Intermediary ("FI"), meaning

that it contracts with the Centers for Medicare & Medicaid Services ("CMS") to administer the

claims processing, payment, and audit functions for various Medicare providers. Pursuant to the

Special Power of Attorney executed effective November 2, 2007, between WPS and Mutual of

Omaha approved by CMS, and, in connection with the Novation Agreement executed effective

November 5, 2007, between WPS and Mutual of Omaha, Mutual of Omaha appointed WPS as

its attorney-in-fact to perform Mutual of Omaha's duties and obligations as the Medicare FI

under Mutual of Omaha's Medicare Part A Contract HCFA-87-319-1, Part A, with CMS. In

conjunction with this proposed novation and pursuant to an Asset Purchase Agreement dated

March 24, 2005, Mutual of Omaha sold certain assets of Mutual of Omaha's Medicare Division

effective November 5, 2007, to WPS. WPS now performs the duties and obligations as the

Medicare Fiscal Intermediary under Mutual of Omaha's Medicare Part A Contract HCFA 87-

319-1, Part A, with CMS, for the covered Medicare providers.

3.    Mariner Health Care Inc. ("Mariner") operated the five provider facilities

involved in this case from April 1, 2003, to November 30, 2006, during which time Mutual of

Omaha (now WPS) served as Mariner's FI. At Mariner's request, Mutual of Omaha (now WPS)

began making periodic interim payments ("PIP") payments to Mariner on August 1, 2003.

4.    On December 13, 2006, Mutual of Omaha (now WPS) made a PIP payment to

Mariner for the service period November 16, 2006, to November 29, 2006. On December 27,

2006, Mutual of Omaha (now WPS) made a PIP payment to Mariner for the service period

November 30, 2006, to December 13, 2006. This service period included one day in which

Mariner operated the facilities and thirteen days in which Triad Senior Living, LLC ("Triad")

operated the facilities. Mutual of Omaha (now WPS) made additional PIP payments to Mariner

on January 10 and 24, 2007, February 7 and 21, 2007, March 7 and 21, 2007, and April 4, 2007,

and to Triad on April 18, 2007, and May 2, 2007, for services rendered between December 2006

and April 2007.

5.    As required by CMS regulations, Mutual of Omaha (now WPS) reviewed and

adjusted Mariner's PIP payments twice a year. The first semi-annual PIP review covered the

first quarter of Mariner's fiscal year, and the second semi-annual review covered the first

through third quarters of its fiscal year. PIP reviews are scheduled to be completed ninety days

after the end of the service period under review so that a provider has time to submit all of its claims for the period before the review.

6.    For the fiscal year April 1, 2006, through March 31, 2007, the first semi-annual PIP review covered the service period April 1, 2006, through June 30, 2006, and was completed on October 3, 2006. The second semi-annual PIP review covered the service period April 1, 2006, through December 31, 2006, and was completed on March 30, 2007.

7.    The March 30, 2007, PIP reviews for the five Mariner facilities indicated a reduction in the biweekly PIP payments and a total amount due the Medicare program for all five facilities in the amount of $1,282,300. Mutual of Omaha (now WPS) made the reduction in the PIP payments effective April 18, 2007. This downward adjustment was not atypical and did not indicate to Mutual of Omaha (now WPS) that a Change of Ownership ("CHOW") was occurring.

8.    The providers continued to submit claims to Mutual of Omaha (now WPS) after December 1, 2006, for services rendered prior to the CHOW. For example, the provider facilities submitted a total of 109 claims in February 2007. The providers continued to submit claims through June 2007 for services rendered prior to December 1, 2006.

9.    Mutual of Omaha (now WPS) did not receive any CMS Form 855As from Mariner regarding the CHOWs from Mariner to Triad. Consequently, Mutual of Omaha (now WPS) first became aware of the Mariner/Triad CHOWs when it received the tie-out notices from the CMS Regional Office ("RO").

10.    On April 13, 2007, Mutual of Omaha (now WPS) received tie-out notices for the LaGrange, Lumber City, Powder Springs, and Thomasville facilities, indicating that payments to Mariner with respect to these facilities should cease. True and correct copies of these notices are attached as Ex. 8 to Plaintiffs' Motion for Summary Judgment. Mutual of Omaha (now WPS)

made the last PIP payments for these four facilities on April 18, 2007. Any changes to the

amount of these last PIP payments, however, had to have been made and entered into the

payment system by April 6, 2007, seven days before Mutual of Omaha (now WPS) received the

tie-out notices. When Mutual of Omaha (now WPS) received the tie-out notices on April 13,

2007, it deleted the electronic funds transfer for these facilities, thereby stopping further

electronic payments to Mariner. Mutual of Omaha (now WPS) instead issued these last PIP

payments to the facilities' addresses. Since Triad was occupying these facilities at this time,

Triad presumably received these last PIP payments.

11.     On April 27, 2007, Mutual of Omaha (now WPS) received a tie-out notice for the

Jeffersonville facility and made the last PIP payment with respect to this facility on May 2, 2007.

A true and correct copy of this notice is attached as Ex. 8 to Plaintiffs' Motion for Summary

Judgment. Similar to the above, any changes to the amount of this PIP payment had to have

been made and entered into the payment system by April 20, 2007, seven days before Mutual of

Omaha (now WPS) received the tie-out notice. Mutual of Omaha, as before, deleted the

electronic funds transfer for this facility and instead issued the last PIP payment to the facility

address.

12.     In May, June, and July 2007, Mutual of Omaha (now WPS) sent five letters to

Blue Cross Blue Shield of Georgia ("Georgia BCBS"), the new FI for the five provider numbers

at issue, captioned as "Settlement Data for Change of Intermediary." These letters notified

Georgia BCBS that PIP payments were made to the five Medicare provider numbers at issue

after the CHOW effective date of December 1, 2006. Mutual of Omaha (now WPS) sent these

letters in response to the tie-out notices so that Georgia BCBS, the new FI, would include these

payments in the providers' cost report settlements. True and correct copies of these letters are

4

attached as Ex. E to Defendants' Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment.

13.   On September 12, 2007, Mutual of Omaha (now WPS) received terminating cost reports for the reporting period that ended November 30, 2006. In October 2007, Mutual of Omaha (now WPS) sent five additional letters to Georgia BCBS to the same effect as the letters described in Paragraph 12 as part of its terminating settlement procedure. True and correct copies of the relevant portions of these letters are attached as Ex. 9 to Plaintiffs' Motion for Summary Judgment.

14.   Mutual of Omaha (now WPS) has not yet issued the final Notice of Program Reimbursement ("NPR") with respect to these terminating cost reports. Mutual of Omaha (now WPS) expects to issue these NPRs by July 2008. The NPRs will notify Triad of any overpayments or underpayments for the cost report period ending November 30, 2006.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2008

Thomas M. Bruce

5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC *et al.*,  )
                                   )
                                     )
                      Plaintiffs,     )
                                       )    Civil Action No. 1:08cv00329 (CKK)
        v.                           )
                                       )
MICHAEL O. LEAVITT *et al.*,         )
                                       )
                      Defendants.    )

## DECLARATION OF DONNA SMOOT

I, Donna Smoot, do hereby declare:

1.      I am employed by Blue Cross Blue Shield of Georgia ("Georgia BCBS") and serve as the Medicare Audit & Reimbursement Manager. I have served in this capacity since June 2002. In this capacity, I manage three functional areas including provider enrollment, reimbursement, and non-Medicare Secondary Payer accounting and debt referral. I supervise the following individuals named in this declaration: Shannon Ray, Sandra Ludwig, and Laura Martin. I make this declaration based on personal knowledge and on information made available to me in the course of my official duties.

### The Mariner/Triad Changes of Ownership

2.      Georgia BCBS is the Medicare fiscal intermediary ("FI") for facilities operated by Triad Senior Living, LLC ("Triad"), including facilities located at LaGrange, Lumber City, Jeffersonville, Powder Springs, and Thomasville, Georgia. Triad began operating these five facilities on December 1, 2006.

3.      On December 1, 2006, Georgia BCBS received five Form CMS 855A ("855A") applications from Triad's facilities at Jeffersonville, LaGrange, Lumber City, Powder Springs,

and Thomasville regarding a Change of Ownership ("CHOW") from Mariner Health Care Inc.

("Mainer") to Triad.  On December 2, 2006, however, Georgia BCBS returned the five

applications because Triad completed an outdated (11/2001) version of the applications.  Georgia

BCBS took no action with respect to the 855A applications received on December 1, 2006.

     4.    Shannon Ray, Medicare Provider Reimbursement Analyst I at Georgia BCBS,

spoke with Marcella Godwin of Triad on January 29, 2007.  Ms. Godwin inquired whether

Georgia BCBS had received Triad's 855A applications.  Ms. Ray could not immediately confirm

receipt of the 855As.  Ms. Ray called Ms. Godwin back the same day, however, and reported that

the applications had been received on December 1, 2006, and returned on December 2, 2006,

because they had been submitted on outdated forms.  Georgia BCBS's correspondence logs do

not reflect, nor does Ms. Ray recall, additional details of those two conversations.  A true and

correct copy of Georgia BCBS's correspondence log reflecting Ms. Ray's conversation with Ms.

Godwin is attached as Ex. D to Defendants' Motion to Dismiss or, in the Alternative, Cross-

Motion for Summary Judgment.

     5.    On January 31, 2007, Georgia BCBS received new applications for four of

Triad's provider facilities (LaGrange, Lumber City, Powder Springs, and Thomasville) on the

correct version of the 855A (07/2006).  On February 5, 2007, Georgia BCBS received an

application for another one of Triad's provider facilities (Jeffersonville) on the correct version of

the 855A.  Upon receipt of the five applications filed on the correct version of the 855A, Georgia

BCBS inventoried the applications and began to process them.  Pursuant to its standard

procedure, Georgia BCBS prescreened the applications within 15 days of receipt.  It then asked

each of the five facilities for additional information – specifically, an Internal Revenue Service

form to validate the legal business name and tax identification number recorded on the 855A

2

application, and a Form 588, which is necessary to establish electronic fund transfers for

provider facilities. Georgia BCBS also verified the information provided in each of the five

applications by reviewing the supporting documentation and checking Qualifier.net.[1] After

receiving the requested information and completing its review, Georgia BCBS recommended

approval of the five 855A applications to the State Agency.

      6.     On April 13, 2007, Georgia BCBS received tie-in notices from the Centers for

Medicare & Medicaid Services ("CMS") Regional Office ("RO") for four of the provider

facilities (LaGrange, Lumber City, Powder Springs, and Thomasville). On April 27, 2007,

Georgia BCBS received the tie-in notice from the CMS RO for one of the facilities

(Jeffersonville). True and correct copies of these notices are attached as Ex. 8 to Plaintiffs'

Motion for Summary Judgment.

Overpayments to Triad

      7.     The Triad facilities had established with Georgia BCBS that they would be paid

on a claim-by-claim basis. Georgia BCBS received no claims for any of the five Triad facilities

for dates of service on and after December 1, 2006, until May 1, 2007. As Triad began

submitting claims to Georgia BCBS in May 2007 after issuance of the tie-in notices, Georgia

BCBS paid the claims from the effective date of the CHOW, December 1, 2006. As Mutual of

Omaha, the FI for former lessee Mariner, maintains separate financial and claims systems than

Georgia BCBS, Georgia BCBS was unaware that Mutual of Omaha had made PIP payments for

that same period of time (from December 1, 2006, through April 2007) until Mutual of Omaha

notified Georgia BCBS of those payments.

---

[1]    Qualifier.net is an online service used to verify information on enrolling providers and
affiliated organizations/individuals by verifying tax identification, incorporation dates and status,
business addresses, phone numbers, information relating to owners/managers/directors, and other
pertinent data.

8.    Georgia BCBS received letters from Mutual of Omaha on May 22, 2007 (LaGrange and Powder Springs), June 18, 2007 (Lumber City and Thomasville), and July 23, 2007 (Jeffersonville). Two of these letters also copied Triad.[2] The letters indicated that payments had been made to Mariner after December 1, 2006, and reflected the amount of those payments. True and correct copies of these letters are attached as Ex. E to Defendants' Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment.

9.    On November 5, 2007, Georgia BCBS received additional letters from Mutual of Omaha with respect to all five facilities. These letters, like the letters described in Paragraph 8, informed Georgia BCBS of the amount paid to each of the five providers after December 1, 2006, to ensure that Georgia BCBS considered these amounts in its upcoming cost report review. Sandra Ludwig received the letters and referred them to the reimbursement area. True and correct copies of the relevant portions of these letters are attached as Ex. 9 to Plaintiffs' Motion for Summary Judgment.

10.    On November 29, 2007, Georgia BCBS received annual cost reports from Triad for all five facilities for the fiscal year ending June 30, 2007 ("FYE 6/30/07"). Georgia BCBS conducted a tentative review for each of the providers. Each review considered amounts paid to Triad's provider numbers for FYE 06/30/07 by both Georgia BCBS and Mutual of Omaha. A comparison of the actual amounts paid to the reimbursable amount due to each provider indicated that all five facilities had been overpaid.

---

[2]    Two of these letters were sent by Connie Wu of Mutual of Omaha, and three of these letters were sent by Buren Hardy of Mutual of Omaha. *See* Defs.' Mot. to Dismiss or, in the Alternative, Cross-Mot. for Summ. J., Ex. E. The two letters from Ms. Wu indicate that the letters were copied to the Current Administrator at the physical location of the LaGrange and the Powder Springs facilities, suggesting that Triad should have received them. *See id.* The three letters from Mr. Hardy, however, do not reflect that they were copied to the facilities. *See id.*

11.    Georgia BCBS's efforts to recoup the overpayments are targeted at Triad because Triad holds the provider agreements for those facilities. Recoupment is not targeted at Mariner as Triad had assumed the Medicare provider agreements indicating to Georgia BCBS that Triad knowingly assumed any and all liabilities owed by Mariner to the Medicare program. *See Medicare Financial Management Manual*, Ch. 3, § 130, attached as Ex. A to Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. Such assumption of liability is automatic when a provider assumes a provider agreement. *Id.* If Triad had chosen to obtain new provider numbers and agreements, rather than to assume Mariner's existing provider numbers and agreements, then Georgia BCBS would not seek repayment from Triad for payments made to Mariner.

12.    On February 11, 2008, Georgia BCBS sent Overpayment First Demand letters to the five facilities. These letters advised the providers that unless receivable amounts due the Medicare program were paid in full by February 26, 2008, withholding of interim payments would begin on that date. True and correct copies of these letters are attached as Ex. 10 to Plaintiffs' Motion for Summary Judgment.

13.    On February 15, 2008, Georgia BCBS received by fax (and by hardcopy on February 18, 2008) correspondence from Triad's counsel, Jack Tranter. This correspondence attached various exhibits and included copies of Mutual of Omaha's payment schedules, copies of Triad's 855A forms, a copy of a letter sent from Mr. Tranter to Mariner's counsel, and a request that CMS pursue collection from Mariner rather than from Triad for funds paid by Mutual of Omaha to Mariner after December 1, 2006. A true and correct copy of this letter (without exhibits) is attached as Ex. 12 to Plaintiffs' Motion for Summary Judgment.

14.    On February 19, 2008, Sandra Ludwig, Accountant Senior at Georgia BCBS, received a phone call from Ron Herbert of Triad. Mr. Herbert questioned Mutual of Omaha's

payments to a bank account owned by Mariner, the prior lessee of the provider facilities. The

same day, Ms. Ludwig responded by email outlining CMS's position with respect to changing

Electronic Funds Transfer information during a CHOW. Ms. Ludwig advised Mr. Herbert that,

while an 855A application is pending (*i.e.*, pre-approval), the old and new owners must work out

arrangements between themselves regarding any funds received by the old owners. A true and

correct copy of this email is attached as Ex. 12 to Plaintiffs' Motion for Summary Judgment.

15. On February 21, 2008, Georgia BCBS received by fax and email (and by

hardcopy on February 25, 2008) correspondence from Mr. Tranter purporting to be a written

response to Ms. Ludwig's February 19, 2008, email to Mr. Herbert. Mr. Tranter explained his

position that Triad was not responsible for the overpayments made to their provider facilities. A

true and correct copy of this letter is attached as Ex. 12 to Plaintiffs' Motion for Summary

Judgment.

16. Between February 21, 2008, and February 25, 2008, Ms. Ludwig and Mr. Tranter

(or his agent, Cindy Clark) exchanged several emails relating to Triad's outstanding

overpayments. In these exchanges, Ms. Ludwig expressed to Mr. Tranter a willingness to

discuss a repayment schedule as opposed to immediate payment in full. Mr. Tranter, however,

maintained that Triad was responsible only for $187,254 and would not discuss a repayment plan

for the total amount owed. A true and correct copy of this email exchange is attached as Ex. F to

Defendants' Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment.

17. On February 22, 2008, Laura Martin, Medicare Provider Reimbursement Analyst

II at Georgia BCBS, received an email from Marcella Godwin of Triad requesting information

on lump sum interim payments Triad was expecting for three of the facilities as Triad was

"anxious to get the amount of the lump sum, as we [Triad] are filing a suit against the prior

owner for these monies . . . ." A true and correct copy of this email exchange is attached as Ex.

G to Defendants' Motion to Dismiss or, in the Alternative, Cross-Motion for Summary

Judgment.

18.    Notice of Program Reimbursement ("NPRs") for FYE 6/30/07 for all five

facilities are scheduled to issue by September 30, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2008

Donna Smoot

7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Civil Action No. 1:08cv00329 (CKK) |
| v. | ) ) | |
| MICHAEL O. LEAVITT *et al.*, | ) ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO
PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

Pursuant to Local Civil Rules 7(h) and 56.1, Defendants submit this response to Plaintiffs' Statement of Material Facts in Support of Motion for Summary Judgment ("Statement" or "Pls.' St."). Because Defendants are filing their own motion for summary judgment in this action, this response is designed solely to respond to Plaintiffs' Statement by identifying which of the factual grounds for Plaintiffs' motion are disputed. In light of Defendants' separate motion for summary judgment, the use of the word "disputed" or similar references herein should not be construed to mean that Defendants believe that there are genuine issues of fact necessitating a trial. Rather, such language simply means that Defendants dispute Plaintiffs' statement regarding that matter. Defendants maintain their position that there are *no* genuine issues of material fact with respect to the grounds entitling *Defendants* to summary judgment.

1.      Undisputed.

2.      Undisputed.

3.      Undisputed (but immaterial).

4.      Undisputed, except that Defendants note that the correct date of the letter referenced in Paragraph 4 is October 10, 2006, not October 10, 2003 (but immaterial except for the fact that on December 1, 2006, Plaintiffs began operating the five SNFs).

5.      Disputed.  On November 30, 2006, the day before Plaintiffs began operating the five nursing homes, Plaintiffs sent their fiscal intermediary ("FI"), Blue Cross Blue Shield of Georgia ("Georgia BCBS"), five outdated and incomplete Form CMS-855As ("855As").  *See* Decl. of Donna Smoot ("Smoot Decl.") ¶ 3; Pls.' Mot. for Summ. J. ("Pls.' Mot."), Ex. 4 at 6 (leaving blank Section 1.b., which required identification of Mariner's fiscal intermediary).  On December 2, 2006, Georgia BCBS returned Plaintiffs' outdated and incomplete 855As and took no action with respect to those applications.  Smoot Decl. ¶ 3.

6.      Undisputed (but immaterial except for the fact that Plaintiffs, in their corrected 855A applications, accepted assignment of Mariner's existing provider agreements).

7.      Disputed (but immaterial except for the fact that Georgia BCBS currently serves as Plaintiffs' Medicare FI).  Georgia BCBS records reflect that Ms. Ray spoke with Ms. Godwin on January 29, 2007, not January 15, 2007.  *Id.* ¶ 4.

8.      Disputed (but immaterial).  Ms. Ray spoke with Ms. Godwin on January 29, 2007, could not initially confirm receipt of the 855As for Triad's facilities without some investigation, and called Ms. Godwin back the same day to report that the applications had been received on December 1, 2006, and returned on December 2, 2006, because they had been submitted on outdated forms.  *Id.*  The correspondence logs do not reflect, nor does Ms. Ray recall, additional details of these conversations.  *Id.*

9.      Disputed (but immaterial except for the fact that Georgia BCBS eventually received corrected applications for each of the five facilities).  Apart from the facts set forth in

Defendants' response to Paragraph 8 of Plaintiffs' Statement, the correspondence logs do not reflect, nor does Ms. Ray recall, additional details of those conversations. *See id.* In addition, Georgia BCBS received four 855A applications from Plaintiffs on January 31, 2007 (LaGrange, Lumber City, Powder Springs, and Thomasville), and received one 855A application on February 5, 2007 (Jeffersonville). *Id.* ¶ 5. Finally, Georgia BCBS returned the erroneous applications to Plaintiffs on December 2, 2006. *Id.* ¶ 3. (Defendants also note that "Mr. Ray" in the first sentence of Paragraph 9 is actually "Ms. Ray," and that the date of the applications referenced in the final sentence of Paragraph 9 should be November 30, 2006, not November 30, 2007.)

10.     Undisputed (but immaterial except for the fact that Plaintiffs accepted assignment of Mariner's existing provider agreements and began operating the five facilities on December 1, 2006).

11.     Undisputed.

12.     Disputed (but immaterial except for the fact that Mutual of Omaha continued to make biweekly PIP payments to Mariner during the CHOW application period). Georgia BCBS received proper 855As from Triad for the five provider facilities on January 31, 2007 (LaGrange, Lumber City, Powder Springs, and Thomasville) and February 5, 2007 (Jeffersonville), not on December 1, 2006. *Id.* ¶ 5. In addition, Mariner's FI, Mutual of Omaha Insurance Company ("Mutual of Omaha"), did not become aware of the Change of Ownership ("CHOW") for four of these facilities (LaGrange, Lumber City, Powder Springs, and Thomasville) until April 13, 2007, and for one of these facilities (Jeffersonville) until April 27, 2007, when it received the tie-out notices for these facilities. Decl. of Thomas M. Bruce ("Bruce Decl.") ¶¶ 10-11. Finally,

Mutual of Omaha continued to receive claims/bills from the Mariner/Triad provider numbers through June 2007 for services rendered prior to December 1, 2006. *Id.* ¶ 8.

13.     Disputed (but immaterial except for the fact that Mutual of Omaha was Mariner's FI and continued to make PIP payments to Mariner during the CHOW application period on the dates specified in Paragraph 13 of Plaintiffs' Statement). Defendants are unaware, without having conducted discovery, whether Mariner has retained the funds paid to it by Mutual of Omaha on December 27, 2006, and on January 10 and 24, February 7 and 21, March 7 and 21, and April 4, 2007.

14.     Disputed (but immaterial except for the fact that CMS/Georgia BCBS seek to recover overpayments made to the Mariner/Triad provider numbers pursuant to the Mariner/Triad provider agreements in the amounts listed in Paragraph 14 of Plaintiffs' Statement). Georgia BCBS has taken action against Plaintiffs to recover overpayments made to the Mariner/Triad provider numbers pursuant to the Mariner/Triad provider agreements. *See* Pls.' Mot., Ex. 10.

15.     Disputed (but immaterial except for the fact that Mutual of Omaha continued to make PIP payments to Mariner during the CHOW application period and began paying Triad after the CHOW application period ended, and the fact that Georgia BCBS sent letters to Plaintiffs on February 11, 2008, advising them of the overpayments and its intent to withhold Medicare payments if the sums were not paid in full or if Plaintiffs did not propose a repayment plan). Mutual of Omaha continued to receive claims/bills from the Mariner/Triad provider numbers through June 2007 for services rendered prior to December 1, 2006. Bruce Decl. ¶ 8. In addition, the February 11, 2008, letters also advised Plaintiffs that, instead of paying the

overpayment amounts in full immediately or having Medicare funds withheld, Plaintiffs could alternatively seek an extended repayment plan. *See* Pls.' Mot., Ex. 10.

16.    Undisputed (but immaterial except for the fact that Georgia BCBS notified Plaintiffs that they could submit a rebuttal to the February 11, 2008, letters notifying Triad of the overpayment and informing Triad that it could seek a repayment plan from Georgia BCBS).

17.    Disputed (but immaterial). Medicare providers have, at the very least, constructive knowledge that FIs will continue to pay the former owner until the tie-out notice issues and, consequently, that they must arrange CHOW period payments with the former owner. *Medicare Program Integrity Manual* ("PIM"), Ch. 10, §§ 5.5.C.3, 11.1.B, attached as Ex. B to Defs.' Mot. to Dismiss or, in the Alternative, Cross-Mot. for Summ. J. ("Defs.' Mot.").

18.    Undisputed.

19.    Undisputed.

20.    Disputed (but immaterial except for the fact that CMS maintains that Plaintiffs are responsible for the overpayments made to their provider number pursuant to their provider agreement). Medicare providers have, at the very least, constructive knowledge that FIs will continue to pay the former provider until the tie-in notice issues and, consequently, that they are to make arrangements regarding the treatment of CHOW period payments with the former owner. Ex. B (PIM), Ch. 10, §§ 5.5.C.3, 11.1.B. Medicare providers should also be aware that, if they accept assignment of a prior owner's provider agreement, they bear the responsibility to repay any outstanding and future overpayments made pursuant to that agreement. *Medicare Financial Management Manual* ("FMM"), Ch. 3, § 130, attached as Ex. A to Defs.' Mot.

21.    Undisputed (but immaterial except for the fact that on February 11, 2008, Georgia BCBS notified Plaintiffs of its overpayment determination and intent to recoup or offset and also advised that Plaintiffs could seek a repayment plan).

22.    Disputed (but immaterial).  Plaintiffs' facilities are paid on a claim-by-claim basis; as such, Plaintiffs' receipt of payment is directly correlated to their submission of claims. Smoot Decl. ¶ 7.  In addition, Defendants have been unable to ascertain the precise amount, if any, of the payments Plaintiffs claim to have received on January 31, 2008, for services specifically rendered from January 1 to January 30, 2008.  Finally, Defendants are unaware whether Plaintiffs' business capitalization is so limited that expenses cannot be paid before revenue is actually received.

23.    Disputed (but immaterial).  Defendants have been unable to ascertain the precise amount, if any, of the claims Plaintiffs allege they submitted on February 8, 2008, for services specifically rendered in January 2008.  Plaintiffs may attempt to secure a loan and/or an extended repayment plan in order to repay CMS.  *See* Pls.' Mot., Ex. 10 (February 11, 2008, letters from Georgia BCBS informing Plaintiffs that they could seek an extended repayment plan to the extent they could not obtain a loan to pay the amounts owed).  Furthermore, Plaintiffs treated Medicare patients for more than five months, from December 1, 2006, until April 18, 2007, without a single payment from the Medicare program.  Smoot Decl. ¶ 8; Bruce Decl. ¶ 10. Finally, the patients currently in Plaintiffs' care can be transferred to one of over three hundred certified skilled nursing facilities in Georgia and therefore do not "depend" on Plaintiffs for their care.  *See* Decl. of Ronald L. Smith ¶ 21.

Respectfully submitted,

`

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

s/ Wendy M. Ertmer
WENDY M. ERTMER
DC Bar No. 490228
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, DC  20530
Telephone:  (202) 616-7420
Fax:  (202) 616-8470
Email:  wendy.ertmer@usdoj.gov

*Counsel for Defendants*

Dated:  March 17, 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:08cv00329 (CKK) |
| MICHAEL O. LEAVITT *et al.*, | ) ) | |
| Defendants. | ) | |

## ORDER

Upon consideration of Plaintiffs' Motion for Summary Judgment, Defendants' Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment, and the parties' respective oppositions, it is hereby ORDERED that Defendants' Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment is GRANTED, and it is further ORDERED that Plaintiffs' Motion for Summary Judgment is DENIED.

_____
THE HONORABLE COLLEEN KOLLAR-KOTELLY
United States District Court Judge