IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC, et al., | * | |
| | * | |
| Plaintiffs | * | Case No. 08-00329 |
| v. | * | |
| MICHAEL O. LEAVITT, et al., | * | |
| Defendants | * | |

## **ERRATA**

Attached is Corrected Memorandum In Support Of Plaintiffs' Motion For

Summary Judgment.  This filing was amended to include a Table of Contents and

Table of Authorities.


Respectfully Submitted,

_____/s/ Jack C. Tranter_____
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702
Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

       I HEREBY CERTIFY that, on this 31st day of March 2008, I mailed and emailed a copy of the foregoing Errata to the following counsel for Defendants:

Wendy M. Ertmer
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, D.C. 20530
wendy.ertmer@usdoj.gov

          _____/s/ Jack C. Tranter_____
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,     *
et al.,

                          *

        Plaintiffs

                          *   Case No. 08-00329

v.

                          *

MICHAEL O. LEAVITT, et al.,

                          *

        Defendants

                          *

**CORRECTED MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................1

MATERIAL UNDISPUTED FACTS ...........................................................................1

STATUTORY AND REGULATORY CONTEXT .....................................................1

ARGUMENT................................................................................................................3

     I.     The Applicable Standard for Summary Judgment..................................................3

     II.    Applicable Medicare Regulations Do Not Permit Recoupment from
              Plaintiffs of Amounts Paid to Mariner After the Provider Agreements
              Were Assigned. ....................................................................................................3

     III.   Alternatively, Plaintiffs are not Liable Because the Payments Were Not
              Properly Made to Mariner. ....................................................................................7

CONCLUSION..............................................................................................................9

# TABLE OF AUTHORITIES

## Federal Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).....................................................3

BP Care, Inc. v. Thompson, 337 F.Supp.2d 1021 (S.D. Ohio 2003), aff'd on other grounds, 398 F.3d 503 (6th Cir. 2005) ..........................................................................6

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..............................................................3

Deerbrook Pavilion, LLC v. Shalala, 235 F.3d 1100 (8th Cir. 2000), cert denied, 534 U.S. 992 (2001)...........................................................................................................3, 6, 7

Delta Health Group, Inc. v. Leavitt, 459 F.Supp.2d 1207 (N.D. Fla. 2006) ...............6, 7

United States v. Vernon Home Health, Inc., 21 F.3d 693 (5th Cir.), cert. denied, 513 U.S. 1015 (1994).........................................................................................................3, 5, 7

## State Cases

Cedar Hill Manor, LLC v. Dep't of Social Services, 145 S.W.3d 447 (Mo. Ct. App. 2004) ......6, 7

## Federal Statutes

42 U.S.C. § 1395.....................................................................................................1

42 U.S.C. § 1395i-3.................................................................................................2

## State Rules

Federal Rule of Civil Procedure 56 .........................................................................1

## Federal Regulations

42 C.F.R. § 405.371................................................................................................3

42 C.F.R. § 405.371(a)(2)........................................................................................3

42 C.F.R. § 413.330................................................................................................2

42 C.F.R. § 413.350..............................................................................................2, 8

42 C.F.R. § 413.355(c) ............................................................................................2

42 C.F.R. § 413.64(h)(7) ......................................................................................8, 9

42 C.F.R. § 489.18(a)(4)..........................................................................................4

42 C.F.R. § 489.18(c) ...........................................................................................................4

42 C.F.R. § 489.18(d) .......................................................................................................3, 5

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (sometimes collectively "Triad") submit this Memorandum In Support Of Motion For Summary Judgment and state:

## INTRODUCTION

Plaintiffs operate five nursing homes in the State of Georgia.  A substantial part of the Plaintiffs' revenue is derived from providing care to Medicare beneficiaries.  This case involves the improper and over-reaching attempt by the Centers for Medicare and Medicaid Services ("CMS") to recoup from Plaintiffs approximately $2.0 million that was improperly paid by CMS to Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc., the prior operator of the five nursing homes now operated by Plaintiffs.  While the Plaintiffs accepted assignment of Mariner's Medicare provider agreements, Plaintiffs are not liable for periodic interim payments erroneously paid by CMS to Mariner after the effective date of the assignment (December 1, 2006) for periods of service that did not even occur until after Mariner stopped providing care to Medicare beneficiaries .

## MATERIAL UNDISPUTED FACTS

The material undisputed facts are set forth in Plaintiff's Statement Of Material Fact In Support Of Motion For Summary Judgment ("Plaintiffs' Statement of Fact") filed in conjunction with this memorandum.

## STATUTORY AND REGULATORY CONTEXT

Established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq., the Medicare Program is a federal health insurance program for the aged, blind and disabled under which qualified health care providers, including nursing homes, are reimbursed by the federal government for the treatment and care provided to Medicare beneficiaries.  Part A of the

Medicare program involves reimbursement paid for skilled nursing facility care.  42 U.S.C. § 1395i-3.

Although previously reimbursed on a reasonable cost basis, Medicare now pays for skilled nursing facility care on a prospective payment basis. 42 C.F.R. § 413.330 et seq. Typically, CMS reimburses a nursing home for care "only following submission of a bill."  42 C.F.R. § 413.350.  However, CMS may also pay for skilled nursing care pursuant to the periodic interim payment ("PIP") system.  Under the PIP methodology, a nursing home is paid, on a bi-weekly basis, in an amount determined by the Fiscal Intermediary " estimating the reimbursable amount for the year based on the previous year's experience," subject to certain adjustments.  42 C.F.R. § 413.355(c).

Whether payment is made as a result of a provider submitting monthly bills or 26 times a year as a result of the PIP methodology, at the end of a fiscal year, the provider submits a cost report.  Medicare audits the cost report and compares the amount paid to the provider and the amount actually due based on the care provided.  If, as a result of the audit, Medicare determines that the amount paid is greater than the amount due, the overpayment is typically recovered by reducing the amount paid to the provider in the next fiscal year.  The converse is true if the provider has been underpaid, i.e., the reimbursement due to the provider is paid during the next fiscal year.

Medicare regulations provide that Fiscal Intermediaries, private non-government organizations, administer the payment, reimbursement and audit process for various Medicare services, including payments to nursing homes that participate in the Medicare program and provide skilled nursing care.  Blue Cross and Blue Shield of Georgia ("BCBS") is the Fiscal Intermediary responsible for overseeing and auditing Medicare reimbursement for skilled nursing facility care provided by Plaintiffs.  Plaintiffs' Statement of Facts at 7.

## ARGUMENT

### I.    The Applicable Standard for Summary Judgment.

Summary judgment is proper if the evidence before the Court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The mere existence of a factual dispute is insufficient to defeat a motion for summary judgment, as the dispute must concern a material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In this case, as explained below, there is no genuine dispute of material fact and Plaintiffs are entitled to judgment as a matter of law.

### II.    Applicable Medicare Regulations Do Not Permit Recoupment from Plaintiffs of Amounts Paid to Mariner After the Provider Agreements Were Assigned.

Under appropriate circumstances and in compliance 42 C.F.R. § 405.371, CMS (or an intermediary) may recoup Medicare overpayments made to a provider by reducing present or future Medicare payments due to the provider.  42 C.F.R. § 405.371(a)(2).  Indeed, in a case involving a provider that accepted assignment of a prior operator's Medicare provider agreement, CMS may pursue the new provider for liability arising out of the original provider agreement.  42 C.F.R. § 489.18(d);  United States v. Vernon Home Health, Inc., 21 F.3d 693, 696 (5th Cir.), cert. denied, 513 U.S. 1015 (1994);  Deerbrook Pavilion, LLC v. Shalala, 235 F.3d 1100 (8th Cir. 2000), cert denied, 534 U.S. 992 (2001).  This concept is sometimes referred to as "successor liability."

In this case, however, CMS seeks to do something remarkably different.  CMS does not seek to recoup an overpayment made to Mariner for services provided by Mariner before the effective date of the assignment of the provider agreements to Plaintiffs.  Rather, CMS seeks to

recover from Plaintiffs periodic interim payments mistakenly made by CMS to Mariner, *after* the effective date of the assignment of Mariner's Medicare provider agreements to Plaintiffs for services that Mariner did not provide. As such, this action is inconsistent with the scope of successor liability as described in the <u>Vernon</u> and <u>Deerbrook</u> cases.

Rather than merely holding Plaintiffs responsible for liabilities that arose under the provider agreements when Mariner still operated the nursing homes, CMS seeks to impose liability on Plaintiffs for funds paid to Mariner that Mariner did not provide for events that had not yet occurred at the time of the assignment of the provider agreements. When Plaintiffs assumed the prior operators' provider agreements, they understood that they were accepting existing Medicare liabilities of the nursing homes. However, they are not responsible for *future* payments mistakenly made to Mariner.

### A. The Mariner Provider Agreements Were <u>Automatically Assigned to Plaintiffs.</u>

42 C.F.R. § 489.18(c) provides that upon a "change in ownership," the "existing provider agreement will automatically be assigned to the new owner." In this case, the "change or ownership" occurred when Plaintiffs began leasing and operating the nursing home on December 1, 2006. <u>See</u> 42 C.F.R. § 489.18(a)(4) ("The lease of all or part of a provider facility constitutes change of ownership of the leased portion"). Indeed, in four letters sent to Plaintiffs on or about April 12, 2007 and in a fifth letter sent on April 26, 2006, CMS acknowledged the change of ownership of each nursing home and that each Medicare provider agreement had been automatically assigned to Plaintiffs, effective December 1, 2006. Plaintiffs' Statement of Facts at 11. Thus, beginning on December 1, 2006, Mariner had no right to be paid by CMS under <u>any</u> Medicare provider agreement applicable to the five nursing homes because those agreements had been assigned to the Plaintiffs as of that date.

### B.     There is no Legal Support for Imposing Successor Liability on Plaintiffs for Events that Occurred After Assignment of the Provide Agreements.

The imposition of successor liability upon the automatic assignment of a provider agreement arises from 42 C.F.R. § 489.18(d), which provides:

> An assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued, including, but not limited to the following:
>
> (1) Any existing plan of correction.
>
> (2) Compliance with applicable health and safety standards.
>
> (3) Compliance with the ownership and financial interest disclosure requirements of part 420, subpart C, of this chapter.
>
> (4) Compliance with civil rights requirements set forth in 45 C.F.R. Parts 80, 84, and 90.

42 C.F.R. § 489.18(d); Vernon, 21 F.3d at 696.

By its express terms, § 489.18(d) does not impose liability upon a successor provider for events that occur *after* the assignment of the provider agreement (e.g., a mistaken payment made to the prior operator after the assignment). Rather, the regulation saddles the new provider with the existing liabilities of the outgoing provider, e.g., liability arising from "[a]ny existing plan of correction." Liability for a mistaken and improper payment to a former provider cannot arise under the provider agreement because the former provider is no longer a party to the agreement after the assignment.

Several courts have followed the Fifth Circuit's reasoning in Vernon in holding that the language of § 489.18(d) establishes successor liability, arising under the original provider agreement, on a provider who accepts assignment of the agreement. However, each of these decisions involves successor liability for obligations that arose *before* the assignment of the provider agreement and for services that were actually provided.

For example, in <u>Deerbrook</u>, the Eighth Circuit held that the new provider was liable for its predecessors' previously established civil monetary penalties because the new provider "assumed the existing provider agreement under which its predecessors incurred CMPs [civil monetary penalties]." <u>Deerbrook</u>, 235 F.3d at 1104.   Likewise, in <u>Delta Health Group, Inc. v. Leavitt</u>, 459 F.Supp.2d 1207 (N.D. Fla. 2006), the Court found the new provider liable for civil monetary penalties imposed upon the prior operator.   <u>See also</u> <u>Cedar Hill Manor, LLC v. Dep't of Social Services</u>, 145 S.W.3d 447 (Mo. Ct. App. 2004) (current provider was liable for civil monetary penalties of prior operator thrice removed).

Not surprisingly, no reported decision imposes liability on a new provider based upon events that occurred after the effective date of the assignment of the provider agreement, as CMS seeks to do here.   As explained above, the applicable regulation does not permit imposition of successor liability under the facts of this case.   Moreover, a determination that a new provider is liable based upon post-assignment events would subvert the policy rationale courts have discussed in rendering decisions based on successor liability.

 In <u>Delta Health Group</u>, the Court identified several justifications and policy bases for successor liability, including   that it is fair to impose successor liability on a new provider because, by accepting the assignment of the old provider agreement, a new provider gains the benefit of receiving uninterrupted Medicare reimbursement payments.   <u>Delta Health Group</u>, 459 F.Supp.2d at 1222–23. The Court further explained that the new owner can refuse assignment of the existing agreement "or it can perform its 'due diligence' prior to the sale to ensure that there are no outstanding [civil monetary penalties]."   <u>Delta Health Group</u>, 459 F.Supp.2d at 1223, <u>citing</u>, <u>Deerbrook</u>, 235 F.3d at 1104-105, and <u>Cedar Hill Manor</u>, 145 S.W.3d at 454; <u>see also</u> <u>BP Care, Inc. v. Thompson</u>, 337 F.Supp.2d 1021, 1029 (S.D. Ohio 2003), <u>aff'd on other grounds</u>, 398 F.3d 503 (6th Cir. 2005) (explaining that prior investigation by the new operator is necessary

since assuming the provider agreement "exposes the new operator to any liability incurred under the agreement because a facility is purchased 'as is'").  Here, no amount of due diligence would have informed Plaintiffs that they would be responsible for payments mistakenly made by CMS to Mariner after Plaintiffs began operating the facilities for periods of service when Mariner did not provide care.  Put simply, CMS's plan to impose liability on Plaintiffs for activities they could not have anticipated is fundamentally unfair.

If CMS had overpaid for care during the period when Mariner was actually operating the facilities and providing care to Medicare beneficiaries (before assignment of the Medicare provider agreements, effective December 1, 2006), Plaintiffs would be responsible for repaying the amount of any such overpayment.  Vernon, 21 F.3d at 696.  However, that is not what occurred here.  Instead, CMS, Mutual of Omaha, Mariner's Fiscal Intermediary, erroneously continued making periodic interim payments to Mariner long after Mariner stopped providing care to Medicare beneficiaries and after the effective date of the assignment of Mariner provider agreements to Plaintiffs.  Under these circumstances and as explained above, there is no legal basis for CMS to recover Medicare funds improperly and mistakenly paid to Mariner by withholding payments due to Plaintiffs for care actually provided to Medicare beneficiaries.

### III.    Alternatively, Plaintiffs are not Liable Because the Payments Were Not Properly Made to Mariner.

Assuming *arguendo* that Plaintiffs are responsible for payments made to Mariner after the date of the automatic assignment of the provider agreements (which they are not) and after Mariner stopped providing care to Medicare beneficiaries, CMS cannot recoup the funds paid to Mariner from Plaintiffs because the payments should have not been made under the applicable regulations.

First, as explained above, CMS erroneously and improperly continued making periodic

interim payments to Mariner even though Plaintiffs advised CMS in their Medicare enrollment applications, first filed on November 30, 2006, that Plaintiffs began providing care to Medicare beneficiaries and other residents of the five nursing homes on December 1, 2006. Thus, CMS had actual notice, as of the date of the change of ownership, that Medicare payments to Mariner should cease because Mariner was no longer providing care to Medicare beneficiaries.

Second, the payments made to Mariner under the periodic interim payment or PIP methodology are not permitted under Medicare regulations. Specifically, 42 C.F.R. § 413.350 provides that a nursing home being paid under the PIP methodology may receive payments for Part A services only if qualifying criteria set forth in Section 413.64(h) are met. Section 413.350 explicitly provides that "an intermediary must terminate PIP payments" if the SNF no longer meets the requirement of Section 413.64(h). In describing a fiscal intermediary's monitoring function under the PIP program, Section 413.64(h)(7) provides:

> A significant factor in evaluating the amount of the payment in terms of the realization of the projected Medicare utilization of services is the timely submittal to the intermediary of completed admissions and billing forms. <u>All providers must complete billings in detail under this method as under regular interim payment procedures</u>. (emphasis added)

42 C.F.R. § 413.64(h)(7).

To obtain Medicare reimbursement under the PIP methodology, a provider must still submit detailed billing requests to the intermediary. Mariner discontinued doing so when it stopped providing care to Medicare beneficiaries on November 30, 2006. Because bills were not submitted and pursuant to its monitoring function, Mariner's Fiscal Intermediary, Mutual of Omaha, should not have made periodic interim payments for ten service periods when no services were provided. As Mariner was no longer providing care to Medicare recipients, it no longer met the qualifying criteria for payment under the PIP methodology. *See* Section

413.64(h)(3) and (5).

Section 80.4 of the <u>Medicare Claim Processing Manual</u> also provides, "To remain on PIP, providers ... must submit 85 percent of their bills timely and accurately." That, obviously, did not happen here because Mariner submitted <u>no</u> bills for the ten service periods in question. Payments should not have been made beginning on December 27, 2006 and continuing at biweekly intervals through April 18, 2007, as no bills were submitted seeking reimbursement during that period.

In sum, CMS cannot seek reimbursement from Plaintiffs for periodic interim payments that Mutual of Omaha improperly and erroneously paid to Mariner. Since those payments were inadvertently paid to Mariner for services that Mariner did not provide, CMS must seek reimbursement from Mariner. It may not recoup those funds by reducing reimbursement to Plaintiffs for services actually provided to Medicare beneficiaries.

## <u>CONCLUSION</u>

For the reasons described above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment.

Respectfully Submitted,

        /s/ Jack C. Tranter
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702
Attorneys for Plaintiffs

<u>**CERTIFICATE OF SERVICE**</u>

   I HEREBY CERTIFY that, on this 31st day of March 2008, I mailed and emailed a copy of the foregoing Corrected Memorandum in Support of Plaintiffs' Motion for Summary Judgment to the following counsel for Defendants:

     Wendy M. Ertmer
     Trial Attorney
     Federal Programs Branch
     U.S. Department of Justice, Civil Division
     20 Massachusetts Avenue NW, Room 7218
     Washington, D.C. 20530
     wendy.ertmer@usdoj.gov

       /s/ Jack C. Tranter
      Jack C. Tranter, Bar No. MD 00310
      Thomas C. Dame, Bar No. MD 08352
      Gallagher Evelius & Jones LLP
      218 N. Charles Street, Suite 400
      Baltimore, MD  21201-4033
      (410) 727-7702

11