IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC, *et al.*, | * | |
| | * | |
| Plaintiffs | | |
| | * | Case No. 08-00329 |
| v. | * | |
| MICHAEL O. LEAVITT, *et al.*, | * | |
| | * | |
| Defendants | * | |

## MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (sometimes collectively "Triad") through their undersigned counsel, respectfully request that this Court grant them leave to file the attached First Amended Complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure.[1]

The proposed amendments include the addition of an applicable jurisdictional basis grounded in 42 U.S.C. § 405(g) of the Social Security Act, and, an additional request for preliminary relief under the All Writs Act, 42 U.S.C. § 1651. Plaintiffs' counsel sought consent to file the amended complaint from opposing counsel. However, Defendants' counsel stated that she did not believe that consent was necessary.[2]

---

[1] Pursuant to Local Rule LCvR 7(i), also attached is a black-lined copy of the proposed First Amended Complaint.

[2] Defendants' counsel expressed concern about how the proposed amended pleading would affect the briefing schedule. Plaintiffs' counsel does not believe that the amendments will have an effect on the briefing schedule as Defendants will have an opportunity to address the amendments in their reply memorandum. To the extent that the Defendants seek to extend the briefing schedule, Plaintiffs' will not oppose the request so long as the agreement to stay recoupment will be

**Standard of Review**

Absent bad faith, undue prejudice to the opposing party, or futility of the amendment, Rule 15 of the Federal Rules of Civil Procedure mandates that leave to amend shall be freely granted. Fed. R. Civ. P. 15(a). <u>See</u> <u>also</u> <u>Richardson v. United States</u>, 193 F.3d 545, 548-49 (D.C.Cir.1999) (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). The rationale behind this liberal granting of leave to amend a complaint is that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." <u>Kidd v. Howard University School of Law</u>, WL 1821159, *1 (D.D.C.2007). (citing <u>Foman</u>, 371 U.S. at 182).

Argument

The proposed amendments are not in bad faith, do not unduly prejudice the Defendants, and are not futile; thus, the Plaintiffs' request to amend their Complaint should be granted. The amendments arise from certain issues raised in Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, but rely on the same set of operative facts set forth in the original Complaint and subsequent pleadings.

The proposed amendments are not made in bad faith. This case has only just commence. The parties have entered into a stipulated briefing schedule based on an agreement that the Defendants stay any agency action until May 2, 2008. The proposed amendments should not affect that schedule as noted above in footnote 2. And, considering that the Plaintiffs' were required to respond within fourteen days to Defendants' notices that they would begin recoupment of least $2.0 million not paid to Plaintiffs, the Complaint set forth all facts and requests for relief known to them at the

---

extended until this Court resolves the motions.

time.  Nevertheless, the underlying nature of the Plaintiffs' claims remain the same - a request that this Court exercise jurisdiction to enjoin the Defendants from taking any action that will cause the Plaintiffs to cease operating five nursing homes in Georgia until the dispute between the parties can be resolved.

The proposed amendments also will not unduly prejudice the Defendants. The amendments do not change the underlying nature of the Complaint and, as such, do not impact the notice received by Defendants in the original pleading regarding the nature of the claims made by the Plaintiffs.  Moreover, because the amendments are based on the same set of facts, the Defendants will have an opportunity to respond to the amendments pursuant to this Court's Order dated February 29, 2008 in its reply memorandum.

Finally, the proposed amendments are not futile. Because of the factual support for the amendments, coupled with the corresponding lack of undue prejudice to Defendants, amending the Complaint to include a another basis for jurisdiction and another request for relief, comports with this Court's policy that Plaintiffs should be afforded the opportunity to test their claims on the merits.

WHEREFORE, for the reasons set forth above, and in the interests of justice, the Plaintiffs request that this Court grant them leave to file the attached amended pleading.

Respectfully Submitted,


_____/s/ Jack C. Tranter_____
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 31st day of March, 2008, I mailed and

emailed a copy of the foregoing Plaintiffs' Motion for Leave to Amend, along with a copy

of the proposed First Amended Complaint, and proposed Order, to the following counsel

for Defendants:

> Wendy M. Ertmer
> Trial Attorney
> Federal Programs Branch
> U.S. Department of Justice, Civil Division
> 20 Massachusetts Avenue NW, Room 7218
> Washington, D.C. 20530
> wendy.ertmer@usdoj.gov

> _____/s/ Jack C. Tranter_____
> Jack C. Tranter, Bar No. MD 00310
> Thomas C. Dame, Bar No. MD 08352
> Gallagher Evelius & Jones LLP
> 218 N. Charles Street, Suite 400
> Baltimore, MD 21201-4033
> (410) 727-7702

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC, *et al.*, | * | |
| | * | |
| Plaintiffs | * | Case No. 08-00329 |
| v. | * | |
| MICHAEL O. LEAVITT, *et al.*, | * | |
| Defendants | * | |

**FIRST AMENDED COMPLAINT FOR
DECLARATORY AND TEMPORARY,
PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (sometimes collectively "Triad") sue the United States Department of Health and Human Services ("HHS"), Michael O. Leavitt, solely in his official capacity as Secretary of HHS, the Centers for Medicare and Medicaid Services ("CMS"), and Kerry N. Weems, solely in his capacity as Administrator (collectively, the "Defendants") for declaratory and injunctive relief and state as follows:

**INTRODUCTION**

1.   Plaintiffs operate five nursing homes in the State of Georgia.  A substantial part of the Plaintiffs' revenue is derived from providing care to Medicare beneficiaries. This case involves the improper and over-reaching attempt by CMS to recoup from Plaintiffs more than $2 million that was improperly paid by CMS to the prior operator of the Plaintiffs' nursing homes.

# 352165
011397-0019

2. While Plaintiffs assumed the Medicare provider agreements of their predecessor, they did not assume liability for payments improperly made to their predecessor during a time when that operator provided no service whatsoever to Medicare beneficiaries, as it was no longer operating these facilities.

3. Despite prompt attempts by Plaintiffs to resolve this dispute, CMS has refused to suspend its recoupment action, which threatens the continued viability of Plaintiffs' nursing homes, as well as the health, well being and safety of the more than five hundred elderly residents of those facilities.

## PARTIES

4. Triad at Jeffersonville I, LLC, is a Georgia limited liability company that leases and operates a 131-bed nursing facility located in Jeffersonville, Georgia.

5. Triad at LaGrange I, LLC is a Georgia limited liability company that leases and operates a 138-bed nursing facility in LaGrange, Georgia.

6. Triad at Lumber City I, LLC is a Georgia limited liability company that leases and operates an 86-bed nursing facility in Lumber City, Georgia.

7. Triad at Powder Springs I, LLC is a Georgia limited liability company that leases and operates a 208-bed nursing facility in Powder Springs, Georgia.

8. Triad at Thomasville I, LLC is a Georgia limited liability company that leases and operates a 52-bed nursing facility in Thomasville, Georgia.

9. Defendant U.S. Department of Health and Human Services is the federal, executive branch agency that administers the Social Security program, including Medicare.

10. Defendant Michael O. Leavitt is the Secretary of HHS. In that capacity, he is responsible for the conduct and policies of HHS, including those of the Centers for Medicare and Medicaid Services. Secretary Leavitt is sued in his official capacity.

11. The Centers for Medicare and Medicaid Services ("CMS") is the agency within HHS responsible for administering the Medicare program.

12. Defendant Kerry N. Weems is the Administrator of CMS. As such, he is responsible or the conduct and policies of CMS, including those of the Fiscal Intermediaries who administer the payment of Medicare reimbursement to nursing homes providing skilled nursing care. Administrator Weeks is sued in his official capacity.

### JURISDICTION AND VENUE

13. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 405(g).

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e), as all Defendants reside in the District of Columbia.

### FACTS

15. Plaintiffs operate five nursing homes with a total of 615 licensed beds in the State of Georgia. All five nursing homes provide skilled nursing facility care to Medicare beneficiaries. Plaintiffs began leasing and operating these nursing homes on December 1, 2006, after the facilities' owner evicted the prior lessee and operator, Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc. (collectively "Mariner").

16. In December of 2003, the owner of the five nursing homes now leased and operated by Plaintiffs directed Mariner to vacate as these nursing homes had been leased

to Plaintiffs. The owner directed Mariner to vacate on January 1, 2004 so Plaintiffs could take possession and begin operating the facilities.

17. Mariner refused to vacate the facilities as directed. After several years of litigation, the Georgia courts determined that Mariner had no lawful basis for retaining possession. *See* <u>Mariner Health Care, Inc., et al. v. Foster</u>, 280 Ga. App. 406, 634 S.E.2d 162 (2006), <u>cert.</u> <u>denied</u> (2006). Reluctantly, Mariner vacated the facilities and Plaintiffs began operating them on December 1, 2006.

18. The Medicare program, established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, <u>et seq.</u>, pays for certain medical care provided to eligible aged and disabled persons. Part A of the Medicare program involves reimbursement for skilled nursing facility care. 42 U.S.C. § 1395i-3. Although previously reimbursed on a reasonable cost basis, Medicare now reimburses a skilled nursing facility on a prospective payment basis. 42 CFR § 413.330 <u>et seq.</u>

19. Typically, CMS reimburses a nursing home for care "only following submission of a bill." 42 CFR § 413.350. However, CMS may also pay for skilled nursing care pursuant to a periodic interim payment ("PIP") system. Under the PIP methodology, a nursing home is paid, on a bi-weekly basis, an amount as determined by the Fiscal Intermediary "by estimating the reimbursable amount for the year based on the previous year's experience," subject to certain adjustment. 42 CFR § 413.355(c).

20. Whether paid by submitting monthly bill relating services provided or 26 times a year pursuant to the PIP methodology, at the end of a fiscal year, the provider submits a cost report. Medicare audits the cost report and compares the amount paid to the provider and the amount actually due based on the care provided. If as a result of the

audit Medicare determines that the amount paid is greater than the amount due, the overpayment is typically recovered by reducing the amount paid to the provider in the next fiscal year. The converse is true if the provider has been underpaid, i.e., the reimbursement due to the provider is paid during the next fiscal year.

21. Medicare regulations provide that Fiscal Intermediaries, private non-government organizations, administer the payment, reimbursement and audit process for various Medicare services, including payments to nursing homes that participate in the Medicare program and provide skilled nursing care.

22. On November 30, 2006, the day before Plaintiffs began operating the subject nursing homes, they filed five Medicare Provider/Supplier Enrollment Applications alerting CMS that Mariner no longer operated these facilities and asking that the Medicare Provider Agreements and numbers be assigned to Plaintiffs, effective December 1, 2006.[1]

23. In January 2007, Plaintiffs contacted Blue Cross Blue Shield of Georgia ("BCBS"), the CMS Fiscal Intermediary responsible for skilled nursing facility services provided in Georgia, seeking information about the status of their applications. At that time, Plaintiff learned that they had used the wrong application form. Plaintiffs immediately filed new applications, using the correct form, on January 30, 2007. As before, the applications related that Plaintiffs began operating these facilities on December 1, 2006. The applications also related the prior operator's name, the doing

---

[1] Operators routinely accept assignment of the prior operator's Medicare provider agreement to avoid a break in service. If an operator filed an application for a new provider agreement, the operator would not receive Medicare reimbursement for care provided to beneficiaries during the period between the termination of the prior provider agreement and the issuance of a new provider agreement. Indeed, provider agreements are automatically assigned to subsequent providers of skilled nursing facility care. 42 CFR § 489.18(c).

business name of the nursing facilities, the prior operator's NPI, the name of the prior operator's Fiscal Intermediary (Mutual of Omaha), the prior operator's Medicare Information Number, the fact that Plaintiffs were "accepting assignment," and the "Effective Date of Transfer," i.e., December 1, 2006.

24. Plaintiff's Medicare Enrollment Applications for the five facilities in question alerted CMS that Mariner no longer operated these facilities and, along with Mariner's failure to submit bills seeking reimbursement, should have caused the Medicare payments to Mariner to end. However, that did not occur. Instead, the government sent periodic interim payments to Mariner on December 27, 2006, January 10 and 24, February 7 and 21, March 7 and 21, and April 4 and 18, 2007 for service periods that did not even begin until after Mariner surrendered the facilities to Plaintiffs on December 1, 2006.

25. Inexplicably, Mariner accepted these payments and has retained over $ 2.0 million in Medicare funds for services it did not provide. Needless to say, Mariner should have advised CMS that it should not have been paid these funds. Plaintiffs' efforts to have Mariner return these funds have not been successful. Clearly, CMS should take action to have Mariner return funds that should have not been paid.

26. In five separate letters dated February 11, 2008, CMS advised Plaintiffs that they were responsible for overpayments made for skilled nursing facility services as noted below:

| Triad at Jeffersonville | $ 246,600 |
| Triad at LaGrange | 370,011 |
| Triad at Lumber City | 424,400 |
| Triad at Powder Springs | 946,700 |

| | |
|---|---|
| Triad at Thomasville | 215,771 |
| TOTAL | $2,203,482 |

27. The February 11, 2008 letters advised that unless Plaintiff paid these sums by February 25, 2008, the alleged overpayments would be recouped by withholding payments due for services provided to Medicare recipients during the previous thirty-day period and for services provided in the future until the purported $2.2 million overpayment was repaid.

28. The February 11, 2008 letters advised that Plaintiffs could object and claim that withholding "should not occur." The letters related that the Fiscal Intermediary, BCBS, would "review your documentation." However, the letters also advised that proceeding in this manner "will not delay recoupment."

29. In letters dated February 15 and 21, 2008, Plaintiffs' counsel advised BCBS that the moneys that CMS seeks to recoup from Plaintiffs ($2,203,482) involve periodic interim payments mistakenly and improperly paid by the Medicare program to Mariner, the prior operator of the five nursing homes now operated by Plaintiffs. These payments were made to Mariner beginning on December 28, 2006 and continuing through April 18, 2007, for periods of service when Mariner did not even operate the facilities and, of course, was not providing care to Medicare recipients because Plaintiffs began operating the facilities on December 1, 2006.

30. In a response to Plaintiffs' February 15 letter, BCBS claimed that the Plaintiffs are responsible for "overpayments" made to Mariner, the prior operator of these facilities, because the Plaintiffs accepted assignment of Mariner's Medicare provider

numbers and agreements. In response to the fact that periodic interim payments were made to Mariner, after CMS had been told that Mariner was no longer providing services to Medicare recipients at these five facilities, BCBS cited CMS Publication 100-08, the Medicare Program Integrity Manual, Chapter 11.1B, which states that a Fiscal Intermediary "may not" change a provider's EFT payment method during a change of ownership (sometimes referred to as "CHOW"). The BCBS response also claimed "payment arrangements between old and new owners, in a [change of ownership] situation is [sic] strictly a civil matter."

31. In a February 21, 2008 letter to BCBS, Plaintiffs pointed out that CMS's obligation to stop making periodic interim payments to Mariner is unrelated to the change in ownership/assignment of Medicare provider agreement process. Rather, Plaintiffs related that CMS should have stopped making payments to Mariner when Mariner stopped submitting claims for services provided to Medicare recipients. As stated in the February 21 letter:

> This situation does not involve a change in a method of payment or a "payment arrangement[ ] between old and new owners." Rather, this situation involves approximately $2.0 million in Medicare funds paid to Mariner that should not have been paid at all. (emphasis in original)

32. 42 CFR § 413.350 provides that a SNF receiving payment under the prospective payment system may be paid under the PIP methodology for Part A services if qualifying criteria set forth in Section 413.64(h) are met. Section 413.350(b)(3)(ii) explicitly provides that an intermediary must terminate PIP "if the SNF no longer meets the requirements of Section 413.64(h)."

33. In describing a fiscal intermediary's monitoring function under the PIP program, Section 413.64(h)(7) provides:

> A significant factor in evaluating the amount of the payment in terms of the realization of the projected Medicare utilization of services is the timely submittal to the intermediary of completed admissions and billing forms. <u>All providers must complete billings in detail under this method as under regular interim payment procedures</u>. (emphasis added)

34. To obtain Medicare reimbursement under the PIP methodology, a provider must still submit detailed billing requests to the intermediary. Mariner discontinued doing so since no services to Medicare beneficiaries were provided after November 30, 2006. Because bills were not submitted and pursuant to its monitoring function, Mariner's Fiscal Intermediary, Mutual of Omaha, should not have made period interim payments for ten service periods <u>when no services were provided</u>.[2] As Mariner was no longer providing care to Medicare recipients, it no longer met the qualifying criteria for payment under the PIP methodology. *See* Section 413.64(h)(3) and (5).

35. CMS cannot seek reimbursement from Plaintiffs for periodic interim payments that Mutual of Omaha improperly and erroneously paid to Mariner. Since those payments were inadvertently paid to Mariner for services that Mariner did not provide, CMS must seek reimbursement from Mariner. It may not recoup those funds by reducing reimbursement due to Plaintiffs for services actually provided to Medicare beneficiaries.

36. Section 80.4 of the <u>Medicare Claim Processing Manual</u> provides "To remain on PIP, providers ... must submit 85 percent of their bills timely and accurately." That,

---

[2] The service periods are 12/1-13/06, 12/14-27/06, 12/28/06 – 1/10/07, 1/11-24/07, 1/25-2/7/07, 2/8-21/07, 2/22–3/7/07, 3/8-21/07 and 3/22-4/4/07, and 4/5-18/07.

obviously, did not happen here because Mariner submitted <u>no</u> bills for the nine service periods in question.

37. In a February 21, 2008 response to the Plaintiffs' February 21 letter, the CMS Office of Financial Management advised that "CMS stands firm that, regardless of the conditions contributing to or resulting in an overpayment, the repayment of any debt owed to the Medicare program is the sole responsibility of the owner(s) of the provider agreement relating to the debt at the time the overpayment is determined." CMS further stated its position that because Plaintiffs accepted assignment of Mariner's provider agreements, "Triad is viewed <u>as</u> <u>the</u> <u>only</u> <u>responsible</u> <u>party</u> in repayment of the debt in question," regardless where the sums were deposited "<u>or</u> <u>the</u> <u>cause</u> <u>of</u> <u>the</u> <u>overpayments</u>" (emphasis added).

38. Ignoring the fact that Plaintiffs obtained possession and began operating the facilities after the Georgia Court of Appeals determined that Mariner had no right to retain possession of these nursing homes, CMS advised Plaintiffs to "pursue reimbursement from Mariner based on the terms of the sales agreement." For these reasons, CMS advised that it would begin withholding interim payments due to Plaintiffs on February 26, 2008, until more than $2.0 million in Medicare funds mistakenly paid to Mariner for care not provided to Medicare beneficiaries was "repaid."

39. 42 CFR § 489.18(c) provides that a provider agreement is automatically assigned to the new provider when there is a change of ownership. Section 489.18(e)(4) provides that the lease of all or part of a provider facility constitutes a change in ownership of the leased facility. The CMS letters issued on April 12, 2007 following review of the Plaintiffs' application advised that Mariner's Medicare agreements were

"automatically assigned" to Plaintiffs effective December 1, 2006. Hence, since Plaintiffs became the provider under the Medicare agreements on December 1, 2006, CMS cannot maintain that more than $2 million paid to Mariner after December 1, 2006 constitute overpayments to the provider, since, as of that date Mariner was no longer a provider since its agreement had been automatically assigned to Plaintiffs as of that date.

40. The five nursing homes/skilled nursing facilities operated by Plaintiffs receive reimbursement for Medicare services on a monthly basis, as a result of billing requests identifying the services provided to Medicare beneficiaries. For example, on January 31, 2008, CMS paid Plaintiffs approximately $775,000 for services provided during the prior thirty-day period. Of course, these funds are used to pay expenses associated with that care, which costs have already been incurred and must be paid.

41. Plaintiffs submitted requests for payment to BCBS on February 8, 2008, seeking $798,477.95 in reimbursement for services provided for the month of January 2008. If CMS withholds those funds to recoup payments mistakenly paid to Mariner for services not provided, Plaintiffs will unable to continue providing skilled nursing and other care and services to the more than 500 frail elderly residents who live in these facilities and depend upon Plaintiffs for their care, safety and well being. Under these circumstances, and as addressed more fully below, Plaintiffs seek declaratory and injunctive relief preventing CMS from recouping $2.2 million mistakenly paid to Mariner by withholding Medicare reimbursement due to Plaintiffs.

42. In the February 21 response to Plaintiffs arguments that Medicare reimbursement due to them should not be withheld to "repay" funds that should not have been paid to Mariner, CMS takes the remarkable position that Plaintiffs are solely

responsible for "repayment of the debt in question" regardless where the sums were deposited "or the cause of the overpayments." Equally shocking and erroneous is the statement that "CMS has no authority to attempt to collect these debts from Mariner."

43. Until Plaintiffs received the February 11, 2008 letters advising that Medicare funds mistakenly paid to Mariner would be recouped by withholding Medicare payments due to the Plaintiffs for services actually provided, they had no idea that payments to Mariner continued for service periods that did not even begin until after Mariner was no longer operating these facilities. CMS, however, maintains that the Plaintiffs are solely responsible for the payments erroneously paid to Mariner because Plaintiffs accepted assignment for Mariner's provider agreements and therefore have "successor liability" for overpayments made to the predecessor operator, Mariner.

44. The five Notices of Desk Review sent to Plaintiffs (Provider #s 115354, 115413, 115538, 115404 and 115427) directed Plaintiffs to pay to CMS the funds improperly paid to Mariner no later than February 25, 2008, relating, "payments will be withheld [on February 26, 2008] until payment in full is received or an extended repayment request is received." However, under the circumstances described above, recoupment" should not occur beginning on February 26, 2008, because Plaintiffs are not obligated to repay funds that should not have been paid to Mariner.

45. If CMS is permitted to regain funds improperly paid to Mariner by withholding approximately $800,000 in Medicare reimbursement due to Plaintiffs on February 26, 2008, Plaintiffs will not have sufficient funds to continue operating these five nursing homes, rendering Plaintiffs incapable of continuing to provide care to the more than five hundred elderly residents of these five nursing homes. Specifically, if the

Medicare payment due on February 26 is not made, Plaintiffs will not have sufficient funds to pay the employees who provide care in Plaintiffs' five nursing homes.

46. Plaintiffs' can seek no relief from recoupment until Notices of Reimbursement are issued by the BCBS/CMS on or about September 30, 2008. By that time, Plaintiffs will have ceased operating the five nursing homes for lack of funds. Plaintiffs, therefore, will be unable to pursue their claim as required under the Medicare Act, and will be unable to exhaust the administrative remedies which would normally be available to it. Consequently, no final decision by the Secretary will be subject to this Court's review.

47. If CMS is permitted to "collect" at least $2.0 million from Triad by withholding future properly earned Medicare reimbursements, Triad will suffer irreparable injury. The Medicare Act offers no initial relief from erroneous recoupment and, if allowed to begin, Triad will not have sufficient funds to continue operating. In addition to the devastating financial impact on the Plaintiffs' business, the health, safety, and well being of the more than 500 elderly residents of the five nursing homes Plaintiffs' operate will be jeopardized.

48. There is a strong likelihood of success on the merits. Moreover, granting the relief requested will not harm the Defendants and the public interest will be furthered.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully ask this Court to:

1      Enter a declaratory judgment that the Defendants may not withhold Medicare reimbursement due to Plaintiffs as a result of CMS mistakenly paying over $2.0 million to Mariner after Mariner stopped providing services to Medicare recipients;

2.      Enter a declaratory judgment that the Plaintiffs have presented their claim to the Defendants and that the requirement to exhaust administrative remedies in these circumstances is waived;

3.      Enjoin the Defendants on a preliminary basis from withholding Medicare reimbursement properly due to Plaintiffs pending the administrative process pursuant to this Court's power arising under the 28 U.S.C. § 1651, the All Writs Act;  and

4.      Grant such other relief, as the Court deems proper and necessary.


Respectfully Submitted,


___/s/ Jack C. Tranter_____
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 31st day of March, 2008, I mailed and emailed a copy of the foregoing Plaintiffs' First Amended Complaint to the following counsel for Defendants:

> Wendy M. Ertmer
> Trial Attorney
> Federal Programs Branch
> U.S. Department of Justice, Civil Division
> 20 Massachusetts Avenue NW, Room 7218
> Washington, D.C. 20530
> wendy.ertmer@usdoj.gov

> _____/s/ Jack C. Tranter_____
> Jack C. Tranter, Bar No. MD 00310
> Thomas C. Dame, Bar No. MD 08352
> Gallagher Evelius & Jones LLP
> 218 N. Charles Street, Suite 400
> Baltimore, MD  21201-4033
> (410) 727-7702

IN THE UNITED STATES DISTRICT COURT[1]
FOR THE DISTRICT OF COLUMBIA[2]

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC,[3] | *[3][4] | |
| ~~TRIAD AT LAGRANGE I, LLC,~~[4] | | |
| ~~TRIAD AT LUMBER CITY I, LLC~~[5] | | |
| ~~TRIAD AT POWDER SPRINGS I, LLC~~[6] | *[3][5] | |
| ~~TRIAD AT THOMASVILLE I, LLC~~[7] | | |
| ~~10 Roswell Street, Suite 210~~[8] | | |
| ~~Alpharetta, Georgia 30004~~[9] | | |
| _et al._,[10] | *[3][6] | |
| Plaintiffs [11] | | Case No. [56] ~~————————~~[57]08-00329[58] |
| v. [12] | *[3][7] | |
| MICHAEL O. LEAVITT, [13]_et al._,[14] | *[3][8] | |
| ~~Secretary of the U.S. Department of Health and Human Services~~[15] | | |
| ~~200 Independence Ave., S.W.~~[16] | | |
| ~~Washington, D.C. 20001~~[17] | | |
| | *[3][9] | |
| ~~and~~[18] | | |
| ~~U.S. DEPARTMENT OF HEALTH AND~~[19] | *[4][0] | |
| ~~HUMAN SERVICES~~[20] | | |
| ~~200 Independence Ave., S.W.~~[21] | | |
| ~~Washington, D.C. 20001~~[22] | | |
| | *[4][1] | |
| ~~and~~[23] | | |
| ~~CENTERS FOR MEDICARE AND~~[24] | *[4][2] | |
| ~~MEDICAID SERVICES~~[25] | | |
| ~~200 Independence Ave., S.W.~~[26] | | |
| ~~Washington, D.C. 20001~~[27] | | |
| | *[4][3] | |
| ~~and~~[28] | | |
| ~~KERRY N. WEEMS,~~[29] | *[4] | |
| ~~Administrator of the Centers for Medicare and Medicaid Services~~[30] | | |
| ~~200 Independence Ave., S.W.~~[31] | | |

~~Washington, D.C. 20001,~~[32]

Defendants[33]

**FIRST AMENDED** [59]**COMPLAINT FOR** ~~DECLARATORY AND~~[60] **DECLARATORYAND**[61] **TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (sometimes collectively "Triad") sue the United States Department of Health and Human Services ("HHS"), Michael O. Leavitt, solely in his official capacity as Secretary of HHS, the Centers for Medicare and Medicaid Services ("CMS"), and Kerry N. Weems, solely in his capacity as Administrator (collectively, the "Defendants") for declaratory and injunctive relief and state as follows:

**INTRODUCTION**

1.  Plaintiffs operate five nursing homes in the State of Georgia. A substantial part of the Plaintiffs' revenue is derived from providing care to Medicare beneficiaries. This case involves the improper and over-reaching attempt by CMS to recoup from Plaintiffs more than $2 million that was improperly paid by CMS to the prior operator of the Plaintiffs' nursing homes.

2.  While Plaintiffs assumed the Medicare provider agreements of their predecessor, they did not assume liability for payments improperly made to their predecessor during a time when that operator provided no service whatsoever to Medicare beneficiaries, as it was no longer operating these facilities.

3.  Despite prompt attempts by Plaintiffs to resolve this dispute, CMS has refused to suspend its recoupment action, which threatens the continued viability of Plaintiffs' nursing homes, as well as the health, well being and safety of the more than five hundred elderly residents of those facilities.

## PARTIES

4.  Triad at Jeffersonville I, LLC, is a Georgia limited liability company that leases and operates a 131-bed nursing facility located in Jeffersonville, Georgia.

5.  Triad at LaGrange I, LLC is a Georgia limited liability company that leases and operates a 138-bed nursing facility in LaGrange, Georgia.

6.  Triad at Lumber City I, LLC is a Georgia limited liability company that leases and operates an 86-bed nursing facility in Lumber City, Georgia.

7.  Triad at Powder Springs I, LLC is a Georgia limited liability company that leases and operates a 208-bed nursing facility in Powder Springs, Georgia.

8.  Triad at Thomasville I, LLC is a Georgia limited liability company that leases and operates a 52-bed nursing facility in Thomasville, Georgia.

9.  Defendant U.S. Department of Health and Human Services is the federal, executive branch agency that administers the Social Security program, including Medicare.

10. Defendant Michael O. Leavitt is the Secretary of HHS.  In that capacity, he is responsible for the conduct and policies of HHS, including those of the Centers for Medicare and Medicaid Services.  Secretary Leavitt is sued in his official capacity.

11. The Centers for Medicare and Medicaid Services ("CMS") is the agency within HHS responsible for administering the Medicare program.

12. Defendant Kerry N. Weems is the Administrator of CMS.  As such, he is responsible or the conduct and policies of CMS, including those of the Fiscal Intermediaries who administer the payment of Medicare reimbursement to nursing homes providing skilled nursing care.  Administrator Weeks is sued in his official capacity.

## JURISDICTION AND VENUE

13. Jurisdiction is proper pursuant to 28 U.S.C. § ~~1331.~~[62]1331 and 42 U.S.C. § 405(g).  [63]

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e), as all Defendants reside in the District of Columbia.

## FACTS

15. Plaintiffs operate five nursing homes with a total of 615 licensed beds in the State of Georgia.   All five nursing homes provide skilled nursing facility care to Medicare beneficiaries.  Plaintiffs began leasing and operating these nursing homes on December 1, 2006, after the facilities' owner evicted the prior lessee and operator, Brian Center Nursing Care/Austell, Inc., a wholly owned subsidiary of Mariner Health Care, Inc. (collectively "Mariner").

16. In December of 2003, the owner of the five nursing homes now leased and operated by Plaintiffs directed Mariner to vacate as these nursing homes had been leased to Plaintiffs.  The owner directed Mariner to vacate on January 1, 2004 so Plaintiffs could take possession and begin operating the facilities.

17. Mariner refused to vacate the facilities as directed.  After several years of litigation, the Georgia courts determined that Mariner had no lawful basis for retaining possession. *See* Mariner Health Care, Inc., et al. v. Foster, 280 Ga. App. 406, 634 S.E.2d 162 (2006), cert. denied (2006).  Reluctantly, Mariner vacated the facilities and Plaintiffs began operating them on December 1, 2006.

18. The Medicare program, established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq., pays for certain medical care provided to eligible aged and

5

disabled persons.  Part A of the Medicare program involves reimbursement for skilled nursing facility care.  42 U.S.C. § 1395i-3.  Although previously reimbursed on a reasonable cost basis, Medicare now reimburses a skilled nursing facility on a prospective payment basis.  42 CFR § 413.330 et seq.

19. Typically, CMS reimburses a nursing home for care "only following submission of a bill."  42 CFR § 413.350.  However, CMS may also pay for skilled nursing care pursuant to a periodic interim payment ("PIP") system.  Under the PIP methodology, a nursing home is paid, on a bi-weekly basis, an amount as determined by the Fiscal Intermediary "by estimating the reimbursable amount for the year based on the previous year's experience," subject to certain adjustment.  42 CFR § 413.355(c).

20.   Whether paid by submitting monthly bill relating services provided or 26 times a year pursuant to the PIP methodology, at the end of a fiscal year, the provider submits a cost report.  Medicare audits the cost report and compares the amount paid to the provider and the amount actually due based on the care provided.  If as a result of the audit Medicare determines that the amount paid is greater than the amount due, the overpayment is typically recovered by reducing the amount paid to the provider in the next fiscal year.  The converse is true if the provider has been underpaid, i.e., the reimbursement due to the provider is paid during the next fiscal year.

21. Medicare regulations provide that Fiscal Intermediaries, private non-government organizations, administer the payment, reimbursement and audit process for various Medicare services, including payments to nursing homes that participate in the Medicare program and provide skilled nursing care.

22. On November 30, 2006, the day before Plaintiffs began operating the subject nursing homes, they filed five Medicare Provider/Supplier Enrollment Applications alerting CMS that Mariner no longer operated these facilities and asking that the Medicare Provider Agreements and numbers be assigned to Plaintiffs, effective December 1, 2006.[1]

23. In January 2007, Plaintiffs contacted Blue Cross Blue Shield of Georgia ("BCBS"), the CMS Fiscal Intermediary responsible for skilled nursing facility services provided in Georgia, seeking information about the status of their applications. At that time, Plaintiff learned that they had used the wrong application form. Plaintiffs immediately filed new applications, using the correct form, on January 30, 2007. As before, the applications related that Plaintiffs began operating these facilities on December 1, 2006. The applications also related the prior operator's name, the doing business name of the nursing facilities, the prior operator's NPI, the name of the prior operator's Fiscal Intermediary (Mutual of Omaha), the prior operator's Medicare Information Number, the fact that Plaintiffs were "accepting assignment," and the "Effective Date of Transfer," i.e., December 1, 2006.

24. Plaintiff's Medicare Enrollment Applications for the five facilities in question alerted CMS that Mariner no longer operated these facilities and, along with Mariner's failure to submit bills seeking reimbursement, should have caused the Medicare payments to Mariner to end. However, that did not occur. Instead, the government sent periodic

---

[1] Operators routinely accept assignment of the prior operator's Medicare provider agreement to avoid a break in service. If an operator filed an application for a new provider agreement, the operator would not receive Medicare reimbursement for care provided to beneficiaries during the period between the termination of the prior provider agreement and the issuance of a new provider agreement. Indeed, provider agreements are automatically assigned to subsequent providers of skilled nursing facility care. 42 CFR § 489.18(c).

interim payments to Mariner on December 27, 2006, January 10 and 24, February 7 and

21, March 7 and 21, and April 4 and 18, 2007 for service periods that did not even begin

until after Mariner surrendered the facilities to Plaintiffs on December 1, 2006.

25. Inexplicably, Mariner accepted these payments and has retained over $ 2.0

million in Medicare funds for services it did not provide.  Needless to say, Mariner

should have advised CMS that it should not have been paid these funds.  Plaintiffs'

efforts to have Mariner return these funds have not been successful.  Clearly, CMS

should take action to have Mariner return funds that should have not been paid.

26. In five separate letters dated February 11, 2008, CMS advised Plaintiffs that

they were responsible for overpayments made for skilled nursing  facility services as

noted below:

| | |
|---|---:|
| Triad at Jeffersonville | $  246,600 |
| Triad at LaGrange | 370,011 |
| Triad at Lumber City | 424,400 |
| Triad at Powder Springs | 946,700 |
| Triad at Thomasville | 215,771 |
| TOTAL | $2,203,482 |

27. The February 11, 2008 letters advised that unless Plaintiff paid these sums by

February 25, 2008, the alleged overpayments would be recouped by withholding

payments due for services provided to Medicare recipients during the previous thirty-day

period and for services provided in the future until the purported $2.2 million

overpayment was repaid.

28. The February 11, 2008 letters advised that Plaintiffs could object and claim that withholding "should not occur."  The letters related that the Fiscal Intermediary, BCBS, would "review your documentation."   However, the letters also advised that proceeding in this manner "will not delay recoupment."

29. In letters dated February 15 and 21, 2008, Plaintiffs' counsel advised BCBS that the moneys that CMS seeks to recoup from Plaintiffs ($2,203,482) involve periodic interim payments mistakenly and improperly paid by the Medicare program to Mariner, the prior operator of the five nursing homes now operated by Plaintiffs.  These payments were made to Mariner beginning on December 28, 2006 and continuing through April 18, 2007, for periods of service when Mariner did not even operate the facilities and, of course, was not providing care to Medicare recipients because Plaintiffs began operating the facilities on December 1, 2006.

30. In a response to Plaintiffs' February 15 letter, BCBS claimed that the Plaintiffs are responsible for "overpayments" made to Mariner, the prior operator of these facilities, because the Plaintiffs accepted assignment of Mariner's Medicare provider numbers and agreements.  In response to the fact that periodic interim payments were made to Mariner, <u>after</u> CMS had been told that Mariner was no longer providing services to Medicare recipients at these five facilities, BCBS cited CMS Publication 100-08, the <u>Medicare Program Integrity Manual</u>, Chapter 11.1B, which states that a Fiscal Intermediary "may not" change a provider's EFT payment method during a change of ownership (sometimes referred to as "CHOW").  The BCBS response also claimed "payment arrangements between old and new owners, in a [change of ownership] situation is [sic] strictly a civil matter."

31. In a February 21, 2008 letter to BCBS, Plaintiffs pointed out that CMS's obligation to stop making periodic interim payments to Mariner is unrelated to the change in ownership/assignment of Medicare provider agreement process. Rather, Plaintiffs related that CMS should have stopped making payments to Mariner when Mariner stopped submitting claims for services provided to Medicare recipients. As stated in the February 21 letter:

> This situation does not involve a change in a method of payment or a "payment arrangement[ ] between old and new owners." Rather, this situation involves approximately $2.0 million in Medicare funds paid to Mariner that should not have been paid at all. (emphasis in original)

32. 42 CFR § 413.350 provides that a SNF receiving payment under the prospective payment system may be paid under the PIP methodology for Part A services if qualifying criteria set forth in Section 413.64(h) are met. Section 413.350(b)(3)(ii) explicitly provides that an intermediary must terminate PIP "if the SNF no longer meets the requirements of Section 413.64(h)."

33. In describing a fiscal intermediary's monitoring function under the PIP program, Section 413.64(h)(7) provides:

> A significant factor in evaluating the amount of the payment in terms of the realization of the projected Medicare utilization of services is the timely submittal to the intermediary of completed admissions and billing forms. All providers must complete billings in detail under this method as under regular interim payment procedures. (emphasis added)

34. To obtain Medicare reimbursement under the PIP methodology, a provider must still submit detailed billing requests to the intermediary. Mariner discontinued doing so since no services to Medicare beneficiaries were provided after November 30,

2006.   Because bills were not submitted and pursuant to its monitoring function, Mariner's Fiscal Intermediary, Mutual of Omaha, should not have made period interim payments for ten service periods when no services were provided.[2]   As Mariner was no longer providing care to Medicare recipients, it no longer met the qualifying criteria for payment under the PIP methodology.   *See* Section 413.64(h)(3) and (5).

35. CMS cannot seek reimbursement from Plaintiffs for periodic interim payments that Mutual of Omaha improperly and erroneously paid to Mariner.   Since those payments were inadvertently paid to Mariner for services that Mariner did not provide, CMS must seek reimbursement from Mariner.   It may not recoup those funds by reducing reimbursement due to Plaintiffs for services actually provided to Medicare beneficiaries.

36. Section 80.4 of the Medicare Claim Processing Manual provides "To remain on PIP, providers ... must submit 85 percent of their bills timely and accurately."   That, obviously, did not happen here because Mariner submitted no bills for the nine service periods in question.

37. In a February 21, 2008 response to the Plaintiffs' February 21 letter, the CMS Office of Financial Management advised that "CMS stands firm that, regardless of the conditions contributing to or resulting in an overpayment, the repayment of any debt owed to the Medicare program is the sole responsibility of the owner(s) of the provider agreement relating to the debt at the time the overpayment is determined."   CMS further stated its position that because Plaintiffs accepted assignment of Mariner's provider agreements, "Triad is viewed as the only responsible party in repayment of the debt in

---

[2] The service periods are 12/1-13/06, 12/14-27/06, 12/28/06 – 1/10/07, 1/11-24/07, 1/25-2/7/07, 2/8-21/07, 2/22–3/7/07, 3/8-21/07 and 3/22-4/4/07, and 4/5-18/07.

question," regardless where the sums were deposited "or the cause of the overpayments" (emphasis added).

38. Ignoring the fact that Plaintiffs obtained possession and began operating the facilities after the Georgia Court of Appeals determined that Mariner had no right to retain possession of these nursing homes, CMS advised Plaintiffs to "pursue reimbursement from Mariner based on the terms of the sales agreement."  For these reasons, CMS advised that it would begin withholding interim payments due to Plaintiffs on February 26, 2008, until more than $2.0 million in Medicare funds mistakenly paid to Mariner for care not provided to Medicare beneficiaries was "repaid."

39. 42 CFR § 489.18(c) provides that a provider agreement is automatically assigned to the new provider when there is a change of ownership.  Section 489.18(e)(4) provides that the lease of all or part of a provider facility constitutes a change in ownership of the leased facility.  The CMS letters issued on April 12, 2007 following review of the Plaintiffs' application advised that Mariner's Medicare agreements were "automatically assigned" to Plaintiffs effective December 1, 2006.  Hence, since Plaintiffs became the provider under the Medicare agreements on December 1, 2006, CMS cannot maintain that more than $2 million paid to Mariner after December 1, 2006 constitute overpayments to the provider, since, as of that date Mariner was no longer a provider since its agreement had been automatically assigned to Plaintiffs as of that date.

40. The five nursing homes/skilled nursing facilities operated by Plaintiffs receive reimbursement for Medicare services on a monthly basis, as a result of billing requests identifying the services provided to Medicare beneficiaries.  For example, on January 31, 2008, CMS paid Plaintiffs approximately $775,000 for services provided during the prior

thirty-day period. Of course, these funds are used to pay expenses associated with that care, which costs have already been incurred and must be paid.

41. Plaintiffs submitted requests for payment to BCBS on February 8, 2008, seeking $798,477.95 in reimbursement for services provided for the month of January 2008. If CMS withholds those funds to recoup payments mistakenly paid to Mariner for services not provided, Plaintiffs will unable to continue providing skilled nursing and other care and services to the more than 500 frail elderly residents who live in these facilities and depend upon Plaintiffs for their care, safety and well being. Under these circumstances, and as addressed more fully below, Plaintiffs seek declaratory and injunctive relief preventing CMS from recouping $2.2 million mistakenly paid to Mariner by withholding Medicare reimbursement due to Plaintiffs.

42. In the February 21 response to Plaintiffs arguments that Medicare reimbursement due to them should not be withheld to "repay" funds that should not have been paid to Mariner, CMS takes the remarkable position that Plaintiffs are solely responsible for "repayment of the debt in question" regardless where the sums were deposited "or the cause of the overpayments." Equally shocking and erroneous is the statement that "CMS has no authority to attempt to collect these debts from Mariner."

43. Until Plaintiffs received the February 11, 2008 letters advising that Medicare funds mistakenly paid to Mariner would be recouped by withholding Medicare payments due to the Plaintiffs for services actually provided, they had no idea that payments to Mariner continued for service periods that did not even begin until after Mariner was no longer operating these facilities. CMS, however, maintains that the Plaintiffs are solely responsible for the payments erroneously paid to Mariner because Plaintiffs accepted

assignment for Mariner's provider agreements and therefore have "successor liability" for overpayments made to the predecessor operator, Mariner.

44. The five Notices of Desk Review sent to Plaintiffs (Provider #s 115354, 115413, 115538, 115404 and 115427) directed Plaintiffs to pay to CMS the funds improperly paid to Mariner no later than February 25, 2008, relating, "payments will be withheld [on February 26, 2008] until payment in full is received or an extended repayment request is received." However, under the circumstances described above, recoupment" should not occur beginning on February 26, 2008, because Plaintiffs are not obligated to repay funds that should not have been paid to Mariner.

45. If CMS is permitted to regain funds improperly paid to Mariner by withholding approximately $800,000 in Medicare reimbursement due to Plaintiffs on February 26, 2008, Plaintiffs will not have sufficient funds to continue operating these five nursing homes, rendering Plaintiffs incapable of continuing to provide care to the more than five hundred elderly residents of these five nursing homes. Specifically, if the Medicare payment due on February 26 is not made, Plaintiffs will not be [64]have sufficient funds to pay the employees who provide care in Plaintiffs' five nursing homes.

46. [65] Plaintiffs' can seek no relief from recoupment until Notices of Reimbursement are issued by the BCBS/CMS on or about September 30, 2008. By that time, Plaintiffs will have ceased operating the five nursing homes for lack of funds. Plaintiffs, therefore, will be unable to pursue their claim as required under the Medicare Act, and will be unable to exhaust the administrative remedies which would normally be available to it. Consequently, no final decision by the Secretary will be subject to this Court's review. [66]

47. [67]If CMS is permitted to "collect" at least $2.0 million from Triad by withholding future properly earned Medicare reimbursements, Triad will suffer irreparable injury. The Medicare Act offers no initial relief from erroneous recoupment and, if allowed to begin, Triad will not have sufficient funds to continue operating. In addition to the devastating financial impact on the Plaintiffs' business, the health, safety, and well being of the more than 500 elderly residents of the five nursing homes Plaintiffs' operate will be jeopardized. [68]

48. [69]There is a strong likelihood of success on the merits. Moreover, granting the relief requested will not harm the Defendants and the public interest will be furthered. [70]

<u>**RELIEF REQUESTED**</u>

WHEREFORE, Plaintiffs respectfully ask this Court to:

1    Enter a declaratory judgment that the Defendants may not withhold Medicare reimbursement due to Plaintiffs as a result of CMS mistakenly paying over $2.0 million to Mariner after Mariner stopped providing services to Medicare recipients;

2.    ~~Enjoin the Defendants on a temporary, interlocutory and permanent~~[71]Enter a declaratory judgment that the Plaintiffs have presented their claim to the Defendants and that the requirement to exhaust administrative remedies in these circumstances is waived; [72]

3.    Enjoin the Defendants on a preliminary[73] basis from withholding Medicare reimbursement ~~due to Plaintiffs as a result of CMS making payments to Mariner after Mariner stopped providing services to Medicare recipients;~~[74]properly due to Plaintiffs pending the administrative process pursuant to this Court's power arising under the 28 U.S.C. § 1651, the All Writs Act; [75] and

3. [76]4. [77]Grant such other relief, as the Court deems proper and necessary.

Respectfully Submitted,

/s/        Jack        C.        Tranter
[78]

Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201-4033
(410) 727-7702

## CERTIFICATE OF SERVICE[79]

I HEREBY CERTIFY that, on this 31st day of March, 2008, I mailed and emailed a copy of the foregoing Plaintiffs' First Amended Complaint to the following counsel for Defendants: [80]

Wendy M. Ertmer[81]
Trial Attorney[82]

Federal Programs Branch[83]
U.S. Department of Justice, Civil Division[84]
20 Massachusetts Avenue NW, Room 7218[85]
Washington, D.C. 20530[86]
wendy.ertmer@usdoj.gov[87]


          /s/    Jack   C.   Tranter[88]

Jack C. Tranter, Bar No. MD 00310[89]
Thomas C. Dame, Bar No. MD 08352[90]
Gallagher Evelius & Jones LLP[91]
218 N. Charles Street, Suite 400[92]
Baltimore, MD  21201-4033[93]
(410) 727-7702[94]


Attorneys for Plaintiffs[95]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,      *
*et al.*,
                                    *
            Plaintiffs
                                    *   Case No. 08-00329
v.
                                    *
MICHAEL O. LEAVITT, *et al.*,
                                    *
            Defendants
                                    *

## ORDER GRANTING PLAINTIFFS'
## <u>MOTION FOR LEAVE TO AMEND COMPLAINT</u>

Upon consideration of the Motion for Leave to Amend Complaint filed by Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC, and any opposition thereto, it is this _____ day of _____, 2008, hereby:

1.      **ORDERED** that Plaintiffs' Motion for Leave to Amend Complaint be and hereby is GRANTED; and it is further

2.      **ORDERED** that the First Amended Complaint shall be deemed to have been filed with the Court; and it is further

3.      **ORDERED** that copies of this Order shall be served on all parties of record.

_____
Judge, United States District Court for the
District of Columbia

# 352323
011397-0019