IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,         *
*et al.*,
                                        *

            Plaintiffs
                                        *   Case No. 08-00329

v.
                                        *

MICHAEL O. LEAVITT, *et al.*,
                                        *

            Defendants
                                        *


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT.................................................................................................................. 2

    I.     FEDERAL QUESTION JURISDICTION UNDER 28 U.S.C. §
           1331 IS NOT BARRED BY SECTION 405(H) OF THE SOCIAL
           SECURITY ACT. ......................................................................................2

    II.    IF FEDERAL QUESTION JURISDICTION IS PRECLUDED
           UNDER § 1331, THE COURT MAY STILL CONSIDER
           TRIAD'S CLAIMS UNDER 42 U.S.C. § 405(G)....................................16

    III.   THIS COURT HAS THE POWER TO ENJOIN RECOUPMENT
           UNDER 28 U.S.C. § 1651, THE ALL WRITS ACT. ...............................18

    IV.   THE MEDICARE REGULATIONS DO NOT PERMIT
           RECOUPMENT FROM TRIAD OF AMOUNTS PAID TO
           MARINER AFTER THE PROVIDER AGREEMENTS WERE
           ASSIGNED. ...............................................................................................22

    V.    EVEN UNDER THE PERTINENT MEDICARE MANUAL
           PROVISIONS, DEFENDANTS CANNOT COLLECT THE
           POST-ASSIGNMENT MARINER PAYMENTS FROM TRIAD. ..........24

         A.    The Medicare Manuals Require Defendants to Pursue
               Mariner for the Improper Post-Assignment Payments. ................ 24

         B.    Pursuant to Section 130 of the Medicare Financial
               Management Manual, Defendants Cannot Recover the
               Post-Assignment Payments They Made to Mariner Because
               Mariner Engaged in Fraud. .......................................................... 26

CONCLUSION............................................................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

American Chiropractic Ass'n v. Leavitt, 431 F.3d 812 (D.C. Cir. 2005) ................... passim

American Lithotripsy Society v. Thompson, 215 F.Supp.2d 23 (D.D.C. 2002) .. 13, 14, 15

Avocado Plus, Inc. v. Veneman, 370 F.3d 1243 (D.C.Cir. 2004) ................................. 6, 7

Bowen v. City of New York, 476 U.S. 467 (1986) ................................................... 16, 17

Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667 (1986) ..................... 13

Davenport v. Int'l Bhd. of Teamsters, 166 F. 3d 356 (D.C. Cir. 1999) ........................... 19

Fed. Trade Comm'n v. Dean Foods Co., 384 U.S. 597 (1966) ........................................ 19

Heckler v. Ringler, 466 U.S. 602 (1984) ................................................................... 16, 17

In re: Tennant, 359 F.3d 523 (D.C. Cir. 2004) ............................................................... 18

Int'l Long Term Care, Inc. v. Shalala, 947 F. Supp. 15 , 20, n.6 (D. D.C. 1996) . 19, 20, 21

Libbie Rehabilitation Center, Inc. v. Shalala, 26 F.Supp.2d 128 (D. D.C. 1998) ...... 19, 21

Mathews v. Eldridge, 424 U.S. 319 (1976) ........................................................... 2, 16, 17

Mediplex of Massachusetts, Inc. v. Shalala, 39 F. Supp. 2d 88, 100-01 (D. Ma. 1999) .. 21

Nat'l Ass'n of Psychiatric Health Sys. v. Shalala, 120 F.Supp.2d 33 (D.D.C. 2000)  12, 13, 14

Pathfinder Healthcare, Inc. v. Thompson, 177 F.Supp.2d 895 (E.D.Ark. 2001).............. 19

Sampson v. Murray, 415 U.S. 61 (1974) ........................................................... 18, 19, 20

Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1 (2000) ................. passim

V.N.A. of Greater Tift County, Inc. v. Heckler, 711 F.2d 1020 (11th Cir. 1983).... 8, 9, 18

Virginia Petroleum Jobbers Ass'n. v. FPC, 298 F.2d 921 (1958) ..................................... 20

**State Cases**

District of Columbia v. Davis, 685 A.2d 389 (D.C.1996) ................................................ 23

Lenkin Co. Management v. District of Columbia Rental Housing Comm'n, 642 A.2d 1282 (D.C.1994) ............................................................................................................ 23

Wilson v. District of Columbia, 675 A.2d 28 (D.C.1996) ................................................ 23

**Federal Statutes**

28 U.S.C. § 1331 ................................................................................................ passim

28 U.S.C. § 1561 ........................................................................................... 9, 11

28 U.S.C. § 1651(a) ...................................................................................... 18, 19

42 U.S.C. § 1395ii ................................................................................................ 2

42 U.S.C. § 405(g) ...................................................................................... passim

42 U.S.C. § 405(h) ...................................................................................... passim

**Federal Rules**

Federal Rules of Civil Procedure 56 ................................................................ 15

**Federal Regulations**

42 C.F.R. § 489.18(c) ...................................................................................... 23

42 CFR § 405.373(a)(2) ..................................................................................... 8

**INTRODUCTION**

Plaintiffs Triad at Jeffersonville I, LLC, Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and Triad at Thomasville I, LLC (collectively "Triad") filed this action seeking to enjoin Defendants from withholding Medicare payments for services rendered by Triad to recover almost $2.0 million paid by Defendants to Brian Center Nursing Care/Austell, Inc., a wholly-owned subsidiary of Mariner Healthcare, Inc. ("Mariner"), the prior operator of five nursing homes now operated by Plaintiffs. Defendants seek to withhold Medicare payments due to Triad to recover the funds paid to Mariner, even though those funds were paid after the effective date of the assignment of Mariner's provider agreements to Triad and involve periods of service that did not even begin until after Mariner vacated the nursing homes and stopped providing care.

Triad's Motion for Temporary Restraining Order Or, In The Alternative, For Preliminary Injunction was not ruled upon by the Court as, pursuant to a stipulation, Defendants agreed not to withhold payments from Triad while the parties filed and the Court considered and addressed cross-motions for summary judgment. As explained below, despite Defendants' claim to the contrary, the Court has general federal question jurisdiction under 28 U.S.C. § 1331 pursuant to an exception to the general statutory bar to § 1331 jurisdiction for matters "arising under" the Medicare law. Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 10-13 (2000). Specifically, in Illinois Council, the Supreme Court held that § 1331 jurisdiction exists and administrative remedies need not be exhausted if the "difficulties" of proceeding in that manner "render judicial review unavailable as a practical matter." 529 U.S. at 23. Those circumstances

are present here.

Moreover, even if jurisdiction does not lie under § 1331, the Court may still consider Triad's claims under its authority to review a decision of Defendant Secretary of Health and Human Services under 42 U.S. Code §405(g), even though Triad has not exhausted its administrative remedies. See Shalala v. Illinois Council On Long Term Care, Inc., 529 U.S. at 24; Mathews v. Eldridge, 524 U.S. 319, 324 (1976).

In terms of the merits, as related below, collection of almost $2.0 million paid to Mariner by withholding funds to Triad, for services provided by Triad to Medicare recipients, is inconsistent with the Medicare statute, regulations, and applicable provisions in the Medicare Provider Reimbursement and Financial Management Manuals. However, if the Court determines that there is a dispute of material fact and does not reach the merits of this action now, Triad respectfully asks the Court to afford Triad injunctive relief, preventing Defendants from collecting from Triad the almost $2.0 million paid to Mariner while Triad exhausts its administrative remedies under the Medicare Act. See 42 U.S.C. § 405(g).

## ARGUMENT

### I. FEDERAL QUESTION JURISDICTION UNDER 28 U.S.C. § 1331 IS NOT BARRED BY SECTION 405(H) OF THE SOCIAL SECURITY ACT.

42 U.S.C. § 405(h), made applicable to the Medicare program by 42 U.S.C. § 1395ii, provides that no action against Secretary of Health and Human Services (the "Secretary") "shall be brought" under 28 U.S.C. § 1331 "to recover on a claim arising under the Medicare Act." The statutory bar to general federal question jurisdiction established by § 405(h), however, is not absolute. As the United States Court of Appeals

for the District of Columbia noted in <u>American Chiropractic Ass'n v. Leavitt</u>, 431 F.3d 812, 816 (D.C. Cir. 2005), the Supreme Court has "recognized an exception: if the claimant can obtain judicial review only in a federal question suit, § 1395ii will not bar the suit." <u>Shalala v. Illinois Council on Long Term Care, Inc.</u>, 529 U.S. 1, 10-13 (2000). Summarizing the Supreme Court's explication of the nature of the exception in <u>Illinois Council</u>, the Court of Appeals related:

> ... [t]he exception applies not only when administrative regulations foreclose judicial review, but also when roadblocks practically cut off any avenue to federal court. As to the latter, it is not enough that claimants would encounter "potentially isolated instances of the inconveniences sometimes associated with the postponement of judicial review," or that their claims might not receive adequate administrative attention. [<u>Ill. Council</u>] at 23, 120 S.Ct. 1084. The difficulties must be severe enough to render judicial review unavailable as a practical matter. <u>Id.</u> at 22-23, 120 S.Ct. 1084.

431 F.3d at 816.

The question thus becomes whether Triad must exhaust the administrative procedures established by 42 U.S.C. § 405(g) and seek judicial intervention at the end of that journey, or whether the "difficulties" of doing so are so "severe [as to] render judicial review unavailable as a practical matter." <u>Id.</u> Making that determination, of course, requires an assessment of what Triad believes are the unique circumstances of this case.

In five letters dated February 11, 2008, received by Triad the following day, Triad's Medicare fiscal intermediary, Blue Cross Blue Shield of Georgia (the "FI") advised that the Medicare program would recover roughly $2.0 million <u>not</u> <u>paid</u> <u>to</u> <u>Triad</u> by withholding all Medicare payments <u>due</u> <u>to</u> <u>Triad</u> until that sum was "repaid." The FI's letters gave Triad fourteen days to either demonstrate why Medicare payments for

services provided by Triad should not be withheld or to present an acceptable repayment plan. [1]

Despite claims to the contrary in Defendants' Memorandum, Triad tried to reach a repayment plan/accommodation with the FI that would have permitted Triad to continue operating its nursing facilities while exhausting its administrative remedies. Specifically, Triad proposed that the last two periodic interim payments made pursuant to Mariner's agreement with CMS, that, for some reason, were paid to Triad (less an adjustment for bad debt) be recouped by withholding funds from Triad's Medicare payments over a twelve-month period. Triad also suggested that the almost $2.0 million paid to Mariner, after Mariner stopped providing care, not be recovered by withholding funds due to Triad during the administrative review process. In effect, Triad asked Defendants to stay collection of those funds until Triad's claim that it was not responsible for payments made to Mariner, after Mariner stopped providing care, were administratively resolved.

In assessing the circumstances present here, it is important to recognize that this case does not involve a Medicare provider attempting to avoid the administrative process applicable when a fiscal intermediary attempts to collect an overpayment to that provider for services rendered by that provider during the prior cost reporting year. Nor does this

---

[1] As Defendants' Memorandum relates, on February 11, 2008, the FI made an "initial determination," that Triad was responsible for almost $2.0 million paid to Mariner and that those funds would be recovered by withholding Medicare reimbursements due to Triad, as a result of the FI's review of the cost reports filed by Triad on June 30, 2007. Defs.' Mem. at 5. However, this "tentative" settlement is not appealable, even though recoupment of the $2.0 million paid to Mariner by withholding Medicare payments due to Triad was scheduled to begin on February 26, 2008, only 15 days after the so-called initial determination had been rendered. Triad cannot challenge this action by appeal to the Provider Reimbursement Review Board ("PRRB") until after the FI issues Notices of Program Reimbursement. Defs.' Mem. at 14. However, that action will not occur until on or about September 30, 2008, more than seven months after recoupment of the $2.0 million will have already occurred.

case involve the sale of a nursing home where the parties are able to address by contract how an overpayment or underpayment to the predecessor provider for services provided, not identified until after assignment of the Medicare provider agreement, will be resolved.[2]

In arguing that this Court lacks federal question jurisdiction to consider Triad's claims, Defendants first assert that "[f]or claims arising under the Medicare act ... § 1331 is not a basis for judicial review." Defs.' Mem. at 10. Defendants maintain that the Court has no jurisdiction whatsoever under § 1331 because Triad must first comply with (exhaust) the administrative processes established by the Medicare Act. See also Defs.' Mem. at 1 ("the Supreme Court has held that [§ 1331] cannot serve as the jurisdictional basis for claims arising under the Medicare Act"). As its principal support for its "no § 1331 jurisdiction" claim, Defendants cite the Supreme Court's decision in Shalala v. Illinois Council on Long Term Care, Inc., supra.

However, the statutory bar to § 1331 jurisdiction for claims "arising under" the Medicare Act is not absolute, as Defendants maintain. As related above, both the Supreme Court in Illinois Council and the U.S. Court of Appeals for the District of Columbia in its 2005 decision in American Chiropractic, held that general federal question jurisdiction under § 1331 exists to consider claims under the Medicare Act

---

[2] When a nursing home is sold and the new operator is assigned the Medicare provider agreement, as almost always occurs, the predecessor operator's last cost report is not filed until after the provider agreement has been assigned to the new operator. Hence, the amount of any underpayment to the predecessor for services provided while the predecessor operated the facility is paid by the fiscal intermediary to the new operator since the provider agreement will have been assigned to the new operator when the fiscal intermediary makes that determination. Conversely, the fiscal intermediary will recoup the amount of any overpayment to the predecessor, for services rendered by the predecessor, by withholding Medicare payment due to the successor for services provided after the successor began operating the facility.

"when roadblocks practically cut off any avenue to federal court" and when "[t]he difficulties are severe enough to render judicial review unavailable as a practical matter." American Chiropractic, 431 F.3d at 816; Illinois Council, 529 U.S. at 19 (where applying 405(h) "would mean no review at all"). None of the cases cited by Defendants are at odds with this holding.[3]

While initially claiming that Section 405(h) is a complete bar to § 1331 jurisdiction, Defendants ultimately address what they characterize as "Triad's claims of financial distress." Defs.' Mem. at 14-16. Defendants do not, however, explicitly recognize or acknowledge the "no [judicial] review at all" exception discussed by the Supreme Court in Illinois Council, as recognized by the Court of Appeals in its 2005 decision in American Chiropractic.

Instead, Defendants cite the Court of Appeals' earlier decision in Avocado Plus, Inc. v. Veneman, 370 F.3d 1243, 1248 (D.C.Cir. 2004) for the proposition that "[i]f the statute does mandate exhaustion, a court cannot excuse it." However, Avocado Plus involved the failure of avocado importers seeking to challenge provisions of the Haas Avocado Promotion, Research and Information Act, on First Amendment grounds, to exhaust their administrative remedies. As is self-evident, this avocado case has nothing to do with the Medicare Act and did not involve a claim that exhausting administrative

---

[3] For example, Defendants cite the Court of Appeals decision in American Chiropractic for the proposition, "district [sic] lacked jurisdiction under 28 U.S.C. §1331 to review challenge to Secretary's interpretation of Medicare statute." Defs.' Mem. at 11. What Defendants fail to mention, however, is that the Court of Appeals recognized the "no judicial remedy" exception to the Section 405(h) "arising under" bar. In American Chiropractic the Court of Appeals held that there was no federal question jurisdiction under § 1331 because chiropractors seeking to challenge the Secretary's interpretation of Medicare law could exhaust the same administrative remedies as are now at issue because doing so would not deprive them of an opportunity for judicial review, as Triad maintains is the case here. 431 F.3d at 816-17. The Court did not hold that § 1331 jurisdiction could never exist, as Defendants maintains. The other cases cited by Defendants on page 11 of the Memorandum are similarly inapposite.

remedies would render "judicial review unavailable as a practical matter," as Triad asserts here.    Given the differences described above and the Court of Appeals' later holding to the contrary in <u>American Chiropractic</u>, it is difficult to understand how Defendants can cite the <u>Avocado Plus</u> case for the proposition that administrative remedies must always be exhausted and that there <u>never</u> can be § 1331 jurisdiction in cases involving the Medicare Act.    Indeed, Judge Randolph authored the Court of Appeals' decisions in both cases. Presumably he remembered what he said in 2004 in <u>Avocado Plus</u> when he addressed subject matter jurisdiction under the Medicare Act in <u>American Chiropractic</u> in 2005.

On pages 14-16 of the Memorandum, Defendants, however, implicitly recognize the "no judicial remedy" exception to the statutory bar on § 1331 jurisdiction by discussing what they characterize as Triad's "claims of financial distress."  Before doing so, however, in what can only be considered as a continuing effort to distort the Supreme Court's holding in <u>Illinois Council</u> and the Court of Appeals' opinion in <u>American Chiropractic</u>, Defendants cite language in <u>Illinois Council</u> relating "Section 405(h) ... demands channeling of virtually all legal attacks through the agency" and recognizing that doing so "comes at a price, namely occasional individual delay-related hardship" (emphasis added).  Defs.' Mem. at 14.  However, Defendants' discussion of <u>Illinois Council</u> stops too soon, ignoring the subsequent determination that § 1331 jurisdiction exists when the "channeling requirement" will result in the "*complete* preclusion of judicial review."  529 U.S. at 22-23 (emphasis in the original).

Defendants, still ignoring the "no judicial review" exception to the § 405(h) jurisdictional bar, assert that "claims of financial distress do not justify judicial waiver of

the requirement to seek PRRB review of the NPR before filing a lawsuit," based on the Eleventh Circuit's 1983 decision in <u>V.N.A. of Greater Tift County, Inc. v. Heckler</u>, 711 F.2d 1020, 1034 (11th Cir. 1983). Apart from predating the Supreme Court's 2000 decision in <u>Illinois Council</u> and the Court of Appeals for the District of Columbia's 2005 opinion in <u>American Chiropractic</u> by, respectively, 17 and 22 years, the <u>VNA</u> case is distinguishable from the circumstances present here.

In <u>VNA</u>, the Eleventh Circuit held that a non-profit provider of home health care to Medicare beneficiaries was not entitled to preliminary injunctive relief because it had not demonstrated "irreparable harm" when it lacked sufficient funds to continue operating while disputing an overpayment that would be recouped before the matter was resolved. 711 F.2d at 1034-35. The fiscal intermediary determined that VNA had been overpaid as a result of a $19,026 overcharge by a related party, VNA's home health management company. VNA filed suit seeking a preliminary injunction preventing recoupment of this sum during the administrative review process.

The Eleventh Circuit denied the request for injunctive relief, under the All Writs Act, because VNA had not demonstrated, among other things, "irreparable harm." The Court based this finding on three considerations: (1) VNA's failure to "negotiate" ... a repayment plan in light of the Secretary's power to effect a "total suspension pending PRRB Review (42 CFR § 405.373(a)(2))"; (2) the problem of bankruptcy "being endemic in a system depending on nonprofit, cash-poor providers"; and (3) VNA being on notice that "situations like this might occur" and choosing to operate within the system on a "cash poor basis." 711 F.2d at 1034.[4]

---

[4] The Court's interpretation of 42 CFR § 405.373(a)(2) apparently conflicts with that of CMS. In this case, Triad asked the FI to suspend collection of the $2.0 million paid to Mariner until after

The foregoing case and refusal to issue a preliminary injunction have absolutely nothing to do with the situation faced by Triad. If anything, the <u>VNA</u> case is helpful to Triad's cause because the Eleventh Circuit recognized that injunctive relief is available to effectuate a stay in the collection of an overpayment during the administrative review process under 28 U.S.C. § 1561, the All Writs Act.

Moreover, unlike the instant case, the overpayment in <u>VNA</u> involved a cost report seeking reimbursement for an overpayment <u>for</u> <u>care</u> <u>VNA</u> <u>provided</u> and the disallowance of an expense of approximately $20,000. Here, CMS seeks to recover almost $2.0 million from Triad because periodic interim payments were made to Mariner after Mariner stopped providing care. The suggestion that Triad is "cash poor" simply because it lacks funds to pay $2.0 million to CMS, while Triad pursues its administrative remedies, is insulting and will be addressed below.

Finally turning to Triad's claim that exhausting administrative remedies in this case would preclude judicial review, Defendants, without explicitly acknowledging the "no [judicial] review at all" exception to the § 405(h) bar to federal question jurisdiction, assert that Triad has not shown "severe economic distress" and could have negotiated a payment schedule with the FI. No facts in the record, however, support those claims.

As related in the March 3, 2008 Affidavit of Ronald Herbert, Triad's Chief Operating Officer:

> If CMS withholds funds due to Plaintiffs for services provided to Medicare beneficiaries to recoup payments mistakenly paid to Mariner for services not provided, Plaintiffs will not be able to continue providing skilled nursing and other care and services to the more than 500

---

administrative review of that matter had been concluded. The FI told Triad's counsel that it <u>could</u> <u>not</u>, not that it <u>would</u> <u>not</u>, proceed in that manner. Second Affidavit of Jack C. Tranter ("Second Tranter Aff.") at ¶ 2.

> frail elderly residents who live in these facilities and
> depend upon Plaintiffs for their care, safety and well being.

Herbert Aff. at ¶ 16.

Otherwise stated, the evidence in the record demonstrates that Triad will not continue operating five nursing homes providing care to Medicare recipients and hundreds of other residents of those facilities if Medicare collects from Triad the $2.0 CMS paid to Mariner after Mariner stopped providing care. Under these circumstances, the existence of an administrative remedy and the potential for judicial review under § 405(g), at the end of a process that will be time-consuming and lengthy (which cannot even begin until the FI issues a final determination approximately 6 months from now), are unavailing. As Mr. Herbert related, Triad will not be able to pay its employees, will have stopped providing care, and will no longer be operating the five nursing homes in question here long before its right to judicial review under § 405(g) will have matured.

Moreover, there is no evidence in the record disputing what Mr. Herbert maintains. Defendants simply counter by stating: "[a]ny allegation by [Triad] of financial distress pending issuance of the NPR and PRRB review will not suffice as a basis for disregarding the exhaustion requirement of the Medicare Act." Defs.' Mem. at 16. Again, no evidence is offered in support of this conclusory claim. Rather, as demonstrated convincingly above, Defendants' claim ignores unrefuted testimony of Triad's Chief Operating Officer demonstrating that Triad has met the "no [judicial] review at all" exception to the otherwise preclusive bar preventing this Court from exercising federal question jurisdiction. [5]

---

[5] Defendants' suggestion that the administrative process could accommodate the fiscal devastation caused by collecting $2.0 million from Triad to regain funds paid to Mariner is difficult to understand. Indeed, Defendants' Memorandum unequivocally states that the "initial

Defendants next assert that Triad should have sought "a loan that could have provided Triad the financial flexibility to comply with the statute and regulations." Defs. Mem. at 16. This comment evidences a remarkably naïve assessment of Triad's ability (or for that matter almost anyone else's) to borrow funds to reimburse CMS for $2.0 million paid to another provider after that provider (Mariner) stopped providing care. In fact, when Triad received the "tentative" settlement letter advising that Triad must pay these funds to CMS within fourteen days or Medicare reimbursement due to Triad would be withheld, Triad was in the process of obtaining additional working capital financing from Capital Finance, LLC. Affidavit of Adam Ashpes, Triad's President and Chief Executive Officer ("Ashpes Aff.") at ¶ 4. After Triad, appropriately, advised Capital Finance of the existence of this potential $2.0 million liability, Capital Finance advised Triad that it would not process Triad's application for financing until after Triad favorably resolved this problem. Id.

In its brief, and somewhat insulting discussion of Triad's options, Defendants also boldly assert that Triad "failed to offer to its FI an extended repayment plan." Defs. Mem. at 16. As noted above, and as related in the Second Tranter Aff., Triad, via counsel, proposed that the almost $2.0 million paid to Mariner not be collected until after Triad exhausted its administrative remedies. Second Tranter Aff. at ¶ 2. The FI rejected this "extended repayment plan," asserting that it had no such power, and that even if it could delay recoupment, Triad would have to agree that it is responsible to pay $2.0 million to CMS, as a result of this sum having been paid to Mariner, as part of any extended repayment plan. Second Tranter Aff. at ¶ 2; see also Defendants' Statement of

---

determination" to collect these funds, by not making Medicare payments otherwise due to Triad, cannot be challenged by Triad seeking review in the PRRB until after CMS issues NPRs on September 30, 2008, precisely six months from now. Smoot Aff. at ¶ 18.

Undisputed Facts at 5 ("we would be agreeable to working out payment arrangements if your clients are willing to consider the entire balance of the overpayments as part of these arrangements").

Defendants next make the insulting claim that Triad has "chosen to operate on such a cash-poor basis that Triad cannot afford to await PRRB review." Defs.' Mem. at 16. The only evidence in the record about Triad's financial circumstances is Mr. Herbert's testimony that Triad cannot continue operating five nursing homes if CMS "collects" almost $2.0 million paid to Mariner, after Mariner stopped providing care, by not paying Triad for services actually provided to Medicare recipients.[6]

As noted above, support for Triad's request that this Court exercise jurisdiction under § 1331 and determine that Triad is not liable for the $2.0 million CMS paid to Mariner, or alternatively enjoin collection of those funds from Triad, while Triad exhausts its administrative remedies, is found in the United States Court of Appeals for the District of Columbia's 2005 decision in American Chiropractic, as discussed above, and in two decisions rendered by the United States District Court for the District of Columbia. In those decisions, both following the Supreme Court's decision in Illinois Council, the United States District Court for the District of Columbia held that the § 405(h) bar to federal question jurisdiction under § 1331 did not apply.

First, in National Association of Psychiatric Health Sys. v. Shalala, 120 F.Supp.2d 33 (D.D.C. 2000), Judge Kessler addressed the challenges of private psychiatric hospitals

---

[6] While a large publicly-traded company, like Beverly Enterprises, which operates hundreds of nursing homes throughout the United States, might be able to proceed in this manner, Triad cannot. Indeed, most operators of skilled nursing facilities are not sufficiently capitalized to absorb an unexpected and immediate $2.0 million liability. Not being able to do so, however, does not somehow demonstrate that Triad is providing care to Medicare beneficiaries and the hundreds of other residents of its nursing homes on a "cash-poor" basis, as Defendants so disrespectfully and without any supporting evidence, maintain.

and others to an interim final rule promulgated by the Secretary requiring a "face-to-face" evaluation within one hour after a patient had been placed in restraints. Finding federal question jurisdiction under the exception to the § 405(h) "arising under" bar, Judge Kessler held, "[u]nlike the nursing homes in <u>Illinois Council</u>, [p]laintiffs' members, as a practical matter, do not have the option of incurring a minor penalty and receiving an administrative hearing before proceeding to federal court." <u>Psychiatric Health</u>, 120 F.Supp. 2d at 39. Judge Kessler characterized the risks associated with exhausting administrative remedies in this case as "economic suicide." <u>Id.</u> at n.4.

Quoting <u>Bowen v. Michigan Academy of Family Physicians</u>, 476 U.S. 667, 681 (1986), Judge Kessler explained, "[a]pplication of § 405(h) would amount to the "practical equivalent of a total denial of judicial review" because "what appears to be simply a channeling requirement [turns] into complete preclusion of judicial review." Judge Kessler, accordingly, concluded that the § 405(h) bar is inapplicable and "that the court has federal question jurisdiction under § 28 U.S.C. § 1331." <u>Id.</u> at 39. The circumstances characterized by Judge Kessler in <u>Psychiatric Health</u> as "economic suicide" if administrative remedies have to be exhausted, and the future faced by Triad if it must proceed in that manner, are essentially the same.

Similarly, in <u>American Lithotripsy Society v. Thompson</u>, 215 F.Supp.2d 23 (D.D.C. 2002), this Court rejected the Secretary's claim of no federal question jurisdiction under § 1331 based on the Supreme Court's decision in <u>Illinois Council</u>. In <u>American Lithotripsy</u>, Judge Kennedy considered challenges to an interim rule promulgated by the Secretary regarding a medical procedure known as lithotripsy. The effect of the regulation was to prohibit urologists and other physicians from referring

13

patients to a facility where lithotripsy was provided if they had an ownership interest in that facility. The risks associated with doing so included civil money penalties of up to $15,000 per bill submitted to CMS, potential exclusion from the Medicare program, and criminal prosecution. Interestingly, in this case, the Secretary did not dispute the physicians' claims that the "fines alone could subject a lithotripsy center to financial ruin." American Lithotripsy, 215 F.Supp.2d at 29.

In assessing the Secretary's claim that this Court lacked § 1331 federal question jurisdiction under § 405(h), the statutory "arising under" bar, Judge Kennedy framed the question to be addressed as "[u]nder Illinois Council ... the relevant question is whether applying § 405(h) ... would have the practical effect of denying Plaintiff's judicial review." Id. In addressing that question, he determined that the Court had federal question jurisdiction because the "penalties were far more serious than those before the Court in Illinois Council," which the Supreme Court described as "minor." Id.; Illinois Council. 529 U.S. at 22.

Citing Judge Kessler's decision in Psychiatric Health, supra, as involving "sanctions almost identical to those threatened here, including termination from the Medicare program," and adopting Judge Kessler's characterization of those penalties as "draconian" and "economic suicide," Judge Kennedy held that the § 405(h) bar to federal question jurisdiction did not apply. American Lithotripsy, 215 F.Supp.2d at 30. He restated Judge Kessler's reasoning in analyzing the threatened sanction and the resulting denial of access to judicial review as "highly persuasive and consistent with the Supreme

Court's holdings in <u>Bowen [v. Michigan Academy of Family Physicians]</u> and <u>Illinois Council</u>," <u>Id.</u> at 30.[7]

While Defendants' Memorandum cites the Court of Appeals 2005 decision in <u>American Chiropractic</u>, as explained in footnote 3 above, the single sentence characterization of that decision's holding misrepresents the Court of Appeals' determination that an exception to the § 405(h) bar to federal question jurisdiction exists. While the Court of Appeals in <u>American Chiropractic</u> determined that the showing necessary to avoid the preclusive effect of § 405(h) had not been made, it did not hold, as Defendants claim, that an exception to the § 405(h) bar to federal question jurisdiction is never available and that administrative remedies must be exhausted even when doing so would result in no judicial remedy at all. As related above, this is precisely the situation faced by Triad here.

In sum, upon a fair reading of the Supreme Court's decision in <u>Illinois Council</u> and the Court of Appeals opinion in <u>American Chiropractic</u>, and upon consideration of the two decisions of this Court not cited by Defendants, the "first defect" alleged by Defendants, Triad's assertion that the Court has subject matter jurisdiction under 28 U.S.C. § 1331, is no "defect" at all. Defs. Mem. at 1.

---

[7] While Judge Kennedy noted that the plaintiffs in that case "do not themselves have standing to challenge the regulations ... because they are not considered 'providers' under the Medicare statute," this was not the basis for his holding. He noted that the "lack of representation in the agency review process presents an even bigger stumbling block to the plaintiffs in this present case because Medicare beneficiaries have no incentive to challenge the regulations" administratively and because plaintiffs' association's members did not have standing to challenge regulations as they were not providers. 215 F.Supp.2d at 30. These observations, however, were an alternative basis for Judge Kennedy's decision, as he clearly rested his finding of federal question jurisdiction on the severity of the penalties, as did Judge Kessler in the earlier <u>American Psychiatric</u> case.

## II. IF FEDERAL QUESTION JURISDICTION IS PRECLUDED UNDER § 1331, THE COURT MAY STILL CONSIDER TRIAD'S CLAIMS UNDER 42 U.S.C. § 405(G).

In <u>Mathews v. Eldridge</u>, 424 U.S. 319, 324 (1976), the Supreme Court held that a Court may exercise jurisdiction under § 405(g) after a claim has been <u>presented</u> to the Secretary and after all administrative remedies have been <u>exhausted</u>. The Court held, however, that the exhaustion requirement could be waived, but presentment of the claim could not. 424 U.S. at 328; <u>see</u> <u>also</u> <u>Bowen v. City of New York</u>, 476 U.S. 467 (1986) (citing <u>Weinberg v. Salfi</u>, 422 U.S. 5749 (1975) and <u>Heckler v. Ringler</u>, 466 U.S. 602 (1984)).[8]

In <u>Illinois Council</u>, the Supreme Court recognized two exceptions to the § 405(g) exhaustion requirement, i.e., either the agency can waive exhaustion or "a court can decree [it] waived in certain circumstances." 529 U.S. at 24. In assessing whether to deem exhaustion waived, the <u>Eldridge</u> Court directed courts to consider the nature of the claim being asserted and the consequence of deferring judicial review while administrative review would be conducted. <u>Eldridge</u>, 424 U.S. at 331-32, n.1; <u>Ringer</u>, 466 U.S. at 617-18.

In <u>Eldridge</u>, a recipient of disability benefits under the Social Security Act claimed that benefits could not be constitutionally terminated until <u>after</u> an evidentiary hearing. While the plaintiff in <u>Eldridge</u> had presented this claim to the Secretary, he had

---

[8] Section 405(g) provides, in pertinent part:

> Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow.

not exhausted administrative remedies and the Secretary had not waived those requirements. Nevertheless, the <u>Eldridge</u> Court deemed the exhaustive requirement waived, finding that the Court could exercise jurisdiction under § 405(g) and consider the constitutional claim because "cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." <u>Eldridge</u>, 424 U.S. at 330; <u>see also</u> <u>Ringer</u>, 466 U.S. at 617-18.

In deeming exhaustion waived and finding jurisdiction under § 405(g), the <u>Eldridge</u> Court did not address the substantive claim. Rather, the Court exercised jurisdiction and considered the constitutional claim because it was "collateral to [the] claim of entitlement" and because the claimant had a "colorable claim" that an erroneous deprivation of disability benefits would "damage him in a way not recompensable through retroactive payments." <u>Eldridge</u>, 424 U.S. at 330-31.

The analysis of the <u>Eldridge</u> Court and its finding of jurisdiction under § 405(g) are applicable here. Triad asks this Court to enjoin collection of the $2.0 million paid to Mariner by withholding Medicare payments due and owing to Triad while Triad exhausts its administrative remedies. <u>See</u>, <u>e.g.</u>, <u>City of New York</u>, 476 U.S. at 483 (claimants challenging Secretary's failure to follow procedures found collateral to claims for benefits). If CMS retains Medicare payments due and owing to Triad for services provided by Triad to collect almost $2.0 million that Triad believes was erroneously paid to Mariner, as a practical matter, Triad has no judicial remedy. As related above and as demonstrated in Mr. Herbert's Affidavit testimony, Triad will have ceased doing business and will no longer be providing care to Medicare beneficiaries long before the appealable

Notices of Program Reimbursement are issued on September 30, 2008, six months from now.

### III.  THIS COURT MAY ENJOIN RECOUPMENT UNDER 28 U.S.C. § 1651, THE ALL WRITS ACT.

Section 405(h) of the Medicare Act does not prevent this Court from temporarily enjoining or staying agency action to maintain the *status quo*.  See V.N.A. of Greater Tift County, Inc. v. Heckler, 711 F.2d 1020 (11th Cir.1983) (relying on Sampson v. Murray, 415 U.S. 61 (1974)).  The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (1976).  Although the All Writs Act does not provide a basis for jurisdiction,

> It is firmly established that the act encompasses the traditional power of the courts to enter a stay of enforcement of an agency decision already entered, pending review in the court issuing the injunction, 'to prevent irreparable injury * * * resulting from the premature enforcement' of an agency decision.  Scripps-Howard Radio, Inc. v. Federal Communications Commission, 316 U.S. 4, 9 . . . (1942).  In Roche v. Evaporated Milk Association, 319 U.S. 21, 25 . . . (1943), the Supreme Court held further that this 'authority is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal but extends to those cases which are within its appellate jurisdiction although no appeal has been perfected.'

V.N.A., 711 F.2d at 102.[9]

The Court's power extends to the "*potential* jurisdiction" of the Court and "includes the traditional power to issue injunctions to preserve the *status quo* while administrative proceedings are in progress and prevent impairment of the effective

---

[9] *Compare* In re: Tennant, 359 F.3d 523 (D.C. Cir. 2004) (where appellate court had no prospective jurisdiction by statute, no writ could issue).

exercise of appellate jurisdiction." Id. at 1027-28 (citing Fed. Trade Comm'n v. Dean Foods Co., 384 U.S. 597, 603-04 (1966)) (emphasis in original).  Although plaintiffs must meet the standards for injunctive relief, where a court's jurisdiction would be "effectively defeated" absent an injunction, such relief is proper.  See Murray, 415 U.S. at 77-78 (confirming finding in Dean Foods).[10]

Here, Triad requests that this Court maintain the *status quo* pending the resolution of the dispute and prevent recoupment of almost $2.0 million paid to Mariner.   Under these circumstances, an injunction would supplement the agency's decision-making power by preserving Triad's claim for agency review.  Such relief would also preserve this Court's "potential jurisdiction" to review the Secretary's final decision.  Absent an injunction, however, Triad will not be able to continue  operating its facilities and the Court's jurisdiction will be "effectively defeated." Murray, 415 U.S. at 77.

To grant a stay or issue an injunction, applicable law requires courts to consider (1) the likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable injury if no injunctive relief is granted; (3) if the injunction will injure another party; and (4) whether the public interest will benefit by granting injunctive relief.  See Davenport v. Int'l Bhd. of Teamsters, 166 F. 3d 356, 360 (D.C. Cir. 1999).  In analyzing whether the plaintiff will suffer irreparable harm:

> [m]ere injuries, however substantial, in terms of money,
> time and energy necessarily expended in the absence of a

---

[10] *Compare* Libbie Rehabilitation Center, Inc. v. Shalala, 26 F. Supp. 2d 128 (D. D.C. 1998) (preliminary injunction granted based on a finding of irreparable harm to nursing home); International Long Term Care, Inc. v. Shalala, 947 F. Supp 15 (D. D.C. 1996) (preliminary injunction granted where  nursing home "might well be forced to close its doors, and the residents might have to be transferred."); Pathfinder Healthcare, Inc. v. Thompson, 177 F.Supp.2d 895 (E.D.Ark. 2001) (preliminary injunction granted and holding that Illinois Council does "not foreclose completely the narrowly crafted injunctive relief granted in this case").

> stay, are not enough. The possibility that adequate
> compensatory or other corrective relief will be available at
> a later date, in the ordinary course of litigation, weighs
> heavily against a claim of irreparable harm. But injury held
> insufficient in one case may well be sufficient to justify it
> in another, where the applicant has demonstrated a higher
> probability of success on the merits.

Virginia Petroleum Jobbers Ass'n. v. FPC, 298 F.2d 921, 925 (1958).

Here, there exists no adequate remedy at a later date because Triad will not have sufficient funds to continue operating. Murray, 415 U.S. at 77 (discussing the "practical disappearance" of an entity preventing adequate agency or judicial relief). Moreover, the health, safety, and well being of the more than 500 elderly residents of the five nursing homes will be jeopardized if Triad ceases to continue providing care. The potential injury to the patients is known as "transfer trauma", which is the adverse effect on the physical and mental health of elderly individuals who are forced to relocate and is recognized as a very real danger. International Long Term Care, Inc. v. Shalala, 947 F. Supp 15, 20, n.6 (D.D.C. 1996) (discussing O'Bannon v. Town Court Nursing Center, 447 U.S. 773 (1980) recognition of "transfer trauma"); see also Teri D. Keville, Studies of Transfer Trauma in Nursing Home Patients: How the Legal System Has Failed to See the Whole Picture, 3 Health Matrix: J. of Law-Medicine 421, 440-51 (Summer 1993)(discussing judicial treatment of transfer trauma). In International Long Term Care, the Honorable Paul Friedman granted a preliminary injunction in favor of a nursing home to preserve Medicare funding and determined that the nursing home "might well be forced to close its doors, and the residents might have to be transferred." 947 F. Supp. at 18. Judge Friedman held "[t]his

is just the sort of irreparable and unnecessary harm that carefully tailored, limited injunctive relief is intended to prevent." Id.[11]

In addition, as related in Section IV below, CMS has no legal basis to assert a right to repayment, much less through a recoupment of future payments from Triad. If CMS had overpaid for care during the period when Mariner was actually operating the facilities and providing care to Medicare beneficiaries prior to the assignment of the Medicare provider agreements, Triad concedes that it would be responsible for repaying the amount of any overpayment. This, however, is not what occurred here.

Furthermore, Defendants will suffer no harm if injunctive relief is granted. The only "hardship" that Defendants can claim is the requirement that they provide administrative services associated with making Medicare payments to Triad pending the outcome of the administrative process.[12] In sum, the certain irreparable harm and injury to Triad and the many elderly residents of its nursing homes, absent injunctive relief, clearly outweighs the *de minimus* administrative burden resulting from CMS continuing to review bills submitted by Triad and sending Medicare reimbursement to them as a compensation for services provided to Medicare beneficiaries, while Triad challenges recouping the $2.0 million paid to Mariner by exhausting its administrative remedies.

---

[11] Judge Freidman did not analyze the jurisdictional basis for his decision (nor did he explicitly rely on this Court's power under the All Writs Act) but stated that his ruling was based on the court's "equitable power to fashion injunctive relief . . . to permit the court to maintain the status quo pending an administrative decision." Id. at 20.

[12] Courts have balanced the government's potential harm against the harm to providers and have determined that any harm to the government is significantly outweighed by the risk of harm to the provider and its patients if interlocutory injunctive relief is not afforded. In Libbie Rehabilitation, 26 F. Supp. 2d at 132-33, the Court characterized this "administrative" type of "harm" as minimal to non-existent." See also Mediplex of Massachusetts, Inc. v. Shalala, 39 F. Supp. 2d 88, 100-01 (D. Ma. 1999); Int'l Long Term Care, 947 F. Supp. at 19.

Finally, the public interest weighs heavily in favor of granting preliminary injunctive relief. Without injunctive relief, the public will suffer because, as explained above, Triad's nursing homes will cease to operate if CMS is permitted to recoup from Triad approximately $2.0 million paid to Mariner for services not provided to Medicare beneficiaries, which payments were made after the effective date of the assignment of Mariner's provider agreements to Triad. As a result, the health, well being and safety of the more than five hundred elderly residents of Triad's nursing homes will be at risk, as they will be forced to relocate to other nursing homes, assuming, of course, that placements for so many of the individuals needing nursing home care can even be found. Under the circumstances here, the public has a significant, important and legitimate interest in the continued payment for Medicare services at the nursing facilities operated by Triad and the continued operation of those facilities while Triad pursues its administrative remedies.

## IV. THE MEDICARE REGULATIONS DO NOT PERMIT RECOUPMENT FROM TRIAD OF AMOUNTS PAID TO MARINER AFTER THE PROVIDER AGREEMENTS WERE ASSIGNED.

Defendants' argument that Triad is liable for the erroneous payments made to Mariner, after the effective date of the assignment of the provider agreements for the five nursing homes in question here, rests upon the false premise that the payments to Mariner were overpayments made to a participating Medicare provider pursuant to a provider agreement then in effect. As explained in Triad's Initial Memorandum, beginning on December 1, 2006, Mariner had no right to be paid under any Medicare provider agreement because the applicable agreements had been assigned to Triad as of that date. Belying the plain language of applicable regulatory authority, Defendants respond by

citing their own policy manuals to assert that Triad is liable for the erroneous payments Defendants made to Mariner after the effective date of the assignment of the provider agreements (i.e., December 1, 2006). <u>See</u> Defs.' Mem. at 17 – 21, <u>citing</u>, Medicare Financial Management Manual, Ch. 3 § 130; Medicare Program Integrity Manual, § 11.1.B.

The manual provisions that Defendants rely upon are interpretative and, as such, should be disregarded to the extent they contradict applicable statutory and regulatory authority. While an administrative agency's interpretation of its own statutes and regulations is entitled to deference, a court should not defer to an interpretation that is plainly erroneous or inconsistent with the statute or regulations. <u>District of Columbia v. Davis</u>, 685 A.2d 389, 393 (D.C.1996); <u>Wilson v. District of Columbia</u>, 675 A.2d 28, 29 (D.C.1996) (quoting <u>Lenkin Co. Management v. District of Columbia Rental Housing Comm'n</u>, 642 A.2d 1282, 1285 (D.C.1994). Here, the applicable regulation, 42 C.F.R. § 489.18(c), states that the assignment of a provider agreement is automatic "when there is a change in ownership." The plain language of § 489.18(c) precludes Defendants' notion that, despite informing Triad that the change of ownership of each of the facilities was effective on December 1, 2006, the provider agreements were not treated as "assigned" until several months later, in April, 2007, when CMS issued "tie-in" and "tie-out" notices. Pursuant to § 489.18(c), the automatic assignment of the provider agreements occurred on December 1, 2006, the effective date of the change of ownership.

V.    **EVEN UNDER THE PERTINENT MEDICARE MANUAL PROVISIONS, DEFENDANTS CANNOT COLLECT THE POST-ASSIGNMENT MARINER PAYMENTS FROM TRIAD.**

    A.    **The Medicare Manuals Require Defendants to Pursue Mariner for the Improper Post-Assignment Payments.**

As related in Triad's Initial Memorandum, the Medicare statute and regulations, and above, Triad is responsible for Medicare overpayments made to Mariner for services rendered by Mariner prior to the change of ownership of the five nursing homes in question on December 1, 2006, as a result of successor liability. However, as shown above, Triad is not responsible for payments made to Mariner <u>after</u> the effective date of the assignment of Mariner's provider agreements to Triad (December 1, 2006).

Defendants maintain that Triad is responsible for almost $2.0 million in periodic interim payments made to Mariner after Mariner stopped providing care based on Chapter 3 Section 130 of the Medicare Financial Management Manual and Chapter 10 Sections 5.5.C.3 and 11.1B of the Medicare Public Integrity Manual, attached to Defendants' Memorandum, respectively, as Exhibit A and B. However, as explained above, Defendants' interpretation of those provisions conflicts with the Medicare statute and regulations. Moreover, Defendants' argument conflicts with specific directives to the contrary in the Medicare Provider Reimbursement and Financial Management Manuals.

Section 2409.1B of the Provider Reimbursement Manual, under the heading "Provider Not Participating in the Medicare Program" relates that a provider agreement may be terminated "as a result of a change in ownership." <u>See</u> Exhibit 1. Chapter 3 Section 20.2 of the Financial Management Manual, (attached hereto as Exhibit 2) which addresses "Provider No Longer Participating in Medicare" states:

> If the FI discovers an overpayment upon the filing of a cost report … with respect to a provider no longer participating in the Medicare program, it shall immediately contact the terminated provider to obtain a refund in a lump-sum, if it has not been made.  If the terminated provider has sold the entity to a participating provider refer to Chapter 3 Section 130 for change of ownership instructions.

Exhibit 2.

As of the effective date of the assignment of Mariner's provider agreements to Triad (December 1, 2006), Mariner no longer participated in the Medicare program. While Mariner did not file closing cost reports within 45 days after it stopped providing care, as required by § 1502 of the Medicare Provider Reimbursement Manual, the preliminary review conducted by Triad's FI of cost reports filed by Triad for the period ending June 30, 2007, determined that Mariner had been paid almost $2.0 million for periods of service that did not even occur until after Mariner vacated the five nursing facilities in question on December 1, 2006.

Chapter 3 Section 20.2 of the Financial Management Manual directs CMS to "immediately contact the terminated provider," in this case Mariner, "to obtain a refund in a lump-sum." See Ex. 2. Instead of proceeding as directed by those applicable provisions of its manuals, i.e., seeking a lump-sum repayment from Mariner, Defendants have instead improperly and erroneously attempted to recover the $2.0 million paid to Mariner by withholding Medicare funds due and owing to Triad for services provided to Medicare beneficiaries.

Moreover, as explicitly stated in Chapter 3 Section 20.2 of the Financial Management Manual, quoted above, the provision relied on by Defendants in attempting to obtain funds paid to Mariner after Mariner stopped providing care from Triad, i.e., Chapter 3 Section 130 of the Financial Management Manual, only applies when the

provider terminating participation in the Medicare program has "sold the entity to a [new] participating provider." Those circumstances, of course, are not applicable here.

> **B.    Pursuant to Section 130 of the Medicare Financial Management Manual, Defendants Cannot Recover the Post-Assignment Payments They Made to Mariner Because Mariner Engaged in Fraud.**

Defendants rely upon Chapter 3, Section 130 of the Financial Management Manual, which addresses change of ownership and is quoted above for the proposition that they may hold Triad liable for "overpayments" made to Mariner after the date of the assignment of the provider agreements. <u>See</u> Defs. Mem. at 17. Specifically, Defendants quote language from Section 130 providing that a new owner is responsible for accrued overpayments "regardless of who had ownership of the Medicare agreement at the time the overpayment was discovered, unless fraud was involved." As related in Section VI above, those provisions are inapplicable because Mariner did not sell the nursing home entities in question to Triad and because there is another manual provision directing CMS to recover these funds directly from Mariner.

However, even assuming Section 130 applies, Defendants are not entitled to summary judgment because the provision has an exception relating that the successor operator is not liable if the former operator committed fraud.[13]

> When a provider undergoes a CHOW where the new provider accepts assignment of the previous owner's Medicare agreement, the responsibility for repaying any

---

[13]    Moreover, even putting aside the fraud exception, the language of § 130 does not support Defendants' attempt to collect the payments at issue in this case from Triad. First, the quoted language expressly applies only to hold a new owner responsible for "*accrued*" overpayments, not payments that had not yet occurred at the time of the change of ownership. Second, the language makes clear that the new owner is responsible for overpayments that are "*discovered*" after the assignment of the provider agreement, not for payments that *occurred* after the assignment, as claimed here.

> outstanding and future overpayments resides with the new owner. *Exception: If any of the overpayments determined for a fiscal year when the previous owner had assignment were discovered due to fraud the responsibility for the repayment of the overpayments does not shift to the new provider. It stays with the old provider.*

Section 130, Medicare Financial Management Manual, attached to Defs.' Mem. as Ex. A. In this case, undisputed facts show that Mariner engaged in fraudulent conduct. Even if Section 130 applies to the situation applicable here, Triad is not responsible for funds paid to Mariner as a result of the fraud exception. Hence, whatever effect § 130 otherwise may have had to suggest that Triad is liable for the payments to Mariner, the provision simply does not apply here.

As set forth more fully in Triad's Statement of Facts, Triad and Mariner are engaged in highly contentious litigation in the Superior Court of Georgia for Fulton County concerning damages flowing from Mariner's refusal to vacate the subject nursing homes until December 1, 2006, almost three years after Triad was entitled to begin operating the facilities. Mariner vacated the nursing homes at that time only because it had exhausted its appeal rights with respect to an earlier lawsuit in which the Georgia courts held that Mariner had no entitlement to continue to occupy and operate the facilities. William M. Foster v. Mariner Healthcare, Inc., et al., In the Superior Court of Twiggs County, Georgia, Case No. 2004-V-069-S. Transition of the operation of the facilities from Mariner to Triad (2006) was anything but cooperative. Unlike most changes in ownership of Triad nursing homes, there was no written agreement between these providers concerning the many transition issues, including reconciliation of any liability for payments. In this context, Mariner's fraudulent and vindictive conduct is better understood.

Despite having received almost $2,000,000 in Medicare payments for services that it did not provide, during a period of time when it did not even operate the nursing homes, Mariner has retained these funds and has refused even to respond to Triad's repeated attempts to cause Mariner to repay the funds to Defendants. Tranter Aff. at ¶ 5. Moreover, as noted above, although Mariner was required to file a terminating cost report no later than 45 days after the change of ownership of the facilities, it failed to do so.

In fact, Mariner has never filed a terminating cost report for these facilities. Instead, with assistance from Mutual of Omaha, in September 2007, Triad filed substitute cost reports on behalf of Mariner in order to avoid suspension of Medicare payments to Triad. Herbert Second Aff. at ¶4. When Mariner's designated deposition witness, Boyd P. Gentry, was asked in the Georgia litigation to explain why Mariner did not file the Medicare cost report, he stated that Mariner did not file the cost report because Mariner did not have funds to pay the liability associated with filing the report, which he believed to be slightly less than $1 million. Deposition Testimony of Boyd Gentry at p. 323, attached as Exhibit 3. However, Mariner never informed Triad that it received $2.0 million in periodic interim payments from Medicare for provision of services that did not occur until after Mariner stopped providing care, after the effective date of the provider agreement to Triad. Herbert Second Aff. at ¶ 5.

As is evident from these undisputed facts summarized above and recorded in the Second Affidavit of Ronald Herbert, Triad's Chief Operating Officer, Mariner received the funds, actively concealing its long-standing possession of the funds, and has wrongfully retained the funds even now. Assuming _arguendo_ that § 130 even applies (which it does not), under these circumstances, the "fraud exception" prohibits

Defendants from collecting these funds from Triad.

On the other hand, if the Court finds that § 130 applies and the Defendants dispute these facts, Defendants are not entitled to summary judgment and their cross-motion should be denied.

## CONCLUSION

For all of the reasons set forth above, Triad respectfully requests this Court to enter judgment for Triad, as Defendants may not lawfully recoup the almost $2.0 million paid to Mariner by withholding Medicare payments due to Triad for care provided to Medicare beneficiaries. Alternatively, the Court should afford Triad injunctive relief preventing Defendants from withholding Medicare payments due to Triad to recoup almost $2.0 million paid to Mariner while Triad exhausts its administrative remedies.

Respectfully Submitted,


_____/s/ Jack C. Tranter_____
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,        *
et al.,
                                       *
             Plaintiffs
                                       *        Case No. 08-cv-00329
v.
                                       *
MICHAEL O. LEAVITT, et al.,
                                       *
             Defendants
                                       *


**PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS
IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rules 7(h) and 56.1, Plaintiffs Triad at Jeffersonville I, LLC,

Triad at LaGrange I, LLC, Triad at Lumber City I, LLC, Triad at Powder Springs I, LLC, and

Triad at Thomasville I, LLC (sometimes collectively "Triad"), hereby submit this Response to

Defendants' Statement of Material Facts in Support of Cross Motion for Summary Judgment.

1.       Undisputed.

2.       Undisputed.

3.       Disputed.  As set forth in the Affidavit of Marcella Godwin ("Godwin Affidavit"),

Triad Senior Living ("TSL") did not receive the initial Form CMS-855A documents that

Defendants assert were returned to TSL on December 2, 2006.  Godwin Affidavit at 4 and 5.

4.       Undisputed.

5.       Disputed.   Plaintiffs admit that Defendants transmitted "tie-in notices" to

Plaintiffs as set forth in paragraph 4.  However, Plaintiffs deny that the Medicare statutes and

regulations provide for a change of ownership ("CHOW") "period."  Rather, 42 C.F.R. § 489.18

states that the assignment of a Medicare provider agreement occurs automatically when there is a change of ownership.   In this case, the Defendants advised Plaintiffs that the change of ownership of each facility was effective December 1, 2006.  Affidavit of Ronald M. Herbert, Jr. ("Herbert Affidavit") at 8; Exhibit 8 (attached to Plaintiffs' Statement of Facts).

6.      Undisputed, but immaterial because Mutual of Omaha did not receive claims from Mariner for services rendered *after* December 1, 2006.

7.      Undisputed, but misleading.  First, Plaintiffs do not allege that the December 13, 2006 PIP payment was made improperly; thus, it is not at issue in this case.  Second, the December 27, 2006 payment included only *one* day of service prior to December 1, 2006. Affidavit of Thomas M. Bruce ("Bruce Affidavit") at 4 (supporting Defendants' Cross Motion for Summary Judgment).  Finally, Plaintiffs dispute that the "remaining payments were periodic payments for services rendered during the CHOW application period."  The payments made to Mariner for the period beginning on December 1, 2006 could not have been for "services rendered" because Mariner provided no services after that date.  Herbert Affidavit at 5 and 9.

8.      Disputed.   Mr. Bruce testified that on October 3, 2006 Mutual of Omaha completed a review of the service period including April 1, 2006 through June 30, 2006.  Bruce Affidavit at 6.  Confusingly, he also testified that Mutual of Omaha completed a review of a period covering the same dates (and others) on March 30, 2007.  Id.   Discovery is needed to determine when Mutual of Omaha reviewed the PIP payments made to Mariner.   Moreover, Mr. Bruce's testimony does not specify when Mutual of Omaha began its PIP reviews.  He addresses only when the reviews were "completed."

9.  Undisputed, but immaterial.  Defendants, through BCBS of Georgia, were aware of the change of ownership when Plaintiffs transmitted the initial Medicare Provide/Supplier Enrollment Applications by overnight mail on November 30, 2006.  Godwin Affidavit at 1 and 4.

10.  Undisputed.

11.  Undisputed, except that Plaintiffs clarify that they began billing for services only after the tie-in notices were issued because they believed that they were not entitled to submit bills prior to receiving the tie-in notices.  Second Affidavit of Ronald M. Herbert, Jr. ("Second Herbert Affidavit") at 3.

12.  Undisputed, but immaterial because the knowledge of Defendants' agents (e.g., the fiscal intermediaries) is imputed to Defendants.

13.  Undisputed, except that Plaintiffs clarify that they filed the terminating cost reports on behalf of Mariner because Mariner refused to file the cost reports.  Second Herbert Affidavit at 4.  Mariner has stated that it did not file the cost reports because it did not have the money to pay the resulting liability, which it estimated to be slightly less than $1 million.  Deposition of Boyd Gentry (as designee of Mariner) at 323 (excerpts of Mr. Gentry's deposition, which was taken on August 13, 2007 in the Georgia Superior Court litigation, are attached as Exhibit 3).  Mariner never informed Triad that it had received and retained PIP payments after the date it vacated the nursing homes, nor was there any agreement between the parties concerning the transition of the nursing homes from Mariner to Triad.  Second Herbert Affidavit at 5.

14.  Undisputed, except that Plaintiffs dispute any suggestion that Triad was overpaid.  Mariner, not Triad, was overpaid.

15.     Undisputed, except that Plaintiffs dispute that Georgia BCBS properly attempted to recoup payments from Triad, as opposed to Mariner.

16.     Undisputed.

17.     Undisputed, except that Plaintiffs dispute that the repayment plan offered by Defendants was a meaningful alternative to avoid this litigation and enable Triad to contest the attempted recoupment action.  Rather, Defendants made clear, through its agent BCBS, that any payment plan must include the entire amount claimed as an overpayment and that Triad would not be able to contest liability for the alleged overpayment if it entered a payment plan.  Second Affidavit of Jack C. Tranter at 2.    Moreover, as set forth in Mr. Herbert's initial affidavit, if Plaintiffs were required to pay the full sum asserted to be due ($2,203,482) in order to contest liability through an administrative process, Plaintiffs could not continue to provide services to the patients of the nursing homes.  Herbert Affidavit at 16.  In addition, when Triad received the "tentative" settlement letters advising that Triad must pay these funds to Defendants within fourteen days or Medicare reimbursement due to Triad  would be withheld, Triad was in the process of obtaining additional working capital financing from Capital Finance, LLC.  Affidavit of Adam Ashpes at 4.  After Triad, appropriately, advised Capital Finance of the existence of this potential $2.0 million liability, Capital Finance advised Triad that it would not process Triad's application for financing until after Triad favorably resolved this problem.  Id.

18.     Undisputed, except that Plaintiffs clarify that they have not yet sought review by the Provider Reimbursement Review Board because Defendants have not issued an appealable final reimbursement determination.

Respectfully Submitted,


_____/s/  Jack C. Tranter_____
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 31st day of March, 2008, I mailed and emailed a copy of the foregoing Plaintiffs' Response to Defendants' Statement of Material Facts in Support of Cross Motion for Summary Judgment to the following counsel for Defendants:

Wendy M. Ertmer
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, D.C. 20530
wendy.ertmer@usdoj.gov

/s/ Jack C. Tranter
Jack C. Tranter, Bar No. MD 00310
Thomas C. Dame, Bar No. MD 08352
Gallagher Evelius & Jones LLP
218 N. Charles Street, Suite 400
Baltimore, MD  21201-4033
(410) 727-7702

Medicare Provider Reimbursement Manual
(Excerpts of Section 2409)



FOREWORD

This manual provides guidelines and policies to implement Medicare regulations which set forth principles for determining the reasonable cost of provider services furnished under the Health Insurance for the Aged Act of l965, as amended. These "Principles of Reimbursement for Provider Costs" have been published in HIRM-l. The provisions of the law and the regulations are accurately reflected in this manual, but it does not have the effect of regulations.

The Social Security Administration (SSA) also publishes quarterly the "Social Security Rulings" under the authority of the Commissioner of Social Security for the purpose of making available official rulings relating to the health insurance program and the other programs under his jurisdiction. The rulings contain appeals case decisions, as well as statements of policy and interpretations of the law (title XVIII of the Social Security Act-Medicare) and regulations which have precedential effect.

Rulings are intended to exemplify general manual instructions and do not alter existing policy guidelines. However, they may place more emphasis on a particular program are that has been identified as a problem. The rulings do not have the force and effect of a statute or regulations, but provide illustrative case material useful in interpreting and applying policies and procedures contained in instructional issuances.

The procedures and methods set forth in this manual have been devised to accommodate program needs and the administrative needs of providers and their intermediaries and will assure that the reasonable cost regulations are uniformly applied nationally without regard to where covered services are furnished. The manual contains informational and procedural material on various aspects of the determination of cost and to assist provider in preparing annual cost reports. The provider's intermediary will issue any necessary supplementary instructions as appropriate for local guidance on items relating to cost determination. For any cost situation that is not covered by the manual's guidelines and policies, generally accepted accounting principles should be applied.

Under generally accepted accounting principles, or under the "Principles of Reimbursement for Provider Costs" there may be more than one method for handling a particular cost item; in such case the method elected by the provider must be consistently followed in subsequent reporting periods. A change of method must be approved by the intermediary (or SSA for providers dealing directly with the Government) on a prospective and not retrospective basis. Where the manual sets a time limit for requesting such change, or limits the number of changes, the provider and intermediary will be guided by the manual instructions.

The manual accommodates new pages or revisions as further interpretations of the regulations and changes in procedures and methods are made.  Accordingly, revised sections, pages, or chapters are issued as necessary.  Brackets in the margin of the page indicate new or changed material.

Questions by a provider on cost policies and procedures in the program should be referred to the provider's intermediary.

II

2409.1    Overpayments Due to Excessive Interim Rates or Failure to File Cost Reports.--The problems arising from excessive interim rates and failure to file cost reports can be divided into two broad categories:  (1) the provider is participating in the program, and (2) the provider is no longer participating.

    A.    Provider Participating in Program.--

        1.    Cost Report Overdue.--For a participating provider, the cost report is due on or before the last day of the third month following the end of the particular cost report period.  (See § 2413.)  In order to ensure the timely receipt of the cost report, the intermediary sends a reminder letter when the provider fails to file a cost report by the last day of the second month following the end of the cost report period.  In this letter, the intermediary informs the provider that the interim payment will be adjusted if the report is not received on or before the last day of the third month after the end of the cost report period.  The letter also explains that the provider may request a 30-day extension of the due date (i.e., the provider would have 4 months after the end of the cost report period to file), based on extenuating circumstances.  Upon receipt of such a request, the intermediary determines whether the circumstances warrant an extension.  If not, the intermediary will reply to the provider, explaining the reason for the decision.  If the intermediary concurs with an extension, the intermediary will send its recommendation with the request for extension to the HCFA Regional Office (RO).  If the RO approves the intermediary's recommendation, the intermediary will grant the extension, making clear to the provider that the extension is not automatic and may not be requested routinely as a grace period.

If the provider has not filed its cost report by the first day after the due date of the cost report (including extensions), the intermediary will send the provider the first demand letter.  This letter will inform the provider that the intermediary will adjust the interim rate of an appropriate response is not received within 30 days from the date of the letter.

If the intermediary does not receive the cost report or a response to the first demand letter within 30 days, the intermediary will adjust the interim rate immediately and send the provider a second demand letter notifying the provider of the reduction.  The letter will also inform the provider that the intermediary will refer the case to the regional office for Health Care Financing Administration collection, if the provider does not take appropriate action.  A copy of this letter will be sent to the HCFA RO.

The intermediary will contact the provider about 7 days after mailing the second demand letter, to ascertain (1) whether the provider is having problems in preparing the cost report, and (2) whether, and when, the provider expects to submit the cost report.  The intermediary will document the provider's response for the record.  If the provider does not submit the cost report or respond to the second demand letter within 30 days from the date of the second demand letter, the intermediary will suspend all payment immediately.

If the provider does not respond or submit a cost report by the 30th day from the date of the second demand letter, the intermediary will send the provider a third demand letter informing the provider that all payments have been suspended and that continued failure to respond may result in termination of the agreement (if the overpayment is $1,000 or more); and that interest will be assessed if it becomes necessary to sue in a court of law. The intermediary will also urge the provider to respond to the third demand letter within 21 days to avoid Health Care Financing Administration or Department of Justice involvement. A copy of this letter is sent to the HCFA regional office.

If no response is received to the third demand letter within 30 days, the intermediary will refer the overpayment to the HCFA RO for necessary action. However, should the provider thereafter submit an acceptable cost report, the intermediary will notify the Regional Office and undertake the necessary audit activities.

       2.    <u>Cost Report is Filed</u>.--When the provider files a cost report indicating that an overpayment has occurred a full refund is to be remitted with the report. If the provider does not remit full refund with the cost report, or, in cases where the intermediary discovers an overpayment during desk review, field audit, or final settlement, the intermediary will immediately send the first demand letter requesting a lump-sum refund. Recovery will be undertaken even though the provider disputes in whole or in part the intermediary's determination of the overpayment.

If the provider cannot refund the total amount of the overpayment within 30 days after receiving the letter, it should immediately request an extended repayment schedule. The intermediary may establish a repayment schedule of up to l2 months to recover all or part of an overpayment. It must offset any money owed to the provider prior to establishing a repayment plan. When a repayment schedule is used to recover part of an overpayment, the remaining amount should be recovered by the reduction of interim payments to the provider or by lump-sum payment by the provider.

The provider must document its need for extended (beyond 30 days) repayment and submit a written proposal scheduling the dates and amounts of repayments. The intermediary will send the provider written notification of the approved repayment schedule, which will be in effect from the date the provider submits the proposal. If an audit later uncovers an additional overpayment, the provider must submit further documentation if it wishes to request an extended repayment schedule for the additional amount.

If a provider demonstrates that repayment within a 12-month period would create extraordinary financial hardship, it may ask the intermediary to approve a longer period of extended repayment.

After an extended repayment schedule has been approved, the intermediary will monitor the case to be certain that the provider is making payments on time.  If for any reason, it appears that the provider's installment payments will not liquidate the overpayment on schedule (e.g., the provider does not adhere to the repayment schedule or a lessening of use by Medicare beneficiaries results in diminished interim payments), the intermediary will attempt to renegotiate the amount of the installment payments in order to recoup the overpayment within the time frame originally agreed upon.

If the provider does not respond affirmatively within 30 days after the date of the first demand letter, the intermediary will send a second demand letter notifying the provider of the adjustment of interim payments.  (If payments have not been completely suspended, the letter will state that interim payments will be suspended in 30 days if repayment arrangements are not made.)  If the Provider does not affirmatively respond, a third demand letter will be sent 30 days after the date of the second letter and will contain further notification of the suspension of all interim payments.

    B.   <u>Provider is Not Participating in Program</u>.--

        l.   <u>Cost Report Overdue</u>.--Where the provider agreement with the Secretary has been terminated, including termination as a result of a change of ownership, and no cost report has been submitted to the intermediary within the 45-day period after the effective date of the termination of the provider agreement or change of ownership, the intermediary will, within 7 days after the expiration of the 45-day filing period, send a letter to the terminated provider.

# Medicare Financial Management Manual
## Chapter 3 - Overpayments

**Table of Contents**
*(Rev. 106, 07-03-06)*

10 – Overpayments Determined by the FI or Carrier
        10.1 – Aggregate Overpayments
        10.2 – Individual Overpayments
20 – Recovery of Cost Report Overpayments- Cost Report Filed
        20.1 – Part A Provider is Participating in Medicare and Medicaid
        20.2 – Provider is No Longer Participating in Medicare and Not Participating in Medicaid
        20.3 – Provider is No Longer Participating in Medicare But is Participating in Medicaid
30 – Recovery of Cost Report Overpayments- Overdue Cost Report
        30.1 - Part A Provider is Participating in Medicare and Medicaid
        30.2 - Provider is No Longer Participating in Medicare and Not Participating in Medicaid
        30.3 - Provider is No Longer Participating in Medicare But is Participating in Medicaid: One or More Cost Reports Not Filed
40 – Recovery of Claims Accounts Receivables from the Provider- FI Only
        40.1 – Demand Letter Contents
        40.2- Sample Demand Letter for Claims Accounts Receivables
50 – Recovery of Overpayments When a Provider Changes its FI- FI Only
        50.1 – Action by Outgoing FI
        50.2 – Action by Incoming FI
        50.3 – Extended Repayment Plan – Change of FI
60 – Interim Rate Adjustments and Periodic Interim Payment Adjustments – FI Only
70 – Determining Liability and Waiver of Recovery for Overpayments
        70.1 – 1879 Determination – Limitation of Liability
        70.2 – 1842(l) Determination
        70.3 – 1870 Determination – Waiver of Recovery of an Overpayment
80 – Individual Overpayments Discovered Subsequent to the Third Year
        80.1 – How to Determine the Third Calendar Year After the Year the Payment was Approved

        80.4 - Recovery of Overpayment Due to Overdue Cost Report
90 – Provider Liability
        90.1 – Examples of Situations in Which Provider is Liable
        90.2 – Provider Protests its Liability
100 – Beneficiary Liability
110 – Recovery Where the Beneficiary is Liable for the Overpayment

**EXHIBIT**

tabbies®

2

110.1 – Recovery Where the Beneficiary is Covered Under Medicaid or Another Health Insurance Plan, Private or Governmental
110.2 – Recovery From the Beneficiary
110.3 - When to Suspend Efforts to Recover from the Beneficiary Following the Initial Demand Letter
110.4 – Content of Demand Letter to Beneficiary
110.5 – Sample Demand Letter to Beneficiary
110.6 – Optional Paragraphs for Inclusion in Demand Letters
110.7 – Recovery Where Beneficiary is Deceased
110.8 – Beneficiary Wishes to Refund in Installments
110.9 – Beneficiary Protests
110.10 – When the FI or Carrier Does Not Take Recovery Action in Beneficiary Cases but Considers Whether Waiver of Recovery is Applicable
110.11 – Recording Overpayment Cases in Which the Provider is Not Liable- FI Only
120 – Referral to the Department of Justice (DOJ)
120.1 – Communication on Cases Sent to RO for DOJ Referral
120.2 – Cases Referred to DOJ for Possible Litigation
130 – Change of Ownership (CHOW)
140 - Bankruptcy
140.1 - Glossary of Acronyms
140.2 - Basic Bankruptcy Terms and Definitions
140.2.1 - Bankruptcy is Litigation
140.2.2 - Types of Bankruptcies
140.2.3 - Filing Bankruptcy Draws a Line in the Sand
140.2.4 - Bankruptcy Affects Nearly All Medicare Operations
140.2.5 - Recoupment and Set-off
140.2.6 - Time is of the Essence
140.2.7 - Definitions
140.3 - Contractor's Establishment of Relationships to Ensure Effective Actions Regarding Providers In Bankruptcy
140.3.1 - Contractor Staff Must Establish Relationships to Ensure That the RO and Regional Counsel Receive Prompt Notice of Provider Bankruptcies, so That Medicare Can Take Quick Action
140.3.2 - Contractors Must Recognize and Advise RO Staff About Potential Provider Bankruptcies
140.3.3 - Contractor Staff Will Establish a Relationship With the RO That has Jurisdiction Over the Bankruptcy
140.3.4 - RO Jurisdiction Generally Parallels the Bankruptcy Court Where Case Is Filed
140.3.5 - Contractor and Regional Office Bankruptcy Point of Contact Staff Member
140.4 - Actions to Take When a Provider Files for Bankruptcy
140.4.1 - Establish Effective Lines of Communications with Partners
140.4.2 - Respond to RO Requests for Information
140.4.3 - Immediate Contractor Directives From the RO

140.4.4 - Tracking Debts/CO Communications
140.5 - Chain Bankruptcies
140.5.1 - Chain Providers
140.5.2 - Single Providers Serviced By a National Contractor
140.6 - Affirmative Recovery Actions
140.6.1 - Working with the RO and Regional Counsel's Office
140.6.2 - Assumption of the Medicare Provider Agreement
140.6.3 - Settlement Agreements or Stipulations
140.6.4 - Recoupment
140.6.5 - Administrative Freeze/Setoff
140.7 - Preparing and Filing Proof of Claim
140.8 - Closure Bankruptcy Cases And Treatment Of Overpayment Reporting
Systems At End Of Bankruptcy
140.8.1 - Closing the Bankruptcy Case
140.8.2 - Debt Located at the Debt Collection Center or Department of the Treasury
140.8.3 - Managing Bankruptcy Debt at the Contractor Location

Bankruptcy Attachments

Attachment A - Referral Checklist in Word format (41.9 KB)
Attachment B - Contractor Bankruptcy Checklist in Word format (30.5 KB)
150 – Accelerated Payments – FI Only
150.1 – Eligibility for Accelerated Payment
150.2 – Computation of the Accelerated Payment
150.3 – The Accelerated Payment and the Provider Overpayment Reporting
(POR) System
150.4 – Recoupment of the Accelerated Payment
Exhibit 1 – Sample Format for Provider Request for Accelerated Payment
160 – Termination of Collection Action
160.1 – Termination of Collection Action – Provider Overpayments
160.2 – Termination of Collection Action – Beneficiary Overpayments
170 – General Overpayment Provisions
170.1 – Offset of Overpayments Against Other Benefits Due- FI Only
170.2 – When the FI or Carrier Does Not Attempt Recovery Action
170.3 – Information and Help Obtainable from the Social Security Office   (SSO)
170.4 – Recovery Where Physician or Other Individual Practitioner is
Deceased- Carrier Only
170.5 – Provider Offers to Settle on Compromise Basis
170.6 – Unsolicited Overpayment Refunds
170.7 – Timely Deposit of Overpayment Refund Checks
170.8 – Informal Referral to RO
180 – Exhibits
180.1-Exhibit 1 – Provider Overpayment Reporting System
180.1.1- Provider Overpayment Reporting System- Data Entry
180.1.2- Provider Overpayment Report Printout
180.1.3- POR System User Manual
180.1.4- List of Status Codes

180.1.5- Posting Interest Entries
180.1.6- Request Provider Debts from the POR History File
180.1.7-Requesting Report from the AD Hoc Reports Management System (ARMS)
180.2- Exhibit 2- Physician/Supplier Overpayment Reporting (PSOR) System
180.2.1- Data Entry
180.2.2- PSOR User Manual
180.2.3 – Advance Payments User Manual
190 – Collection of Fee-for-Service Payments Made During Periods of Medicare Advantage (MA) Enrollment

**NOTE:** Revision 3 includes a cross reference to the source sections in current manuals. The manual is identified by A1, A2, A3, or A4 for Intermediary Manual Parts 1 through 4; or by B1, B2, B3 or B4 for Carriers Manual Parts 1 through 4. This indicator is followed by a dash and the related section number.

## 10 - Overpayments Determined by the FI or Carrier
**(Rev. 29, 01-02-04)**

Overpayments are Medicare payments a provider or beneficiary has received in excess of amounts due and payable under the statute and regulations. Once a determination of an overpayment has been made, the amount is a debt owed by the debtor to the United States Government.

Under the Federal Claims Collection Act of 1966, as amended, each agency of the Federal Government (pursuant to regulations jointly promulgated by the Attorney General and the Comptroller General of the U.S.) must attempt collection of claims of the Federal Government for money arising out of the activities of the agency. The FI or carrier will not be liable for overpayments it makes to debtors in the absence of fraud or gross negligence on its part, however once an intermediary or carrier determines an overpayment has been made it must attempt recovery of overpayments in accordance with CMS regulations.

The Federal Claims Collection Act requires timely and aggressive efforts to recover overpayments, including efforts to locate the debtor where necessary, demands for repayment, and establishment of repayment schedules, suspension of interim payments by intermediaries to institutional providers, and recoupment or setoff, where appropriate.

In addition, The Debt Collection Improvement Act of 1996 requires Federal agencies to refer eligible delinquent debt to a Treasury designated Debt Collection Center (DCC) for cross servicing and offset. CMS is mandated to refer all eligible debt over 180 days delinquent for cross servicing and offset.

This chapter deals with two general types of overpayments.

Aggregate overpayments involve a group or all of a Part A provider's claims, e.g., overpayments discovered at cost-report settlement time or change of FI, overpayments resulting from a pattern of improper application of Medicare coverage provisions, overpayments resulting from a periodic interim payment adjustment, situations involving provider failure to file a cost report, or occasions of fraud or program abuse. Aggregate overpayments are described in §10.1, §20 and §30 of this chapter and Chapter 4, Debt Collection.

Individual overpayments refer to incorrect claims payment for services under Part A or Part B. Individual overpayments are described in §10.2, §80ff and Chapter 4, Debt Collection. Medicare Secondary Payer (MSP) instructions can be found in the Medicare Secondary Payer Manual, CMS Publication 100-5.

## 10.1 - Aggregate Overpayments
**(Rev. 29, 01-02-04)**

**A. Stitutional Providers Serviced By Fis**

Aggregate overpayments to providers (overpayments arising in other than individual cases) may occur by:

- A pattern of furnishing and billing for excessive or noncovered services (see Program Integrity Manual);
- Inclusion of non-allowable or excessive costs in the provider's cost report;
- Excessive interim payments made to the provider;
- Failure to repay accelerated payments;
- Failure to file cost reports (Chapter 3, §30);or
- Determination of amounts due upon filing the cost report, during desk review, final settlement and reopening of the cost report.

## 10.2 - Individual Overpayments
**(Rev. 29, 01-02-04)**

An individual overpayment is an incorrect payment for provider or physician services made under title XVIII.

Examples of individual overpayment cases are:

- Payment for provider, supplier or physician services after benefits have been exhausted, or where the individual was not entitled to benefits.

- Incorrect application of the deductible or coinsurance.

- Payment for noncovered items and services, including medically unnecessary services or custodial care furnished an individual.

- Payment based on a charge that exceeds the reasonable charge.

- Duplicate processing of charges/claims.

- Payment to a physician on a non-assigned claim or to a beneficiary on an assigned claim. (Payment made to wrong payee.)

- Primary payment for items or services for which another entity is the primary payer

- Payment for items or services rendered during a period of non-entitlement.

## 20 - Recovery of Cost Report Overpayments- Cost Report Filed
**(Rev. 29, 01-02-04)**

Providers of services under Part A of the Medicare program are normally required to submit a cost report. A cost report must be submitted for each cost reporting year or upon termination of the Medicare agreement.

## 20.1 - Part A Provider is Participating in Medicare and Medicaid
**(Rev. 29, 01-02-04)**

When the provider files a cost report indicating an overpayment, a final determination is deemed to have occurred if the cost report is not accompanied by payment in full.  Where the provider does not remit the overpayment in full, the FI sends the first demand letter notifying the provider that it will reduce or suspend interim payments in 15 days if the provider does not make repayment arrangements.

If an overpayment is determined as a result of a tentative settlement, final settlement, interim rate adjustment, or reopening the FI sends the first demand letter within 7 calendar days. (See Chapter 4, §20)

When the Notice of Program Reimbursement (NPR), which is sent at the conclusion of an audit, results in an overpayment a first demand letter must also be sent.  The NPR and the first demand letter may be sent simultaneously, the first demand letter may be sent as a separate document or the first demand letter may be incorporated into the NPR. If the issuance of the NPR changes the facts as stated in prior demand letters, the FI shall include in the NPR an explanation of the revised overpayment amount.

See Chapter 4, §40 to determine if the overpayment requires a withhold of payments.

If the provider does not respond within 30 days after the date of the first demand letter, the FI sends a second demand letter notifying the provider of the FI's intent to recoup the overpayment from interim payments. (If the current percentage of withhold is less than 100%, the demand letter shall state that interim payments will be withhold at 100% in 30 days if repayment arrangements are not made.)  If appropriate, the FI shall advise the provider that action to withhold its Federal share of Medicaid payments has been requested. The FI shall attempt to make personal (or telephone contact) with the provider, 15 days after sending the second demand letter to encourage either a lump-sum refund or a request for an extended repayment plan. It shall document each contact. (See Chapter 4, §10-20)

If there is no response or if the overpayment is still outstanding 30 days after the date of the second demand letter the FI shall send a third demand letter.  If eligible, the third demand letter shall include notification of the intent to refer the entire debt to the Department of Treasury for additional collection action. (See Chapter 4, §20)

## 20.2 - Provider is No Longer Participating in Medicare and Not Participating in Medicaid
(Rev. 29, 01-02-04)

If the FI becomes aware that there is an imminent likelihood that a provider will be terminating from the Medicare program it shall contact the RO with regard to future collection efforts.

If the FI discovers an overpayment upon the filing of a cost report, or on determination of program reimbursement, with respect to a provider no longer participating in Medicare, it shall immediately contact the terminated provider to obtain a refund in a lump-sum, if it has not been made.

The first demand letter shall be sent and all subsequent collection activities performed as specified in §20.1 and Chapter 4, §10-20.

If the terminated provider has sold the entity to a participating provider refer to Chapter 3,

§130 for change of ownership instructions.

## 20.3 - Provider is No Longer Participating in Medicare But Is Participating in Medicaid
(Rev. 29, 01-02-04)

If the FI discovers an overpayment upon the filing of a cost report, or on determination of the amount of program reimbursement for a former Medicare provider that is still participating in Medicaid, it shall immediately contact the provider to obtain a refund in a lump sum, if it has not been made.

The first demand letter shall be sent and all subsequent collection activities performed as specified in §20.1 and Chapter 4, §10-20.

The first demand letter must provide notice (See Chapter 4, §10-20 and §60) that action to withhold its Federal share of Medicaid payments will be requested if repayment arrangements are not made within 15 days of the date of this notice. The second demand letter must provide notice that action to withhold its Federal share of Medicaid payments has been requested and will be initiated if repayment arrangements are not made. The FI shall send the third demand letter 30 days following the second where the provider has not responded, even though procedures for withholding the Federal share of payments in title XIX have been initiated, so that if recoupment efforts and withholding of Medicaid funds are not effective, the case will be ready for referral to the Department of Treasury.

If the terminated provider has sold the entity to a participating provider refer to Chapter 3, §130 for change of ownership instructions.

## 30 - Recovery of Cost Report Overpayments - Overdue Cost Report
(Rev. 29, 01-02-04)

When a provider fails to submit a cost report by the due date the FI shall take recovery action to notify the provider that submission of the cost report is required and that additional collection action will continue until an acceptable cost report is submitted.

## 30.1 - Provider is Participating in Medicare and Medicaid
(Rev. 29, 01-02-04)

### A.  General

For a participating provider, the cost report required for each cost report period is due on or before the last day of the fifth month following the end of that particular cost report period. For cost reports ending on a day other than the last day of the month, cost reports are due 150 days after the last day of the cost reporting period.

If no cost report has been received by the seventh day after the due date (including extensions), the FI must send the first demand letter in Chapter 4, §20. (The seven-day timeframe allows for processing and mail time.) In addition the FI must initiate 100% suspension of all Medicare payments on day seven if the cost report has not been received,

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

TRIAD HEALTH MANAGEMENT
OF GEORGIA, LLC,

                Counter-Plaintiff,

        vs.                    NO. 2005-CV-99496

BRIAN CENTER NURSING CARE/
AUSTELL, INC., MARINER
HEALTH CARE, INC., MARINER
HEALTH CARE MANAGEMENT
COMPANY, BOYD GENTRY, C.
CHRISTIAN WINKLE, AND
HARRY GRUNSTEIN,

                Counter-Defendants,

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


            30(b)(6) DEPOSITION OF


    BRIAN CENTER NURSING CARE/AUSTELL, INC.,


            BY BOYD GENTRY


            August 13, 2007

            10:14 a.m.


        3348 Peachtree Road

        Atlanta, Georgia


EXHIBIT
3


Margaret L. Messer, RPR, CCR-B-2024

1            APPEARANCES OF COUNSEL:

2

3    On Behalf of the Counter-Defendants Brian

4    Center Nursing Care/Austell, Inc., Mariner

5    Health Care, Inc., Mariner Health Care

6    Management Company, Boyd Gentry, and C.

7    Christian Winkle:

8    CHRISTOPHER P. GALANEK, ESQUIRE

9    Powell Goldstein, LLP

10        1201 West Peachtree Street, N.W.

11        1400 One Atlantic Center

12        Atlanta, Georgia 30309

13        404.572.6600

14        cgalanek@pogolaw.com

15

16    On Behalf of the Counter-Plaintiff:

17    JACK C. TRANTER, ESQUIRE

18    MARK S. SAUDEK, ESQUIRE

19    Gallagher, Evelius & Jones, LLP

20        218 North Charles Street

21        Suite 400

22        Baltimore, Maryland 21201

23        410.347.1370

24        jtranter@gejlaw.com

25        msaudek@gejlaw.com

30(b)(6) By Boyd Gentry                                    August 13, 2007

1        APPEARANCES OF COUNSEL (continued)

2

3    Also present:

4    Mr. Ron Herbert

5    Mr. Devin Erhlich

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

323

1    yes.

2         Q.    Anyone else on that call?

3         A.    Devin Ehrlich.

4         Q.    And when did that call occur?

5         A.    Last week.

6         Q.    And when do you expect the cost

7    reports?  When do you expect that the cost

8    reports will be filed?

9         A.    I'm not sure when I will file them.

10   The reason I had originally instructed that

11   the cost reports not be filed, this would be

12   prior to any knowledge of any effect on you,

13   was because Brian Center/Austell is, in my

14   opinion, in the zone of insolvency and does

15   not have the money, and that would be --

16        Q.    Does not have the money to pay the

17   Medicare cost -- or to file the Medicare cost

18   reports.

19        A.    To pay -- to pay the payment that

20   typically accompanies the filing of a Medicare

21   cost report.

22        Q.    What is the amount of that payment?

23        A.    Something slightly less than a

24   million dollars, to the best of my knowledge.

25        Q.    Your understanding is that Brian



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

324

1    Center, in order to file the Medicare cost

2    report for the 11-month period ending

3    November 30th, 2006, has to send along with

4    that report a check in the amount of

5    $1 million?

6          A.    That is the practice.

7          Q.    I'm sorry?

8          A.    That's -- you know, it's -- when

9    you file the cost report, you pay any amounts

10   that are due.

11         Q.    And it's your understanding, based

12   on those reports that there has been an

13   overpayment to Brian Center for the 11-month

14   period ending November 30, 2006, by the

15   Medicare program in the neighborhood of

16   $1 million?

17         A.    I believe it's slightly less.

18         Q.    And your testimony is that Brian

19   Center doesn't have those dollars?

20         A.    Certainly when you look at the

21   accounts receivable collection that's occurred

22   since closing, in addition, we know -- we've

23   known and we've made an offer to Mr. Foster

24   for liquidated damages pursuant to his lease.

25   When all those liabilities are considered,


BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

342

1

2  STATE OF GEORGIA:

3  COUNTY OF FULTON:

4     I hereby certify that the foregoing

5  transcript was reported, as stated in the

6  caption, and the questions and answers

7  thereto were reduced to typewriting under my

8  direction; that the foregoing pages represent

9  a true, complete, and correct transcript of

10 the evidence given upon said hearing, and I

11 further certify that I am not of kin or

12 counsel to the parties in the case; am not

13 in the employ of counsel for any of said

14 parties; nor am I in anywise interested in

15 the result of said case.

16

17

18

19

20

21

22

23

24

25

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

343

1

2         Disclosure Pursuant to Article

3    8(B) of the Rules and Regulations of the

4    Board of Court Reporting of the Judicial

5    Council of Georgia, I make the following

6    disclosure:

7         I am a Georgia Certified Court

8    Reporter, here as a representative of

9    Brown & Gallo, L.L.C., to report the

10   foregoing matter. Brown & Gallo, L.L.C.,

11   is not taking this deposition under any

12   contract that is prohibited by O.C.G.A.

13   5-14-37 (a) and (b).

14        Brown & Gallo, L.L.C., will be

15   charging its usual and customary rates

16   for this transcript.

17

18

19

20                    

21   _____

22   MARGARET L. MESSER, RPR,

23

24

25

BROWN & GALLO
LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

**Exhibit A**
**Boyd Gentry Deposition**
**Errata Sheet**
**Triad Health Management Deposition**

| Chg # | Page # | Line # | Change From | Change To | Reason |
|-------|--------|--------|-------------|-----------|--------|
| 1 | 19 | 17 | "associated" | "associate" | Wrong / Typo |
| 2 | 20 | 2 | "counselor" | "counsel" | Wrong / Typo |
| 3 | 44 | 4 | "-" | "recollection" | Missing Word |
| 4 | 50 | 4 | "July" | "January" | Wrong / Typo |
| 5 | 101 | 16 | "foriegn" | "" (delete the word foreign) | Not sure of reference? |
| 6 | 110 | 2 | "fire" | "fair" | Wrong / Typo |
| 7 | 141 | 13 | "High" | "My" | Wrong / Typo |
| 8 | 204 | 13 | "held" | "heard" | Wrong / Typo |
| 9 | 205 | 12 | "I" | "I've" | Wrong / Typo |
| 10 | 233 | 23 | "Arit" | "REIT" | Wrong / Typo |
| 11 | 262 | 24 | "acts" | "accounts" | Wrong / Typo |
| 12 | 312 | 16 | "our" | "over" | Wrong / Typo |
| 13 | 317 | 12 | "Stanger" | "Stenger" | Wrong / Typo |
| 14 | 321 | 13 | "Stanger" | "Stenger" | Wrong / Typo |



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,      \*
et al.,
                                     \*

        Plaintiffs
                                     \*      Case No. 08-cv-00329

v.
                                     \*

MICHAEL O. LEAVITT, et al.,
                                     \*

        Defendants
                                     \*

## SECOND AFFIDAVIT OF JACK C. TRANTER
## SUPPORTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    1.    My name is Jack C. Tranter. I am at least 21 years of age and am competent to testify to the matters set forth in this affidavit. I am an attorney licensed to practice in the State of Maryland. I am a partner in the law firm, Gallagher Evelius & Jones LLP, which serves as counsel for Plaintiffs in the above-captioned case. Among other court memberships, I am a member in good standing of the bar of the United States District Court for the District of Columbia.

    2.    As set forth in my initial affidavit, I corresponded with various representatives of Blue Cross and Blue Shield of Georgia ("BCBS") in February of 2008 to contest, on behalf of Triad, Defendants' recoupment action and to attempt to resolve the dispute between the parties. On or about February 25, 2008, Sandra Ludwig of BCBS and I discussed the possibility of Triad establishing a payment plan to resolve the dispute. Ms. Ludwig advised me, among other things, that any payment plan must include the entire amount claimed as an overpayment and that Triad would not be able to contest liability for the alleged overpayment if it entered a payment plan.

I solemnly affirm under the penalties of perjury that the contents of the foregoing

Affidavit are true and correct based upon my personal knowledge.

3/31/08
Date

Jack C. Tranter, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC, et al., | * |
| | * |
| Plaintiffs | * Case No. 08-cv-00329 |
| v. | * |
| MICHAEL O. LEAVITT, et al., | * |
| Defendants | * |
| | * |

### SECOND AFFIDAVIT OF RONALD M. HERBERT, JR. SUPPORTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.      My name is Ronald M. Herbert, Jr.  I am at least 21 years of age and I am competent to testify to the matters set forth herein.  I am the Chief Operating Officer of Triad Senior Living, LLC ("TSL").

2.      Plaintiffs are five separate, but affiliated, entities that operate nursing homes in Georgia.

3.      As set forth in my initial affidavit, CMS acknowledged the change of ownership of each nursing home in four letters dated April 12, 2007, and a fifth dated April 26, 2007, commonly known as "tie-in notices." CMS related that the Medicare provider agreements had been "automatically assigned" to Plaintiffs, effective December 1, 2006.  After receiving the tie-in notices, Plaintiffs commenced billing Medicare for services provided to Medicare beneficiaries because the bills would not have been processed and paid if submitted before the tie-in notices were issued.

4.      Mariner failed, and refused, to file terminating cost reports for the nursing homes for the period ending November 30, 2006.  Triad filed the terminating cost reports

on behalf of Mariner because Mariner refused to file the cost reports and Defendants threatened to suspend ongoing Medicare payments for the facilities in the absence of terminating cost reports. Mutual of Omaha assisted Triad in preparing the data necessary to file the terminating cost reports, which were filed in September, 2007.

5.    Mariner never informed Triad that it had received and retained PIP payments after the date it vacated the nursing homes.

6.    There was no agreement between the parties concerning the transition of the nursing homes from Mariner to Triad, and the transition of the operation of the nursing homes was not cooperative. For example, Mariner refused to release resident trust accounts to Triad's custody and it refused to pay to its former employees the vacation and leave time they accrued while employed by Mariner at the facilities. These, and other problems presented by Mariner, made the transition of operations difficult.

I solemnly affirm under the penalties of perjury that the contents of the foregoing Affidavit are true and correct based upon my personal knowledge.

3.31.2008
Date

Ronald M. Herbert, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC,     *
et al.,
                                    *
          Plaintiffs
                                    *     Case No. 08-cv-00329
v.
                                    *
MICHAEL O. LEAVITT, et al.,
                                    *
          Defendants
                                    *

## AFFIDAVIT OF ADAM T. ASHPES
## SUPPORTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.      My name is Adam T. Ashpes.  I am at least 21 years of age and I am competent to testify to the matters set forth herein.  I am the President and Chief Executive Officer of Triad Senior Living, LLC ("TSL").

2.      Plaintiffs are five separate, but affiliated, entities that operate nursing homes in Georgia.

3.      As part of my role as President and CEO of TSL, I recently sought, on behalf of TSL, working capital financing from a lender known as Capital Finance, LLC.

4.      The process of closing the working capital line of credit with Capital Finance was progressing when Triad received the "tentative" settlement letters from Blue Cross and Blue Shield of Georgia ("BCBS"), previously attached as Exhibit 10 to Plaintiffs' Memorandum in Support of Motion for Summary Judgment.  These letters advised that Triad must pay in excess of $2 million to Defendants within fourteen days or Medicare reimbursement due to Triad would be withheld.  I then informed Capital Finance of the existence of this potential $2.0 million liability.  Capital Finance advised

Triad that it would not process Triad's application for financing until after Triad favorably resolved this problem.

I solemnly affirm under the penalties of perjury that the contents of the foregoing Affidavit are true and correct based upon my personal knowledge.

03-31-08
Date

Adam T. Ashpes