**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Civil Action No. 1:08cv00329 (CKK) |
| v. | ) ) | |
| MICHAEL O. LEAVITT *et al.*, | ) ) | |
| Defendants. | ) | |

---

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, CROSS-MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 3

I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION UNDER ANY OF THE THREE JURISDICTIONAL PROVISIONS UPON WHICH PLAINTIFFS NOW RELY. .................................................................................................... 3

    A.    Judicial Review is Not Available Under 28 U.S.C. § 1331. ................................... 3

        1.    Plaintiffs Have Failed to Demonstrate Irreparable Financial Hardship. ........... 5

        2.    Delay-Related Hardship Does Not Render Judicial Review Unavailable Under the Medicare Act. ................................................................. 7

    B.    Judicial Review Is Not Currently Available Under Section 42 U.S.C. § 405(g). .................................................................................................... 9

    C.    This Court Lacks Jurisdiction Under the All Writs Act. ...................................... 12

        1.    Plaintiffs Cannot Invoke the All Writs Act to Circumvent the Administrative Exhaustion Requirements of the Medicare Act. .................... 13

        2.    Even if Plaintiffs Could Invoke the All Writs Act, They Must Post a Bond. ................................................................................................... 16

II.   PLAINTIFFS' CLAIMS FAIL ON THE MERITS. ............................................... 16

    A.    The *Medicare Program Integrity Manual* and the *Medicare Financial Management Manual* Do Not Conflict With CMS's Regulations. ........................ 17

    B.    Georgia BCBS Followed Agency Procedures in Seeking Recoupment from Triad. ................................................................................................... 20

    C.    Plaintiffs' Allegations of Fraud by Mariner Do Not Constitute "Fraud" Within the Meaning of the *Medicare Financial Management Manual*. ................ 22

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812 (D.C. Cir. 2005) .................................... 3, 4

*Am. Lithotripsy Soc'y v. Thompson*, 215 F. Supp. 2d 23 (D.D.C. 2002) ........................................ 8

*Avocados Plus Inc. v. Veneman*, 370 F.3d 1243 (D.C. Cir. 2004) ................................................. 9

*Bailey v. Mutual of Omaha Ins. Co.*, 534 F. Supp. 2d 43 (D.D.C. 2008) ....................................... 8

*Bowen v. City of New York*, 476 U.S. 467 (1986) .................................................................... 9, 10

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ........................................................ 17

*BP Care, Inc. v. Thompson*, 337 F. Supp. 2d 1021 (S.D. Ohio 2003) ......................................... 24

*BP Care, Inc. v.* Thompson, 398 F.3d 503 (6th Cir. 2005) .......................................................... 24

*Cardiac Monitoring Servs., Inc. v. Blue Cross & Blue Shield of Ark.*, 807 F. Supp. 1422
    (E.D. Ark. 1992) ...................................................................................................... 11

*Carson v. U.S. Merit Sys. Prot. Bd.*, 534 F. Supp. 2d 96 (D.D.C. 2008) ................................... 12

*Clinton v. Goldsmith*, 526 U.S. 529 (1999) .......................................................................... 12

*Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100 (8th Cir. 2000) ......................................... 23

*Delta Health Group, Inc. v. U.S. Dep't of Health & Human Servs.*, 459 F. Supp. 2d 1207
    (N.D. Fla. 2006) ...................................................................................................... 24

*Drake v. Fed. Aviation Admin.*, 291 F.3d 59 (D.C. Cir. 2002) .................................................. 17

*Great Rivers Home Care, Inc. v. Thompson*, 170 F. Supp. 2d 900 (E.D. Mo. 2001) .................. 11

*Heckler v. Ringer*, 466 U.S. 602 (1984) ....................................................................... 8, 12, 13

*Landmark Med. Ctr. v. Bowen*, 700 F. Supp. 350 (W.D. Tex. 1988) ......................................... 15

*Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293 (11th Cir. 2004) ...................... 10

*Manakee Prof'l Med. Transfer Serv., Inc. v. Shalala*, 71 F.3d 574 (6th Cir. 1995) .................... 11

*Martin v. Shalala*, 63 F.3d 497 (7th Cir. 1995) ..................................................................... 11

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................................................. 9

*Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 33 (D.D.C. 2000) ................ 8

*Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127 (D.C. Cir. 1992) .................................. 16

*Nattah v. Bush*, -- F. Supp. 2d --, 2008 WL 839205 (D.D.C. Mar. 31, 2008) ............................ 23

*Power Mobility Corp. v. Leavitt*, 404 F. Supp. 2d 190 (D.D.C. 2005) ........................................ 10

*Ross v. United States*, 460 F. Supp. 2d 139 (D.D.C. 2006) ........................................................ 13

*Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000) ....................... 7, 9, 10, 13

*Three Lower Counties Cmty. Health Servs. Inc. v. U.S. Dep't of Health & Human Servs.*,
    517 F. Supp. 2d 431 (D.D.C. 2007) ............................................................................ 10

*United States v. Vernon Home Health, Inc.*, 21 F.3d 693 (5th Cir. 1994) .................................... 20

*V.N.A. of Greater Tift County, Inc. v. Heckler*, 711 F.2d 1020 (11th Cir. 1983) ............ 13, 14, 15

*Walters v. Leavitt*, 376 F. Supp. 2d 746 (E.D. Mich. 2005) ........................................ 10

*Weinberger v. Salfi*, 422 U.S. 749 (1975) ................................................................. 12

## Statutes

28 U.S.C. § 1331 ................................................................................................. passim

28 U.S.C. § 1651 ................................................................................................. 12

42 U.S.C. § 405 .................................................................................................. passim

42 U.S.C. § 1395g ................................................................................................ 19

42 U.S.C. § 1395ff ................................................................................................ 1

42 U.S.C. § 1395ii ................................................................................................ 3

42 U.S.C. § 1395oo ......................................................................................... 1, 3, 4, 13

## Rules

Federal Rule of Civil Procedure 65(c) .................................................................. 16

## Regulations

42 C.F.R. § 1001.1901 ........................................................................................ 19

42 C.F.R. § 455.2 ................................................................................................ 23

42 C.F.R. § 489.18 ........................................................................................ 17, 19, 21

## Other Authorities

*Medicare Financial Management Manual* .......................................................... passim

*Medicare Program Integrity Manual* ............................................................... 17, 18

*Medicare Provider Reimbursement Manual* ................................................... 6, 21, 22

## INTRODUCTION

In response to Defendants' argument that this Court lacks jurisdiction under 28 U.S.C. § 1331, Plaintiffs last week amended their Complaint at the same time that they responded to Defendants' Motion to Dismiss and Cross-Motion for Summary Judgment. In their First Amended Complaint, Plaintiffs cite two new jurisdictional provisions: the Medicare Act, 42 U.S.C. §§ 405(g), 1395ff(b)(1)(A), and the All Writs Act, 28 U.S.C. § 1651. Neither of these provisions helps Plaintiffs. The most fundamental problem that pervades each of the three jurisdictional bases Plaintiffs now claim is that Plaintiffs failed to exhaust the administrative remedies they admit are available under the Medicare Act or to demonstrate the irreparable injury they claim overcomes their admitted failure to exhaust.

In particular, the Medicare Act provides Plaintiffs a clear mechanism for administrative and judicial review of their claim that they are not liable for the overpayments at issue in this case. Plaintiffs submitted their annual cost reports; their fiscal intermediary – Blue Cross Blue Shield of Georgia ("Georgia BCBS") – issued tentative settlements of those cost reports; and Georgia BCBS will issue final settlements of those cost reports by September. Plaintiffs may then challenge those final settlements – including any overpayments reflected therein – with the PRRB and, ultimately, with this Court. 42 U.S.C. § 1395oo.

Plaintiffs, however, have chosen not to exhaust these administrative remedies but to file this lawsuit instead. They claim that they will go out of business if Medicare payments are withheld pending their exhaustion of administrative remedies and that this "fact" justifies disregard of the Medicare Act's exhaustion requirements. Suspension of Medicare payments, however, is not Plaintiffs' only administrative option. Instead, Plaintiffs may apply for an extended repayment plan ("ERP"), an option specifically available to providers confronted with

overpayment determinations they cannot immediately afford to repay.  Plaintiffs, however, have

failed to apply for an ERP that could have accommodated their allegedly difficult financial

situation until they have exhausted their administrative remedies.  Having failed to pursue this

available administrative option to mitigate their claimed harm, Plaintiffs cannot demonstrate that

their financial circumstances are so dire as to justify disregard of the Medicare Act's exhaustion

requirements.

  Even if this Court does reach the merits of Plaintiffs' claims, Plaintiffs have failed to

explain how the agency action at issue here was arbitrary or capricious.  Plaintiffs implicitly

concede that the agency followed longstanding procedures of which Plaintiffs, who sought to

become Medicare providers, should have been aware, and which expressly provide that (1) CMS

will continue to pay the provider facility for services rendered after the transfer date, (2) those

payments will be directed to the *old* owner until CMS approves the new owner, and (3) the new

owner *must* work out with the old owner how it will be paid for services it renders until that time.

Instead, Plaintiffs argue that the CMS procedures they ignored are inconsistent with other CMS

procedures and/or inconsistent with CMS regulations.  CMS's interpretation of its own

regulations, of course, is owed substantial deference.  As explained herein, CMS's Change of

Ownership ("CHOW") payment procedures are an eminently reasonable interpretation and

application of its own regulations.  CMS's recoupment from Plaintiffs of the overpayments made

pursuant to their provider agreements is therefore proper.

**ARGUMENT**

I.    **THIS COURT LACKS SUBJECT MATTER JURISDICTION UNDER ANY OF THE THREE JURISDICTIONAL PROVISIONS UPON WHICH PLAINTIFFS NOW RELY.**

    A.    <u>Judicial Review is Not Available Under 28 U.S.C. § 1331.</u>

As discussed in Defendants' opening brief, "[n]o action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 . . . of Title 28 to recover on any claim arising under [the Medicare Act]." 42 U.S.C. § 405(h) (made applicable to the Medicare Act by 42 U.S.C. § 1395ii); *see also* Defs.' Opp'n to Pls.' Mot. for Summ. J. and Memo. in Supp. of Defs.' Mot. to Dismiss or, in the Alternative, Cross-Mot. for Summ. J. ("Defs.' Br.") at 10-12. Instead, judicial review of claims arising under the Medicare Act is available only to the extent provided in the Medicare Act. 42 U.S.C. § 405(h). Plaintiffs seek to take advantage of a narrow exception to this broad prohibition. *See* Pls.' Memo. in Opp'n to Defs.' Cross-Mot. for Summ. J. and Reply to Defs.' Opp'n to Pls.' Mot. for Summ. J. ("Pls.' Opp'n") at 2-15. This narrow exception, however, is plainly inapplicable to this case.

In particular, "if the claimant can obtain judicial review *only* in a federal question suit, § [405(h)] will not bar the suit." *Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005) (emphasis added). As explained in Defendants' opening brief, however, Plaintiffs have a clear route to judicial review through the Medicare Act. *See* Defs.' Br. at 13-14. Specifically, Plaintiffs may obtain judicial review of Georgia BCBS's overpayment determination – to the extent that determination becomes final – through the mechanism set forth in 42 U.S.C. § 1395oo of the Medicare Act:

> (a) Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a Provider Reimbursement Review Board . . . .
> . . .

(f) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received.

42 U.S.C. §§ 1395oo(a), (f).

Plaintiffs have filed their annual cost reports, as specified in subparagraph (a) of § 1395oo. Georgia BCBS issued tentative settlements with respect to those cost reports on February 11, 2008, and is currently finalizing its processing of those cost reports. Plaintiffs will receive Georgia BCBS's final determinations with respect to their cost reports around September 30, 2008. Those final determinations will include any overpayments or underpayments Georgia BCBS has determined to exist. If Plaintiffs disagree with Georgia BCBS's final determination, they may challenge that determination with the Provider Reimbursement Review Board ("PRRB"), and then may challenge the PRRB's decision (or the Secretary's modification/affirmance/reversal of that decision) in this Court. *See id.*; *see also* Defs.' Br. at 12-14 (explaining administrative and judicial review opportunities available to Plaintiffs).

Accordingly, § 1331 is hardly the "only" means of judicial review available to Plaintiffs. In *American Chiropractic Association, Inc. v. Leavitt* – the case upon which Plaintiffs principally rely – the D.C. Circuit held that, because the Medicare statute provided a mechanism for review, § 1331 was not the only means of obtaining judicial review. 431 F.3d at 816-18. This case is no different in this regard. Because the Medicare Act provides a mechanism for administrative and judicial review, Plaintiffs cannot invoke the narrow exception to the rule that § 1331 is not a jurisdictional basis for claims arising under the Medicare Act.

4

Plaintiffs do not dispute that they have a mechanism for judicial review under the Medicare Act. Indeed, they appear to concede the existence of this mechanism. *See, e.g.*, Pls.' Opp'n at 10 (recognizing "the existence of an administrative remedy and the potential for judicial review"). Instead, Plaintiffs argue that they cannot afford the delay associated with that mechanism. Not only is such delay-related hardship not the sort of impediment to judicial review capable of invoking the narrow exception to § 405(h), but Plaintiffs have failed to demonstrate – as a factual matter – that they cannot afford to exhaust their remedies.

1.    <u>Plaintiffs Have Failed to Demonstrate Irreparable Financial Hardship.</u>

CMS recognizes that overpayment recoupment actions may on occasion present a financial hardship to Medicare providers. For this reason, the agency gives a provider assessed with an overpayment three options: (a) pay the full amount of the overpayment immediately; (b) have Medicare payments withheld until the debt is repaid; or, importantly, (c) apply for an extended repayment plan ("ERP"). *See* Memo. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Memo."), Ex. 10 at 2; *see also Medicare Financial Management Manual* ("FMM"), Ch. 4, § 50, attached as Ex. H (outlining ERP application procedures). The purpose of the ERP option is to accommodate the financial situation of a provider that has received an overpayment but is financially incapable of either paying the full amount of the overpayment immediately or continuing to operate without Medicare payments. The application for an ERP requires a thorough analysis of the provider's financial situation so that the ERP can accommodate that situation. *See e.g.*, Ex. H (FMM), Ch. 4, § 50.3 ("[The FI] analyzes the financial data submitted to determine the availability of cash, marketable securities, accounts receivable, restricted and unrestricted endowment funds, or special funds. It considers whether these funds could be used for partial or full payment of the overpayment.").

As such, if Plaintiffs' financial situation is truly as dire as they profess, then Plaintiffs should apply for an ERP, which could be structured to accommodate their financial circumstances. Plaintiffs suggest to this Court that they did offer an ERP to Georgia BCBS. *See* Pls.' Opp'n at 11. Plaintiffs mischaracterize the facts. Although Plaintiffs expressed a willingness to repay a very small fraction of the $2 million that Plaintiffs admit their provider numbers owe the agency ($187,254), they were not willing to enter into an ERP for the overpayment amount. *See* Defs.' Br., Ex. F at 1. Instead, Plaintiffs proposed that the overpayment amount (minus $187,254) not be collected at all until after they exhausted their administrative remedies. *See* Pls.' Opp'n at 11. That is not an ERP. Georgia BCBS responded, appropriately, that an ERP must cover the full amount of the overpayment. *See* Defs.' Br., Ex. F at 1. Plaintiffs, apparently not liking that answer, immediately filed this lawsuit. That Plaintiffs did not *like* the terms of the ERP for which they may apply, and would have preferred some alternative payment arrangement, does not mean that they could not *afford* the ERP Georgia BCBS may be able to provide them.[1]

Plaintiffs also claim the government is "naïve" to suggest that Plaintiffs could have sought a loan. Pls.' Opp'n at 11. The agency does not expect that Plaintiffs obtain a loan. The

---

[1]     Plaintiffs also suggest that CMS requires a legal admission of responsibility as a condition of an ERP and that Plaintiffs would forego all appeal rights by agreeing to an ERP. *See* Pls.' Opp'n at 11 ("Triad would have to agree that it is responsible to pay $2.0 million to CMS . . . ."). Plaintiffs are incorrect. Notwithstanding their entry into an ERP in response to Georgia BCBS's tentative settlements, Plaintiffs remain free to challenge any overpayments, including those at issue here, by challenging the NPRs that Georgia BCBS will issue in September. In other words, administrative and judicial review mechanisms are not waived by paying an overpayment. *See Medicare Provider Reimbursement Manual* ("PRM"), § 2905, attached as Ex. I (noting that appeals occur concurrently with recovery of overpayments and that "[i]f necessary, appropriate adjustments will be made upon completion of the review process"); Decl. of Sandra Ludwig ¶ 3; Decl. of Renee Brown ¶ 3. To enter into an ERP, the provider need only acknowledge that an overpayment determination has been made, not its ultimate responsibility for that overpayment.

agency simply expects that if Plaintiffs require a repayment plan of 12 months or more, they present evidence that they cannot afford to pay the agency – i.e., that they *attempted* to obtain a loan and were refused.  *See* Ex. H (FMM), Ch. 4, § 50.1 ("A request for an extended repayment of 12 months or more must also be accompanied with at least one letter from a financial institution denying the debtor's loan request for the amount of the overpayment.").

In short, CMS procedures expressly provide for situations in which the provider cannot afford immediate repayment of an overpayment in full or the total suspension of Medicare payments.  Having failed to apply for an ERP, Plaintiffs have thus far deprived CMS of the opportunity to evaluate the same set of financial circumstances Plaintiffs ask this Court to evaluate in granting Plaintiffs relief from the statutory exhaustion requirements.  Because they have failed to give CMS the opportunity to mitigate the financial burden of the overpayment determination, Plaintiffs have failed to demonstrate that there is no conceivable set of circumstances that could permit them to exhaust their remedies as required by the Medicare Act.  Plaintiffs have therefore failed to establish jurisdiction under § 1331.

2.    <u>Delay-Related Hardship Does Not Render Judicial Review Unavailable Under the Medicare Act.</u>

The hardship Plaintiffs allege is not the type of hardship that renders judicial review under the Medicare Act unavailable.  In *Shalala v. Illinois Council on Long Term Care, Inc.*, the Supreme Court recognized that "delay-related hardship" is one consequence of the statutory scheme Congress created:

> But this assurance [*i.e.*, agency review] comes at a price, namely, occasional individual, delay-related hardship.  In the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts, paying this price may seem justified.  In any event, such was the judgment of Congress . . . .

529 U.S. 1, 13 (1999); *see also Heckler v. Ringer*, 466 U.S. 602, 627 (1984) ("Congress must have felt that cases of individual hardship resulting from delays in the administrative process had to be balanced against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year."); *Bailey v. Mutual of Omaha Ins. Co.*, 534 F. Supp. 2d 43, 52 (D.D.C. 2008) ("Any inconvenience and delay associated with Ms. Bailey's first seeking administrative review of her denied claim does not equate to 'unavailability of review.'").

The only cases Plaintiffs cite in support of their argument that financial hardship equates to unavailability of review under the Medicare Act are preenforcement challenges involving severe penalties for noncompliance with the subject regulation. *See Am. Lithotripsy Soc'y v. Thompson*, 215 F. Supp. 2d 23, 29-30 (D.D.C. 2002); *Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 33, 38-39 (D.D.C. 2000). In each of these cases, the plaintiffs were forced to choose between incurring severe penalties so that they could challenge the regulation – *i.e.*, criminal sanctions and exclusion from the Medicare program, *Am. Lithotripsy Soc'y*, 215 F. Supp. 2d at 29, and termination from the Medicare program, *Nat'l Ass'n of Psychiatric Health Sys.*, 120 F. Supp. 2d at 38 – or complying with the regulation and foregoing their challenge. The courts determined that these penalties served as a severe disincentive to violate the regulations and, as a practical matter, prevented the exhaustion that would otherwise trigger judicial review. Although Defendants disagree with these decisions, they are inapplicable here. Plaintiffs need not violate the statute or regulations and incur severe penalties to be able to exhaust their remedies. They just need to exhaust the remedies that are indisputably already available to them under the Medicare Act.

B.    Judicial Review Is Not Currently Available Under Section 42 U.S.C. § 405(g).

Because their claims are not viable under 28 U.S.C. § 1331, Plaintiffs cite *Mathews v. Eldridge*, 424 U.S. 319 (1976), for the proposition that this Court may instead exercise jurisdiction under the Medicare Act, 42 U.S.C. § 405(g).  Section 405(g), however, requires a "final decision" of the Secretary as a prerequisite to judicial review.  Because no "final decision" has occurred here (which Plaintiffs concede), and because Plaintiffs do not present any exceptional circumstances warranting judicial waiver of the requirement for a "final decision," § 405(g) is not a basis for this Court's jurisdiction.

As a general rule, "[i]f the statute mandates exhaustion, a court cannot excuse it." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247-48 (D.C. Cir. 2004) (citing *Illinois Council* and the Medicare Act as example of statute that "mandates exhaustion").  The Supreme Court, however, has previously sanctioned waiver of § 405(g) exhaustion requirements in very limited circumstances:  (1) the issue raised was entirely collateral to a claim for payment; (2) plaintiffs showed that they would be irreparably injured were the exhaustion requirement enforced against them; and (3) exhaustion would be futile.  *Bowen v. City of New York*, 476 U.S. 467, 483-85 (1986).

Cautious invocation of a court's extremely limited authority to waive statutory exhaustion requirements is particularly warranted in the Medicare context since the Supreme Court's decision in *Illinois Council* (2000), in which the Court explained that § 405(h) may prevent application of judicially-crafted exhaustion exceptions:

> Insofar as § 405(h) prevents application of the . . . "exhaustion" exceptions, *i.e.*, insofar as it demands the "channeling" of virtually all legal attacks through the agency, it assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying . . . "exhaustion" exceptions case by case.

529 U.S. at 13; *see also Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293, 1296 (11th Cir. 2004) ("Nor is Medicare's statutory exhaustion requirement subject to judge-made exceptions on a case by case basis when a particular court might find the requirement too burdensome or futile. . . . Judge-made exceptions do not apply . . . to a statutorily-mandated exhaustion requirement like Medicare's.") (quotations and alterations omitted); *Three Lower Counties Cmty. Health Servs. Inc. v. U.S. Dep't of Health & Human Servs.*, 517 F. Supp. 2d 431, 435 (D.D.C. 2007) (Medicare exhaustion requirements must be followed "even if [the process] is time-consuming, and even if the agency cannot grant the relief sought") (citations omitted); *Walters v. Leavitt*, 376 F. Supp. 2d 746, 757 (E.D. Mich. 2005) ("While in some contexts, administrative exhaustion requirements may be tempered by judge-made exceptions, such exceptions do not apply to statutorily-mandated exhaustion requirements [like Medicare]. Therefore, the court need not consider Plaintiffs' argument that it has satisfied the traditional three factors warranting an exception to an exhaustion requirement . . . .") (citations omitted). *Cf. Power Mobility Corp. v. Leavitt*, 404 F. Supp. 2d 190, 202-03 & n.10 (D.D.C. 2005) (no jurisdiction because § 405(h) requires exhaustion; noting that "the *Secretary* has the option of waiving the exhaustion of administrative remedies in order to expedite judicial review, if necessary") (emphasis added).

Regardless, Plaintiffs do not satisfy the three *City of New York* criteria for waiver of statutory exhaustion requirements. First, far from being "collateral" to any claim of entitlement to Medicare payment for services rendered, the issue Plaintiffs raise *is* their claim of entitlement to Medicare payment for services rendered. The agency has determined that Plaintiffs were paid too much for services rendered by their provider facilities. Because the issue Plaintiffs have raised in this case is their entitlement to payment for services rendered, Plaintiffs fail the first

prong of the exhaustion test. *See, e.g.*, *Manakee Prof'l Med. Transfer Serv., Inc. v. Shalala*, 71 F.3d 574, 580 (6th Cir. 1995) ("Plaintiffs' claim that the Secretary incorrectly applied its regulations in denying them reimbursement for non-emergency health transportation is not a claim that is 'collateral' to a claim for benefits."); *Martin v. Shalala*, 63 F.3d 497, 504 (7th Cir. 1995) (claim not "collateral":  "[W]hen a complaint asserts that the plaintiffs have not received the full Part B Medicare benefits and seeks damages for lost benefits, we cannot consider it as anything other than a claim for higher benefits.").

Second, for the reasons discussed in the preceding section, Plaintiffs have not demonstrated irreparable injury pending exhaustion of their administrative remedies.  Plaintiffs have failed to show – or even allege – that they were denied an extended repayment plan.  Nor could Plaintiffs make such a showing, as they failed even to apply for an ERP but instead filed this lawsuit.  *See* discussion *supra* § I.A.1.  Furthermore, even if Plaintiffs' allegations of "financial doom" were substantiated, they would not warrant judicial waiver of the exhaustion requirement here, given the "risk known to the health care provider when it enters the Medicare program."  *Manakee*, 7 F.3d at 581; *see also Great Rivers Home Care, Inc. v. Thompson*, 170 F. Supp. 2d 900, 905 (E.D. Mo. 2001) (declining to waive Medicare exhaustion requirements even though provider claimed that, by the time its FI issued its NPRs, "plaintiff will be out of business"); *Cardiac Monitoring Servs., Inc. v. Blue Cross & Blue Shield of Ark.*, 807 F. Supp. 1422, 1427 (E.D. Ark. 1992) (declining to waive Medicare exhaustion requirements even though "compelling [the provider] to exhaust its remedy could very well drive it out of business") (quotations and alterations omitted).

Finally, channeling Medicare claims through the Act's administrative processes, via a decision of the Secretary, is not futile.  The Act's scheme promotes administrative efficiency by

protecting HHS and CMS from the "potential for overly casual or premature judicial intervention" in their administrative processes. *See Ringer*, 466 U.S. at 627. It also promotes judicial economy by allowing the agency an opportunity to "correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975). Indeed, channeling claims through the administrative process may even avert the need for judicial review altogether. *See id.* at 762. The need for and utility of exhaustion is particularly evident, for example, in the context of Plaintiffs' claims that Mariner engaged in "fraud" within the meaning of the *Medicare Financial Management Manual*, claims that have never even been presented to the agency for consideration. *See* Pls.' Opp'n at 26-29.

For all of these reasons, the Court lacks jurisdiction under 28 U.S.C. § 405(g) to hear Plaintiffs' claims.

C.      This Court Lacks Jurisdiction Under the All Writs Act.

Plaintiffs finally argue that the All Writs Act, 28 U.S.C. § 1651(a), while not a general grant of jurisdiction, would allow this Court to enjoin the agency's recoupment action until Plaintiffs exhaust their administrative remedies. *See* Pls.' Opp'n at 18-22.

The All Writs Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651(a), but the Act "confines the authority to the issuance of process 'in aid of' the issuing court's jurisdiction" and "does not enlarge that jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 534-35 (1999). The All Writs Act therefore is not an independent basis for subject matter jurisdiction but merely "allows the Court to order a remedy only where subject matter jurisdiction already exists." *Carson v. U.S. Merit Sys. Prot. Bd.*, 534 F. Supp. 2d 96, 98 (D.D.C. 2008); *see also Ross v. United States*, 460

F. Supp. 2d 139, 151 (D.D.C. 2006).  To the extent Plaintiffs cannot establish subject matter

jurisdiction under 28 U.S.C. § 1331 or under 42 U.S.C. §§ 405(g), 1395oo, the All Writs Act

cannot serve as the jurisdictional basis for this lawsuit.

> 1.    Plaintiffs Cannot Invoke the All Writs Act to Circumvent the
>       Administrative Exhaustion Requirements of the Medicare Act.

Plaintiffs do correctly cite *V.N.A. of Greater Tift County, Inc. v. Heckler* – an Eleventh

Circuit decision decided before *Illinois Council* or *Ringer* – as holding that the All Writs Act,

although not an independent grant of subject matter jurisdiction, gives the district court limited

power to enjoin agency action pending a party's exhaustion of administrative remedies.  711

F.2d 1020, 1027-29 (11th Cir. 1983).

The Eleventh Circuit's willingness to invoke the All Writs Act in the Medicare context,

however, does not help these Plaintiffs.  Plaintiffs fail to inform the Court that *Tift County* also

established that, when a plaintiff asks a court to exercise its limited power under the All Writs

Act to enjoin agency action before the agency has issued a final decision, the usual requirements

for a preliminary injunction are subject to *heightened* standards.  Specifically, a plaintiff must

show "(1) a *virtual certainty* of irreparably injury, (2) a similar *certainty* of success on the merits,

for example, outrageous or entirely unauthorized (*ultra vires*, so to speak) agency action, (3)

minimal harm to the agency, in the sense of disruption of its processes, and (4) the public interest

*clearly* favoring the assumption of jurisdiction."  *Id.* at 1033-34 (emphases added).  "All of these

requirements must be satisfied."  *Id.* at 1034.

This case does not come close to meeting these standards.  First, Plaintiffs have failed to

show a "virtual certainty," or even any likelihood, of irreparably injury.  Although Plaintiffs

claim that they will go out of business if forced to exhaust their remedies, the Eleventh Circuit in

*Tift County* considered the same claim of a Medicare provider. *Id.* at 1034. The Eleventh Circuit

quickly dispensed with the plaintiff's argument, explaining:

> The significance of this injury [*i.e.*, alleged business closure] under the Medicare Act is
> lessened . . . by three considerations. First, the Secretary may enter into an agreement to
> make suspension of payments as painless as possible. Such an agreement will stay total
> suspension pending PRRB review. In this case, Blue Cross offered to negotiate such a
> plan, but V.N.A. did not respond, instead filing for a preliminary injunction. (A plan was
> entered into between Alabama Home Health Care and its intermediary.) Second, the
> problem of bankruptcy is endemic to a system which relies on non-profit, cash-poor
> providers which are wholly dependent on Medicare reimbursement. Were irreparable
> injury the only criteria for exercise of jurisdiction, the courts would be inundated by
> claims from other providers whenever they were determined by the intermediary to have
> been overpaid. Third, providers do not lack notice of these review provisions. Having
> chosen to operate within the system on a cash-poor basis, they take a knowing risk that an
> intermediary's determination might delay payment. In sum, there is no reason to think
> that the straits in which this provider finds itself so far depart from the normal situation as
> to justify fundamental deviation from the statutory scheme.

*Id.* at 1034 (citations and footnotes omitted).

Plaintiffs here, as in *Tift County*, have failed to apply for an extended repayment plan that

could prevent complete suspension of their Medicare payments. As discussed above, the

purpose of the ERP is to accommodate a Medicare provider's financial situation in the event of

an overpayment determination. The ERP process involves a thorough review of a provider's

financial data to ensure that the plan developed accommodates the financial needs of the

provider. *See* discussion *supra* § I.A.1; *see also* Ex. H (FMM), Ch. 4, § 50. Having failed to

pursue this option with Georgia BCBS, Plaintiffs have not demonstrated that they are financially

incapable of making monthly payments pursuant to a plan specifically designed to accommodate

their financial situation.

Furthermore, even if Plaintiffs could show that they are unable to afford the ERP they

failed to pursue with the agency, under *Tift County*, "[h]aving chosen to operate within the

system on a cash-poor basis, [Medicare providers] take a knowing risk that an intermediary's

determination might delay payment." *Id.* at 1034. As the Eleventh Circuit said, "[w]ere irreparable injury the only criteria for exercise of jurisdiction, the courts would be inundated by claims from other providers whenever they were determined by the intermediary to have been overpaid." *Id.*; *see also Landmark Med. Ctr. v. Bowen*, 700 F. Supp. 350, 351 (W.D. Tex. 1988) (no jurisdiction under All Writs Act, even though Medicare provider claimed that agency's action would drive it out of business). In short, Plaintiffs' alleged "injury" – even under the standard applied in the case they invoke – does not come close to satisfying their burden.

Second, Plaintiffs cannot show a "virtual certainty" of success on the merits, for the reasons discussed below, *see* discussion *infra* § II, and in Defendants' opening brief, *see* Defs.' Br. at 16-23. The recoupment action is authorized by the Medicare statute, Medicare regulations, Medicare case law, and is consistent with agency practice and procedures. It is hardly the sort of "outrageous" conduct or "*ultra vires*" action that could satisfy the standard enunciated in *Tift County*. *Tift County*, 711 F.2d at 1033.

Finally, Plaintiffs cannot demonstrate that the public interest "clearly" favors issuance of an injunction. Although Plaintiffs claim that beneficiaries will be harmed if forced to transfer to a new facility, Pls.' Opp'n at 20, they have not shown that any such transfer is necessary because they have not shown that they are unable, until they have had an opportunity to exhaust their administrative remedies, to make payments pursuant to an extended repayment plan. Furthermore, even if Plaintiffs cannot afford to continue operating, closure of the five provider facilities – and transfer of their patients – is far from imminent, as the owner of the provider facilities Plaintiffs are currently leasing could seek another lessee that is financially able to operate the facilities and provide care to the beneficiaries.

2.    Even if Plaintiffs Could Invoke the All Writs Act, They Must Post a Bond.

Even if the All Writs Act may be invoked as an independent basis of jurisdiction to stay agency action pending exhaustion of administrative remedies, Plaintiffs must be required to post a bond under Federal Rule of Civil Procedure 65(c). Under Rule 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

To the extent CMS is required to continue making Medicare payments in full to Plaintiffs even though Plaintiffs owe money to CMS, CMS could suffer damages in the amount of the overpayment – $2,203,482. Indeed, if Plaintiffs' financial situation is as dire as they claim, a bond that would protect the Medicare program is particularly necessary here. This Court, if it enjoins CMS at all, must require Plaintiffs to post a bond in an amount sufficient to ensure that, once the administrative process is complete and Plaintiffs obtain judicial review, the Medicare program may recover the funds improperly paid to Plaintiffs during the pendency of the injunction. *See Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992) ("[A] defendant injured by a wrongfully issued preliminary injunction is presumptively entitled to recovery on the injunction bond.").

## II.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS.

As set forth in Defendants' opening brief, (1) Mutual of Omaha's continued payments to Mariner during the CHOW were proper because CMS procedures call for payments to the provider facility to continue after the transfer date, and, more specifically, for those payments to continue to the *old* owner of the provider facility until CMS approves the new owner via the tie-in notice; and (2) Georgia BCBS's recoupment from Plaintiffs is proper because CMS

procedures call for recoupment of overpayments, regardless of when they occurred, from the entity holding the provider agreement at the time the overpayments were discovered. *See* Defs.' Br. at 17-21. In apparent recognition of the fact that they ignored these agency procedures, Plaintiffs respond by arguing that the procedures they ignored are either inconsistent with CMS's regulations and/or with other CMS procedures. *See* Pls.' Opp'n at 22-29. Their arguments are meritless.

A.    The *Medicare Program Integrity Manual* and the *Medicare Financial Management Manual* Do Not Conflict With CMS's Regulations.

Plaintiffs first argue that the provision of the *Medicare Program Integrity Manual* ("PIM") and *Medicare Financial Management Manual* ("FMM") calling for payments to the former owner to continue until the tie-in notice issues should be disregarded because it is inconsistent with the agency's regulations. *See id.* at 22-23. Plaintiffs must overcome a significant hurdle to succeed on this claim: "[A]n agency's interpretation of one of its own regulations commands substantial judicial deference. That interpretation 'becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Drake v. Fed. Aviation Admin.*, 291 F.3d 59, 68 (D.C. Cir. 2002) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). The Manual provision at issue is consistent with, and an eminently reasonable interpretation of, CMS's regulations.

The regulation upon which Plaintiffs rely provides: "When there is a change of ownership as specified in paragraph (a) of this section, the existing provider agreement will automatically be assigned to the new owner." 42 C.F.R. § 489.18(c). The provision of the PIM that Plaintiffs claim is inconsistent with this regulation states:

In a CHOW, the intermediary shall continue to pay the old owner until it receives the tie-in notice from the RO. Hence, any request from the old or new owner to change the EFT account to that of the new owner shall be denied. It is ultimately the responsibility of the

17

old and new owners to work out any payment arrangements between them while the CHOW is being processed by the intermediary and the RO.

Defs.' Br., Ex. B (PIM), Ch. 10, § 11.1.B.; *see also id.* Ch. 10, § 5.5.C.3. ("Medicare payments shall continue to be made to the old owners until the CHOW is approved by the RO, even if the old owner submits a CMS 588 to change the bank account to that of the new owner."). And the provision of the FMM Plaintiffs claim is inconsistent with the regulation provides that, when the new owner accepts assignment of the provider agreement, CMS will recoup overpayments from the new owner. Defs.' Br., Ex. A (FMM), Ch. 3, § 130.

First, the payment procedures outlined in the PIM are a reasonable interpretation and application of this regulation and the regulatory scheme as a whole. While the regulation provides for "automatic[]" assignment of the provider agreement "when there is a change of ownership as specified in paragraph (a)," CMS and/or the FI still must be notified of the alleged change in ownership, must determine whether there in fact has been a change of ownership as specified in paragraph (a), and must approve the new owner. Importantly, nothing in the regulation specifies that a Change of Ownership will be instantaneous upon mere submission of an *application* seeking recognition of the CHOW, much less how CMS will handle *payments* to the provider until it approves the CHOW and the new owner. The PIM therefore outlines payment procedures for the period prior to CMS's approval of the CHOW, specifying that the old owner will continue to be paid until the tie-in notice issues and that the new and old owners must work out payments between themselves during this period.

The only alternative procedures either are precluded by the regulations or would undermine the statutory and regulatory scheme. First, CMS could conceivably have adopted a procedure according to which it begins paying the new owner immediately upon receipt of an 855A application. The regulations, however, do not permit CMS to do so. CMS may make "no

payment" to an entity excluded from the Medicare program. 42 C.F.R. § 1001.1901(b)(1). CMS therefore could not pay Plaintiffs directly until it determined that Plaintiffs were not an entity excluded from the Medicare program.[2] Second, CMS could conceivably have adopted a procedure according to which it stops all payments upon receipt of an 855A. Termination of all payments to the provider, however, would defeat one of the principal purposes of the "automatic" assignment called for in the regulation, 42 C.F.R. § 489.18(c) – *i.e.*, to allow the facility to continue to be paid while the FI and CMS approve the new owner of the provider agreement. Accordingly, CMS's decision to establish a procedure according to which payments to the old owner of the provider agreement will continue until the new owner is approved – and to explicitly state that the new and old owners must work out the payments between themselves until that time – is an entirely reasonable interpretation and application of its regulations.[3]

Second, the recoupment procedures outlined in the FMM are a reasonable interpretation and application of the regulations and statute. Again, the regulation upon which Plaintiffs rely, 42 C.F.R. § 489.18(c), says nothing about recoupment of overpayments. Another regulation, however, specifies that an assigned agreement is subject to the "terms and conditions under which it was originally issued." 42 C.F.R. § 489.18(d). Because one of those conditions is that adjustments are made for overpayments (and underpayments), 42 U.S.C. § 1395g(a), the new owner is responsible for all overpayments (and is the beneficiary of all underpayments) made to the former owner under the provider agreement. The recoupment procedures outlined in the

---

[2]    CMS must also determine as a threshold matter whether a CHOW has actually occurred before it starts paying a new owner. Among other things, an unscrupulous entity could falsify an 855A, receive Medicare payments, and disappear.

[3]    Furthermore, Plaintiffs here did not even submit the *correct* paperwork notifying Georgia BCBS of the changes of ownership for the five facilities until two months *after* the transfer date of December 1, 2006. *See* Defs.' St. of Undisputed Material Facts ¶ 3. Plaintiffs can hardly claim that Mutual of Omaha should have stopped payments to Mariner *two months* before it even submitted the proper paperwork to Georgia BCBS.

FMM are therefore a reasonable interpretation of the statute and regulations.  Indeed, the Fifth

Circuit has already determined that CMS's recovery from the new owner of overpayments made

to the old owner (when the new owner accepts assignment of the provider agreement) is a

reasonable interpretation of the statute and regulations:

> We also note that the Secretary's interpretation of the regulation and statute is eminently
> reasonable.  By encompassing a system of interim payments on an estimated cost basis,
> subject to year-end accounting, the program ensures Medicare providers a steady flow of
> income sufficient to provide service.  The assignee of a provider number is subject to this
> accounting procedure in order to provide continuous services. . . .  [The new owner]
> could have chosen not to accept the automatic assignment of the provider agreement. . . .
> By accepting that assignment, [it] agreed (albeit unknowingly) to accept the terms and
> conditions of the regulatory scheme.

*United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994).

Finally, the combined effect of the two Manual provisions Plaintiffs challenge – which

renders the new owner liable for overpayments made during the CHOW approval period – is also

reasonable.  Together, the CMS provisions established a straight-forward procedure – of which

all parties are on notice – calling for the old and new owners to work out an arrangement

whereby the old owner transfers the payments it receives from CMS for the CHOW approval

period to the new owner, and for the new owner then to repay CMS for any overpayments that

occurred during that period (or to collect any underpayments).  The instant litigation is a direct

result not of any defect in CMS procedures, but of Plaintiffs' admitted failure to follow the

explicit agency directive either to work out an arrangement to be paid by Mariner or to reject

assignment of the provider agreements.

        B.    Georgia BCBS Followed Agency Procedures in Seeking Recoupment from Triad.

Plaintiffs also claim that CMS procedures require collection of overpayments from

Mariner, not Triad.  In particular, they cite the *Medicare Provider Reimbursement Manual*

("PRM") and the FMM for the proposition that, whenever a provider terminates from the

Medicare program, the FI must seek recoupment of overpayments that occurred prior to the transfer date from the *former* owner.  *See* Pls.' Opp'n at 24-26; *see also* Pls.' Opp'n, Ex. 1 (PRM), § 2409.1.B.1; Ex. 2 (FMM), Ch. 3, § 20.2.  According to Plaintiffs, these provisions conflict with the FMM provision upon which CMS is relying, which specifies that CMS will seek recoupment from the *new* owner when the new owner has accepted assignment of the provider agreement.  *See* Defs.' Br., Ex. A (FMM), Ch. 3, § 130.

The Manual provisions upon which Plaintiffs rely, however, are not relevant to the Changes of Ownership that occurred in this case.  First, § 2409.1.B.1 of the PRM says nothing about liability for overpayments.  Moreover, that provision governs situations in which the provider agreement terminates.  The provider agreements here, however, did *not* terminate. Instead, Plaintiffs agreed to accept assignment of Mariner's provider agreements for all five providers.  *See* Defs.' St. of Undisputed Material Facts ¶ 3.  Second, § 20.2 of the FMM by its terms does not apply to CHOWs but instead expressly references § 130 – the provision upon which Defendants rely – for a discussion of recoupment procedures in the event of a CHOW. *See* Pls.' Opp'n, Ex. 2 (FMM), Ch.3, § 20.2 ("If the terminated provider has sold the entity to a participating provider refer to Chapter 3, §130 for change of ownership instructions.").[4]  A CHOW occurred here.  As discussed in Defendants' opening brief, CMS's CHOW procedures call for collection of overpayments from the *new* owner when the new owner has accepted assignment of the old owner's provider agreement.  *Id.* § 130.  Indeed, Plaintiffs explicitly agreed to this procedure in the 855A applications they signed and filed:  "I agree that *any existing or future overpayment* made to the provider by the Medicare program may be recouped

---

[4]     Plaintiffs seem to argue that § 130 of the FMM only applies when the provider has been "sold" to a new owner, whereas here the provider was leased to a new lessee.  *See* Pls.' Opp'n at 25-26.  By its terms, however, § 130 governs *all* CHOWs, one type of which is a change in the provider's lessee.  *See* Defs.' Br., Ex. A (FMM), Ch. 3, § 130; 42 C.F.R. § 489.18(a)(4).

by Medicare through the withholding of future payments."  Pls.' Memo., Ex. 6 at 37 (emphasis added).

The provisions of the PRM and FMM are therefore internally consistent and consistent with Georgia BCBS's recoupment efforts here:  If the new owner accepts assignment of the provider agreement, the provider agreement does not terminate and responsibility for overpayments made pursuant to that provider agreement rests with the *new* owner.  If the new owner rejects assignment, the provider agreement does terminate, and responsibility for all overpayments made to that provider for services rendered before the transfer date remains with the *old* owner.  Georgia BCBS's recoupment efforts against Plaintiffs for overpayments made to their provider numbers are therefore completely consistent with CMS procedures.

C.     Plaintiffs' Allegations of Fraud by Mariner Do Not Constitute "Fraud" Within the Meaning of the *Medicare Financial Management Manual*.

Plaintiffs argue that CMS cannot collect the overpayment from them because the FMM sets forth an exception to recoupment from the new owner when the overpayment was caused by the old owner's fraud.  *See* Pls.' Opp'n at 26-29.

As an initial matter, this particular argument exemplifies the reason for the statutory exhaustion requirements discussed above.  Plaintiffs ask this Court to make a determination whether, under the agency's procedural manuals, Mariner has as a factual matter engaged in "fraud" sufficient to warrant collection from Mariner instead of Triad.  This is the quintessential type of fact-finding and application of agency procedures and regulations that has been delegated to the agency.  The agency is better equipped than this Court to apply its own procedures to the facts of this case, and the agency should be given the opportunity to consider any arguments and facts Plaintiffs present.  Because Plaintiffs have failed even to present this argument to the agency, much less to await a "final decision" of the Secretary, *see* 42 U.S.C. §§ 405(g), (h),

22

this Court should not make this factual determination in the first instance.

Plaintiffs' argument also fails on the merits.  Although fraud is not defined in Medicare regulations or manuals, it is defined in Medicaid regulations as "an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or some other person.  It includes any act that constitutes fraud under applicable Federal or State law."  42 C.F.R. § 455.2.  At common law, fraud consists of five elements:  (1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with intent to deceive, and (5) an action that is taken in reliance upon the representation.  *Nattah v. Bush*, -- F. Supp. 2d --, at *9, 2008 WL 839205 (D.D.C. Mar. 31, 2008).

Plaintiffs' allegations do not support the existence of an "intentional deception or false representation" to the agency.  "Fraud" entails more than simply failure to follow agency procedures, which appears to be the definition of "fraud" Plaintiffs now put forward by claiming that Mariner's failure to submit a terminating cost report and pay the associated cost constitutes "fraud."  *See* Pls.' Opp'n at 28.  Indeed, several courts that have applied the agency's successor liability provisions have applied those provisions in the context of civil monetary penalties imposed by the agency as a result of the predecessor's non-compliance with agency regulations.  *See, e.g.*, *Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1103-04 (8th Cir. 2000); *Delta Health Group, Inc. v. U.S. Dep't of Health & Human Servs.*, 459 F. Supp. 2d 1207, 1226 (N.D. Fla. 2006); *BP Care, Inc. v. Thompson*, 337 F. Supp. 2d 1021, 1028-29 (S.D. Ohio 2003), *aff'd on other grounds*, 398 F.3d 503 (6th Cir. 2005).  If "fraud" were nothing more than the failure to follow agency procedures, then successor liability in these instances would have been precluded.  Mariner's mere failure to submit a terminating cost report and pay the associated cost, without

more, was not "fraud" within the meaning of the FMM, as informed by the Medicaid definition of "fraud."

Plaintiffs alternatively claim that the fraud exception should apply here because Mariner "has retained these funds and refused even to respond to Triad's repeated attempts to cause Mariner to repay the funds to Defendants." Pls.' Opp'n at 28. Notably, however, Plaintiffs have not sought to join Mariner in this action despite their allegations that Mariner perpetrated fraud against them. In any event, Plaintiffs have failed to show that whatever "fraud" Mariner may have perpetrated against Plaintiffs in February 2008 as Plaintiffs have tried to collect their money from Mariner was either "fraud" that caused the 2006/2007 overpayments or "fraud" perpetrated against the government.[5]

\*        \*        \*

Plaintiffs stress throughout their papers that their relations with Mariner during the change in ownership were less than amicable. In such cases, accepting assignment of a provider agreement is a particularly risky proposition for a new owner. Under these circumstances, the advisable course may well be to reject assignment and apply for a new provider agreement. While this course would have been less than ideal from Plaintiffs' perspective (because it would have involved a disruption in Plaintiffs' cash flow), it remains an option for circumstances just

---

[5]       Plaintiffs also argue that the terms of § 130 of the FMM do not permit CMS to recoup from them the overpayments made to their facilities. Pls.' Opp'n at 26 n.13. First, they argue that it allows recovery of only "accrued" overpayments. *Id.* The sentence upon which Plaintiffs rely, however, is merely an *example* of the penalties and sanctions for which the new owner is liable. Defs.' Br., Ex. A (FMM), Ch. 3, § 130 ("[T]he new owner assumes all penalties and sanctions under the Medicare program, *including* the repayment of any accrued overpayments . . . .") (emphasis added). The very next paragraph states more specifically that the new owner is responsible for "any outstanding and future overpayments." *Id.* Second, Plaintiffs argue that § 130 permits recoupment from the new owner only of overpayments that occurred *before* the transfer date. Pls.' Opp'n at 26 n.13. Section 130 says no such thing but, to the contrary, provides that the new owner is responsible for any "outstanding and future overpayments." Defs.' Br., Ex. A (FMM), Ch. 3, § 130.

like those represented by Triad.  Had Plaintiffs followed this course, CMS's only recourse for

overpayments made pursuant to these provider agreements after the transfer date would have

been with Mariner.  Plaintiffs chose not to do so.  The Medicare program should not bear the $2

million loss associated with Plaintiffs' ill-advised choice.

## CONCLUSION

For the foregoing reasons, and for those stated in Defendants' opening brief, Defendants

respectfully request that this Court grant Defendants' Motion to Dismiss or, in the alternative,

their Cross-Motion for Summary Judgment, and deny Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

`

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

SHEILA M. LIEBER
Deputy Director
Federal Programs Branch

s/ Wendy M. Ertmer
WENDY M. ERTMER
DC Bar No. 490228
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7218
Washington, DC  20530
Telephone:  (202) 616-7420
Fax:  (202) 616-8470
Email:  wendy.ertmer@usdoj.gov

*Counsel for Defendants*

Dated:  April 7, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2008, a copy of the foregoing pleading, together with all

attachments, was filed electronically via the Court's ECF system, through which an electronic

notice of filing will be sent to the following counsel of record:

| | |
|---|---|
| Jack C. Tranter | jtranter@gejlaw.com |
| Thomas C. Dame | tdame@gejlaw.com |

s/ Wendy M. Ertmer
WENDY M. ERTMER

26

# EXHIBIT H

# Medicare Financial Management
## Chapter 4 - Debt Collection

**Table of Contents**
*(Rev. 136, 02-14-08)*
*(Rev. 137, 02-29-08)*

## Transmittals Issued for this Chapter

10 – Requirements for Collecting Overpayments - Fiscal Intermediaries
20 – Cost Report Demand Letters
    20.1 - Number of Demand Letters
    20.2 - Content of Demand Letters- FI Serviced Providers
    Exhibit 1 – Contents of a Demand Letter
    Exhibit 2 - Overpayment Demand Letter – Cost Report Filed - First Request Exhibit 3 - Overpayment Demand Letter – Cost Report Filed - Second Request
    Exhibit 4 – Overpayment Demand Letter – Cost Report Filed – Third Request
    Exhibit 5 – Overpayment Demand Letter – Unfiled Cost Report – First Request
    Exhibit 6 – Overpayment Demand Letter – Unfiled Cost Report – Second Request
    Exhibit 7 – Modified Intent Letter for Unfiled Cost Report
30 – Interest Assessment/Payment on Overpayments and Underpayments
    30.1 - Final Determination
    30.2 – Rates of Interest – FIs and Carriers
    30.3 – Interest Accruals
    30.4 – Procedures for Applying Interest During Overpayment Recoupment
    30.5 – Notification to Providers Regarding Interest Assessment
    30.6 – Waiver and Adjustment of Interest Charges
40 – Withholds and Suspensions
    40.1 – Recoupment by Withholding Payments
    40.2 – Suspension of Payment
50 – Establishing Extended Repayment
    50.1 – Documentation Required in an ERP Application – Debtor is a Sole Proprietor – Carrier Only
    50.2 – Documentation Supporting a Request for Extended Repayment – Debtor is an Entity Other than a Sole Proprietor
    50.3 – Approval Process
    Exhibit 1 – Protocol for Reviewing Extended Repayment Plan – Provider/Physician Medicare Overpayments
    Exhibit 2 – Statement of Source and Application of Funds Period Covered
    Exhibit 3 – Cash Flow Statement Period Covered
    Exhibit 4 – Projected Cash Flow Statement Cash From Operations (Schedule A) Period Covered
    50.4 – Sending the ERP Request to the Regional Office
    50.5 – Monitoring an Approved Extended Repayment Plan
    50.6 – Requests From Terminated Providers or Debts that are Pending Referral to Department of Treasury

60 - Withholding the Federal Share of Payments to Recover Medicare or Medicaid
Overpayments - General
    60.1 - Withholding the Federal Share of Medicaid Payments to Recover Medicare
    Overpayments
    60.2 – Withholding Medicare Payments to Recover Medicaid Overpayments
70 – Non-Medicare Secondary Payer (Non-MSP Debt Referral Instructions and Debt Collection
Improvement Act of 1996 (DCIA) Activities
    70.1 – Background
    70.2 – Cross Servicing
    70.3 – Treasury Offset program (TOP)
    70.4 – Definition of Delinquent Debt
    70.5 – Referral Requirements
    *70.6 – Debt Ineligible for Referral*
    *70.7 – Intent to Refer Letter*
    *70.8 – Response to Intent to Refer Letter*
    *70.9 – Debt Collection System*
    *70.10 – Cross Servicing Collection Efforts*
    *70.11 – Actions Subsequent to DCS Input*
    *70.12 - Transmission of Debt*
    *70.13 – Update to DCS after Transmission*
    *70.14 – Collections*
        *70.14.1 – Background*
        *70.14.2 – Intra-governmental Payment and Collection (IPAC) System*
        *70.14.3 – Collections Posted to the Debt Collection System*
        *70.14.4 - Collection Refund Spreadsheet*
        *70.14.5 - Debt Paid in Full*
        *70.14.6 - Extended Repayment Schedule (ERS)*
        *70.14.7 - Excess Collections*
        *70.14.8 - Applying Excess Collections*
            *70.14.8.1 - If the Debtor Has Other Outstanding Debt*
            *70.14.8.2 - If the Debtor Has No Other Outstanding Debt*
    70.15 – Financial Report for Debt Referred
        70.15.1 – Financial Reporting for Non- MSP Debt
        70.15.2 – Financial Reporting for Intermediary Claims Accounts Receivable
        (A/R)
        70.15.3 - Financial Reporting for Collections Received on Debts from Cross
        Servicing
    *70.16 – Intermediary Claims Accounts Receivable (A/R)*
    Exhibit 1 – Intent to Refer Letter (IRL)
    Exhibit 3A - Collection/Refund Spreadsheet
    Exhibit 3B - Collection/Refund Spreadsheet
    <u>Exhibit 4</u> - DCS User Guide
    <u>Exhibit 5</u> – *Treasury Cross-Servicing Dispute Resolution*
80 - Requirements for Collecting Overpayments - Carriers
    80 1 - Overpayment Recovery from the Beneficiary
    80 2- Overpayment Recovery from Physician/Supplier
90 - Physician/Supplier Overpayment Demand Letter - Carrier

90 1 – Part B Overpayment Demand Letters Beneficiaries
90 2 - Part B Overpayment Demand Letters to Physicians/Suppliers
Exhibit 1 – Initial Demand Letter to Physicians/Suppliers
Exhibit 2 – Follow Up Demand Letter to Physicians/Suppliers
Exhibit 3 – Intent to Refer Letter
Exhibit 4 – Optional Overpayment Customizing Paragraphs
Exhibit 5 – Sample Letter – Check Included for Correct Amount
Exhibit 6 – Sample Letter – Check Included for Wrong Amount (Too Much)
90.3 - Notification to the Beneficiary When Recovery is Sought from the Provider or Physician
90.4 - Sample Letter to Beneficiary Where Recovery is Sought from Provider
100 – Affiliated Contractor and PSC Interaction with the Non-MSP Recovery Audit Contractors
100.1 – Non-Medicare-Secondary-Payer (Non-MSP) Recovery Audit Contractors (RACs)
100.2 - AC/PSC Communication with the RACs
100.3 - Overview of the RAC Process
100.4 - AC/Full PSC Requirements Surrounding RAC Non-MSP Identification Process
100.4.1 - Providing Suppressed Cases to the RAC Database
100.4.2 – Adjusting the Claim
100.5 - Disputing/ Disagreeing with a RAC Decision
100.6 - Handling Overpayment and Underpayments Resulting from the RAC Findings
100.6.1 Underpayments
100.6.2 Setting up an Accounts Receivable
100.6.3 Recoupments Received on a RAC initiated overpayment
100.6.4 Extended Repayment Requests Received on a RAC Initiated Overpayment
100.7 - Handling Appeals Resulting from RAC Initiated Denials
100.8 – Referrals to the Department of Treasury
100.9– Tracking Overpayments and Appeals
100.9.1 - Tracking Overpayments
100.9.2 - Tracking Appeals
100.10- Reporting Administrative Costs Directly Associated with the RAC *Program*
100.11 - Potential Fraud
100.12 – AC/full PSC Requirements Involving RAC Information Dissemination
100.13 – Contacting Non-Responders
100.14- Voluntary Refunds
100.15 – Working with RAC Evaluation Contractor

**NOTE:** Revision 4 includes a cross reference to the source sections in current manuals. The manual is identified by A1, A2, A3, or A4 for Intermediary Manual Parts 1 through 4; or by B1, B2, B3 or B4 for Carriers Manual Parts 1 through 4. This indicator is followed by a dash and the related section number.

All funds withheld shall be applied towards the outstanding overpayment. The funds shall be applied to the outstanding interest first and then to the outstanding principal balance.

**F.  Duration of Withhold**

The withhold shall remain in effect until:

- The overpayment is liquidated;

- You enter into an agreement with the provider for liquidation of the overpayment; or

- On the basis of subsequently acquired evidence, or otherwise, you determine that there is no overpayment.

## 40.2 – Suspension of Payment (See Program Integrity Manual)
**(Rev. 29, 01-02-04)**

Medicare authority to withhold payment in whole or in part for claims otherwise determined to be payable is found in federal regulations at 42 CFR 405.370-377, which provides for the suspension of payments.

Suspension may be used when the contractor possesses reliable information that:

- Fraud or willful misrepresentation exists;

- An overpayment exists but the amount of the overpayment is not yet determined;

- The payments to be made may not be correct; or

- The provider fails to furnish records and other requested information. (Some examples include cost reports, credit balance reports, and form CMS-91.)

## 50 - Establishing Extended Repayment
**(Rev. 29, 01-02-04)**

Where the debtor does not comply with the first demand letter requesting that full refund of the overpayment be made, but acknowledges the existence of an overpayment, it may contact the FI or carrier to arrange for a repayment plan.

A debtor is expected to repay any overpayment as quickly as possible.  If it cannot refund the total overpayment within 30 days after receiving the first demand letter, it should request an extended repayment plan immediately.  However, an ERP request may be received and shall be reviewed at any time the overpayment is outstanding.  The provider must explain and document its need for an extended (beyond 30 days) repayment plan.

A repayment plan may be established to recover all or part of an overpayment. Following the withhold guidelines in Chapter 4, §40 the FI or carrier shall offset any money owed to the

provider prior to establishing a repayment plan. Some examples of monies owed to the provider include underpayments money held by suspension or money withheld from the provider based on Chapter 4, §40. When a repayment plan is used to recover part of an overpayment, the FI/carrier recovers the remainder of the overpayment by withholding interim payments (See Chapter 4, §40), setoff of monies due the debtor, or from a lump-sum payment by the provider. Any approved ERP will run from the date of the initial demand letter.

**NOTE:** Once an ERP is established, the offset of an underpayment against the ERP is not automatic. If a Medicare underpayment is determined subsequent to an established ERP, the FI shall notify the provider in writing of the underpayment. The FI will permit the provider 15 calendar days following the date of notification to submit a statement (including any pertinent evidence) as to why the underpayment should not be offset.
If the provider does not respond in the required time, the FI shall offset the underpayment against the ERP. If the provider responds timely, the FI shall not take action to offset until it has completed its review of the documentation. Based on its review, the FI will make a determination as to whether the facts justify offsetting the underpayment. If the FI determines that offset is appropriate, in whole or in part, written notice will be sent to the provider. Such notice shall contain specific findings on the conditions upon which the offset was based, and an explanation for the final decision.

## 50.1 – Documentation Required in an ERP Application--Physician is a Sole Proprietor – Carrier Only
**(Rev. 29, 01-02-04)**

The carrier shall request the physician to complete and return a Form CMS-379, Financial Statement of Debtor and a copy of the physician's income tax filing for the most recent calendar year. A request for an extended repayment of 12 months or more must also be accompanied with at least one letter from a financial institution denying the debtor's loan request for the amount of the overpayment. Also, include a copy of the loan application with the denial letter from the bank.

## 50.2 - Documentation Supporting a Request for Extended Repayment – Provider is an Entity Other Than a Sole Proprietor
**(Rev. 29, 01-02-04)**

The FI/carrier shall request the provider to furnish the following:

- **Amortization Schedule**- this schedule shall contain the proposed repayment schedule, including length of schedule, dates of payment, and payment amount broken down between principal and interest for the life of the schedule

- **Balance sheets** - the most current balance sheet and the one for the last complete Medicare cost reporting period or the most recent fiscal year (preferably prepared and certified by the provider's accountant).

**NOTE:** If the time period between the two balance sheets is less than 6 months (or the provider cannot submit balance sheets prepared by its accountant), it must submit balance sheets for the last two complete Medicare reporting periods (providers that file a cost report) or last two complete fiscal years.

- **Income statements** - related to the balance sheets (preferably prepared by the provider's accountant).

The CMS suggests that both the balance sheets and income statements include the following statements:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS BALANCE SHEET OR INCOME STATEMENT MAY BE PUNISHABLE BY FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW.

> CERTIFICATION BY OFFICER OF ADMINISTRATOR
> OF PROVIDER(S)

> (For physicians/suppliers, "CERTIFICATION BY OFFICER/OWNER OF DEBTOR(S))

I HEREBY CERTIFY that I have examined the balance sheet and income statement prepared by _____and that to the best of my knowledge and belief, it is a true, correct, and complete statement from the books and records of the provider.

> <u>Signed</u>
> Officer or Administrator of
> <u>Provider(s)</u>
> Title

> Date

> (For physicians/suppliers:
> Signed
> Officer or Owner of
> Debtor(s)
> Title)

- **Statement of Sources and Application of Funds** - for the periods covered by the income statements (see Exhibit 2 for recommended format).

- **Cash flow statements** - for the periods covered by the balance sheets (see Exhibit 3 for recommended format). If the date of the request for an extended repayment schedule is more than 3 months after the date of the most recent balance sheet, a cash flow statement should be provided for all months between that date and the date of the request.

In addition, whether or not the date of the request is more than 3 months after that of the most recent balance sheet, a projected cash flow statement should be included for the 6 months following the date of the request.

- **Projected cash flow statement** - covering the remainder of the current fiscal year.  If fewer than 6 months remain, a projected cash flow statement for the following year should be included. (See Exhibit 3 for recommended format.)

- **List of restricted cash funds** - by amount as of the date of request and the purpose for which each fund is to be used.

- **List of investments** - by type (stock, bond, etc.), amount, and current market value as of the date of the report.

- **List of notes and mortgages payable** - by amounts as of the date of the report, and their due dates.

- **Schedule showing amounts** - due to and from related companies or individuals included in the balance sheets.  The schedule should show the names of related organizations or persons and show where the amounts appear on the balance sheet--such as Accounts Receivable, Notes Receivable, etc

- **Schedule showing types** - and amounts of expenses (included in the income statements) paid to related organizations.  The names of the related organizations should be shown.

- **Loan Applications** - Requests for extended repayment of 12 months or more.  Have the debtor include at least one letter from a financial institution denying the debtor's loan request for the amount of the overpayment.  Also, include a copy of the loan application with the denial letter from the bank.

- **FIs Only - The percentage of occupancy** - by type of patient (e.g., Medicare, Medicaid, private pay) and total available bed days for the periods covered by the income statements; and

All financial records must be for the business participating in the program.  They should not be for the owner if the business is a partnership or a corporation.  If the financial aspects of the business are managed by an outside facility, the provider's individual financial records must still be submitted as well as the financial records of the outside facility.

If a debtor is unable to furnish some of the documentation, it should fully explain why it is unable to.  Where the debtor's explanation is reasonable and the documentation is otherwise acceptable, the FI/carrier shall forward the request for extended repayment to the RO with its recommendation.  It shall comply with Chapter 4, §40 regarding recoupment of the overpayments pending receipt of the documentation and a decision on the extended repayment request.

## 50.3- Approval Process

**(Rev. 29, 01-02-04)**

Below is a chart detailing the requirements of a Medicare contractor for an extended repayment plan.  Once the FI/carrier completes these requirements a decision regarding approval must be made.  If the FI/carrier determines that the provider does not meet the requirements for an extended repayment plan the provider shall be notified in writing.  If the FI/carrier determines that the provider does meet the requirements for an extended repayment plan the following criteria shall be followed:

- If the ERP request is for 12 months or less the FI/carrier shall notify the provider immediately in writing of the approval.

- If the ERP request is greater than 12 months the FI/carrier must send the entire ERP package including the documentation prepared by the FI/carrier to the servicing RO for approval.

The FI/carrier has the option of altering the length of time when approving an ERP request. For example, if a provider requests 24 months, but the FI/carrier feels that 12 months is sufficient the FI/carrier can deny the 24 month request and extend an offer of a 12 month repayment plan.  If the FI/carrier recommends approval of an ERP that is over 12 months in length, the recommendation must be forwarded to the RO for approval.

The FI/carrier may request additional financial information from the provider as well as financial information from the owner if the owner is requesting to submit personal capital to help repay the Medicare debt.

The FI/carrier shall attempt to review and approve or deny or recommend approval to CMS within 20 days of receipt of the completed ERP application.

| Requirements to be Completed before approval or denial | ERP request 12 months or less | ERP request greater than 12 months | ERP request asking for an unconventional payment arrangement |
|---|---|---|---|
| **ERP Protocol** (See Exhibit 1) | X | X | X |
| **Analysis of financial statements** | X | X | X |
| **Review of Last 12 months of claim history** | X | X | X |
| **Payments on the claim floor** | X | X | X |
| **Outstanding Advance/Accelerated Payments** (Accelerated Payments are FI only) | X | X | X |
| **FI- Outstanding** | X | X | X |

| settlements | | | |
|---|---|---|---|
| **Outstanding Fraud Investigations** | X | X | X |
| **Send to RO for additional approval** | | X | X |

**Exhibit 1 - Protocol for Reviewing Extended Repayment Plan (ERP) - Provider/Physician Medicare Overpayments**

### Protocol for Reviewing Extended Repayment Plan (ERP)

Provider_____

Provider Number _____

(FIs Only) Cost Report FYE _____

(Carriers Only) Date(s) Overpaid _____

Overpayment Amount $_____

Date of Demand Letter_____   No. of Months Requested for ERP_____

Date ERP Approved/Not Approved (12 mos. or less) _____No. of Mos. Approved

Date Referred to RO for Consideration _____

Name of FI/carrier

Reviewed By_____   Date _____

FI/carrier Analyst

Supervisor Review_____   Date _____

FI/carrier Official

1.   Summarize the major reasons why the overpayment occurred.

2.   FI/carrier reviews the documentation sent by the debtor for completeness.  (Refer to §70.2 for required documentation.)  It analyzes the financial data submitted to determine the availability of cash, marketable securities, accounts receivable, restricted and unrestricted endowment funds, or special funds.  It considers whether these funds could be used for partial or full payment of the overpayment.

3.   FI/carrier performs the following calculations by using the most current financial data submitted by the provider to determine if it qualifies for an ERP.

a.   Current Ratio

The current ratio relates the dollar value of current assets to the dollar value of current liabilities in order to evaluate an organization's ability to pay its current debt.  Derived as:

$$\frac{\text{CURRENT ASSETS}}{\text{CURRENT LIABILITIES}} = \underline{\hspace{6cm}}$$

This ratio defines the number of dollars held in current assets per dollar of current liabilities (e.g., it relates current assets to current liabilities).  Multiple coverage of liabilities is desirable.  Generally, high values for the current ratio imply a good ability to pay short-term obligations and thus a low probability of technical insolvency.

Normally, the FI/carrier considers a current ratio of 2 to 1 adequate to meet current liabilities.  However, a debtor with a current ratio (2 to 1 or greater) may have short-term payment problems if its current assets are not expected to be in liquid form (cash or short-term investments) in time to meet the expected payment dates of the current liabilities.

b.   Quick Ratio

A liquidity ratio which measures the number of dollars of liquid assets (cash plus marketable securities plus accounts receivable) that are available per dollar of current liabilities.  Derived as:

$$\frac{\text{CASH + MARKETABLE SECURITIES + ACCOUNTS RECEIVABLE}}{\text{CURRENT LIABILITIES}} = \underline{\hspace{3cm}}$$

This is a more stringent measure of liquidity than the current ratio.  The FI/carrier uses it to determine the adequacy of cash, accounts receivable, and marketable securities to pay current liabilities.

Normally, the FI/carrier considers a quick ratio of 1.5 to 1 adequate to meet current liabilities.  However, a debtor with a high quick ratio may have short-term payment problems if there are excessive amounts of slow-paying or doubtful accounts receivable which may not be turned into cash soon enough to meet maturing current liabilities.  Conversely, a low quick ratio may not imply a future liquidity crisis if current liabilities include terms that will not require payment from existing current assets.

4.   The FI, for institutional debtors, determines if there are any settlements (interim rate adjustments or cost report) in process which could be used to offset the outstanding overpayment.

5.   Based upon the previous steps, the FI/carrier summarizes whether or not a repayment plan should be approved or denied.  If approval is recommended, it indicates the number of months, how it calculated the monthly payment and the reason(s) for the approval. If denial is recommended, it indicates the reason(s).

## Exhibit 2 - Statement of Source and Application of Funds Period Covered

**STATEMENT OF SOURCE AND APPLICATION OF FUNDS**
**FOR THE PERIOD _____**

Funds Provided by:

| | |
|---|---|
| Operations - Net income for the period | $XXXX |
| Add:   Charges not affecting working capital (depreciation, amortization, etc.) | XXXX |
| | $XXXX |
| Less:   Operating revenues not affecting working capital | XXXX |
| Total fund provided by Operation | $XXXX |
| Long term loans          XXXX | |
| Unrestricted cash donations | XXXX |
| Other (identify) | XXXX |
| Total Funds Provided | $XXXX |

Exhibit 2 (Cont.)

**STATEMENT OF SOURCE AND APPLICATION OF FUNDS**
**FOR THE PERIOD _____**

Funds Applied to:

|  |  |
|---|---|
| Retirement of long-term obligations (mortgages, notes, bonds, etc.) | $XXXX |
| Purchase of equipment | XXXX |
| Purchase of land | XXXX |
| Dividends to stockholders | XXXX |
| Other (identify) | XXXX |
| Total Funds Applied | -XXXX |
| Net Increase (Decrease) in Working Capital | *$XXXX |

---------------------------------------------------------------------------------------------------------

|  |  |
|---|---|
| Working Capital* (end of period) _(date)_ | XXXX |
| Less:   Working Capital* (beginning of period) (date) | -XXXX |
| Net Increase (Decrease) in Working Capital | *$XXXX |

*Current Assets less Current Liabilities

## Exhibit 3, Cash Flow Statement Period Covered

**CASH FLOW STATEMENT**
**FOR THE PERIOD**

Cash provided by:

| | |
|---|---|
| Operations (net) (Schedule A) (See Exhibit 4) | $XXXX |
| Cash donations (unrestricted) | XXXX |
| Long-term borrowing | XXXX |
| Investment earnings (cash dividends, interest) | XXXX |
| Sale of long-term investments | XXXX |
| Sale of equipment | XXXX |
| Issuance of bonds | XXXX |
| Decrease in current assets – other than Accounts Receivable, Prepaid Expenses, and Inventory | XXXX |
| Increase in current liabilities – other than Accounts Receivable, Prepaid Expense, and Inventory | XXXX |
| Others | <u>XXXX</u> |
| Total Cash Provided | $XXXX |

Exhibit 3 (Cont.)

## CASH FLOW STATEMENT
## FOR THE PERIOD

Cash applied to:

| | | |
|---|---|---|
| Purchase of equipment | | $XXXX |
| Payment of long-term debt | | XXXX |
| Payment of bond redemption fund | | XXXX |
| Purchase of long-term investments | XXXX | |
| Payment of dividends | | XXXX |
| Purchase of land and/or building (purchase price less mortgage, capital stock and non-cash assets given toward purchase) | XXXX | |

| | |
|---|---|
| Increases in current assets - other than Accounts Receivable, Prepaid Expenses, and Inventory | XXXX |
| Decreases in current liabilities – other than Accounts Payable and Prepaid Income | XXXX |
| Other | XXXX |
| Total Cash Applied | XXXX |
| Increase (Decrease) in Cash | $XXXX |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| Cash at end of period (date) | $XXXX |
| Less:   Cash at beginning of period (date) | XXXX |
| Increase (Decrease) in Cash | XXXX |

## Exhibit 4, Projected Cash Flow Statement Cash From Operations (Schedule A) Period Covered

**PROJECTED CASH FLOW**
**CASH FROM OPERATIONS (SCHEDULE A)**

| | | | |
|---|---|---|---|
| Net Income (or Net Loss) | | | $XXXX |
| Increases: | Depreciation expense | $XXXX | |
| | Loss from sale of equipment | XXXX | |
| | Decrease in net Accounts Receivable | XXXX | |
| | Decrease in Prepaid Expense | XXXX | |
| | Decrease in Inventory | XXXX | |
| | Increase in Accounts Payable | XXXX | |
| | Increase in Prepaid Income | XXXX | |
| | Others | XXXX | XXXX |
| | Gross Cash from Operations | $XXXX | |
| Decreases: | Gain from sale of equipment | $XXXX | |
| | Increase in net Accounts Receivable | XXXX | |
| | Increase in Prepaid Expense | XXXX | |
| | Increase in Inventory | XXXX | |
| | Decrease in Accounts Payable | XXXX | |
| | Decrease in Prepaid Income | XXXX | |
| | Others | <u>XXXX</u> | <u>XXXX</u> |
| | Net Cash from Operations | | <u>$XXXX</u> |

## 50.4 – Sending the ERP Request to the Regional Office
**(Rev. 29, 01-02-04)**

After the FI/carrier has reviewed the documentation submitted in support of the ERP request, it sends its recommendation to the RO for approval if the ERP request is over 12 months in length. It submits the following:

- All information submitted by the provider. (See § 50.l.);

- The date of the initial contact between the FI/carrier and the provider concerning the overpayment;

- Copies of all correspondence (including demand letters) about the overpayment and the request for the ERP (including telephone conversations, if applicable);

- FI-The amount of the overpayment; cost report year in which it occurred; dates and amounts of any repayments; dates and amounts of payments (interim or retroactive) held in account.

- Carrier-The amount of the overpayment, claim paid date, dates and amounts of any repayment

- FI-The cost reports in which the overpayments appeared or were found. The FI furnishes any information it has on the financial status of related organizations, as determined through audits and other sources such as mercantile reports;

- The provider's proposed repayment plan and rationale;

- The FI/carrier's recommendation and supporting rationale including a completed extended repayment plan protocol (See Exhibit 1) and the last twelve months claim history; and

- The FI/carrier's opinion, based on experience, as to the reliability of the financial data.

## 50.5 - Monitoring An Approved Extended Repayment Plan
**(Rev. 29, 01-02-04)**

After an extended repayment plan has been approved, the FI/carrier shall continue to monitor the case to ascertain whether recoupment is being effectuated as contemplated. If it becomes apparent that the repayment plan will not result in a liquidation of the indebtedness within the time period contemplated, it shall take further action, preferably the renegotiation of the amount of installment payments so that the overpayment will be recouped within the time period originally agreed upon. The FI/carrier reports to the RO any significant changes in the provider's financial condition or any indication that the provider misstated or failed to disclose pertinent facts that may raise a question of its ability to refund the overpayment. The FI/carrier shall notify the RO immediately by telephone and send a detailed written statement of the problem.

## 50.6 - Requests from Terminated Providers or Debts that are Pending Referral to Department of Treasury
**(Rev. 29, 01-02-04)**

When approving/denying an ERP request the FI/carrier is making a subjective decision concerning the provider/supplier's ability to repay. All complete ERP requests shall be

reviewed.  This includes ERP requests from terminated providers and requests received for debts where an Intent to Refer has already been sent.  If the provider is still actively participating in the Medicare Program and claims are being submitted on a regular basis (no more than a 20% drop off during the last twelve month period) the FI/carrier shall attempt to work with the provider to approve an ERP request.  If denying an ERP request will result in the immediate referral of the active provider to the Department of Treasury the RO shall be contacted to determine if an alternative exists.  If at all possible the referral of an active provider, who has requested a legitimate repayment plan, to the Department of Treasury should be avoided.  (The requirements set forth in the Debt Collection Improvement Act of 1996 still apply.)

## 60 - Withholding the Federal Share of Payments to Recover Medicare or Medicaid Overpayments
**(Rev. 29, 01-02-04)**

Institutions and persons furnish health care services under both the Medicare and Medicaid programs, and are reimbursed according to the rules applicable to each program. Overpayments may occur in either program; at times resulting in a situation where an institution or person that provides services owes a repayment to one program while being reimbursed from the other.

## 60.1 - Withholding the Federal Share of Medicaid Payments to Recover Medicare Overpayments
**(Rev. 29, 01-02-04)**

Section 1914 of title XIX and 42 CFR §447.30 provide for CMS to withhold the Federal share of Medicaid payments with respect to Medicaid providers that have, or previously had, a Medicare provider agreement under §1866, and for physicians when:

- They have received an overpayment of title XVIII funds, and efforts to collect it have been unsuccessful; or

- Efforts to secure from the provider, the necessary data and information to determine the amount, if any, of the overpayment have been unsuccessful (i.e., a deemed overpayment because the provider failed to file a cost report); and

- For physicians or suppliers, they have previously accepted Medicare payment on the basis of an assignment under section 1842(b)(3)(B)(ii) of the Act, and during the 12 month period preceding the quarter in which CMS proposes to withhold the Federal share of Medicaid payments for a Medicare overpayment, submitted no claims under Medicare or submitted claims which total less than the amount of the overpayment.

The CMS may order the State to withhold the Federal share of Medicaid payments of a provider to recover Medicare overpayments plus accrued interest.

The FI/carrier shall establish whether or not a provider is subject to these procedures.  The FI/carrier must be sure the provider is participating in title XIX program prior to referring the case to the RO for withholding.  It shall refer only those cases that it is unable to collect through

# EXHIBIT I

General

**2900.    REQUIREMENT FOR A HEARING ON A DISPUTED INTERMEDIARY DETERMINATION.**

Under the agreements entered into between the Secretary of Health and Human Services and the intermediaries pursuant to section 1816 of the Social Security Act, intermediaries are required to establish and maintain procedures for resolving payment disputes. However, these agreements do not specify the requirements these procedures must meet. Medicare regulations at 42 CFR Part 405, Subpart R, and the implementing procedures set out in this chapter are intended to bring uniformity to the process by which all intermediaries settle disagreements with providers and other entities. (See A2 below.)

Under Section 1878 of the Social Security Act, the Provider Reimbursement Review Board hears appeals from providers (but not other entities) involving $10,000 or more per cost report period ($50,000 for any group of providers where the matters in controversy involve a common question of fact or of interpretation of law, regulations or HCFA Rulings). Medicare regulations at 42 CFR Part 405, Subpart R, and the discussion set out in §§ 2920ff. describe the Board and its operation.

Both providers and other entities may request intermediary hearings, but only providers may request Board hearings and obtain judicial review of a final administrative decision.

  A.   Definitions.-- For purposes of the appeal process:

    1.   "Provider" refers to a hospital, a skilled nursing facility, a home health agency, or a comprehensive outpatient rehabilitation facility;  and, for the limited purposes of furnishing outpatient physical therapy or speech pathology services, a clinic, rehabilitation agency, or public health agency.  The term also refers to an end-stage renal dialysis facility, but only with respect to disputes concerning the amount of the facility's allowable Medicare bad debts.  (See 42 CFR §405.439(h)(1).)

    2.   "Other Entities" refers to a health maintenance organization, a group practice prepayment plan, a federally funded clinic, or any other organization which is obliged to file periodic cost reports and is reimbursed on the basis of information furnished in such reports.

  B.   Intermediary Procedure on Payment Disputes.--In order to meet their responsibilities in the settlement and hearing of disputes, intermediaries must:

    1.   Issue to each provider and other entity that files an acceptably completed cost report, a dated written notice containing the intermediary's determination as to the total amount of payment due the provider or other entity under title XVIII for the covered services furnished to Medicare beneficiaries during the cost reporting period;

2.    Afford the provider or other entity a right to a hearing if it is dissatisfied with the determination and the amount in controversy (§2910) is at least $1,000.  Where the amount at issue is $10,000 or more, the intermediary must advise the provider of its right to a hearing before the Provider Reimbursement Review Board (PRRB);

3.    Establish procedures for intermediary hearings and the right to a PRRB hearing, which meet the standards set out in the regulations and the general instructions in this chapter, and supply copies of the procedures to the providers and other entities it serves;

4.    Provide an intermediary hearing which is conducted in such a manner, and at a place which is reasonably convenient to the provider or other entity as to insure that a fair hearing is afforded;

5.    Provide for the issuance of a dated written notice of the hearing officer's decision after the intermediary hearing;

6.    When a request for PRRB hearing has been filed with the Board:

a.    Review the materials submitted by the provider;

b.    Notify the Provider and the Board if it appears that the request for hearing was not timely or where the amount in controversy is not $10,000.

c.    Review its record which formed the basis for its determination of the total amount of payment due the provider;

d.    Attempt to join with the provider in written stipulations setting forth any issues that the review has resolved and the issues (and any facts which are not in dispute and relate directly to the issue) that remain for Board resolution; and

e.    Assure that all available documentary evidence in support of the provider or the intermediary is part of the record.

Unless the agreement between the Secretary and the intermediary provides otherwise, the responsibility for providing the intermediary hearing, for furnishing written notice to providers and other entities of the availability of the hearing, and for designating a hearing officer to conduct the hearing, as required by this and following sections, may not be subcontracted by the intermediary.

<u>Intermediary Determination</u>

## 2905.    ISSUANCE OF INTERMEDIARY DETERMINATION

Upon receipt of a perfected (final) cost report the intermediary, within  a reasonable period of time (§2905.1), sends the provider or other entity a written Notice of Amount of Program Reimbursement (NPR) (§2906)   setting forth the amounts arrived at in its determination, including any underpayment or overpayment made to the provider or other entity.  This NPR is considered the intermediary's final determination for purposes of any future appeal rights.

PROVIDER PAYMENT
02-85          DETERMINATIONS AND APPEALS PROCEDURES                    2905.2

The NPR shall be sent even though the intermediary has reason to believe that the provider intends to request a hearing on the determination. Furthermore, where the determination shows that the provider, or other entity, is indebted to the program, the intermediary must take the necessary action to recover the overpayment, including a suspension of interim payments. Such action of recovery or suspension should continue in accordance with existing instructions even after a request for a hearing has been filed. If necessary, appropriate adjustments will be made upon completion of the review process.

2905.1     Time Frame for Issuance of Intermediary Determination.--The intermediary is to make every attempt to issue a NPR within 12 months of receipt of a cost report. Regulations provide that where the intermediary fails to render a determination within 12 months after receipt of the perfected (final) cost report, the provider (as defined in § 2900) may request a hearing before the PRRB, provided that (a) the cause of such delay does not lie with the provider and (b) the amount stated on the cost report as the amount of intended program payment due is at least $10,000 per cost report period.

2905.2     Nonallowable Cost Report Entries.--The intermediary has the responsibility of providing necessary guidance to providers in preparing their cost reports. If certain cost report items are discovered during an audit or desk review which are not related to patient care and, therefore, are nonallowable, the intermediary will make the necessary adjustments and inform the provider of them. Additionally, the intermediary will document any adjustments made to the cost report involving nonallowable items.

If these same nonallowable items appear on a subsequent cost report, the intermediary will inform the provider why these costs were disallowed. This notification will be made by a letter from the intermediary advising the provider that any further insistence by the provider on including the same nonallowable items in the next cost report could result in referral to the U.S. Attorney for consideration of criminal and/or civil prosecution.

There will be no referral to the U.S. Attorney where:

     A.   The provider clearly indicates this item(s) is being included in the cost report only to establish the basis for an appeal and each disputed item and amount is specifically identified.

     B.   The issue pertains to the cost reporting period for which the cost report is filed.

It is important to note, however, that if there is a suspicion of any intent to defraud the United States Government supported by even the initial insertion of a nonallowable item in the cost report, no warning is required prior to a prompt referral of the case for investigation and prosecution.

2906.    NOTICE OF AMOUNT OF PROGRAM REIMBURSEMENT

As a minimum, the intermediary's NPR to a provider or other entity will contain the legend "Notice of Amount of Program Reimbursement for Cost Report Period _____ for (name of provider or other entity)" and will:

   A.    For providers or other entities, underline excluding hospitals that receive payment under the prospective payment system;

      1.    Set forth the intermediary's determination of the total Medicare reimbursement (including allowable bad debts attributable to deductible and coinsurance amounts) due the provider or other entity on a cost reimbursement basis for the reporting period covered by the cost report;

      2.    Set forth the provider's or other entity's claimed Medicare reimbursement (including allowable bad debts attributable to deductible and coinsurance amounts) for this period;

      3.    Set forth total interim and other payments made to the provider or other entity and the net retroactive amount due the provider or other entity (or the program) for this period; and

      4.    Set forth and explain by use of money amounts and appropriate citation of law, regulations, HCFA Rulings or program instructions why the intermediary's determination of total Medicare reimbursement due differs from the amounts claimed by the provider or other entity on its cost report.

NOTE:    An intermediary may use a copy of the audit adjustment report and the explanations of adjustment columns of the report with the addition of appropriate citations of law, regulations, HCFA Rulings or general instructions as an enclosure of the notice of amount of program reimbursement to meet some of the explanation requirements of section 405.1803 of the regulations. However, the brief explanation of an adjustment and citation on such a report may not always suffice where a claimed cost is found unallowable, or if allowable, not reasonable.  In that case, detailed rationale for the adjustment may be necessary.  Similarly, where the provider or other entity, either as part of the audit process or otherwise, has already furnished the intermediary with a written explanation of the reasons for its objections to the adjustment(s), the notice of amount of program reimbursement should respond to these arguments with an elaboration of the basis of the intermediary's actions reasonably consonant with the extent of argumentation furnished by the provider or other entity.

   B.    For hospitals receiving payment under the prospective payment system for cost reporting periods beginning on or after October 1, 1983;

      1.    Set forth the intermediary's determination of the total Medicare reimbursement (including allowable bad debts attributable to deductible and coinsurance amounts) due the hospital on a cost reimbursement basis for the reporting period covered by the cost report;

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

TRIAD AT JEFFERSONVILLE I, LLC *et al.*,

               Plaintiffs,

      v.

MICHAEL O. LEAVITT *et al.*,

               Defendants.

)
)
)
)
)
)   Civil Action No. 1:08cv00329 (CKK)
)
)
)
)
)

## DECLARATION OF RENEE BROWN

I, Renee Brown, do hereby declare:

1.     I work in the Atlanta Regional Office of the Centers for Medicare & Medicaid Services ("CMS") and serve as the Medicare Part A Payment & Recovery Specialist in the Financial Management Branch of the Division of Financial Management & Fee-for-Service Operations. I have served in this capacity since August of 2000. In this capacity, I am responsible for monitoring all Medicare Part A Non-Medicare Secondary Payer activities in the Regional Office to include the review and approval of extended repayment plans ("ERP"). I also monitor and provide technical assistance to each Medicare Part A fiscal intermediary ("FI") in our region on overpayment recovery. I make this declaration based on personal knowledge and on information made available to me in the course of my official duties.

2.     If a Medicare fiscal intermediary determines based on a tentative settlement of a provider's cost report that the provider has received an overpayment and commences an action to recoup the overpayment, the provider must refund the overpayment amount in full within 15 days from the date of the overpayment notice. However, a provider may submit a request for an ERP and provide to the FI documentation for the financial hardship that necessitates the ERP. If

the FI (or the CMS Regional Office in the case of an ERP longer than 12 months or CMS Central

Office in the case of an ERP longer than 36 months) approves the ERP, the provider makes

payments pursuant to the repayment schedule.

     3.     Regardless of the provider's agreement to an ERP, the provider may challenge the

overpayment determination when the FI issues the provider a Notice of Program Reimbursement

after final settlement of the cost report. If the provider is successful in its challenge, the provider

may recover amounts paid pursuant to the ERP that the agency ultimately determined the

provider did not owe.

     I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 7, 2008

Renee Brown

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| | ) Civil Action No. 1:08cv00329 (CKK) |
| v. | ) ) |
| MICHAEL O. LEAVITT *et al.*, | ) ) |
| Defendants. | ) ) |

## DECLARATION OF SANDRA LUDWIG

I, Sandra Ludwig, do hereby declare:

1.      I am employed by Blue Cross Blue Shield of Georgia ("Georgia BCBS") and serve as a Senior Accountant in the Medicare Provider Audit & Reimbursement department. I have served in this capacity since 2006. In this capacity, I monitor and ensure the accuracy of financial activities relating to the non-Medicare Secondary Payer debt collection and referral processes. I make this declaration based on personal knowledge and on information made available to me in the course of my official duties.

2.      I corresponded with Jack Tranter in February 2008 regarding the overpayments made to the five Triad nursing facilities that were discovered in the course of the tentative settlement of the facilities' cost reports for the period ending 6/30/07. In the course of these exchanges, I expressed to Mr. Tranter a willingness to discuss an extended repayment plan ("ERP") as opposed to immediate payment in full. Mr. Tranter, however, maintained that Triad was responsible only for $187,254, rather than the full overpayment amount of $2,203,482, and would for this reason not discuss an ERP for the total amount owed.

3.      At no time did I tell Mr. Tranter that Triad would not be able to contest liability for the alleged overpayment if it entered into an ERP.  If Triad had entered – or at some point does enter – into an ERP for the full overpayment amount, the appeal rights based on the issuance of the Notice of Program Reimbursement after final settlement of the cost reports would remain.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 7, 2008

Sandra Ludwig