UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRIAD AT JEFFERSONVILLE I, LLC, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>MICHAEL O. LEAVITT, Secretary of the<br>United States Department of Health and Human<br>Services, *et al*.<br><br>    Defendants. | Civil Action No. 08-329 (CKK) |

**MEMORANDUM OPINION**
(April 21, 2008)

Plaintiffs Triad at Jeffersonville I, LLC; Triad at LaGrange I, LLC; Triad at Lumber City

I, LLC; Triad at Powder Springs I, LLC; and Triad at Thomasville I, LLC (collectively "Triad")

bring this suit for declaratory and injunctive relief against Michael O. Leavitt, in his official

capacity as Secretary of the United States Department of Health and Human Services, Kerry N.

Weems, in his official capacity as Administrator of the Centers for Medicare and Medicaid

Services, the United States Department of Health and Human Services, and the Centers for

Medicare and Medicaid Services (collectively "CMS").  The Parties' dispute arises in the context

of a transition between the operators of five nursing care facilities in Georgia.  Triad (the current

operator) and Brian Center Nursing Care/Austell, Inc., a wholly-owned subsidiary of Mariner

Health Care, Inc. ("Mariner") (the former operator), both received Medicare reimbursements for

the same services provided at the nursing care facilities from approximately December 2006 to

April 2007.  CMS determined that Triad was responsible for repaying the overpayment from this

period, and Triad contends that CMS must recoup the funds from Mariner.

Triad filed the present Complaint on February 26, 2008, along with a Motion for a Temporary Restraining Order and/or Preliminary Injunction barring CMS from recouping the funds from Triad. The Parties and the Court thereafter agreed to convert Triad's Motion into a decision on the merits through cross-motions, and CMS agreed to hold in abeyance its efforts to recoup the overpayment from Triad until the Court rendered its decision, or May 2, 2008, whichever occurred first. After a thorough review of the Parties' submissions, including the attachments thereto, applicable case law, statutory authority and regulations, the Court shall deny Plaintiffs' [9] Motion for Summary Judgment, grant Defendants' [10] Motion to Dismiss, or in the alternative, Motion for Summary Judgment, and deny Plaintiffs' [12] Motion for Leave to File an Amended Complaint, for the reasons that follow.

## I. BACKGROUND

The Court shall first describe the Medicare statutes, regulations, and procedures providing the necessary context for the factual and procedural backgrounds that follow.

    *A.*     *Medicare Statutes, Regulations, and Procedures*

    1.     Medicare Reimbursement

Established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, the Medicare Program is a federal medical insurance program for the aged and disabled. Part A of the Medicare Program provides payments to, *inter alia*, operators of skilled nursing facilities ("providers"). *Id.* § 1395i-3. To participate in the Medicare program and receive reimbursement for the services they render to Medicare beneficiaries, providers must enter into Provider Agreements with the Secretary of the Department of Health and Human Services. *Id.* § 1395cc(a). Reimbursements are handled through "Fiscal Intermediaries," which are public or a

private entities that make initial determinations as to the appropriate reimbursement amounts. *Id.* §§ 1395g, 1395h.

Providers must submit regular billings to their Fiscal Intermediaries.[1]  42 C.F.R. 413.350(b)(2).  At the end of each annual period, a provider must submit an annual cost report to its Fiscal Intermediary which reconciles its payments against the actual reasonable costs incurred by the provider.  *Id.* §§ 413.20, 413.60, 413.64.  If the Fiscal Intermediary believes an overpayment has occurred, it must notify the provider of its intent to offset or recoup the funds and give the provider an opportunity to respond.  *Id.* § 405.373(a).  If the provider submits a response, CMS or the Fiscal Intermediary "must within 15 days . . . consider the statement (including any pertinent evidence submitted), together with any other material bearing upon the case, and determine whether the facts justify" the offset or recoupment.  *Id.* § 405.375(a).  A determination that an offset or recoupment is justified is not immediately appealable, *id.* § 405.375(c), and the Fiscal Intermediary may begin offsetting or recouping an overpayment notwithstanding a provider's intention to administratively challenge the overpayment determination, *id.* §§ 405.373(d), 405.375(a).  *See also id.* § 405.1803(c).  After the Fiscal Intermediary completes its audit of the provider's annual cost report, it must issue a Notice of Program Reimbursement ("NPR") that identifies and explains any adjustments, overpayments, or reimbursements.  *Id.* § 405.1803(a), (b).  A provider who is dissatisfied with its NPR may appeal

---

[1] Medicare regulations provide two reimbursement methods, either a Prospective Payment System ("PPS") or a Periodic Interim Payment system ("PIP").  42 C.F.R. §§ 413.335(a), 413.64(h)(6), 413.350(b)(2).  Even though the PIP method allows providers to receive biweekly payments based on historical payment levels and not the provider's actual billings, both methods require providers to submit regular billings so the Fiscal Intermediary can periodically audit providers' accounts.  *Id.* § 413.350(b)(2).

to the Provider Reimbursement Review Board ("PRRB").  42 U.S.C. § 1395oo; 42 C.F.R.

§ 405.1835.  The PRRB's decisions are final unless the Secretary reverses, affirms, or modifies

the PRRB's decision within sixty days.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. §§ 405.1875,

405.1877(a).

 Medicare procedures recognize that providers may be financially incapable of paying the

full amount of the overpayment immediately or continuing to operate without Medicare

payments while awaiting administrative review of a Fiscal Intermediary's recoupment decision.

Accordingly, a provider facing financial hardship may negotiate an Extended Repayment Plan

("ERP") with its Fiscal Intermediary that takes into account the provider's particular financial

circumstances.  *See* Defs.' Reply, Ex. H, Ch. 4, §§ 50.2, 50.3 (Medicare Financial Management

Manual) (describing the process for obtaining an ERP, including the Fiscal Intermediary's

examination of a provider's financial records, to create an ERP appropriate for the particular

provider).  Such plans may extend beyond 12 months if the provider sends its Fiscal Intermediary

"at least one letter from a financial institution denying the [provider's] loan request for the

amount of the overpayment."[2]  *Id.* § 50.1.

  2. <u>Changes of Ownership</u>

---

 [2] Medicare Financial Management Manual Chapter 4, § 50.1, is titled "Documentation
Required in an ERP Application – Physician is a Sole Proprietor – Carrier Only."  Neither party
explains whether Triad falls within this category, but the letters sent to Triad concerning the
overpayment indicated that "[r]equests for extended repayments of 12 months or more must be
accompanied by at least one letter from a financial institution denying [the] loan request for the
amount of [the] overpayment," Pls.' Mot., Ex. 10 (Letter to Triad dated February 11, 2008), and
Triad does not argue that Georgia BCBS was not authorized to offer Triad an ERP beyond 12
months consistent with § 50.1 and these letters.

When a nursing care facility undergoes a Change of Ownership ("CHOW"),[3] the former

and the new owners must each submit a CMS-855A application ("855A application") to their

respective Fiscal Intermediaries.  *See* Medicare Program Integrity Manual, Ch. 10, § 5.5.C.3.

The new owner must indicate in its respective 855A application whether it wants to apply for a

new Provider Agreement or accept assignment of the former owner's Provider Agreement.  *See*

Medicare Financial Management Manual, Ch. 3, § 130.  That decision has significant

consequences.  By accepting assignment of an existing Provider Agreement, the new owner must

assume responsibility for all outstanding or future overpayments associated with the agreement:

> With assignment, the new owner assumes all penalties and sanctions under the
> Medicare program, including the repayment of any accrued overpayments,
> regardless of who had ownership of the Medicare agreement at the time the
> overpayment was discovered, unless fraud was involved . . . When a provider
> undergoes a CHOW where the new provider accepts assignment of the previous
> owner's Medicare agreement, the responsibility for repaying any outstanding and
> future overpayments resides with the new owner.

Ex. A, FMM, Ch. 3, § 130.  A new provider is responsible for all overpayments even when its

contract with a former owner provides otherwise.  *Id.* ("A sales agreement stipulating that the

new owner is not liable for the overpayments made to the previous owner is not evidence enough

for recovery from the new owner to not occur . . . If the new owner assumes assignment of the

Medicare agreement, Medicare will attempt to recover from the new/current owner regardless of

the sales agreement").  By accepting assignment, however, the new owner "receives the benefits

of assuming the Medicare provider agreement, such as receiving underpayments discovered after

---

[3]  The provisions governing CHOWs are set forth in applicable Medicare regulations, as
well as the Medicare Financial Management Manual (attached as Defs.' Mot, Ex. A & Defs.'
Reply, Exhibit H) and the Medicare Program Integrity Manual (attached as Defs.' Mot., Exhibit
B).  For ease of reference, the Court shall cite directly to the Manual provisions throughout this
Memorandum Opinion.

the CHOW," and will automatically receive the agreement "subject to all the terms and conditions under which the existing agreement was issued." *Id.*

After receiving an 855A application, the new Fiscal Intermediary must review it for consistency with the sales agreement associated with the CHOW, as well as confirm that the transaction qualifies as a CHOW under applicable Medicare regulations. Medicare Program Integrity Manual, Ch. 10, 5.5.C.3. The Fiscal Intermediary then forwards its recommendation for approval to CMS, which verifies and validates the information, and confirms that the new owner is not on the Medicare Exclusion Database and the General Services Administration Debarment list. *See* Defs.' Mot., Ex. G, ¶ 13 (Decl. of Ronald L. Smith). If CMS approves the CHOW, it issues a "tie-in notice" to the former and new owners and their respective Fiscal Intermediaries, notifying them of the approval.[4]  *Id.*; Medicare Program Integrity Manual, Ch. 10, §§ 11.1.A, 11.1.B. Until the CMS Regional Office issues a tie-in notice, a Fiscal Intermediary must continue paying claims for a facility to its *former* owner, and must deny any request "to change the bank account to that of the new owner" during the CHOW period. *Id.* §§ 5.5.C.3, § 11.1.B ("In a CHOW, the intermediary shall continue to pay the old owner until it receives the tie-in notice from the [CMS Regional Office]"). The Medicare Program Integrity Manual advises the former and new owners to reach an agreement related to payments received during the CHOW period:

> It is ultimately the responsibility of the old and new owners to work out any payment arrangements between them while the CHOW is being processed by the

---

[4] Copies of tie-in notices sent to former owners and Fiscal Intermediaries are typically called "tie-out notices," even though the notices are the same. Defs.' Mot., Ex. G, ¶ 15 (Decl. of Ronald L. Smith). For ease of reference, the Court shall refer to all of these notices as "tie-in notices."

intermediary and the [CMS Regional Office].

*Id.* § 11.1.B.

Finally, a provider may choose to reject assignment of an existing Provider Agreement in its 855A application. *See* Medicare Financial Management Manual, Ch. 3, § 130. In such an instance, the new owner avoids responsibility for any overpayments made to the former owner because "there would be no CHOW of the Medicare agreement [so] the previous owner would still be responsible for any outstanding overpayments." *Id.* Because the new owner would have to apply for a new Provider Agreement, there would also be a break in Medicare coverage. *See* Pls.' Opp'n, Ex. 6, ¶¶ 7 (Affidavit of Ronald M. Herbert, Jr.); *Raintree Healthcare Corp. v. Omega Healthcare Investors, Inc.*, 431 F.3d 685, 687 (9th Cir. 2005) (explaining that a new owner could not participate in Medicare program while its application was pending if it refused assignment of an existing Provider Agreement).

### B.    Factual Background

The material facts underlying this action are undisputed.[5] Triad consists of five separate,

---

[5] As a preliminary matter, the Court notes that it strictly adheres to the text of Local Civil Rule 56.1 when resolving motions for summary judgment. *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (district courts need to invoke Local Civil Rule 56.1 before applying it to the case). Although discretionary in the text of the Local Civil Rule 56.1, in resolving the present summary judgment motion, this Court "assumes that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1. The Court issued an Order on February 28, 2008, explaining that the parties were expected to comply fully with Local Civil Rule 56.1, and stating that the Court would "assume[] facts identified by the moving party in its statement of material facts [were] admitted" unless controverted by the non-moving party. *See* [7] Order at 2 (Feb. 28, 2008). Thus, in most instances the Court shall cite only to Plaintiffs' Statement of Material Facts ("Pls.' Stmt.") or Defendants' Statement of Material Facts ("Defs.' Stmt.") unless a statement is contradicted by the opposing party. Where a party objects to relevant aspects of an opposing party's proffered material fact, the Court shall cite to Plaintiffs' Response to Defs.' Stmt. ("Pls.' Resp. Stmt.") or Defendant's Response to Pls.' Stmt. ("Defs.'

but affiliated, entities that lease and operate five nursing homes in Georgia that provide care to Medicare beneficiaries. Pls.' Stmt. ¶¶ 1-2. Although Triad expected to begin its operations at these facilities in January 2004, the previous operator of the nursing homes, Mariner, refused to timely cease its operations. Pls.' Stmt. ¶¶ 3-4. After several years of litigation, Mariner vacated the facilities on December 1, 2006, and Triad began operating the facilities. *Id. See also Mariner Health Care, Inc. v. Foster*, 634 S.W. 2d. 162 (Ga. App. 2006). The transition was contentious and Mariner was uncooperative. Pls.' Opp'n, Ex. 6, ¶¶ 3-6 (Affidavit of Ronald M. Herbert, Jr.). For example, Mariner failed to file a terminating cost report for the nursing homes and refused "to release resident trust accounts to Triad's custody and it refused to pay to its former employees the vacation and leave time they accrued while employed by Mariner at the facilities." *Id.* ¶ 6. Triad and Mariner also failed to reach an agreement as to how funds paid during the CHOW would be handled. *Id.* ("There was no agreement between the parties concerning the transition of the nursing homes from Mariner to Triad").

Despite this contentiousness, Triad accepted assignment of Mariner's existing Provider Agreements. On November 30, 2006, the day before Triad began operating the five nursing homes, Triad sent its Fiscal Intermediary, Blue Cross Blue Shield of Georgia ("Georgia BCBS"), five 855A applications asking to have Mariner's Provider Agreements assigned to Triad effective December 1, 2006. Pls.' Stmt. ¶¶ 5-6. The Parties do not dispute that Triad submitted its 855A applications using outdated forms, and that Georgia BCBS took no immediate action with respect

---

Resp. Stmt."), as necessary. The Court shall also cite directly to evidence in the record, where appropriate, to provide additional information not covered by either of the parties' Statements.

the applications.[6]  Pls.' Stmt. ¶ 9; Defs.' Stmt. ¶ 3.  After learning that it had submitted improper

applications, Triad re-sent its 855A applications to Georgia BCBS (using the correct forms) on

January 31, 2007, although CMS contends that one of the applications was not received until

February 5, 2008.  Pls.' Stmt. ¶ 9; Defs.' Resp. Stmt. ¶ 9.  These applications included, among

other information, Mariner's name, the name of Mariner's Fiscal Intermediary ("Mutual of

Omaha"), Mariner's Medicare Information Number, and a representation that Triad was choosing

to accept assignment of Mariner's Medicare Provider Agreements effective December 1, 2006.

Pls.' Stmt. ¶ 10.  The applications also contained a clause wherein Triad "agree[d] that any

existing or future overpayment made to [Triad] by the Medicare program may be recouped by

Medicare through the withholding of future payments."  Pls.' Mot., Ex. 6 at 37 (855A

application).  In four letters dated April 12, 2007, and a fifth dated April 26, 2007, CMS

acknowledged the change of ownership for each of the five nursing homes, respectively, and

indicated that the Medicare Provider Agreement for each facility had been "automatically

assigned" to Triad, effective December 1, 2006.  Pls.' Stmt. ¶ 11.

     Mutual of Omaha continued to receive and pay claims to Mariner for these five facilities

between December 2006 and April 2007.  Defs.' Stmt. ¶¶ 6-7.  Mutual of Omaha first became

aware of the change in ownership of the facilities after receiving a tie-in notice sent by the CMS

Regional Office in April 2007.  *Id.* ¶ 9.  Pursuant to that notice, Mutual of Omaha made its last

payment on April 18, 2007 to four of Triad's facilities, and its last payment to the fifth facility on

May 2, 2007.  *Id.* ¶ 10.  After receiving notice of the change in ownership, Mutual of Omaha

---

     [6] The Parties dispute whether Georgia BCBS returned these applications to Triad, but this
dispute is immaterial.  Defs.' Stmt. ¶ 3; Pls.' Resp. ¶ 3.

redirected its April 18, 2007 and May 2, 2007 payments to the facilities' physical addresses rather than to Mariner's account. *Id.*

From December 1, 2006 through May 1, 2007, Triad operated the five facilities but received no Medicare payments. *Id.* ¶ 11. On May 1, 2007, after CMS issued its tie-in notices, Triad began submitting claims to Georgia BCBS for services rendered beginning December 1, 2006. *Id.* Georgia BCBS thereafter paid those claims. *Id.* In May, June, July, and October 2007, Mutual of Omaha sent letters to Georgia BCBS explaining that it had made payments to Mariner for services rendered between December 2006 and April 2007. *Id.* ¶ 12. Because Mutual of Omaha and Georgia BCBS maintain separate financial and claims systems, Georgia BCBS was unaware that Mutual of Omaha had already made payments for the same service period for which it had paid Triad. *Id.*

On November 29, 2007, Georgia BCBS received annual cost reports from Triad for the fiscal year ending June 30, 2007. *Id.* ¶ 14; Pls.' Resp. Stmt. ¶ 14. A comparison of the actual amounts paid for the services rendered at the facilities revealed an overpayment of approximately $2.0 Million because both Triad and Mariner had received reimbursements for the services rendered during the CHOW. *Id.* Georgia BCBS sent Overpayment First Demand letters to the five Triad facilities on February 11, 2008. Defs.' Stmt. ¶ 15. The letters advised Triad that "unless receivable amounts due the Medicare program were paid in full by February 26, 2008, withholding of interim payments would begin on that day." *Id.* The letters also advised Triad that it had the right to seek an ERP if it could not afford to pay the full sum. *Id.* Triad and Georgia BCBS thereafter exchanged correspondence reflecting Triad's position that Mariner was responsible for the overpayment during the CHOW, and Georgia BCBS' position that Triad

owed the funds as the owner of the Provider Agreements.  Defs.' Stmt. ¶¶ 16-17.

     C.     *Procedural Background*

     Triad filed a Complaint in the present action on February 26, 2008, along with a [3]

Motion for a Temporary Restraining Order, or in the alternative, Motion for a Preliminary

Injunction.  After discussions between themselves and with the Court, the Parties submitted a

stipulation on February 28, 2008, whereby CMS agreed to forego recoupment of the alleged

Medicare overpayment until the Court rendered its decision on the merits, or May 2, 2008,

whichever occurred first.  *See* [7] Stipulation at 1-2 (Feb. 28, 2008).  As part of the stipulation,

Triad agreed to withdraw its [3] Motion for a Temporary Restraining Order, or in the alternative,

Motion for a Preliminary Injunction.  *Id.*

     Pursuant to the briefing schedule adopted by the Court, Triad filed a [9] Motion for

Summary Judgment on March 3, 2008 ("Pls.' Mot."), and CMS filed a [10] Motion to Dismiss

or, in the alternative, Motion for Summary Judgment and consolidated Opposition to Triad's

Motion, on March 17, 2008 ("Defs.' Mot.").  Although it was not included in the Parties'

briefing schedule, Triad filed a [12] Motion for Leave to File an Amended Complaint on March

31, 2008, in addition to filing a consolidated Opposition to CMS's Motion and Reply to CMS's

Opposition ("Pls.' Opp'n").  Triad's Motion for Leave to File proposes amendments adding (i)

an additional basis for invoking federal jurisdiction in the present case and (ii) a request for

preliminary relief under the All Writs Act, 42 U.S.C. § 1651.  *See* Pls.' Mot. for Leave to File

Am. Compl. at 1-2.  CMS filed its Reply to Triad's Opposition on April 7, 2008, ("Defs.'

Reply") which also addresses Triad's proposed amendments.  Accordingly, the Parties' Motions

have been fully briefed and are ripe for decision.

## II.  LEGAL STANDARD

*A.     Summary Judgment*

A party is entitled to summary judgment if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the opposing party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Liberty*

*Lobby*, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

      B.     *Leave to Amend Complaint*

      Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading once as a matter of course at any time before a responsive pleading is served.  *See* Fed. R. Civ. P. 15(a).  Additionally, Rule 15(a) allows a party to amend its pleading to add a new party.  *Id.*; *Wiggins v. Dist. Cablevision, Inc.*, 853 F. Supp. 484, 499 (D.D.C. 1994).  Once a responsive pleading is served, however, a party may amend its complaint only by leave of the court or by written consent of the adverse party.  *Id.*; *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The grant or denial of leave to amend is committed to the sound discretion of the district court.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  The court must, however, heed Rule 15's mandate that leave is to be "freely given when justice so requires."  *Id.*; *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1083 (D.C. Cir. 1998).  Indeed, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Foman*, 371 U.S. at 182.

Accordingly, "[a]lthough the grant or denial of leave to amend is committed to a district court's discretion, it is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as 'undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by [previous] amendments . . . [or] futility of amendment.'" *Firestone*, 76 F.3d at 1208 (quoting *Foman*, 371 U.S. at 182); *see also Caribbean Broad. Sys.*, 148 F.3d at 1084 (citing *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991) (holding that a district court's discretion to grant leave to amend is "severely restricted" by Rule 15's command that such leave "be freely given"). Moreover, "'Rule 15(a) does not prescribe any time limit within which a party may apply to the court for leave to amend . . . . In most cases[,] delay alone is not a sufficient reason for denying leave . . . . If no prejudice [to the non-moving party] is found, the amendment will be allowed.'" *Caribbean Broad. Sys.*, 148 F.3d at 1084 (quoting 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: Civil 2d § 1488, at 652, 659, 662-69 (1990 & Supp. 1997)). However, the Court may deny as futile a motion to amend a complaint when the proposed complaint would not survive a motion to dismiss. *James Madison*, *Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996); *see also* 3 Moore's Federal Practice § 15.15[3] (3d ed. 2000) ("An amendment is futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss.").

### III.  DISCUSSION

The Parties vigorously dispute whether Triad has set forth a proper basis for the Court's jurisdiction.  Triad's initial Complaint invokes general federal question jurisdiction under 28 U.S.C. § 1331, which states that "district courts shall have original jurisdiction of all civil actions

arising under the Constitution, laws, or treaties of the United States." *See* Compl. ¶ 13. Triad's

Amended Complaint proposes a second basis for jurisdiction under 42 U.S.C. § 405(g), which

states that "[a]ny individual, after any final decision of the [Secretary] made after a hearing to

which he was a party, irrespective of the amount in controversy, may obtain a review of such

decision by a civil action . . . ."[7] *See* Am. Compl. ¶ 13. Triad concedes that it did not exhaust its

administrative remedies as required by § 405(g) prior to bringing this action. *See* Pls.' Opp'n at

2 ("Triad has not exhausted its administrative remedies"). Accordingly, the Court must first

determine whether it may exercise general federal question jurisdiction over Triad's claims. If

not, the Court must then decide whether Triad's proposed amendments to its Complaint provide

the Court with a proper basis to exercise jurisdiction or whether the amendments would be futile.

> A.    *Subject Matter Jurisdiction*

Section 405(h) of the Social Security Act, made applicable to the Medicare Act by 42

U.S.C. § 1395ii, strips courts of general federal question jurisdiction under 28 U.S.C. § 1331 for

claims arising under the Medicare Act:

> No findings of fact or decision of the [Secretary] shall be reviewed by any person,
> tribunal, or governmental agency except as herein provided. No action against the
> United States, the [Secretary], or any officer or employee thereof shall be brought
> under section 1331 or 1346 of title 28 to recover on any claim arising under this
> subchapter.

42 U.S.C. § 405(h). *See Amer. Chiropractic Assoc., Inc. v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir.

2005) ("[t]his bar against § 1331 actions applies to all claims that have their 'standing and

---

[7] The Court notes that 42 U.S.C. § 405(g) is applicable to the Medicare Act through 42
U.S.C. § 405(h) (made applicable to the Medicare Act by 42 U.S.C. § 1395ii and providing that
42 U.S.C. § 405(g) sets forth the sole means for judicial review of claims arising under the
Medicare Act).

substantive basis' in the Medicare Act") (quoting *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 11 (2000)). The Supreme Court has explained that "insofar as [§ 405(h)] demands the 'channeling' of virtually all legal attacks through the agency, it assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying 'ripeness' and 'exhaustion' exceptions case by case." *Ill. Council*, 529 U.S. at 13. CMS argues that "there can be no dispute that [Triad's] Medicare reimbursement claims 'aris[e] under' the Medicare Act, 42 U.S.C. § 405(h), thereby precluding jurisdiction of those claims under 28 U.S.C. § 1331." Defs.' Mot. at 12. Accordingly, CMS argues that Triad must exhaust its administrative remedies and bring suit under the provisions of the Medicare Act. Defs.' Reply at 4.

Triad does not dispute that § 405(h) generally prohibits the exercise of general federal question jurisdiction for claims arising under Medicare Act (and does not dispute that its claims arise under the Medicare Act), but it argues that § 405(h) does not deprive a court of jurisdiction where "the claimant can obtain judicial review *only* in a federal question suit . . . ." *Amer. Chiropractic Assoc., Inc.*, 431 F.3d at 816 (emphasis in original) (citing *Ill. Council*, 529 U.S. at 10-13, 17-20). As explained by the D.C. Circuit,

> [t]he exception applies not only when administrative regulations foreclose judicial review, but also when roadblocks practically cut off any avenue to federal court. As to the latter, it is not enough that claimants would encounter 'potentially isolated instances of the inconveniences sometimes associated with the postponement of judicial review,' or that their claims might not receive adequate administrative attention. The difficulties must be severe enough to render judicial review unavailable as a practical matter.

*Id.* (quoting *Ill. Council*, 529 U.S. at 23) (internal citations omitted). Triad argues that it does not have sufficient economic resources to continue operating its nursing facilities if CMS recoups the

16

$2.0 Million overpayment, and consequently, that requiring it to exhaust its administrative

remedies and proceed under § 405(g) would, as a practical matter, deny Triad meaningful judicial

review.  Pls.' Opp'n at 9-10.  Ronald M. Herbert, Jr., Triad's Chief Operating Officer, states in

his affidavit that:

> If CMS withholds funds due to Plaintiffs for services provided to Medicare
> beneficiaries to recoup payments mistakenly paid to Mariner for services not
> provided, Plaintiffs will not be able to continue providing skilled nursing and
> other care and services to the more than 500 frail elderly residents who live in
> these facilities and depend upon Plaintiffs for their care, safety and well being.

*See* Pls.' Mot., Ex. 6, ¶ 16 (Affidavit of Ronald M. Herbert, Jr.).  As further support for its

position, Triad identifies cases in this district where courts have allowed plaintiffs to proceed

with claims arising under the Medicare Act pursuant to this general federal question jurisdiction

exception.  *See Am. Lithotripsy Soc'y v. Thompson*, 215 F. Supp. 2d 23, 29-30 (D.D.C. 2002)

(holding that judicial review was unavailable because plaintiffs' ability to challenge a Medicare

regulation required a putative plaintiff to face criminal sanctions and exclusion from the

Medicare program, which no plaintiff would be willing to bear); *Nat'l Assoc. of Psychiatric

Health Sys. v. Shalala*, 120 F. Supp. 2d 33, 38-39 (D.D.C. 2000) (holding that judicial review

was unavailable because plaintiffs' ability to challenge a regulation required a putative plaintiff

to violate the regulation and be terminated from the Medicare program).  Based on Mr. Herbert's

representation and these cases, Triad surmises that "the existence of an administrative remedy

and the potential for judicial review under § 405(g), at the end of a process that will be time-

consuming and lengthy . . . are unavailing."  Pls.' Opp'n at 10.

      The Court is unpersuaded by Triad's arguments concerning the jurisdictional bar posed

by § 405(h).  As an initial matter, the Supreme Court's opinion in *Shalala v. Illinois Counsel on*

17

*Long Term Care, Inc.* suggests that an individual provider's delay-related harm is insufficient to demonstrate the complete preclusion of judicial review:

> we do not hold that an individual party could circumvent [the Medicare Act's] channeling requirement simply because that party shows that postponement would mean added inconvenience or cost in an isolated, particular case. Rather, the question is whether, as applied generally to those covered by a particular statutory provision, hardship likely found in many cases turns what appears to be simply a channeling requirement into *complete* preclusion of judicial review.

529 U.S. at 23. The Supreme Court emphasized that Congress chose to channel all claims through the Medicare Act's provisions which

> comes at a price; namely, occasional individual, delay-related hardship. In the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts, paying this price may seem justified . . .

529 U.S. at 13. This language suggests that a plaintiff must show a systemic deprivation of review – not an individual hardship based on delay. The cases on which Triad relies only underscore this distinction, as the plaintiffs in those cases were precluded from seeking review by facing the Hobbsian choice of abandoning legitimate challenges to agency regulations or violating the regulations and incurring draconian sanctions. In contrast, Triad's arguments that delayed administrative review will be lengthy and time-consuming–or even financially difficult–do not transform its circumstances into a situation where "as applied generally to those covered by a particular statutory provision, hardship likely found in many cases" effectively precludes judicial review. *Illinois Council*, 529 U.S. at 23. *See also Three Lower Counties Cmty. Health Servs. Inc. v. U.S. Dep't of Health & Human Servs.*, 517 F. Supp. 2d 431, 435 (D.D.C. 2007) (holding that the Medicare exhaustion requirements are essential "even if [the

administrative process] is time-consuming, and even if the agency cannot grant the relief

sought").

Even if individual delay-related harm *could* be found to render judicial review

unavailable as a practical matter, Triad's assertion of the same is directly undermined by the

Medicare procedures that consider an individual provider's financial circumstances.  For

example, where a provider is unable to immediately repay an overpayment and cannot continue

its operations if Medicare funds are withheld, the provider may negotiate an ERP with its Fiscal

Intermediary.  *See* Medicare Financial Management Manual, Ch. 4, §§ 50.2, 50.3.  Such plans

may even extend beyond 12 months when the provider sends its Fiscal Intermediary "at least one

letter from a financial institution denying the [provider's] loan request for the amount of the

overpayment."  *Id.* § 50.1.  An ERP allows a provider to continue its operations while awaiting

administrative review where, as is claimed here, a provider may not be able to repay the full

amount and wait to exhaust its administrative remedies.

Triad argues that it sought an ERP when it "proposed that the almost $2.0 million paid to

Mariner not be collected until after Triad exhausted its administrative remedies."  Pls.' Opp'n at

11.  CMS is correct that this "proposal" is not an ERP, as it does not meet any of the

requirements associated with an ERP, including the submission of a proposed amortization

schedule, balance sheets, income statements, among other specified information.  *See* Medicare

Financial Management Manual, Ch. 4, § 50.2.  Triad also argues, in passing, that it could not

enter an ERP because "Triad would have to agree that it is responsible to pay $2.0 million to

CMS."  Pls.' Opp'n at 11.  That argument is misleading because it implies that Triad would have

to admit liability in order to enter into an ERP, thereby foregoing meaningful subsequent

administrative or judicial review.  As CMS explains, a provider's decision to enter into an ERP is

not an admission of liability, as "the provider need only acknowledge that an overpayment

determination has been made, not that it is responsible for that overpayment."  Defs.' Reply at 6

n.1.  The Medicare Provider Reimbursement Manual, for example, specifically contemplates that

adjustments may be made to an overpayment determination following administrative review.  *See*

Defs.' Reply, Ex. I, § 2905 (Medicare Provider Reimbursement Manual).   Applicable Medicare

regulations also permit a Fiscal Intermediary to begin offsetting or recouping an overpayment

notwithstanding a provider's intention to subsequently challenge the overpayment determination,

*id.* §§ 405.373(d), 405.375(a).  *See also id.* § 405.1803(c).  In short, Triad did not take advantage

of the procedures available to providers who, like Triad, claim that their financial circumstances

render later administrative and judicial review unavailable.

Triad's argument is further undermined by its failure to submit any evidence into the

record suggesting that it faces a financial hardship if it must enter into an ERP.  For example,

Ronald Herbert, Triad's Chief Operating Officer, states in his affidavit that Triad will be unable

to continue its operations at its nursing care facilities if CMS withholds funds due to Triad.  Pls.'

Opp'n, Ex. 6, ¶ 16 (Affidavit of Ronald M. Herbert, Jr.).  This representation, however, has no

bearing on Triad's ability to continue its operations if Triad must repay the funds at issue to

Georgia BCBS pursuant to an ERP.  Triad's only other representation concerning its financial

condition is contained in an affidavit by Adam Ashpes, President and Chief Executive Officer of

Triad Senior Living, LLC, who states that Triad was in the process of "closing [a] working

capital line of credit with Capital Finance," but after informing Capital Finance about "this

potential $2.0 million liability[,] Capital Finance advised Triad that it would not process Triad's

application for financing until after Triad favorably resolved this problem." Pls.' Opp'n, Ex. 7, ¶ 4 (Affidavit of Adam T. Ashpes). Again, this representation does not indicate that Triad could not continue its operations if it were required to repay Georgia BCBS over time. If anything, the representation concerning the Capital Finance line of credit undercuts Triad's arguments because the Medicare Financial Management Manual allows a provider to enter an ERP beyond 12 months if it has unsuccessfully attempted to obtain a loan for the overpayment amount, *see* Ch. 4, §§ 50.1 – certainly enough time for Triad in the present case to exhaust its administrative remedies and seek judicial review under the provisions of the Medicare Act. Triad's choice to instead immediately file this lawsuit does not create a proper basis to exercise general federal question jurisdiction pursuant to 18 U.S.C. § 1331. Accordingly, the Court concludes that it cannot exercise general federal question jurisdiction over Triad's claims.

> B.    *Triad's Amended Complaint*

After receiving CMS' Motion that identified the jurisdictional defect in Triad's initial Complaint, Triad filed a Motion for Leave to File an Amended Complaint which also asserts jurisdiction under the Medicare Act, 42 U.S.C. § 405(g). *See* Am. Compl. ¶ 13. Triad's Amended Complaint also seeks to have the Court enjoin CMS from recouping the overpayment prior to Triad's exhaustion of its administrative remedies pursuant to the All Writs Act, 42 U.S.C. § 1651. *Id.* at 14. The Court shall (1) describe each of these proposed amendments below, and then (2) explain why granting Triad leave to file its Amended Complaint would be futile.

> 1.    <u>Proposed Amendments</u>

Triad's new proposed basis for jurisdiction is 42 U.S.C. § 405(g), which states that "[a]ny

individual, after any final decision of the [Secretary] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . ."  A provider challenging a determination by its Fiscal Intermediary obtains a "final decision" from the Secretary by appealing to the PRRB.  *Id.* §§ 1395oo(a).  The PRRB's decision is final unless the Secretary reverses, affirms, or modifies the PRRB's decision.  *Id.* § 1395oo(f)(1).  Triad does not dispute that it failed to obtain a "final decision" prior to filing this action, *see* Pls.' Opp'n at 2, but argues that the exhaustion requirements applicable to § 405(g) may be waived by the Court in order to reach the merits of Triad's claims, *id.* at 16.

The D.C. Circuit recently explained that the word "exhaustion" describes two different legal concepts.  *See Avocados Plus, Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004).  The first describes a "judicially created doctrine requiring parties who seek to challenge agency action to exhaust available administrative remedies before bringing their case to court."  *Id.*  In circumstances where these judicially created doctrines apply, a district court "may, in its discretion, excuse exhaustion if 'the litigation's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further.'"  *Id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)).  The second type of exhaustion "arises when Congress requires resort to the administrative process as a predicate to judicial review.  This 'jurisdictional exhaustion' is rooted, not in prudential principles, but in Congress' power to control the jurisdiction of the federal courts."  *Id.*  Where a statute mandates this second type of exhaustion, "a court cannot excuse it."  *Id.*

The Supreme Court has repeatedly held that the exhaustion requirements described in § 405(g) may be waived, but the requirement that a plaintiff "present" its claim to the Secretary

cannot. *See Illinois Council*, 529 U.S. at 22 ("Of course, individual hardship may be mitigated in

a different way [under § 405(g)], namely, through excusing a number of the steps in the agency

process, though not the step of presentment of the matter to the agency"); *Bowen v. City of New

York*, 476 U.S. 467, 483 (1986) ("Our decisions teach that the final decision requirement

embodied in [§ 405(g)] consists of two elements, only one of which is purely jurisdictional in the

sense that it cannot be waived by the Secretary in a particular case . . . The nonwaivable element

is the requirement that a claim for benefits shall have been presented to the Secretary") (quoting

*Mathews v. Eldridge*, 424 U.S. 319, 328 (1976) (internal punctuation omitted)).  A court may

waive the exhaustion requirements of § 405(g) when: (1) the issue raised is entirely collateral to a

claim for payment; (2) plaintiffs show they would be irreparably injured were the exhaustion

requirement enforced against them; and (3) exhaustion would be futile.  *See Bowen*, 476 U.S. at

483-85.  Triad asks the Court to waive the exhaustion requirements of § 405(g) because

collection of the $2.0 Million overpayment would leave Triad without a judicial remedy.  *See*

Pls.' Opp'n at 16-17.  CMS requests the opposite, arguing that there is no basis for waiving the

§ 405(g) exhaustion requirements on this record.[8]  Defs.' Reply at 9-12.

---

[8] Both Parties assume that Triad has presented its claim to the Secretary to overcome the
"non-waivable" requirement of § 405(g), and the Court agrees.  *See Eldridge*, 424 U.S. at 328
(referencing presentment of a claim as a "decision of any type").  The Court also notes that the
D.C. Circuit's decision in *Avocados Plus Inc. v. Veneman* held that a court cannot excuse a
plaintiff's failure to exhaust its administrative remedies if the statute mandates exhaustion, citing
§ 405(g) as an example.  370 F.3d at 1247-48.  The context of the D.C. Circuit's decision
clarifies that it used § 405(g) as an example of where a plaintiff must proceed with a claim
arising under the provisions of the Medicare Act (which contains administrative exhaustion
procedures) as opposed to proceeding with a suit under 28 U.S.C. § 1331 (general federal
question jurisdiction, which does not contain administrative exhaustion procedures).  Once
proceeding under § 405(g), the Supreme Court's holdings in *Mathews v. Eldridge* and its progeny
explain that a Court may waive the exhaustion requirements except for a plaintiff's
"presentment" of its claim to the Secretary.

Setting that dispute aside for the present moment, Triad's Amended Complaint also proposes to have the Court enjoin recoupment of the overpayment under the All Writs Act to allow Triad the opportunity to exhaust its administrative remedies. Pls.' Opp'n at 18-22. The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdiction." 28 U.S.C. § 1651. To grant relief under the All Writs Act, a court must find "the well established requirements that [are] routinely appl[ied] to motions for stay pending appeal, among which is the likelihood of irreparable harm." *Reynolds Metals Co. v. Fed. Energy Regulatory Comm'n*, 777 F.2d 760, 762 (D.C. Cir. 1985). *See also V.N.A. of Greater Tift County, Inc. v. Heckler*, 711 F.2d 1020, 1034 (11th Cir. 1983) (holding that an injunction under the All Writs Act is available where there is a virtual certainty of irreparable injury, a similar certainty of success on the merits, a minimal harm to the agency, and a public interest clearly favoring the assumption of jurisdiction), *cert. denied*, 466 U.S. 936 (1984). Not surprisingly, the Parties also disagree as to whether the court should enter an injunction to allow Triad to exhaust its administrative remedies.

The Court has examined the merits of Triad's claims as part of its inquiry into whether Triad has established that it would suffer irreparable injury without a waiver of the exhaustion requirements under § 405(g), and whether Triad has shown a likelihood of success on the merits to obtain an injunction under the All Writs Act. The Court has already rejected Triad's argument that "collection of the $2.0 Million overpayment would leave Triad without a judicial remedy" in the discussion above, *see* section III.A, and that decision alone suggests that Triad is not susceptible to irreparable injury or that exhaustion is futile. Nevertheless, the Court also finds that it need not engage in a detailed discussion of Triad's proposed amendments because Triad's

24

claims fail on the merits, and accordingly, its proposed amendments would be futile.

2.    Futility of Amendments Based on the Merits of Triad's Claims

As set forth above, a provider entering a CHOW must decide to accept or refuse assignment of an existing Provider Agreement.  By accepting assignment, the new owner must assume responsibility for all overpayments associated with the agreement:

> With assignment, the new owner assumes all penalties and sanctions under the Medicare program, including the repayment of any accrued overpayments, regardless of who had ownership of the Medicare agreement at the time the overpayment was discovered, unless fraud was involved . . . When a provider undergoes a CHOW where the new provider accepts assignment of the previous owner's Medicare agreement, the responsibility for repaying any outstanding and future overpayments resides with the new owner.

Medicare Financial Management Manual, Ch. 3, § 130.  A new provider is responsible for all overpayments even when its contract with a former owner provides otherwise.  *Id.* ("A sales agreement stipulating that the new owner is not liable for the overpayments made to the previous owner is not evidence enough for recovery from the new owner to not occur . . . If the new owner assumes assignment of the Medicare agreement, Medicare will attempt to recover from the new/current owner regardless of the sales agreement").  Courts have repeatedly upheld CMS' ability to recoup an overpayment from a new provider even though the overpayment occurred prior to the new provider's acceptance of the Provider Agreement.  *See, e.g.*, *United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994) ("[The defendant] could have chosen not to accept the automatic assignment of the provider agreement . . . By accepting that assignment, [the defendant] agreed (albeit unknowingly) to accept the terms and conditions of the regulatory scheme.  Thus, it is liable for the overpayments."), *cert. denied*, 513 U.S. 1015 (1994).

Triad acknowledges this authority and even agreed to assume liability for any

25

overpayments associated with these Provider Agreements when it submitted its 855A

applications. *See* Pls.' Mot., Ex. 6 at 37 (Triad's 855A application) ("[Triad] agrees that any

existing or future overpayment made to [Triad] by the Medicare program may be recouped by

Medicare through the withholding of future payments"). Nevertheless, Triad argues that the

circumstances in the present case are distinguishable because the overpayment was made *after*

the effective date of the assignment of the Provider Agreements at issue. *See* Pls.' Mot. at 4.

According to Triad, CMS cannot "impose liability on [Triad] for funds paid to Mariner . . . for

events that had not yet occurred at the time of the assignment of the provider agreements." *Id.* at

4. Triad argues that the Provider Agreements were assigned in December 2006 because

Medicare Regulation 42 C.F.R. § 489.18(c) provides that upon a change of ownership the

"existing provider agreement will automatically be assigned to the new owner." Because CMS

"acknowledged the change of ownership of each nursing home and that each medicare provider

agreement had been automatically assigned to [Triad], effective December 1, 2006," Triad argues

that CMS must pursue Mariner for the overpayment. Pls.' Mot. at 4.

      According to CMS, Triad is responsible for the overpayments that occurred during the

CHOW period (approximately December 2006 through April 2007), in part because Medicare

procedures require Fiscal Intermediaries to continue paying former providers until a CHOW is

complete. *See* Medicare Program Integrity Manual, Ch. 10, § 5.5.C.3 ("Medicare payments shall

continue to be made to the old owners until the CHOW is approved by the [CMS Regional

Office], even if the old owner submits a [request] to change the bank account to that of the new

owner"); *id.* § 11.1.B ("In a CHOW, the intermediary shall continue to pay the old owner until it

receives the tie-in notice from the [CMS Regional Office]"). The Medicare Program Integrity

Manual also advises the former and new providers to reach an agreement related to payments

received during the CHOW period:

> It is ultimately the responsibility of the old and new owners to work out any payment arrangements between them while the CHOW is being processed by the intermediary and the [CMS Regional Office].

*Id.* § 11.1.B.

Recognizing the impediment that these provisions pose to its argument that CMS paid the

wrong provider for the services rendered during the CHOW period, Triad argues that CMS'

procedures conflict with the language of 42 C.F.R. § 489.18(c) (stating that the assignment of a

Provider Agreement is "automatic" when there is a change of ownership).  Pls.' Opp'n at 23.

According to Triad, "[t]he plain language of § 489.18(c) precludes [CMS'] notion that, despite

informing Triad that the change of ownership of each of the facilities was effective on December

1, 2006, the provider agreements were not treated as "assigned" until several months later, in

April[] 2007, when CMS issued 'tie-in' and 'tie-out' notices."  *Id.*  In effect, Triad is arguing that

its change of ownership was instantaneous upon the submission of its 855A applications (which

Triad concedes were submitted improperly and therefore not acted upon initially).

As both Parties recognize, courts must defer to an agency's interpretation of its own

regulations unless the interpretation is clearly erroneous or in conflict with the applicable

regulation.  *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506-07 (1994) (holding that

courts must "give substantial deference to an agency's interpretation of its own regulations");

*Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994) ("in framing the

scope of review, the court takes special note of the tremendous complexity of the Medicare

statute.  That complexity adds to the deference which is due to the Secretary's decision.").  CMS

does not read the regulation identified by Triad as requiring that a CHOW "be instantaneous upon mere submission of an *application* seeking recognition of the CHOW" nor that it mandates how CMS must "handle *payments* to the providers until the CHOW is approved." Defs.' Reply at 18 (emphasis in original). Instead, CMS interprets the regulations to require that once an application is submitted to CMS, it must confirm that a CHOW has occurred and that the new owner is eligible to participate in the Medicare program. *See* Defs.' Mot., Ex. G, ¶ 13 (Decl. of Ronald L. Smith). Until those determinations have been made, CMS interprets the regulations to require payments to continue to the former owner. Medicare Program Integrity Manual, Ch. 10, § 5.5.C.3. Although the regulation specifies that assignment of a Provider Agreement is "automatic," the Medicare Financial Management Manual explains that "[a]utomatic assignment of the existing provider agreement to the new owner means the new owner is subject to all the terms and conditions under which the existing agreement was issued" – not that assignment of a Provider Agreement is instantaneous upon submission of an 855A application for a change of ownership. Ch. 3, § 130. The regulatory and procedural scheme proposed by Triad–that the mere submission of an 855A application is enough to require a transfer of payments and deem the change of ownership complete–would allow providers who are ineligible to participate in the Medicare program to receive Medicare funds simply by submitting an application (even a false application) for a CHOW. *Id.* at 19.

The Court finds that CMS' interpretation of the applicable statutes and regulations to be entirely reasonable, as they specify that a provider may accept assignment of a Provider Agreement subject to the "terms and conditions under which it was originally issued," 42 C.F.R. 489.18(d), and that one such condition is responsibility for all overpayments associated with that

agreement, including overpayments arising during the CHOW period. Accordingly, Triad has

failed to demonstrate, particularly under the deferential standard of review required by *Thomas

Jefferson Univ.*, 512 U.S. at 506-07, that CMS has improperly interpreted applicable statutes and

regulations.[9]

Triad next argues that two provisions in the Provider Reimbursement Manual and

Medicare Financial Management Manual, respectively, require CMS to pursue Mariner and not

Triad for the overpayment. Provider Reimbursement Manual § 2409.1B states that a Provider

Agreement may be terminated "as a result of a change in ownership," and Medicare Financial

Management Manual § 20.2 states that "[i]f the [Fiscal Intermediary] discovers an overpayment

upon the filing of a cost report . . . with respect to a provider no longer participating in the

Medicare program, it shall immediately contact the terminated provider to obtain a refund in a

lump-sum, if it has not been made." According to Triad, these provisions suggest that CMS must

pursue Mariner for the overpayment and not Triad because Mariner is no longer participating in

the Medicare program. Pls.' Opp'n at 24. The Court disagrees.

CMS correctly explains that Provider Reimbursement Manual § 2409.1B governs

situations in which a Provider Agreement has been terminated. *See* Defs.' Reply at 21. In

contrast to the present case, Triad accepted assignment of Mariner's existing Provider

Agreements rather than having them terminated. While it is undisputed that if Triad had rejected

---

[9] Triad's Motion also argues that Triad is not liable for the overpayment because the payments made to Mariner were not properly made. Pls.' Mot. at 7-9. Triad abandoned this argument after CMS explained in its Opposition that the Medicare procedures expressly require payments to be made to the former provider during a CHOW, *see* Medicare Program Integrity Manual, Ch. 10, §§ 5.5.C.3, 11.1.B, and that the purpose of recoupment is to recover payments that were *improperly* made to providers for Medicare services.

the existing Provider Agreements that Mariner would have been liable for any existing

overpayments, Triad accepted assignment of the agreements, and in so doing, assumed liability

for any existing or future overpayments discovered while Triad owns the Provider Agreements.

Similarly, Medicare Financial Management Manual, Ch. 3 § 20.2 contemplates situations where

the Fiscal Intermediary "becomes aware that there is an imminent likelihood that a provider will

be terminating from the Medicare program . . ."  In the event of a CHOW, however, the provision

references the application of § 130 – the provision discussed above that states that "the new

owner assumes all penalties and sanctions under the Medicare program" when accepting an

existing Provider Agreement.[10]  Thus, as CMS explains, these provisions are consistent with

efforts to recoup the overpayment from Triad:

> If the new owner accepts assignment of the provider agreement, the provider
> agreement does not terminate and responsibility for overpayments made pursuant
> to that provider agreement rests with the *new* owner.  If the new owner rejects
> assignment, the provider agreement does terminate, and responsibility for all
> overpayments made to that provider for services rendered before the transfer date
> remains with the *old* owner.

Defs.' Reply at 22.  CMS' interpretation of its own procedures is entirely reasonable.

Triad's final argument is based on Medicare Financial Management Manual, Ch. 3,

§ 130, which explains that new owners are responsible for liabilities on existing Provider

Agreements:

> When a provider undergoes a CHOW where the new provider accepts assignment
> of the previous owner's Medicare agreement, the responsibility for repaying any

---

[10] Although Triad makes a passing argument that § 130 does not apply where, as here, the
provider begins operating a facility based on a change of "lease" rather than a "sale," Pls.' Opp'n
at 25, the applicable regulation 25 C.F.R. § 489.18(a)(4) expressly includes a "lease of all or part
of a provider facility" as constituting a "change of ownership," and § 130 does not suggest
otherwise.

> outstanding and future overpayments resides with the new owner.  Exception: If
> any of the overpayments determined for a fiscal year when the previous owner had
> assignment were discovered due to fraud the responsibility for the repayment of
> the overpayments does not shift to the new provider.  It stays with the old
> provider.[11]

Medicare Financial Management Manual, Ch. 3, § 130.  According to Triad, the "undisputed

facts show that Mariner engaged in fraudulent conduct . . . Triad is not responsible for funds paid

to Mariner as a result of the fraud exception" because "[t]ransition of the operation of the

facilities from Mariner to Triad [] was anything but cooperative.  Unlike most changes in

ownership of Triad nursing homes, there was no written agreement between these providers

concerning the many transition issues, including reconciliation of any liability for payments."

Pls.' Opp'n at 27.  This argument is unavailing.

Triad has identified an error of judgment, not fraud.  Triad knew that Mariner was

uncooperative because it had been engaged in three years of litigation over operation of the

facilities.  *See* Pls.' Mot., Ex. 15 ¶¶ 2-3 (Affidavit of Jack C. Tranter).  Triad also knew that it

had no agreement in place for the transition of the facilities.  *See* Pls.' Opp'n, Ex. 6 ¶ 6 (Affidavit

of Ronald M. Herbert).  The Medicare Integrity Manual clearly states that payments made during

any CHOW period must be sent to the former owner, *see* Medicare Program Integrity Manual,

Ch. 10, §§ 5.5.C.3, 11.1.B, and the Manual specifically suggests that the former and new owners

reach an agreement concerning those payments, *id.* § 11.1.B.  It is undisputed that Triad could

have refused assignment of Mariner's Provider Agreements, thereby avoiding the possibility of

any liability for overpayments associated with the existing Provider Agreements, including the

---

[11] Triad's argument is apparently made in the alternative because it also briefly argued
that this provision was inapplicable on the present facts, *see* Pls.' Opp'n at 25-26, an argument
rejected by the Court in footnote 10, *supra*.

payments now at issue where were made during the CHOW period.  Instead, and despite the

foregoing, Triad accepted assignment of Mariner's Provider Agreements, and with them, the

overpayment that CMS now seeks to recoup.  None of these facts suggest that this case fits

within the fraud exception included in § 130.

Additionally, while Triad is correct that Mariner has received almost $2.0 Million in

Medicare payments for services it did not provide, Pls.' Opp'n at 28, that does not, *ipso facto*,

show that Mariner received these payments based on any intentional misrepresentation to CMS.

Nor does it appear that Mariner's failure to follow certain agency procedures constitute fraud

under this exception.  As CMS correctly explains, courts have applied recoupment provisions in

the context of a predecessor's non-compliance with agency regulations.  *See, e.g.*, *Deerbrook*

*Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1103-04 (8th Cir. 2000), *cert. denied*, 534 U.S. 992

(2001).  While Mariner may be liable to Triad for the amount of the overpayment (and the Court

expresses no opinion one way or the other on that issue), the present record cannot support

Triad's claims that Mariner's purported fraud excuses Triad from the liability associated with the

Provider Agreements that it knowingly accepted.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall deny Plaintiffs' [9] Motion for Summary

Judgment, grant Defendants' [10] Motion to Dismiss, or in the alternative, Motion for Summary

Judgment, and deny Plaintiffs' [12] Motion for Leave to File an Amended Complaint.  An

appropriate order accompanies this memorandum opinion.

Date: April 21, 2008

_/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge